UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

CHATTANOOGA DIVISION

| | |
|---|---|
| LEWIS STEIN, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>U.S. XPRESS ENTERPRISES, INC., ERIC FULLER, ERIC PETERSON, JASON GREAR, MAX FULLER, LISA QUINN PATE, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, MORGAN STANLEY & CO. LLC, J.P. MORGAN SECURITIES LLC, WELLS FARGO SECURITIES, LLC, STEPHENS INC., STIFEL, NICOLAUS & COMPANY, INCORPORATED and WR SECURITIES, LLC., )<br><br>Defendants. ) | Civil Action No. 1:19-cv-00098<br><br>CLASS ACTION<br><br>Judge Harry S. Mattice, Jr.<br>Magistrate Judge Christopher H. Steger |

LEAD PLAINTIFF'S COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

Page

I. Introduction..................................................................................................1

II. Summary of the Action...............................................................................1

III. Jurisdiction and Venue...............................................................................8

IV. Parties........................................................................................................8

    A.    Plaintiffs..........................................................................................8

    B.    USX Defendants .............................................................................9

    C.    Underwriter Defendants.................................................................11

V. Background...............................................................................................13

    A.    USX's Inadequate Driver Recruitment and Retention Initiatives Negatively Impacted the Company and Contradicted Its Stated Business Strategy ........................................................................................21

    B.    USX's Business Strategy Did Not Provide for the Necessary Expenditures to Raise Wages, Improve Conditions and Provide Incentives to Adapt to the Driver Shortage Directly Causing the Company to Be Unable to Address Changing Account Shipping Patterns or Profitably Run Dedicated Routes ...........................................................................................24

    C.    USX's Exposure to Liability Claims Was Riskier than Conveyed to Investors.......................................................................................28

VI. False and Misleading Offering Documents ..............................................31

VII. Additional False and Misleading Statements and Omissions During the Class Period for the Exchange Act Claims.............................................................39

VIII. Additional Allegations for the Exchange Act Claims................................45

    A.    Scienter .........................................................................................45

    B.    Loss Causation...............................................................................49

    C.    Applicability of Presumption of Reliance.....................................54

IX. Statutory Safe Harbor Does Not Apply to Defendants' False and Misleading Statements and Material Omissions............................................................55

4819-0257-8344.v1

X.     Class Action Allegations.................................................................................................58

       First Cause of Action ...........................................................................................60

       Second Cause of Action........................................................................................61

       Third Cause of Action...........................................................................................62

       Fourth Cause of Action.........................................................................................64

XI.    Prayer for Relief................................................................................................................65

XII.   Jury Trial Demanded.........................................................................................................65

## I.  Introduction

Plaintiffs, by and through their undersigned counsel, bring this securities class action against Defendants upon personal knowledge as to those allegations concerning themselves and, as to all other matters upon the investigation of counsel, which included, without limitation, the review and analysis of: (a) public filings made by U.S. Xpress Enterprises, Inc. ("USX," "U.S. Xpress" or the "Company"), and other related non-parties with the United States Securities and Exchange Commission ("SEC"); (b) releases and other publications disseminated by Defendants; (c) interviews with percipient witnesses; (d) compilations of data from federal agencies; and (e) securities analyst reports, news articles, websites, and other publicly available information concerning Defendants and other related non-parties.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II.  Summary of the Action

1.       This is a securities class action brought on behalf of all persons who purchased or otherwise acquired Class A common stock of USX between June 14, 2018 and November 1, 2018 (the "Class Period"), inclusive, including shares purchased or otherwise acquired pursuant and/or traceable to the Offering Documents, and were damaged thereby against USX, certain of its senior insiders, and the underwriters of its offering for violations of the federal securities laws.

2.       This action asserts strict liability claims under §11 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77k, against USX, Eric Fuller, Eric Peterson, Max Fuller, Jason Grear, Lisa Quinn Pate and the underwriters of the Company's IPO (collectively, the "Securities Act Defendants").  It also alleges control liability claims pursuant to §15 of the Securities Act, 15 U.S.C. §77o, against USX, Eric Fuller, Eric Peterson, Max Fuller, Jason Grear and Lisa Quinn Pate.  In addition, this action asserts claims under §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") 15 U.S.C. §78j(b) and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, against

- 1 -

USX, Eric Fuller and Eric Peterson (collectively, the "Exchange Act Defendants"). It also alleges control liabilities claims pursuant to §20(a) of the Exchange Act, 15 U.S.C. §78t(a), against USX, Eric Fuller, Eric Peterson and Max Fuller.

3. USX is a trucking company that was founded as a privately held company in 1986 by Defendant Max Fuller and Patrick Quinn, when Max Fuller was gifted trucks by his father Clyde Fuller. The Company went public in 1994 but returned to private ownership in 2007 with the purchase of Class A shares at $20.10 per share in a leveraged buyout. As a result of the leveraged buyout, USX took on a significant amount of debt. In October 2015, Max Fuller's eldest son Eric Fuller was appointed President and COO of USX. At the same time, Eric Peterson was promoted to CFO of USX. A year and a half later, Eric Fuller was appointed as USX's CEO, taking over the position from his father. The new guard at the helm of USX immediately led what Eric Fuller would describe in an August 7, 2018 Q&A with Truckinginfo.com, as a "turnaround" to "clos[e] the gap with [USX's] peer group on operating ratios" and to take USX public once again to pay off the debt on USX's balance sheet to the tune of $237.7 million. This included $26 million owed to Max Fuller and other related parties as well as millions in debt owed to USX's creditors including an affiliate of Wells Fargo Securities, LLC, an underwriter of the IPO.

4. USX went public for the second time on June 14, 2018 at the price of $16 per share, selling 16,668,000 Class A shares of USX common stock to the public for net proceeds of approximately $245.2 million after deducting underwriting discounts and commissions and offering expenses. It did so under the guise that USX was a changed company with new management and that "tactical execution" was now critical to USX's success. USX had the lowest margins of any public trucking company and improving the Company's operating ratio was key to demonstrating to investors that USX could turn the corner and be a profitable company. Indeed, the Company emphasized in the Offering Documents management's "focus" on USX's Adjusted Operating Ratio

- 2 -

"because it provides investors and securities analysts the same information that we use internally to assess our core operating performance." USX further explained why now – at the time of its IPO – it was in a position to succeed: "We believe our scale, management team and continued roll-out of tactical operational improvements, as well as our mix of over-the road ["OTR"], dedicated and brokerage services, position [USX] for long-term success in our industry."

5.      USX's success was dependent on "a small number of major customers," who generated a significant portion of USX's revenue. The Company's largest customer was Walmart, which accounted for more than 10% of USX's revenue for FY17 and 1Q18. Indeed, USX's top five customers comprised 38.2% and 37.7% of the Company's revenues for 1Q18 and FY17, respectively, and the Company's top ten customers comprised more than 50% of USX's revenues for the same periods.

6.      As of March 31, 2018, 54% of the Company's revenues were from OTR (short-term contracts without pricing or volume guarantees), 33% from dedicated (multi-year contracts with committed rates and volumes), and 12% from brokerage services (brokering shipping contracts to another company typically for a commission). USX's Offering Documents highlighted as a strength its "complementary mix of services" – OTR, dedicated and brokerage – as "afford[ing] flexibility and stability throughout economic cycles."

7.      The Company and its management were, according to USX's Offering Documents, "Focus[ed] on Front-line Tactics" and acknowledged that "tactical execution [was] critical to our success." To that end, USX told investors that three initiatives had already delivered results in improving the Company's operating metrics and were ongoing: (i) load planning in order to maximize utilization of drivers' available hours; (ii) fleet management involving proactive interactions with drivers to anticipate and fix issues such as home time planning and load scheduling purportedly resulting in less driver turnover; and (iii) customer service to drive knowledge of

- 3 -

specific markets to improve equipment utilization, driver satisfaction and network balance. As part of USX's transformation the Offering Documents[1] also claimed that since 2015 USX had "redesign[ed] [its] fleet renewal and maintenance programs" to improve reliability and reduce downtown time for all tractors and reduce maintenance costs for older tractors.

8. USX indicated in the Offering Documents that improving profitability depended on several factors "including our ability to successfully execute both our ongoing and planned strategic initiatives, such as increasing our fleet efficiency and utilization, decreasing driver turnover and further refinement of our business mix profile." Growth would be prioritized in the Company's dedicated division because it "offers more predictable revenue streams and greater asset productivity."

9. In particular, USX's Offering Documents assured investors that USX had "implemented driver pay increases to address this [driver] shortage," and merely warned of the risk that USX's earnings could in the future be adversely affected by high deductibles on claims, including those for third-party bodily injury.

10. To the detriment of Plaintiffs and the proposed Class, Defendants did not give an accurate picture of USX's then-existing operations, risks facing the Company or disclose adverse events necessary to make the statements made therein not materially misleading. In contrast to the representations in the Offering Documents:

(a) USX did not have in place compensation packages sufficient to hire and retain quality truck drivers to meet the demand for its services. Such incentives and/or compensation required additional expenditures that necessarily would negatively impact the Company's operating ratio. Nor were the incentives USX had in place successful;

---

[1] The "Offering Documents" refer to USX's June 11, 2018 final Amended Registration Statement on Form S-1/A, which amended the May 7, 2018 Registration Statement on Form S-1; and the June 13, 2018 final Prospectus on Form 424B4.

4819-0257-8344.v1

(b)     USX drivers were not among the "best paid in the industry," nor had USX increased driver pay commensurate with the market wages for truck drivers which slowed the pace of hiring and hindered the retention of drivers;

(c)     USX's purported "transformation" and "driver-centric" initiatives did not improve load planning or truck maintenance which harmed trucker morale and worsened USX's poor driver retention rates;

(d)     USX was unable to "priortiz[e] growth in dedicated contract services" because a shortage of drivers for trucks was negatively impacting USX's dedicated division, which forced USX to reallocate OTR drivers (at an increased cost) to drive dedicated routes – this was a common practice prior to the IPO which caused underperformance in OTR and continued after the IPO;

(e)     certain account shipping patterns had already been negatively impacted, including those of USX's largest customer Walmart, adversely impacting utilization as well as driver retention and hiring;

(f)     USX's cost per mile for driver wages and independent contractors was exceeding the Company's internal expectations;

(g)     USX's insurance coverage was not symmetrical with USX's overall credit and earnings profile and leverage;

(h)     the risks USX warned might occur had already come to pass and were negatively impacting USX's operations; and

(i)     USX's driver safety initiatives were inadequate and lagged behind its peers resulting in riskier drivers and a poorly maintained fleet and, as a result, increased the Company's exposure to liability claims.

11.     Following USX's IPO in June 2018, the Company and its executives Eric Fuller and Eric Peterson made a series of materially false and misleading statements in violation of the

- 5 -

Exchange Act which further artificially inflated and maintained USX's stock price. For example, the Exchange Act Defendants falsely stated on August 2, 2018, that USX's 2Q18 results could be attributed to its "[t]ransformation," but failed to disclose the true facts known or recklessly disregarded at the time. Similarly, these defendants falsely claimed that USX's "driver-centric" initiatives had improved driver pay and truck utilization in order to assure investors USX could compete for drivers despite a driver shortage plaguing the trucking industry. In fact, former USX employees have described the Company as unable to recruit and retain a sufficient number of drivers to service its customers' demands, primarily because the drivers' wages were so low.

12.     USX and its executives also deliberately downplayed issues USX had with utilization and drivers after reporting a 9.8% decline in revenue miles per tractor in the Company's dedicated division when reporting 2Q18 financial results. When asked by securities analysts on an August 2, 2018 conference call whether it was "due to the inability to get drivers" or problems with customers, Defendant Eric Fuller misled investors by blaming the degradation on "how things were sold versus how they actually operated." While indicating that degradation had been seen prior to USX's IPO (late first quarter/early second quarter), they pointed to rate increases given in July as an offset. In doing so they failed to disclose that: (i) the issues with utilization were related to USX's largest customer Walmart, among others; (ii) the issues had not been resolved; and (iii) the magnitude of the adverse impact on the Company was far greater than USX had led investors to believe. Rather, they told investors "there's still some negotiations with a few different customers on some changes in how they are operating."

13.     In reality, USX's OTR drivers were continuing to be shifted to dedicated routes with the support of OTR increasing and peaking in 3Q18 (July-September) as Defendant Eric Fuller would later admit on a November 1, 2018 conference call. Likewise, it was highly misleading to tell investors on August 2, 2018, that "certain accounts' shipping patterns performed differently than

- 6 -

expected" when USX and its executives knew that its largest customer's shipping patterns changed prior to the IPO.

14. Unbeknownst to investors, USX's systemic failure to sufficiently pay and incentivize drivers was negatively impacting the Company's profits. Because USX did not have enough dedicated drivers, it had to shift its OTR drivers to drive for the dedicated division negatively impacting profitability. While not disclosing the true reason for additional programs in September 2018, USX initiated additional (and costly) incentives to hire new drivers, including making new employees and their families eligible for health benefits from day one and offering full college scholarships to drivers and their families. Soon after the initiation of these incentives, USX's Chief Sales and Marketing Officer John W. White was terminated on October 22, 2018.

15. Six weeks after announcing additional incentives had been deployed to attract drivers, on November 1, 2018, USX issued a press release announcing the Company's financial and operating results for the third fiscal quarter and nine months ending September 30, 2018. In the press release, as well as during a conference call to discuss the results, USX was finally forced to disclose how changed shipping patterns were impacting its segments and how market challenges for drivers had, in fact, negatively impacted the Company, resulting in a year-to-year tractor count decrease. Specifically, USX disclosed that it was not until the last six weeks (mid-September 2018) that "the support provided to our dedicated division by our [OTR] division has been reduced significantly due to increased traction in our recruiting efforts to fill these dedicated positions." The Company and its executives also disclosed higher driver wages and independent contractor costs, lower than expected recruitment levels, and a higher insurance expense.

16. Following the Company's disclosures on November 1, 2018, the price of USX's common stock declined from a close of $10.14 per share on November 1, 2018, to a close of $7.10

per share on November 2, 2018, plummeting approximately 29.98% in a single day, on unusually high trading volume.

## III.    Jurisdiction and Venue

17.    As to the claims asserted herein that arise under and pursuant to §§11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the Securities Act, 15 U.S.C. §77v.

18.    As to the claims asserted herein that arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the 17 C.F.R. §240.10b-5, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

19.    Venue is proper in this Court pursuant to §22 of the Securities Act, 15 U.S.C. §77v and §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b).  The Company maintains its principal executive offices in this District.  The dissemination of the materially false and misleading statements occurred in this District.

20.    In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE").

## IV.    Parties

### A.    Plaintiffs

21.    Lead Plaintiff Deirdre Terry purchased USX securities pursuant and/or traceable to the Company's Offering Documents for the IPO and was damaged thereby as set forth in the certification filed with the Court in this action on May 10, 2019.  ECF No. 22

22.     Named Plaintiff Charles Clowdis purchased USX securities pursuant and/or traceable to the Company's Offering Documents for the IPO and was damaged thereby as set forth in the attached certification.

23.     Named Plaintiff Bryan K. Robbins purchased USX securities pursuant and/or traceable to the Company's Offering Documents for the IPO and was damaged thereby as set forth in the attached certification.

**B.     USX Defendants**

24.     Defendant U.S. Xpress Enterprises, Inc. is a publicly traded company incorporated in Nevada with its principal executive offices located at 4080 Jenkins Road, Chattanooga, Tennessee, 37421.  Following the Company's IPO, its common stock began trading on the NYSE under the ticker symbol "USX."

25.     Defendant Eric Fuller was, at all relevant times, Chief Executive Officer ("CEO") and a Director of USX.  Eric Fuller has worked for USX for approximately 20 years and was, according to his Company biography, "particularly attuned to the day-to-day challenges" faced by his employees.  Defendant Eric Fuller signed the Registration Statement[2] filed with the SEC.  He also spoke on quarterly earnings calls during the Class Period and signed the Registration Statement and Reoffer Prospectus filed with the SEC on June 18, 2018.

26.     Defendant Eric Peterson was, at all relevant times, USX's Chief Financial Officer ("CFO"), Treasurer and Secretary.  Eric Peterson has worked for USX for more than 15 years and, according to his Company's biography, "plays a vital role in company transactions and all of U.S. Xpress' strategic incentives."  Defendant Eric Peterson signed the Registration Statement filed with the SEC.  He also spoke on quarterly earnings calls and signed the quarterly report on Form 10-Q

---

[2]     The Registration Statement refers to USX's final amended Registration Statement on Form S-1/A filed on June 11, 2018.

issued during the Class Period and the Registration Statement and Reoffer Prospectus filed with the SEC on June 18, 2018.

27. Defendant Jason Grear was, at all relevant times, Chief Accounting Officer of USX. Defendant Grear signed the Registration Statement filed with the SEC. He also signed the Registration Statement and Reoffer Prospectus filed with the SEC on June 18, 2018.

28. Defendant Max Fuller was, at all relevant times, a Director and Executive Chairman involved in the day-to-day management of USX. Max Fuller was the CEO of USX until his son, Eric Fuller, took over in April 2017. During Max Fuller's transition to Executive Chairman, Eric Fuller said in an interview that he and Lisa Quinn Pate "anticipate having [Max Fuller] working directly with us every day for years to come." The Offering Documents state the Executive Chairman benefits the Company through his "strategic oversight and considerable experience." For his role as Executive Chairman, Max Fuller was compensated a base salary of $1.3 million for 2017 and $1 million for 2018, plus incentives. Defendant Max Fuller signed the Registration Statement filed with the SEC. He also signed the Registration Statement and Reoffer Prospectus filed with the SEC on June 18, 2018.

29. Defendant Lisa Quinn Pate was, at all relevant times, a Director of USX. Lisa Quinn Pate was also Chief Administrative Officer in March 2017, a position she announced she would retire from on November 2, 2018. Defendant Lisa Quinn Pate signed the Registration Statement filed with the SEC. She also signed the Registration Statement and Reoffer Prospectus filed June 18, 2018.

30. Defendants Eric Fuller, Eric Peterson, Jason Grear, Max Fuller and Lisa Quinn Pate are collectively referred to herein as the "Individual Defendants."

31. The Company and Individual Defendants are strictly liable for the materially false and misleading statements contained in the Offering Documents. By virtue of their positions with

- 10 -

the Company, the Individual Defendants possessed the power and authority to control the contents of USX's Offering Documents.

32. The Company, Eric Fuller and Eric Peterson are also liable pursuant to the Exchange Act for the materially false and misleading statements made throughout the Class Period. They were provided with copies of and/or contributed to the Company's statements alleged herein to have been false or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions, and their access to material non-public information available to them but not to the public, the Exchange Act Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Exchange Act Defendants are liable for the false and misleading statements and omissions pleaded herein.

## C. Underwriter Defendants

33. Under the terms and subject to the conditions in the underwriting agreement, the underwriters named below (the "Underwriter Defendants") severally agreed to purchase, and USX and certain pre-IPO stockholders agreed to sell to them, the number of shares indicated below, for which the Underwriter Defendants collectively were paid approximately $16.7 million in discounts and commissions, excluding exercise of any over-allotment option:

| Underwriter | Number of Shares |
|---|---|
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 5,348,644 |
| Morgan Stanley & Co. LLC | 5,348,664 |
| J.P. Morgan Securities LLC | 2,452,891 |
| Wells Fargo Securities, LLC | 2,452,891 |
| Stephens Inc. | 817,630 |
| Stifel, Nicolaus & Company, Incorporated | 817,630 |
| WR Securities, LLC | 817,630 |
| **Total** | **18,056,000** |

34.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") served as an underwriter for the IPO.

35.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter for the IPO.

36.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter for the IPO.

37.     Defendant Wells Fargo Securities, LLC ("Wells Fargo") served as an underwriter for the IPO.

38.     Defendant Stephens Inc. ("Stephens") served as an underwriter for the IPO.

39.     Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") served as an underwriter for the IPO.

40.     Defendant WR Securities, LLC ("WR") served as an underwriter for the IPO.

41.     The Underwriter Defendants are liable for the false and misleading statements in the Offering Documents. The Underwriter Defendants assisted USX and the Individual Defendants in planning the IPO and were required to conduct an adequate and reasonable investigation into the business and operations of the Company – a process known as a "due diligence" investigation. The Underwriter Defendants were required to conduct a due diligence investigation in order to participate

- 12 -

in the IPO. During the course of their investigation, the Underwriter Defendants had continual access to confidential corporate information concerning USX's operations and financial prospects.

42.    In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with USX's lawyers, management and top executives and engaged in "drafting sessions" between at least March 2018 and May 2018. During these sessions, the Underwriter Defendants, USX and the Individual Defendants made joint decisions regarding: (a) the terms of the IPO, including the price at which USX shares would be sold to the public; (b) the strategy to best accomplish the IPO; (c) the information to be included in the Offering Documents; and (d) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and USX's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, USX's existing material problems as alleged herein for the Securities Act claims.

43.    The Offering Documents, including documents incorporated by reference, contained materially false and misleading statements and/or omissions. The Securities Act Defendants, including the Underwriter Defendants, negligently allowed the Offering Documents to contain materially false and misleading statements and/or omissions to the extent that they knew or should have known that the Offering Documents were materially misleading, but failed to act in a reasonable manner to prevent the Offering Documents from being disseminated.

## V.    Background

44.    USX was founded by Defendant Max Fuller and co-founder Patrick Quinn in 1985 and commenced operations in the transportation business in 1986. In October 1994, USX completed an IPO of Class A common stock and traded on the NASDAQ stock market until October 2007. In June 2007, New Mountain Lake Acquisition Company ("New Mountain Lake"), an entity controlled

by Defendant Max Fuller and co-founder Patrick Quinn, commenced a tender offer for all outstanding Class A common stock of USX as part of a "going private transaction." Prior to the IPO at issue in this complaint, New Mountain Lake merged into U.S. Xpress Enterprises, Inc., and continued to do business as USX.

45.     USX provides services using both its own truckload fleet and third-party carriers. As of March 31, 2018, USX's fleet consisted of more than 6,800 tractors and approximately 16,000 trailers.

46.     USX divides its services into two reportable segments: the Truckload segment and the Brokerage segment. The truckload segment offers asset-based truckload services operating through two divisions – the OTR division and the dedicated division. As of March 31, 2018, truckload represented 87% of USX's revenues, of which 54% of revenues were from OTR and 33% from its dedicated division. The Brokerage segment consists of non-asset-based freight brokerage services and as of the same date, represented 12% of the Company's revenues.

47.     USX describes OTR contracts as the transport of a trailer of freight for a single customer ("truckload"), pursuant to a short-term contract or one-time spot rate transaction, operated by one ("solo") or two ("team") expedited service drivers for a route between 450 and 1,050 miles in length. OTR, "the largest part of [USX's] business," provides more flexible, and more costly, shipping options to customers whose needs cannot support a regular shipping schedule.

48.     Dedicated contracts are multi-year, and assign drivers and equipment designed to meet customers' needs. Dedicated provides less flexible freight transportation services, pursuant to agreements where it makes equipment, drivers and on-site personnel available to a specific customer to address needs for committed capacity and service levels.

49.     Some of USX's largest dedicated customers are Walmart, Dollar Tree, Dollar General, Target and Kroger, with Walmart being the largest. By the time of the IPO in June 2018,

USX had grown to be the fifth largest asset-based truckload carrier in the United States, generating over $1.5 billion in total operating revenue. USX, however, had been a perennially underperforming trucking company, teetering on the edge of profitability. As recognized by the Company in April 2017 when it was contemplating an IPO, its operating ratio lagged behind even its least successful industry peers and needed significant improvement to justify an IPO. For example, USX's operating ratio in 2016 was 97.9%, whereas its peers operated in ranges of 86.0% to 94.0%.

50.     The Offering Documents stated that the operating ratio is a key business metric for trucking companies, as it expresses operating expenses as a percentage of revenue. The operating ratio provides insight to a company's ability to generate revenue while controlling costs, which is particularly important in industries that require a large percentage of revenues to maintain operations, such as trucking. Lower ratios indicate greater profitability. Internal USX documents confirm that USX was focused on improving its operating ratio as the primary means of preparing for, and increasing the price of, its IPO.

51.     In addition, by the time of the IPO, USX had incurred significant and unsustainable amounts of high-interest debt to fund its operations. For example, as of March 31, 2018, USX had drawn $192.5 million from its $275 million loan facility, which bore interest of Libor + 10.0% to 11.5%, maturing in May 2020. In addition, Defendant Max Fuller, the estate of his co-founder Patrick Quinn, and former Company CFO Ray Harlin, set up a company for the "sole purpose of acquiring and holding a participation interest in a former term loan facility," to which USX owed $26.0 million as of March 31, 2018, maturing in November 2020 at an interest rate of 13.0%. The $26.0 million owed on the loan was paid off in full with the proceeds of the IPO. $7.5 million in proceeds from the IPO would also be used to purchase real estate USX was leasing from Q&F Realty, a related party owned by Anna Marie Quinn (widow of Patrick Quinn and mother of Lisa Quinn Pate), certain Quinn family trusts, Defendant Max Fuller and certain Fuller family trusts.

4819-0257-8344.v1

52. As described in its Offering Documents, USX undertook a "Transformation" beginning with the appointment of Defendant Eric Fuller to President and COO in 2015 (then CEO in 2017) and the replacement of 61 out of 94 of USX's executives to improve leadership and company culture. USX purportedly recruited and developed new executive and operational management teams with significant industry experience and instilled a new culture of professional management.

53. Further into its "Transformation" initiative, USX purportedly began a multistep process to improve truck utilization (*i.e.*, the frequency the trucks are used for revenue generating trips). It claimed to do so through: (i) optimizing truck maintenance and replacement; (ii) optimizing the selection of freight for USX trucks through load optimization software; and (iii) brokering the excess freight to third-party carriers. In addition, starting in 2017, USX represented it had improved "load planning" to minimize empty travel miles and also had initiated a "fleet management pilot" to further improve truck maintenance.

54. The "Transformation" initiative conveyed to investors that USX had and was continuing to improve its ability to move more freight with fewer trucks and at lower cost – improving its operating ratio. By the time of the IPO, USX had already stated the "Transformation" was having a positive effect on driver recruitment and retention. High utilization of trucks allows more miles and freight to be delivered. Better maintenance allows trucks to spend less time in the repair shop and more time on the road. Because truck drivers are generally paid a per mile rate but limited by federal "hours-of-service" regulations, moving more freight more miles, more efficiently, increases the drivers' pay without necessitating an increase in per mile rates. Nearing the time and by the advent of the IPO, USX was purportedly focused on its core service offerings which involved refining its network to concentrate on shorter, more profitable lanes, which are trucking routes, with more density, which they represented as being more attractive to drivers.

4819-0257-8344.v1

55.     According to the Company, its "Transformation" helped it maintain relatively stable profitability during the weak truckload market of 2016 and early 2017 and drive significant improvements to profitability during the strong truckload market beginning in the second half of 2017.  In the second half of 2017, truckload freight demand surged and exceeded the number of available trucks and drivers, which allowed trucking companies to increase their profitability through higher truckload volume and higher rates.  As an inducement for investors to participate in the IPO, USX pointed to its 1Q18 results, disclosed in the Offering Documents, which produced a 300 basis point improvement in its operating ratio, compared to 1Q17.

56.     This fortuitous and newfound profitability provided the perfect opportunity for USX-related individuals in the Fuller and Quinn families to sell privately held shares of USX stock, representing approximately 1.39 million of the 18.01 million shares offered in the IPO.  At $16 per share the proceeds exceeded $22.2 million.  USX also needed to go public to retire its soon-maturing high interest debt, $26 million of which it was borrowing from its founders' business at high interest rates.

57.     In the Offering Documents the Company claimed "the current truckload market presents us with an opportunity to take advantage of rising rates across all of our service offerings, while continuing to benefit from our operational initiatives.  We believe our scale, management team and continued roll-out of tactical operational improvements, as well as our mix of over-the-road, dedicated and brokerage services, position us for long-term success in our industry."

58.     To assure investors that USX could succeed in a variety of market conditions, the Offering Documents highlighted USX's service offering mix between its truckload OTR and dedicated segments, and its brokerage business as a "[c]omplementary mix of services to afford flexibility and stability throughout economic cycles."  This is because "OTR business involves short-term customer contracts without pricing or volume guarantees that allow us to benefit from periods

- 17 -

of supply and demand imbalance and price volatility." OTR "is the largest part of [USX's] business and the overall truckload market, which is currently benefiting from strength in pricing and volumes . . . ."

59.     On the other hand, the "[d]edicated business features committed rates, lanes and volumes under contracts that generally afford us greater revenue predictability over the contract period and help smooth the impact of market cycles." USX further indicated that its dedicated division "generally has higher driver retention rates than our OTR service offering, which we believe is because our professional drivers prefer the more predictable time at home that dedicated routes offer." USX also claimed that the dedicated business had "increased visibility allows us to commit and invest fleet resources with a more predictable return profile."

60.     Finally, its brokerage segment purportedly allowed USX to allocate loads to third-party carriers, giving USX "more choices for optimizing the utilization and pricing of our fleet every day and throughout market cycles."

61.     The ability of USX to recruit and retain quality truck drivers was also fundamentally important to its success. As Defendant Eric Fuller acknowledged in a January 4, 2018 interview, "[o]ne of the biggest challenges the trucking industry faces today is the growing shortage of drivers . . . ." And surging freight shipping demands in the time period preceding the Offering Documents exacerbated the truck driver shortage. Yet, USX gave the impression at the time of the IPO and throughout the Class Period that this challenge would not interfere with the improvement of USX's operating ratio or profitability.

62.     By the time of the Company's IPO, the recruitment and retention of quality drivers, as well as maintaining sufficient capacity to service customer demands and achieving necessary levels of "utilization," were key components of USX's business success. The lack, however, of quality drivers was negatively impacting multiple aspects of USX's business.

63.     Additional factors tracked by USX further constrained driver availability and relatedly, capacity. In the months prior to the IPO, new federal requirements for electronic logging devices went into effect to ensure drivers were not exceeding their maximum hours of service. These requirements further constricted driver pay by strictly limiting the number of hours a driver could drive. In addition, the industry had been advocating for, and engaging in, more accurate hair-follicle drug testing, which eliminated unqualified drivers from the profession. The driver pool was also further reduced because, as the Company recognized, drivers were being siphoned off by the booming construction and manufacturing sector which allowed employees to live closer to home. Similarly, by no later than the start of 2018, drivers were moving to smaller carriers or becoming independent in order to take advantage of the "spot" market,[3] which was becoming more robust. This created a potentially adverse situation for carriers, including USX, because it could frustrate the pace of new hiring in an already challenging driver "capacity" environment.

64.     As a general matter, truck drivers are also hard to retain and tend to flow to the highest paying jobs. Because drivers could simply switch companies in search of better pay or conditions, there is and was little loyalty to any particular trucking company. Although some in the industry turned to signing bonuses and other perks to lure drivers, it had an effect of exacerbating turnover because drivers could work at one company long enough to earn a bonus then switch to begin earning another signing bonus.

65.     Changes in driver turnover or retention rates were important. A decrease in qualified drivers would require increased recruitment costs which, in turn, would increase the cost of operations by reason of the financial inducements, including paying higher wages, necessary to recruit additional quality drivers. Increases in driver turnover rates or lower driver retention also

---

[3]     The spot market is one in which contracts are entered into on the spot and at the correct market rate. Spot rates are volatile and respond quickly to supply and demand.

4819-0257-8344.v1

diminished "utilization," adversely affecting the ability to meet demand, thereby negatively impacting profitability. As a result, it was important to investors that USX's driver "capacity" was under control and able to provide sufficient truck utilization across its divisions. In particular, it was important that USX was experiencing favorable driver retention rates in its more predictable dedicated division. In fact, as described below by former USX employees, USX's driver retention rate in its dedicated division was an important metric and barometer of its ability to maintain sufficient service capacity and consistent profits.

66.     Any material deceleration in the pace of hiring impacted USX's ability to provide its core services and, in turn, its profitability. The Offering Documents did not disclose information adversely impacting USX's profitability and business including, *inter alia*: (i) the cannibalization of USX's more profitable OTR division by shifting its generally better-compensated drivers to the comparatively less profitable dedicated division as a result of inadequate driver capacity; (ii) Company-specific reductions in driver retention (*i.e.*, higher turnover); and (iii) a consequent shortage of sufficient drivers to support sufficient utilization and customer needs. A need to shift drivers away from OTR would raise red flags and have an adverse ripple effect on USX, including higher operational costs, lower utilization, and lower margins and profitability.

67.     The importance of drivers and their utilization to USX's core business is reflected in USX's Offering Documents, wherein USX highlighted a number of changes it had made to improve driver recruitment and retention to weather the difficult hiring environment. These were:

- increasing driver pay to attract drivers;

- focusing on shorter, more profitable lanes to attract drivers who would otherwise work in construction or manufacturing to be closer to home;

- improving load planning so that drivers spend less time waiting for loads and driving empty trucks, and more time making money driving revenue generating loads;

- 20 -

- institing a fleet management initiative to improve maintenance efficiency and procuring a "modern fleet" so that drivers can spend more time driving earning money and less time waiting for their trucks to be repaired; and

- improving customer service so that local experts manage freight flows and load pickup/delivery timing to improve driver satisfaction.

68. As for the size of the pay raises, in an interview reported on February 13, 2018, leading up to the IPO Defendant Eric Fuller claimed that "[t]he improved pay levels and benefits for U.S. Xpress team drivers should make them among the best paid in the industry." In other words, USX was offering pay to drivers that would encourage drivers to work for and stay at the Company.

**A.  USX's Inadequate Driver Recruitment and Retention Initiatives Negatively Impacted the Company and Contradicted Its Stated Business Strategy**

69. In contrast to what investors had been led to believe, USX was not reaping the benefits of its "Transformation" (*i.e.*, a sustainable improvement of its operating ratio), but had instead received a short-lived bump in profitability stemming from the early stages of the truckload freight services demand surge. USX was able to take advantage of increasing volumes and rates which were reflected in its 1Q18 results highlighted in the Company's Offering Documents. But as stated earlier, the industry demand in truckload services had also led to an increase in demand for truck drivers, who were then able to demand higher per-mile rates.

70. In fact, USX was not able to maintain enough drivers as a result of its failure to effectively implement its driver recruitment and retention strategy as it had assured investors in the Company's Offering Documents. Moreover, USX had unique structural disadvantages in attracting and retaining drivers. As a result, USX could not unilaterally raise the per-mile rates it paid to drivers without concurrently securing increased rates from its customers. The failure to secure increased rates would result in harm to margins and adversely impact USX's operating ratio. Consequently, USX could not to deliver on its plan to improve its operating ratio as described in the Offering Documents.

- 21 -

71.     Former USX employees, such as CW5, a USX Fleet Manager who primarily managed dedicated team driver accounts from late 2016 to April 2018, confirmed that driver turnover was a significant problem at USX in the years prior to the IPO.  According to USX's careers website, Fleet Managers are the "first line of communication" with USX's drivers and, according to the Offering Documents, are responsible for "interact[ing] with drivers to anticipate and fix issues such as home time planning and load scheduling."  CW2, an OTR Logistics Planner at USX based in Chattanooga from 2013 to early 2018, described USX as having very high turnover and that turnover at USX appeared to be particularly high in comparison to its peers.  According to CW1, an employee tenured at USX for over 10 years until a few months preceding the IPO, the longstanding driver turnover issue was so important to USX, that it was internally dubbed a wildly important goal.  CW1 observed that USX failed to meet its driver turnover goals the majority of the time and regularly discussed the issue in weekly emails sent to office employees starting in approximately April 2017 and during daily operations calls with driver managers and customer service employees.

72.     For example, USX had not meaningfully raised pay rates prior to the IPO as promised in the Offering Documents.  USX pay was still among the worst in the industry and drove a driver exodus from the Company.  CW3, a former USX Fleet Manager from 2016 to early 2019, described USX pay to be so low that a brand new driver at a competitor would often make about the same wage as USX's best compensated drivers.  As a result, CW3 described the turnover rate as insanely high.  By a large margin, pay was the primary factor guiding drivers' employment decisions, regardless of the success of other USX driver-centric initiatives.

73.     In addition, USX's "Transformation" was a failure and contributed to USX's inability to attract or retain qualified drivers.  CW5, a former Fleet Manager, noted that as a result of USX's low pay, USX resorted to lax hiring requirements and recruited the cheapest drivers – often without

any experience – that could meet the minimum requirements to be a driver, *i.e.*, possessing a commercial driver's license.

74.     The drivers USX did recruit encountered pay and working conditions worse than those advertised by the Company and its recruiters.  There were a number of reasons for this discrepancy.  First and foremost, USX did not want to or could not increase the per-mile rate it gave its drivers to match its peers, and its signing bonuses were not guaranteed unless a driver drove an unrealistic number of miles – asking much of drivers who were already frustrated by USX's poor load planning and truck maintenance.  Truck maintenance was so poor that CW3, a former USX Fleet Manager, observed that trucks generally needed to be repaired on a monthly basis.  In addition to the poor pay, CW5 also blamed the particularly high turnover rate, when compared to other trucking companies, on USX not providing its drivers any vacation or sick leave.

75.     Second, USX, despite claiming that it had improved utilization and truck maintenance in 2016, had a poorly maintained fleet of older than average trucks.  When these trucks inevitably broke down, the drivers sat idle, making no money for themselves (or the Company).  As CW5, a former Fleet Manager, noted, drivers complained that these extended delays had a negative impact on their earnings.  Thus on Truckers Report, a truck drivers' messages board, new drivers were warned by fellow drivers that USX trucks had significant breakdown issues had that caused them significant delays.

76.     Third, USX was unable to improve its poor load planning which created bottlenecks for their drivers.  CW2, a former OTR Logistics Planner until March 2018, described instances where drivers would wait all day for a load, nearly reaching the daily hours of service limit, and barely have any time remaining to drive.  Thus, the drivers would barely earn any money, as they were paid on a per-mile basis.  Throughout 2017, prior to the IPO, drivers continually complained of driving deadhead (empty and uncompensated) routes or wasting time waiting for loads or late

deliveries. Similarly, CW5, a former Fleet Manager, received pushback from upper management for holding back truck deliveries during adverse weather events such as snowstorms – a decision designed to prevent a driver from sitting on the side of the road during a snowstorm. These conditions crushed driver morale and reduced their earning potential.

77. Fourth, USX did not provide many of its drivers with the consistency in dedicated routes that it touted would assist driver retention. Per former Fleet Manager CW2's account, drivers were subject to arbitrary reassignment away from the division they thought they were being recruited to work for. For example, USX would move drivers from a dedicated to an OTR route shortly after being hired, or vice versa. The practice of shifting OTR to dedicated was a common practice at USX during CW2's tenure which ended just prior to the IPO. All of this contributed to particularly high turnover.

78. Fifth, USX recruiters had difficulty convincing drivers to join USX. Ultimately, the drivers who were recruited found conditions and pay to be different than what they expected. CW2 observed that some of the Company's recruiters would mislead potential drivers about the job to get them hired. Many of the new recruits would leave the company when they realized the job was not as they thought.

79. As a result of the driver shortage and USX's inability to address the issues impeding its drivers' success, USX's cost-per-mile for driver wages and independent contractors was exceeding the Company's internal expectations.

**B.** **USX's Business Strategy Did Not Provide for the Necessary Expenditures to Raise Wages, Improve Conditions and Provide Incentives to Adapt to the Driver Shortage Directly Causing the Company to Be Unable to Address Changing Account Shipping Patterns or Profitably Run Dedicated Routes**

80. USX dedicated routes were neither growing nor a source of stability for its business and for its drivers as represented in the Offering Documents. At USX, its dedicated routes were

inconsistent, especially due to USX's reliance on large national clients that would change shipping patterns it requested from USX. Large national clients, such as Walmart possessed bargaining power to dictate their terms to USX. USX did not have adequate staffing to adapt to these changing requirements in a cost efficient manner. For example, CW4, a former USX Fleet Manager from 2015 until April 2018, who remained with the Company throughout the Class Period, described USX's issues with the Walmart dedicated accounts. Around the end of 2017 or early 2018, Walmart put up for bid all of its distribution centers' dedicated contracts. When the bids were awarded, USX lost a few of its Walmart dedicated contracts, including one in Texas, but won new dedicated business in Virginia and Louisiana. As a result, the legacy Texas dedicated drivers lost their dedicated routes and USX needed to hire new drivers at the Virginia and Louisiana facilities. Thus, the fact that dedicated drivers were easier to retain did not provide any benefit to USX when the dedicated facilities were not static.

81. CW3 similarly described the Walmart situation. In the summer of 2018, USX shifted 35 OTR drivers to assist dedicated with the Walmart account.

82. USX would also overbook loads as is commonplace in trucking, which would further contribute to the shortage of dedicated drivers available for the Walmart account.

83. CW4, a former Fleet Manager, noted that because USX's per-mile rates were so low, USX could only hire about a quarter of the drivers it needed to staff the new dedicated lanes. To make up for these driver shortages, USX had to "temporarily" reassign OTR drivers to work the new Walmart dedicated contracts, which were some of the lowest margin contracts for USX. Because of the difficulties recruiting new drivers and retaining the existing drivers, the sites needed more OTR drivers than had been originally expected, and at times there were as many as 120 OTR drivers assisting with the new Walmart accounts. Contrary to USX's statements that dedicated routes were good for retention in the Offering Documents, CW4 confirmed that the reassigned OTR drivers,

unlike dedicated drivers, prefer long haul routes, rather than the shorter routes dedicated provided. But because OTR drivers commanded a higher wage, USX had to pay higher wages to service its lower margin Walmart account than it would have had to pay dedicated drivers.

84. Unsurprisingly, shifting drivers away from OTR left the division shorthanded and unable to meet its own obligations. Worse, CW2 recalled instances where USX would reassign OTR drivers from other markets to make up the shortfall in the affected market, causing the shortages to permeate throughout USX's OTR division. CW2 also recognized that reassignments were costly to USX. As a result, these reassignments were harmful to driver retention as they often had to upend their current routes and make deadhead, or relocation trips to the new route.

85. Ultimately, OTR's woes negatively impacted USX's ability to capitalize on the rising rate environment in the OTR market, especially in single-run spot market truckloads. USX's failure to meet certain service level requirements would result in USX losing future business, leaving the OTR business stuck in a downward spiral. OTR also experienced difficulty renegotiating underperforming OTR contracts to profitability. For example, CW5, a former Fleet Manager, described a situation where USX was losing money with a long-term OTR customer for years, and ultimately lost the contract because the customer refused to renegotiate its rate.

86. Dedicated contracts, however, locked USX into fixed long-term rates for terms up to three years. In the time leading up to the IPO, these contracts were underperforming because USX's drivers were not locked into accepting the low per-mile rates necessary to profitably run those dedicated routes. Until USX could renegotiate these contracts, which is an uncertain endeavor, these routes would prove a drag on USX's profitability.

87. USX's poor operating ratio forced it to renegotiate contracts more urgently when it experienced increased costs of doing business. Unlike its competitors who could absorb short-term

cost increases due to a lower operating ratio, USX's operating ratio was close to 100% so that even trivial cost increases were significant issues.

88. USX was left in a precarious position not disclosed to investors. It was neither receiving the predictable profits from its dedicated routes due to the driver wage pressures (and USX's low operating ratio did not leave much room for error), nor could it take advantage of the rising rates in the OTR market as its OTR drivers were needed to support the dedicated lanes.

89. At the time of the IPO and prior thereto, USX's focus internally was on growing the OTR division as Defendant Eric Fuller acknowledged in August 2018. But changing account patterns prior to the IPO, including the loss of a large customer contract, forced USX to cannibalize its OTR segment and shift much needed drivers and trucks in a challenging "capacity" environment to support contractually committed long term business in its dedicated division, even though the margins in that division were not comparatively favorable. The Offering Documents failed to disclose this existing material adverse information. Instead, the Offering Documents represented that USX's strategic goal was to "enlarge" its dedicated division as part of its plan to strengthen the Company when USX needed to grow OTR to obtain improvements in its operating ratio. What was not disclosed was that in order to meet existing contractual commitments for the dedicated division, USX had to pay OTR drivers higher sums, adversely impacting the Company's operating ratio.

90. The undisclosed use of OTR to support the dedicated division stood in contrast to what was disclosed in the Offering Documents with respect to the Brokerage segment being able to fill excess orders via third parties. Despite this claim, USX was unable to find sufficient third-party carriers to profitably deliver its excess dedicated freight to reduce the burden of OTR supporting dedicated.

91. USX operational issues in part stemmed from USX's "Transformation" in which much of senior management was replaced during 2017. Although the move was ostensibly to

- 27 -

improve the leadership talent and business culture at the Company, it was done as a means to reduce overhead from high employee salaries prior to the IPO to improve the financial prospects of the Company without regard to competence. For example, CW5's supervisor, a Transportation Supervisor, was laid off in July 2017 due to the supervisor's high salary. CW5 noted that the replacement was an individual with no trucking industry experience and was ultimately let go.

92. The issues described above resulted in a decrease in the dedicated division's "average revenue per tractor per week" and "revenue miles per tractor per mile." In the second quarter of 2018, USX's average "revenue per tractor per week" decreased 2.4% and its "revenue miles per tractor per mile" (excluding fuel surcharges) decreased 9.8%, which was an adverse trend, the import of which and impact on USX's business was not adequately disclosed until USX's revelations on November 1, 2018, as discussed below.

C.     USX's Exposure to Liability Claims Was Riskier than Conveyed to Investors

93. USX self-insured a significant portion of its automobile related liabilities, using high deductible plans. At the time of the IPO and continuing until August 31, 2018, the Company could be liable for up to $10.0 million per liability event. The deductible for any single occurrence was approximately $5.0 million and USX was responsible for the next $5.0 million of excess coverage. But the risks relating to the $10.0 million in potential liability per occurrence, as admitted by Defendant Eric Peterson on November 1, 2018, were not "really symmetrical with our overall credit and earnings profile and leverage."

94. Further omitted from USX's Offering Documents were USX's business deficiencies that made its self-insurance scheme far riskier than described. Because USX could not effectively implement its maintenance and fleet management initiatives, it sent poorly maintained and aging trucks on the road. These trucks were more likely to experience problems on the road that could lead to liability events USX would have to self-insure.

95.     USX's self-insurance risks were also exacerbated by its lax hiring criteria.  Due to USX's low pay, CW5 noted that USX could only attract low-quality or inexperienced drivers whom would later be fired when it became clear they were not qualified to do the job.  With its driver pool plagued with less experienced drivers, the likelihood of exposure to claims for unsafe driving and the risk of material liability events occurring were significantly higher than as described in the Offering Documents.

96.     USX also lagged behind its peers in installing and utilizing information logged by forward-facing event recorders to enhance driver safety.  Forward-facing event records are triggered by unsafe driving events and then record information about the event.  The information can then be used for individualized driver safety training.  Companies tend to see improved safety results within 18-24 months of installing the recorders.  USX's peers had begun installing them in 2015 and 2016.  USX, however, was just beginning to install the recorders at the time of the IPO in June 2018, and as a result could not realize the same safety improvements of its peer groups to reduce the likelihood of liability events in the months following the IPO, all while self-insuring its automobile liability.

97.     In the same vein, while at the time of the IPO the trucking industry was pushing for hair follicle rather than urine drug testing to better identify risky drivers, USX did not institute hair follicle testing until 2019, after the Opioid Crisis Act of 2018 mandated follicle testing.  This similarly increased the risk that USX would continue to employ risky drivers who could not pass a hair follicle test and, as a result, would cause a higher than average number of liability events.

98.     USX also subsequently admitted that its driver training programs at the time of the Offering were "antiquated."  In February 28, 2019, then Chief Marketing Officer Justin Harness told *Logistics Management*, a logistics professions magazine, that over the last 18 months (since August 2017) with respect to driver training, "'[f]rankly, we found that a lot of what we were doing was not

working, it was very antiquated. We were not really trying to train and develop the drivers in a fashion that was conducive with adult learning.'"

99.     Indeed, based on U.S. Department of Transportation data, USX had 12 fatalities in the period from July 1, 2017 to December 31, 2017 and drove 650.57 million miles during the full year 2017. Even conservatively excluding any fatalities from the entire half-year before July 2017, USX had an average of 1.84 fatalities per 100 million vehicle miles traveled. In contrast, per FMCSA data, in 2017 of all large trucks, there were 1.60 fatalities per 100 million vehicle miles travelled.

100.     As a general matter, insurance costs and claims go up when USX drives more miles. USX's 3Q18 results show a decrease in "average revenue miles per week" both when comparing the third quarter 2017 to 2018 and comparing the first nine months of 2017 and 2018. Yet, USX paradoxically experienced an increase in insurance costs during 2018. Accordingly, safety was decreasing rather than increasing as claimed in the Offering Documents. The undisclosed deficiencies in hiring and safety that existed at the time of IPO were material risks that materialized through the increase in insurance claims and expenses.

101.     These adverse risks materialized prior to September 1, 2018. On November 1, 2018, it was disclosed that USX's insurance costs increased $7.6 million – or 43.3% – compared to the third quarter of 2017 with USX reporting total insurance costs of $25.1 million. Reportedly, USX drivers were involved in two large liability incidents, which contributed to the majority of the $7.6 million increase insurance cost. The adverse factors contributing to unsafe and inadequately trained drivers driving poorly-maintained USX trucks were not disclosed by USX. Nor was the corresponding material risk that there would be multiple major events which USX would have to self-insure adequately disclosed throughout the Class Period. As a result, USX lowered its maximum out-of-pocket liability to $3.0 million per liability event, beginning September 1, 2018.

## VI.     False and Misleading Offering Documents

102.     On May 7, 2018, USX filed a registration statement on Form S-1 with the SEC. The registration statement was subsequently amended, with the final amended registration statement on Form S-1/A filed on June 11, 2018 (collectively, the "Registration Statement"). The Registration Statement was declared effected by the SEC on June 13, 2018. USX filed its final prospectus with the SEC on June 15, 2018 (the "Prospectus"). These documents are referred to collectively as the "Offering Documents" herein.

103.     In the IPO, the Company sold 16,668,000 shares of Class A common stock at a price of $16.00 per share. The Company received proceeds of approximately $245.2 million from the IPO, net of underwriting discounts and commissions.[4]

104.     ***Misrepresentation***[5]: The Offering Documents, which were signed by each of the Individual Defendants, emphasize the Company's "improved performance" due to "***asset optimization***" under a section entitled "Our Transformation":

**Asset Optimization.**

- In 2015, we began to redesign our fleet renewal and maintenance programs with the goal of improving reliability, reducing downtime for all tractors and reducing maintenance costs on the older tractors in our fleet. These initiatives, among others, were intended to improve the quality of our assets by purchasing, maintaining and trading our tractors in a manner designed to optimize life cycle costs.

- In addition, in early 2016 ***we began enhancing our asset utilization by analyzing our consolidated Truckload and Brokerage freight demand using optimization software,*** allocating the most profitable freight to our Truckload assets and outsourcing the remainder to third-party carriers. With more loads

---

[4]     Additional USX shares were registered by the June 18, 2018 Reoffer Registration Statement and Prospectus. The Reoffer Prospectus permitted certain named shareholders to sell 1,830,377 shares of Class A USX common stock. The June 18, 2018 Registration Statement, which was signed by the Individual Defendants, and Reoffer Prospectus incorporated by reference the Offering Documents, which are alleged to be false and misleading herein.

[5]     Emphasis added unless otherwise noted.

to choose from, we have more options for improving the pricing and miles on our company tractor and trailer assets.

105.     **Misrepresentation**:  As part of the "Transformation" in 2017, USX claimed it would "Focus on Front-line Tactics" because "tactical execution" is "critical to [USX's] success," such as improving utilization and driver satisfaction.  The Offering Documents went on to state that "the early results of our load planning, fleet management and customer service initiatives have begun to be reflected in our operating metrics," stating in pertinent part:

   •     *Load Planning Initiative*.  ***During 2017, we shifted from a load planning strategy based on minimizing empty miles to one that maximizes utilization of our drivers' available hours.***  We believe the focus on drivers' hours more effectively utilizes our scarcest resource and improves driver satisfaction.  Following this change, miles per seated tractor per week and driver turnover rate both improved.

   •     *Fleet Management Initiative*.   In October 2017, we initiated a fleet management pilot program on 250 tractors in which our fleet managers emphasize proactive interactions with drivers to anticipate and fix issues such as home time planning and load scheduling.  ***Inbound driver calls declined and driver turnover decreased***, resulting in more time for our managers to proactively solve problems, ***thereby improving our efficiency and utilization***.  ***We have seen similar results as we continue to roll out this program to the rest of our fleet***, which we expect to complete during 2018.

   •     *Customer Service Initiative*.  ***In January 2018, we redesigned our customer service around regional specialists to drive deeper knowledge of specific markets***.  Under this new structure, experts in managing freight flows in and out of their respective regions become key points of contact with customers and arrange load pickup and delivery to meet available service hours for our drivers.  ***We believe this service model will contribute to improved equipment utilization, driver satisfaction and network balance***.

106.     **Misrepresentation**:  USX credited the "Transformation" for "maintaining a relatively steady Adjusted Operating Ratio during the negative freight markets of 2016 and early 2017" and in the first quarter 2018 "meaningful[ly] narrowing of the gap between our Adjusted Operating Ratio and the average Adjusted Operating Ratio of a group of publicly traded truckload companies."

107.     **Misrepresentation**:   The Offering Documents identified USX's "***competitive strengths***" and emphasizes a "***complementary mix of services to afford flexibility and stability***"

including that USX was "***capable of handling meaningfully larger volumes without meaningful***

***additional investment***." The Offering Documents stated, in relevant part:

### Complementary mix of services to afford flexibility and stability throughout economic cycles

Our service offerings have unique characteristics and are subject to differing market forces, which we believe allows us to respond effectively through economic cycles.

*OTR*

OTR business involves short-term customer contracts without pricing or volume guarantees ***that allow us to benefit from periods of supply and demand imbalance and price volatility. This is the largest part of our business*** and the overall truckload market, which is currently benefiting from strength in pricing and volumes described under "–Truckload Market."

*Dedicated*

***Dedicated business features committed rates, lanes and volumes under contracts that generally afford us greater revenue predictability over the contract period and help smooth the impact of market cycles.*** Additionally, our dedicated contract service offering generally has higher driver retention rates than our OTR service offering, which we believe is because our professional drivers prefer the more predictable time at home that dedicated routes offer. In addition, ***this increased visibility allows us to commit and invest fleet resources with a more predictable return profile.***

108. ***Misrepresentation***: USX also claimed in the Offering Documents that additional

flexibility could be achieved through Brokerage offloading excess or less profitable loads to third

parties:

*Brokerage*

Brokerage capacity allows us to aggregate volume and to flex the amount allocated to our own fleet with freight cycles. Typically, ***we allocate more loads to our OTR fleet during slow freight demand to keep our assets productive, and more loads to third-party carriers during higher freight demand to maintain control over customer freight and make a margin on outsourcing the moves***. By retaining control over significantly more freight than we are able to serve with our own assets, and allocating the available loads first to our own tractors, ***we have more choices for optimizing the utilization and pricing of our fleet every day and throughout market cycles.***

109.     In addition, USX reported in the Offering Documents that it had a "[l]ong-standing, diverse and resilient customer base," including Amazon, Dollar General, Dollar Tree, FedEx, Home Depot, Kroger, Procter & Gamble, Target, Tractor Supply and Walmart.

110.     ***Misrepresentation***:  Consistent with USX's claims regarding its "Transformation," USX described its truck fleet as a "modern and well-maintained fleet."   USX also described its revamped maintenance program as follows:

> Over the past several years, we have developed a disciplined and effective in-house maintenance program designed to actively manage these assets based on customized timetables for preventive maintenance and replacement of parts.  We believe this approach, coupled with our in-house maintenance facilities and in-house technicians dedicated to fleet maintenance, helps us effectively manage our maintenance cost per mile, ***keeps drivers on the road efficiently*** and creates an attractive asset and record for resale.

111.     ***Misrepresentation***:   Throughout the Offering Documents, the Defendants also described USX's growth strategy to "***capitalize on current favorable truckload environment***," stating in relevant part:

> The truckload market is cyclical and it is currently experiencing increases in volumes and rates, primarily due to tightening driver supply coupled with increasing industrial and retail freight demand.  According to FTR Transportation Intelligence, truckload rates (excluding fuel surcharge) in the first quarter of 2018 were 14.4% higher than rates in the first quarter of 2017.  ***We believe the current truckload market presents us with an opportunity to take advantage of rising rates across all of our service offerings, while continuing to benefit from our operational initiatives.***  We believe our scale, management team and continued roll-out of tactical operational improvements, as well as our mix of over-the-road, dedicated and brokerage services, position us for long-term success in our industry.

112.     ***Misrepresentation***:  The Offering Documents also claimed USX had the flexibility to "***[g]row profitably as appropriate to the market cycle***" when the rising rate market subsides:

> •     Continue to leverage our service mix to manage through all market cycles
>
> •     Grow our revenue base prudently with a focus on dedicated contract service and brokerage by cross-selling our services with existing customers and pursuing new customer opportunities

•    Maximize profitability for new freight across OTR and brokerage operations by selectively allocating freight to company assets

•    Seek favorable dedicated service contracts and brokerage freight to manage

•    ***Capitalize on current favorable truckload environment***

•    ***Continue to secure rate increases in all of our service offerings***

•    ***Strategically expand our fleet based on expected profitability and driver availability, including through our company-sponsored independent contractor lease program (which has grown from zero drivers in the second quarter of 2017 to approximately 485 drivers at March 31, 2018)***

•    ***Leverage current market conditions to accelerate timeline for enhancement of network***

113.    ***Misrepresentation***:  The Offering Documents further describe how the Company seeks to "***maintain flexibility through long-term enterprise planning***" by "***prioritizing growth in dedicated contract services***."  In pertinent part the Offering Documents stated:

***Maintain flexibility through long-term enterprise planning and conservative financial policies***

•    Maximize our free cash flow generation by managing expenses, taxes and capital expenditures

•    Prioritize growth in dedicated contract services, which offers more predictable revenue streams and greater asset productivity

•    Prioritize growth in brokerage, which requires limited capital investment and affords network-balancing freight volumes

•    Monitor capital allocation to improve long-term return on invested capital

•    Maintain a conservative leverage profile after this offering.

114.    The Offering Documents also reported USX's first quarter 2018 financial results.  In sum USX reported, "our first quarter of 2018, [] produced a 300 basis point improvement in our operating ratio, compared to our first quarter of 2017, and a 330 basis point improvement in our Adjusted Operating Ratio for the same period."

- 35 -

115.    *Misrepresentation*:  The results in the Offering Documents also indicated increased contract rates and pricing, which would be used to counteract increases in driver pay:

> For the quarter ended March 31, 2018, our Truckload revenue, before fuel surcharge increased by $34.3 million, or 11.6% compared to the same quarter in 2017. ***The primary factors driving the increase in Truckload revenue were a 9.0% increase in revenue per loaded mile due to increased contract rates and increased pricing in the spot market compared to the same quarter in 2017***, combined with a slight increase in average revenue miles per tractor and average available tractors, due to a stronger freight environment and our continued focus on executing our operating initiatives.

116.    *Misrepresentation*:  The Offering Documents also contained risk factors that USX claimed "***could impair [its] ability to improve our profitability*** and materially adversely affect our results of operations "including that USX ***may*** have difficulty recruiting and retaining drivers because our competitors offer better compensation or working conditions."

117.    *Misrepresentation*:  While USX acknowledged the driver shortage in the Offering Documents risk factors section, it also assured investors "***[w]e have implemented driver pay increases to address this shortage***."

118.    *Misrepresentation*:  USX also acknowledged in the Offering Documents that it had a higher turnover rate of drivers the industry average and compared to our peers but claimed that it spent "***significant resources recruiting a substantial number of drivers in order to operate existing revenue equipment***."  Further, that USX that "***employ[ed] driver hiring standards***" implying that it was attracting quality drivers by linking those standards as "further reduc[ing] the pool of available drivers from which we would hire."  The Offering Documents also claimed that: "***[i]f we are unable to continue to attract and retain a sufficient number of drivers, we could be forced to, among other things, continue to adjust our compensation packages or operate with fewer tractors and face difficulty meeting shipper demands, either of which could materially adversely affect our growth and profitability***."

- 36 -

119. **Misrepresentation**: The Offering Documents also warned of the risk that "*[a] reduction in or termination of our services by one or more of our major customers*, including our dedicated customers, *could have a material adverse effect on our business*, financial condition and results of operations."

120. **Misrepresentation**: The Offering Documents also described certain risks related to high deductibles on claims exposure, telling investors that they "may" occur, but did not disclose the factors known to the Company that were increasing such risk, stating in relevant part:

> *We retain high deductibles on a significant portion of our claims exposure, which could significantly increase the volatility of, and decrease the amount of, our earnings and materially adversely affect our results of operations.*
>
> We retain high deductibles on a significant portion of our claims exposure and related expenses associated with third-party bodily injury and property damage, employee medical expenses, workers' compensation, physical damage to our equipment and cargo loss. We retain a deductible of approximately $5.0 million per occurrence for automobile bodily injury and property damage through our captive risk retention group and up to $500,000 per occurrence for workers' compensation claims, both of which can make our insurance and claims expense higher or more volatile than if we maintained lower retentions. We are also responsible for the first $5.0 million aggregate in the $5.0 million to $10.0 million layer of excess insurance coverage for automobile bodily injury and property damage. Additionally, with respect to our third-party insurance, reduced capacity in the insurance market for trucking risks can make it more difficult to obtain both primary and excess insurance, can necessitate procuring insurance offshore, and could result in increases in collateral requirements on those primary lines that require securitization.

121. To the detriment of Plaintiffs and all those that bought shares pursuant and/or traceable to the Offering Documents, the Offering Documents omitted material information regarding the Company's business prospects and financial health. As such, the Offering Documents contained untrue statements of material facts or omitted to state the facts necessary to make the statements made therein not misleading, thus violating the rules and regulations governing its preparation.

122. More specifically, the statements identified above in ¶¶104-108, 110-113, 115-120 were materially false and/or misleading because they failed to disclose:

- 37 -

(a)     USX did not have in place compensation packages sufficient to hire and retain quality truck drivers to meet the demand for its services.  Such incentives and/or compensation required additional expenditures that necessarily would negatively impact the Company's operating ratio.  Nor were the incentives USX had in place sufficient;

(b)     USX drivers were not among the "best paid in the industry" nor had USX increased driver pay commensurate with the market wages for truck drivers which slowed the pace of hiring and hindered the retention of drivers;

(c)     USX's purported "transformation" and "driver-centric" initiatives did not improve load planning or truck maintenance which harmed trucker morale and worsened USX's poor driver retention rates;

(d)     USX was unable to "priortiz[e] growth in dedicated contract services" because a shortage of drivers for trucks was negatively impacting USX's dedicated division, which forced USX to reallocate OTR drivers (at an increased cost) to drive dedicated routes – this was a common practice prior to the IPO which caused underperformance in OTR and continued after the IPO;

(e)     certain account shipping patterns had already been negatively impacted, including those of USX's largest customer Walmart, adversely impacting utilization as well as driver retention and hiring;

(f)     USX's cost per mile for driver wages and independent contractors was exceeding the Company's internal expectations;

(g)     USX's insurance coverage was not symmetrical with USX's overall credit and earnings profile and leverage;

(h)     the risks USX warned might occur had already come to pass and were negatively impacting USX's operations; and

- 38 -

(i)      USX's driver safety initiatives were inadequate and lagged behind its peers resulting in riskier drivers and a poorly maintained fleet and, as a result, increased the Company's exposure to liability claims.

123.    The Offering Documents were also materially untrue and misleading because they failed to meet the requirements of Item 303 of Regulation S-K.  17 C.F.R. §229.303(a)(3)(ii).  Item 303 requires the disclosure of known trends that have had or are reasonably expected to have a material impact on a company's business.  As set forth in detail above, all of these trends were reasonably likely to have a negative impact on USX's financial condition, and thus were required to be disclosed under Item 303.

124.    The adverse trends known to the Securities Act Defendants, but omitted from the Offering Documents, included: (i) USX had prior to the IPO, been unable to hire and retain sufficient numbers of drivers to meet its customers' demands; (ii) in the time prior to the IPO, USX's compensation paid to its drivers was not rising fast enough to keep up with prevailing rates for drivers, impacting hiring and retention; (iii) prior to the IPO, OTR drivers were reallocated to support the dedicated division, negatively impacting profitability; and (iv) USX's lax driver safety practices and hiring had increased the Company's exposure to liability claims.

## VII.    Additional False and Misleading Statements and Omissions During the Class Period for the Exchange Act Claims

125.    In addition to the statement made in the Offering Documents, after the IPO, the Exchange Act Defendants made additional false and misleading statements and omissions:

126.    ***Misrepresentation***:  On August 2, 2018, USX issued a press release announcing its 2Q18 financial results for the period ending June 30, 2018.  The press release was filed on a Form 8-K, signed by Defendant Eric Peterson, with the SEC on the same day.  The press release quoted Defendant Eric Fuller falsely highlighting the success of USX's "Transformation":

Over the last three years we have implemented a complete overhaul of the Company's strategy and operations that we expect will improve execution and profitability. ***To achieve our goal, we changed the Company's culture and recruited the expertise necessary to drive our transformation. We also implemented several strategic initiatives focused on improving driver retention, increasing our asset utilization, creating synergies for our customers within our different service offerings and driving a culture of cost management. The early success of our initiatives can clearly be seen in our second quarter results*** where we delivered our best Adjusted Operating Ratio since 1998.

127.     *Misrepresentation*:  The press release went on to falsely assure investors that USX saw no adverse factors that would negatively impact current trends and that the Company maintained its focus on retaining and hiring drivers, allowing USX to offset any driver supply challenges that they had known of prior to the IPO:

Overall, we remain optimistic as we continue to execute our strategy and market conditions remain strong. ***Of note, we experienced improving rates and volumes through the second quarter and expect no catalyst over the near term that would negatively impact current trends***. That said, we continue to see an erosion of professional driver availability.  As a result, ***we are continuing to focus on our driver centric initiatives to both retain the professional drivers who have chosen to partner with us and to attract new professional drivers to our team.*** We believe this focus allowed us to offset the difficult conditions, which have created a significant professional driver supply challenge for the broader industry as we ***slightly increased our tractor count during the second quarter of 2018 through an 11% reduction in our driver turnover percentage***.  The environment in the third quarter of 2018 remains strong from a rate and volume perspective and we are currently anticipating rates to further increase on a sequential basis as ***we continue to implement contract rate increases in both our over the road and dedicated divisions***.

128.     *Misrepresentation*:  The August 2, 2018 press release also misleadingly downplayed the adverse impact that the shift of OTR drivers to dedicated had on USX, when in reality, the shift of OTR assets to dedicated was a pervasive and long-standing problem:

Despite the challenging market for drivers, utilization increased through the successful execution of numerous operational initiatives gaining traction through the quarter. ***This strong utilization was impacted by the over the road division's support of dedicated accounts during the quarter***, which negatively impacted over the road utilization by approximately 150 basis points.  While supporting the dedicated accounts with the Company's over the road fleet negatively affected our utilization in the second quarter, ***management believes that when these accounts are operationally established, U.S. Xpress will be able to recognize this increase in over the road utilization***.

129.     *Misrepresentation*:  USX and its executives also falsely downplayed issues with "certain" accounts' shipping patterns and "mix changes" by not disclosing that the issue involved a major customer and implying that rate increases, which were previously implemented in July 2018, had resolved those issues:

> The reduction in our utilization was primarily the result of ***certain accounts' shipping patterns that performed differently than expected*** which affected utilization, driver hiring, and retention, and due in part to mix changes in the portfolio.  As a result of negotiations related to these accounts that were underperforming from a utilization standpoint, rate increases have been implemented that were effective as of the end of July 2018.

130.     *Misrepresentation*:  As to the brokerage segment, the Exchange Act Defendants claimed that the brokerage unit allowed the Company to meet its customers' capacity requirements:

"***[t]he brokerage segment continues to provide additional selectivity for the Company's assets to optimize yield while at the same time offering more capacity solutions to our customers***."  In fact, the use of the OTR drivers had been required to cover dedicated customers adversely impacting the Company.

131.     *Misrepresentation*:  That same day, August 2, 2018, USX held an earnings conference call in which Defendants Eric Fuller and Eric Peterson participated and answered questions from securities analysts.  When asked if USX could handle wage boosts if necessary, Eric Fuller indicated that OTR drivers already received a significant wage boost and that dedicated could pass on the rate changes to its customers:

> Sure.  Yes, Ravi, I think, obviously, and I know we have talked about this, is the way we look at driver wages is in two buckets.  ***You have dedicated, which we believe we can be made whole for any increases that we have to give our drivers in the dedicated segment*** and on over the road is obviously where you have a little bit more exposure.

> If you look at our over the road drivers, again, they have received a 15% increase in their weekly take-home this year versus last year.  So we think that's a significant increase and we think that we can continue to, at least over the near term, we can stay fairly disciplined in our having to increase wages.

132.    When asked on the conference call, with respect to the dedicated accounts that had experienced unexpected shipping patterns, "when was this customer deterioration or you said multiple customer deterioration that needed to shift around the fleet," Eric Fuller admitted the issue existed before the IPO: "***So that really occurred starting in late first quarter, early second quarter we started to see a degradation and partially in part because of how things were sold versus how they actually operated***." But the Exchange Act Defendants continued to mislead investors regarding the scope and magnitude of the adverse impact on USX, implying that the issue was under control.

133.    *Misrepresentation*:  Eric Fuller further assured investors on the August 2, 2018 conference call that the issue regarding shipping patterns had been addressed and would soon be behind the Company by noting that rate increases had already been incorporated into the dedicated fleet's numbers and that there were active negotiations to recapture the lost margin:

> I think we still have a little bit of ways to go and ***there's still some negotiations with a few different customers*** on some changes in how they are operating.  And so those negotiations are still happening, ***but the 3.5% went into our dedicated rate per mile and that is already effective in our numbers on a go-forward basis***.

134.    *Misrepresentation*:  Defendant Eric Peterson also misled investors on the conference call, describing the 11% improvement in driver retention as an "improvement in the overall driver retention percentage."

135.    *Misrepresentation*:  Later on the conference call, Eric Fuller also emphasized that the driver-centric initiatives were enhancing driver take-home pay, thus implying driver hiring and retention and the operating ratios were also increasing.  "Obviously, ***the load planning initiative is around driving improvements in our utilization and that utilization is leading to drivers taking home more pay***."

136.    *Misrepresentation*:  USX's 2Q18 Form 10-Q filed with the SEC on August 9, 2018 and signed by Defendant Eric Peterson also echoed the false statements seen in the press release issued a week earlier.  For example:

- 42 -

We continue to see an erosion of professional driver availability. As a result, we are continuing to focus on our driver centric initiatives to both retain the professional drivers who have chosen to partner with us and attract new professional drivers to our team. *We believe this focus allowed us to offset the difficult conditions* which have created a significant professional driver supply challenge for the broader industry. *We slightly increased our tractor count during the second quarter of 2018 and had an 11% reduction in our driver turnover percentage*, which we expect will continue to improve. We will continue to focus on implementing and executing our initiatives that we expect will continue to drive sustainable improved performance over time.

137. ***Misrepresentation***: USX's 2Q18 Form 10-Q also referenced the Offering Documents indicating "***[t]here have been no material changes from the risk factors disclosed in the Prospectus***" and directed investors to the Offering Documents for the "Risk Factors" that "could cause future events and actual results to differ materially." As such, the false and misleading risks that the Offering Documents warned could happen in ¶¶116-120 were fully incorporated into the USX's 2Q Form 10-Q and reaffirmed on August 9, 2018. These warnings were materially false and misleading because the risks that the Exchange Act Defendants warned could materially impact USX's business had already come to pass and continued to negatively impact USX's business.

138. On September 8, 2018, USX announced that new drivers would receive health benefits '"from day one"' instead of having to wait 90 days. Defendant Eric Fuller proclaimed this would improve driver recruitment because drivers would be '"able to shift to another carrier and not have to wait."'

139. Also on September 10, 2018, USX announced its "Full Ride" scholarship program which allowed USX drivers to earn certain bachelors' degrees at no cost. In the announcement posted on USX's website, defendant Eric Fuller represented that the program would "help[] our company recruit and retain more drivers," further demonstrating that USX's prior efforts to recruit and retain drivers had been unsuccessful.

140. ***Misrepresentation***: On September 13, 2018 USX presented at the Morgan Stanley Laguna conference. Defendants Eric Peterson and Eric Fuller participated in the conference. When

- 43 -

asked if USX was contemplating additional pay raises for its drivers, Eric Fuller highlighted all the

pay raises USX had purportedly already given to their drivers:

> So you've really got to look at it in a lot of different buckets. We've got dedicated. And on the dedicated side, which makes up half of our trucks and half of our drivers, ***we're constantly giving increases in conjunction with the customer***. So we would go back to the customer and get – kind of get, make a decision with the customer in that certain location to give increases. So I would take half of that truck count and say I'm going to give made-whole on any kind of increases on a dollar-for-dollar basis in that bucket. ***On over the road, we have given – the drivers have received about a 15% increase on a year-over-year basis. We've given about a 9% increase. And that utilization increase has led to the rest of it***. We're constantly looking at pay. Right now, I don't have any plans in the near term to increase pay. But I mean, very competitive environment, and I would tell you that sometimes in this environment, things can change pretty quickly. So it's something that we keep an eye on. But at this junction, I'm not planning on raising pay in the near term.

141. ***Misrepresentation***: Later that week, on September 18, 2018, Eric Fuller gave an

interview on Bloomberg TV confirming that dedicated was not seeing difficulty passing driver pay

raise costs on to its customers:

> FULLER: ***We are finding the ability to pass along any kind of increases to our customers***. And for the most part, our customers are aware of the driver situation and are concerned enough about being able to find capacity that ***they are understanding for the most part on any type of increases that we are asking for, from a pay standpoint.***

142. These statements identified above in ¶¶126-131, 133-137, 140-141 were materially

false and misleading because:

(a) USX did not have in place compensation packages sufficient to hire and retain

quality truck drivers to meet the demand for its services. Such incentives and/or compensation

required additional expenditures that necessarily would negatively impact the Company's operating

ratio. Nor were the incentives USX had in place sufficient;

(b) USX drivers were not among the "best paid in the industry" nor had USX

increased driver pay commensurate with the market wages for truck drivers which slowed the pace

of hiring and hindered the retention of drivers;

- 44 -

(c)     USX's purported "transformation" and "driver-centric" initiatives did not improve load planning or truck maintenance which harmed trucker morale and worsened USX's poor driver retention rates;

(d)     USX was unable to "priortiz[e] growth in dedicated contract services" because a shortage of drivers for trucks was negatively impacting USX's dedicated division, which forced USX to reallocate OTR drivers (at an increased cost) to drive dedicated routes;

(e)     certain account shipping patterns had already been negatively impacted, including those of USX's largest customer Walmart, adversely impacting utilization as well as driver retention and hiring;

(f)     USX's cost per mile for driver wages and independent contractors was exceeding the Company's internal expectations;

(g)     USX's insurance coverage was not symmetrical with USX's overall credit and earnings profile and leverage;

(h)     the risks USX warned might occur had already come to pass and were negatively impacting USX's operations; and

(i)     USX's driver safety initiatives were inadequate and lagged behind its peers resulting in riskier drivers and a poorly maintained fleet and, as a result, increased the Company's exposure to liability claims.

## VIII.    Additional Allegations for the Exchange Act Claims

### A.    Scienter

143.    Defendants USX, Eric Fuller and Eric Peterson acted with scienter in that they had actual knowledge or recklessly disregarded the alleged scheme and materially false and misleading statements and omissions set forth above.

144. The alleged scheme and materially false and misleading statements and omissions, related to the core operations of USX's business. For instance, the Exchange Act Defendants repeatedly stated that they were focused on driver retention, "driver-centric" initiatives and utilization throughout the Class Period:

- "[W]e are continuing to focus on our driver-centric initiatives to both retain the professional drivers who have chosen to partner with us and to attract new professional drivers to our team."[6]

- "During 2017, we shifted from a load planning strategy based on minimizing empty miles to one that maximizes utilization of our drivers' available hours. We believe the focus on drivers' hours more effectively utilizes our scarcest resource and improves driver satisfaction."[7]

- "We also implemented several strategic initiatives focused on improving driver retention, increasing our asset utilization, creating synergies for our customers."[8]

- "We believe this focus [on our driver centric initiatives] allowed us to offset the difficult conditions which have created a significant professional driver supply challenge for the broader industry."[9]

145. The Exchange Act Defendants' focus and attention to these issues, and their acknowledgement that such issues were critical to USX success, supports a strong inference that they knew or recklessly disregarded the falsity of their statements made in connection with the Offering Documents, and the announcement of the Company's 2Q18 financial results. ¶¶8, 11, 53-54, 62, 67, 104-105, 126-128, 135-136, 140.

146. The Exchange Act Defendants were also motivated to make the materially misleading statements and omissions in the Offering Documents in order to take advantage of the cyclical nature

---

[6] 2Q18 US Xpress Enterprises, Inc., Earnings Call Tr. at 5 (Aug. 2, 2018).

[7] US Xpress Enterprises, Inc., Prospectus (Form 424B4) at 3 (June 15, 2018).

[8] Press Release, US Xpress Enterprises, Inc., Form 8-K at Ex. 99 (Aug. 2, 2018).

[9] *Id.*

- 46 -

of the truckload market, which at the time of the IPO was experiencing increases in volume and rates.

147. As Wolfe Research stated in a July 9, 2018 analyst report, the trucking industry is highly cyclical, was at a perceived peak in July 2018, and was expected to soften, which would negatively impact USX's pricing and earnings:

> ***Potential Peak in TL Cycle***. Current TL fundamentals are terrific and we expect strong earnings growth for USX and all of the TLs in the current environment. But the industry is highly cyclical as evidenced by frequent gyrations in the level of perceived TL capacity tightness in our 17-year proprietary shipper survey. As shown below, we're basically at peak tightness levels in the history of our survey, and we've only seen two similar periods in 2004/05 and 2014/15. While the current backdrop of strong GDP growth and low unemployment seems supportive of an extended cycle, the cycle will eventually soften as we've seen before. So eventually, pricing and earnings will inflect negative for USX and the group.

148. Morgan Stanley made similar observations in July 9, 2018 report stating that the market generally believed that trucking earning in July 2018 were "not sustainable":

> ***Cyclicality of the business***: Trucking is a deeply cyclical business and peak to trough earnings could see swings of as much as 50%. Where we are in the cycle today is up for debate but the market has determined that we are near the end as reflected in TL valuations. We note that since last November, TL peer earnings estimates have increased roughly 50% while multiples in the same period have decreased nearly 50% as the market views current earnings level as not sustainable/ past mid cycle levels.

149. The Exchange Act Defendants knew or recklessly disregarded that USX's purported "Transformation," had not been successful, or achieved the progress they represented, but were determined to complete the IPO, and reap the substantial rewards therefrom, while the cyclic nature of trucking was at a peak, and before industry fundamentals declined, which would have substantially reduced the benefits USX received in connection with the IPO, or prevented USX from completing the IPO at all.

150. Defendants Eric Fuller and Eric Peterson were able to reap substantial and unusual financial benefits as a result of the false and misleading statements and omissions contained in the

Offering Documents.  Defendants Eric Fuller and Eric Peterson both received $500,000 specifically related to the completion of the IPO.  USX also engaged in numerous related-party transactions with IPO proceeds, giving the Fuller and Quinn families strong incentives to complete the IPO regardless of the actual state of USX's operations.  As set forth above, founder Max Fuller, and the estate of his co-founder Patrick Quinn, and former Company CFO Ray Harlin, held a $26 million participation interest in USX's $275 million facility.  The $26 million owed on the loan was paid off in full with the proceeds of the IPO.  Proceeds from the IPO were also used to purchase real estate USX was leasing for $7.5 million from Q&F Realty, a related party owned by Anna Marie Quinn (widow of Patrick Quinn and mother of Lisa Quinn Pate), certain Quinn family trusts, Defendant Max Fuller and certain Fuller family trusts.

151.    Successfully completing the IPO was also critical because, at the time of the IPO USX was funding its operations in part through significant and unsustainable amounts of high-interest debt.  For example, as of March 31, 2018, USX had drawn $192.5 million from its $275 million loan facility, which bore interest of Libor + 10.0% to 11.5%, and matured in May 2020.  These high levels of high interest debt created a strong drag on USX's operating ratio, and was a substantial impediment to USX's ability to compete effectively with other trucking companies.  Had Defendants revealed the truth about USX's operations in connection with IPO, the Company would have failed to raise sufficient funds to repay its loan facilities, if it had been able to complete the IPO at all.

152.    The closeness in time between the allegedly fraudulent statements or omissions and the later disclosure of inconsistent information also supports a strong inference of scienter.  The IPO occurred in June 2018.  ¶4.  The Exchange Act Defendants continued making additional materially false and misleading statements and omissions in connection with their 2Q18 earnings announcement and results in August 2018.  ¶¶126-143.  Yet just three months later, in connection

with the results announced from USX's very first quarter as a public company, the Company would admit that USX's hiring initiatives had been unsuccessful, the dedicated division had been cannibalizing drivers from OTR, shipping patterns were negatively impacting revenue per tractor, and its insurance costs has ballooned, negatively impacting its operating ratio. ¶¶155-161. The closeness in time between Defendants' false statement and the disclosure of inconsistent information supports a strong inference of scienter.

153. Several unusual executive departures around the time of USX's 3Q18 earnings announcement also support a strong inference of scienter. On October 26, 2018, USX announced that John W. White, Chief Sales and Marketing Officer, had "ceased to serve as an employee," just days before on October 22, 2018. On November 2, 2018, just a day after the announcement of USX's poor 3Q18 results, the Company announced that Lisa Quinn Pate, Chief Administrative Officer and daughter of company co-founder Patrick Quinn, would "retire" as an employee of the Company. USX would later announce, on August 16, 2019, that Lisa Quinn Pate had resigned from USX Board of Directors.

## B. Loss Causation

154. During the Class Period, as detailed herein, the Exchange Act Defendants made materially false and misleading statements and/or omitted material information concerning USX's business fundamentals and financial prospects and engaged in a scheme to deceive the market. By artificially inflating and manipulating USX's stock price, the Exchange Act Defendants deceived Plaintiffs and the Class and caused them losses when the truth was revealed. When the risks concealed by the Exchange Act Defendants' prior misrepresentations and fraudulent conduct materialized, it caused USX's stock price to fall precipitously as the prior artificial inflation came out of the stock price. As a result, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

155.     On November 1, 2018, USX issued a press release, also attached as Exhibit 99.1 to

the Form 8-K filed with the SEC on the same day, announcing the Company's financial and

operating results for the third fiscal quarter and nine months ending September 30, 2018.  Therein,

USX stated in relevant part:

> Eric Fuller, CEO and President, commented, "'We continued to see the results of our initiatives and cultural overhaul in the third quarter of 2018 as we experienced our fifth consecutive quarter of year over year improvements in our operating ratio while generating the largest amount of net income during a single quarter in our Company's history, a testament to our team's efforts and dedication. ***However, we are far from satisfied with our operating performance for the third quarter, as we believe our seated truck count and miles per tractor could have performed better had we executed more effectively during the quarter***. We have taken steps internally to address the relevant issues and both average seated truck count and average miles per tractor per working day have increased in October compared with the third quarter.  Based on the strong freight volumes, rate environment and the capacity currently being requested from our customers for the upcoming peak season during the fourth quarter, we feel well positioned to make 2018 the most profitable year in our history.'"

*       *       *

> Operating income for the third quarter of 2018 was $22.9 million which compares favorably to the $11.5 million achieved in the third quarter of 2017.  This improvement was achieved despite incurring $7.6 million of incremental insurance and claims expense in the third quarter of 2018, as compared to the prior year period, partially offset by a $4.0 million gain on life insurance reflected in a reduction in salaries, wages, and benefits, or a net negative impact of approximately $0.05 to earnings per share.

*       *       *

> Mr. Fuller said, "'Market conditions remained strong in the third quarter as we saw our rates increase sequentially from the second quarter and are continuing to experience further increases into the fourth quarter. ***Market conditions for drivers, however, remained challenging during the quarter as we were unable to increase our tractor count despite improvements in our turnover percentage.  The modest decline was primarily due to a deceleration in the pace of hiring through the first half of the quarter which has since reversed***.  We continue to execute on our initiatives that are focused on being a valued partner to our professional drivers by offering them increased miles, modern equipment, and a driver centric operations team.'"

*       *       *

In the over the road division, average revenue per tractor per week increased 12.0% in the third quarter of 2018, as compared to the third quarter of 2017. The increase was primarily the result of an 11.3% increase in the division's rate per mile. *It is worth noting that utilization was essentially flat in the third quarter of 2018, from the year ago period, with headwinds from temporary support of our dedicated division.* Looking forward, the Company sees additional opportunities to improve the division's results through the continued execution of its driver and utilization centric initiatives.

The dedicated division's average revenue per tractor per week increased 5.0% in the third quarter of 2018 as compared to the third quarter of 2017. The increase was primarily the result of a 10.3% increase in the division's revenue per mile partially offset by a 4.9% decrease in the division's revenue miles per tractor per week. *The division's results continue to be impacted by certain accounts' shipping patterns performing differently than expected which was first experienced in the second quarter of 2018*. The Company made progress addressing the issue which resulted in a sequential improvement in utilization to a decline of 5.0% in the third quarter of 2018 from the 9.8% decline in utilization experienced in the second quarter of 2018.

156. During a conference call held on November 1, 2018 to discuss the Company's financial and operating results for the third fiscal quarter and nine months ending September 30, 2018, Defendant Eric Fuller explained:

*During the quarter, our over the road division supported contractual commitments in our dedicated division, which adversely impacted this division's utilization*. Initially, we thought the support would be reduced toward the beginning of the third quarter. However, *it progressively increased* and peaked during the quarter. Over the last six weeks, the support provided to our dedicated division by our over the road division has been reduced significantly due to increased traction in our recruiting efforts to fill these dedicated positions.

*Additionally, the market for drivers remained challenging through the third quarter, which resulted in a slight decline in our average tractor count as compared to the second quarter of 2018. Tractor count in our over the road division troughed in the back half of the third quarter as we experienced a slight deceleration in the pace of hiring*, which has since reversed.

\* \* \*

Turning to our dedicated division, the average revenue per tractor per week, excluding fuel surcharges, increased 5% in the third quarter of 2018, as compared to the third quarter of 2017. The increase was primarily a result of a 10.3% increase in the division's revenue per mile, which was partially offset by a 4.9% decrease in the division's revenue miles per tractor per week. *The division's results continue to be*

*impacted by certain accounts' shipping patterns performing different than expected*, which was first experienced in the second quarter of 2018.

157. During the November 1, 2018 conference call regarding insurance claims, Defendant Eric Fuller further disclosed "our net insurance and claims expense for the quarter was the highest recorded in our Company's history and up $7.6 million year-over-year primarily due to two events."

158. With respect to insurance claims, driver wages and independent contractor costs, Defendant Eric Peterson stated on the conference call, in relevant part:

> To conclude, I thought it would be helpful to provide further insight into the variance of our results relative to our expectations as you think about modeling our business looking to the fourth quarter. ***Overall, when I think about the third quarter relative to our initiatives and where we thought we would be had you asked me two quarters ago, we are essentially in line with operating income expectations with the exception of the excess insurance and claims expense we incurred during the quarter, which we consider to be $3.6 million net of the life insurance benefit***.

> When developing initial expectations prior to our IPO, we analyzed our rate per mile from our customers in conjunction with our cost per mile for driver wages and independent contractors as these line items have an interdependent relationship. ***Our rates, driver wages and independent contractor costs are all higher than expectations***. Importantly, our rate has outpaced the increase in our driver and independent contractor costs and has been a net tailwind to our financial results.

> ***During the quarter, tractor utilization was approximately 100 basis points lower than expected in our over the road division and around 450 basis points lower in our dedicated division***. However, a portion of this unanticipated shortfall in the dedicated utilization has been covered with incremental rate increases implemented during the third quarter. This is a component of our year-over-year increase in our dedicated division's revenue per mile of 10.3%.

> ***Our average tractor count was slightly lower than expected for the third quarter due to slightly lower recruiting levels than expected***. We have seen an improvement in both hiring and retention thus far in the fourth quarter, which we expect will increase our overall tractor count to levels slightly above second quarter levels. All other costs, except insurance and claims, were essentially in line with expectations. Fuel and maintenance were slightly higher, while equipment and other general expenses were lower.

159. On the call, Defendant Eric Peterson indicated that the two liability incidents leading to the increased insurance charge occurred prior to September 1, 2018, and constituted the majority of the $7.6 million" increase in insurance and claims expense. Defendant Eric Peterson further

- 52 -

admitted that the insurance plan as described in the Offering Documents was too risky when compared to USX's earnings:

> I think we determined ***the risks that we were taking before with the $10 million on a claim probably wasn't really symmetrical with our overall credit and earnings profile and leverage***.  And so, with this new program in place we think it's much more prudent for predictability in earnings on a go forward basis.

160.    Defendant Eric Peterson confirmed that "[a]s of September 1st of this year, we just found our new policy.  And our exposure will now be limited to $3 million and going forward down from $10 million."

161.    On this news, the price of USX's common stock declined from a close of $10.14 per share on November 1, 2018 to a close of $7.10 per share on November 2, 2018, ***a drop of approximately 29.98%***, on unusually high trading volume.

162.    The decline in the price of USX stock after these disclosures came to light was a direct result of the risks concealed by the Exchange Act Defendants' scheme and fraudulent misrepresentations materializing.  The timing and magnitude of the price decline in USX stock compared to the market and its peers negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Exchange Act Defendants' fraudulent conduct.   The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of the Exchange Act Defendants' fraudulent scheme to artificially inflate the price of USX stock and the subsequent significant decline in the value of USX stock when the risks concealed by the Exchange Act Defendants' prior misrepresentations and other fraudulent conduct materialized.

163.    The large decline in USX's stock price was company-specific, as its stock has dramatically underperformed its peer group, as reflected in the following chart, showing changes in USX stock price compared to Werner Enterprises, Heartland Express, Schneider National and Knight Swift:



US Xpress vs Competitors

**C.      Applicability of Presumption of Reliance**

164.    Plaintiffs and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against the Exchange Act Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

165.    Plaintiffs and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for USX stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a)      USX stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient market;

(b)     as a regulated issuer, USX filed periodic public reports with the SEC;

(c)     USX regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     USX was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were distributed to the salesforces and certain customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

166.     As a result of the foregoing, the market for USX common stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the price of the stock. Under these circumstances, all those who transacted in USX stock during the Class Period suffered similar injury through their transactions in USX stock at artificially inflated prices and a presumption of reliance applies.

167.     Without knowledge of the misrepresented or omitted material facts, Plaintiffs and other Class members purchased or acquired USX stock between the time the Exchange Act Defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed. Accordingly, Plaintiffs and other Class members relied, and are entitled to have relied, upon the integrity of the market price for USX stock, and are entitled to a presumption of reliance on the Exchange Act Defendants' materially false and misleading statements and omissions during the Class Period.

## IX.     Statutory Safe Harbor Does Not Apply to Defendants' False and Misleading Statements and Material Omissions

168.     The statements alleged herein to be false and misleading are not subject to the protections of the Private Securities Litigation Reform Act of 1995's ("PSLRA") statutory Safe

Harbor for forward-looking statements because: (a) they are not forward looking; (b) they are subject to exclusion; or (c) even if purportedly forward looking, defendants cannot meet the requirements for invoking the protection, *i.e.*, identifying the statements as forward looking and demonstrating that the statements were accompanied by meaningful cautionary language. Many of the statements were misleading in light of omissions of material present or historical facts and cannot be considered forward looking.

169. Under the PSLRA's statutory Safe Harbor for written statements, a forward-looking statement is protected if it is: (a) identified as such; and (b) "accompanied by meaningful cautionary statements." 15 U.S.C. §78u-5(c)(1)(A)(i). An oral forward-looking statement must be accompanied by an oral cautionary statement that it is forward looking, that actual results may differ materially, and that additional information concerning risk factors is contained in a readily available written document. In addition, the oral statement must: (a) identify the written document, or portion thereof, that contains such factors; and (b) the referenced written document must contain meaningful cautionary language. 15 U.S.C. §78u-5(c)(2)(B).

170. The Safe Harbor excludes from protection all forward-looking statements that are included in financial statements purportedly prepared in compliance with Generally Accepted Accounting Principles ("GAAP"), including those filed with the SEC on Form 8-K. 15 U.S.C. §78u-5(b)(2)(A).

171. Statements of historical fact, current condition, or a mixture thereof are not "forward looking" and thus not protected by the Safe Harbor.

172. To the extent any of the statements were identified as forward-looking statements, they do not fall within the protections of the Safe Harbor because they lacked specific, meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. A warning that identifies a potential risk,

but implies that such risk had not materialized – *i.e.*, states that something might occur but does not state that something actually has already occurred – is not meaningful and does not fall within the protections of the Safe Harbor.

173.     For example, as described in ¶¶93-101, the Company did not disclose specific and meaningful cautionary statements relating to then-existing material adverse facts relating to driver quality, fleet maintenance and safety initiatives that materially increased USX's exposure to liability and liability claims.

174.     Meaningful risk disclosures must also be substantive and tailored to the forward-looking statements they accompany.  Defendants' purported risk disclosures remained unchanged over the course of the Class Period, despite the fact that such risks had in fact materialized, which change in circumstance was material to the reasonable investor.  Defendants' risk disclosures were therefore neither substantive nor tailored and do not satisfy the requirements of the Safe Harbor.

175.     Nor were the historic or present-tense statements made by Defendants assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

176.     As described in ¶¶69-74, 78, USX's low pay, illusory pay increases and particularly high turnover with respect to the risks relating to the driver shortage were a present fact at the time of the IPO, which falsely understated the risks posed to the Company by the driver shortage.

177.     As described in ¶¶80-81, 89, the change in shipping patterns seen at a large account existed during the late first quarter to early second quarter of 2018, before USX's IPO.

- 57 -

178. As described in ¶¶83-85, prior to and leading up to the IPO, as well as throughout the Class Period, USX relied on its OTR division to support dedicated accounts, which negatively impacted the OTR business.

179. As described in ¶¶75-77, prior to the IPO, the Company's "Transformation" failed to improve load planning and truck maintenance sufficient to maintain or grow its operating revenue.

180. Defendants' alleged forward-looking statements also do not fall within the protections of the Safe Harbor because they had no reasonable basis. Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of USX, who knew that those statements were false or misleading when made.

## X.    Class Action Allegations

181. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a)-(b)(3) on behalf of a class consisting of all persons who purchased or otherwise acquired the Class A common stock of USX between June 14, 2018 and November 1, 2018, inclusive, including shares purchased or acquired pursuant and/or traceable to the Offering Documents, and were damaged thereby (the Class). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

182. The members of the Class are so numerous that joinder of all members is impracticable. Following the IPO, USX shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class,

if not more.  Record owners and other members of the Class may be identified from records maintained by USX, its transfer agent or securities' brokers, and may be notified of the pendency of this action electronically or by mail, using the form of notice similar to that customarily used in securities class actions.

183.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

184.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

185.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public misrepresented material facts about the business and operations of USX; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

186.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**First Cause of Action**

**Violation of §11 of the Securities Act**
**(Against the Defendants USX, Eric Fuller, Max Fuller, Eric Peterson,**
**Jason Grear, Lisa Quinn Pate and the Underwriter Defendants)**

187.    Plaintiffs incorporate by reference and realleges ¶¶1, 3-10, 17-31, 33-55, 57-100, 102-124, 181-186 as though fully set forth herein.

188.    For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence and/or strict liability.

189.    The Offering Documents were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

190.    The Securities Act Defendants are strictly liable to Plaintiffs and the other members of the Class for the misstatements and omissions.

191.    None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and complete, such as to render them not false and misleading.

192.    By reason of the conduct herein alleged, each Securities Act Defendant violated §11 of the Securities Act.

193.    Plaintiffs acquired the Company's stock pursuant and/or traceable to the Offering Documents.  Plaintiffs and other members of the Class have sustained damages.  The value of the Company's stock has declined substantially subsequent to and due to Securities Act Defendants' violations.

194.    At the time of their purchases of the Company's stock, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein

and could not have reasonably discovered those facts prior to the disclosures alleged herein. Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based and the time that this action was commenced. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs commenced this action.

195.     By reason of the foregoing, Plaintiffs and the other members of the Class are entitled to damages as measured by the provisions of §11(e), 15 U.S.C. 77k(e), from the Securities Act Defendants and each of them, jointly and severally.

## Second Cause of Action

### Violation of §15 of the Securities Act
### (Against Defendants USX, Eric Fuller, Max Fuller, Eric Peterson, Jason Grear and Lisa Quinn Pate)

196.     Plaintiffs incorporate by reference and realleges ¶¶1, 3-10, 17-31, 33-55, 57-100, 102-124, 181-195 as though fully set forth herein.

197.     For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence and/or strict liability.

198.     The Individual Defendants each were control persons of the Company by virtue of their positions as directors and/or senior officers of the Company, and personal and familial relationships.

199.     The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of USX.

200.     The Individual Defendants were each participants in the violation of §11 of the Securities Act, alleged in the First Cause of Action above, based on their having signed or authorized

the signing of the Registration Statement and having otherwise participated in the process that allowed the IPO to be successfully completed.

201.     None of the Individual Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects.  Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

202.     This claim was brought within one year after the discovery of the untrue statements and omissions in the Offering Documents and within three years after the Company's securities were sold to the Class in connection with the IPO.

203.     The Company and the Individual Defendants are primarily liable, joint and severally, by reason of the above conduct pursuant to §15 of the Securities Act, 15 U.S.C. §77o.

**Third Cause of Action**

**Violation of §10(b) of the Exchange Act and Rule 10b-5**
**(Against Defendants USX, Eric Fuller and Eric Peterson)**

204.     Plaintiffs incorporate by reference and realleges ¶¶1-32, 44-186 as though fully set forth herein.

205.     During the Class Period, the Exchange Act Defendants disseminated or approved the statements as specified above in ¶¶104-108, 110-113, 115-120, 126-131, 133-137, 140-141, which they knew or recklessly disregarded contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

206.     The Exchange Act Defendants violated §10(b) of the 1934 Act and SEC Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c)      engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of USX securities during the Class Period.

207.      The Exchange Act Defendants, individually and together, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous scheme and course of conduct to conceal the truth and/or adverse material information about USX's business, operations and financial condition as specified herein.

208.      The Exchange Act Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.

209.      As a result of the dissemination of the materially false or misleading information and/or failure to disclose material facts, as set forth above, the market price of USX securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of USX securities was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which USX securities traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants (but not disclosed in Defendants' public statements during the Class Period), Plaintiffs and the other Class members purchased or otherwise acquired USX securities during the Class Period at artificially high prices and were damaged thereby.

210.      Plaintiffs and the Class, in reliance on the integrity of the market, paid artificially inflated prices for USX securities, and suffered losses when the relevant truth was revealed.

211.     Plaintiffs and the Class would not have purchased USX securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these Defendants' misleading statements.

212.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their Class Period transactions in USX securities.

213.     By reason of the foregoing, Defendants named in this Count have violated §10(b) of the 1934 Act and SEC Rule 10b-5.

## Fourth Cause of Action

### Violations of §20(a) of the Exchange Act
### (Against Defendants USX, Eric Fuller, Max Fuller and Eric Peterson)

214.     Plaintiffs incorporate by reference and realleges ¶¶1-32, 44-186, 204-213 as though fully set forth herein.

215.     Defendants Eric Fuller, Max Fuller and Eric Peterson were controlling persons of USX within the meaning of §20(a), 15 U.S.C. 78t(a), of the Exchange Act.  By virtue of their high-level positions as officers and/or directors of USX, their personal and familial relationships, their ownership and contractual rights, participation in and awareness of the Company's operations, and intimate knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, these Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the contest and dissemination of the allegedly false and misleading statements.

216.     In particular, each of these Defendants had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions and business practices giving rise to the securities violations as alleged in the Third Cause of Action above, and exercised that power.

- 64 -

217. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases and acquisitions of USX securities during the Class Period when the relevant truth was revealed.

218. By reason of the foregoing, the Defendants named in this Count violated §20(a) of the Exchange Act.

## XI. Prayer for Relief

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A. Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Federal Rules of Civil Procedure Rule 23 and Lead Plaintiff's counsel as class counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

D. Granting extraordinary equitable and/or injunctive relief as permitted by law; and

E. Such other and further relief as the Court may deem just and proper.

## XII. Jury Trial Demanded

Plaintiffs hereby demand a jury trial.

DATED: October 8, 2019　　　　　ROBBINS GELLER RUDMAN & DOWD LLP
　　　　　　　　　　　　　　　　　CHRISTOPHER M. WOOD


　　　　　　　　　　　　　　　　s/ CHRISTOPHER M. WOOD
　　　　　　　　　　　　　　　　CHRISTOPHER M. WOOD

- 65 -

414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com

ROBBINS GELLER RUDMAN & DOWD LLP
WILLOW E. RADCLIFFE (*pro hac vice*)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
willowr@rgrdlaw.com

ROBBINS GELLER RUDMAN & DOWD LLP
KEVIN S. SCIARANI (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
ksciarani@rgrdlaw.com

LEVI & KORSINSKY, LLP
NANCY A. KULESA (*pro hac vice*)
SHANNON L. HOPKINS (*pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: 203/363-7500
866/367-6510 (fax)
nkulesa@zlk.com
shopkins@zlk.com

Lead Counsel for Lead Plaintiff

BRAGAR EAGEL & SQUIRE, P.C.
W. SCOTT HOLLEMAN
MARION C. PASSMORE
885 Third Avenue, Suite 3040
New York, NY 10022
Telephone: 646/860-9449
212/214-0506 (fax)
holleman@bespc.com
passmore@bespc.com

Counsel for Charles Clowdis and Bryan K.
Robbins

- 66 -

BARRETT JOHNSTON MARTIN
  &amp; GARRISON, LLC
JERRY E. MARTIN, #20193
DAVID GARRISON, #24968
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2202
615/252-3798 (fax)
jmartin@barrettjohnston.com
dgarrison@barrettjohnston.com

Local Counsel

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, the undersigned Charles Clowdis, certify that:

1.      I have reviewed the complaint, and have authorized its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2.      I did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.      I want to serve as a lead plaintiff and representative party on behalf of the class, including providing testimony at deposition and trial. I fully understand the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the class.

4.      Attached hereto as Schedule A is a complete listing of all my U.S. Xpress Enterprises, Inc. securities (NYSE: USX) transactions during the Class Period.

5.      I have not served as a representative party on behalf of a class under this title during the last three years.

6.      I will not accept any payment for serving as a representative party on behalf of the class beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 7 OCT. 2019

_____
Charles Clowdis

1

## SCHEDULE A

Class Period Transactions of Charles Clowdis in U.S. Xpress Enterprises, Inc. securities (NYSE: USX).

| Transaction | Date | Quantity | Price Per Share |
|---|---|---|---|
| Purchase | 6/18/2018 | 100 | $16.51 |

2

# CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, the undersigned Bryan K. Robbins, certify that:

1.      I have reviewed the complaint, and have authorized its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2.      I did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.      I want to serve as a lead plaintiff and representative party on behalf of the class, including providing testimony at deposition and trial. I fully understand the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the class.

4.      Attached hereto as Schedule A is a complete listing of all my U.S. Xpress Enterprises, Inc. securities (NYSE: USX) transactions during the Class Period.

5.      I have not served as a representative party on behalf of a class under this title during the last three years.

6.      I will not accept any payment for serving as a representative party on behalf of the class beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: Oct 6, 2019

*Bryan K. Robbins*
Bryan K. Robbins (Oct 6, 2019)

Bryan K. Robbins

**SCHEDULE A**

Class Period Transactions of Bryan K. Robbins in U.S. Xpress Enterprises, Inc. securities (NYSE: USX).

| Transaction | Date | Quantity | Price Per Share |
|---|---|---|---|
| Purchase | 6/15/2018 | 20 | $16.56 |
| Purchase | 6/15/2018 | 30 | $16.28 |

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on October 8, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List.

s/ CHRISTOPHER M. WOOD
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN & DOWD LLP
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 800/449-4900
615/252-3798 (fax)
E-mail: cwood@rgrdlaw.com