# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF TENNESSEE

## CHATTANOOGA DIVISION

| | |
|---|---|
| LEWIS STEIN, Individually and on Behalf of All Others Similarly Situated, ) ) | Civil Action No. 1: 19-cv-00098-CLC-CHS |
| ) Plaintiffs, ) | <u>CLASS ACTION</u> |
| ) vs. ) | Judge Harry S. Mattice, Jr.<br>Magistrate Judge Christopher H. Steger |
| ) U.S. XPRESS ENTERPRISES, INC., et al., ) ) | |
| Defendants. ) ) | |
| ———————————————— ) | |

**PLAINTIFFS' OMNIBUS MEMORANDUM IN OPPOSITION TO THE U.S. XPRESS DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT AND THE UNDERWRITERS' MOTION TO DISMISS PLAINTIFFS' SECTION 11 CLAIM**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................1

II. STANDARD OF REVIEW ......................................................................................5

III. THE SECTION 11 CLAIMS SATISFY THE NOTICE PLEADING STANDARD...................................................................................................................6

    A. The Complaint Sufficiently Alleges that the Offering Documents Were Materially False and Misleading..................................................................7

        1. Material Omissions Concerning Issues Plaguing the Company's Driver Workforce and the Ripple Effect Through USX's Operating Ratio...................................................................................8

        2. Misstatements Concerning USX's Decision to Bolster its Lower Margin Dedicated Division at the Detriment of its OTR Segment............11

        3. Misstatements Concerning the Company's Rising Self-Insurance Risks.................................................................................................13

    B. The Complaint's Section 11 Claims Do Not Sound in Fraud................................13

    C. USX's Offering Documents Violated Item 303......................................................16

IV. DEFENDANTS' STATEMENTS ARE NOT IMMUNIZED AND ARE OTHERWISE ACTIONABLE................................................................................20

    A. The Challenged Statements Are Not Forward-Looking .......................................20

    B. The Challenged Statements Are Not Protected Opinion Statements.....................24

    C. The Challenged Statements Are Not Corporate Optimism...................................25

V. DEFENDANTS VIOLATED SECTION 10(b) OF THE EXCHANGE ACT...................27

    A. USX, Its CEO and CFO's Misrepresentations After the IPO Were Materially False and Misleading in Violation of Section 10(b) ...........................27

        1. Misstatements Concerning the Company's Driver Workforce..................27

        2. Misstatements Concerning the Impact of Using OTR Drivers to Support Dedicated Accounts and USX's Utilization Shortcomings..........28

        3. Misstatements Concerning Then-Existing Risk Factors...........................29

    B. The Complaint Pleads a Strong Inference of Scienter .........................................30

- i -

1. Divergence Between Internal USX Reports and Public Statements..........31

2. Defendants Admitted They Disregarded Their Most Current Knowledge of the Driver Retention, Dedicated Route and Insurance Risk Issues Before Making Their False Statements..................32

3. Defendants' "Day-to-Day" Role in the Core Operations of the Company Underscores the Strong Inference of Scienter Pled in the Complaint...............................................................................................35

4. Plaintiffs Allege a Temporal Proximity Between the Fraudulent Statements and the Disclosure of the Truth ...............................................37

5. CEO Eric Fuller and CFO Eric Peterson Were Motivated by Personal Financial Benefits Obtained by Completing the Offering ..........37

6. USX Was Motivated to Conduct the Offering Because of Substantial Burdens Related to Impending Debt Obligations ...................39

7. Executive Departures Further Suggest Scienter ........................................40

8. Defendants' Devotion to the *Helwig* Factors Ignores Supreme Court Authority and Provides No Basis to Discredit Plaintiffs' Allegations ..................................................................................................42

9. The Complaint's CW Allegations Further Corroborate and Add Support to a Strong Inference of Scienter..................................................43

10. Defendants' Attacks on the CW Allegations Do Not Negate Scienter ......................................................................................................44

VI. PLAINTIFFS ADEQUATELY ALLEGE CONTROL PERSON LIABILITY................45

VII. IF THE MOTIONS ARE GRANTED, PLAINTIFFS SEEK LEAVE TO AMEND........46

VIII. CONCLUSION.....................................................................................................47

4851-6949-8295.v1

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abuhamdan v. Blyth, Inc.*,
9 F. Supp. 3d 175 (D. Conn. 2014) ...................................................................................20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..........................................................................................................5

*Ashland, Inc. v. Oppenheimer & Co.*,
648 F.3d 461 (6th Cir. 2011) ......................................................................................30, 42

*Beach v. Healthways, Inc.*,
No. 3:08-0569, 2009 U.S. Dist. LEXIS 17809 (M.D. Tenn. Mar. 9, 2009) ...........................23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......................................................................................................5, 6

*Blackmoss Invs. Inc. v. ACA Capital Holdings*
No. 07 Civ. 10528, 2010 U.S. Dist. LEXIS 2899 (S.D.N.Y. Jan. 12, 2010) ........................19

*Bondali v. Yum! Brands, Inc.*,
620 Fed. App'x 483 (6th Cir. 2015) ...................................................................................15

*Burges v. Bancorpsouth, Inc.*,
No. 3:14-cv-1564, 2017 U.S. Dist. LEXIS 169463 (M.D. Tenn. Oct. 12, 2017) ....................9

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) .................................................................................. *passim*

*City of Pontiac Gen. Emps. Ret. Sys. v. Stryker Corp.*,
No. 1:10-CV-520, 2011 U.S. Dist. LEXIS 72362 (W.D. Mich. July 6, 2011) ........................6

*Cozzarelli v. Inspire Pharm. Inc.*,
549 F.3d 618 (4th Cir. 2008) ...........................................................................................15

*Dougherty v. Esperion Therapeutics, Inc.*,
905 F.3d 971 (6th Cir. 2018) .................................................................................21, 31, 37

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) .........................................................................30, 31, 36, 41

*Galestan v. Onemain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018) ................................................................................22

*Grae v. Corr. Corp. of Am.*,
No. 3:16-cv-2267, 2017 U.S. Dist. LEXIS 207475 (M.D. Tenn. Dec. 18,
2017) ..........................................................................................................................25, 36

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) ...................................................................................... *passim*

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983).........................................................................................................6

*In Re Am. Serv. Grp., Inc.*,
No. 3:06-0323, 2009 U.S. Dist. LEXIS 28237 (M.D. Tenn. Mar. 30, 2009) ..............12, 29, 40

*In re CornerStone Propane Partners, L.P. Sec. Litig.*,
355 F. Supp. 2d 1069 (N.D. Cal. 2005) ...................................................................7

*In re Envision Healthcare Corp. Sec. Litig.*,
No. 3:17-cv-01112, 2019 U.S. Dist. LEXIS 200986 (M.D. Tenn. Nov. 19,
2019) ...................................................................................................................... *passim*

*In re EveryWare Global, Inc. Sec. Litig.*,
175 F. Supp. 3d 837 (S.D. Ohio 2016) ..............................................................22, 45

*In re Faro Techs. Sec. Litig.*,
534 F. Supp. 2d 1248 (M.D. Fla. 2007)...................................................................43

*In Re FirstEnergy Corp. Sec. Litig.*,
316 F. Supp. 2d 581 (N.D. Ohio 2004).............................................................14, 15

*In re Guidant Corp. S'holders Derivative Litig.*,
No. 1:03-cv-955, 2005 U.S. Dist. LEXIS 45701 (S.D. Ind. Dec. 22, 2005) ..........................47

*In re Initial Pub. Offering Sec. Litig.*,
241 F. Supp. 2d 281 (S.D.N.Y 2003)......................................................................14

*In re Intelligroup Securities Litigation*,
527 F. Supp. 2d 262 (D.N.J. 2007) .........................................................................41

*In re MF Global Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013)......................................................................23

*In re Miller Energy Res. Sec. Litig.*,
No. 3:11-CV-386-TAV-CCS, 2014 U.S. Dist. LEXIS 15810 (E.D. Tenn.
2014) ..................................................................................................................36, 39

*In re Musicmaker.com Sec. Litig.*,
No. CV 00-2018 CAS, 2001 U.S. Dist. LEXIS 25118 (C.D. Cal. June 4, 2001)....................20

4851-6949-8295.v1

*In re Nash Finch Co. Sec. Litig.*,
502 F. Supp. 2d 861 (D. Minn. 2007).......................................................................................10

*In re Nat'l Century Fin. Enters., Inv. Litig.*,
504 F. Supp. 2d 287 (S.D. Ohio 2007) ....................................................................................46

*In re No. Nine Visual Tech. Corp. Sec. Litig.*,
51 F. Supp. 2d 1 (D. Mass. 1999) ...........................................................................................15

*In re Officemax, Inc. Sec. Litig.*,
No. 1:00-CV-2432, 2002 U.S. Dist. LEXIS 27019 (N.D. Ohio Mar. 26, 2002) .....................42

*In re Omnicare, Inc. Sec. Litig.*,
769 F.3d 455 (6th Cir. 2014) ........................................................................................9, 18, 29

*In re Prison Realty Sec. Litig.*,
117 F. Supp. 2d 681 (M.D. Tenn. 2000)..............................................................14, 23, 27, 46

*In re ProQuest Sec. Litig.*,
527 F. Supp. 2d 728 (E.D. Mich. 2007)...................................................................................45

*In re Quality Sys.*,
865 F.3d 1130 (9th Cir. 2017) .................................................................................................10

*In re Regions Morgan Keegan Sec., Derivative, & ERISA Litig.*,
743 F. Supp. 2d 744 (W.D. Tenn. 2010)..................................................................................46

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001).................................................................................................9, 33

*In re Sirrom Capital Corp. Sec. Litig.*,
84 F. Supp. 2d 933 (M.D. Tenn. 1999)....................................................................................14

*In re Telxon Corp. Sec. Litig.*,
133 F. Supp. 2d 1010 (N.D. Ohio 2000)..................................................................................39

*In re Thornburg Mortg. Sec. Litig.*,
824 F. Supp. 2d 1214 (D.N.M. 2011) ......................................................................................20

*In re Tronox, Inc. Sec. Litig.*,
09 CIV. 6220 (SAS), 2010 U.S. Dist. LEXIS 67664 (S.D.N.Y. June 28, 2010).....................39

*Ind. State Dist. Council of Laborers v. Omnicare, Inc.*,
583 F.3d 935 (6th Cir. 2009) ..................................................................................................13

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)..................................................................................9

*J&R Mktg. v. GMC*,
549 F.3d 384 (6th Cir. 2008) ...............................................................................7

*Konkol v. Diebold, Inc.*,
590 F.3d 390 (6th Cir. 2009) .........................................................................30, 44

*Kyrstek v. Ruby Tuesday, Inc.*,
No. 3:14-cv-01119, 2016 U.S. Dist. LEXIS 43523 (M.D. Tenn. Mar. 31,
2016) ...........................................................................................................12, 16, 18

*Laborers' Local #231 Pension Fund v. PharMerica Corp.*,
No. 3:18-CV-109-RGJ, 2019 U.S. Dist. LEXIS 162763 (W.D. Ky. Sept. 23,
2019) ...........................................................................................................................6

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
No. 07 CIV. 0976 (LAP), 2008 U.S. Dist. LEXIS 76670 (S.D.N.Y. Sept. 30,
2008) .........................................................................................................................22

*Ley v. Visteon Corp.*,
543 F.3d 801 (6th Cir. 2008) .............................................................................44

*Local 295/Local 851 IBT Employer Group Pension Trust & Welfare Fund v. Fifth
Third Bancorp.*,
731 F. Supp. 2d 689 (S.D. Ohio 2010) ..........................................................22, 42

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
238 F.3d 363 (5th Cir. 2001) .............................................................................13

*Mallen v. Alphatec Holdings, Inc.*,
861 F. Supp. 2d 1111 (S.D. Cal. 2012).............................................................20

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)...........................................................................................6, 30

*Morse v. McWhorter*,
290 F.3d 795 (6th Cir. 2002) .............................................................................47

*Nguyen v. Radient Pharm. Corp.*,
SA CV 11-0406 DOC, 2011 U.S. Dist. LEXIS 122533 (C.D. Cal. Oct. 20,
2011) .........................................................................................................................40

4851-6949-8295.v1

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015).................................................................................6, 24, 25, 26

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012)...........................................................................19

*Plotkin v. IP Axess Inc.*,
  407 F.3d 690 (5th Cir. 2005) ..........................................................................33

*PR Diamonds, Inc. v. Chandler*,
  364 F.3d 671 (6th Cir. 2004) ..................................................................... *passim*

*Primo v. Pacific Biosciences of Cal., Inc.*,
  940 F. Supp. 2d 1105 (N.D. Cal. 2013) ..........................................................7, 13

*Pullins v. Klimley*,
  No. 3:05-cv-082, 2008 U.S. Dist. LEXIS 3467 (W.D. Ohio Jan. 7, 2008) .......................45, 46

*Ret. Sys. v. Psychiatric Sols., Inc.*,
  No. 3:09-00882, 2011 U.S. Dist. LEXIS 35661 (M.D. Tenn. Mar. 31, 2011) ......23, 32, 35, 36

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)............................................................................22

*Rosenbaum Capital, LLC v. McNulty*,
  549 F. Supp. 2d 1185 (N.D. Cal. 2008) ............................................................10

*Schuh v. HCA Holdings, Inc.*,
  947 F. Supp. 2d 882 (M.D. Tenn. 2013).........................................................16, 17, 19, 20

*Shane v. Bunzl Distrib. USA, Inc.*,
  200 Fed. App'x. 397 (6th Cir. 2006) ................................................................46

*Shapiro v. Merrill Lynch & Co.*,
  634 F. Supp. 587 (S.D. Ohio 1986) .................................................................44

*Slater v. A.G. Edwards & Sons, Inc.*,
  719 F.3d 1190 (10th Cir. 2013) .......................................................................20

*Sohol v. Yan*,
  No. 1:15-cv-00393, 2016 U.S. Dist. LEXIS 56049 (N.D. Ohio Apr. 27, 2016) .................6, 28

*Stone v. Life Partners Holdings, Inc.*,
  26 F. Supp. 3d 575 (W.D. Tex. 2014)...............................................................28

4851-6949-8295.v1

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................................5, 30, 31, 42

*Weiner v. Tivity Health, Inc.*,
    365 F. Supp. 3d 900 (M.D. Tenn. 2019)........................................................22, 23

*Welgus v. TriNet Group, Inc.*,
    No. 15- cv-03625-BLF, 2017 WL 6466264 (N.D. Cal. Dec. 18, 2017)..................................13

*Wilkof v. Caraco Pharm. Labs., Ltd.*,
    No. 09-cv-12830, 2010 U.S. Dist. LEXIS 112768 (E.D. Mich. Oct. 21, 2010).....................45

*Willis v. Big Lots, Inc.*,
    No. 2:12-cv-604, 2016 U.S. Dist. LEXIS 8028 (S.D. Ohio Jan. 21, 2016).......................29, 41

*Winslow v. BancorpSouth, Inc.*,
    No. 3:10-00463238, 2011 U.S. Dist. LEXIS 45559 (M.D. Tenn. Apr. 26,
    2011) ......................................................................................................23, 35

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .........................................................................44

*Zucker v. Quasha*,
    891 F. Supp. 1010 (D.N.J. 1995) ...................................................................13

*Zwick Partners LP v. Quorum Health Corp.*,
    No. 3:16-cv-02475, 2019 U.S. Dist. LEXIS 54810 (M.D. Tenn. Mar. 29,
    2019) ......................................................................................................24

*Zwick Partners, LP v. Quorum Health Corp.*,
    No. 3:16-cv-2475, 2018 U.S. Dist. LEXIS 97942 (M.D. Tenn. Apr. 19, 2018) ............. *passim*

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    § 77k(a) ......................................................................................................6
    §77z-2(b)(2)(D)..............................................................................................20

Exchange Act ................................................................................ *passim*

Exchange Act
    §10(b) and 20(a)..........................................................................................5
    §20(a) ......................................................................................................45, 46

Federal Rule of Civil Procedure 8(a) .........................................................................6, 14

4851-6949-8295.v1

FRCP Rule 9(b).................................................................................................................13

4851-6949-8295.v1

## I.   INTRODUCTION

Plaintiffs Deidre Terry, Charles Clowdis, and Bryan K. Robbins (collectively, "Plaintiffs") respectfully submit this omnibus memorandum in opposition to the USX Defendants'[1] and Underwriter Defendants'[2] respective motions to dismiss.[3] ECF Nos. 72, 73.

This case involves the second IPO in June 2018 of a trucking company that is still controlled by its founding families – the Fullers and the Quinns. The IPO was largely undertaken to pay-off significant high-interest debt amounting to almost $200 million as a result of the Company's leveraged buyout more than ten years earlier. ¶3. The approximately $245 million in IPO proceeds were also designed to pay $26 million to co-founder and defendant Max Fuller and other related parties, as well as millions to other creditors, including an affiliate of Wells Fargo Securities, LLC, an underwriter of USX's IPO. ¶¶3, 51.

At the time of the IPO, USX was facing an uphill battle with the lowest margins of any public trucking company, and improving the Company's operating ratio was critical to USX's profitability and success as a public company. ¶4. In order to attract investors, USX's Offering Documents represented that the Company already had the tools to succeed long-term: "We believe our scale, management team and continued roll-out of tactical operational improvements, as well as our mix of over-the road ["OTR"], dedicated and brokerage services, position [USX] for long-term success in our industry." ¶4. Defendants also assured investors that three initiatives had already improved the Company's operating metrics: (i) load planning in order to maximize utilization of

---

[1]   The "USX Defendants" include U.S. Xpress Enterprises, Inc. ("USX" or the "Company"), Eric Fuller, Eric Peterson, Jason Grear, Max Fuller, and Lisa Quinn Pate.

[2]   The "Underwriters" or "Underwriter Defendants" include Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC, Wells Fargo Securities, LLC, Stephens Inc.; WR Securities LLC, and Stifel, Nicolaus & Company, Inc.

[3]   All terms not otherwise defined herein have the same meaning as defined in the Lead Plaintiff's Complaint for Violation of the Federal Securities Laws (ECF No. 57).

- 1 -

drivers' available hours; (ii) fleet management involving proactive interactions with drivers to anticipate and fix issues such as home time planning and load scheduling purportedly resulting in less driver turnover; and (iii) customer service to drive knowledge of specific markets to improve equipment utilization, driver satisfaction and network balance. ¶¶7, 105. In addition, the Offering Documents assured investors that USX had maintenance programs in place to reduce downtown time for all tractors and reduce maintenance costs for older tractors. ¶¶7, 105. Further, the Offering Documents represented that USX had "implemented driver pay increases" to address the industry wide driver shortage and warned of potential risks to USX's earnings as a result of high deductibles on insurance claims. ¶¶9, 117.

The Offering Documents were materially false and misleading in violation of Section 11 of the Securities Act of 1933 (the "Securities Act"). As detailed in the Complaint, confidential witnesses' accounts along with USX's own belated admissions demonstrate that the Company was cutting corners to temporarily boost its profitability leading up to the IPO. In contrast to what the Offering Documents represented to investors regarding driver retention: (i) USX did not have in place compensation packages sufficient to hire and retain quality truck drivers to meet demand; (ii) USX had not increased driver pay commensurate with the market wages for truck drivers which slowed the pace of hiring and hindered the retention of drivers; (iii) USX's cost per mile for driver wages and independent contractors was exceeding the Company's internal expectations; and (iv) USX's purported "transformation" and "driver-centric" initiatives did not improve load planning or truck maintenance resulting in upset drivers and poor driver retention rates. ¶¶69-79. Likewise, USX was unable to "priortiz[e] growth in dedicated contract services" as represented in the Offering Documents because a shortage of drivers for trucks was negatively impacting USX's dedicated division (multi-year contracts involving multiple drivers), which forced USX to reallocate OTR division (short-term or one-off contracts at higher prices) drivers (at an increased cost) to drive

- 2 -

dedicated routes – a common practice prior to and after the IPO which caused underperformance in OTR. ¶¶80-90. Further, account shipping patterns had already been negatively impacted, including those of USX's largest customer Walmart, adversely impacting utilization as well as driver retention and hiring. ¶¶80-83. In addition, USX's driver safety initiatives were inadequate and lagged behind its peers resulting in riskier drivers and a poorly maintained fleet and, as a result, increased exposure to liability claims when the Company's insurance coverage was inadequate. ¶¶93-101.

It is telling that Defendants largely seek dismissal of Plaintiffs' negligence-based Securities Act claims by erroneously advocating for a heightened pleading standard. Compliance with Rule 8 is all that is required and is easily met here. Nor can Defendants escape liability by recasting the material omissions here as forward-looking, opinion or mere optimism. Given the true state of USX at the time of the IPO (and later), Defendants' omissions and misrepresentations are all actionable.

In addition to Plaintiffs' claims under the Securities Act for negligent misrepresentations in the IPO Offering Documents, the Complaint alleges that USX, its CEO Eric Fuller (son of Max Fuller) and its CFO Eric Peterson committed securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") by deceiving investors with their representations in the Offering Documents as well as subsequent misrepresentations in August and September 2018 regarding the "success" of the Company's initiatives, representations that "there have been no material changes from the risk factors disclosed in the Prospectus," and that "strong utilization was impacted by the over the road division's support of dedicated accounts during the quarter," which could be resolved via "negotiations with a few different customers." ¶¶128-29, 131-133, 137.[4] As with the Offering Documents, these statements were materially false and misleading

---

[4] The Complaint's principal claims include alleged violations of Section 11 of the Securities Act against USX, Eric Fuller, Eric Peterson, Max Fuller, Jason Grear, Lisa Quinn Pate, and the Underwriters (collectively, the "Securities Act Defendants"), and alleged violations of Section 10(b) of the Exchange Act against USX, Eric Fuller, and Eric Peterson (collectively, the "Exchange Act Defendants"). The Complaint also alleges control-person liability claims.

- 3 -

and/or failed to disclose that (i) USX did not have compensation packages, incentives, or working conditions sufficient to hire and retain quality truck drivers to meet the demand for its services; (ii) USX's "driver-centric" initiatives did not improve load planning or truck maintenance contributing to poor driver retention rates; (iii) a shortage of drivers was negatively impacting the dedicated division and forcing the Company to reallocate OTR drivers (at an increased cost) to drive dedicated routes; (iv) certain account shipping patterns including at USX's largest customer Walmart had already been negatively impacted, adversely impacting driver retention and hiring; (v) USX's cost per mile for driver wages and independent contractors was exceeding the Company's internal expectations; and (vi) USX's insurance coverage was not symmetrical with USX's overall credit and earnings profile and leverage and the risks USX warned might occur had already come to pass and were negatively impacting USX's operations and increasing the Company's exposure to liability claims. ¶142.

Not until November 1, 2018, less than five months after the Offering, was USX forced to reveal that its initiatives and transformation had not been successful. Defendants admitted that the OTR division had supported the dedicated division, which continued to "adversely impact[]" the OTR division's utilization. ¶156. Defendants also admitted that USX's "rates, driver wages and independent contractor costs are all higher than expectations" and performance was lower because of recruiting levels. ¶158. Similarly, insurance claims were the highest ever and risks they had taken "before with the $10 million on a claim probably wasn't really symmetrical with our overall credit and earnings profile and leverage." ¶¶159-60. On this news, the price of USX's common stock plummeted 30% on unusually high trading volume, from a close of $10.14 per share on November 1, 2018, to a close of $7.10 per share on November 2, 2018 (¶¶16, 161) and representing a 56% discount to the IPO price. ¶4.

- 4 -

Contrary to the Exchange Act Defendants' contentions, when considered holistically the Complaint's allegations are more than sufficient to allege a strong inference of scienter with respect to these claims. The litany of facts pled include (i) the divergence between internal USX reports and the public misrepresentations; (ii) admissions that Defendants disregarded the most current information available before they made their statements; (iii) Defendants Eric Fuller and Eric Peterson's hands-on role in the core operations of USX; (iv) the extremely close temporal proximity between Defendants' misrepresentations and the disclosure of the truth; (v) the financial benefits realized as a result of the alleged fraud; and (vi) the suspicious departures of key employees.

Because Plaintiffs have alleged underlying violations of the Securities Act and Exchange Act, Defendants' challenges to their control person liability claims also fail. In short, Plaintiffs have sufficiently stated claims under Sections 11 and 15 of the Securities Act and Section 10(b) and 20(a) of the Exchange Act. Accordingly, and as detailed further herein, the Court should deny the motions to dismiss.

## II.     STANDARD OF REVIEW

A court ruling on a motion to dismiss pursuant to Rule 12(b)(6) must "accept all factual allegations in the complaint as true," and construe those allegations in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). To survive, a complaint need only "contain sufficient factual matter . . . to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage."). This determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense," *Ashcroft*, 556 U.S. at 679, and "[a] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable,

- 5 -

and 'that a recovery is very remote and unlikely,'" *Twombly*, 550 U.S. at 556. Defendants' motions should be denied because the Complaint satisfies these standards.

## III. THE SECTION 11 CLAIMS SATISFY THE NOTICE PLEADING STANDARD

Section 11 of the Securities Act allows a purchaser of stock to sue for damages when a registration statement "either 'contain[s] an untrue statement of a material fact' or 'omit[s] to state a material fact . . . necessary to make the statements therein not misleading.'" *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 178 (2015) ("*Omnicare*") (quoting 15 U.S.C. § 77k(a)). A fact is material when a "reasonable investor would have viewed the nondisclosed information as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 28 (2011) (internal quotation marks omitted). Once a material misstatement is shown, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). A "buyer need not prove . . . that the issuer acted with any intent to deceive or defraud." *Omnicare*, 575 U.S. at 179.

"Because claims under Sections 11 & 12(a)(2) need not include allegations of fraud, 'this is an ordinary notice pleading case, subject only to the 'short and plain statement' requirements of Federal Rule of Civil Procedure 8(a).'" *See Sohol v. Yan*, No. 1:15-cv-00393, 2016 U.S. Dist. LEXIS 56049, at \*20 (N.D. Ohio Apr. 27, 2016).[5]

---

[5] Defendants err in accusing Plaintiffs of puzzle-pleading (USX Br. at 13; UW Br. at 3). Plaintiffs have specifically identified each statement alleged to be materially false and misleading and concisely alleged the basis for each statement's falsity, which is all that is required. *See, e.g.*, *Laborers' Local #231 Pension Fund v. PharMerica Corp.*, No. 3:18-CV-109-RGJ, 2019 U.S. Dist. LEXIS 162763, at \*28 n.3 (W.D. Ky. Sept. 23, 2019) (rejecting puzzle pleading defense even where "[c]omplaint is no pinnacle of precision"); *City of Pontiac Gen. Emps. Ret. Sys. v. Stryker Corp.*, No. 1:10-CV-520, 2011 U.S. Dist. LEXIS 72362, at \*23-\*25 (W.D. Mich. July 6, 2011) (rejecting puzzle pleading argument where plaintiffs relied on a single set of reasons to explain why various statements were false). Defendants' apparent dislike of the Complaint's structure is not a basis for what other courts have referred to as the "drastic step of dismissal based on the form of the

- 6 -

**A. The Complaint Sufficiently Alleges that the Offering Documents Were Materially False and Misleading**

The law is clear: corporate actors must "provide complete and non-misleading information with respect to the subjects on which [they] undertake[] to speak." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001). "[A] company may choose silence or speech elaborated by the factual basis as then known – but it may not choose half-truths." *Id*; *see also City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 673 (6th Cir. 2005) ("Corporate officers are not required to speak, but once they do, they must be truthful if their comments are material to investors' decisionmaking.").[6]

When a statement is made misleading by omission, "'[t]he question . . . is not whether a [defendant's] silence can give rise to liability, but whether liability may flow from his decision to speak . . . concerning material details . . . without revealing certain additional known facts necessary to make his statements not misleading.'" *Bridgestone*, 399 F.3d at 670.[7]

---

pleading." *In re CornerStone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1081 (N.D. Cal. 2005). Defendants' reliance on *Primo v. Pacific Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1112 (N.D. Cal. 2013) (USX Br. at 13; UW Br. at 3 n.4), is also unavailing. Unlike here, the plaintiffs in *Primo* offered "lengthy quotes and recitations of the contents of the offering materials and public comments" that "require[d] the reader to guess what particular statements they mean or how those statements were rendered false and misleading." *Id*. at 1112.

[6] The Underwriter Defendants attempt to re-frame the allegations of the Complaint in the context of any absence of a duty to disclose results from a quarter then in progress. UW Br. at 11 n.13. But this is not what Plaintiffs allege. Instead, Plaintiffs' Complaint makes clear that the Securities Act Defendants disregarded the most recent, then-available information to them at the time of the Offering and failed to conduct diligence into the reasonableness of their statements on the various subjects set forth in the Offering Documents.

[7] The Sixth Circuit's commentary on omissions in *J&R Mktg. v. GMC*, 549 F.3d 384, 394 (6th Cir. 2008), relied upon by the USX Defendants (USX Br. at 24) is not at odds with this well-established precedent. Instead, *J&R Mktg*. reaffirmed that a company must disclose additional information "when what it has disclosed would be rendered misleading without that additional information." *Id.* (finding that statement regarding "inextricable link" between GM and GMAC, without more, was not enough to trigger a duty to provide additional information).

- 7 -

The Complaint alleges investors were told in USX's Offering Documents that the Company's purported "Transformation" was paying dividends for USX prior to the IPO in the area of utilization and efficiency, all to the benefit of driver recruitment and retention. ¶54. According to the Company, its "Transformation" helped it maintain relatively stable profitability during the weak truckload market of 2016 and early 2017 and drove significant improvements to profitability during the strong truckload market beginning in the second half of 2017. ¶55. The impact supposedly flowed through to the Company's operating ratio as well, with Defendants pointing to USX 1Q18 financial results in its Offering Documents (showing a 300 basis point improvement in operating ratio over the same quarter, prior year). *Id*. The truth, however, was far different.[8]

### 1. Material Omissions Concerning Issues Plaguing the Company's Driver Workforce and the Ripple Effect Through USX's Operating Ratio

The Offering Documents are littered with statements regarding the adequacy, availability, and mobility of the Company's driver workforce – the purported lifeblood for capitalizing on USX's "Transformation" – including that, *inter alia*: (i) the Company's "fleet management initiatives" implemented in October 2017 (well prior to the IPO) directly resulted in a decline in driver turnover and increased efficiency and driver utilization, with USX seeing "similar results as [it] continued to roll out this program to the rest of [its] fleet" (¶105); (ii) that the Company's supposedly revamped in-house maintenance program "ke[pt] drivers on the road efficiently" (¶110); and (iii) USX had supposedly "implemented driver pay increases" to address an ongoing driver shortage acknowledged in the Offering Documents (¶117), despite claiming earlier in the Offering Documents that the Company was poised to "[c]apitalize on [the] *current favorable truckload environment*" by

---

[8]  The USX Defendants' invocation of the veracity of historical financials (USX Br. at 22) is a red herring. The Complaint alleges that the Offering Documents used those abnormal historical financials to misrepresent the then-existing conditions at the Company and present a skewed vision of the future. *See, e.g.*, ¶¶55-60.

4851-6949-8295.v1

"[s]trategically expand[ing] [USX's] fleet based on expected profitability *and driver availability*" (¶112). Each of these statements was materially false and misleading when made. In fact, USX was unable to adequately recruit drivers because of its low-quality fleet and substandard pay,[9] and the retention initiatives it did institute had the effect of further eroding the Company's already tenuous operating ratio. *See, e.g.*, ¶¶69-79.

The falsity of these statements has been confirmed by several former employees who witnessed and endured the turnover issues firsthand. For example, CW5,[10] a USX Fleet Manager who primarily managed dedicated team driver accounts from late 2016 to April 2018 (and, who by his/her position, was necessarily the "first line of communication with USX drivers" responsible for the "fleet management initiatives" touted in the Offering Documents), confirmed that driver turnover was a significant problem at USX in the years prior to the IPO. ¶71. CW1 and CW2 similarly recalled the high turnover problem, with CW1 discussing the issue in weekly emails and during daily

---

[9]  While the Offering Documents did not repeat verbatim Defendant Eric Fuller's February 13, 2018 statement that "[t]he improved pay levels and benefits for U.S. Xpress team drivers should make them among the best paid in the industry" (¶68), they did tout "driver pay increases to address" the ongoing driver shortage (¶117). The Underwriters' argument that this cannot support a §11 claim solely because it was not repeated in the Prospectus (UW Br. at 7, n.8) is misplaced, particularly as the Sixth Circuit has said "[a] duty to affirmatively disclose 'may arise when there is insider trading, a statute requiring disclosure,' *or, as relevant in this case, 'an inaccurate, incomplete[,] or misleading prior disclosure*.'" *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 471 (6th Cir. 2014) ("*KBC v. Omnicare*") (emphasis added). Indeed, it would be difficult for investors to accept the Offering Documents' driver pay references without regard to Fuller's prior statements.

[10]  The Underwriter Defendants claim that CW5's knowledge is somehow inapplicable to this Action because he/she departed his/her position shortly before the IPO. *See* UW Br. at 9-10. This is not the law. Courts have acknowledged that statements by pre-class period witnesses may be relevant to show defendants knowledge at the start of the period. *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 72 (2d Cir. 2001); *see Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 249 n.13 (3d Cir. 2009) (acknowledging that both post-class period data and pre-class period data can be used to confirm what a defendant should have known during the class period); *Burges v. Bancorpsouth, Inc.*, No. 3:14-cv-1564, 2017 U.S. Dist. LEXIS 169463, at *10-*11 (M.D. Tenn. Oct. 12, 2017) ("It is well established that facts from before the class period are relevant to establish that statements made during the class period were materially false."). That is precisely how the information was used in the Complaint. ¶¶71, 73-76, 85.

operations calls with driver managers and customer service employees. *Id.* CW3, a former USX Fleet Manager who was employed by the Company from 2016 to early 2019 (and thus, at the time of the IPO) attributed the turnover problem to the Company's lower-than-average pay in the industry (despite representations of increased and competitive pay), describing a dire situation where brand new drivers at competitors were making nearly equal wages to USX's best drivers. *Id.* The issues went beyond driver pay, however, with CW5 recalling the widespread truck maintenance problems at USX that caused drivers to complain of extended delays negatively impacting their earnings and truckers taking to the internet to warn fellow drivers of the issues. ¶75. These maintenance issues exacerbated bottlenecks already attributable to the Company's poor load planning, as recalled by CW2. ¶76.

The Complaint alleges that the purported "Transformation" did nothing to fix the Company's primary issues in its most important resource – drivers – and that these longstanding and continued issues were "inconsistent" with the public impressions Defendants created of the successful implementation of "Transformation" as of the IPO. *See In re Quality Sys.*, 865 F.3d 1130, 1143-44 (9th Cir. 2017) ("Similarly, a statement that the company 'anticipates a continuation of its accelerated expansion schedule' when the expansion had already failed was materially misleading."); *Rosenbaum Capital, LLC v. McNulty*, 549 F. Supp. 2d 1185, 1187, 1193 (N.D. Cal. 2008) (statements that "all phases of the integration process are either on target or ahead of plan" were false where "Defendants knew of the problems with the integration"); *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 877, 880-81 (D. Minn. 2007) (statements that the "'[i]ntegration . . . is proceeding according to plan,'" were false given CWs "recount[ing] numerous problems . . . that caused . . . the integration process to not proceed smoothly").

### 2. Misstatements Concerning USX's Decision to Bolster its Lower Margin Dedicated Division at the Detriment of its OTR Segment

At the time of the IPO, the Company was cannibalizing drivers from its OTR driver segment for the benefit of its lower-margin dedicated division, all in an attempt to keep the Company's long-standing dedicated customers' (*e.g.*, Walmart, Dollar Tree, Dollar General, Target, and Kroger) cargo moving in the face of changing account patterns and the loss of a large customer contract. ¶89. The Offering Documents failed to disclose this existing material adverse information, as corroborated by several former Company employees. *See* ¶80 (CW4 describing USX's issues with its Walmart dedicated account, including the shift of dedicated lanes from Texas to Virginia and Louisiana); ¶81 (CW3 describing the Company's shift of 35 OTR drivers to Walmart's dedicated account); ¶83 (CW4 noting that the Company's low wages made it difficult to attract new dedicated drivers so the Company had to reassign higher-paid OTR drivers to work these lower-margin routes). Instead, the Offering Documents represented that USX's strategic goal was to "enlarge" its dedicated division as part of its plan to strengthen the Company when USX needed to grow OTR to obtain improvements in its operating ratio. ¶¶89, 113 (Company sought to "prioritize[e] growth in dedicated contract services"). Defendants failed to disclose that USX had to pay OTR drivers higher sums to satisfy dedicated contractual commitments, thus adversely impacting the Company's operating ratio. ¶89.

Not only did the shift in drivers cut into the already thin margins in the dedicated division, but it also left the OTR division unable to meet its own obligations, as recalled by CW2. ¶84. Compounding the issue, driver shortage left USX unable to capitalize on the rising rate environment in the OTR market, especially in single-run spot market truckloads. ¶85. As a result, USX did not receive the predictable profits from its dedicated routes because of its reliance on costlier OTR drivers, nor could it take advantage of the rising OTR rates. ¶88.

4851-6949-8295.v1

The truth regarding the Company's actions, and the impact on its financials, was ultimately admitted well-after the Offering when, on November 1, 2018, Defendant Eric Fuller referred to the "temporary support of [USX's] dedicated division" as a "headwind" dragging down the Company's utilization. ¶155. "During the quarter, our over the road division supported contractual commitments in our dedicated division, which adversely impacted this division's utilization. *Initially, we thought the support would be reduced toward the beginning of the third quarter. However, it progressively increased* and peaked during the quarter. . . . The [dedicated] division's results continue to be impacted by certain accounts' shipping patterns performing different than expected, *which was first experienced in the second quarter of 2018*." ¶156. Thus, Defendant Eric Fuller's statements make clear that, during the Company's 2Q18 (which necessarily included the June 14, 2018 IPO (*i.e.*, just *two weeks* before quarter end)): (i) the Company was necessarily shifting OTR truckers to dedicated routes to address a driver shortfall; (ii) changes in dedicated account shifting patterns were negatively impacting the division's results; and (iii) the Company *did not* have "increased visibility" into the dedicated division at the time of the IPO allowing it to "commit and invest fleet resources with a more predictable return profile," (¶107) and instead, the division remained in a state of flux.

The Complaint makes clear that, as of the IPO, the Company derived 54% of its revenues from its OTR division, with an additional 33% from dedicated. ¶6. Thus, there can be no doubt that the above-identified false and misleading statements were material. *See In Re Am. Serv. Grp., Inc.*, No. 3:06-0323, 2009 U.S. Dist. LEXIS 28237, at *131-32 (M.D. Tenn. Mar. 30, 2009) (holding that "material omissions about [] actual practices, costs and gross margins during the class period [] are actionable); *Kyrstek v. Ruby Tuesday, Inc*., No. 3:14-cv-01119, 2016 U.S. Dist. LEXIS 43523, at *25

4851-6949-8295.v1

(M.D. Tenn. Mar. 31, 2016) (finding statements presenting "optimistic puffery" while "with[olding] hard information" on negative margins constitutes a material omission).[11]

### 3. Misstatements Concerning the Company's Rising Self-Insurance Risks

The Offering Documents materially misstated the Company's liability exposure stemming from its practice of self-insuring an increasingly risky driver pool. ¶120. At the time of the IPO and continuing until August 31, 2018, the Company was liable for up to $10.0 million per liability event. The deductible for any single occurrence was approximately $5.0 million and USX was responsible for the next $5.0 million of excess coverage – exposure that Defendant Peterson stated on November 1, 2018, was not "symmetrical with [USX's] overall credit and earnings profile and leverage." ¶93.

### B. The Complaint's Section 11 Claims Do Not Sound in Fraud

The Complaint's §11 allegations meet the Federal Rules of Civil Procedure ("FRCP") Rule 8's notice pleading requirements. Contrary to Defendants' contentions, a §11 claim is only subject to FRCP Rule 9(b) ("Rule 9(b)") when it "sounds in fraud." *Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d 935, 948 (6th Cir. 2009); *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,

---

[11] Defendants unpersuasively rely on a trio of cases. UW Br. at 12 n.14. Plaintiffs have provided facts from CWs 2-4 detailing the problems facing USX from within the Company ***at the time of the IPO***. ¶¶80-81, 83-84. This contrasts with *Zucker v. Quasha*, 891 F. Supp. 1010, 1015-16, 1018 (D.N.J. 1995), where the court dismissed plaintiff's claims because the plaintiff failed to identify any contemporaneous facts indicating a fraud, instead relying solely on inferences from subsequent SEC filings. A similar distinction can be made to *Welgus v. TriNet Group, Inc.*, No. 15- cv-03625-BLF, 2017 WL 6466264, at *6 (N.D. Cal. Dec. 18, 2017), where the court dismissed the plaintiff's claims because the complaint was "devoid of allegations regarding who TriNet's risk management personnel were or how those individuals were inexperienced or ineffective at the time that the allegedly false statements were made." *Welgus*, 2017 WL 6466264, at *7. Plaintiffs have expressly identified the challenges facing USX with the statements of CWs from *within* USX at the time of the IPO. The plaintiffs in *Primo* failed to allege any material omission or misleading statement on the plans to develop future applications because the plaintiffs failed to "show anything about the company's intention at the time of the IPO." That is not the case here. Plaintiffs adequately allege Defendants did not have the ability to "commit and invest fleet resources with a more predictable return profile" because of the problems facing the dedicated division described by CWs 2-4. ¶¶80-81, 83-84, 107.

- 13 -

238 F.3d 363, 369 (5th Cir. 2001) (claims that do not sound in fraud "cannot be dismissed for failure to satisfy Rule 9(b)").

Where Securities Act claims are premised on allegations independent of fraud, such as the failure to make a reasonable investigation, the claims do not "sound in fraud." *See In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 938 (M.D. Tenn. 1999) (holding the Rule 9(b) pleading standard inapplicable to claims in which "[p]laintiffs speak in terms of defendants' failure to make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were true"); *accord In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 688 (M.D. Tenn. 2000).

Defendants contend that since the Complaint "employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act" the §11 claims must meet the heightened pleading standard of Rule 9(b). USX Br. at 12. In fact, in addition to carefully segregating the §11 claims from fraud claims, the Complaint expressly disclaims allegations of fraud in connection with the §11 claims. ¶¶2, 188, 197. Such disclaimers suffice to prevent the application Rule 9(b)'s heightened pleading standards. *In Re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 602 n.19 (N.D. Ohio 2004) (§11 claims not governed by Rule 9(b) where plaintiffs "have purposely not premised their claims on any allegations of fraud" by "exclud[ing] any allegation contained [in the Complaint] that could be construed to allege intentional or reckless conduct"); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 341 (S.D.N.Y 2003) (stating "whether Rule 8(a) or 9(b) is triggered turns on the type of claim alleged (*i.e*., the cause of action) rather than the factual allegations on which that claim is based."); *Sirrom*, 84 F. Supp. 2d at 938 (no heightened pleading standard where "plaintiffs' section 11 claims do not mention fraud, except to expressly exclude any allegations which might sound in fraud").

- 14 -

*Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 629 (4th Cir. 2008), at most indicates an intra-circuit conflict as to whether disclaimers of fraud are sufficient on their own to avoid the heightened pleading standard. *Compare id.*, *with FirstEnergy*, 316 F. Supp. 2d at 602. Here, as Defendants admit, the Complaint includes a disclaimer against "any allegation that could be construed as alleging or sounding in fraud or intention or reckless misconduct." And as in *Number Nine¸* the Complaint also segregates out 65 paragraphs relating to scienter for the Exchange Act claims and Plaintiffs do not rely on those allegations to support their Securities Act claim. *In re No. Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1, 12 (D. Mass. 1999). Where there are no allegations of fraud that must be proven to sustain the Securities Act claims, and where those claims have been carefully segregated from fraud-based allegations, there is no basis to subject the claims to Rule 9(b).

As the Complaint's Securities Act claims do not sound in fraud, Defendants' efforts to inject into those claims a scienter requirement (USX Br. at 11; UW Br. at 3) should be disregarded. Even so, Defendants misconstrue the application of FRCP 9(b) to §11 claims. As stated by the Sixth Circuit in *Bondali v. Yum! Brands, Inc*., 620 Fed. App'x 483, 488-89 (6th Cir. 2015), "[f]raud is alleged with particularity by identifying the statements or omissions alleged to be false or misleading and detailing the 'who, what, when, where, and how' of the alleged fraud." Defendants cannot graft a scienter element onto Plaintiffs' Securities Act claims, particularly where it is well-established that scienter and the heightened pleading standards of the PSLRA ***do not apply*** to non-fraud claims. *See In re Envision Healthcare Corp. Sec. Litig.*, No. 3:17-cv-01112, 2019 U.S. Dist. LEXIS 200986, at \*84 (M.D. Tenn. Nov. 19, 2019) ("[P]laintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation."). Even if the heightened pleading standards of Rule 9(b) applied to the Securities Act Claims (which they do not), "Plaintiffs have provided sufficient detail of the alleged scheme and which statements are alleged to be false to allow [D]efendants to

defend the charges"; as such, they have "satisf[ied] the purpose of Rule 9(b)" and their Complaint's §11 claims should be sustained. *Envision*, 2019 U.S. Dist. LEXIS 200986, at *86.

### C. USX's Offering Documents Violated Item 303

The Offering Documents failed to disclose adverse material trends, events and uncertainties that were known or reasonably expected to have a material impact on revenues or income as required by Item 303 of SEC Regulation S-K. *Schuh v. HCA Holdings, Inc.*, 947 F. Supp. 2d 882, 888 (M.D. Tenn. 2013); *Ruby Tuesday, Inc.*, 2016 U.S. Dist. LEXIS 43523, at *24-*25; *see also* ¶¶123-24. Those adverse undisclosed material trends and uncertainties included USX's insufficient pay to its drivers and retention failures, reallocation of drivers to USX's dedicated division and lax driver safety practices. All these negatively impacted USX's financial condition. ¶¶79, 92, 100-01, 123-24. Specifically, Plaintiffs allege:

- Inability to Pay, Hire and Retain Drivers: The Offering Documents did not disclose that, prior to and at the time of the IPO, USX had been unable to pay, hire and retain sufficient numbers of drivers to meet its customers' demands, which negatively impacted the Company's financial condition. ¶¶69-79, 124. For example, as CW3, a former USX Fleet Manager described, USX grossly underpaid its employees and the working conditions were far worse than competitors, exacerbating driver turnover. ¶72. Further, not until September 2018 – three months after the IPO – did USX undertake costly initiatives to increase driver retention such as a scholarship program. ¶139. In contrast to these known trends, the Offering Documents claimed that USX expended "significant resources recruiting a substantial number of drivers" and USX "employ[ed] driver hiring standards" to maximize efficiency. ¶¶104, 118.

- Driver Reallocation: The Offering Documents did not disclose that OTR drivers were reallocated to support the less profitable dedicated division, which contributed to higher costs and higher driver turnover. ¶¶66, 77, 80-92, 124. According to CW2, a former Fleet Manager, this was a "common practice" and exacerbated the driver shortage problem in the Company's OTR division. ¶¶77, 81, 84, 89. These driver shifting practices resulted in a decrease in the dedicated division's "average revenue per tractor per week" and "revenue miles per tractor per mile," while also preventing the Company from taking advantage of rising rates in the OTR market. ¶¶88, 92. This practice was contrary to the Offering Documents' representation that the Company's Brokerage segment was able to fill excess orders via third parties. ¶¶89-90, 123-24.

- Driver Safety and Liability Exposure: The Offering Documents did not disclose the drastic increase in the Company's exposure to liability claims as a result of USX's lax driver safety practices. ¶¶93-101, 123-24. Unbeknownst to investors USX

- 16 -

increased its exposure to insurance claims by sending poorly maintained trucks to the road while also self-insuring itself with high deductible rates. ¶¶93-94. In addition, USX continued to hire inexperienced drivers, failed to implement forward-facing event records in a timely manner, and utilized less-accurate urine drug testing when hair-follicle testing was available. ¶¶95-98. The impact of these practices, which inevitably resulted in more claims, was not known to investors until November 2018 – after the IPO – when USX's insurance costs increased due to multiple large liability events that the Company was required to self-insure. ¶101. Only recently did USX admit the known importance of proper safety practices indicating that USX and its management had "***been working on*** [the very safety initiatives not undertaken at the time of the IPO] ***over the last two years,***" but only recently implemented them.[12]

These misrepresentations violate Item 303. In *HCA*, Judge Sharp relied on the 11th Circuit's explanation of Item 303:

> "If there has been an important change in your company's business or environment that significantly or materially decreases the predictive value of your reported results, explain this change in the prospectus. The obvious focus is on preventing the latest reported results from misleading potential investors, thereby promoting a more accurate picture of the registrant's future prospects."

947 F. Supp. 2d at 892-93.

The allegations here are adequate because it "suffices for present purposes that Plaintiffs allege (. . .based upon some facts) that there was a downward trend of which [Defendants] had knowledge. The details can be fleshed out later." *HCA*, 947 F. Supp. 2d at 891.

The Securities Act Defendants' misinterpret the law in this Circuit regarding pleading requirements for a claim of negligence. In rejecting the actual knowledge standard urged by the §11 Defendants here (USX Br. at 23-24; UW Br. at 15), *HCA* held that *J&R Marketing* does not "impos[e] a heightened pleading standard with regard to knowledge" for purposes of Item 303. *Id*. at 887. "While the Sixth Circuit stated in that case that pleading a trend was 'knowable' was not sufficient, it also made clear that 'the text of Item 303' which sets forth the required disclosures 'only requires known trends or known demands, commitments, events or uncertainties.'" *Id*. Here,

---

[12] *See* USX 4Q19 Earnings Call Tr., available at https://finance.yahoo.com/news/edited-transcript-usx-earnings-conference-123823096.html.

- 17 -

Plaintiffs do not plead that these trends were merely "knowable"; rather, Plaintiffs plead specific details from which this Court can infer knowledge under a notice pleading standard. ¶¶10-11, 14-15, 53, 71, 77, 90-97, 100, 105.

As an initial matter, driver pay, retention, routes and safety are all integral to USX and are topics which USX and its management frequently discussed, signaling their knowledge of the topics on which they spoke. ¶¶59-62, 117. Given the gravity of the driver shortage and dismal pay rates, the lengths to which USX went to reallocate drivers, and the inadequacy of the Company's safety practices, when USX "undertook to speak about [its turnover rate, hiring and safety practices,] as an important component of the Company . . . they had an obligation to provide complete and not misleading information." *Ruby Tuesday*, 2016 U.S. Dist. LEXIS 43523, at *25. Indeed, according to CW1 – an employee tenured at USX for 10 years – driver turnover was such an important issue to USX it was internally dubbed a wildly important goal. ¶71. CW2 – a former USX Fleet Manager – confirmed that drivers were often arbitrarily reassigned to different divisions shortly after being hired. ¶77. As to insurance liability, in February 2019, Chief Marketing Officer Justin Harness admitted that since August 2017, the Company's drivers were not being properly trained to perform at the requisite level of expertise, thereby increasing their likelihood of causing liability events. ¶98.

The Underwriter Defendants' thinly veiled materiality or truth on the market challenge that USX disclosed its adverse trends is not a proper basis for dismissal at the pleading stage. UW Br. at 16; *see KBC v. Omnicare*, 769 F.3d at 472 (cautioning against deciding materiality, a fact question, at the motion to dismiss stage); *Zwick Partners, LP v. Quorum Health Corp*., No. 3:16-cv-2475, 2018 U.S. Dist. LEXIS 97942, at *29 (M.D. Tenn. Apr. 19, 2018) ("Because [truth-on-the-market] argument is intensely fact-specific, it is not appropriate for the Court to consider it on these Motions

to Dismiss.").[13]  The purported "disclosures" the Securities Act Defendants rely on regarding USX's safety practices and driver retention neither refute as a matter of law the impression created by the Offering Documents as to the adverse trends then impacting USX, nor did they "provide complete and non-misleading information with respect to the subjects on which [they] under[took] to speak." *Envision*, 2019 U.S. Dist. LEXIS 200986, at *29.

The Underwriter Defendants concede that the Offering Documents failed to disclose the impact of USX's driver reallocation practices.  Instead, they contend that this trend was too short "as a matter of law."  UW Br. at 16.  Defendants' reliance on out-of-circuit cases to assert that the adverse trend arising from USX's driver reallocation practices is too short "as a matter of law" falls flat.  UW Br. at 16 n.19.  First, there is no bright line rule that a two-month period prior to the IPO is too short to constitute a trend for purposes of the disclosures required by Item 303.  *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 116, 118-19, 122 (2d Cir. 2012) (trend occurring "in the **weeks** leading up to the Secondary Offering"); *HCA*, 947 F. Supp. 2d at 892 (expressly rejecting the *Blackmoss Invs. Inc. v. ACA Capital Holdings* rule cited by Underwriter Defendants here).  Second, unlike the trend in *Blackmoss*, which definitively existed for no more than two months, the trend here may have existed longer.  *Blackmoss*, No. 07 Civ. 10528, 2010 U.S. Dist. LEXIS 2899, at *26-*27 (S.D.N.Y. Jan. 12, 2010).[14]  Plaintiffs did not plead that the

---

[13]  The "detailed disclosures" highlighted by Underwriter Defendants are by no means detailed.  For example, while the Offering Documents may have disclosed that it experienced difficulty retaining sufficient numbers of qualified drivers, they failed to disclose that USX's OTR contracts were suffering from the reallocation of its drivers to the dedicated division.  UW's Br. at 5; ¶88.  While the Offering Documents represent that USX had only recently begun to implement forward-looking event loggers, in context, they made this representation to promote USX's "modern and well-maintained fleet"; when, USX's truck fleet was outdated, poorly maintained and increased liability exposure.  UW Br. at 14; ¶75.  As alleged, the impact of all these trends were likely to materially affect the Company's financial condition.  ¶¶79, 92, 100-01, 123-24.

[14]  The remaining cases cited by Underwriter Defendants are similarly inapposite.  As Judge Sharp explained in *HCA* while rejecting the defendants' reliance on *Blackmoss*, "what may not constitute a trend in one industry may signal a trend in another."  *HCA*, 947 F. Supp. 2d at 891.  For this reason,

- 19 -

reallocation services began in summer 2018; rather, the reallocation peaked in 3Q18. ¶¶13, 81, 89. Multiple confidential witnesses who were employed by USX for numerous years, dating back to 2013, confirmed that USX's reallocation of drivers from the OTR to dedicated division was frequent and common practice. ¶¶71, 77. Plaintiffs have alleged more than enough. *See HCA*, 947 F. Supp. 2d at 891 ("[I]n the absence of discovery, Plaintiffs cannot be expected to know exactly what may or may not have happened at [the Company] to cause the downward trend (if there was one) as 'Plaintiffs' pleadings are not drafted by clairvoyants[.]'"). Third, the duration of the trend does not dictate whether the trend or uncertainty requires disclosure; rather, the inquiry is whether that trend is likely to impact the company's financial condition. *See id*. at 892. This is precisely what is alleged here. ¶¶69, 77, 79, 80-81, 83, 92-101, 123.

## IV. DEFENDANTS' STATEMENTS ARE NOT IMMUNIZED AND ARE OTHERWISE ACTIONABLE

### A. The Challenged Statements Are Not Forward-Looking

Defendants wrongly contend that the statements in the Complaint are forward-looking and protected by either the bespeaks caution doctrine or the PSLRA's safe harbor. USX Br. at 14-19; UW Br. at 3. As an initial matter, the PSLRA safe harbor ***does not apply*** to Plaintiffs' §11 claims related to the Offering Documents where the statute expressly excludes from safe harbor protections any statements "made in connection with an initial public offering" of securities. 15 U.S.C. §77z-2(b)(2)(D). Statements in a "registration statement and prospectus are 'made in connection with an initial public offering,' 15 U.S.C. §77z-2(b)(2)(D), and the PSLRA safe harbor does not apply to them." *In re Musicmaker.com Sec. Litig.*, No. CV 00-2018 CAS (MANx), 2001 U.S. Dist. LEXIS

---

the Underwriter Defendants' reliance on out-of-circuit cases concerning different industries fails. *See Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1116 (S.D. Cal. 2012) (spinal implant company); *In re Thornburg Mortg. Sec. Litig.*, 824 F. Supp. 2d 1214, 1222 (D.N.M. 2011) (residential-mortgage lender); *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1193, 1202-03 (10th Cir. 2013) (same); *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 181, 206 (D. Conn. 2014) (personal health products).

- 20 -

25118, at \*44 n.7 (C.D. Cal. June 4, 2001). An "initial public offering," is simply "an issuer's first offering of equity securities pursuant to a registration statement." §3:31. *Misleading statement – Rules and statute relating to misleading statements – Section 27A of the Securities Act, 5 Disclosure & Remedies Under the Sec. Laws § 3:31.* The shares offered meet this definition, rendering the safe harbor provision inapplicable.

Additionally, most of the challenged statements are alleged to be misleading due to the description of current and historical facts about USX, meaning they fall outside of the protections claimed by Defendants. For example, the alleged false and misleading statements from the Offering Documents state that "the early results of our load planning . . . have begun to be reflected in our operating metrics" (¶105); "[b]y retaining control over significantly more freight . . . we have more choices for optimizing the utilization" (¶108); "[w]e have implemented driver pay increases to address this shortage" (¶116); and USX spends "significant resources recruiting a substantial number of drivers in order to operate existing revenue equipment" (¶118). Post-IPO statements such as, "[t]o achieve our goal, we changed the Company's culture and recruited the expertise necessary" (¶126); "but the 3.5% went into our dedicated rate per mile and that is already effective in our numbers" (¶133); and, "the drivers have received about a 15% increase on year-over-year basis" (¶140) are statements of present or past conditions.

Defendants' attempt to transform statements of then-existing facts into forward-looking statements should be rejected. USX Br. at 15. The Offering Documents listed USX's current "competitive strengths" (¶107), and those are what Plaintiffs allege to be false, not the following pages of management's plans for tapping those strengths. *See supra.*

Similarly, Defendants' attempt to parse a few forward-looking tag lines and words is a red herring (USX Br. at 15, 17-18). The statements, viewed in context, are statements of present or historical fact which "can be analyzed discreetly from forward-looking statements." *Dougherty v.*

- 21 -

*Esperion Therapeutics, Inc.*, 905 F.3d 971, 984 (6th Cir. 2018).  For example, the statement on August 2, 2018 that "we remain optimistic as we continue to execute our strategy" was immediately followed by "[o]f note, we experienced improving rates and volumes" and "we are continuing to focus on our driver centric initiatives." ¶127.  Such "mixed" statements are not afforded safe harbor or bespeaks caution protection.  *In re EveryWare Global, Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 856 (S.D. Ohio 2016) (finding statements about company's goals and projections supported by facts about "then-current conditions" not protected by safe harbor).[15]

*Second*, both the bespeaks caution doctrine and the safe harbor are inapplicable to the numerous ***omissions*** alleged in the Complaint.  *Helwig*, 251 F.3d at 560-61 (although "forward-looking statements may contain soft information, they do not themselves constitute soft information" and if such statements were afforded protection, "a company could offer a patchwork of honesty and omission.  This proposition is untenable, however, both as a matter of policy and precedent."); *Galestan v. Onemain Holdings, Inc.*, 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018) ("the PSLRA safe harbor . . . [does not] protect[] material omissions").

*Third*, neither the challenged statements in the Offering Documents nor those that followed the IPO (discussed below) were accompanied by meaningful cautionary language.  USX Br. at 15-16, 18-19.  Cautionary language cannot, as here, be "boilerplate[,]" lacking "substantive and tailored" information, or inconsistent with "the historical facts when the statements were made." *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 912 (M.D. Tenn. 2019); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired").  Defendants cannot invoke bespeaks caution or the

---

[15]    *Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07 CIV. 0976 (LAP), 2008 U.S. Dist. LEXIS 76670 (S.D.N.Y. Sept. 30, 2008) is inapposite.  USX Br. at 15.  In *Globalstar*, the "fact" about the then-current conditions of the company came from a third-party report and a study that occurred after the IPO (*Id*. at *45-46) not, as here, facts from CWs and facts from the prior to and concurrent with the IPO.

- 22 -

safe harbor because the purported cautionary language is meaningless where it "portend[s] the future, but did not alert investors about the conditions that then existed." *Winslow v. BancorpSouth, Inc.*, No. 3:10-00463238, 2011 U.S. Dist. LEXIS 45559, at *48-*49 (M.D. Tenn. Apr. 26, 2011); *Envision*, 2019 U.S. Dist. LEXIS 200986, at *50-*51 ("If a company were to warn of the potential deterioration of one line of business, when in fact it was established that that line of business had already deteriorated, then . . . its cautionary language would be inadequate to meet the safe harbor standard."). The Complaint clearly states, for example, that Defendants' purported warning that there may be "an imbalance between our capacity and our customers' freight demand" (USX Br. at 16) had already occurred at the time of the Offering Documents, making such warnings themselves false and misleading. *See, e.g.*, ¶¶80-90 (explaining the then-current situation of how low-margin dedicated routes were cannibalizing the OTR segment). As "'a matter of policy and precedent,' false cautionary language cannot immunize defendants' misconduct." *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, No. 3:09-00882, 2011 U.S. Dist. LEXIS 35661, at *130 (M.D. Tenn. Mar. 31, 2011) (citing *Helwig*, 251 F.3d at 560-61); *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 304-05 (S.D.N.Y. 2013) ("cautionary language that is misleading in light of historical fact cannot be meaningful under the statute.").

*Fourth*, whether cautionary language is "sufficiently meaningful" often raises "questions of fact that are inappropriate for determination on [a] [m]otion to dismiss." *Prison Realty*, 117 F. Supp. 2d at 690; *Envision*, 2019 U.S. Dist. LEXIS 200986, at *51; *Beach v. Healthways, Inc.*, No. 3:08-0569, 2009 U.S. Dist. LEXIS 17809, at *12 (M.D. Tenn. Mar. 9, 2009).[16] Thus, neither the bespeaks caution doctrine nor the PSLRA's safe harbor shields Defendants.

---

[16] Defendants' reliance on *Zwick* (USX Br. at 18) is misplaced. As noted in *Weiner v. Tivity Health*, for cautionary language to be meaningful it must be "comprehensive and tailored. . . [and] changed over time to address new risks." No. 3:17-cv-01469, 2019 U.S. Dist. LEXIS 86237, at *3 (M.D. Tenn. May 22, 2019) (distinguishing *Zwick*). Here, not only was the cautionary language meaningless because the risks had ***already*** come to pass, but as pointed out by Defendants

## B. The Challenged Statements Are Not Protected Opinion Statements

Defendants wrongly contend that certain alleged false statements are non-actionable opinions. USX Br. at 19-21; UW Br. at 3. But prefacing statements with "we believe" does not render them inactionable. *Omnicare*, 575 U.S. at 192-93.[17] Moreover, opinion statements ***are*** actionable where, like here, they are not genuinely held, or if they omit facts rendering them misleading. *Id.* at 1326, 1328-32; *See also Zwick*, 2018 U.S. Dist. LEXIS 97942, at \*13 ("An opinion statement may also become actionable if it is paired with a sufficiently material omission that makes the statement misleading."); *Envision*, 2019 U.S. Dist. LEXIS 200986, at \*39-\*40 ("Whether stated as an opinion or fact, a reasonable person could view the statements regarding the drivers of success as misleading for omitting information regarding out-of-network-billing as a factor driving revenue.") (collecting cases).

Here, the Complaint adequately alleges Defendants' purported "beliefs" about driver retention and hiring were untrue and not truly held, USX's ability to "prioritz[e] growth in dedicated contract services," and the Company's insurance coverage were misleading because they omitted material information regarding the then-current issues on those matters. *See* Section III.A *supra*.

---

themselves, the language did not change for the post-IPO statements. USX Br. at 18. Indeed, the cautionary statements at issue in *Zwick* "consistently provided comprehensive and tailored warnings, which changed over time to address new risks as the spinoff developed, and were the antithesis of 'generic' warnings." *Zwick Partners LP v. Quorum Health Corp.*, No. 3:16-cv-02475, 2019 U.S. Dist. LEXIS 54810, at \*27 (M.D. Tenn. Mar. 29, 2019).

[17] Defendants contend that numerous statements are inactionable opinion statements (USX Br. at 19), but the majority of the cited statements contain no opinion language and are plainly pure statements of fact. *See, e.g.*, ¶117 ("[w]e have implemented driver pay increases to address this shortage"); ¶130 ("[t]he brokerage segment continues to provide additional selectively for the Company's assets to optimize yield while at the same time offering more capacity solutions to our customers"); ¶140 ("we're constantly giving increases in conjunction with the customer"); ¶133 ("And so those negotiations are still happing, but the 3.5% went into our dedicated rate per mile and that is already effective in our numbers on a go-forward basis."). *Envision*, 2019 U.S. Dist. LEXIS 200986, at \*37-\*38 ("As an initial matter, the Court notes that not all of the statements are couched as statements of opinion. Several of the statements raised by Plaintiffs state unequivocally the reasons for Envision's growth.").

- 24 -

Defendants attempt to discredit certain allegations within the Complaint by calling them "vague and unsubstantiated statements from a handful of" CWs which simply amount to "some 'facts' [that] cut[] the other way." USX Br. at 20 (quoting *Omnicare*, 575 U.S. at 189). Not so; the CWs detail specific facts regarding the Company's inadequate recruitment and retention initiatives and cannibalization of the OTR division, facts that contradict the state of business operations that the Company publicly conveyed in the Offering Documents.[18] ¶¶71-92. When viewed in a light most favorable to Plaintiffs, these allegations indicate that the speakers did not hold the opinion they expressed because this "insanely high" turnover rate and inability to maintain equipment or efficient driver schedules would have been known to Defendants and would make such an opinion baseless. *Zwick*, 2018 U.S. Dist. LEXIS 97942, at \*14-\*18.

### C. The Challenged Statements Are Not Corporate Optimism

Defendants are not availed by incanting the words "optimism" and "puffery[.]" USX Br. at 21-22; UW Br. at 4. Even an initial look at these statements reveal that they are specific factual statements, not the "mere corporate puffery or statements of optimism" that Defendants claim them to be. Unlike in *In re Ford Motor Co. Sec. Litig.*, where the statements at issue were general claims of commitment to quality (381 F.3d 563, 570 (6th Cir. 2004)), the statements challenged here are objectively verifiable statements of fact. *See Bridgestone*, 399 F. 3d at 671-73; *Grae v. Corr. Corp. of Am.*, No. 3:16-cv-2267, 2017 U.S. Dist. LEXIS 207475, at \*44-\*49 (M.D. Tenn. Dec. 18, 2017).

Defendants attempt to isolate statements, or even portions of statements, to create a seemingly vague and optimistic snippet of corporate puffery, however, as outlined above and in Defendants' own motion, context matters when analyzing materiality. USX Br. at 21. For example,

---

[18] For example, CW1 observed regular failures to meet turnover goals and alleges that these failures were regularly discussed in weekly emails sent to employees. ¶71. Similarly, CW5, a Fleet Manger who managed dedicated driver accounts from late 2016 to April 2018, stated that low pay rates lead to lax hiring requirements resulting in hiring inexperienced drivers. ¶¶71, 73.

4851-6949-8295.v1

Defendants pull several sentence fragments such as "grow our revenue base" among others from ¶112 of the Complaint and claim corporate optimism. The complete statement however, is "[g]row our revenue base prudently with a focus on dedicated contract services and brokerage by cross-selling our services with existing customers and pursuing new customer opportunities." ¶112. Although "grow our revenue base" may seem optimistic in nature, when coupled with the following lines, the statement creates a clear outline of the means by which USX is effecting that goal and thus the statement includes within it, a statement of fact, not to be confused with goal itself. *Omnicare*, 575 U.S. at 185-86 ("some sentences that begin with opinion words . . . contain embedded statements of fact" . . . "Accordingly, liability under §11's false statement provision would follow . . . not only if the speaker did not hold the belief she professed but also if the supporting fact she supplied were untrue"). Given that USX was unable to prioritize growth in dedicated contract services because a shortage of drivers was negatively impacting USX's dedicated division, forcing USX to reallocate OTR drivers to drive dedicated routes, the underlying fact used to support the claimed corporate optimism was in fact, false and materially misleading. ¶¶83-86, 112-113, 122. This need to shift drivers from OTR to dedicated routes was common practice since at least 2013 and, thus, known to Defendants. ¶76.

By treating each individual assertion in isolation, Defendants' assertions for each of the sentence fragments pulled from ¶112 of the Complaint as well as ¶105 and ¶113, take the exact approach that the Sixth Circuit has held is improper. Statements "must not be assessed in a vacuum (*i.e.*, by plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently 'vague' so as to constitute puffery)." *Bridgestone*, 399 F.3d at 672. In fact, ¶113 of the Complaint includes an almost identical factual statement regarding prioritizing growth in dedicated contract services as ¶112. When looked at holistically as is required by *Bridgestone*, the alleged misstatements would not be viewed by a reasonable investor as mere corporate optimism

because the statements indicate a basis for those supposed optimism or goals that are objectively verifiable facts. *Bridgestone*, 399 F.3d at 671-72. Such fact-based contentions are inappropriate for resolution at this stage. *Prison Realty*, 117 F. Supp. 2d at 690.

## V. DEFENDANTS VIOLATED SECTION 10(b) OF THE EXCHANGE ACT

### A. USX, Its CEO and CFO's Misrepresentations After the IPO Were Materially False and Misleading in Violation of Section 10(b)

Plaintiffs allege that the Exchange Act Defendants – USX, CEO Eric Fuller and CFO Eric Patterson – violated the anti-fraud provisions of the Exchange Act when they issued materially false and misleading statements regarding, *inter alia*: (i) the supposed historical impact of the purported "Transformation," including its "early success"; (ii) USX's ability to withstand then-current trends in the driver retention and hiring space and the supposedly minimal impact that the shift of OTR drivers to dedicated accounts had on the Company, including the need to pay higher wages to these drivers to service the lower-margin dedicated routes; (iii) USX's supposed rate adjustment to address changes in shipping patterns among the Company's customers; and (iv) the Brokerage division's ability to allow the Company to meet its capacity requirements. ¶¶126-31, 133-37, 140-41. As set forth herein, these statements were each made with the requisite scienter and are otherwise actionable under Section 10(b).

### 1. Misstatements Concerning the Company's Driver Workforce

In the wake of the IPO, the Exchange Act Defendants sought to paint the Company's driver workforce, supposedly spurred on by USX's "Transformation," as a strength, claiming "early success[es]" from USX's initiatives targeted at increasing driver retention and asset utilization. ¶126. More importantly, the Exchange Act Defendants downplayed the impact of industry-wide driver supply challenges, claiming that they "expect[ed] no catalyst over the near term that would negatively impact current trends" related to improved rates and volumes (¶127) despite

acknowledging that the "difficult conditions [] ha[d] created a significant professional driver supply challenge for the broader industry. ¶136.

Like the similar statements in the Offering Documents, these statements (¶¶126-27, 133-36, 140-41) regarding the Company's most important asset and the fundamental product it provides to customers (its drivers) were materially false and misleading as USX was unable to effectively recruit and retain drivers because of its substandard pay and poor load planning and truck maintenance programs. ¶142. *See Sohol*, 2016 U.S. Dist. LEXIS 56049, at *27-29 (finding statements regarding the high quality of a company's product material). Furthermore, statements regarding USX's purported ability to better withstand the industry-wide driver shortage (¶136) was materially false, as attested to by several former USX employees. ¶¶83-84. *See Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 596 (W.D. Tex. 2014) (claim that, "due to its unique business model, [a company] is more viable than those around it, when the company has knowledge that this same business model is an inherently unsustainable one for different reasons," is "materially false and misleading") (emphasis in original).

### 2. Misstatements Concerning the Impact of Using OTR Drivers to Support Dedicated Accounts and USX's Utilization Shortcomings

Even after the Offering, USX was continuing to reallocate drivers from its more profitable OTR segment to support the lower-margin dedicated accounts, meaning the Company was not only unable to capitalize on the rising rate environment (¶127), but also left USX vulnerable to certain client shipping patterns "perform[ing] differently than expected" (¶129). Defendants' misstatements on these subjects (¶¶128-29) and the impact such changes were having on the Company (¶¶127, 131) were material and actionable. In fact, the Company was not able to seamlessly transition drivers between its two most important divisions and was stuck pulling OTR drivers to service dedicated accounts, despite the increase in costs (and decrease in margins) associated with such re-scheduling

- 28 -

and the impact on driver morale.  ¶¶10, 76, 122.  As the Company's operating ratio was already razor thin, even slight changes to margins on dedicated accounts reverberated throughout the Company, making its ability to withstand such changes in the long-term untenable.  *See Willis v. Big Lots, Inc.*, No. 2:12-cv-604, 2016 U.S. Dist. LEXIS 8028, at *80 (S.D. Ohio Jan. 21, 2016) (statements that conceal known "issues that would call into question the viability of [the issuer's] business model or the integrity of its . . . operations" are actionable).

Furthermore, the Exchange Act Defendants' invocation of its brokerage segment as somehow providing the Company with the flexibility needed to "optimize yield" (¶130) was a false and misleading statement, particularly as the driver shortage already left the Company scrambling to plug holes in the dedicated division and USX was unable to find sufficient third-party carriers to profitably deliver its excess dedicated freight to reduce the burden on its OTR drivers.  ¶90.  *See ASG*, 2009 U.S. Dist. LEXIS 28237, at *44-52, 119-123 (holding that "widespread practices" of inadequate medical services to inmates that "were critical to [the Company's] control of its costs and . . . profitability" were actionable non-disclosures).

### 3.    Misstatements Concerning Then-Existing Risk Factors

Finally, the Exchange Act Defendants doubled down on the inadequate risk disclosures set forth in the Offering Documents, including the materially false and misleading omissions regarding the Company's insurance liability exposure.  ¶137.  This, despite the fact that Defendant Peterson acknowledged in November 2018 that "the risks that [USX] was taking before with the $10 million on a claim probably wasn't really symmetrical with [its] overall credit and earnings profile and leverage."  ¶159.  This admission rendered the Company's affirmance of its risk factors materially false and misleading where, at the very least, USX was under a duty to correct the inadequate risk disclosures in the Offering Documents.  *See KBC*, 769 F.3d at 471 ("A duty to affirmatively disclose 'may arise when there is' . . . 'an inaccurate, incomplete[,] or misleading prior disclosure.'").

- 29 -

### B. The Complaint Pleads a Strong Inference of Scienter

Scienter may take the form of "'knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness.'" *Frank v. Dana Corp.*, 646 F.3d 954, 958-59 (6th Cir. 2011) ("*Dana*") (quoting *Konkol v. Diebold, Inc.*, 590 F.3d 390, 396 (6th Cir. 2009)). Recklessness is "'highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.'" *Id.* (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004)). In considering scienter, courts must consider the totality of circumstances to determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 322-23 (emphasis in original); *accord PR Diamonds*, 364 F.3d at 683. A complaint will survive "if a reasonable person would deem the inference of scienter cogent and ***at least as*** compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.*

While the Sixth Circuit has identified nine non-exhaustive factors of scienter[19] ("the *Helwig* factors"), the Sixth Circuit has "eschewed *Helwig*'s checklist approach in favor of *Tellabs*'s and *Matrixx*'s [*Matrixx*, 563 U.S. 27] entirely collective assessment." *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 469 (6th Cir. 2011). Indeed, as the *Helwig* court recognized, assessing scienter

---

[19] The *Helwig* factors are: (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs. *Frank v. Dana Corp.*, 646 F.3d 954, 958 n.2 (6th Cir. 2011) (citing *Helwig*, 251 F.3d at 552). *Helwig* factors herein will be referred by the numbers designated above.

4851-6949-8295.v1

Case 1:19-cv-00098-TRM-CHS   Document 85   Filed 03/09/20   Page 40 of 59
PageID #: 1402

"necessarily involves a sifting of allegations in the complaint. . . . [R]ecklessness in securities fraud is an untidy, case-by-case concept." *Helwig*, 251 F.3d at 551. The Court cannot, as Defendants attempt here, treat each paragraph of the Complaint in isolation. *Tellabs*, 551 U.S. at 323. Viewed holistically, the Complaint pleads a strong inference of knowing or reckless behavior, which is at least as compelling as any innocent inferences. *See Dana*, 646 F.3d at 961 (citing *Tellabs* and eschewing isolated review in favor a holistic review).

### 1. Divergence Between Internal USX Reports and Public Statements

The Complaint alleges that internal USX reporting was at odds with the Exchange Act Defendants' public statements. *See Helwig*, 251 F.3d at 552. Divergence is a "key factor" in finding a strong inference scienter. *Esperion*, 905 F.3d at 981.

In April 2017, prior to the Offering, USX internally recognized it had one of the worst operating ratios amongst publicly traded trucking companies and trailed its peers' operating ratios by up to 11.9 percentage points. ¶49. Before USX could tap the public financial markets, a massive "transformation" was required to improve tactical execution. ¶¶52-54. This transformation was intended, in part, to remedy the pervasive driver retention problem at USX, which existed prior to the Offering and continued throughout the Class Period. ¶¶71-72. Internally, USX employees struggled to handle these issues. For example, a former USX employee, CW1, noted that the driver retention issue was such a concern, that driver retention improvement was dubbed a "wildly important goal" by USX. ¶71. USX Fleet Managers also encountered difficulties addressing the poor driver retention attributable to low pay and poor conditions. ¶¶71-72. These former employees similarly struggled to fill the newly reassigned Walmart dedicated routes with new hires instead of relying on OTR drivers, damaging OTR performance. ¶¶81, 83. It is implausible that Defendant Eric Fuller – who proclaimed he was "particularly attuned to the day-to-day challenges" of his employees (¶25), and of which he described the "growing shortage of drivers" to be "one of the

- 31 -

biggest challenges" in the trucking industry (¶61) – did not receive the identical information regarding USX's underperformance compared to its peers and the ubiquitous struggles seen by USX's employees. *See Psychiatric Sols*., 2011 U.S. Dist. LEXIS 35661, at \*146 (allegation that management "actively tracked" data supported inference of scienter); Section V.B.3, *infra*.

The facts disclosed to investors on November 1, 2018, were consistent with what USX employees experienced before and during the Class Period and the internal April 2017 view of USX's underperformance. The statements during the Class Period, however, diverged from that information. In contrast to the internal reports regarding negative performance, the Offering Documents and continued Class Period statements described USX's transformation as a resounding success. For instance, in the Offering Documents, USX noted that its "Load Planning Initiative" had improved truck utilization and its "Fleet Management Initiative" had already decreased driver turnover. ¶105. After the Offering, the Exchange Act Defendants continued to tout truck utilization improvements in their public statements. ¶126. This divergence of facts is indicative of scienter.

### 2. Defendants Admitted They Disregarded Their Most Current Knowledge of the Driver Retention, Dedicated Route and Insurance Risk Issues Before Making Their False Statements

The Complaint alleges that the Exchange Act Defendants "disregard[ed] the most current factual information before making [their] statements" and later admitted to doing so. *See Helwig*, 251 F.3d at 552. "Specific factual allegations that a defendant ignored red flags, or warning signs," that would reveal the falsity of their statements may support a strong inference of recklessness, particularly where plaintiffs allege "multiple, obvious" warnings. *PR Diamonds*, 364 F.3d at 686-87. For example, Walmart, USX's largest customer, solicited bids to reallocate its distribution centers between USX and its competitors in early 2018. ¶80. These changes immediately began to adversely impact USX's dedicated shipping patterns prior to the Offering, as Defendant Eric Fuller admitted, starting in the "late first quarter, early second quarter" of 2018. ¶¶80-90, 132. Because

- 32 -

Walmart awarded USX new routes in different states than those that USX dedicated drivers serviced, USX could not simply shift its dedicated drivers to the new routes. ¶80. Instead, USX relied on its OTR drivers to cover the reassigned dedicated accounts (despite claiming it could broker out excess orders to third parties). ¶¶80-90. Defendants disregarded this sweeping change in business from its largest customer by lauding the higher driver retention rate in dedicated as a result of giving drivers "more predictable time at home" and omitted that Walmart shipping patterns had already impacted driver hiring, driver retention and its OTR segment. *See* ¶¶59, 80-90. Defendants' subsequent August 2, 2018 statement that the problems with Walmart had already begun by the "late first quarter, early second quarter," confirms the Company was focused on the Walmart issue at the time of their statements and gives rise an inference of knowledge of these adverse facts. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 71 (2d Cir. 2001) (post-class period data can confirm what was known during the class period); *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698-99 (5th Cir. 2005) ("later-emerging facts can . . . provide warrant for inferences about an earlier situation"). Defendants' disregard for known current facts thus increase the weight of the inference of scienter the Court may attribute to Plaintiffs' allegations.

Similarly, when reporting the second quarter 2018 results, Defendant Eric Fuller misleadingly quelled investor concern over dedicated driver hiring problems by assuring investors that customer rate increases would allow USX to offer higher wages to phase out OTR's support of the dedicated routes. ¶¶131, 133. Again, Defendants cast aside knowledge that the dedicated segment's reliance on OTR support was "progressively increas[ing]" during 3Q18 (which was concurrent to Eric Fuller's August 2, 2018 and September 18, 2018 statements). ¶156. Defendants' disregard of these facts while misleading investors about dedicated pay increases further bolsters an inference of scienter.

4851-6949-8295.v1

The Exchange Act Defendants also disregarded key risk factors that its truck drivers were more likely to cause major accidents than its competitors' drivers, which exposed USX to far more self-insurance risks than disclosed. USX had unique exposure to major liability events prior to the Offering and throughout the Class Period because (a) USX relaxed hiring criteria to offset its low pay and as a result, hired low quality drivers; (b) USX had just begun to install forward facing event recorders at the time of the Offering to identify and remediate unsafe driving and needed up to two years to see positive results, unlike its peers who were already seeing improvements from recorders installed in 2016-2017; (c) USX did not implement hair follicle testing to filter out unfit drivers with dangerous drug habits until after the Class Period in 2019; (d) the Company's driver training programs were "antiquated"; and (e) USX trucks were poorly maintained. ¶¶74, 93-98. Moreover, due to the Company's high debt load and low operating ratio, it was not in a position to endure volatility in insurance claims as a result of its self-insurance. USX trailed its peers in adopting risk reduction measures but nevertheless Defendants disregarded and omitted mentioning those amplified risks when discussing its self-insurance exposure. It is no wonder after Defendants disclosed that USX's insurance costs skyrocketed by 43% on November 1, 2018, Defendant Peterson was forced to belatedly admit "the risks that we were taking before with the $10 million on a claim probably wasn't really symmetrical with our overall credit and earnings profile and leverage." ¶159. These risks were indeed real—when USX actually performed hair follicle drug tests on its drivers in 2019, it saw "failure rates as high as 10 drivers a week failing hair follicle that are passing urinalysis."[20] The disregard for these risks and red flags of the Company's sky-high liability exposure, further demonstrates the Exchange Act Defendants' scienter.

---

[20] *See* 4Q19 Earnings Call Tr., *available at* https://finance.yahoo.com/news/edited-transcript-usx-earnings-conference-123823096.html.

### 3. Defendants' "Day-to-Day" Role in the Core Operations of the Company Underscores the Strong Inference of Scienter Pled in the Complaint

This Court can further infer that the Exchange Act Defendants were aware of the driver retention issues requiring OTR to support dedicated accounts and its asymmetrical self-insurance program and increased insurance risks due to Defendants' involvement in the day-to-day management of the Company. "'Courts may presume that high-level executives are aware of matters related to their business' operation where the misrepresentations as omissions pertain to 'central, day-to-day operational matters,'" and especially where they are "'[f]acts critical to a business's core management.'" *Psychiatric Sols.*, 2011 U.S. Dist. LEXIS 35661, at \*159 (alteration in original). Furthermore, the inference is particularly warranted when coupled with "specific admissions from top executives that they are involved in every detail of the company." *BancorpSouth*, 2011 U.S. Dist. LEXIS 45559, at \*67.

The Exchange Act Defendants were intimately involved in the day-to-day management of USX. Indeed, Defendant Eric Fuller's Company biography states that he was "particularly attuned to the day-to-day challenges" faced by his employees. ¶25. So when employees such as the Fleet Planners encountered difficulties in coping with high driver turnover caused by low pay and dedicated route shipping pattern changes, Fuller would have been aware of the same issues. Similarly, Defendant Peterson's Company biography asserts he "plays a vital role in company transactions and all of U.S. Xpress' strategic incentives." ¶26. Accordingly, Peterson had access to information informing him that USX's strategic "transformation" was a failure. They both also would have been aware of the Walmart dedicated route changes because of their roles in USX's business transactions and the importance of Walmart as a customer.

The Exchange Act Defendants' awareness of the misrepresented and omitted facts alleged in the Complaint can be inferred because the subject matter of these issues were central to USX's

4851-6949-8295.v1

business, including achieving its operating ratio targets. *See* ¶4. As represented by Defendants, to achieve meaningful results, USX needed to improve its "tactical execution" which was "critical" to the Company's success. ¶105. Improving truck utilization through better load planning was intended to have the dual effect of improving the operating ratio and improving driver wages and retention. Furthermore, the problematic dedicated account, Walmart, was the Company's biggest and most important customer, representing more than 10% of USX's revenue. ¶5; *see also Grae*, 2017 U.S. Dist. LEXIS 207475, at *65 (a customer providing "between 11% and 13% of the company's annual revenue, was central to [the company's] operations . . ."). A shift as significant as a rebid of *all* Walmart accounts would have been a glaring red flag to Defendants. Defendants cannot plausibly claim they were unaware of the adverse facts alleged in the Complaint when they regularly stated that these issues were so important to the company. *See id.* at *64 (finding a company's "own public statements . . . go a long way" to explaining how defendants knew about the issues in the complaint). And if they were unaware, they were reckless.

The Exchange Act Defendants retort that the core operations theory has been implicitly repealed by the PSLRA. USX Br. at 31-32. Not so. Defendants, in fact, cite no Sixth Circuit cases for such proposition, likely because courts in the Sixth Circuit regularly credit the core operations theory or similar inferences of scienter. *See, e.g.*, *Dana*, 646 F.3d at 961-62; *Grae*, 2017 U.S. Dist. LEXIS 207475, at *65-*66; *Psychiatric Sols., Inc.*, 2011 U.S. Dist. LEXIS 35661, at *158-*59; *In re Miller Energy Res. Sec. Litig.*, No. 3:11-CV-386-TAV-CCS, 2014 U.S. Dist. LEXIS 15810, at *58-*62 (E.D. Tenn. 2014). Finally, Defendants' suggestion that Plaintiffs present the core operations allegations as a standalone basis for scienter (USX Br. at 32) misstates *Tellabs*' instructions. When considered in the context of the multitude of other factors, the core operations allegations render it implausible Defendants made their statements without knowledge of falsity or were reckless.

The temporal proximity between the Exchange Act Defendants' fraudulent statements and the disclosure of the truth is an additional *Helwig* factor relevant to the holistic scienter assessment. *See Helwig*, 251 F.3d at 552. Here, Defendants repeated their false and misleading statements throughout the Class Period. For example, on September 18, 2018, Defendant Eric Fuller claimed that USX could "pass along any kind of [pay] increase to our customers" to address the driver shortage which was plaguing USX's dedicated routes. ¶141. But just over six weeks later, on November 1, 2018, Defendants disclosed for the quarter ending September 30, 2018 that USX's fortunes had suddenly and inexplicably changed course and the driver shortage caused USX to be "unable to increase [its] tractor count" and described "a deceleration in the pace of hiring through the first half of the quarter." ¶155. Defendants were also forced to admit USX's "transformation" was not in fact "closing the gap" with USX's peers, its "driver centric" programs failed to meaningfully improve fleet utilization and driver retention, and that its risk profile was not symmetric with its self-insurance scheme. ¶¶155-59. The drastic change from just days until the quarter's end or weeks until the announcement allows for a strong inference of Defendants' scienter. *See Esperion*, 905 F.3d at 981 (six-weeks between fraudulent statement and disclosure of truth weighs in plaintiff's favor). Moreover, Defendants do not even contest this factor which is pled in the Complaint. *See* USX Br. at 27 (conceding the third factor).

### 5. CEO Eric Fuller and CFO Eric Peterson Were Motivated by Personal Financial Benefits Obtained by Completing the Offering

The allegations in the Complaint describe how CEO Eric Fuller and CFO Eric Peterson had a self-serving financial interest to preserve a substantial bonus promised to them if they completed the Offering, and then conceal such misstatements in the hopes that the problems plaguing the Company resolved themselves. ¶150. Personal motivations "can be catalysts to fraud and so serve as external

- 37 -

markers to the required state of mind." *Helwig*, 251 F.3d at 550. The Sixth Circuit has recognized such motives as highly probative of scienter, particularly where, as here, Plaintiffs allege "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *PR Diamonds*, 364 F.3d at 690; *Bridgestone*, 399 F.3d at 687.

Here, USX's Offering was far from certain, and consequently, defendants Eric Fuller and Eric Peterson could only save their $500,000 bonus by misrepresenting facts to complete the Offering. Prior to the Offering, the Company recognized that investor demand for an offering was contingent on a successful "transformation," which would require tangible improvements to fleet utilization (*i.e.*, the percent of time the trucks are carrying freight), driver retention, and thus its operating ratio. ¶¶49-50, 52-55. Taken together, the Offering – and Defendants' bonuses – were contingent on Defendants painting a picture of success in improving these metrics for the company. But USX was not on track with its transformation. As a result, their motivation, when combined with the urgency of closing the Offering before the truckload market cycle reversed, §V.B.6, *infra*, required they mislead investors to close the Offering and to receive their substantial bonuses.

The Exchange Act Defendants were further motivated by their familial pecuniary interests.[21] The families of USX's co-founders, Defendant Max Fuller (Defendant Eric Fuller's father) and Patrick Quinn (Defendant Quinn Pate's father), were financially entangled with the Company through stock, real estate and debt holdings, including a $26 million loan and real estate assets to be sold to USX. ¶51. These family investments could not be monetized without Offering proceeds, which were dependent on false and misleading statements of a remarkable transformation at the

---

[21] The crux of this allegation is not, as Defendants imply, that the non Exchange Act Defendants engaged in profitable insider sales. *See* USX Br. at 33 n.8 (citing cases relating to non-defendant stock insider transactions). The focus of allegations here is that the Exchange Act Defendants were motived to undertake the Offering as it was a necessary precedent for their related parties to profit off their USX related holdings.

- 38 -

Company.  And given the impending truckload market contraction, the deal needed to be finalized sooner rather than later.

Defendants quibble that these allegations add nothing to scienter but their cases merely stand for the proposition scienter cannot be "pleaded *solely* on the basis . . . [of] increased compensation." USX Br. at 32-33 (citing *In re Tronox, Inc. Sec. Litig.*, 09 CIV. 6220 (SAS), 2010 U.S. Dist. LEXIS 67664, at \*36 n.129 (S.D.N.Y. June 28, 2010)).  None of which involve the close family ties here. Plaintiffs' allegations here are only one of many components giving way to the strong inference that the Exchange Act Defendants acted with scienter.  Furthermore, as discussed *infra*, §V.B.6, Defendants' position fails to take into account the unique pressures to complete the Offering before the truckload market cycle inverted while being constrained by the Company's poor performance. Increasing their compensation was thus dependent on making false and misleading statements to investors.

### 6. USX Was Motivated to Conduct the Offering Because of Substantial Burdens Related to Impending Debt Obligations

The pressure to manage costs to the Company adds to the inference of scienter.  *See In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1028 (N.D. Ohio 2000).  Here, USX funded its operations with high interest debt that it needed to retire.  USX had drawn $192.5 million from its $275 million loan facility at an interest rate of over LIBOR + 10.0% to 11.5%, due in May 2020.  ¶4. USX also owed related parties $26.0 million at 13% interest, due in November 2020.  ¶51.  As the cyclical trucking market was peaking before an inevitable decline, the Offering was directly tied to the financial drag of servicing its maturing debt.  *Miller Energy*, 2014 U.S. Dist. LEXIS 15810, at \*62-\*63 (alleged motivation to "facilitate financing" considering company's need for financing supported inference of scienter).

4851-6949-8295.v1

The Exchange Act Defendants claim that the desire to pay down debt or raise capital "in the normal course of business" cannot infer scienter.[22] USX Br. at 32-33. USX's circumstances, however, were anything but ordinary. For the same reasons described *supra* section V.B.5, the Exchange Act Defendants were under unique pressure to complete the Offering before the truckload market cycle reversed, but were constrained by the Company's weak position and unattractive operating ratio. *See* ¶111. Because there was no time to see if the transformation would pan out, Defendants needed to misrepresent USX's financial condition to raise money in an offering. If Defendants had not done so, USX's debt service would shackle the Company. *Nguyen v. Radient Pharm. Corp.*, SA CV 11-0406 DOC, 2011 U.S. Dist. LEXIS 122533, at *23 (C.D. Cal. Oct. 20, 2011) ("a demonstration of a desire to raise company financing, combined with the 'red flags' of a company's financial condition, are sufficient to plead scienter"). As the timing of the Offering was necessary for the Exchange Act Defendants to receive the numerous company-specific and personal benefits related to the Offering, it buttresses the inference of scienter alleged in the Complaint.

### 7.      Executive Departures Further Suggest Scienter

Adding to the constellation of factors described above, USX removed executives concurrently with the revelation of Defendants' false and misleading statements. The suspicious timing of the termination of executives is an additional indication of fraud. *ASG*, 2009 U.S. Dist. LEXIS 28237, at *159 ("Such house-cleaning and reforms do not follow innocent mistakes. Rather, they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls."). Here, on October 22, 2018, just days before USX revealed that its transformation was not as successful as represented in prior quarters and the Offering Documents, Chief Sales and

---

[22]   Defendants' claim that they disclosed that the Offering proceeds would be used to pay down debt is a red herring. USX Br. at 33. It is the urgency of the Offering to pay down debt *before* the truckload cycle reversed that suggests scienter. Nor does it negate certain defendants received a financial benefit.

Marketing Officer John C. White unceremoniously "ceased" to serve as an employee. ¶153. And the day following USX's November 1, 2018 announcement, the Company announced that Defendant Quinn Pate would retire as an employee of the company – she had held her most recent position for less than a year . ¶¶29, 153. The timing of the departures of these two high-ranking executives is suspiciously close to the revelation of serious and previously undisclosed issues at the Company[23]. Thus the Complaint's allegations of executive departures further tip the scales toward an inference of scienter.

While Defendants admit that White was terminated, they claim that because no cause was announced, there can be no inference of scienter, citing out of circuit authority. Courts in the Sixth Circuit, however, have regularly credited resignations or terminations without cause in the scienter analysis. *See Dana*, 646 F.3d at 960-962. (considering an executive's retirement in its scienter analysis); *Big Lots*, 2016 U.S. Dist. LEXIS 8028, at *98 (considering resignation on the last day of the class period "noteworthy" in the scienter analysis). Moreover, Defendants provide no competing inference on why White would have been fired just as USX was primed to inform investors that its purported transformation was a fabrication. Defendants further note that Defendant Quinn Pate, daughter of USX co-founder Quinn, remained on USX's Board of Directors. USX Br. at 34. But Quinn Pate stepped away from an active role in the Company only months after the IPO, and her board membership may also be a result of her close family relations with the Fuller and Quinn families (and, nonetheless, Quinn Pate left the Board in August 2019 – barely a year after the IPO).

---

[23] The near concurrent timing of the separation of Quinn Pate and White from employment at USX is completely absent in *In re Intelligroup Securities Litigation*, 527 F. Supp. 2d 262, 347 (D.N.J. 2007), where the resignations occurred "many months – or a year – before or after" a restatement announcement.

- 41 -

### 8. Defendants' Devotion to the *Helwig* Factors Ignores Supreme Court Authority and Provides No Basis to Discredit Plaintiffs' Allegations

The Exchange Act Defendants attempt to discredit many of the factors Plaintiffs pled on the basis that they are not *Helwig* factors. USX Br. at 26-27. But *Helwig* does not stand for the proposition that case-specific factors suggesting an inference of fraud are lesser factors than those identified in *Helwig*. *See In re Officemax, Inc. Sec. Litig.*, No. 1:00-CV-2432, 2002 U.S. Dist. LEXIS 27019, at *34-*35 (N.D. Ohio Mar. 26, 2002) (noting that the scienter analysis is "a fact-specific inquiry [which] does not lend itself to rigid formulas" and that the list is "only meant to point to fixed constellations of facts that courts have found probative of securities fraud")[24]. In addition, the Supreme Court's decision in *Tellabs* which instructs that courts must consider the totality of circumstances to determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter" has been embraced by the Sixth Circuit. *Ashland*, 648 F.3d 461, 469 (citing *Tellabs*, 551 U.S. at 321-22). Plaintiffs' allegations here consist of factors in addition to the examples in *Helwig*, which provide substantial heft under Supreme Court and Sixth Circuit authority to Plaintiffs' allegations of scienter.

Defendants contend that Plaintiffs have only alleged one *Helwig* factor, oddly citing one paragraph of the Complaint that is not in the scienter section. *Compare* USX Br. at 27 (citing ¶158) *with* ¶¶143-53. In addition to other *indicia* of scienter pled in the Complaint, Plaintiffs have alleged four *Helwig* factors. ¶¶49, 149-50, 152. Other *Helwig* factors are clearly inapplicable to the facts of this case, such as bribery, accounting issues, and insider trades which were restricted by to lock-up agreements. *See* USX Br. Ex. 4 at 44.

---

[24] Defendants' own authority *Local 295/Local 851 IBT Employer Group Pension Trust & Welfare Fund v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 727 (S.D. Ohio 2010), confirms that a failure to allege *Helwig* factors is "not dispositive."

In sum, Plaintiffs have alleged numerous factors, including four *Helwig* factors, all of which strongly infer that the Securities Act Defendants acted with knowledge or at minimum were reckless when making their false and misleading statements. Defendants' efforts to critique certain factors as individually insufficient should be rejected by this Court as they contravene the Sixth Circuit's and the Supreme Court's direction to review the allegations holistically in their entirety. Moreover, Defendants do little to set forth a competing inference of scienter, let alone one that is more compelling than the inference of scienter supported by numerous allegations in the Complaint. Where a defendant fails to come forward with any plausible opposing inferences, "the inference of scienter is cogent, indeed." *In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1264 (M.D. Fla. 2007).

### 9. The Complaint's CW Allegations Further Corroborate and Add Support to a Strong Inference of Scienter

The Complaint cites statements by former employees which confirm, add context to and corroborate the falsity and scienter allegations in the Complaint. These CW-based allegations are accompanied by information that establishes their reliability.

> Courts . . . will credit confidential source allegations, generally, in two situations. The first is when those sources' position and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations. *Id*. at 590. Second, when independent adequately pled factual allegations corroborate a confidential source's statements, the requirement of a description of the source's job is loosened.

*Zwick*, 2018 U.S. Dist. LEXIS 97942, at *15.

Plaintiffs have named the CWs' job titles, such as Fleet Managers (CW3, CW4, CW5) and Logistics Planners (CW2), provided their dates of employment that overlap with the time leading up to the IPO and the Class Period, and described their job responsibilities. ¶¶71-72, 80. As for CW1, Plaintiffs explained that CW1, a USX employee during the time leading up to the IPO, obtained knowledge of USX's view that improving driver retention was a "wildly important goal" through

- 43 -

receipt of weekly internal emails and by attending Company operations calls. ¶71. The designation of driver retention as a wildly important goal is corroborated by the Offering Materials, and certainly by Defendant Eric Fuller's public statement that the "growing shortage of drivers" was "[o]ne of the biggest challenges facing the trucking industry. . ." ¶¶61, 117. Plaintiffs have provided ample information for the Court to credit the CW allegations.

### 10. Defendants' Attacks on the CW Allegations Do Not Negate Scienter

Defendants primarily ask the Court to discredit CW1's view of USX's driver retention issues because Plaintiffs did not provide CW1's job title. USX Br. at 28-29 (conceding that the other CWs' job titles and descriptions are alleged). But Plaintiffs pled the source from which CW1 obtained the driver retention information which is corroborated by the Offering Materials, other CWs[25] and Defendant Eric Fuller's statements. These are sufficient under *Zwick*.[26]

Defendants' reliance on *Konkol* is similarly misplaced because unlike here, the *Konkol* plaintiffs did not "provide any details about most of the Confidential Witnesses. . . ." 590 F.3d at

---

[25] Defendants' contention that CW2's corroborating statements about recruiters misleading driver is mere "gossip" misses the point of those allegations. USX Br. at 30. The significance of the allegations is not what the recruiters told the drivers, but the fact CW2 understood that drivers did not believe they were receiving from USX what they were promised, thereby making it less likely USX could retain them. Nonetheless, the Court may consider these allegations because a complaint need not plead evidence. *See Shapiro v. Merrill Lynch & Co.*, 634 F. Supp. 587, 593 (S.D. Ohio 1986); *accord Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997 n.4 (9th Cir. 2009) ("the fact that a confidential witness reports hearsay does not automatically disqualify [her] statement from consideration . . . .").

[26] Defendants reliance on *Ley v. Visteon Corp.*, 543 F.3d 801, 811 (6th Cir. 2008), is, at best, incomplete. In *Ley*, the court "steeply discounted" the allegations from confidential witnesses not because they were unnamed sources, but because their allegations were "too vague and conclusory." The allegations in *Ley* failed to allege "who knew about [the alleged fraud] and what, when, where, and how they knew." That is not the case here. CWs 1-5 adequately describe the "who, what when where, and how." For example, CW1 detailed that he knew of the driver turnover issue because it was "a wildly important goal" that was "regularly discussed in weekly emails sent to office employees starting in approximately April 2017 and during daily operations calls with driver managers and customer service employees." ¶71.

- 44 -

399. Moreover, unless the claim that Defendant Eric Fuller was "attuned" to his employees' "day-to-day challenges" is another one of Defendants' false statements – he was well aware of the concerns observed by his employees.[27] *See* ¶25. The fact the USX had driver retention issues (¶¶71-78) is not even disputed by Defendants. USX Br. at 30.

In any event, Defendants overstate Plaintiffs' reliance on CWs because the CW allegations are additional evidence to be considered amongst the litany of allegations strongly inferring scienter. Plaintiffs' use of the CWs' statements to allege scienter is limited to just two factors described above.[28] Even setting aside those allegations, this Court can still easily find that Plaintiffs have alleged a strong inference of scienter.

## VI. PLAINTIFFS ADEQUATELY ALLEGE CONTROL PERSON LIABILITY

To state a prima facie case of control person liability, a plaintiff must show (1) a primary violation of the securities laws and (2) "control" over the primary violator by the alleged controlling person.[29] *See Handler*, 364 F.3d at 696-97.[30] "Control" is "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through

---

[27] Defendants' citation to *EveryWare Global*, 175 F. Supp. 3d at 852, is both misleading and inapposite. The quoted language was not actually part of the court's holding, which instead rested on the fact that a confidential witness did not share his subjective belief about a company's projections with the defendants, thus undercutting plaintiffs' scienter theory regarding the allegedly misleading projections. Here, however, the facts attested to by the CWs relate to the very revelations that foretold USX's demise.

[28] The Motion does not challenge the veracity of the CWs' allegations with respect to falsity.

[29] Courts analyze claims under §15 of the Securities Act and under §20(a) of the Exchange Act using the same standards. *Pullins v. Klimley*, No. 3:05-cv-082, 2008 U.S. Dist. LEXIS 3467, at *73-*74 (W.D. Ohio Jan. 7, 2008).

[30] "The Sixth Circuit has not held that culpable participation is an element of a section 20(a) claim." *In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728, 746 (E.D. Mich. 2007); *see also Wilkof v. Caraco Pharm. Labs., Ltd.*, No. 09-cv-12830, 2010 U.S. Dist. LEXIS 112768, at *30 (E.D. Mich. Oct. 21, 2010) (The Sixth Circuit "does not require that 'culpable participation' be plead in order to set forth a Section 20(a) violation.").

- 45 -

ownership of voting securities, by contract, or otherwise." *Id*.[31] The question of control person liability is necessarily fact intensive and cannot normally be resolved at the pleadings stage. *In re Regions Morgan Keegan Sec., Derivative, & ERISA Litig.*, 743 F. Supp. 2d 744, 761 (W.D. Tenn. 2010) ("Whether a party exercised the requisite control involves a factual analysis best saved for later determination."); *Envision*, 2019 U.S. Dist. LEXIS 200986, at *92 (similar).

Here, the relevant Defendants[32] do not deny that they are control persons, but only argue that Plaintiffs' §§15 and 20(a) claims should be dismissed because Plaintiffs have not adequately pled underlying violations. USX Br. at 35. However, as set forth herein, Defendants are liable under §§10(b) and 11. Because Plaintiffs have adequately pled primary violations of §§10(b) and 11, and Defendants do not dispute control, Plaintiffs have pled control person liability under §§15 and 20(a). *See Prison Realty*, 117 F. Supp. 2d at 691-92 (denying motion to dismiss §§ 15 and 20(a) claims where plaintiffs adequately pled primary violations).[33]

## VII. IF THE MOTIONS ARE GRANTED, PLAINTIFFS SEEK LEAVE TO AMEND

Generally, "leave to amend [is] to be freely given when justice so requires." *See Shane v. Bunzl Distrib. USA, Inc.*, 200 Fed. App'x. 397, 406 (6th Cir. 2006) (reversing district court's refusal of plaintiff's request to file third amended complaint because amendment was not futile); *Chandler*, 364 F.3d at 698 ("[W]hen a motion to dismiss a complaint is granted, courts typically permit the

---

[31]   *See also In re Nat'l Century Fin. Enters., Inv. Litig.*, 504 F. Supp. 2d 287, 300 (S.D. Ohio 2007) ("Control is the practical ability to direct the actions of the people who committed the violation.").

[32]   Plaintiffs state a §15 claim against USX, Eric Fuller, Max Fuller, Eric Peterson, Jason Great, and Lisa Quinn Pate and §20(a) claim against USX, Eric Fuller, Max Fuller, and Eric Peterson.

[33]   Plaintiffs have also alleged in detail that the relevant Defendants had day-to-day control over USX and had the power to directly control and influence corporate policies. ¶¶1-16, 24-32, 44-180. These allegations more than suffice to state a claim for control person liability. *See Pullins*, 2008 U.S. Dist. LEXIS 3467, at *77 (control established if "defendant had some indirect means of discipline or influence, even if short of actual directions, over the corporation").

- 46 -

losing party leave to amend."). "In the securities litigation context, leave to amend is particularly appropriate[.]" *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002). Filing a consolidated complaint does not affect a plaintiff's ability to amend by right under Rule 15(a). *See*, *e.g.*, *In re Guidant Corp. S'holders Derivative Litig.,* No. 1:03-cv-955, 2005 U.S. Dist. LEXIS 45701, at *4-*5 (S.D. Ind. Dec. 22, 2005). Thus, Plaintiffs seek leave to amend if the Court grants Defendants' motions.

## VIII. CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions to dismiss.

DATED: March 9, 2020 ROBBINS GELLER RUDMAN
& DOWD LLP
CHRISTOPHER M. WOOD


s/ Christopher M. Wood
CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
WILLOW E. RADCLIFFE
HADIYA K. DESHMUKH
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
willowr@rgrdlaw.com
hdeshmukh@rgrdlaw.com

- 47 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
KEVIN S. SCIARANI
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
ksciarani@rgrdlaw.com

LEVI & KORSINSKY, LLP
NANCY A. KULESA
SHANNON L. HOPKINS
1111 Summer Street, Suite 403
Stamford, CT  06905
Telephone:  203/363-7500
866/367-6510 (fax)
nkulesa@zlk.com
shopkins@zlk.com

Lead Counsel for Lead Plaintiff

BARRETT JOHNSTON MARTIN
  & GARRISON, LLC
JERRY E. MARTIN, #20193
DAVID GARRISON, #24968
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2202
615/252-3798 (fax)
jmartin@barrettjohnston.com
dgarrison@barrettjohnston.com

Local Counsel

- 48 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on March 9, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e mail addresses of the CM/ECF participants in this case.

<div style="margin-left: 50%;">

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
    & DOWD LLP
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 800/449-4900
615/252-3798 (fax)
Email: cwood@rgrdlaw.com

</div>