# Exhibit 11

**CONFIDENTIAL TRANSCRIPT**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

CHATTANOOGA DIVISION

LEWIS STEIN, Individually and on Behalf of All Others Similarly Situated,

PLAINTIFFS,

VS.

U.S. XPRESS ENTERPRISES, INC., ERIC FULLER, ERIC PETERSON, JASON GREAR, MAX FULLER, LISA QUINN PATE, MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED, MORGAN STANLEY & CO., LLC, J.P. MORGAN SECURITIES, LLC, WELLS FARGO SECURITIES, LLC, STEPHENS, INC., STIFEL, NICOLAUS & COMPANY, INCORPORATED, and WR SECURITIES, LLC,

DEFENDANTS.

Civil Action No. 1:19-cv-00098

CLASS ACTION

Judge Harry S. Mattice, Jr.

Magistrate Judge Christopher Steger

VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF CHARLES CLOWDIS

Reported by:

Karen C. Popernik, MS CCR 1276, TN LCR 469

Q. If you answer any question without telling me that you didn't understand something about it, we will assume that you understood the question. Is that fair?

A. I understand.

Q. And, Mr. Clowdis, are you logged into the exhibit share function?

A. I am not. I was under -- under duress getting this far, and I saw that, but I did not log in.

Q. Okay.

A. I could not. I'm sorry.

Q. Why don't we take a -- go off the record for a quick minute and allow Mr. Clowdis to log in?

A. How do I do that?

BY THE VIDEOGRAPHER: The time is 11:45 a.m. We are going off the record.

(Break in the deposition.)

CONTINUING:

BY THE VIDEOGRAPHER: The time is 12:29 p.m. We are going on the record.

Q. Mr. Clowdis?

A. Yes.

Q. You've now been shown what has been marked as Exhibit No. 1 for your deposition.

(UNITED STATES SECURITIES AND EXCHANGE COMMISSION REGISTRATION STATEMENT MARKED

AS EXHIBIT NO. 1.)

Q. Have you seen this document before?

A. I'm sure I did. I don't recall when or where, but I'm sure I did.

Q. Okay. Do you -- do you know when the first time you saw this document was?

A. Probably when the announcement was made, and either -- either Yahoo Finance or someone that I was getting at the time. It might have been Wolfe Research. I got it off their website or their -- their whatever, and I pulled it -- it's not something I read in its entirety, but obviously I looked through it because I was -- I remembered at the time that some of the businesses that were mentioned as customers made quite an impression because they are good guys.

And so I don't do as much transportation consulting that I can talk about anymore with clients, but that impressed me, so, yeah, I do remember that part I'm scrolling down to. I remember the percentage of dedicated impressed me and the ability to do dedicated was -- and to keep some of those clients happy was impressive. So...

Q. When you say you recall at the time, what time are you referring to then?

A. When I first knew that there was going to be an

IPO, before I bought the stock.

Q. Okay. Fair enough. Do you believe you reviewed this document prior to purchasing USX stock?

A. I -- I -- I -- I think -- I must have. I don't know when I reviewed it, to be honest with you.

Q. Okay.

A. It was not the primary reason because there were a lot of announcements in all the trade press so I saw it at some period of time. So...

Q. Okay. When you say it was not the primary reason, do you mean it was not the primary reason why you purchased USX stock?

A. It played a role in it. And I don't mean to be too verbose and talky. That's my Southern term for it. But from time to time clients that are similar to those are looking for carriers and who can do dedicated, who is doing dedicated, who is doing it well, and it just happened, maybe the stars aligned, but all of a sudden I was seeing U.S. Xpress trucks delivering to places like Family Dollar, Dollar Tree, as I recall. I lived at the time in a little bucolic area outside of Sewanee, Tennessee, and so the major shopping locales are Fred's, Dollar General, Family Dollar, Dollar Tree, those -- those types of retailers.

So I noticed U.S. Xpress, and I said, now,

there's something I should pay attention to. I haven't been asked recently, but I may be asked to recommend who is doing this now. So that's -- that prompted me to say, why don't I go to my little Merrill Lynch and a buy hundred shares. So -- and did.

Q. Okay. Okay. Mr. Clowdis, sitting here today do you contend that Exhibit No. 1 was false or misleading in any respect at the time that it was issued in June of 2018?

BY MR. HOLLEMAN: Objection.

BY THE WITNESS: I'm really not -- I'm sorry, Scott. Did I --

BY MR. HOLLEMAN: I'm objecting. You can answer if you know how to answer that question.

A. You're going to have to ask me the question again. I was wondering what dropped.

Q. No problem. And, Mr. Clowdis, as you know, from time to time lawyers may object during the deposition, and unless your counsel instructs you not to answer, just go ahead and answer the question after the objection.

A. Sure.

Q. Okay?

A. Okay. Yes. And the question was --

Q. The question is do you contend that

Exhibit No. 1 was false or misleading in any respect at the time that it was issued on June 11, 2018?

BY MR. HOLLEMAN: Same objection.

BY THE WITNESS: Go ahead and answer, Scott?

BY MR. HOLLEMAN: You can answer if you can. As Mr. Keel said, I may object from time to time. If I say, Mr. Clowdis, you don't have to answer, then you don't have to answer. But if I don't instruct you not to answer, then you can assume that you can answer any question as best you can.

A. Yes. I don't -- I'm not an attorney, especially I don't get involved in SEC matters and the filing and things of that nature so I -- I have no opinion on that as to whether it is misleading. I would -- that's not something I could really opine on from the point of view.

Q. Mr. Clowdis, do you know what this litigation is about?

A. Yes, it's about SEC -- some section SEC violations of the way that the information was presented to the prospective buyers of the stock.

Q. And -- and what is it that you contend -- what information do you contend was misrepresented to the buyers of the stock?

A. I think that it was not -- it was -- not familiar, I think, to a certain extent of forward-looking statements, but it was, we are going to pay down debt and we are going to -- and I guess they did. We are going to expand our areas of expertise, which are, at the time, long haul trucking, dedicated contract carriage, and, frankly, that's what caught my attention, as I said earlier, and I knew that they had, you know, a presence with the automotive guys, they had a presence in Mexico. They had a brokerage operation that I hear about from time to time. And I said, well, they seem to be structured well and that seemed to be reflected in what they said.

Q. What is it, Mr. Clowdis, that you contend was misrepresented by the company?

A. I think that the biggest thing that comes to me now in retrospect is that the concept of dedicated drivers versus over-the-road drivers in my experience, and I worked with drivers closely over the last fifty years probably, is that as a driver ages, and, frankly, as a fleet ages -- and this is not for education. This is not -- I'm not supposed to talk this much, but I will just to explain this. U.S. Xpress has been innovating and trying a lot of things, but they've got a situation I think they've missed on this one, in my opinion, in

that more drivers are anxious to run a dedicated route than they are an over-the-road even though their pay might suffer a bit, but marginally they are willing to do that trade-off in order to be home. Well, that's a little bit reverse as to what I -- I thought would happen and that's what they allege happened. I think I didn't get all discouraged until we took a lot of the analysts' jobs. So that's what I think that they were either misleading on or indirect.

Q. And do you understand, Mr. Clowdis, that the claims in this case allege that USX made false or misleading statements to the public?

A. Yes.

Q. What false or misleading statements do you contend were issued by USX?

BY MR. HOLLEMAN: Objection.

A. I'll leave that up to the attorneys.

Q. Do you have any understanding sitting here today about what statements are alleged to be false or misleading in this case?

A. I understand what are false and misleading to me. Whether they are in violation of some section of the SEC regulations, which I know nothing about, I couldn't tell you.

Q. Understood. And I'm -- what I'm really asking,

Mr. Clowdis, is do you know what statements USX issued that are alleged to be false or misleading in this case?

A. That -- that -- that dedicated was a target of growth, which I agreed with, and certainly, in hindsight was. We were coming off '18, one of the biggest years in trucking success, one of the best years we've had ever, and I looked at an optimistic outlook and I felt that they were positioned to do that. As it turns out, they really weren't. So...

Q. So it's your understanding that the allegations in this case are that USX misrepresented that the dedicated division was a target for growth?

BY MR. HOLLEMAN: Objection.

A. I don't -- it certainly was to me. A presence in so many -- so many vital areas that at the time, even though -- a presence in Mexico, a presence with the automotive that teaches you just-in-time delivery, makes you have disciplined drivers and makes you be available to deliver on time, they had all the features that I thought from primarily an advisor on the purchase of transportation, rather than with how truck lines operated, they looked positioned and poised for growth, and they seemed that optimistic, also.

Q. So just to clarify, Mr. Clowdis, I'm trying to get your understanding of what information USX issued

that you claim was misleading. And I believe you testified that the information that was misleading in your view was that the dedicated division was a target for growth. Is that correct?

A. That was my -- that was the assumption I made after reading as much as I read of this and what I was seeing and hearing, that -- that we are willing to pull other drivers off to maintain our dedicated. Yeah, that's -- that's the impression I got from reading.

Q. And based on your work as a consultant in the industry you viewed it that that was a good idea for USX to target the dedicated division for growth. Is that what you said?

BY MR. HOLLEMAN: Objection.

A. I think dedicated is a good target for any truck line that can manage it. It does a lot of things for them. It lets them use that older driver. You didn't ask me that, but it lets them use the older driver, use older equipment in some cases, and retain someone in a driver position. And, frankly, you are doing contracts that you are assured of the revenue you're going to get for the period of the contract. The tricky part is pricing it correctly. That's too much information, but, yeah, that's my contention. Dedicated is a desired quality for most any truck line.

Q. Mr. Clowdis, turning to Exhibit 1 for a second, if you could, please, turn to page 9, there's a little number on the bottom of the page -- if you could, please, turn to the page No. 9.

BY MR. HOLLEMAN: Hey, Brandon. You're talking about page 9 of the .pdf or page 9 of the document, which is actually page 18 of the .pdf?

BY MR. KEEL: Correct. The internal page 9. Not 9 of the .pdf but actually labeled No. 9 on the document.

A. Oh, okay. I got it now. It's not that preface. Page 9. Hold on. (Reviews.) Yeah. I think I've got it.

Q. All right. Mr. Clowdis, do you see, beginning on page 9, there's a section titled Our Strategies in bold on the left-hand side?

A. Yes.

Q. Do you see that?

A. Yes.

Q. And you see that that -- that section Our Strategies continues on to page 10. Do you see that?

A. Yes.

Q. Do you contend that any statement contained on pages 9 and 10 of this document were false or misleading

at the time Exhibit 1 was issued in June 2018?

BY MR. HOLLEMAN: Objection.

A. I'm reading. Hold on. I've read parts of this. Or heard it or read it. I think at the time this was issued it was probably believed -- it was believed by the issuers. I think that -- I mean, who doesn't want to grow profitably as appropriate to the market cycle? That's -- these are -- these are -- these are factual statements. They are honorable statements. I like the ones that maybe where I found out that they were -- I didn't know they didn't have a robust load planning initiative or fleet management initiative. You know, I'm assuming that they had those things already, they were going to refine them. Profitability on new freight across the over-the-road section, the brokerage operations. I know brokerage is robust, but you don't always know which one of those segments is most profitable, but you have to be playing in them if you are going to be a full-service transportation provider like US Xpress tries to be. Expand our fleet based on expected profitability and driver availability. Certainly.

Q. So is it your testimony that you do not contend that any of the statements on pages 9 and 10 were false or misleading when the document was issued back in

June of 2018?

BY MR. HOLLEMAN: Objection.

A. Well, I think that those are all plans and strategies that they had. The ability to carry through with them is -- you know, I assume that they knew, and that's an assumption -- I assume that they knew how to do those things, and new management and fresh management, fresh eyes would have helped -- would help. It's -- they have great relationships, and I said to leverage those, scale those up and do more of that. But the plans were good. I mean, they were misleading in that the ability to execute those is tough to know. Whether they knew they could do them or believed they could do them, I don't know.

Q. All right. So is it your contention that USX did not have the ability to achieve these goals in June of 2018?

BY MR. HOLLEMAN: Objection.

A. I'm not in a position to say whether they had it at that time they said these things or not or whether they planned to expand their executive pool or operational pool.

Q. Okay. Could you, please, turn to Exhibit Number -- or, excuse me, page No. 21 in Exhibit 1?

A. Okay. (Reviews.) Risk Factors? Is that it?

Q. That's it, sir. Do you see beginning on page 21 and continuing on for several pages following there's a section that is titled Risk Factors? Do you see that, sir?

A. Yes.

Q. Do you contend that any statement contained in these Risk Factors section was false or misleading when this document was issued in June of 2018?

BY MR. HOLLEMAN: Objection. And, Mr. Clowdis, if you need to take the time to read all the pages that Mr. Keel is referring to, by all means, take the time.

A. Thank you. (Reviews.) Okay. I'm at the end of 23. (Reviews.)

BY MR. HOLLEMAN: Brandon, what is the end page number in the section that you're referring to?

BY MR. KEEL: It ends on page 40.

A. Lord. Okay. I'll speed up. (Reviews.) I think I can -- I can -- I can -- I can -- I can sum this up, I think, without reading these, and what I wondered at the time was how does a -- how does someone that -- and I didn't read all of it at the time. I looked through them. And they are like, without digressing too long, they are what my doctors tell me when they are

about to repair a broken neck or replace a shoulder. This is all the things -- these are all the caveats or things that might go wrong, and there's some things in there that can and probably won't. I just wondered what someone that didn't understand that would have thought. Would they understand that upgrading tractors to reduce -- let me just take one example. Reduce the average age of our fleet, may not increase profitability or result in cost savings as expected, if at all. The odds on that happening in my opinion mean that if you upgrade your fleet you can recruit and retrain -- retain drivers in a much better fashion. You are going to get better fuel, you are going to get better maintenance. You are going to do that. So you have to weigh that. That's an activity cost basing thing that I did at Ernst & Young for truckers for years.

But most of these are things that I expect to see. They are caveats that -- things can happen, things can go wrong, but, yet, we have a seasoned management team. We've got a third generation leader and we've got great plans and we've got great customers. Rates have to be negotiated. Rates may fall. We had COVID, for gosh sakes, so I'm going to stop preaching. Yeah. I -- these did not -- they didn't -- they alarmed me so of how other investigators might look at this.

Q. Okay. But you, personally, Mr. Clowdis, you, personally, don't contend that any of the statements in this section were false or misleading when this document was issued; is that right?

BY MR. HOLLEMAN: Objection.

A. They were -- let me sum it up this way because I do feel that they were misleading to the point that they exaggerated to the extreme what can happen. The realistic expectation of those things were exaggerated and that -- I mean, fuel is going to be all over the place. All of those things are going to fluctuate. Anybody knows that, you know. I mean, a soccer mom buying this stock would probably not understand that about diesel fuel, but it's -- it's -- the odds are aren't going to happen.

Q. So is it your testimony that you considered parts of these risk factors misleading only in that they overstated the likely risk of some of these things?

BY MR. HOLLEMAN: Objection.

A. Or understatement.

BY THE WITNESS: I'm sorry, Scott. I'm sorry.

BY MR. HOLLEMAN: I was -- objection. You can answer.

A. Overstated and understated in certain cases.

You could never -- I could never understand, for example -- and I answer better with examples -- why drivers tend to choose to leave or what gets one driver to change jobs. You never know what drivers are going to do. You never know how long equipment is going to last. You never know what insurance premiums are going to do. So, yeah, those things could change, but, yeah, that's the -- the fact that we have these strategies and they are great, but there's a million reasons why they won't happen, and some of those were exaggerated to the extreme and some of them were not explained as succinctly as I think that soccer mom would have understood. Now, whether soccer moms bought the stock or not -- I'm sorry I went down that road, but, yeah, some of them were exaggerated and some of them were less than --

Q. Mr. Clowdis, can you identify for me any particular statement in this section that you contend was misleading in that it understated USX's risk?

BY MR. HOLLEMAN: Objection.

A. (Reviews.) I think some -- some of them misled me to the point that I thought, gosh, this is -- this just isn't -- this just isn't the way things are. You've got a great enterprise in your international operations. There was no mention that -- that there was

any contemplation of closing it within a year, Mexico, for example, and it still operates, but, yeah, those are -- those are things that I thought were --

Q. Anything else that you can identify that you think was understated in this Risk Factors section?

BY MR. HOLLEMAN: Objection.

A. Not as I sit here now. I haven't read it entirely. And, as I said, I accepted it as the caveats of worst case scenario.

Q. Is it fair to say, Mr. Clowdis, that you did not rely on any statements that are contained in this Rick Factors section when you were deciding to whether to purchase USX stock?

BY MR. HOLLEMAN: Objection.

A. As I recall, I didn't read it -- if I read it, I was looking for risk factor in -- gosh, in the retail trade, which is primarily the focus of dedicated. And I'm thinking that, you know, we are in one of the most robust economies we've had in a while, and I think that's -- to even mention that there might be inventory or inventory built that don't get completed is just wrong so...

Q. Did you say you don't know if you read the Risk Factors section before you purchased USX stock?

A. I don't remember when I read it. I must have,

but I don't know. I can't tell you that for sure. I'm not going to guess, so...

Q. I'm going to introduce another document so I'm going to e-mail it around here. It will just take a second.

A. Okay.

(CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS MARKED AS EXHIBIT NO. 2.)

(Briefly off the stenographic record.)

CONTINUING:

Q. (By Mr. Keel:) Sorry. It's taking a minute marking it in the exhibit share thing.

A. Well, I've slowed down dramatically all of a sudden. I'm not sure why, but as long as you guys can still hear me.

Q. We can hear you.

(Pausing to load exhibit.)

BY MR. HOLLEMAN: And, Brandon, I don't know if you are going to continue to post it to the Veritext exhibit share. The one thing that I know you probably don't want to preview what's going on too much, but if you post those to there, then I can probably download it and e-mail it to Mr. Clowdis possibly faster, but, again, that's up to you.

BY MR. KEEL: Understood. Thanks, Scott.

I might do that at the next break and just send a couple over your way. I don't know why it is taking so long right now. (Pauses.) It's taking forever to mark so I just went ahead and e-mailed it around without the sticker on it, but this will be Exhibit 2, and I'll replace it with a stamped one once it starts working again.

BY MR. HOLLEMAN: Are we done with Exhibit 1 for now?

BY MR. KEEL: Yeah, for the time being.

(Briefly off the stenographic record to discuss technical difficulties with the Veritext representative.)

BY THE VIDEOGRAPHER: Did you want to go off the record?

BY MR. KEEL: Scott, do you want to go off the record to see if the tech can get us squared away?

BY MR. HOLLEMAN: Let's go off the record.

BY THE VIDEOGRAPHER: The time is 1:02 p.m. We are going off the record.

(Break in the deposition.)

CONTINUING:

BY THE VIDEOGRAPHER: The time is 1:31 p.m. We are going on the record.

Q. Mr. Clowdis, this is the Certification. Do you

I can check my call log, but it's in the office. Just a second. (Refers to seating.) This is making me squirm. Just a second.

Q. Do you know how the three of you came to be grouped as Plaintiffs in this litigation?

BY MR. HOLLEMAN: Objection.

Q. I don't recall. I was asked that would I object to being a named Plaintiff in this, and I said, if it would help your -- if it would help the class, then sure. So I -- I -- it might have been Brandon. Not Brandon. You're Brandon. It might have been Scott.

I get this way in the afternoons so...

Q. How will the three of you, you and Ms. Terry and Mr. Robbins, go about making decisions for this litigation?

BY MR. HOLLEMAN: Objection.

A. I -- I think that the decisions that we are presented with we discuss. That was part of the conference call. I leave that up to the attorneys. They are better at structuring legal action than I am, and I'm assuming that Ms. Terry and Mr. Robbins are doing the same thing.

Q. So to the extent that decisions have to be made in this litigation, is it fair to say that you would defer to your attorneys for those matters?

BY MR. HOLLEMAN: Objection.

BY THE WITNESS: Sorry. Can I answer?

BY MR. HOLLEMAN: Yes, you may.

A. Yes.

Q. Do you have any understanding of how decisions will be made if the three of you or your counsel don't agree on a course of action for the case?

BY MR. HOLLEMAN: Objection.

A. No, I don't.

Q. Mr. Clowdis, have you read any documents that have been filed in this litigation?

A. I've reviewed them and then -- yeah, I have. I -- the Amended Complaint or the Complaint, I guess, that was filed with the State. I worried about that one the other day. I didn't even retain it. And when it went to Federal Court I read those or when they were presented and I reviewed them.

Q. Okay. So you reviewed the Amended Complaint that was filed in Federal Court and a Complaint that was filed in State Court; is that right?

A. As I recall it, yeah.

Q. Did you -- have you reviewed any other documents that have been filed in this litigation?

A. Not to my recollection right now. As I said, I -- my notebook is in the office so...

named Plaintiffs are being compensated for their work in this litigation?

A. I do not.

Q. Mr. Clowdis, do you have any understanding of what you've alleged in this litigation with respect to the individuals you named that are affiliated with USX?

A. Only to the extent that they, certainly, were instrumental in preparing the document or overseeing the document as it was prepared, and to that extent bear responsibility for it.

Q. Do you accuse them of committing fraud?

BY MR. HOLLEMAN: Objection.

A. No. Fraud is a -- that -- I'm careful with that word so...

Q. I'd like to move onto another topic for a minute, Mr. Clowdis. What is your current professional title?

A. Managing director of a small corporation.

Q. What is that small corporation?

A. Trans-Logistics Group, Incorporated.

Q. What does Trans-Logistics Group do?

A. We do transportation consulting and litigation support, which is rapidly becoming attorney advisory work only simply because of COVID, and we are at times retained by shippers to help them prepare requests for

for your allegations against the Defendants in this case were credible before you authorized the Complaint to be filed?

A. I'm assuming that the attorneys know that and would not have selected those people unless they were credible or had -- or they thought they had knowledge that would contribute to the case.

Q. You're relying on your counsel for that inquiry?

A. Yes. Yes, I am.

Q. Do you have -- do you have any obligation to determine if the allegations in the Complaint were accurate before you authorized that it be filed?

A. No.

BY MR. HOLLEMAN: Objection.

A. I'm sorry. Go ahead?

BY MR. HOLLEMAN: You may answer.

A. No, I wasn't asked to and didn't volunteer to and was pleased with both those answers.

BY MR. HOLLEMAN: And, Mr. Clowdis, I'd just caution you not to relay what we might have -- any privileged attorney/client communication, including what we might have or might not have discussed.

BY THE WITNESS: Oh, okay.

A. That's --