# EXHIBIT 2

Case 1:19-cv-00098-TRM-CHS    Document 129-2    Filed 12/16/20    Page 1 of 145
PageID #: 3122

**CONFIDENTIAL TRANSCRIPT**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

CHATTANOOGA DIVISION

LEWIS STEIN, Individually and on

Behalf of All Others Similarly

Situated,

    PLAINTIFFS,       Civil Action No. 1:19-cv-00098

    VS.        CLASS ACTION

U.S. XPRESS ENTERPRISES,  Judge Harry S. Mattice, Jr.

INC., ERIC FULLER, ERIC  Magistrate Judge Christopher

PETERSON, JASON GREAR,      Steger

MAX FULLER, LISA QUINN PATE,

MERRILL LYNCH, PIERCE,

FENNER & SMITH, INCORPORATED,

MORGAN STANLEY & CO., LLC,

J.P. MORGAN SECURITIES, LLC,

WELLS FARGO SECURITIES, LLC,

STEPHENS, INC., STIFEL, NICOLAUS &

COMPANY, INCORPORATED, and

WR SECURITIES, LLC,

    DEFENDANTS.

VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF CHARLES CLOWDIS

Reported by:

    Karen C. Popernik, MS CCR 1276, TN LCR 469

Page 1

Case 1:19-cv-00098-TRM-CHS   Document 129-2   Filed 12/16/20   Page 2 of 145
PageID #: 3123

VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF CHARLES CLOWDIS

Held on Thursday, October 8, 2020, at 10:40 a.m., CDT, with the witness appearing in Tennessee, at the instance of the U.S. Xpress Enterprises, Inc., Defendants

Appearances Noted Herein

(All appearing remotely)

Reported by:

Karen C. Popernik, MS CCR 1276, TN LCR 469

Videographed by: Tiffany Holloway

Page 2

Case 1:19-cv-00098-TRM-CHS    Document 129-2    Filed 12/16/20    Page 3 of 145
PageID #: 3124

APPEARANCES:    (ALL APPEARING REMOTELY:)

REPRESENTING THE PLAINTIFFS:

W. SCOTT HOLLEMAN, ESQUIRE

MARION PASSMORE, ESQUIRE

Bragar Eagel & Squire, P.C.

885 Third Avenue, Suite 3040

New York, NY  10022

917.325.3798

Holleman@bespc.com

Passmore@bespc.com

CHRISTOPHER M. WOOD, ESQUIRE

DEBASHISH BAKSHI, ESQUIRE

Robbins, Geller, Rudman & Dowd, LLP

414 Union Street, Suite 900

Nashville, TN  37219

615.244.2203

Cwood@grdlaw.com

DBakshi@rgrdlaw.com

APPEARANCES CONTINUED:

REPRESENTING THE U.S. XPRESS DEFENDANTS:

    BRANDON R. KEEL, ESQUIRE

    JESSICA CORLEY, ESQUIRE

    LISA BUGNI, ESQUIRE

    King & Spalding

    1180 Peachtree Street, NE, Suite 1600

    Atlanta, GA  30309

    404.572.2780

    Bkeel@kslaw.com

    Jpcorley@kslaw.com

    Lbugni@kslaw.com

REPRESENTING THE UNDERWRITER DEFENDANTS:

    WILLIAM J. SUSHON, ESQUIRE

    O'Melveny & Myers, LLP

    7 Times Square

    New York, NY  10036

    212.728.5693

    Wsushon@omm.com

Page 4

Veritext Legal Solutions
866 299-5127
Case 1:19-cv-00098-TRM-CHS    Document 129-2    Filed 12/16/20    Page 5 of 145
PageID #: 3126

## TABLE OF CONTENTS

Stipulation                                                    7

Examination by Mr. Keel                                        9

Exhibit No. 1, United States Securities and
     Exchange Commission Registration Statement        11

Exhibit No. 2, Certification Pursuant to the
     Federal Securities Laws                           28

Exhibit No. 3, Clowdis LinkedIn Profile                57

Exhibit No. 4, Clowdis CV                              68

Exhibit No. 5, Plaintiffs' Responses and
     Objections to the USX Defendants' First
     Requests for Production of Documents to
     Plaintiffs                                        84

Exhibit No. 6, Plaintiff Charles Clowdis's
     Responses and Objections to the USX
     Defendants' First Set of Interrogatories to
     Plaintiffs                                        96

Examination by Mr. Sushon                             105

Examination by Mr. Holleman                           109

Examination by Mr. Sushon                             113

Certificate of Court Reporter                         115

Deponent's Certificate and Errata Sheet               116

Veritext Legal Solutions
866 299-5127

LISTING OF EXHIBITS

Exhibit No. 1, United States Securities and

Exchange Commission Registration Statement    11

Exhibit No. 2, Certification Pursuant to the

Federal Securities Laws    28

Exhibit No. 3, Clowdis LinkedIn Profile    57

Exhibit No. 4, Clowdis CV    68

Exhibit No. 5, Plaintiffs' Responses and

Objections to the USX Defendants' First

Requests for Production of Documents to

Plaintiffs    84

Exhibit No. 6, Plaintiff Charles Clowdis's

Responses and Objections to the USX

Defendants' First Set of Interrogatories to

Plaintiffs    96

Veritext Legal Solutions
866 299-5127

Stipulation

It is stipulated by and between the parties that the Videoconference Videotaped Deposition of CHARLES CLOWDIS is being taken pursuant to notice under the Federal Rules of Civil Procedure and for all purposes permitted thereunder.

All objections, except as to the form of the question, are reserved until such time as the deposition, or any portion thereof, is sought to be introduced into evidence.

The reading and signing of the deposition by the deponent is expressly not waived.

It is further stipulated by the parties that the administration of the oath to the witness through videoconferencing means is allowed.

Veritext Legal Solutions
866 299-5127
Case 1:19-cv-00098-TRM-CHS    Document 129-2    Filed 12/16/20    Page 8 of 145
PageID #: 3129

BY THE VIDEOGRAPHER: Good morning. We are going on the record at 11:40 a.m. on October 8, 2020. This is Media Unit 1 of the video recorded deposition of Charles Clowdis -- I'm sorry, Charles Clowdis, taken by counsel in the matter of Lewis Stein versus U.S. Xpress Enterprises, Inc., et al.

This deposition is being held remotely. My name is Tiffany Holloway, from the firm Veritext, and the Court Reporter is Karen Popernik. I'm not authorized to administer an oath. I am not related to any party in this action, nor am I financially interested in the outcome.

Counsel and all present in the room and everyone attending remotely will now state their appearances and affiliations for the record. If there are any objections to proceeding, please state them at the time of your appearance, beginning with the noticing attorney.

BY MR. KEEL: Yes, this is Brandon Keel of King & Spalding on behalf of the USX Defendants, and also on behalf of USX Defendants we have Jessica Corley and Lisa Bugni.

BY MR. HOLLEMAN: Scott Holleman from Bragar Eagel & Squire on behalf of the Plaintiff and

Page 8

deponent, Charles Clowdis.

BY MR. WOOD: Chris Wood, Robbins Geller, on behalf of the Plaintiffs.

BY MS. PASSMORE: Marion Passmore, Bragar Eagel Squire on behalf of the Plaintiffs.

BY MR. CLOWDIS: My turn? Chuck Clowdis, one of the Plaintiffs.

BY MR. SUSHON: This is William Sushon of O'Melveny & Myers on behalf of the underwriter defendants. That's Merrill Lynch, Morgan Stanley, Wells Fargo Securities, J. P. Morgan Securities, Stifel Nicolaus, Stephens Inc., and WR Securities.

BY MR. BAKSHI: And this is Debashish Bakshi on behalf of Plaintiffs from Robbins Geller.

BY THE VIDEOGRAPHER: Will the Court Reporter, please, swear in the witness?

CHARLES CLOWDIS, having been first duly sworn, was examined and testified under oath as follows:

EXAMINATION BY MR. KEEL:

Q. Please state your name for the record.

A. Charles W. Clowdis.

Q. And, Mr. Clowdis, I mentioned a second ago, but my name is Brandon Keel, and I represent the USX Defendants in this litigation.

Could you confirm for me, sir, that you do not have your cell phone on and with you?

A. I have it with me, but it's not on.

Q. Thank you. Mr. Clowdis, I assume you've had your deposition taken before; is that right?

A. Yes, I have.

Q. How many times have you had your deposition taken?

A. Other the last thirty years probably a dozen times.

Q. Were those prior instances matters in which you were offering expert opinion testimony?

A. Some were, yes. Some were expert opinion witnessing in logistics disputes.

Q. So you're familiar with the deposition process; is that right?

A. Yes.

Q. I won't go back through all of those rules now except for one, and that is if you do not understand any question that I ask today, will you, please, let me know?

A. I sure will.

Page 10

Q. If you answer any question without telling me that you didn't understand something about it, we will assume that you understood the question. Is that fair?

A. I understand.

Q. And, Mr. Clowdis, are you logged into the exhibit share function?

A. I am not. I was under -- under duress getting this far, and I saw that, but I did not log in.

Q. Okay.

A. I could not. I'm sorry.

Q. Why don't we take a -- go off the record for a quick minute and allow Mr. Clowdis to log in?

A. How do I do that?

BY THE VIDEOGRAPHER: The time is 11:45 a.m. We are going off the record.

(Break in the deposition.)

CONTINUING:

BY THE VIDEOGRAPHER: The time is 12:29 p.m. We are going on the record.

Q. Mr. Clowdis?

A. Yes.

Q. You've now been shown what has been marked as Exhibit No. 1 for your deposition.

(UNITED STATES SECURITIES AND EXCHANGE COMMISSION REGISTRATION STATEMENT MARKED

Veritext Legal Solutions
866 299-5127

AS EXHIBIT NO. 1.)

Q. Have you seen this document before?

A. I'm sure I did. I don't recall when or where, but I'm sure I did.

Q. Okay. Do you -- do you know when the first time you saw this document was?

A. Probably when the announcement was made, and either -- either Yahoo Finance or someone that I was getting at the time. It might have been Wolfe Research. I got it off their website or their -- their whatever, and I pulled it -- it's not something I read in its entirety, but obviously I looked through it because I was -- I remembered at the time that some of the businesses that were mentioned as customers made quite an impression because they are good guys.

And so I don't do as much transportation consulting that I can talk about anymore with clients, but that impressed me, so, yeah, I do remember that part I'm scrolling down to. I remember the percentage of dedicated impressed me and the ability to do dedicated was -- and to keep some of those clients happy was impressive. So...

Q. When you say you recall at the time, what time are you referring to then?

A. When I first knew that there was going to be an

Page 12

IPO, before I bought the stock.

Q. Okay. Fair enough. Do you believe you reviewed this document prior to purchasing USX stock?

A. I -- I -- I -- I think -- I must have. I don't know when I reviewed it, to be honest with you.

Q. Okay.

A. It was not the primary reason because there were a lot of announcements in all the trade press so I saw it at some period of time. So...

Q. Okay. When you say it was not the primary reason, do you mean it was not the primary reason why you purchased USX stock?

A. It played a role in it. And I don't mean to be too verbose and talky. That's my Southern term for it. But from time to time clients that are similar to those are looking for carriers and who can do dedicated, who is doing dedicated, who is doing it well, and it just happened, maybe the stars aligned, but all of a sudden I was seeing U.S. Xpress trucks delivering to places like Family Dollar, Dollar Tree, as I recall. I lived at the time in a little bucolic area outside of Sewanee, Tennessee, and so the major shopping locales are Fred's, Dollar General, Family Dollar, Dollar Tree, those -- those types of retailers.

So I noticed U.S. Xpress, and I said, now,

there's something I should pay attention to.  I haven't been asked recently, but I may be asked to recommend who is doing this now.  So that's -- that prompted me to say, why don't I go to my little Merrill Lynch and a buy hundred shares.  So -- and did.

Q.  Okay.  Okay.  Mr. Clowdis, sitting here today do you contend that Exhibit No. 1 was false or misleading in any respect at the time that it was issued in June of 2018?

BY MR. HOLLEMAN:  Objection.

BY THE WITNESS:  I'm really not -- I'm sorry, Scott.  Did I --

BY MR. HOLLEMAN:  I'm objecting.  You can answer if you know how to answer that question.

A.  You're going to have to ask me the question again.  I was wondering what dropped.

Q.  No problem.  And, Mr. Clowdis, as you know, from time to time lawyers may object during the deposition, and unless your counsel instructs you not to answer, just go ahead and answer the question after the objection.

A.  Sure.

Q.  Okay?

A.  Okay.  Yes.  And the question was --

Q.  The question is do you contend that

Veritext Legal Solutions
866 299-5127

Exhibit No. 1 was false or misleading in any respect at the time that it was issued on June 11, 2018?

BY MR. HOLLEMAN: Same objection.

BY THE WITNESS: Go ahead and answer, Scott?

BY MR. HOLLEMAN: You can answer if you can. As Mr. Keel said, I may object from time to time. If I say, Mr. Clowdis, you don't have to answer, then you don't have to answer. But if I don't instruct you not to answer, then you can assume that you can answer any question as best you can.

A. Yes. I don't -- I'm not an attorney, especially I don't get involved in SEC matters and the filing and things of that nature so I -- I have no opinion on that as to whether it is misleading. I would -- that's not something I could really opine on from the point of view.

Q. Mr. Clowdis, do you know what this litigation is about?

A. Yes, it's about SEC -- some section SEC violations of the way that the information was presented to the prospective buyers of the stock.

Q. And -- and what is it that you contend -- what information do you contend was misrepresented to the buyers of the stock?

A. I think that it was not -- it was -- not familiar, I think, to a certain extent of forward-looking statements, but it was, we are going to pay down debt and we are going to -- and I guess they did. We are going to expand our areas of expertise, which are, at the time, long haul trucking, dedicated contract carriage, and, frankly, that's what caught my attention, as I said earlier, and I knew that they had, you know, a presence with the automotive guys, they had a presence in Mexico. They had a brokerage operation that I hear about from time to time. And I said, well, they seem to be structured well and that seemed to be reflected in what they said.

Q. What is it, Mr. Clowdis, that you contend was misrepresented by the company?

A. I think that the biggest thing that comes to me now in retrospect is that the concept of dedicated drivers versus over-the-road drivers in my experience, and I worked with drivers closely over the last fifty years probably, is that as a driver ages, and, frankly, as a fleet ages -- and this is not for education. This is not -- I'm not supposed to talk this much, but I will just to explain this. U.S. Xpress has been innovating and trying a lot of things, but they've got a situation I think they've missed on this one, in my opinion, in

Veritext Legal Solutions
866 299-5127

that more drivers are anxious to run a dedicated route than they are an over-the-road even though their pay might suffer a bit, but marginally they are willing to do that trade-off in order to be home. Well, that's a little bit reverse as to what I -- I thought would happen and that's what they allege happened. I think I didn't get all discouraged until we took a lot of the analysts' jobs. So that's what I think that they were either misleading on or indirect.

Q. And do you understand, Mr. Clowdis, that the claims in this case allege that USX made false or misleading statements to the public?

A. Yes.

Q. What false or misleading statements do you contend were issued by USX?

BY MR. HOLLEMAN: Objection.

A. I'll leave that up to the attorneys.

Q. Do you have any understanding sitting here today about what statements are alleged to be false or misleading in this case?

A. I understand what are false and misleading to me. Whether they are in violation of some section of the SEC regulations, which I know nothing about, I couldn't tell you.

Q. Understood. And I'm -- what I'm really asking,

Veritext Legal Solutions
866 299-5127

Mr. Clowdis, is do you know what statements USX issued that are alleged to be false or misleading in this case?

A. That -- that -- that dedicated was a target of growth, which I agreed with, and certainly, in hindsight was. We were coming off '18, one of the biggest years in trucking success, one of the best years we've had ever, and I looked at an optimistic outlook and I felt that they were positioned to do that. As it turns out, they really weren't. So...

Q. So it's your understanding that the allegations in this case are that USX misrepresented that the dedicated division was a target for growth?

BY MR. HOLLEMAN: Objection.

A. I don't -- it certainly was to me. A presence in so many -- so many vital areas that at the time, even though -- a presence in Mexico, a presence with the automotive that teaches you just-in-time delivery, makes you have disciplined drivers and makes you be available to deliver on time, they had all the features that I thought from primarily an advisor on the purchase of transportation, rather than with how truck lines operated, they looked positioned and poised for growth, and they seemed that optimistic, also.

Q. So just to clarify, Mr. Clowdis, I'm trying to get your understanding of what information USX issued

Page 18

that you claim was misleading. And I believe you testified that the information that was misleading in your view was that the dedicated division was a target for growth. Is that correct?

A. That was my -- that was the assumption I made after reading as much as I read of this and what I was seeing and hearing, that -- that we are willing to pull other drivers off to maintain our dedicated. Yeah, that's -- that's the impression I got from reading.

Q. And based on your work as a consultant in the industry you viewed it that that was a good idea for USX to target the dedicated division for growth. Is that what you said?

BY MR. HOLLEMAN: Objection.

A. I think dedicated is a good target for any truck line that can manage it. It does a lot of things for them. It lets them use that older driver. You didn't ask me that, but it lets them use the older driver, use older equipment in some cases, and retain someone in a driver position. And, frankly, you are doing contracts that you are assured of the revenue you're going to get for the period of the contract. The tricky part is pricing it correctly. That's too much information, but, yeah, that's my contention. Dedicated is a desired quality for most any truck line.

Page 19

Q. Mr. Clowdis, turning to Exhibit 1 for a second, if you could, please, turn to page 9, there's a little number on the bottom of the page -- if you could, please, turn to the page No. 9.

BY MR. HOLLEMAN: Hey, Brandon. You're talking about page 9 of the .pdf or page 9 of the document, which is actually page 18 of the .pdf?

BY MR. KEEL: Correct. The internal page 9. Not 9 of the .pdf but actually labeled No. 9 on the document.

A. Oh, okay. I got it now. It's not that preface. Page 9. Hold on. (Reviews.) Yeah. I think I've got it.

Q. All right. Mr. Clowdis, do you see, beginning on page 9, there's a section titled Our Strategies in bold on the left-hand side?

A. Yes.

Q. Do you see that?

A. Yes.

Q. And you see that that -- that section Our Strategies continues on to page 10. Do you see that?

A. Yes.

Q. Do you contend that any statement contained on pages 9 and 10 of this document were false or misleading

Page 20

at the time Exhibit 1 was issued in June 2018?

BY MR. HOLLEMAN: Objection.

A. I'm reading. Hold on. I've read parts of this. Or heard it or read it. I think at the time this was issued it was probably believed -- it was believed by the issuers. I think that -- I mean, who doesn't want to grow profitably as appropriate to the market cycle? That's -- these are -- these are -- these are factual statements. They are honorable statements. I like the ones that maybe where I found out that they were -- I didn't know they didn't have a robust load planning initiative or fleet management initiative. You know, I'm assuming that they had those things already, they were going to refine them. Profitability on new freight across the over-the-road section, the brokerage operations. I know brokerage is robust, but you don't always know which one of those segments is most profitable, but you have to be playing in them if you are going to be a full-service transportation provider like US Xpress tries to be. Expand our fleet based on expected profitability and driver availability. Certainly.

Q. So is it your testimony that you do not contend that any of the statements on pages 9 and 10 were false or misleading when the document was issued back in

Veritext Legal Solutions
866 299-5127

June of 2018?

BY MR. HOLLEMAN: Objection.

A. Well, I think that those are all plans and strategies that they had. The ability to carry through with them is -- you know, I assume that they knew, and that's an assumption -- I assume that they knew how to do those things, and new management and fresh management, fresh eyes would have helped -- would help. It's -- they have great relationships, and I said to leverage those, scale those up and do more of that. But the plans were good. I mean, they were misleading in that the ability to execute those is tough to know. Whether they knew they could do them or believed they could do them, I don't know.

Q. All right. So is it your contention that USX did not have the ability to achieve these goals in June of 2018?

BY MR. HOLLEMAN: Objection.

A. I'm not in a position to say whether they had it at that time they said these things or not or whether they planned to expand their executive pool or operational pool.

Q. Okay. Could you, please, turn to Exhibit Number -- or, excuse me, page No. 21 in Exhibit 1?

Page 22

A. Okay. (Reviews.) Risk Factors? Is that it?

Q. That's it, sir. Do you see beginning on page 21 and continuing on for several pages following there's a section that is titled Risk Factors? Do you see that, sir?

A. Yes.

Q. Do you contend that any statement contained in these Risk Factors section was false or misleading when this document was issued in June of 2018?

BY MR. HOLLEMAN: Objection. And, Mr. Clowdis, if you need to take the time to read all the pages that Mr. Keel is referring to, by all means, take the time.

A. Thank you. (Reviews.) Okay. I'm at the end of 23. (Reviews.)

BY MR. HOLLEMAN: Brandon, what is the end page number in the section that you're referring to?

BY MR. KEEL: It ends on page 40.

A. Lord. Okay. I'll speed up. (Reviews.) I think I can -- I can -- I can -- I can -- I can sum this up, I think, without reading these, and what I wondered at the time was how does a -- how does someone that -- and I didn't read all of it at the time. I looked through them. And they are like, without digressing too long, they are what my doctors tell me when they are

Page 23

about to repair a broken neck or replace a shoulder. This is all the things -- these are all the caveats or things that might go wrong, and there's some things in there that can and probably won't. I just wondered what someone that didn't understand that would have thought. Would they understand that upgrading tractors to reduce -- let me just take one example. Reduce the average age of our fleet, may not increase profitability or result in cost savings as expected, if at all. The odds on that happening in my opinion mean that if you upgrade your fleet you can recruit and retrain -- retain drivers in a much better fashion. You are going to get better fuel, you are going to get better maintenance. You are going to do that. So you have to weigh that. That's an activity cost basing thing that I did at Ernst & Young for truckers for years.

But most of these are things that I expect to see. They are caveats that -- things can happen, things can go wrong, but, yet, we have a seasoned management team. We've got a third generation leader and we've got great plans and we've got great customers. Rates have to be negotiated. Rates may fall. We had COVID, for gosh sakes, so I'm going to stop preaching. Yeah. I -- these did not -- they didn't -- they alarmed me so of how other investigators might look at this.

Page 24

Q. Okay. But you, personally, Mr. Clowdis, you, personally, don't contend that any of the statements in this section were false or misleading when this document was issued; is that right?

BY MR. HOLLEMAN: Objection.

A. They were -- let me sum it up this way because I do feel that they were misleading to the point that they exaggerated to the extreme what can happen. The realistic expectation of those things were exaggerated and that -- I mean, fuel is going to be all over the place. All of those things are going to fluctuate. Anybody knows that, you know. I mean, a soccer mom buying this stock would probably not understand that about diesel fuel, but it's -- it's -- the odds are aren't going to happen.

Q. So is it your testimony that you considered parts of these risk factors misleading only in that they overstated the likely risk of some of these things?

BY MR. HOLLEMAN: Objection.

A. Or understatement.

BY THE WITNESS: I'm sorry, Scott. I'm sorry.

BY MR. HOLLEMAN: I was -- objection. You can answer.

A. Overstated and understated in certain cases.

Page 25

You could never -- I could never understand, for example -- and I answer better with examples -- why drivers tend to choose to leave or what gets one driver to change jobs.  You never know what drivers are going to do.  You never know how long equipment is going to last.  You never know what insurance premiums are going to do.  So, yeah, those things could change, but, yeah, that's the -- the fact that we have these strategies and they are great, but there's a million reasons why they won't happen, and some of those were exaggerated to the extreme and some of them were not explained as succinctly as I think that soccer mom would have understood.  Now, whether soccer moms bought the stock or not -- I'm sorry I went down that road, but, yeah, some of them were exaggerated and some of them were less than --

Q.  Mr. Clowdis, can you identify for me any particular statement in this section that you contend was misleading in that it understated USX's risk?

BY MR. HOLLEMAN:  Objection.

A.  (Reviews.)  I think some -- some of them misled me to the point that I thought, gosh, this is -- this just isn't -- this just isn't the way things are. You've got a great enterprise in your international operations.  There was no mention that -- that there was

Page 26

Veritext Legal Solutions
866 299-5127
Case 1:19-cv-00098-TRM-CHS    Document 129-2    Filed 12/16/20    Page 27 of 145
PageID #: 3148

any contemplation of closing it within a year, Mexico, for example, and it still operates, but, yeah, those are -- those are things that I thought were --

Q. Anything else that you can identify that you think was understated in this Risk Factors section?

BY MR. HOLLEMAN: Objection.

A. Not as I sit here now. I haven't read it entirely. And, as I said, I accepted it as the caveats of worst case scenario.

Q. Is it fair to say, Mr. Clowdis, that you did not rely on any statements that are contained in this Rick Factors section when you were deciding to whether to purchase USX stock?

BY MR. HOLLEMAN: Objection.

A. As I recall, I didn't read it -- if I read it, I was looking for risk factor in -- gosh, in the retail trade, which is primarily the focus of dedicated. And I'm thinking that, you know, we are in one of the most robust economies we've had in a while, and I think that's -- to even mention that there might be inventory or inventory built that don't get completed is just wrong so...

Q. Did you say you don't know if you read the Risk Factors section before you purchased USX stock?

A. I don't remember when I read it. I must have,

Page 27

but I don't know.  I can't tell you that for sure.  I'm not going to guess, so...

Q.  I'm going to introduce another document so I'm going to e-mail it around here.  It will just take a second.

A.  Okay.

(CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS MARKED AS EXHIBIT NO. 2.)

(Briefly off the stenographic record.)

CONTINUING:

Q.  (By Mr. Keel:)  Sorry.  It's taking a minute marking it in the exhibit share thing.

A.  Well, I've slowed down dramatically all of a sudden.  I'm not sure why, but as long as you guys can still hear me.

Q.  We can hear you.

(Pausing to load exhibit.)

BY MR. HOLLEMAN:  And, Brandon, I don't know if you are going to continue to post it to the Veritext exhibit share.  The one thing that I know you probably don't want to preview what's going on too much, but if you post those to there, then I can probably download it and e-mail it to Mr. Clowdis possibly faster, but, again, that's up to you.

BY MR. KEEL:  Understood.  Thanks, Scott.

Veritext Legal Solutions
866 299-5127

I might do that at the next break and just send a couple over your way.  I don't know why it is taking so long right now.  (Pauses.)  It's taking forever to mark so I just went ahead and e-mailed it around without the sticker on it, but this will be Exhibit 2, and I'll replace it with a stamped one once it starts working again.

BY MR. HOLLEMAN:  Are we done with Exhibit 1 for now?

BY MR. KEEL:  Yeah, for the time being.

(Briefly off the stenographic record to discuss technical difficulties with the Veritext representative.)

BY THE VIDEOGRAPHER:  Did you want to go off the record?

BY MR. KEEL:  Scott, do you want to go off the record to see if the tech can get us squared away?

BY MR. HOLLEMAN:  Let's go off the record.

BY THE VIDEOGRAPHER:  The time is 1:02 p.m. We are going off the record.

(Break in the deposition.)

CONTINUING:

BY THE VIDEOGRAPHER:  The time is 1:31 p.m.  We are going on the record.

Q.  Mr. Clowdis, this is the Certification.  Do you

Page 29

recognize this document?

A. Certification Pursuant to the Federal Securities Laws.

Q. Okay. And is that your signature on the bottom of the first page?

A. Yes, it is.

Q. Could you, please, turn for me to the third page of this document?

A. Yes.

BY MR. HOLLEMAN: And for the record we are going to designate this transcript as confidential. The Court has not yet entered a confidentiality order, but these documents have been stamped Confidential so they'll be designated as confidential pursuant to the anticipated entry of the confidentiality order.

Q. Mr. Clowdis, do you see at the bottom right-hand corner of this page it says USX_Clowdis_0003?

A. I do.

Q. Okay. Could you describe for me what this page is showing, please?

A. That's my certification as being qualified to enter as a lead Plaintiff in this class action.

Q. Do you recognize -- the page 3 that we are looking at now, is this a statement from your brokerage account?

Page 30

A. Yes, it is.

Q. Okay. And the date on the top left-hand corner of it says August 19, 2020. Is that when you printed this document?

A. That is.

Q. Okay. And the document shows that you purchased 100 shares of USX stock on June 18, 2018; is that correct?

A. That's correct.

Q. Is that the total amount of USX stock that you have ever purchased?

A. To my knowledge and recollection, it is. I don't think I ever owned any when they were public before. I don't own a lot of common stocks, I don't. Never have. So, yes, that's the only stock I've ever -- U.S. Xpress stock, common stock, I've ever owned.

Q. Okay. Have you ever sold any of your USX stock?

A. No.

Q. So you still hold 100 shares of USX common stock today?

A. Yes.

Q. Now, you mentioned that it's not typical for you to purchase common stock. Right?

A. Well, if we hadn't redacted it, you would see

Page 31

it's -- I purchased a little bit of several things.  If I'm interested in it or I know management or if I just want to track them a little bit better than just being a reader of a trade press so...  Yeah, that's -- I don't.  My money is not -- has never been in common stock.

Q.  Why did you decide to purchase USX common stock on June 18, 2018?

A.  Well, I had seen both in several, not necessarily trade publications, but living in Chattanooga you read the business journals and both -- the newspaper, and I had read it in other places that they were going to do a public offering, and that perks my interest, people ask about it.  So I said, shoot, that's -- let me order -- let me go to Merrill Edge and spend a little money.  So that's why I did it.

Q.  And at that point --

A.  In addition to what I told you earlier about being impressed with having seen them in more interesting locations all of a sudden, like dedicated deliveries.

Q.  All right.  Any other reason you can recall why you purchased USX stock?

A.  Other than that management had looked new or refreshed or legacy.  I didn't know many of them but just two.  I doubt that I ever even met the others, but

Page 32

Veritext Legal Solutions
866 299-5127
Case 1:19-cv-00098-TRM-CHS    Document 129-2    Filed 12/16/20    Page 33 of 145
PageID #: 3154

I said, I think this might be time for U.S. Xpress, and it would be nice to have them right here. I like to visit carriers from time to time. It always helps if you've got something -- got a reason for being there. So...

Q. Could you describe for me all of the documents that you recall reading about USX before you decided to purchase common stock?

BY MR. HOLLEMAN: Objection.

A. I'm not sure I can. I mean, I can speculate on it. It would be purely a guess. I subscribe to some of those magazines, some of the trade publications. I get the Chattanooga Times Free Press, The Wall Street Journal. I can't list all of them, but the usual suspects.

Q. Okay. Sitting here today there's nothing else that you recall reading about USX prior to deciding to purchase common stock?

A. There could have been something. As I said I've got an icon from Yahoo Finance. There could have been something there. I used to be on the Wolfe Group, and that's no pun intended, Mr. Group, Scott Group, used to publish -- or may still do it -- when I was in my day job ten years ago, or ten years, three years ago, two years ago so I was on that, and it could have there. I

Veritext Legal Solutions
866 299-5127

don't -- I don't recall.

Q. Nothing specifically you can recall reading other than what you've said already.

A. Not specifically today, no.

Q. Do you manage all of your trades on your brokerage account yourself?

A. Yes.

Q. Did anybody recommend to you that you should buy USX common stock?

A. No.

Q. Okay. Is it common for you to purchase common stock in trucking companies?

BY MR. HOLLEMAN: Objection.

A. It's -- it's more frequent than others, but probably right now, out of five stocks of whatever is on there, gosh, only -- only two are in the transportation industry so...

Q. Had you purchased stock in other trucking companies prior to purchasing stock in USX?

A. Over the years the only stock that I've been given was while I was an employee of Roadway Express and probably Transcon Lines, but that's been 25 years ago so, or more, longer.

Q. And why have you decided not to sell USX stock?

A. I'm just watching it flop around. I watched --

Page 34

pardon the term. I'm just watching the stock price move around. I don't necessarily need the money right now. And it is just kind of interesting to watch, so... That's true of all the stocks on that page.

Q. Do you have any current plan to dispose of your USX stock?

A. No.

Q. Do you understand -- well, strike that.

Why did you decide to file a lawsuit against USX?

BY MR. HOLLEMAN: Objection.

A. Oh, I think the precipitous drop in the stock price was what caught my attention, and I started listening to some of the analysts calls and the other trade presence, whatever, the typical trade presence, and I said, this just really shouldn't be. And this is something that if I had time, I would really delve into, but I didn't know the -- enough to -- I didn't have the time and the inclination until someone came along and said, other people feel the same way you do, so that's what prompted you.

Q. Okay. When you say after seeing the stock drop you read trade press and you said to yourself, well, this shouldn't be, what is the "this" you are referring to there?

Page 35

A. This, this, this missing of our projections, this missing of opportunities. This was in 2019 when -- or 2018, the end of 2018, 2019 when the stock dropped precipitously in my opinion, at least, and I don't watch it every day, but it dropped, and I said, gee, why is this happening? And that's when I started listening and reading and paying more closely -- close attention to what was happening.

Q. And what did you learn from listening and reading and paying closer attention to what was happening with USX at that point in time?

A. Well, I learned that -- that they were having a hard time getting drivers, keeping drivers. They were moving out of the Mexico operation. Things were -- things were changing, and it just -- nothing was happening as we expected, and it was worrisome.

Q. Did you contact a lawyer to pursue a lawsuit about USX?

A. No. Well, I read probably on one of the websites that -- that a class action was contemplated. Are you a USX shareholder? Fill in the blanks and someone may call.

I filled in the blanks and someone called, and I was, I guess, a little bit concerned about something I expressed earlier, that, you know, I don't

Page 36

have the money and inclination to do this, but if other people feel the same way, then, perhaps, I could be of service so...

Q. And who contacted you after you plugged your information into a website?

A. Gosh. An attorney and, I guess, his paralegal, an attorney Brandon Walker from Bragar Squire -- Bragar Eagel and Squire, and his paralegal, I think, was Lillie, a nice young lady. So...

Q. All right. Did you retain Mr. Walker to represent you in this case?

A. I told them, yes, I guess I must have, because I --

BY MR. HOLLEMAN: And, Mr. Clowdis, I'm just going to caution you not to reveal any of the substance of the conversations that you might have had with Mr. Walker or Lillie or anyone else in the firm.

BY THE WITNESS: Sure. I'm sorry.

BY MR. HOLLEMAN: So far so good.

Q. So you put your information into a website that you saw about a potential class action against USX and you received a phone call from Mr. Walker of Bragar Eagel & Squire. Right?

A. As I recall, yes.

Q. Okay. And when did you decide to retain

Veritext Legal Solutions
866 299-5127

Bragar Eagel & Squire?

A. Probably -- I don't know. It was -- it was not the same day and not the same week. I did a little investigation, as I like to do. I think that's -- on who they are. They have a good reputation, and, so, yeah, if my participation will -- if I can limit anything in my -- then why not? Let's do. Let's go. I'd like to find some answers, too, so that's how I approached it.

Q. When did you first have this call with Mr. Walker?

A. I don't recall. It was -- it was -- gosh. I have no idea, to be honest with you.

Q. Roughly how long after that call was it when you retained the law firm?

A. Several weeks probably.

Q. Did you sign an engagement letter?

A. I must have. I didn't retain copies of this.

Q. Before deciding -- well, are you represented by any attorneys other than Bragar Eagel & Squire in this case?

A. Not in this case, no.

BY MR. HOLLEMAN: Objection.

A. Sorry. I may have answered that wrong. I mean, there are other attorneys representing other

Page 38

people, but they are representing me.

Q. You don't have an agreement with any counsel other than Bragar Eagel & Squire related to this litigation; is that right?

A. I do not.

Q. Before deciding to retain Bragar Eagel & Squire did you conduct any research on any other potential law firms?

A. I don't remember. I did look in Martindale-Hubbell, which I do from time to time, and I think that's probably it. But I do know that's -- I tell you, I can feel comfortable saying that I did do a Martindale-Hubble check so...

Q. When you say you did a Martindale-Hubbell check, was that a check to make sure that the person you spoke with was a licensed attorney?

A. Make sure they were who they said they were, yes.

Q. Okay. Did you do any other research into Bragar Eagel & Squire before deciding to retain them as your counsel in this case?

A. I looked at their website and...

Q. Anything else, sir?

A. Not that I can recall. I'm trying to be thorough here, and --

Page 39

Q. And you didn't speak with any other attorneys about this potential litigation prior to retaining Bragar Eagel & Squire; is that right?

A. Only my personal attorney that -- ███████

███████████████████████████

███████████████████████████

███████████████████ ██████████

██████████████████████████████

██ ████████████████████

██ ███████████

██ ████████████████████████████

██ █████████████

Q. And how often have you been in contact with your counsel since this litigation was filed?

A. Frequently enough. I have never had to call and say, what's going on? They are very communicative and we have -- fairly often, being at least -- I can't say once a month, but frequently enough.

Q. When you communicate with your counsel about this case, do you do so via e-mail or over the phone?

A. Most of the time it's with a phone call.

Q. Have you had any communication with your counsel over e-mail about this case?

A. I'm sure we've exchanged e-mails and documents so, yes.

Page 40

Q. Have you ever met with your counsel in person?

A. I want to say yes, but I'm not sure.

Q. Which specific attorneys are representing you in this case?

A. Scott and -- and Marion.

Q. Mr. Walker is not representing you in this litigation to your understanding?

A. To my understanding he isn't. I haven't talked with him since -- since Scott took over.

Q. Other than your attorneys and ▮▮▮▮▮▮ have you communicated with anybody else about this case?

A. Not to my recollection. I have had -- when you are in Chattanooga, it affects the two truck lines that are based here, and if you've been in the industry as long as I have, you'll get calls from all kinds of people, what is going on, are they going to do this, is this going to do that, do you know if -- but, yeah, I don't recall all who, but, you know, I get those calls. I decline to talk to the press about much of anything anymore.

Q. So is it your testimony that you've received calls from non- -- not your lawyers, but from other people?

A. Primarily journalists. I get calls on any kind of litigation. I'm sorry to interrupt you, but...

Page 41

Q.  That's okay.

Do you recall any particular person you've spoken with about this case other than your counsel and ██████████

A.  Not in particular, no.

Q.  Do you exchange any e-mails with anybody about this case other than your counsel and ██████████

A.  Not that I'm aware of. ████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████  ████████

Q.  And why did you send an e-mail to your boss -- your former boss at ████ about this case?

A.  He was asking about the relationship of U.S. Xpress and one of their subsidiaries, and he wanted to know if another company was a subsidiary, and I told him I had no idea, and I didn't.  So that's the extent of that.

Q.  And that was an e-mail about USX more generally and not actually about this litigation.  Is that right?

A.  No, not about the litigation.  Nothing -- not at all.  I don't think he even knows about it so...

Q.  Okay.  What is it you are seeking to achieve in this litigation, sir?

BY MR. HOLLEMAN:  Objection.

Page 42

A.   I think -- I think that's more -- if you are talking about damages or if you are talking about -- I'm not a damage calculator and never pretend to be.  I don't deal in actuarial science so...  I'd just like to get some answers as to what the defense is and what happened and exactly what the -- what the reaction is.

Q.   Now, when you say you would like to get some answers about what happened, what do you mean?

A.   The precipitous drop in stock and all of these things that have happened.  What are their plans now?  We've regrouped.  What are the plans?  We haven't regrouped because we are not back to the offering price yet.

Q.   And you'd like to know what those plans are going forward because you are still a stockholder?

A.   Yeah.  And I'm still an interested participant in the logistics field so...  And I live here so...

Q.   Okay.  And, Mr. Clowdis, what is it that you contend USX did wrong that you're -- has caused you to authorize a lawsuit in this case?

BY MR. HOLLEMAN:  Objection.

A.   I -- I -- what they did wrong, what they did that was illegal, you know, I'm not an attorney so I can't tell you about the securities laws that may have been violated.  It is just that it was, in my opinion,

Page 43

was -- the explanation for the drop in stock and the changes and things like inability to hire drivers, those kind of things disturb me. I mean, I deal with other truck lines and everybody has trouble hiring drivers, but not to the extent that what this has been portrayed.

Q. And you are aware that the trucking industry, that there had been a shortage of qualified drivers at the time of the IPO and long before that. Right?

BY MR. HOLLEMAN: Objection.

A. Yes.

Q. And you've been quoted in a series of articles and publically-available documents discussing how there was a shortage of qualified drivers in the trucking industry prior to the IPO. Right?

BY MR. HOLLEMAN: Objection.

A. Yes, there is. There is a plethora of articles where I've been quoted. So...

Q. And how did you -- how were you aware about the shortage of qualified drivers in the trucking industry that existed prior to the time of USX's IPO?

A. How was I aware? That's a broad question.

Q. (Nods head.)

A. Years and years ago I had a driver retention program when we didn't know driver retention was going to be as critical as it is today. So it has been an

Page 44

Q. Aside from USX, Mr. Clowdis, who are you suing in this litigation?

A. The key players are named in the suit at U.S. Xpress.

Q. And who are those key players?

A. The Fullers, two people I don't know, and Lisa Quinn Pate.

Q. Are you suing anyone else in this litigation other than USX, the Fullers, two people you don't know, and Lisa Quinn Pate?

A. Not that I'm aware of.

Q. Mr. Clowdis, who is Deirdre Terry?

A. She is the named Plaintiff.

Q. Who is Brian Robbins?

A. He is the other named Plaintiff.

Q. Have you ever spoken or communicated in any way with Deirdre Terry or Brian Robbins?

A. I've been on two conference calls with them.

Q. Were those conference calls in which your

Page 45

counsel was also present?

A.   Absolutely.  Yes.

Q.   Were those calls ones in which counsel for Ms. Terry and Mr. Robbins were also present?

A.   Yes.

Q.   Was anybody on those conference calls other than you, Ms. Terry, Mr. Robbins, and your counsel?

A.   Yeah, there were -- there were people from the other two law firms.  Don't press me for the names, but I can guess at a couple of them.  There's -- gosh. Don't press me.  So...

Q.   Sitting here today you're not sure who was representing Deirdre Terry and Brian Robbins?

BY MR. HOLLEMAN:  Objection.

A.   Yes.  The law firms are Levi & -- or Levi & Korsinsky.  Nobody pronounces that correctly, I don't think.  And Robbins Geller.

Q.   You're aware of the law firms that are representing them, just not the specific attorneys.  Is that right?

BY MR. HOLLEMAN:  Objection.

A.   I don't recall any names.  I mean, I would be hard pressed to get the names correct.

Q.   When did these two conference calls take place?

A.   In the last four or five, three or four months.

Page 46

I can check my call log, but it's in the office.  Just a second.  (Refers to seating.)  This is making me squirm.  Just a second.

Q.  Do you know how the three of you came to be grouped as Plaintiffs in this litigation?

BY MR. HOLLEMAN:  Objection.

Q.  I don't recall.  I was asked that would I object to being a named Plaintiff in this, and I said, if it would help your -- if it would help the class, then sure.  So I -- I -- it might have been Brandon.  Not Brandon.  You're Brandon.  It might have been Scott.

I get this way in the afternoons so...

Q.  How will the three of you, you and Ms. Terry and Mr. Robbins, go about making decisions for this litigation?

BY MR. HOLLEMAN:  Objection.

A.  I -- I think that the decisions that we are presented with we discuss.  That was part of the conference call.  I leave that up to the attorneys.  They are better at structuring legal action than I am, and I'm assuming that Ms. Terry and Mr. Robbins are doing the same thing.

Q.  So to the extent that decisions have to be made in this litigation, is it fair to say that you would defer to your attorneys for those matters?

Page 47

BY MR. HOLLEMAN: Objection.

BY THE WITNESS: Sorry. Can I answer?

BY MR. HOLLEMAN: Yes, you may.

A. Yes.

Q. Do you have any understanding of how decisions will be made if the three of you or your counsel don't agree on a course of action for the case?

BY MR. HOLLEMAN: Objection.

A. No, I don't.

Q. Mr. Clowdis, have you read any documents that have been filed in this litigation?

A. I've reviewed them and then -- yeah, I have. I -- the Amended Complaint or the Complaint, I guess, that was filed with the State. I worried about that one the other day. I didn't even retain it. And when it went to Federal Court I read those or when they were presented and I reviewed them.

Q. Okay. So you reviewed the Amended Complaint that was filed in Federal Court and a Complaint that was filed in State Court; is that right?

A. As I recall it, yeah.

Q. Did you -- have you reviewed any other documents that have been filed in this litigation?

A. Not to my recollection right now. As I said, I -- my notebook is in the office so...

Page 48

Q. And when did you review the Amended Complaint that was filed in the Federal litigation?

A. I've --

BY MR. HOLLEMAN: Objection.

A. I can't recall, honestly.

Q. Was it within the last six months?

A. Probably.

Q. Mr. Clowdis, how are your counsel being compensated for their work on this matter?

A. I have no idea.

Q. Do you have any understanding as to how the other counsel involved representing the other Plaintiffs will be compensated for their work in this matter?

A. Let me make sure I understand the question. Do I understand how the counsel, the other counsel, are being compensated?

Q. That's correct, sir.

A. No, I don't.

BY MR. HOLLEMAN: Brandon, I don't mean to interrupt. I just want to make sure you're clear about which counsel. I -- it seems like Mr. Clowdis isn't sure who you are talking about.

BY MR. KEEL: Sure. I can restate it.

Q. Mr. Clowdis, do you have any understanding as to how the other counsel representing the other two

Veritext Legal Solutions
866 299-5127

named Plaintiffs are being compensated for their work in this litigation?

A. I do not.

Q. Mr. Clowdis, do you have any understanding of what you've alleged in this litigation with respect to the individuals you named that are affiliated with USX?

A. Only to the extent that they, certainly, were instrumental in preparing the document or overseeing the document as it was prepared, and to that extent bear responsibility for it.

Q. Do you accuse them of committing fraud?

BY MR. HOLLEMAN: Objection.

A. No. Fraud is a -- that -- I'm careful with that word so...

Q. I'd like to move onto another topic for a minute, Mr. Clowdis. What is your current professional title?

A. Managing director of a small corporation.

Q. What is that small corporation?

A. Trans-Logistics Group, Incorporated.

Q. What does Trans-Logistics Group do?

A. We do transportation consulting and litigation support, which is rapidly becoming attorney advisory work only simply because of COVID, and we are at times retained by shippers to help them prepare requests for

Page 50

proposals.  And so I work on the shipper side as much as I do on the carrier side now.

Q.  What are your responsibilities as your -- in your role as the managing director of Trans-Logistics Group?

A.  To make sure we get our -- our taxes filed and that I have money to pay our contractors if we have them.  So...

Q.  How long have you held your current role?

A.  Since 20- -- early 2018.

Q.  And part of your work, Mr. Clowdis, includes serving as an expert witness for litigation matters; is that correct?

A.  Yes, it is.

Q.  Roughly what percentage of your work involves serving in a capacity of an expert witness or a consultant for litigation?

BY MR. HOLLEMAN:  Objection.

A.  This year is a strange year.  In the past, and especially when I was at IHS Markit, it was probably less than 10 percent.  It probably jumped up in 2018 to like 25 percent.  Now it is about -- since I can't travel to job sites, it's mostly over the phone so it's probably a good 50 percent now.

Q.  How long have you been serving as an expert

witness in litigation matters?

BY MR. HOLLEMAN: Objection.

A. That goes all the way back to Ernst & Young days so that was back in the '80s. They had a litigation support group, and I was their transportation go-to guy if they were called upon to do -- get involved in anything dealing with transportation.

Q. And over the course -- going back to 1980, you have on a number of occasions been retained to serve as an expert witness in cases involving the trucking industry. Correct?

A. Oh, yes. Yes.

Q. How many times have you been retained as an expert, testifying or otherwise, for a litigation matter involving the trucking industry?

BY MR. HOLLEMAN: Objection.

A. Oh, I -- thank you, Scott. It would be speculation to say that. Retained, probably I can't even count so...

Q. More than -- more than 20 times?

A. Yes.

Q. More than 50 times?

A. Over 30 years, yes.

Q. Do you think you've been retained as an expert in matters involving the trucking industry more than a

Page 52

hundred times in your career?

A. No. No. Not at all. Everything I do touches on the trucking industry, but not specifically for truck lines or -- not specifically so -- not involving.

Q. Have you ever worked with any of the lawyers involved in this case?

A. No.

Q. Have you ever offered expert testimony in a case that was pending in the Eastern District of Tennessee?

A. No, I haven't.

Q. Have you ever offered expert testimony in a case that was pending in any Court in Tennessee?

A. Yes. Several years ago I gave a deposition in a case ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ I didn't look back. And that's the only one. I can get you the details on that. I just don't have them here.

Q. What was the general subject matter of the litigation if you recall?

▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆

Page 53

Q. Have you been qualified as an expert witness in cases involving the trucking industry?

BY MR. HOLLEMAN: Objection.

A. Yeah, I expect so, yes.

Q. Has your testimony ever been excluded when you've offered testimony as an expert witness?

BY MR. HOLLEMAN: Objection.

A. In the interest of yet -- of -- of being forthcoming, I never thought so. I still don't know specifically that I have, but someone alleged that I had been disqualified on a case in Alabama, but I don't know that to be true so...

Q. And when did somebody allege that you had been disqualified or your testimony had been disqualified in a case in Alabama?

A. Probably last year, I think, on a case last year.

Q. What was that case?

A. I don't -- I'd rather not say. It's still in litigation.

Q. Are you serving as a testifying expert in that case?

A. Yes, I am.

Q. Okay. Can you disclose -- can you tell me what the name of the case is?

Page 54

BY MR. HOLLEMAN:  Now, Mr. Clowdis, I just want to make sure that if you entered into any agreements, be mindful of your obligation to other parties.

A.  I am under -- I mean, I'm under a strict confidentiality agreement with both sides there so...

Q.  Okay.  Well, what we'll do is take that up with your counsel separately because this testimony is going to be marked confidential, but we can deal with that separately.

Q.  Do you intend to offer any expert testimony in this case?

BY MR. HOLLEMAN:  Objection.

A.  I haven't been asked to and haven't asked to do or I haven't been asked to do it, so, no.  I don't plan to.

Q.  Are you being compensated in any way for your role in this litigation?

A.  No.

Q.  Have you been promised any compensation that you will receive in the future for your role in this litigation?

Page 55

A. No.

Q. How would you describe your expertise?

BY MR. HOLLEMAN: Objection.

A. Well, Ernst & Young arguably called me their transportation economist and cost specialist operation specialist, and I've never had an ego that driven, but it's difficult to find a witness that can -- that is willing to do these things. And so I probably -- there are probably a dozen guys out there that do the same thing I do. I don't do it nearly as much as some of the other guys. And I don't do accidents, per se. Road accidents, I don't do those. There are thousands of guys that will do that. And -- but -- so that's -- I bring a lot of information over a lot of years with a pretty good memory, except this year, and that's my expertise.

Q. Mr. Clowdis, I'm going to send around a couple of documents that we are going to use. Would you like to take a quick break now or do you want to keep going?

A. Yeah, let's go because I need to be somewhere.

Q. All right.

(Briefly off the stenographic record for a discussion with the Veritext Concierge representative.)

Q. (E-mails documents to attendees.)

Page 56

A. I have to get back into the slow loading here.

Q. You won't have to load anything.

A. Oh, good.

Q. I'm going to e-mail it around.

A. Oh, that's what I mean. I've got to get back into my e-mail. I drifted away from that.

(CLOWDIS LINKEDIN PROFILE MARKED AS EXHIBIT NO. 3.)

Q. All right. I've sent around Exhibit 3, Mr. Clowdis. Your counsel will forward that to you. Just let me know when you have it up.

A. Okay. Hold on. I'm still trying to get to AOL so... (Pauses.)

BY MR. HOLLEMAN: Brandon, I received a document and forwarded it to Mr. Clowdis.

BY MR. KEEL: Great. Thank you.

A. I've got my LinkedIn and saw it there. It hasn't made it to AOL yet. Yes, it has. It just did. Sorry about that.

Q. No problem. So you should have in front of you now what's been marked as Exhibit 3 for your deposition. Do you see that?

A. I do.

Q. Okay. What is Exhibit 3, Mr. Clowdis?

A. It's part of my LinkedIn, it looks like. No.

Page 57

Maybe not. Let me see what this is. (Reviews.) Yeah, that looks like an old LinkedIn page.

Q. I want to ask you about a few specific things referenced in your LinkedIn here and then a couple more general questions, but, first, on the first page you see there is a reference that says, near the bottom, Created the North American Truck Load RATE INDEX in 1983. The INDEX offers truck-load benchmark freight rates for dry van operations to/from, over 15,000 origination/ destination pairs. Available currently only to Consulting project clients.

Do you see that?

A. Yes.

Q. What is the North American Truck Load Rate Index?

A. In -- in -- well, here comes another quick long story.

We saw a need in 1983, a partner of mine at the time, to capture rates as best we could back then. That -- the sources have changed over the years, and publish an origin/destination. We got sophisticated with it, it went all over the place. In trying to -- back then it was very difficult. Rates weren't as available. You had to source them both through proposed rates and paid rates. But then we put those into a

Page 58

format and between 14,799 origin and destination pairs by regions of the country. And we did it as a print version. Of course, obviously we didn't have the Internet versions that we have today and continue to do it on that basis. But it has evolved over the years so that it's -- there's only probably three or four people that still use it. We still maintain it, but it's not something that -- a lot of people still remember it, but there's things that are much more instantaneous than what we did so...

Q. So is the index that you created a centralized source of information reflecting trucking rates?

BY MR. HOLLEMAN: Objection.

A. Well, it was at the time. Over the years, I guess about three years ago, we decided to update it only if someone asked because our sources, which are proprietary, of course, were going away and it just -- the effort wasn't worth the return so only occasionally will someone say, can you go to your source and find the rates between these two, or these origination and destination pairs. But at one time during the time from '83 until about probably about 2007 or '8, a lot of the states bought it, a lot of DOT guys bought it. It was -- a lot of shippers liked to know on a benchmark what was the rate for Dalton, Georgia, to LA, California, for

Page 59

a 53-foot dry van or a 45-foot dry van over the years. So it lost its impact, and we recognized that so, yes, at one time it was. We would sell a thousand copies a year of the thing so...

Q. Where do you get the rate data that is used in the index?

A. I can't tell you that.

Q. Why is that?

A. Because I have -- I have a confidentiality agreement with the people that share it with me.

Q. Okay. So without identifying the individuals or the companies, in particular, could you describe for me how you obtained the data that is -- that goes into your North American Truck Load Rate Index?

A. In the final ten years it was exclusively obtained from -- by reviewing redacted paid shipping bills, showing origin, destination, commodity if it was on there. But no carrier, no shipper, no destination, and we took that and ran it through an old AS400 and came up with high rate, the highest average rate -- the highest rate, the average rate, and the lowest rate in the index at thousands of locations.

Q. And you never made the index publicly available; is that right?

A. We never advertised it. Most people knew about

Page 60

Veritext Legal Solutions
866 299-5127
Case 1:19-cv-00098-TRM-CHS    Document 129-2    Filed 12/16/20    Page 61 of 145
PageID #: 3182

it, heard about it. We were doing it, though. We were doing as much as three or four people could do at the time. So...

Q. But you would only disclose the information that's in the index to paying clients?

A. Yes. And occasionally I'd get a call from a good client wanting to know one specific lane. We would tell him, but it was -- or them, but that's a rare exception to that. So as far as advertising it, we mentioned it a couple of times when we were trading something with a trade press, but I don't even have copies of those anymore.

Q. But, generally speaking, what you would do is gather data from your proprietary sources that would show the rates charged for particular routes at these thousands of different locations, and you would combine all that data into your index that could be used to discover what type of rates were being charged for the different routes; is that right?

A. That's right. That's right.

Q. And this was not something that was generally available to the public?

A. Only if the public knew about it. I mean, it's...

Q. As far as you're aware, your index was not made

Veritext Legal Solutions
866 299-5127

publicly available.  Correct?

A.  No.  It was never posted anywhere, no.

Q.  Okay.  And the index still exists to this day?

A.  The remnants of it do.  I've still got the AS400 squirreled away somewhere, but we still get four million bills dropped on us annually I think because mainly maybe somebody will want it, but it's not robust enough to be competitive in today's marketplace. So...

Q.  Did you say you get four million rate bills dropped on you annually?  Is that the data source for the index?

A.  Yes.

Q.  Okay.  And the shippers' shipping information is redacted so you don't know who the actual carrier is for each load; is that right?

A.  You don't know the carrier, the shipper, or the receiver.

Q.  You just know the rates and what the route was. Is that right?

A.  I see the rate and -- and other information. They are called escrow charges.  If they are on the bill we capture those.  Intuitively we were able to finally, in the later years, do more than that, but that's the gist of it.

Page 62

Q. Without going through all the other items in your LinkedIn profile, Mr. Clowdis, could you generally describe for me your professional history prior to the role that you have now?

A. Yeah. It's -- it's -- I got in the business, order truck parts business and was calling on one of the truck lines and they recruited me. I joined them, as it will show here, Roadway Express, and stayed with them through their long training program. Learned a lot, did a lot of things, and then just was recruited from there. I've always been recruited in most cases to the next step along the way, and I worked for the TNT organization, which was out of Australia. They wanted to raise the profile of TNT in North America so I was encouraged to become a member of the American Trucking Association to speak and be quoted, and then I also did some due diligence work for them.

I ran into Ernst & Young along the way, made the transition to Transcon Lines to help a friend. I opened the first Transcontinental with carrier holding authority to go from East Coast to West Coast. And Ernst & Young came along and said, would you like to do work with us? And, frankly, I was flattered and said, sure, and that started a long relationship, ending only when Capgemini acquired them, and I still continued to

Page 63

work a little bit with Capgemini until 2008.

Q. And then what did you do following your work with Capgemini in 2008?

A. I did some independent consulting work. I -- I actually did some of that work after I had a fairly serious accident and was probably out of -- out of capacity, couldn't travel. Didn't do a lot except by phone and e-mail. And then I was recruited by IHS or Global Insight at the time.

Q. What was your role at IHS?

A. I was recruited as managing director of the transportation practice for North America. I'll make that long story short as best I can.

Q. What were your responsibilities at IHS?

A. All the transportation activities which included all modes, air, sea, rail, truck in North America, and it was -- it was a -- it was a challenging job. Barge lines, freight operators, all things transportation. And our flagship research project was an annual project called Transom, which I had used years ago when it was created as -- I knew it as the Reby data. So it was an all-encompassing -- about a two billion -- about two million data bit when I got it source of information that was just too complicated for words, but it was used by the railroads,

Veritext Legal Solutions
866 299-5127

truck lines, certain truck lines. It was difficult for truck lines to use it so we only had some of the larger guys buying it. And we sourced that information again from proprietary sources, which included railroads. Some trucking companies would share data with us and my sources would share a little bit just for the origin and destination, but that was produced annually, and it's still being produced. It's called Trans Search.

Q. On the first page of your LinkedIn profile, Mr. Clowdis, underneath Expertise, it says transportation cost specialist, supply chain design, M&A assessment, operational review, implementation, outsourcing specialist, private fleet assessment, and then it goes on from there. Do you see that?

A. I do.

Q. What does operational review refer to?

A. Do we have too many terminals? Do we have any -- do we have too many tractors versus number of trailers? We had formulas for all of this that have been developed over the years, but primarily is our operation in tune with the way our freight is flowing? That works both ways, both for the shipper and the truck line.

Q. The next term, implementation, what does that refer to?

Page 65

A.  If we recommend you need more terminals in Atlanta, and you only have one -- there's more to Atlanta than Peach Tree Industrial Park.  You tell us where specifically and why we should put them there, and at one stage we actually helped prepare an industrial bond application, and I gave the rationale behind seeking the money to build terminals.  So it's an all-encompassing thing.  I was just trying to say, we'll help you.  After we tell you what to do, if you need some help, we'll help you.

Q.  So it's more like implementing any type of strategies with respect to transportation or trucking.

A.  Sure.

Q.  What about private fleet assessment?  What does that refer to?

A.  That ties into my love of dedicated contract carriage.  If I'm a corporation and I'm running tractors -- unless I'm Walmart -- running 300 tractors and 1,200 trailers, is that the right mix, and should I even be in the trucking industry?  Do I need a private fleet?  Guys that run them don't know what the costs are and once we do a cost analysis of what it's costing you to run those trucks and then bring in some dedicated guys that can make a proposal, and we'll assume that dedicated or -- that would be part of the dedicated.  We did that in a

Page 66

lot of places. I've done it both on my own and with Ernst & Young so that's the -- is your assessment worth having and, if so, why?

Q. And then there's a term following that that says demand-planning. What exactly does that refer to?

A. Here's a -- here's a -- here's a -- I have to answer with an example. I'm serving this particular niche. This particular niche makes decisions to give you a huge block of business in a two-week notice. I'm replacing this carrier with you if you can handle this in two weeks. So what is the demand? And this is a simplification, too. What is the demand for new trucks. I'm going to have to go out and buy 75 to 100 trucks. What do I do because I can't order them to my specifications and have them here in two weeks. So what's the cost benefit and cost and benefit of having 50 trucks that aren't fully utilized because you know you are getting business in that nature. That's just one example.

Seasonal traffic -- and a lot of these businesses we talked about have seasonal businesses not so much this year, but -- I mean, Family Dollar, candy at Halloween, candy at Valentine's Day, candy at Christmas. What kind of demand am I going to have if I'm a shipper for more warehouse space, for more

Veritext Legal Solutions
866 299-5127

distribution capabilities, or how many truck lines should I line up and say, we are going to have a spike in these periods. So that's demand-planning.

Q. And you have expertise in all of these different areas that are reflected on your LinkedIn profile on page 1?

A. Thanks to as many years as I had at Ernst & Young, yes, and I don't have the expertise -- if I don't have, the good thing is I know the people that do. That's why we bring in from time to time, or have, contractors who have that expertise, and I've served as a contractor for a good -- it's knowing which law book to pull off the shelf. No pun intended, guys.

Q. Mr. Clowdis, I just e-mailed your counsel the next exhibit, Exhibit 4. He'll forward that on to you and just let me know when you have it up.

A. Okey doke.

(CLOWDIS CV MARKED AS EXHIBIT NO. 4.)

BY MR. HOLLEMAN: I've received it and forwarded it on.

BY THE WITNESS: I'll get to it in just a moment. There it is.

BY MR. SUSHON: Brandon, it's Bill. Did you e-mail that to me as well?

BY MR. KEEL: Yeah, I sent it to the same

Page 68

chain, Bill.

BY MR. SUSHON: Okay. And it's the firewall.

BY MR. KEEL: It may be just a little bit slower over there.

BY MR. SUSHON: Yeah.

Q. Mr. Clowdis, do you have Exhibit 4 in front of you now?

A. It's working on it. That's my CV. It tells me what it is doing. So... Sorry it's so slow. I'm not the only one that is --

Q. No problem.

A. (Reviews.) I should be familiar enough that you can start.

Q. Well, I want to make sure that you're -- that you recognize the document before we -- before we get started and you know what it is.

A. Thank you. Takes time to download, takes time to pull up. (Pauses.) I think it's pulling the tricks it pulled on Bill, and it's just -- oh, there we go. Got you. My goodness. It must have reformatted that thing. Okay.

Q. All right. Do you recognize Exhibit No. 4, Mr. Clowdis?

A. Yes. It's -- it's the Westlaw. Okay. Well,

that's got some age on it.  2019, yeah.  Okay.

Q.  What is this exhibit?

A.  That's my CV.

Q.  Is this an accurate copy of your CV as of 2019?

A.  I moved from Monteagle, Tennessee, in 20- -- in June of 2019, but prior to that it was accurate because the address is different.  The phone numbers, the fax numbers, mobile numbers, e-mail.

Q.  At the bottom of Exhibit No. 4, do you see there's a -- in bold, refers to Selected Assignments-Short List, and then it continues on into the next page with examples of different assignments you've had over the years.  Do you see that?

A.  Hold on.  (Reviews.)  Okay.  Yes.

Q.  If you turn to the second page of Exhibit 4, the third bullet point down says provided expert opinion witness reports, non-testifying and testifying support in Federal, State Courts, as well as arbitration, in cases involving logistics and transportation issues. And then it goes on to describe some clients and areas of testimony.  Do you see that?

A.  I do.

Q.  Okay.  And one of the categories listed here that says you provided opinion witness testimony is brokerage operations and fraud.  What expertise do you

Veritext Legal Solutions
866 299-5127

have with respect to fraud?

BY MR. HOLLEMAN: Objection.

A. The fraud was the -- was an insurance case. The broker had absconded with the money. It was pretty clearcut. So, you know, there was -- there was a dispute on how much he was able to abscond with, did he pay truckers beforehand or whatever, so it was a defalcation, I guess, more than anything else of a fiduciary responsibility.

Q. Okay. You weren't actually offering any opinion testimony about whether somebody committed fraud? Is that fair?

A. No. I think they had kind of proven that, but they went through the nature of the fraud and how is this possible. So...

Q. If you turn to the next page under Professional Affiliations, the second paragraph down says you're a frequent contributor to industry publications, speaker to industry groups with over 200 articles and white papers published. Do you see that?

A. Yeah.

Q. Is that correct, sir?

A. It's probably more than correct, yes, it is. And that's not as frequent as it has been. I do not travel, I don't pontificate or speak to any reporters at

Page 71

all so...

Q. Is it fair to say that a number of those publications you've authored over the year involved the trucking industry?

A. Yes. Some of them did, yeah.

Q. Okay. And in one format or another, Mr. Clowdis, is it fair to say that you've been working in the trucking industry for more than 40 years?

A. Yes.

Q. And you would consider yourself to be an expert in the trucking industry. Correct?

A. I would -- I would consider myself to be an expert in certain facets of it. Certainly, not finance. Certainly, not maintenance, for example, but, yeah.

Q. You would consider -- you would consider yourself to be more knowledgeable about the trucking industry than your typical stock investor. Is that fair?

A. Yeah. I think so. I don't look at a lot of stock. I'll stop there. I don't know.

Q. Could you, please, turn to page 6 of Exhibit No. 4?

A. My scroll is slow. Yes.

Q. You see page 6 of Exhibit No. 4 contains a listing of selected major clients that you've provided

Veritext Legal Solutions
866 299-5127

work for over the years?

A. Yes.

Q. And in the middle column in the middle of the page it lists U.S. Xpress Enterprises. Do you see that, sir?

A. I do.

Q. And what work have you performed for U.S. Xpress over the years?

A. I did a small project for the -- I guess he was senior vice-president of sales and marketing. He hired me, not Ernst & Young, to do a project that helped him understand how to respond to an RFP, request for proposal, from shippers and how to position their responses to be as attractive and feature -- and stress or outline or emphasize the features of U.S. Xpress. And it was a small project. He insisted on paying me some way. And at the time, I said, look, I'll be glad to do this if you guys will let us audit you, but that's -- that's the extent of that.

Q. Is that the only work you've ever performed for U.S. Xpress?

A. Directly for U.S. Xpress, yes.

Q. When were you retained for this project with U.S. Xpress?

A. Why?

Page 73

Q. When?

A. Gosh. Had to be back in the middle nineties or even prior to that. The gentleman who hired me and I met through the ATA, and we were sending them an awful lot of RFPs, and I got to know him well. He and his pricing people were not -- not -- they weren't a piece of cake to deal with or negotiate with, but they were nice and knowledgeable, and so if it was a truck load endeavor that U.S. Xpress could handle, they got an RFP. And I knew I could always call him and find out, can you really serve Casper, Wyoming, and those things. So... That was the middle nineties. That was why so...

Q. Who was the senior VP in sales and marketing at USX that retained you for this project?

A. Bill Lusk, L-u-s-k.

Q. Have you stayed in contact with Mr. Lusk since that project?

A. Yeah. Over the years. I stayed around with Bill and -- I don't know where he is today. I kind of lost touch with everybody when I went to Boston, but, yeah, on a cursory basis, I do, yes.

Q. When was the last time you communicated with Mr. Lusk?

A. Probably five years ago. Could be even longer than that.

Page 74

Q. Do you know Max Fuller?

A. I've met Max, I'm sure. Max is famous in the circles. I may have met him at an ATA meeting. I've met Pat Quinn several times at the ATA meetings. Pat may have been the designated attendee because he was there, but I'm sure I met Max somewhere along the line.

Q. So you've also mentioned you met Pat Quinn before. Have you met Eric Fuller?

A. I must have, but I can't remember it. I don't know. In fact, no, I haven't. I can't remember that I've -- I've said, Hi, Eric, I'm Chuck, and we've shaken hands. That's a meet to me. No, I don't know that.

Q. Have you met Lisa Quinn Pate?

A. I have. I've dealt with Lisa on some issues, contract issues and thing of that nature when U.S. Xpress would secure some business. Yeah, we were always the liaison between the two parties to the contract so I spoke with her there and enjoyed my relationship with her.

Q. In what period of time were you working with Lisa Quinn Pate on contract issues?

A. It had to be -- I'm sorry. I answered too quickly, but back in the '80s or '90s. I don't know. She was chief counsel, I think, at the time.

Q. And you said you had a good opinion of working

Page 75

with Lisa Quinn Pate?

A. She was responsive. She was a hard negotiator, but she was responsive.

Q. Okay. Do you know who Jason Grear is?

A. I do not. Only when he's been hired and positioned and whatever and what I've read in the papers and trade press.

Q. Do you know Eric Peterson?

A. Know the name, again.

Q. Have you ever met Eric Peterson or Jason Grear?

A. Not to my knowledge.

Q. Do you know who Ray Harlin is?

A. Ray was chief financial officer. I met Ray on several occasions.

Q. And what were your interactions with Mr. Harlin about?

A. I think -- I don't know. It was probably when I was coming up to see Lusk or Lisa Pate. No major interactions that I recall right now.

Q. Do you know anybody else who currently works for USX?

A. Who currently works there. I don't.

Q. I'm sorry. I didn't hear your answer. You cut out a little.

A. No, I'm sorry, no, I don't, not currently.

Page 76

Q. Do you know anyone else other than the names that we've already discussed who formerly worked for USX?

A. Jeff Waterburg. Ed Kern. There are a lot of people around Chattanooga that worked there, but those are the two that I stay in reasonably close contact with.

Q. And how do you know Jeff Waterburg?

A. He was Bill Lusk's protege.

Q. Did you interact with Mr. Waterburg similar to Mr. Lusk in your roles with respect to the trucking industry over the years?

A. Yes.

Q. How do you know Ed Kern?

A. Ed was a pricing analyst there. I think I first met Ed at J. B. Hunt or somewhere, but he surfaced in the hallway and we said, we know each other so... And we did. First time I met him or re-met him, whatever.

Q. Other than Jeff Waterburg and Ed Kern and the other names we've discussed already, do you know any other former employees of USX?

A. Not of USX, no.

Q. Okay. When was the last time you communicated with any current or former employee of USX?

Page 77

A. Gosh. Well, before COVID I had lunch with Ed. Ed and I used to have lunch about every month or two, but Waterburg, I haven't even spoken to him probably in the last seven or eight years. No one else.

Q. So this year, prior to COVID, you had a regular practice of having lunch with Ed Kern every month or two; is that right?

A. Well, it's not a regular practice. He would call, I would call. It was a relationship at IHS in that Covenant where Ed is, I'm sorry, I don't guess that's proprietary, Ed shared data with IHS for the Trans Search project.

Q. This was the annual project that you mentioned earlier that you did at IHS?

A. Yes.

Q. Do you consider yourself friends with Ed Kern?

A. I think so, yeah. I'd consider him a friend.

Q. Do you consider yourself friends with Jeff Waterburg?

A. Probably not anymore. It's hard to be friends with a guy you see every ten or twelve years.

Q. Fair enough.

A. So...

Q. Do you have any other personal relationships with anyone who has worked at USX?

Page 78

A. I'm trying to think. I knew a character named Cort Dondaro years ago, but he doesn't -- I don't even know where he is now, but that's the only other person that I had any prior or previous relationship that even attempted to go on while they were at U.S. Xpress so...

Q. Could you describe for me all the communications you've had with Max Fuller?

A. "Hello, how are you?"

Q. Anything more than that?

A. No. Just things that you would see and hear, and I'd listen. I don't do the club gossip. I listen, and if someone asks me something, I usually plead ignorance, but, yeah, I mean, I've heard him discussed, but that doesn't matter. That's just gossip. So, no, nothing else.

Q. What about Pat Quinn? Can you walk me through what communications you've had with Pat Quinn over the years?

Q. Simply at, I think, at meetings. I don't know that I ever even saw Pat when I visited Waterburg or Lusk or Lisa, but, you know, we -- he knew I was from Lafayette or Chattanooga, even though I didn't live there any longer, and I guess we both talked funny. So he -- he would always smile. I don't know whether he'd remember me or not, and we would chat about the industry

Page 79

in general, or how do you think this conference is going? I did a panel on the economics of the trucking industry one year, and he ribbed me about that. He said, well, you should have been telling me all of this good stuff all along. I said, well, we are not sure it's right, man, but that's all. It was just a banter so...

Q. What communications have you had with Ray Harlin over the years?

A. Just to know who he was.

Q. You never communicated with him directly?

A. Not that I recall, no.

Q. Okay. And Lisa Quinn Pate, when was the last time you communicated with her?

A. Oh, gosh, I mean, prior to the broken neck, I'm almost certain. That was 2006 so... And it had to be before then because things kind of went downhill so...

Q. Can you describe any of your communications you've had with Ms. Quinn other than what you've already testified about being involved and helping you with things with different contract issues?

A. No.

Q. Have you ever had a dispute with USX prior to this lawsuit?

A. USX, no.

Veritext Legal Solutions
866 299-5127

BY MR. HOLLEMAN: Objection.

Q. Have you ever had a dispute with anyone who worked at USX prior to this lawsuit?

BY MR. HOLLEMAN: Objection.

A. A dispute? No.

Q. Did you ever try to get a job at USX?

A. No. I was never offered one at U.S. Xpress.

Q. Turning back to your CV, Exhibit No. 4, on page 7 of this exhibit it lists a number of law firms --

A. Yes.

Q. -- that you have provided work for over the years. Do you see that?

A. Uh-huh.

Q. One of the law firms in the middle column, second to last one, says Barrack Rodos & Bacine. Do you see that?

A. Uh-huh.

Q. What work did you do for that law firm?

BY MR. HOLLEMAN: Mr. Clowdis, before you answer, just in case you were covered by a confidentiality order, I just want to make sure that you're abiding by the terms of that.

A. I got permission to use their name, but I can't talk about any of the cases with these guys.

Q. Were you a testifying expert in that case?

Page 81

A. I was a -- no, I was a non-testifying expert.

Q. Okay. Who did you work with from that law firm in that case?

A. Mr. Bacine, as I recall. No, Mr. Barrack.

Q. Jeffery Barrack?

A. Jeff Barrack.

Q. Okay. Do you know a Stephen Basser that works at that law firm?

A. Maybe one of their guys on the West Coast? I don't know. I talked with several of their people.

Q. Okay. Do you recall any lawyers you worked with at that firm other than Mr. Barrack?

A. Jeffery would always -- Jeff would always set up the call. He'd say, I have my colleagues on, here's Bill Becker, and I don't remember, but we'd have conference calls and they'd ask questions about one of the parties to the suit or the case or the situation.

Q. Have any of the cases in which you were either a consulting or testifying expert over the years, did any of those involve USX?

A. I don't -- this case never got this far, but I don't know who the -- this was a case involving one of the -- one of the dedicated operations that used several truck lines. U.S. Xpress may have been one of them, but I never saw anything where it was revealed to me that

Page 82

U.S. Xpress was a Defendant or a possible Defendant, but -- so I -- and I'm under a terrible confidentiality agreement because they never went to Court in their -- everybody is -- anyway, so that's the only one that -- and that's the McAleer Law Firm in Georgia.

Q. And that was a matter where you were hired as a consultant for a case that had not actually been in litigation?

BY MR. HOLLEMAN: Objection.

A. That was my understanding. That was an over the phone -- it went out, gosh, I don't know, two or three months probably while they decided, I guess, whether they were going to file suit so, yeah, but I never saw a Complaint so...

Q. When did that case occur?

A. Oh, gosh. 2017 probably.

Q. And as you sit here today you don't know one way or the other whether USX was involved in that matter. Is that right?

A. No, no. That was just my speculation because they were -- I don't know. They were a player with the potential Defendant so...

Q. The case that you had with Barrack, Rodos & Bacine, did that involve USX?

A. No.

Page 83

Q. Have you ever had any communications with anybody from that law firm about this litigation?

A. Which one?

Q. The Barrack, Rodos & Bacine.

A. I've had no communication about this lawsuit with any of these, no.

Q. Okay. That makes it easy.

I'm going to go on to a new document. Do you want to take a quick restroom break or keep going?

A. Oh, I took a break and you guys didn't know it. So... I'm kidding. We can go on.

Q. Okay.

BY THE VIDEOGRAPHER: Are we taking a break or --

BY THE WITNESS: No, not for me.

BY MR. KEEL: We are going to keep going unless you need to change tape.

BY THE VIDEOGRAPHER: No, it's fine.

(PLAINTIFFS' RESPONSES AND OBJECTIONS TO THE USX DEFENDANTS' FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFFS MARKED AS EXHIBIT NO. 5.)

Q. Mr. Clowdis, I just e-mailed Exhibit 5 to your counsel. He'll be forwarding it on to you in just a minute, and just let me know when you have it up,

please.

BY MR. HOLLEMAN:  I received it and I have forwarded it on so, Mr. Clowdis, hopefully you'll receive it momentarily.

BY THE WITNESS:  My battery just died. That's cool.

A.  (Pauses.)  Got it.  Scanning.  (Pauses.)  Okay. Got it.

Q.  All right.  You should be looking at what's been marked as Exhibit 5.  Mr. Clowdis, have you ever seen this document before?

A.  Yes.

Q.  What is Exhibit 5?

A.  It's the Plaintiffs' Responses and Objections to USX -- I'm just reading it -- Defendants' First Requests for Production of Documents.

Q.  Have you read this document prior to today?

A.  Yeah, I read it.  I've looked through it to see what we were objecting to.

Q.  And when did you look through this document before today?

A.  I can't say.  I don't -- I don't even put that in my diary.  But I remember reading through it at some period, and, of course, a lot of it were objections.  I understood -- once reading them I understood how that

Page 85

translated to my vernacular, but it's -- that's the extent of my review of it. I reviewed these to see if I had anything I objected to and I didn't so...

Q. Okay. But you were aware that USX served requests for you to produce documents in connection with this litigation?

A. Yes.

Q. What did you do to collect documents in response to these requests for production?

A. I went back and looked at any -- anything I had sent between the attorneys, anything that, of course, I received -- anything I received they knew about. And that was the extent of it. So... I sent them all to the attorneys and let them go through what was privileged and what wasn't and send them to you, I guess.

Q. Did you search your e-mail account for documents in response to these requests?

A. I did. I did.

Q. Did you search for documents relating to your trading in USX stock?

BY MR. HOLLEMAN: Objection.

A. Yeah, I -- I had to get the -- to recall the exact date I purchased it, so, yeah. I produced the document that we had that was redacted.

Page 86

Q. And, for the record, what is your e-mail address?

A. ChuckClowdis@aol.com.

Q. Do you use a computer at home, Mr. Clowdis?

A. I use a laptop at home.

Q. Did you search your laptop for documents --

A. Yes.

Q. -- responsive to these requests?

A. Yes.

Q. Do you use a different computer at work?

A. I -- I have access to a different computer at work, but it's -- gosh, it's so new. I only got the thing, I guess, right as COVID was starting. And so I've only been in sporadically so most everything I had put on a thumb drive or had printed out and put in a notebook, which I still have, and so there's nothing on -- but, yeah, I did search it. There's just nothing there. There's not enough history. So...

Q. You reference a notebook. What notebook are you talking about?

A. If I print out something I'll three-hole punch it and stick it in a three-ring binder.

Q. Do you have a notebook of materials relating to this litigation?

A. Yeah. And most everything that is in that

Page 87

notebook you've covered right here, except my -- there's some other stuff in there. I just don't remember what it was.

Q. All right. Did you provide your notebook to your counsel for purposes of responding to these requests for production?

A. No. Everything in it had come from him so... I didn't.

Q. Did you -- did you search anywhere else other than your computers and this notebook for documents responsive to these requests for production?

A. No. I did not. That's all I had access to.

Q. Was there any other location where you would store information relating to USX?

A. No.

Q. I'll represent to you, Mr. Clowdis, that the only document that was produced to us in response to these requests for production was the four pages that we looked at earlier that was marked as Exhibit No. 2. Do you have any documents relating to USX or this litigation other than those four pages that were marked as Exhibit No. 2?

BY MR. HOLLEMAN: Objection. And, Mr. Clowdis, I'm just going to remind you not to reveal the substance of any privileged communications that you

Veritext Legal Solutions
866 299-5127

and I have had regarding this matter.

BY THE WITNESS: Okay.

A. I don't know how to answer that. I, certainly, sent those four documents. I probably, four others, five, I don't remember how many -- those were probably deemed privileged, but they really -- they were just thanking you, thank you for this, are we going to get to this, what is next, what should I anticipate, because I'm trying to carve out time to deal with this matter. That's -- that's it. I mean, there's nothing meaningful there.

Q. Could you, please, turn to page 10 of Exhibit No. 5?

A. Sure. Give me a minute.

Q. Let me know when you are there.

A. Got it.

Q. Okay. Do you see under Request No. 2, it states, in part, and it asks for all documents reviewed, received, considered or relied upon by you or anyone acting on your behalf when determining whether to acquire, transfer, sell, or retain USX securities?

Do you see that?

A. I do.

Q. Do you have any documents that fall within that category, sir?

Page 89

A. No.

Q. Were there any documents that you reviewed, received, considered or relied upon when determining whether to acquire USX securities?

A. Nothing that I retained. As I stated, there was trade press, there was local newspaper, there was financial sites. I mean, I looked at those in anticipation of, so, no, no, nothing else. I didn't -- no.

Q. Could you turn, please, to page 15 of Exhibit 5?

A. Sure. (Reviews.) I'm there.

Q. And do you see Request No. 9 asks for documents sufficient to show the source of funds you used to engage in transactions in any USX securities?

A. Sure.

Q. And what was the source of funds that you used to purchase USX common stock?

BY MR. HOLLEMAN: I'm going to object and instruct the witness not to answer. Brandon, I think that you see the response we have made to that request. So if you have a problem with our request or our response to your document request, then you can take that up with us directly, but I'm going to instruct the witness not to answer on this front.

Page 90

BY MR. KEEL: Scott, on what basis?

BY MR. HOLLEMAN: That you've read -- have you -- you see our response to Request No. 9.

BY MR. KEEL: I do.

BY MR. HOLLEMAN: I can read it for the record, and on that basis we are not searching for or producing documents responsive to that request. It's irrelevant.

BY MR. KEEL: I'm not asking him to search or produce documents right now. I'm asking him a question, and unless your position is that the answer to that question is privileged, I don't think you can instruct him not to answer.

BY MR. HOLLEMAN: Well, I will permit the witness just to answer that question, but not to reveal anything else about the existence or lack thereof of any documents regarding that, and in agreeing to let the witness answer this question we are not waiving our responses to Request No. 9.

So, Mr. Clowdis, if you can answer just that question and only that question, then you may proceed.

A. It came out of my personal checking account from personal funds.

Q. Thank you, Mr. Clowdis.

Page 91

A. You're welcome.

Q. Turning to Request No. 10, right below that, do you see that that request calls for all documents concerning your commencement or maintenance of this lawsuit, including, but not limited to, and it goes on and provides certain descriptions?

A. Right.

BY MR. HOLLEMAN: Mr. Clowdis, you can read the entire thing to the extent there's going to be a question on that.

BY THE WITNESS: I see it. I haven't read it. I'll read it now. I see it.

A. (Reviews.) Okay.

Q. And, Mr. Clowdis, without revealing the substance of any documents, could you tell me whether you have any documents that fall within the description of Request No. 10?

A. I don't think -- we talked about this earlier. I don't think I have the retention agreement, I don't know, but, no, nothing else, you know, that it's -- no.

Q. On the next page, page 17, sir, I'd like to direct your attention to Request No. 12. Let me know when you are there.

A. Yes, I'm here.

Q. And Request No. 12 asks for documents obtained

Page 92

at any time from anyone you knew or understood to be a current or former employee of USX or anyone you understood or believed to be acting on behalf of USX. Do you see that, sir?

A. Yes.

Q. Do you have any documents falling within the description requested in 12?

A. I don't.

Q. Down on the same page under Request No. 13, it asks for all agreements between you and Plaintiffs' counsel, including, but not limited to, the engagement letters. Do you see that?

A. Right.

Q. I know you've already testified you don't recall whether you retained a copy of the engagement letter with your counsel, but do you have any other agreements with Plaintiffs' counsel in this case?

A. No.

Q. If you could turn to page 25, and I'll direct your attention to Request No. 26. Let me know when you are there.

A. No. 26. (Reviews.)

Q. Are you there?

A. Yes, I'm here. I'm sorry. I was drinking some water.

Page 93

Q. Yeah. No problem.

A. I had to put my water away.

No. There's nothing else there so...

Q. Okay. Just so the record is clear, I'll ask the question real quick, Mr. Clowdis. Request No. 26 asks for all documents that reflect any communications concerning USX, any of the Defendants in the lawsuit or the subject matter of the lawsuit that you had with anyone other than Defendants, and it goes on from there. Do you see that?

A. Yes.

Q. Do you have any documents that fall within the category described in Request No. 26?

BY MR. HOLLEMAN: And just, Mr. Clowdis, before you answer, I would remind you that we have responded to this request so I would ask you to confine your answer to within our response and objection.

BY MR. KEEL: Hold on, hold on. I don't understand what that is. Is that an objection to the form of the question, Scott?

BY MR. HOLLEMAN: Are you asking if these documents exist about USX? And is this being limited to the relevant time frame? So, yes, I'm objecting to the form of that question.

BY MR. KEEL: Objection to form is totally

Page 94

fine, but I don't think it's appropriate for you to direct the witness to look at anything or to describe something else in response to my question or to limit his answer to something in a document. If you want to object to form, that's fine, and your objection will be noted. But I think the question is fine.

BY MR. HOLLEMAN: Okay. I'm objecting to the question.

BY MR. KEEL: All right.

Q. Let me restate the question for you, Mr. Clowdis. Request No. 26 asks for all documents that reflect any communications concerning USX, any of the Defendants in the lawsuit, or the subject matter of the lawsuit that you have ever had with anyone other than Defendants, and then it goes on from there. Do you see that?

A. Yes.

Q. And my question is simply do you have any documents that fall within the scope of what is described in Request 26?

BY MR. HOLLEMAN: And one thing, Mr. Clowdis, before you answer insofar as any -- your response might relate to any agreements you have, confidentiality agreements with any other parties who are not present here, just be mindful of whatever

Page 95

obligations you have.

A. I do have an obligation that I was going to mention that -- with IHS Markit that prohibits me to be involved -- to reveal any communications I had, and, besides that, it was on their computer, I think -- in fact, I know it was because it wasn't on mine -- concerning data sharing and USX. So that's going to -- that's probably not anywhere near the period of this lawsuit. So...

Q. Okay. I'm only asking what you have, Mr. Clowdis.

A. I don't have it. And I don't know of anything other than that one little document. So...

Q. Okay. And, just generally, I don't -- what you are describing is you may have had communication regarding USX back in your connection with your former employment at IHS, but those documents would exist on your work computer.

A. Yes.

Q. Let me introduce another document or e-mail another document.

(PLAINTIFF CHARLES CLOWDIS'S RESPONSES AND OBJECTIONS TO THE USX DEFENDANTS' FIRST SET OF INTERROGATORIES TO PLAINTIFFS MARKED AS EXHIBIT NO. 6.)

Page 96

BY MR. HOLLEMAN:  While you're doing that, could we go off the record for just a moment?

BY MR. KEEL:  Sure.

BY THE VIDEOGRAPHER:  The time is 3:13 p.m.  We are going off the record.

(Break in the deposition.)

CONTINUING:

BY THE VIDEOGRAPHER:  All right.  The time is 3:34 p.m.  We are going on the record.

Q.  Mr. Clowdis --

A.  Yes.

Q.  -- you should have in front of you what has been marked Exhibit 6 for your deposition.  Do you see that?

A.  I don't know that I have it yet.  Let's see.  Hold on.  What was it called?  That's not the same one with all the requests, is it, responses?

Q.  It looks similar, but it's -- it's a different document.

A.  All right.  Hold on.

BY MR. HOLLEMAN:  For some reason, it's still in my out box.  I've tried to refresh the send.

A.  Oh, okay.  Good, because I don't have anything yet.  Thanks.

BY MS. PASSMORE:  I just resent it as well.

Page 97

A.   Well -- (pauses.)  Sorry about this, guys.

Q.   It's not your fault.  Don't worry about it.

A.   My wife taught me to say that everything I do so...  I guess we are back on the record.  I'm sorry.

Okay.  There we go.  Now we are searching.  Let's see what this is.  (Reviews.)  Ah, yes.  All right.

Q.   What is Exhibit No. 6, Mr. Clowdis?

A.   Charles Clowdis' responses and objections.

Q.   If you turn to the very last page of this document --

A.   All right.  Hold on.  That should be easy.  (Reviews.)  Yes.

Q.   You see there's an electronic signature there dated October 2, 2020.  Is that your signature?

A.   Yes, it is.

Q.   Okay.  If you could, please, turn to page 7 of Exhibit 6.

A.   Got it.

Q.   At the very bottom of the page there's a request that said, under Interrogatory No. 2, it says identify CW1, CW2, CW3, CW4, CW5 and any other confidential witness whom you or anyone acting on your behalf communicated with in connection with the lawsuit, including, but not limited to, in connection with

preparing the Complaint.

Do you see that, sir?

A. Right.

Q. And if you turn to the next page --

A. Right.

Q. -- your response under Interrogatory No. 2 at the very end says, Plaintiff states that he lacks personal knowledge of any information responsive to this interrogatory.

Do you see that?

A. Yes.

Q. Is it correct that you have no information regarding who CW1, CW2, CW3, CW4 or CW5 are?

A. I have no idea.

Q. Okay. You reviewed the Complaint that was filed in this case, the Amended Complaint; is that right?

A. Right. Right.

Q. When you read the Amended Complaint, did you wonder who these confidential witnesses were who are referenced in that?

A. Well, of course, I did, but -- that's human nature, but I probably wouldn't know them, anyway, so...

Q. Okay. Did you think it was important for you to understand whether these people you were relying on

Page 99

for your allegations against the Defendants in this case were credible before you authorized the Complaint to be filed?

A. I'm assuming that the attorneys know that and would not have selected those people unless they were credible or had -- or they thought they had knowledge that would contribute to the case.

Q. You're relying on your counsel for that inquiry?

A. Yes. Yes, I am.

Q. Do you have -- do you have any obligation to determine if the allegations in the Complaint were accurate before you authorized that it be filed?

A. No.

BY MR. HOLLEMAN: Objection.

A. I'm sorry. Go ahead?

BY MR. HOLLEMAN: You may answer.

A. No, I wasn't asked to and didn't volunteer to and was pleased with both those answers.

BY MR. HOLLEMAN: And, Mr. Clowdis, I'd just caution you not to relay what we might have -- any privileged attorney/client communication, including what we might have or might not have discussed.

BY THE WITNESS: Oh, okay.

A. That's --

Page 100

Q. Mr. Clowdis, what would be your responsibilities if you were to serve as the class representative in this litigation?

BY MR. HOLLEMAN: Objection. You may answer.

A. Okay. My class -- my responsibility to the rest of the class is to make sure that we are being represented correctly, that we trust the law firm or they trust the law firm as much as I do to do -- and so far that's what I've tried to make sure that I don't question them because I'm not an attorney, and I can understand why these witnesses are confidential so I don't question that. So I'm looking out for the rest of the class to the best of my ability, having some knowledge of the industry, so...

Q. Turning back to Exhibit No. 6, if you could, please look on page -- at the bottom of page 8 and continuing on to page 9, if you could read Interrogatory No. 4 to yourself, please.

A. Interrogatory No. 4. Okay. That's -- okay. Hold on. (Reviews.) Have you ever been a named party?

Q. Yeah. You don't have to read it out loud, just read it to yourself.

A. Okay. I just want to make sure I'm on the right place.

Page 101

Q. That's the one.

A. (Reviews.) No. No.

Q. Okay. So just so the record is clear, Mr. Clowdis, you've never been a party to any administrative proceeding, civil action other than this case, or the one similar case you filed in State Court in Tennessee or any criminal action?

A. No. Not to my knowledge, no.

Q. Before filing or before authorizing the Amended Complaint to be filed in this litigation, as you mentioned earlier, you had filed a separate lawsuit against USX in Tennessee State Court. Right?

A. That I had?

Q. Yes.

A. I thought that this case -- this case with the same attorneys was filed originally in the State Court in Tennessee and then it went into Federal Court. That was my understanding.

Q. And do you understand that the Complaint that was filed in State Court was voluntarily dismissed?

A. Yes.

BY MR. HOLLEMAN: Objection.

A. Well, I understand that, yes.

Q. Okay. And why did you dismiss that case and join the case that was filed in Federal Court?

Page 102

A. Well, I'm prefacing my answer. Me, not being an attorney, I felt that it was probably more appropriate in Federal Court for some reason.

Q. Mr. Clowdis, you'd mentioned earlier that you're familiar with a dedicated division of a truck load carrier. Right?

A. Yes.

Q. And how would you describe that?

A. Dedicated has dedicated shippers, dedicated clients, either could be operated under contract for some certain number of miles per tractor or some variation of that so that once you enter the contract you know how many units this contract covers, drivers, whatever, sometimes trailers, sometimes not, and you know the revenue that if all things happen the way they should, the revenue that will be generated by that contract on an annual or quarterly basis.

Q. Are you familiar with what's referred to as an over-the-road division?

A. Over the road is when you are, what I call, catch as catch can. You are called. You are usually moving under some other sort of contract, but it's not dedicated. And in many cases a carrier could have a contract and end up brokering it with permission of the shipper to someone else. But it's a -- usually a

Page 103

contract rate. It's a fixed rate or a spot rate so it's totally different. There's no contractual obligation to run so many miles at so many cents per mile or rate.

Q. And in your experience have you ever seen instances in which drivers that would normally be operated in the OTR group also worked on dedicated accounts?

A. That happens during the spike seasons. Yes, I have seen that.

Q. And is that a common occurrence during the spike seasons in the trucking industry?

A. It's common with some carriers that operate in that genre, yes.

Q. Okay. And would it be more common for -- in your experience for that to occur in periods in which there were driver shortages?

A. Could be. Yes. Could.

Q. Just a few more questions, Mr. Clowdis.

Without disclosing any communications you had with your counsel, could you describe for me what you did to prepare for your deposition today?

A. Just talked about to tell the truth, answer succinctly, which I rarely do, and, you know, look over what you think you should look over from what we've sent you, and be prepared.

Page 104

Q. Did you take any notes in preparing for this deposition?

A. I didn't take any. I made a few because I -- I wanted to make sure I understood how to get the -- these were notes I took more this morning to know how to get into the system. So...

Q. You didn't take notes that you relied upon to prepare for your deposition today; is that fair?

A. No.

Q. Okay. Mr. Clowdis, I think that's all the questions I have for you. Thank you very much for your time and putting up with some of the difficulties we've had with technology today. I think Mr. Sushon may ask you a few additional question.

EXAMINATION BY MR. SUSHON:

Q. Hi, Mr. Clowdis. Just to introduce myself again, I'm Bill Sushon from O'Melveny & Myers, and I represent the underwriters of U.S. Xpress' IPO. I just have a few questions for you.

First, I think I know the answer to this. Are you familiar with an entity Merrill Lynch, Pierce, Fenner & Smith, Incorporated?

A. The thundering herd when I was kid, yes, I'm familiar with it.

Page 105

Q. And did you have any communications with anyone from Merrill Lynch concerning U.S. Xpress?

A. No.

Q. Did you have any communications with Merrill Lynch concerning U.S. Xpress' IPO?

A. No.

Q. Okay. Another entity, Morgan Stanley & Co., LLC, are you familiar with that entity?

A. I know them, yes.

Q. Did you have any communications with anyone from Morgan Stanley concerning U.S. Xpress' IPO?

A. I did not.

Q. Or about U.S. Xpress generally?

A. No.

Q. Okay. Another entity, J. P. Morgan Securities, LLC. Are you familiar with that entity?

A. Part of the J. P. Morgan empire. Yeah, I know who they are, sure.

Q. And did you have any communications with anyone from J. P. Morgan Securities concerning U.S. Xpress?

A. No.

Q. Another entity, Wells Fargo Securities, LLC. Are you familiar with them?

A. I know Wells Fargo, not the securities division, no.

Page 106

Q. Okay. So, I take it, you had no communications with anyone from Wells Fargo Securities concerning U.S. Xpress?

A. No.

Q. Okay. Stephens, Inc. Is that an entity with which you're familiar?

A. I'm not that familiar with them. I'm sure I know who -- have seen them, but I'm not that familiar with them as I am the others.

Q. Okay. So, again, you had no communications with anyone from Stephens, Inc., concerning U.S. Xpress.

A. No. No.

Q. How about an entity called Stifel, Nicolaus & Company, Incorporated? Are you familiar with them?

A. I'm familiar with them. Had a friend who was there years ago -- well, not that many years ago, but -- so I knew of them through him. He was a good trucking analyst. And so I knew him, but that's the extent of that. Never had an account with them. Never called on them for investment advice.

Q. And what was your friend's name?

A. John Larkin.

Q. And how well do you know Mr. Larkin?

A. Just from industry events, I mean, gosh, going back 30 years.

Page 107

Q. And did you have any communications with Mr. Larkin concerning U.S. Xpress?

A. No. No. I mean, he -- he -- I think -- I don't think I even thought to ask anyone's advice, but not John, no, I didn't.

Q. And so, I take it, then, you had no communications with anyone from Stifel concerning U.S. Xpress or its IPO?

A. Right. No.

Q. Okay. How about an entity known as WR Securities, LLC? Are you familiar with them?

A. Not at all.

Q. And so you've had no communications with them concerning U.S. Xpress; is that correct?

A. That's correct.

Q. Now, earlier you mentioned an entity called Wolfe Research? Do you recall that?

A. Yes. Yes.

Q. And I'll ask you again, did you have any information that you gleaned from Wolfe Research concerning U.S. Xpress?

A. No. I didn't because I had dropped off their line of daily updates probably at the very -- very beginning of 2018 so...

Q. Okay. And you mentioned something called

Page 108

Wolfe Pack?  What is that?

A.  Oh, if I mentioned that, that was a mis- -- slip of the tongue.  I don't know.

Q.  Okay.  Thank you very much for your time.  I have nothing further, Mr. Clowdis.

A.  Thank you, sir.

BY THE VIDEOGRAPHER:  Ready to go off the record?

BY MR. KEEL:  Yes, I think so.

BY MR. HOLLEMAN:  If we could go off the record for just a couple minutes, I will have just two or three quick questions, and I'll chime in just along, but probably just two minutes off the record.  That will be great.

BY THE VIDEOGRAPHER:  The time is 3:50 p.m.  We are going off the record.

(Break in the deposition.)

CONTINUING:

BY THE VIDEOGRAPHER:  The time is 3:54 p.m.  We are going on the record.

EXAMINATION BY MR. HOLLEMAN:

Q.  Mr. Clowdis, do you have any understanding as to whether after we filed our Complaint the Defendants filed a Motion to Dismiss that Complaint?

Page 109

A. Yes, I think I know that, yes.

Q. Do you know how the Court ruled on that motion?

A. To make it succinct, won some, lost some, depending on whose side you are on, and there was enough to stay. We talked about this, I think. There was enough to stay involved and so, yeah, I remember it to answer your question.

Q. And do you, by chance, recall the Judge's name?

A. I should. He was -- he was a -- but I don't remember his name right offhand.

Q. Okay. Mr. Clowdis, do you, by chance, know what the legal definition is for "fraud"?

A. Not the legal definition. If I were -- well, I've used that too much today, but I have a legal dictionary so --

Q. And I don't want you to guess. Okay.

A. I don't know the legal definition.

Q. If I were to --

A. Sorry.

Q. If I were to cite a specific section of the U.S. Code, would you have any understanding as to whether that was securities fraud or some other violation of securities laws that was not, per se, securities fraud?

BY MR. KEEL: Object to the form.

Page 110

A.   Yes.   Yes.   As I said, the term we used was defalcation, which was fraud, when you fraudulently -- a traffic manager fraudulently cashed a check payable to his employer.   Yeah, I know that one.   I know that much.

Q.   What in your words is the ultimate goal of this lawsuit?

A.   To make things right with the original investors, and that's -- again, there's probably a legal remedy that's more succinct than I am, but we just want to right a wrong and right a misdeed, and that's -- that's my goal for it.   It's everyone's, I suspect it is.

Q.   And earlier you were asked a few questions about lawyers or the individual Plaintiffs getting compensated.   I believe earlier you testified that you have not been paid anything and you have not been promised anything.   Is that a correct statement?

A.   That's correct.

Q.   And do you have any understanding as to how the attorneys are either being compensated right now or how they might be compensated in the future depending on the outcome of the case?

BY MR. KEEL:   Objection to form.   Asked and answered.

BY MR. SUSHON:   I join.

Page 111

A. Should I -- well, I guess I have to. I answered, but, yes.

BY MR. HOLLEMAN: Well, technically, your objection was how they are being compensated and not about how they might be compensated.

Q. Go ahead, Mr. Clowdis. You may answer.

A. Okay. My understanding, and it's just my understanding from having been involved in litigation, that -- that the three law firms will share in any award, and then at that time, I guess we will all decide who gets what based on the performance or whatever, the holdings. I don't know how that works, but I'm assuming the law firms are paid like any law firm in a case like this. And that's my understanding. That's an assumption, but that's the way I understand it. And I agree with it. I don't know the percentages. I don't know the deals between the three so that's my understanding.

BY MS. PASSMORE: Okay. I'm just jumping in. Scott got disconnected. Just give me one second.

BY THE COURT REPORTER: Is this Ms. Passmore?

BY MS. PASSMORE: Yes, it is.

BY THE COURT REPORTER: Thank you.

BY THE WITNESS: Hi, Marion.

Page 112

BY MS. PASSMORE:  Hello.

(Pauses.)  Okay.  That is all the questions we have from our side from Scott.  Unless -- (pauses.) And that's -- yeah, those were all the questions we have.

BY THE VIDEOGRAPHER:  The time is 3:59 p.m. We are going off the record.

BY MR. SUSHON:  I'm sorry.  Before we go off the record, I have one redirect question.  I don't know, Brandon, if you have any redirect.

BY THE VIDEOGRAPHER:  Oh.

BY MR. KEEL:  Go ahead, Bill.

BY THE VIDEOGRAPHER:  Let me go back on the record.  Sorry.

The time is 4:00 p.m.  We are going on the record.

EXAMINATION BY MR. SUSHON:

Q.  Mr. Clowdis, it's Bill Sushon from O'Melveny & Myers again.  In the course of your cross-examination by your counsel, you mentioned that you brought this lawsuit to address any misdeeds that had occurred.  Do you recall that testimony?

A.  I do.  Yes, I said that just now.

Q.  Do you believe that your friend John Larkin

Page 113

would have committed any misdeeds?

BY MS. PASSMORE: Objection.

A. I know John -- but --

BY THE WITNESS: I'm sorry. Thank you, Marion. Should I answer?

BY MS. PASSMORE: Yes.

A. I know John well enough not to comment on his misdeeds or what he might have done. I know him as a -- more as a friend and colleague, not from his professional work at Stifel so...

Q. Thank you. I have nothing further.

BY MR. KEEL: I have nothing further. I think we can go off the record.

BY THE VIDEOGRAPHER: Okay. Just making sure. The time is 4:01 p.m. We are going off the record.

(Deposition concluded at 4:01 p.m. EDT/3:01 p.m. CDT.)

Page 114

CERTIFICATE OF COURT REPORTER

I, KAREN CARNELL POPERNIK, MS CCR 1276, TN LCR 469, Notary Public commissioned by the State of Mississippi, do hereby certify that the foregoing pages, and including this page, contain a true and correct transcript of the testimony of the witness, CHARLES CLOWDIS, as taken by me at the time and place heretofore stated, and later reduced to typewritten form to the best of my skill and ability; that I placed the witness under oath to truthfully answer all questions in this matter by the authority vested in me by the State of Mississippi and the State of Tennessee and by agreement of counsel; that the signature of the witness was expressly not waived; and that I am not in the employ of, or related to, any counsel or party in this matter, and have no interest, monetary or otherwise, in the final outcome of the proceeding.

Witness my signature and seal on this the 21st day of October, 2020.

*Karen Carnell Popernik*

KAREN CARNELL POPERNIK,

MS CCR 1276, TN LCR 469 (Exp. 7/1/22)

My Commission Expires: 3/5/24

Page 115

DEPONENT'S CERTIFICATE AND ERRATA SHEET

CHARLES CLOWDIS, the Deponent in the foregoing Deposition, do hereby certify that I have read the foregoing pages and that the same, with corrections, the reason therefor set forth on that page, is a true and correct transcript of my deposition given at the time and place hereinbefore set forth.

_____

CHARLES CLOWDIS

State of Tennessee

County of _____

Sworn to and subscribed to before me on this the _____ day of _____, 2020.

_____

NOTARY PUBLIC

My Commission Expires:

Page:            Line:           Correction:

_____

_____

_____

_____

_____

_____

_____

Page 116

Page:          Line:          Correction:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Page  117

[& - able]

| & | | | |
|---|---|---|---|
| **&** 1:14,15,18 3:6 3:15 4:6,16 8:21 8:25 9:9 24:15 37:23 38:1,20 39:3,6,20 40:3 46:15,15 52:3 56:4 63:18,22 67:2 68:8 73:11 81:15 83:23 84:4 105:18,23 106:7 107:13 113:20 | **1276** 1:25 2:13 115:2,24 **12:29** 11:19 **13** 93:9 **14,799** 59:1 **15** 90:10 **15,000** 58:9 **1600** 4:7 **17** 92:21 **18** 18:5 20:7 31:7 32:7 **19** 31:3 **1980** 52:8 **1983** 58:7,18 **1:02** 29:19 **1:19** 1:7 **1:31** 29:24 | **22427** 115:22 **23** 23:15 **25** 34:22 51:22 93:19 **26** 93:20,22 94:5 94:13 95:11,20 **28** 5:7 6:5 | **50** 51:24 52:22 67:17 **53** 60:1 **57** 5:8 6:6 |

| 0 | | 3 | 6 |
|---|---|---|---|
| **0003** 30:17 **00098** 1:7 | | **3** 5:8 6:6 30:23 57:8,9,21,24 **3/5/24** 115:25 **30** 52:23 107:25 **300** 66:18 **30309** 4:8 **3040** 3:7 **320** 55:13 **37219** 3:17 **3:01** 114:18 **3:13** 97:5 **3:34** 97:9 **3:50** 109:16 **3:54** 109:20 **3:59** 113:6 | **6** 5:14 6:12 72:21 72:24 96:25 97:13 98:8,18 101:16 **615.244.2203** 3:18 **68** 5:9 6:7 |

| 1 | 2 | | 7 |
|---|---|---|---|
| **1** 5:4 6:2 8:3 11:23 12:1 14:7 15:1 20:1 21:1 22:25 29:9 68:6 **1,200** 66:18 **10** 20:21,25 21:24 51:21 89:12 92:2 92:17 **100** 31:7,20 67:13 **10022** 3:8 **10036** 4:18 **105** 5:18 **109** 5:19 **10:40** 2:2 **11** 5:5 6:3 15:2 **113** 5:20 **115** 5:21 **116** 5:22 **1180** 4:7 **11:40** 8:2 **11:45** 11:15 **12** 45:3 92:22,25 93:7 | **2** 5:6 6:4 28:8 29:5 88:19,22 89:17 98:15,21 99:6 **20** 51:10 52:20 70:5 **200** 71:19 **2006** 80:16 **2007** 59:22 **2008** 64:1,3 **2017** 83:16 **2018** 14:9 15:2 21:1 22:1,17 23:9 31:7 32:7 36:3,3 51:10,21 108:24 **2019** 36:2,3 70:1,4 70:6 **2020** 2:2 8:3 31:3 98:15 115:21 116:13 **21** 22:24 23:3 **212.728.5693** 4:19 **21st** 115:21 | | **7** 4:17 5:2 81:9 98:17 **7/1/22** 115:24 **75** 67:13 |

| 4 | 8 |
|---|---|
| **4** 5:9 6:7 68:15,18 69:7,23 70:9,15 72:22,24 81:8 101:19,20 **40** 23:18 72:8 **404.572.2780** 4:9 **414** 3:16 **45** 60:1 **469** 1:25 2:13 115:3,24 **4:00** 113:15 **4:01** 114:15,18 | **8** 2:2 8:3 59:22 101:17 **80s** 52:4 75:23 **83** 59:22 **84** 5:13 6:11 **885** 3:7 |

| 5 | 9 |
|---|---|
| **5** 5:10 6:8 84:22 84:23 85:10,13 89:13 90:11 | **9** 5:3 20:2,4,6,6,9,9 20:9,12,15,25 21:24 90:13 91:3 91:19 101:18 **900** 3:16 **90s** 75:23 **917.325.3798** 3:9 **96** 5:17 6:15 |

| a |
|---|
| **a.m.** 2:2 8:2 11:15 **abiding** 81:22 **ability** 12:20 22:4 22:12,16 101:14 115:10 **able** 53:23 62:23 71:6 |

Veritext Legal Solutions
866 299 5127

abscond 71:6
absconded 71:4
absolutely 46:2
accepted 27:8
access 87:11 88:12
accident 64:6
accidents 56:11,12
account 30:25
34:6 86:17 91:23
107:19
accounts 104:7
accurate 70:4,6
100:13
accuse 50:11
achieve 22:16
42:23
acquire 89:21 90:4
acquired 63:25
acting 89:20 93:3
98:23
action 1:7,8 8:12
30:22 36:20 37:21
40:6 47:20 48:7
102:5,7
activities 64:15
activity 24:15
actual 62:15
actuarial 43:4
addition 32:17
additional 105:14
address 70:7 87:2
113:22
administer 8:11
administration
7:14
administrative
102:5
advertised 60:25
advertising 61:9
advice 107:20
108:4

advisor 18:20
advisory 50:23
affiliated 50:6
affiliations 8:16
71:17
afternoons 47:12
age 24:7 70:1
ages 16:20,21
ago 10:1 33:24,24
33:25 34:22 44:23
53:14 59:15 64:21
74:24 79:2 107:16
107:16
agree 48:7 112:16
agreed 18:4
agreeing 91:17
agreement 39:2
42:9 55:6 60:10
83:3 92:19 115:14
agreements 55:3
93:10,17 95:23,24
ah 98:6
ahead 14:20 15:4
29:4 100:16 112:6
113:12
air 64:16
al 8:7
alabama 54:11,15
alarmed 24:24
aligned 13:18
allegations 18:10
100:1,12
allege 17:6,11
54:13
alleged 17:19 18:2
50:5 54:10
allow 11:12
allowed 7:15
amended 48:13,18
49:1 99:16,19
102:10

america 63:14
64:12,17
american 58:7,14
60:14 63:15
amount 31:10
analysis 66:22
analyst 77:15
107:18
analysts 17:8
35:14
announcement
12:7
announcements
13:8
annual 64:20
78:13 103:17
annually 62:6,11
65:7
answer 11:1 14:14
14:14,20,20 15:4,6
15:8,9,10,10 25:24
26:2 48:2 67:7
76:23 81:20 89:3
90:20,25 91:11,13
91:15,18,20 94:15
94:17 95:4,22
100:17 101:5
103:1 104:22
105:21 110:7
112:6 114:5
115:11
answered 38:24
75:22 111:24
112:2
answers 38:8 43:5
43:8 100:19
anticipate 89:8
anticipated 30:15
anticipation 90:8
anxious 17:1

anybody 25:12
34:8 41:11 42:6
46:6 76:20 84:2
anymore 12:17
41:20 61:12 78:20
anyone's 108:4
anyway 83:4
99:23
aol 57:12,18
aol.com. 87:3
appearance 8:18
appearances 2:8
3:1 4:1 8:16
appearing 2:3,9
3:1
application 66:6
approached 38:9
appropriate 21:7
95:1 103:3
arbitration 70:18
area 13:21
areas 16:5 18:15
68:5 70:20
arguably 56:4
articles 44:11,16
71:19
as400 60:19 62:5
aside 45:7
asked 14:2,2 47:7
55:17,17,18 59:16
100:18 111:13,23
asking 17:25
42:14 91:9,10
94:21 96:10
asks 79:12 89:18
90:13 92:25 93:10
94:6 95:11
assessment 65:12
65:13 66:14 67:2
assignments 70:10
70:12

Veritext Legal Solutions
866.299.5127

| | | | |
|---|---|---|---|
| **association** 63:16 | **authorizing** 102:9 | **bear** 50:9 | **bottom** 20:3 30:4 |
| **assume** 10:7 11:3 | **automotive** 16:9 | **becker** 82:15 | 30:16 58:6 70:9 |
| 15:10 22:5,6 | 18:17 | **becoming** 50:23 | 98:20 101:17 |
| 66:24 | **availability** 21:21 | **beginning** 8:18 | **bought** 13:1 26:13 |
| **assuming** 21:13 | **available** 18:18 | 20:14 23:2 108:24 | 59:23,23 |
| 47:21 100:4 | 44:12 58:10,24 | **behalf** 1:5 8:21,22 | **box** 97:22 |
| 112:12 | 60:24 61:22 62:1 | 8:25 9:3,5,9,14 | **bragar** 3:6 8:25 |
| **assumption** 19:5 | **avenue** 3:7 | 89:20 93:3 98:24 | 9:5 37:7,7,23 38:1 |
| 22:6 112:15 | **average** 24:7 | **believe** 13:2 19:1 | 38:20 39:3,6,20 |
| **assured** 19:21 | 60:20,21 | 111:15 113:25 | 40:3 |
| **ata** 74:4 75:3,4 | **award** 112:10 | **believed** 21:5,5 | **brandon** 4:3 8:21 |
| **atlanta** 4:8 66:2,3 | **aware** 42:8 44:6 | 22:13 93:3 | 10:2 20:5 23:16 |
| **attempted** 79:5 | 44:18,21 45:17 | **benchmark** 58:8 | 28:18 37:7 47:10 |
| **attendee** 75:5 | 46:18 61:25 86:4 | 59:24 | 47:11,11 49:19 |
| **attendees** 56:25 | **awful** 74:4 | **benefit** 67:16,16 | 57:14 68:23 90:20 |
| **attending** 8:15 | **b** | **bespc.com** 3:10,11 | 113:10 |
| **attention** 14:1 | | **best** 15:11 18:6 | **break** 11:16 29:1 |
| 16:8 35:13 36:7 | **b** 77:16 | 58:19 64:13 | 29:21 56:19 84:9 |
| 36:10 92:22 93:20 | **bacine** 81:15 82:4 | 101:14 115:9 | 84:10,13 97:6 |
| **attorney** 8:19 | 83:24 84:4 | **better** 24:12,12,13 | 109:17 |
| 15:12 37:6,7 | **back** 10:21 21:25 | 26:2 32:3 47:20 | **brian** 45:20,23 |
| 39:16 40:4,9 | 43:12 52:3,4,8 | **biggest** 16:16 18:5 | 46:13 |
| 43:23 50:23 53:15 | 53:18 57:1,5 | **bill** 62:22 68:23 | **briefly** 28:9 29:11 |
| 100:22 101:11 | 58:19,23 74:2 | 69:1,20 74:15,19 | 56:22 |
| 103:2 | 75:23 81:8 86:10 | 77:9 82:15 105:18 | **bring** 56:14 66:23 |
| **attorneys** 17:17 | 96:16 98:4 101:16 | 113:12,19 | 68:10 |
| 38:20,25 40:1 | 107:25 113:13 | **billion** 64:23 | **broad** 44:21 |
| 41:3,10 46:19 | **bakshi** 3:14 9:13 | **bills** 60:17 62:6,10 | **broken** 24:1 80:15 |
| 47:19,25 86:11,14 | 9:14 | **binder** 87:22 | **broker** 71:4 |
| 100:4 102:16 | **banter** 80:6 | **bit** 17:3,5 32:1,3 | **brokerage** 16:10 |
| 111:20 | **barge** 64:18 | 36:24 64:1,23 | 21:16,16 30:24 |
| **attractive** 73:14 | **barrack** 81:15 | 65:6 69:4 | 34:6 70:25 |
| **audit** 73:18 | 82:4,5,6,12 83:23 | **bkeel** 4:10 | **brokering** 103:24 |
| **august** 31:3 | 84:4 | **blanks** 36:21,23 | **brought** 113:22 |
| **australia** 63:13 | **based** 19:10 21:21 | **block** 67:9 | **bucolic** 13:21 |
| **authored** 72:3 | 41:14 112:11 | **bold** 20:16 70:10 | **bugni** 4:5 8:23 |
| **authority** 63:21 | **basing** 24:15 | **bond** 66:6 | **build** 66:7 |
| 115:12 | **basis** 59:5 74:21 | **book** 68:12 | **built** 27:21 |
| **authorize** 43:20 | 91:1,6 103:17 | **boss** 42:11,12,13 | **bullet** 70:16 |
| **authorized** 8:11 | **basser** 82:7 | **boston** 74:20 | **business** 32:10 |
| 100:2,13 | **battery** 85:5 | | 63:5,6 67:9,18 |

Veritext Legal Solutions
866-299-5127

75:16
**businesses** 12:14
67:21,21
**buy** 14:4 34:9
67:13
**buyers** 15:22,25
**buying** 25:13 65:3

**c**

**c** 1:25 2:13 40:12
**cake** 74:7
**calculator** 43:3
**california** 59:25
**call** 36:22 37:22
38:10,14 40:15,21
47:1,19 61:6
74:10 78:9,9
82:14 103:20
**called** 36:23 52:6
56:4 62:22 64:20
65:8 97:16 103:21
107:13,19 108:16
108:25
**calling** 63:6
**calls** 35:14 41:15
41:18,22,24 45:24
45:25 46:3,6,24
82:16 92:3
**candy** 67:22,23,23
**capabilities** 68:1
**capacity** 51:16
64:7
**capgemini** 63:25
64:1,3
**capture** 58:19
62:23
**career** 53:1
**careful** 50:13
**carnell** 115:2,23
**carriage** 16:7
66:17

**carrier** 51:2 60:18
62:15,17 63:20
67:10 103:6,23
**carriers** 13:16
33:3 104:12
**carry** 22:4
**carve** 89:9
**case** 17:11,20 18:2
18:11 27:9 37:11
38:21,22 39:21
40:20,23 41:4,11
42:3,7,13 43:20
48:7 53:6,9,13,15
54:11,15,16,18,22
54:25 55:15 71:3
81:20,25 82:3,17
82:21,22 83:7,15
83:23 93:17 99:16
100:1,7 102:6,6,15
102:15,24,25
111:22 112:13
**cases** 19:19 25:25
52:10 54:2 63:11
70:19 81:24 82:18
103:23
**cashed** 111:3
**casper** 74:11
**catch** 103:21,21
**categories** 70:23
**category** 89:25
94:13
**caught** 16:7 35:13
**caused** 43:19
**caution** 37:15
100:21
**caveats** 24:2,18
27:8
**ccr** 1:25 2:13
115:2,24
**cdt** 2:3 114:18

**cell** 10:5
**centralized** 59:11
**cents** 104:3
**certain** 16:2 25:25
65:1 72:13 80:16
92:6 103:11
**certainly** 18:4,14
21:22 50:7 72:13
72:14 89:3
**certificate** 5:21,22
115:1 116:1
**certification** 5:6
6:4 28:7 29:25
30:2,21
**certify** 115:4
116:3
**chain** 65:11 69:1
**challenging** 64:18
**chance** 110:8,11
**change** 26:3,7
84:17
**changed** 58:20
**changes** 44:2
**changing** 36:15
**character** 79:1
**charged** 61:15,18
**charges** 62:22
**charles** 1:23 2:1
5:14 6:12 7:4 8:4
8:5 9:1,19,25
96:22 98:9 115:7
116:2,9
**chat** 79:25
**chattanooga** 1:3
32:10 33:13 41:13
53:15 77:5 79:22
**check** 39:13,15,15
47:1 111:3
**checking** 91:23
**chief** 75:24 76:13

**chime** 109:12
**choose** 26:3
**chris** 9:2
**christmas** 67:24
**christopher** 1:10
3:13
**chuck** 9:6 75:11
**chuckclowdis** 87:3
**circles** 75:3
**cite** 110:20
**civil** 1:7 7:5 102:5
**claim** 19:1
**claims** 17:11
**clarify** 18:24
**class** 1:8 30:22
36:20 37:21 40:5
47:9 101:2,6,7,14
**clear** 49:20 94:4
102:3
**clearcut** 71:5
**client** 45:2 61:7
100:22
**clients** 12:17,21
13:15 58:11 61:5
70:20 72:25
103:10
**close** 36:7 77:6
**closely** 16:19 36:7
**closer** 36:10
**closing** 27:1
**clowdis** 1:23 2:1
5:8,9 6:6,7 7:4 8:4
8:5 9:1,6,7,19,25
10:1,7 11:5,12,20
14:6,17 15:8,18
16:14 17:10 18:1
18:24 20:1,14
23:11 25:1 26:17
27:10 28:23 29:25
30:16,17 37:14
43:18 45:7,18

Case 1:19-cv-00098-TRM-CHS   Document 129-2   Filed 12/16/20   Page 122 of 145
PageID #: 3243

48:10 49:8,21,24 50:4,16 51:11 55:1 56:17 57:7 57:10,15,24 63:2 65:10 68:14,18 69:7,24 72:7 81:19 84:23 85:3 85:10 87:4 88:16 88:24 91:20,25 92:8,14 94:5,14 95:11,22 96:11 97:10 98:8,9 100:20 101:1 102:4 103:4 104:18 105:10,17 109:5,23 110:11 112:6 113:19 115:7 116:2,9

**clowdis's** 5:14 6:12 96:22

**club** 79:11

**coast** 63:21,21 82:9

**code** 110:21

**collapsed** 53:24

**colleague** 114:9

**colleagues** 82:14

**collect** 86:8

**column** 73:3 81:14

**combine** 61:16

**come** 88:7

**comes** 16:16 58:16

**comfortable** 39:12

**coming** 18:5 76:18

**commencement** 92:4

**comment** 114:7

**commission** 5:5 6:3 11:25 115:25 116:16

**commissioned** 115:3

**committed** 71:11 114:1

**committing** 50:11

**commodity** 60:17

**common** 31:14,16 31:21,24 32:5,6 33:8,18 34:9,11,11 90:18 104:10,12 104:14

**communicate** 40:19

**communicated** 41:11 45:22 74:22 77:24 80:11,14 98:24

**communication** 40:22 84:5 96:15 100:22

**communications** 79:7,17 80:8,18 84:1 88:25 94:6 95:12 96:4 104:19 106:1,4,10,19 107:1,10 108:1,7 108:13

**communicative** 40:16

**companies** 34:12 34:19 60:12 65:5

**company** 1:19 16:15 42:16 107:14

**compensated** 49:9 49:13,16 50:1 55:20 111:15,20 111:21 112:4,5

**compensation** 55:23

**competitive** 62:8

**complaint** 48:13 48:13,18,19 49:1 83:14 99:1,15,16 99:19 100:2,12 102:10,19 109:24 109:25

**completed** 27:21

**complicated** 64:25

**computer** 87:4,10 87:11 96:5,18

**computers** 88:10

**concept** 16:17

**concerned** 36:24

**concerning** 92:4 94:7 95:12 96:7 106:2,5,11,20 107:2,11 108:2,7 108:14,21

**concierge** 56:23

**concluded** 114:17

**conduct** 39:7

**conference** 45:24 45:25 46:6,24 47:19 80:1 82:16

**confidential** 1:1 30:11,13,14 55:9 98:23 99:20 101:12

**confidentiality** 30:12,15 42:9 55:6 60:9 81:21 83:2 95:24

**confine** 94:16

**confirm** 10:4

**connection** 86:5 96:16 98:24,25

**consider** 72:10,12 72:15,15 78:16,17 78:18

**considered** 25:16 89:19 90:3

**consultant** 19:10 51:17 83:7

**consulting** 12:17 50:22 58:11 64:4 82:19

**contact** 36:17 40:13 74:16 77:6

**contacted** 37:4

**contain** 115:5

**contained** 20:24 23:7 27:11

**contains** 72:24

**contemplated** 36:20

**contemplation** 27:1

**contend** 14:7,25 15:23,24 16:14 17:15 20:24 21:23 23:7 25:2 26:18 43:19

**contention** 19:24 22:15

**contents** 5:1

**continue** 28:19 59:4

**continued** 4:1 63:25

**continues** 20:21 70:11

**continuing** 11:17 23:3 28:10 29:22 97:7 101:18 109:18

**contract** 16:7 19:22 66:16 75:15 75:18,21 80:21 103:10,12,13,17 103:22,24 104:1

Veritext Legal Solutions
866 299-5127

| | | | |
|---|---|---|---|
| **contractor** 68:12 | 49:21,25 55:8 | **cursory** 74:21 | **decided** 33:7 |
| **contractors** 51:7 | 57:10 68:14 75:24 | **customers** 12:14 | 34:24 59:15 83:12 |
| 68:11 | 84:24 88:5 93:11 | 24:21 | **deciding** 27:12 |
| **contracts** 19:21 | 93:16,17 100:8 | **cut** 76:23 | 33:17 38:19 39:6 |
| **contractual** 104:2 | 104:20 113:21 | **cv** 1:7 5:9 6:7 | 39:20 |
| **contribute** 100:7 | 115:14,16 | 68:18 69:9 70:3,4 | **decisions** 47:14,17 |
| **contributor** 71:18 | **count** 52:19 | 81:8 | 47:23 48:5 67:8 |
| **conversations** | **country** 59:2 | **cw1** 98:22 99:13 | **decline** 41:19 |
| 37:16 | **county** 116:11 | **cw2** 98:22 99:13 | **dedicated** 12:20 |
| **cool** 85:6 | **couple** 29:1 46:10 | **cw3** 98:22 99:13 | 12:20 13:16,17 |
| **copies** 38:18 60:3 | 56:17 58:4 61:10 | **cw4** 98:22 99:13 | 16:6,17 17:1 18:3 |
| 61:12 | 109:11 | **cw5** 98:22 99:13 | 18:12 19:3,8,12,15 |
| **copy** 70:4 93:15 | **course** 48:7 52:8 | **cwood** 3:19 | 19:24 27:17 32:19 |
| **corley** 4:4 8:23 | 59:3,17 85:24 | **cycle** 21:8 | 66:16,23,24,25 |
| **corner** 30:17 31:2 | 86:11 99:22 | **d** | 82:23 103:5,9,9,9 |
| **corporation** 50:18 | 113:20 | | 103:23 104:7 |
| 50:19 66:17 | **court** 1:1 5:21 | **daily** 108:23 | **deemed** 89:6 |
| **correct** 19:4 20:8 | 8:10 9:16 30:12 | **dalton** 59:25 | **defalcation** 71:8 |
| 31:8,9 46:23 | 48:16,19,20 53:13 | **damage** 43:3 | 111:2 |
| 49:17 51:13 52:11 | 83:3 102:6,12,16 | **damages** 43:2 | **defendant** 83:1,1 |
| 62:1 71:22,23 | 102:17,20,25 | **data** 60:5,13 61:14 | 83:22 |
| 72:11 99:12 | 103:3 110:2 | 61:17 62:11 64:22 | **defendants** 1:21 |
| 108:14,15 111:17 | 112:21,24 115:1 | 64:23 65:5 78:11 | 2:5 4:2,14 5:11,16 |
| 111:18 115:6 | **courts** 70:18 | 96:7 | 6:9,14 8:22,22 |
| 116:6 | **covenant** 78:10 | **date** 31:2 86:24 | 9:10 10:3 84:20 |
| **correction** 116:18 | **covered** 81:20 | **dated** 98:15 | 85:15 94:7,9 |
| 117:1 | 88:1 | **day** 33:23 36:5 | 95:13,15 96:23 |
| **corrections** 116:4 | **covers** 103:13 | 38:3 48:15 62:3 | 100:1 109:24 |
| **correctly** 19:23 | **covid** 24:23 50:24 | 67:23 115:21 | **defense** 43:5 |
| 46:16 101:8 | 78:1,5 87:13 | 116:13 | **defer** 47:25 |
| **cort** 79:2 | **created** 58:6 59:11 | **days** 52:4 | **definition** 110:12 |
| **cost** 24:9,15 56:5 | 64:21 | **dbakshi** 3:20 | 110:13,17 |
| 65:11 66:22 67:16 | **credible** 100:2,6 | **deal** 43:4 44:3 | **deirdre** 45:18,23 |
| 67:16 | **criminal** 102:7 | 55:9 74:7 89:9 | 46:13 |
| **costing** 66:22 | **critical** 44:25 | **dealing** 52:7 | **deliver** 18:19 |
| **costs** 66:21 | **cross** 113:21 | **deals** 112:17 | **deliveries** 32:20 |
| **counsel** 8:5,14 | **current** 35:5 50:16 | **dealt** 75:14 | **delivering** 13:19 |
| 14:19 39:2,21 | 51:9 77:25 93:2 | **debashish** 3:14 | **delivery** 18:17 |
| 40:14,19,23 41:1 | **currently** 58:10 | 9:14 | **delve** 35:17 |
| 42:3,7 46:1,3,7 | 76:20,22,25 | **debt** 16:4 | **demand** 67:5,11 |
| 48:6 49:8,12,15,15 | | **decide** 32:6 35:9 | 67:12,24 68:3 |
| | | 37:25 112:10 | |

Case 1:19-cv-00098-TRM-CHS   Document 129-2   Filed 12/16/20   Page 124 of 145
PageID #: 3245

**depending** 110:4 111:21
**deponent** 7:12 9:1 116:2
**deponent's** 5:22 116:1
**deposition** 1:23 2:1 7:3,9,11 8:4,8 10:8,10,18 11:16 11:23 14:19 29:21 53:14,16 57:21 97:6,13 104:21 105:2,8 109:17 114:17 116:3,6
**describe** 30:19 33:6 56:2 60:12 63:3 70:20 79:6 80:18 95:2 103:8 104:20
**described** 94:13 95:20
**describing** 96:15
**description** 92:16 93:7
**descriptions** 92:6
**design** 65:11
**designate** 30:11
**designated** 30:14 75:5
**desired** 19:25
**destination** 58:10 58:21 59:1,21 60:17,18 65:7
**details** 53:19
**determine** 100:12
**determining** 89:20 90:3
**developed** 65:20
**diary** 85:23
**dictionary** 110:15

**died** 85:5
**diesel** 25:14
**different** 61:16,19 68:5 70:7,12 80:21 87:10,11 97:18 104:2
**difficult** 56:7 58:23 65:1
**difficulties** 29:12 105:12
**digressing** 23:24
**diligence** 63:17
**direct** 92:22 93:19 95:2
**directly** 73:22 80:11 90:24
**director** 50:18 51:4 64:11
**disciplined** 18:18
**disclose** 54:24 61:4
**disclosing** 104:19
**disconnected** 112:20
**discouraged** 17:7
**discover** 61:18
**discuss** 29:12 47:18
**discussed** 77:2,21 79:13 100:23
**discussing** 44:12
**discussion** 56:23
**dismiss** 102:24 109:25
**dismissed** 102:20
**dispose** 35:5
**dispute** 71:6 80:23 81:2,5
**disputes** 10:17
**disqualified** 54:11 54:14,14

**distribution** 68:1
**district** 1:1,2 53:9
**disturb** 44:3
**division** 1:3 18:12 19:3,12 103:5,19 106:25
**doctors** 23:25
**document** 12:2,6 13:3 20:7,10,25 21:25 23:9 25:3 28:3 30:1,8 31:4,6 50:8,9 57:15 69:16 84:8 85:11 85:17,20 86:25 88:17 90:23 95:4 96:13,20,21 97:19 98:11
**documents** 5:12 6:10 30:13 33:6 40:24 44:12 48:10 48:23 56:18,25 84:21 85:16 86:5 86:8,18,20 87:6 88:10,20 89:4,18 89:24 90:2,13 91:7,10,17 92:3,15 92:16,25 93:6 94:6,12,22 95:11 95:19 96:17
**doing** 13:17,17 14:3 19:21 47:22 61:1,2 69:10 97:1
**doke** 68:17
**dollar** 13:20,20,23 13:23,23 67:22
**dondaro** 79:2
**dot** 59:23
**doubt** 32:25
**dowd** 3:15
**downhill** 80:17

**download** 28:23 69:18
**dozen** 10:12 56:9
**dramatically** 28:13
**drifted** 57:6
**drinking** 93:24
**drive** 87:15
**driven** 56:6
**driver** 16:20 19:17 19:19,20 21:21 26:3 44:23,24 53:22 104:16
**drivers** 16:18,18 16:19 17:1 18:18 19:8 24:11 26:2,4 36:13,13 44:2,4,7 44:13,19 45:5 103:13 104:5
**drop** 35:12,22 43:9 44:1
**dropped** 14:16 36:3,5 62:6,11 108:22
**dry** 58:8 60:1,1
**due** 63:17
**duly** 9:20
**duress** 11:7

**e**

**e** 28:4,23 29:4 40:12,12,20,23,24 42:6,12,19 56:25 57:4,6 64:8 68:14 68:24 70:8 84:23 86:17 87:1 96:20
**eagel** 3:6 8:25 9:5 37:8,23 38:1,20 39:3,6,20 40:3
**earlier** 16:8 32:17 36:25 78:14 88:19 92:18 102:11

Veritext Legal Solutions
866 299-5127

103:4 108:16 111:13,15
**early** 51:10
**east** 63:21
**eastern** 1:2 53:9
**easy** 84:7 98:12
**economics** 80:2
**economies** 27:19
**economist** 56:5
**ed** 77:4,14,15,16 77:20 78:1,2,6,10 78:11,16
**edge** 32:14
**edt** 114:18
**education** 16:21
▮▮▮▮▮▮▮▮
**effort** 59:18
**ego** 56:6
**eight** 78:4
**either** 12:8,8 17:9 82:18 103:10 111:20
**electronic** 98:14
**emphasize** 73:15
**empire** 106:17
**employ** 115:16
**employee** 34:21 77:25 93:2
**employees** 77:22
**employer** 42:10 111:4
**employment** 96:17
**encompassing** 64:22 66:8
**encouraged** 63:15
**endeavor** 74:9
**ends** 23:18
**engage** 90:15
**engagement** 38:17 93:11,15

**enjoyed** 75:18
**enter** 30:22 103:12
**entered** 30:12 55:2
**enterprise** 26:24
**enterprises** 1:9 2:4 8:6 73:4
**entire** 92:9
**entirely** 27:8
**entirety** 12:12
**entity** 105:22 106:7,8,15,16,22 107:5,13 108:10 108:16
**entry** 30:15
**equipment** 19:19 26:5
**eric** 1:10,10 75:8 75:11 76:8,10
**ernst** 24:15 52:3 56:4 63:18,22 67:2 68:8 73:11
**errata** 5:22 116:1
**escrow** 62:22
**especially** 15:13 51:20
**esquire** 3:4,5,13 3:14 4:3,4,5,15
**et** 8:6
**events** 107:24
**everybody** 44:4 74:20 83:4
**everyone's** 111:11
**evidence** 7:10
**evolved** 59:5
**exacerbated** 45:1
**exact** 86:24
**exactly** 43:6 67:5
**exaggerated** 25:8 25:9 26:10,15
**examination** 5:3 5:18,19,20 9:23

105:16 109:22 113:18,21
**examined** 9:20
**example** 24:7 26:1 27:2 67:7,19 72:14
**examples** 26:2 70:12
**exception** 61:9
**exchange** 5:5 6:3 11:24 42:6
**exchanged** 40:24
**excluded** 54:5
**exclusively** 60:15
**excuse** 22:24
**execute** 22:12
**executive** 22:21
**exhibit** 5:4,6,8,9 5:10,14 6:2,4,6,7,8 6:12 11:6,23 12:1 14:7 15:1 20:1 21:1 22:24,25 28:8,12,17,20 29:5 29:9 57:8,9,21,24 68:15,15,18 69:7 69:23 70:2,9,15 72:22,24 81:8,9 84:22,23 85:10,13 88:19,22 89:13 90:11 96:25 97:13 98:8,18 101:16
**exhibits** 6:1
**exist** 94:22 96:17
**existed** 44:20
**existence** 91:16
**exists** 62:3
**exp** 115:24
**expand** 16:5 21:20 22:21
**expect** 24:17 54:4

**expectation** 25:9
**expected** 21:21 24:9 36:16
**experience** 16:18 104:4,15
**expert** 10:15,16 51:12,16,25 52:10 52:14,24 53:8,12 54:1,6,21 55:12,14 70:16 72:10,13 81:25 82:1,19
**expertise** 16:5 56:2,16 65:10 68:4,8,11 70:25
**expires** 115:25 116:16
**explain** 16:23
**explained** 26:11
**explanation** 44:1
**express** 34:21 63:8
**expressed** 36:25
**expressly** 7:12 115:15
**extent** 16:2 42:17 44:5 47:23 50:7,9 73:19 86:2,13 92:9 107:18
**extreme** 25:8 26:11
**eyes** 22:8

**f**

**facets** 72:13
**facility** 53:24
**fact** 26:8 75:10 96:6
**factor** 27:16
**factors** 23:1,4,8 25:17 27:5,12,24
**factual** 21:9
**fair** 11:3 13:2 27:10 47:24 71:12

Page 8

72:2,7,18 78:22 105:8
**fairly** 40:17 64:5
**fall** 24:22 89:24 92:16 94:12 95:19
**falling** 93:6
**false** 14:7 15:1 17:11,14,19,21 18:2 20:25 21:24 23:8 25:3
**familiar** 10:18 16:2 69:13 103:5 103:18 105:22,25 106:8,16,23 107:6 107:7,8,14,15 108:11
**family** 13:20,23 67:22
**famous** 75:2
**far** 11:8 37:19 61:9,25 82:21 101:10
**fargo** 1:17 9:11 106:22,24 107:2
**fashion** 24:12
**faster** 28:24
**fault** 98:2
**fax** 70:7
**feature** 73:14
**features** 18:19 73:15
**federal** 5:7 6:5 7:5 28:7 30:2 48:16 48:19 49:2 70:18 102:17,25 103:3
**feel** 25:7 35:20 37:2 39:12
**felt** 18:7 103:2
**fenner** 1:14 105:23

**fiduciary** 71:9
**field** 43:17
**fifty** 16:19
**file** 35:9 83:13
**filed** 40:14 48:11 48:14,19,20,23 49:2 51:6 99:16 100:3,13 102:6,10 102:11,16,20,25 109:24,25
**filing** 15:14 102:9
**fill** 36:21
**filled** 36:23
**final** 60:15 115:18
**finally** 62:23
**finance** 12:8 33:20 72:13
**financial** 76:13 90:7
**financially** 8:13
**find** 38:8 56:7 59:19 74:10
**fine** 84:18 95:1,5,6
**firewall** 69:3
**firm** 8:10 37:17 38:15 81:18 82:2 82:8,12 83:5 84:2 101:8,9 112:13
**firms** 39:8 46:9,15 46:18 81:9,14 112:9,13
**first** 5:11,16 6:9 6:14 9:19 12:5,25 30:5 38:10 58:5,5 63:20 65:9 77:16 77:18 84:20 85:15 96:23 105:21
**five** 34:15 46:25 74:24 89:5
**fixed** 104:1

**flagship** 64:19
**flattered** 63:23
**fleet** 16:21 21:12 21:20 24:8,11 65:13 66:14,20
**flop** 34:25
**flowing** 65:21
**fluctuate** 25:11
**focus** 27:17
**following** 23:3 64:2 67:4
**follows** 9:21
**foot** 60:1,1
**foregoing** 115:4 116:2,4
**forever** 29:3
**form** 7:7 94:20,24 94:25 95:5 110:25 111:23 115:9
**format** 59:1 72:6
**former** 42:10,13 77:22,25 93:2 96:16
**formerly** 77:2
**formulas** 65:19
**forth** 116:5,7
**forthcoming** 54:9
**forward** 16:3 43:15 57:10 68:15
**forwarded** 57:15 68:20 85:3
**forwarding** 84:24
**found** 21:10
**four** 46:25,25 59:6 61:2 62:6,10 88:18,21 89:4,4
**frame** 94:23
**frankly** 16:7,20 19:20 63:23
**fraud** 50:11,13 70:25 71:1,3,12,14

110:12,22,24 111:2
**fraudulently** 111:2,3
**fred's** 13:22
**free** 33:13
**freight** 21:15 53:22 58:8 64:18 65:21
**frequent** 34:14 71:18,24
**frequently** 40:15 40:18
**fresh** 22:7,8
**friend** 63:19 78:17 107:15 113:25 114:9
**friend's** 107:21
**friends** 78:16,18 78:20
**front** 57:20 69:7 90:25 97:12
**fuel** 24:13 25:10 25:14
**full** 21:19
**fuller** 1:10,12 75:1 75:8 79:7
**fullers** 45:12,15
**fully** 67:17
**function** 11:6
**funds** 90:14,17 91:24
**funny** 79:23
**further** 7:13 109:5 114:11,12
**future** 55:24 111:21

---

**g**

**ga** 4:8
**gather** 61:14

Veritext Legal Solutions
866.299.5127

gee 36:5
geller 3:15 9:3,15 46:17
general 13:23 53:20 58:5 80:1
generally 42:19 61:13,21 63:2 96:14 106:13
generated 103:16
generation 24:20
genre 104:13
gentleman 74:3
georgia 59:25 83:5
getting 11:7 12:9 36:13 67:18 111:14
gist 62:25
give 67:8 89:14 112:20
given 34:21 116:6
glad 73:17
gleaned 108:20
global 64:9
go 10:21 11:11 14:4,20 15:4 24:3 24:19 29:14,16,18 32:14 38:7 47:14 52:6 56:20 59:19 63:21 67:13 69:20 79:5 84:8,11 86:14 97:2 98:5 100:16 109:7,10 112:6 113:8,12,13 114:13
goal 111:5,11
goals 22:16
goes 52:3 60:13 65:14 70:20 92:5 94:9 95:15
going 8:2 11:15,19 12:25 14:15 16:3

16:4,5 19:22 21:14,19 24:12,13 24:14,23 25:10,11 25:15 26:4,5,6 28:2,3,4,19,21 29:20,24 30:11 32:12 37:15 40:16 41:16,16,17 43:15 44:24 52:8 55:8 56:17,18,19 57:4 59:17 63:1 67:13 67:24 68:2 80:2 83:13 84:8,9,16,16 88:24 89:7 90:19 90:24 92:9 96:2,7 97:5,9 107:24 109:16,20 113:7 113:15 114:15
good 8:1 12:15 19:11,15 22:11 37:19 38:5 51:24 56:15 57:3 61:7 68:9,12 75:25 80:5 97:23 107:17
goodness 69:21
gosh 24:23 26:22 27:16 34:16 37:6 38:12 46:10 74:2 78:1 80:15 83:11 83:16 87:12 107:24
gossip 79:11,14
grdlaw.com 3:19
grear 1:11 76:4,10
great 22:9 24:21 24:21 26:9,24 57:16 109:14
group 33:21,22,22 50:20,21 51:5 52:5 104:6

grouped 47:5
groups 71:19
grow 21:7
growth 18:4,12,22 19:4,12
guess 16:4 28:2 33:11 36:24 37:6 37:12 46:10 48:13 59:15 71:8 73:9 78:10 79:23 83:12 86:16 87:13 98:4 110:16 112:1,10
guy 52:6 78:21
guys 12:15 16:9 28:14 56:9,11,13 59:23 65:3 66:20 66:23 68:13 73:18 81:24 82:9 84:10 98:1

## h

h 40:12
halloween 67:23
hallway 77:17
hand 20:16 30:17 31:2
handle 67:10 74:9
hands 75:12
happen 17:6 24:18 25:8,15 26:10 103:15
happened 13:18 17:6 43:6,8,10
happening 24:10 36:6,8,11,16
happens 104:8
happy 12:21
hard 36:13 46:23 76:2 78:20
harlin 76:12,15 80:9

harry 1:9
haul 16:6
he'll 68:15 84:24
head 44:22
hear 16:11 28:15 28:16 76:23 79:10
heard 21:4 61:1 79:13
hearing 19:7
held 2:2 8:8 51:9
hello 79:8 113:1
help 22:8 47:9,9 50:25 63:19 66:9 66:10,10
helped 22:8 66:5 73:11
helping 80:20
helps 33:3
herd 105:24
hereinbefore 116:7
heretofore 115:8
hey 20:5
hi 75:11 105:17 112:25
high 60:20
highest 60:20,21
hindsight 18:4
hire 44:2
hired 73:10 74:3 76:5 83:6
hiring 44:4
history 63:3 87:18
hold 20:12 21:3 31:20 57:12 70:14 94:18,18 97:16,20 98:12 101:21
holding 63:20
holdings 112:12
hole 87:21

Case 1:19-cv-00098-TRM-CHS Document 129-2 Filed 12/16/20 Page 128 of 145 PageID #: 3249

| holleman 3:4,10 5:19 8:24,24 14:10,13 15:3,6 17:16 18:13 19:14 20:5 21:2 22:2,18 23:10,16 25:5,19 25:23 26:20 27:6 27:14 28:18 29:8 29:18 30:10 33:9 34:13 35:11 37:14 37:19 38:23 42:25 43:21 44:9,15 46:14,21 47:6,16 48:1,3,8 49:4,19 50:12 51:18 52:2 52:16 54:3,7 55:1 55:16 56:3 57:14 59:13 68:19 71:2 81:1,4,19 83:9 85:2 86:22 88:23 90:19 91:2,5,14 92:8 94:14,21 95:7,21 97:1,21 100:15,17,20 101:4 102:22 109:10,22 112:3 holloway 2:16 8:9 home 17:4 87:4,5 honest 13:5 38:13 honestly 49:5 honorable 21:9 hopefully 85:3 hourly 55:11 hubbell 39:10,14 hubble 39:13 huge 67:9 huh 81:13,17 human 99:22 hundred 14:5 53:1 hunt 77:16 | **i** icon 33:20 idea 19:11 38:13 42:17 49:10 99:14 identify 26:17 27:4 98:22 identifying 60:11 ignorance 79:13 ihs 42:10,13 51:20 64:8,10,14 78:9,11 78:14 96:3,17 illegal 43:23 impact 60:2 implementation 65:12,24 implementing 66:11 important 99:24 impressed 12:18 12:20 32:18 impression 12:15 19:9 impressive 12:22 inability 44:2 inclination 35:19 37:1 included 64:16 65:4 includes 51:11 including 92:5 93:11 98:25 100:22 115:5 incorporated 1:14 1:19 50:20 105:23 107:14 increase 24:8 independent 64:4 index 58:7,8,15 59:11 60:6,14,22 60:23 61:5,17,25 62:3,12 | indirect 17:9 individual 111:14 individually 1:4 individuals 50:6 60:11 industrial 66:3,5 industry 19:11 34:17 41:14 44:6 44:14,19 52:11,15 52:25 53:3 54:2 66:20 71:18,19 72:4,8,11,17 77:12 79:25 80:3 101:15 104:11 107:24 information 15:21 15:24 18:25 19:2 19:24 37:5,20 56:14 59:12 61:4 62:14,21 64:24 65:3 88:14 99:8 99:12 108:20 initiative 21:12,12 injured 53:22,25 innovating 16:23 inquiry 100:9 insight 64:9 insisted 73:16 insofar 95:22 instance 2:4 instances 10:14 104:5 instantaneous 59:9 instruct 15:9 90:20,24 91:13 instructs 14:19 instrumental 50:8 insurance 26:6 71:3 intend 55:14 | intended 33:22 68:13 interact 77:10 interactions 76:15 76:19 interest 32:13 54:8 115:17 interested 8:13 32:2 43:16 interesting 32:19 35:3 internal 20:8 international 26:24 internet 59:4 interrogatories 5:16 6:14 96:24 interrogatory 98:21 99:6,9 101:19,20 interrupt 41:25 49:20 introduce 28:3 96:20 105:17 introduced 7:10 intuitively 62:23 inventory 27:20 27:21 investigation 38:4 investigators 24:25 investment 107:20 investor 72:17 investors 111:8 involve 82:20 83:24 involved 15:13 49:12 52:6 53:6 72:3 80:20 83:18 96:4 110:6 112:8 |

Veritext Legal Solutions
866 299 5127

**involves** 51:15
**involving** 52:10,15
  52:25 53:4 54:2
  70:19 82:22
**ipo** 13:1 44:8,14
  44:20 105:19
  106:5,11 108:8
**irrelevant** 91:8
**issued** 14:8 15:2
  17:15 18:1,25
  21:1,5,25 23:9
  25:4
**issuers** 21:6
**issues** 70:19 75:14
  75:15,21 80:21
**items** 63:1

**j**

**j** 4:15 9:11 77:16
  106:15,17,20
**j.p.** 1:16
**jason** 1:11 76:4,10
**jeff** 77:4,8,20
  78:19 82:6,13
**jeffery** 82:5,13
**jessica** 4:4 8:23
**job** 33:24 51:23
  64:18 81:6
**jobs** 17:8 26:4
**john** 107:22 108:5
  113:25 114:3,7
**join** 102:25 111:25
**joined** 63:7
**journal** 33:14
**journalists** 41:24
**journals** 32:10
**jpcorley** 4:11
**jr** 1:9
**judge** 1:9,10
**judge's** 110:8
**jumped** 51:21

**jumping** 112:19
**june** 14:9 15:2
  21:1 22:1,16 23:9
  31:7 32:7 70:6

**k**

**k** 74:15
**karen** 1:25 2:13
  8:11 115:2,23
**keel** 4:3 5:3 8:20
  8:21 9:23 10:2
  15:7 20:8 23:12
  23:18 28:11,25
  29:10,16 49:23
  57:16 68:25 69:4
  84:16 91:1,4,9
  94:18,25 95:9
  97:3 109:9 110:25
  111:23 113:12
  114:12
**keep** 12:21 56:19
  84:9,16
**keeping** 36:13
**kern** 77:4,14,20
  78:6,16
**key** 45:9,11
**kid** 105:24
**kidding** 84:11
**kind** 35:3 41:24
  44:3 67:24 71:13
  74:19 80:17
**kinds** 40:7 41:15
**king** 4:6 8:21
**knew** 12:25 16:8
  22:5,6,13 60:25
  61:23 64:21 74:10
  79:1,21 86:12
  93:1 107:17,18
**know** 10:24 12:5
  13:5 14:14,17
  15:18 16:9 17:23
  18:1 21:11,13,16

21:17 22:5,12,14
  25:12 26:4,5,6
  27:18,23 28:1,19
  28:20 29:2 32:2
  32:24 35:18 36:25
  38:2 39:11 41:17
  41:18 42:16 43:14
  43:23 44:24 45:12
  45:15 47:4 54:9
  54:11 57:11 59:24
  61:7 62:15,17,19
  66:21 67:17 68:9
  68:16 69:17 71:5
  72:20 74:5,19
  75:1,10,12,23 76:4
  76:8,9,12,17,20
  77:1,8,14,17,21
  79:3,19,21,24
  80:10 82:7,10,22
  83:11,17,21 84:10
  84:25 89:3,15
  92:20,20,22 93:14
  93:20 96:6,12
  97:15 99:23 100:4
  103:13,15 104:23
  105:5,21 106:9,17
  106:24 107:8,23
  109:3 110:1,2,11
  110:17 111:4,4
  112:12,16,17
  113:10 114:3,7,8
**knowing** 68:12
**knowledge** 31:12
  76:11 99:8 100:6
  101:15 102:8
**knowledgeable**
  72:16 74:8
**known** 108:10
**knows** 25:12 42:22
**korsinsky** 46:16

**kslaw.com** 4:10,11
  4:12

**l**

**l** 40:12 74:15
**la** 59:25
**labeled** 20:9
**lack** 91:16
**lacks** 99:7
**lady** 37:9
**lafayette** 79:22
**lane** 61:7
**laptop** 87:5,6
**larger** 65:2
**larkin** 107:22,23
  108:2 113:25
**law** 38:15 39:7
  46:9,15,18 68:12
  81:9,14,18 82:2,8
  83:5 84:2 101:8,9
  112:9,13,13
**laws** 5:7 6:5 28:8
  30:3 43:24 110:23
**lawsuit** 35:9 36:17
  43:20 80:24 81:3
  84:5 92:5 94:7,8
  95:13,14 96:9
  98:24 102:11
  111:6 113:22
**lawyer** 36:17
**lawyers** 14:18
  41:22 53:5 82:11
  111:14
**lbugni** 4:12
**lcr** 1:25 2:13 115:3
  115:24
**lead** 30:22
**leader** 24:20
**learn** 36:9
**learned** 36:12 63:9
**leave** 17:17 26:3
  47:19

Veritext Legal Solutions
866 299-5127

**[left - marked]**

| | | | **m** |
|---|---|---|---|
| **left** 20:16 31:2 | **litigation** 10:3 | 38:14 41:15 44:8 | **m** 3:13 40:12 |
| **legacy** 32:24 | 15:18 39:4 40:2 | 51:9,25 58:16 | **m&a** 65:12 |
| **legal** 47:20 110:12 | 40:14 41:7,25 | 63:9,24 64:13 | **magazines** 33:12 |
| 110:13,14,17 | 42:20,21,24 45:8 | **longer** 34:23 74:24 | **magic** 45:2 |
| 111:8 | 45:14 47:5,15,24 | 79:23 | **magistrate** 1:10 |
| **letter** 38:17 93:16 | 48:11,23 49:2 | **look** 24:25 39:9 | **mail** 28:4,23 40:20 |
| **letters** 93:12 | 50:2,5,22 51:12,17 | 53:17 72:19 73:17 | 40:23 42:12,19 |
| **leverage** 22:10 | 52:1,5,14 53:21 | 85:20 95:2 101:17 | 57:4,6 64:8 68:24 |
| **levi** 46:15,15 | 54:20 55:21,25 | 104:23,24 | 70:8 86:17 87:1 |
| **lewis** 1:4 8:6 | 83:8 84:2 86:6 | **looked** 12:12 18:7 | 96:20 |
| **liaison** 75:17 | 87:24 88:21 101:3 | 18:22 23:23 32:23 | **mailed** 29:4 68:14 |
| **licensed** 39:16 | 102:10 112:8 | 39:22 85:18 86:10 | 84:23 |
| **liked** 59:24 | **little** 13:21 14:4 | 88:19 90:7 | **mails** 40:24 42:6 |
| **lillie** 37:9,17 | 17:5 20:2 32:1,3 | **looking** 13:16 16:3 | 56:25 |
| **limit** 38:6 95:3 | 32:15 36:24 38:3 | 27:16 30:24 85:9 | **maintain** 19:8 |
| **limited** 92:5 93:11 | 40:6 64:1 65:6 | 101:13 | 59:7 |
| 94:22 98:25 | 69:4 76:24 96:13 | **looks** 57:25 58:2 | **maintenance** |
| **line** 19:16,25 | **live** 43:17 79:22 | 97:18 | 24:13 72:14 92:4 |
| 65:23 68:2 75:6 | **lived** 13:20 | **lord** 23:19 | **major** 13:22 72:25 |
| 108:23 116:18 | **living** 32:9 | **lost** 60:2 74:20 | 76:18 |
| 117:1 | **llc** 1:15,16,17,20 | 110:3 | **making** 47:2,14 |
| **lines** 18:21 34:22 | 106:8,16,22 | **lot** 13:8 16:24 17:7 | 114:14 |
| 41:13 44:4 53:4 | 108:11 | 19:16 31:14 56:14 | **man** 80:6 |
| 63:7,19 64:18 | **llp** 3:15 4:16 | 56:14 59:8,22,23 | **manage** 19:16 |
| 65:1,1,2 68:1 | **load** 21:12 28:17 | 59:24 63:9,10 | 34:5 |
| 82:24 | 53:22,24 57:2 | 64:7 67:1,20 | **management** |
| **linkedin** 5:8 6:6 | 58:7,8,14 60:14 | 72:19 74:5 77:4 | 21:12 22:7,8 |
| 57:7,17,25 58:2,4 | 62:16 74:8 103:6 | 85:24 | 24:20 32:2,23 |
| 63:2 65:9 68:5 | **loading** 57:1 | **loud** 101:22 | **manager** 111:3 |
| **lisa** 1:12 4:5 8:23 | **local** 90:6 | **love** 66:16 | **managing** 50:18 |
| 45:13,16 75:13,14 | **locales** 13:22 | **lowest** 60:21 | 51:4 64:11 |
| 75:21 76:1,18 | **location** 88:13 | **lunch** 78:1,2,6 | **marginally** 17:3 |
| 79:21 80:13 | **locations** 32:19 | **lusk** 74:15,16,23 | **marion** 3:5 9:4 |
| **list** 33:14 70:11 | 60:22 61:16 | 76:18 77:11 79:21 | 41:5 112:25 114:5 |
| **listed** 70:23 | **log** 11:8,12 47:1 | **lusk's** 77:9 | **mark** 29:3 |
| **listen** 79:11,11 | **logged** 11:5 | **lynch** 1:13 9:10 | **marked** 11:22,25 |
| **listening** 35:14 | **logistics** 10:17 | 14:4 105:22 106:2 | 28:8 55:9 57:7,21 |
| 36:6,9 | 43:17 50:20,21 | 106:5 | 68:18 84:22 85:10 |
| **listing** 6:1 72:25 | 51:5 70:19 | | 88:19,21 96:25 |
| **lists** 73:4 81:9 | **long** 16:6 23:25 | | 97:13 |
| | 26:5 28:14 29:2 | | |

Veritext Legal Solutions
866 299 5127

| | | | |
|---|---|---|---|
| **market** 21:7 | **memory** 56:15 | **misled** 26:21 | **named** 45:9,19,21 |
| **marketing** 73:10 | **mention** 26:25 | **misrepresented** | 47:8 50:1,6 79:1 |
| 74:13 | 27:20 96:3 | 15:24 16:15 18:11 | 101:21 |
| **marketplace** 62:8 | **mentioned** 10:1 | **missed** 16:25 | **names** 46:9,22,23 |
| **marking** 28:12 | 12:14 31:23 61:10 | **missing** 36:1,2 | 77:1,21 |
| **markit** 42:10 | 75:7 78:13 102:11 | **mississippi** 115:4 | **nashville** 3:17 |
| 51:20 96:3 | 103:4 108:16,25 | 115:13 | **nature** 15:14 |
| **martindale** 39:9 | 109:2 113:21 | **mix** 66:19 | 67:18 71:14 75:15 |
| 39:13,14 | **merrill** 1:13 9:10 | **mobile** 70:8 | 99:23 |
| **materials** 87:23 | 14:4 32:14 105:22 | **modes** 64:16 | **ne** 4:7 |
| **matter** 8:5 49:9,13 | 106:2,5 | **mom** 25:12 26:12 | **near** 58:6 96:8 |
| 52:14 53:20 79:14 | **met** 32:25 41:1 | **moment** 68:22 | **nearly** 56:10 |
| 83:6,19 89:1,9 | 74:4 75:2,3,4,6,7,8 | 97:2 | **necessarily** 32:9 |
| 94:8 95:13 115:11 | 75:13 76:10,13 | **momentarily** 85:4 | 35:2 |
| 115:17 | 77:16,18,18 | **moms** 26:13 | **neck** 24:1 80:15 |
| **matters** 10:14 | **mexico** 16:10 | **monetary** 115:17 | **need** 23:11 35:2 |
| 15:13 47:25 51:12 | 18:16 27:1 36:14 | **money** 32:5,15 | 56:20 58:18 66:1 |
| 52:1,25 | **middle** 73:3,3 74:2 | 35:2 37:1 51:7 | 66:9,20 84:17 |
| **mattice** 1:9 | 74:12 81:14 | 66:7 71:4 | **negotiate** 74:7 |
| **max** 1:12 75:1,2,2 | **mile** 104:3 | **monteagle** 70:5 | **negotiated** 24:22 |
| 75:6 79:7 | **miles** 103:11 104:3 | **month** 40:18 78:2 | **negotiator** 76:2 |
| **mcaleer** 83:5 | **million** 26:9 62:6 | 78:6 | **never** 26:1,1,4,5,6 |
| **mean** 13:11,13 | 62:10 64:23 | **months** 46:25 49:6 | 31:15 32:5 40:15 |
| 21:6 22:11 24:10 | **mindful** 55:3 | 83:12 | 43:3 54:9 56:6 |
| 25:10,12 33:10 | 95:25 | **morgan** 1:15,16 | 60:23,25 62:2 |
| 38:25 40:7 43:8 | **mine** 58:18 96:6 | 9:10,11 106:7,11 | 80:11 81:7 82:21 |
| 44:3 46:22 49:19 | **minute** 11:12 | 106:15,17,20 | 82:25 83:3,14 |
| 55:5 57:5 61:23 | 28:11 50:16 84:25 | **morning** 8:1 105:5 | 102:4 107:19,19 |
| 67:22 79:13 80:15 | 89:14 | **motion** 109:25 | **new** 3:8 4:18 |
| 89:10 90:7 107:24 | **minutes** 109:11,13 | 110:2 | 21:15 22:7 32:23 |
| 108:3 | **mis** 109:2 | **move** 35:1 50:15 | 67:12 84:8 87:12 |
| **meaningful** 89:10 | **misdeed** 111:10 | **moved** 70:5 | **newspaper** 32:11 |
| **means** 7:15 23:12 | **misdeeds** 113:22 | **moving** 36:14 | 90:6 |
| **media** 8:3 | 114:1,8 | 103:22 | **nice** 33:2 37:9 74:8 |
| **meet** 75:12 | **misleading** 14:8 | **myers** 4:16 9:9 | **niche** 67:8,8 |
| **meeting** 75:3 | 15:1,15 17:9,12,14 | 105:18 113:20 | **nicolaus** 1:18 9:12 |
| **meetings** 75:4 | 17:20,21 18:2 | | 107:13 |
| 79:19 | 19:1,2 20:25 | **n** | **nineties** 74:2,12 |
| **member** 40:5 | 21:25 22:11 23:8 | **name** 8:9 9:24 | **nods** 44:22 |
| 63:15 | 25:3,7,17 26:19 | 10:2 40:11 54:25 | **non** 41:22 70:17 |
| | | 76:9 81:23 107:21 | 82:1 |
| | | 110:8,10 | |

Case 1:19-cv-00098-TRM-CHS   Document 129-2   Filed 12/16/20   Page 132 of 145
PageID #: 3253

| | | | |
|---|---|---|---|
| **normally** 104:5 | 49:4 50:12 51:18 | **officer** 76:13 | 103:12 |
| **north** 58:7,14 | 52:2,16 54:3,7 | **oh** 20:11 35:12 | **ones** 21:10 46:3 |
| 60:14 63:14 64:12 | 55:16 56:3 59:13 | 52:12,17 57:3,5 | **ongoing** 45:1 |
| 64:17 | 71:2 81:1,4 83:9 | 69:20 80:15 83:16 | **opened** 63:20 |
| **notary** 115:3 | 86:22 88:23 94:17 | 84:10 97:23 | **operate** 104:12 |
| 116:15 | 94:19,25 95:5 | 100:24 109:2 | **operated** 18:22 |
| **notebook** 48:25 | 100:15 101:4 | 113:11 | 103:10 104:6 |
| 87:16,19,19,23 | 102:22 111:23 | **okay** 11:9 12:5 | **operates** 27:2 |
| 88:1,4,10 | 112:4 114:2 | 13:2,6,10 14:6,6 | **operation** 16:10 |
| **noted** 2:8 95:6 | **objections** 5:11,15 | 14:23,24 20:11 | 36:14 56:5 65:21 |
| **notes** 105:1,5,7 | 6:9,13 7:7 8:17 | 22:23 23:1,14,19 | **operational** 22:22 |
| **notice** 7:4 67:9 | 84:19 85:14,24 | 25:1 28:6 30:4,19 | 65:12,16 |
| **noticed** 13:25 | 96:23 98:9 | 31:2,6,17 33:16 | **operations** 21:16 |
| **noticing** 8:19 | **obligation** 55:3 | 34:11 35:22 37:25 | 26:25 58:9 70:25 |
| **number** 20:3 | 96:2 100:11 104:2 | 39:19 42:1,23 | 82:23 |
| 22:24 23:17 52:9 | **obligations** 96:1 | 43:18 48:18 54:24 | **operators** 64:18 |
| 65:18 72:2 81:9 | **observe** 53:23 | 55:7 57:12,24 | **opine** 15:16 |
| 103:11 | **obtained** 60:13,16 | 60:11 62:3,14 | **opinion** 10:15,16 |
| **numbers** 70:7,8,8 | 92:25 | 69:2,22,25 70:1,14 | 15:15 16:25 24:10 |
| **ny** 3:8 4:18 | **obviously** 12:12 | 70:23 71:10 72:6 | 36:4 43:25 70:16 |
| | 59:3 | 76:4 77:24 80:13 | 70:24 71:11 75:25 |
| **o** | **occasionally** 59:18 | 82:2,7,11 84:7,12 | **opportunities** 36:2 |
| | 61:6 | 85:7 86:4 89:2,17 | **optimistic** 18:7,23 |
| **o'melveny** 4:16 | **occasions** 52:9 | 92:13 94:4 95:7 | **order** 17:4 30:12 |
| 9:9 105:18 113:20 | 76:14 | 96:10,14 97:23 | 30:15 32:14 63:6 |
| **oath** 7:14 8:12 | **occur** 83:15 | 98:5,17 99:15,24 | 67:14 81:21 |
| 9:20 115:10 | 104:15 | 100:24 101:6,20 | **organization** |
| **object** 14:18 15:7 | **occurred** 113:23 | 101:20,24 102:3 | 63:13 |
| 47:8 90:19 95:5 | **occurrence** 104:10 | 102:24 104:14 | **origin** 58:21 59:1 |
| 110:25 | **october** 2:2 8:3 | 105:10 106:7,15 | 60:17 65:6 |
| **objected** 86:3 | 98:15 115:21 | 107:1,5,10 108:10 | **original** 111:7 |
| **objecting** 14:13 | **odds** 24:9 25:14 | 108:25 109:4 | **originally** 102:16 |
| 85:19 94:23 95:7 | **offer** 55:14 | 110:11,16 112:7 | **origination** 58:9 |
| **objection** 14:10,21 | **offered** 53:8,12 | 112:19 113:2 | 59:20 |
| 15:3 17:16 18:13 | 54:6 81:7 | 114:14 | **otr** 104:6 |
| 19:14 21:2 22:2 | **offering** 10:15 | **okey** 68:17 | **outcome** 8:13 |
| 22:18 23:10 25:5 | 32:12 43:12 71:10 | **old** 58:2 60:19 | 111:22 115:18 |
| 25:19,23 26:20 | **offers** 58:8 | **older** 19:17,18,19 | **outline** 73:15 |
| 27:6,14 33:9 | **offhand** 110:10 | **omm.com** 4:20 | **outlook** 18:7 |
| 34:13 35:11 38:23 | **office** 40:8 47:1 | **once** 29:6 40:18 | **outside** 13:21 |
| 42:25 43:21 44:9 | 48:25 | 66:21 85:25 | |
| 44:15 46:14,21 | | | |
| 47:6,16 48:1,8 | | | |

Page 15

| | | | |
|---|---|---|---|
| **outsourcing** 65:13 | **pardon** 35:1 | **people** 32:13 | **pierce** 1:13 105:22 |
| **overseeing** 50:8 | **park** 66:3 | 35:20 37:2 39:1 | **place** 25:11 46:24 |
| **overstated** 25:18 | **part** 12:18 19:23 | 41:16,23 45:12,15 | 58:22 101:25 |
| 25:25 | 47:18 51:11 57:25 | 46:8 59:6,8 60:10 | 115:8 116:7 |
| **owned** 31:13,16 | 66:25 89:18 | 60:25 61:2 68:9 | **placed** 115:10 |
| **p** | 106:17 | 74:6 77:5 82:10 | **places** 13:19 32:11 |
| **p** 9:11 106:15,17 | **participant** 43:16 | 99:25 100:5 | 67:1 |
| 106:20 | **participation** 38:6 | **percent** 45:3 51:21 | **plaintiff** 5:14 6:12 |
| **p.c.** 3:6 | **particular** 26:18 | 51:22,24 | 8:25 30:22 45:19 |
| **p.m.** 11:19 29:19 | 42:2,5 60:12 | **percentage** 12:19 | 45:21 47:8 96:22 |
| 29:24 97:5,9 | 61:15 67:7,8 | 51:15 | 99:7 |
| 109:16,20 113:6 | **parties** 7:2,13 55:4 | **percentages** | **plaintiffs** 1:7 3:3 |
| 113:15 114:15,18 | 75:17 82:17 95:24 | 112:16 | 5:10,13,17 6:8,11 |
| 114:18 | **partner** 58:18 | **performance** | 6:15 9:3,5,7,14 |
| **pack** 109:1 | **parts** 21:3 25:17 | 112:11 | 47:5 49:12 50:1 |
| **page** 20:2,3,4,6,6,7 | 63:6 | **performed** 73:7 | 84:19,21 85:14 |
| 20:9,12,15,21 | **party** 8:12 101:21 | 73:20 | 93:10,17 96:24 |
| 22:24 23:3,17,18 | 102:4 115:17 | **period** 13:9 19:22 | 111:14 |
| 30:5,8,17,19,23 | **passmore** 3:5,11 | 75:20 85:24 96:8 | **plan** 35:5 55:18 |
| 35:4 58:2,5 65:9 | 9:4,4 97:25 | **periods** 68:3 | **planned** 22:21 |
| 68:6 70:11,15 | 112:19,22,23 | 104:15 | **planning** 21:12 |
| 71:16 72:21,24 | 113:1 114:2,6 | **perks** 32:12 | 67:5 68:3 |
| 73:4 81:9 89:12 | **pat** 75:4,4,7 79:16 | **permission** 81:23 | **plans** 22:3,11 |
| 90:10 92:21,21 | 79:17,20 | 103:24 | 24:21 43:10,11,14 |
| 93:9,19 98:10,17 | **pate** 1:12 45:13,16 | **permit** 91:14 | **played** 13:13 |
| 98:20 99:4 101:17 | 75:13,21 76:1,18 | **permitted** 7:6 | **player** 83:21 |
| 101:17,18 115:5 | 80:13 | **person** 39:15 41:1 | **players** 45:9,11 |
| 116:5,18 117:1 | **pauses** 29:3 57:13 | 42:2 79:3 | **playing** 21:18 |
| **pages** 20:25 21:24 | 69:19 85:7,7 98:1 | **personal** 40:4,9 | **plead** 79:12 |
| 23:3,12 88:18,21 | 113:2,3 | 78:24 91:23,24 | **please** 8:17 9:17 |
| 115:5 116:4 | **pausing** 28:17 | 99:8 | 9:24 10:23 20:2,4 |
| **paid** 53:17 58:25 | **pay** 14:1 16:4 17:2 | **personally** 25:1,2 | 22:23 30:7,20 |
| 60:16 111:16 | 51:7 71:7 | **pertaining** 53:16 | 40:11 72:21 85:1 |
| 112:13 | **payable** 111:3 | **peterson** 1:11 76:8 | 89:12 90:10 98:17 |
| **pairs** 58:10 59:1 | **paying** 36:7,10 | 76:10 | 101:17,19 |
| 59:21 | 61:5 73:16 | **phenomenal** 45:3 | **pleased** 53:17 |
| **panel** 80:2 | **pdf** 20:6,7,9 | **phone** 10:5 37:22 | 100:19 |
| **papers** 71:20 76:6 | **peach** 66:3 | 40:20,21 51:23 | **plethora** 44:16 |
| **paragraph** 71:17 | **peachtree** 4:7 | 64:8 70:7 83:11 | **plugged** 37:4 |
| **paralegal** 37:6,8 | **pending** 53:9,13 | **piece** 74:6 | **point** 15:17 25:7 |
| | | | 26:22 32:16 36:11 |

Veritext Legal Solutions
866 299 5127

70:16
**poised** 18:22
**pontificate** 71:25
**pool** 22:21,22
**popernik** 1:25
2:13 8:11 115:2
115:23
**portion** 7:9
**portrayed** 44:5
**position** 19:20
22:19 73:13 91:11
**positioned** 18:8,22
76:6
**possible** 71:15
83:1
**possibly** 28:23
**post** 28:19,22
**posted** 62:2
**potential** 37:21
39:7 40:2 83:22
**practice** 64:12
78:6,8
**preaching** 24:23
**precipitous** 35:12
43:9
**precipitously** 36:4
**preface** 20:12
**prefacing** 103:1
**premiums** 26:6
**prepare** 50:25
66:5 104:21 105:8
**prepared** 50:9
104:25
**preparing** 50:8
99:1 105:1
**presence** 16:9,10
18:14,16,16 35:15
35:15
**present** 8:14 46:1
46:4 95:25

**presented** 15:21
47:18 48:17
**president** 73:10
**press** 13:8 32:4
33:13 35:23 41:19
46:9,11 61:11
76:7 90:6
**pressed** 46:23
**pretend** 43:3
**pretty** 42:9 45:3
53:25 56:15 71:4
**preview** 28:21
**previous** 79:4
**price** 35:1,13
43:12
**pricing** 19:23 74:6
77:15
**primarily** 18:20
27:17 41:24 65:20
**primary** 13:7,10
13:11
**print** 59:2 87:21
**printed** 31:3 87:15
**prior** 10:14 13:3
33:17 34:19 40:2
44:14,20 53:23
63:3 70:6 74:3
78:5 79:4 80:15
80:23 81:3 85:17
**private** 65:13
66:14,20
**privileged** 86:15
88:25 89:6 91:12
100:22
**probably** 10:12
12:7 16:20 21:5
24:4 25:13 28:21
28:22 34:15,22
36:19 38:2,16
39:11 49:7 51:20
51:21,24 52:18

54:16 56:8,9 59:6
59:22 64:6 71:23
74:24 76:17 78:3
78:20 83:12,16
89:4,5 96:8 99:23
103:2 108:23
109:13 111:8
**problem** 14:17
45:1 57:20 69:12
90:22 94:1
**procedure** 7:5
**proceed** 91:22
**proceeding** 8:17
102:5 115:19
**process** 10:18
**produce** 86:5
91:10
**produced** 65:7,8
86:24 88:17
**producing** 91:7
**production** 5:12
6:10 84:21 85:16
86:9 88:6,11,18
**professional** 50:16
63:3 71:16 114:10
**profile** 5:8 6:6
57:7 63:2,14 65:9
68:6
**profitability** 21:14
21:21 24:8
**profitable** 21:18
**profitably** 21:7
**program** 44:24
63:9
**prohibits** 96:3
**project** 58:11
64:20,20 73:9,11
73:16,23 74:14,17
78:12,13
**projections** 36:1

**promised** 55:23
111:17
**prompted** 14:3
35:21
**pronounces** 46:16
**proposal** 66:24
73:13
**proposals** 51:1
**proposed** 58:24
**proprietary** 59:17
61:14 65:4 78:11
**prospective** 15:22
**protege** 77:9
**proven** 71:13
**provide** 88:4
**provided** 70:16,24
72:25 81:11
**provider** 21:20
**provides** 92:6
**public** 17:12 31:13
32:12 61:22,23
115:3 116:15
**publically** 44:12
**publications** 32:9
33:12 71:18 72:3
**publicly** 60:23
62:1
**publish** 33:23
58:21
**published** 71:20
**pull** 19:7 68:13
69:19
**pulled** 12:11 69:20
**pulling** 69:19
**pun** 33:22 68:13
**punch** 87:21
**purchase** 18:20
27:13 31:24 32:6
33:8,18 34:11
90:18

Page 17

Case 1:19-cv-00098-TRM-CHS   Document 129-2   Filed 12/16/20   Page 135 of 145
PageID #: 3256

**purchased** 13:12 27:24 31:7,11 32:1,22 34:18 86:24

**purchasing** 13:3 34:19

**purely** 33:11

**purposes** 7:6 88:5

**pursuant** 5:6 6:4 7:4 28:7 30:2,14

**pursue** 36:17

**put** 37:20 58:25 66:4 85:22 87:15 87:15 94:2

**putting** 105:12

**q**

**qualified** 30:21 44:7,13,19 54:1

**quality** 19:25

**quarterly** 103:17

**question** 7:8 10:23 11:1,3 14:14,15,20 14:24,25 15:11 44:21 49:14 91:11 91:12,15,18,21,21 92:10 94:5,20,24 95:3,6,8,10,18 101:11,13 105:14 110:7 113:9

**questions** 58:5 82:16 104:18 105:11,20 109:12 111:13 113:2,4 115:11

**quick** 11:12 56:19 58:16 84:9 94:5 109:12

**quickly** 75:23

**quinn** 1:12 45:13 45:16 75:4,7,13,21 76:1 79:16,17

80:13,19

**quite** 12:14

**quoted** 44:11,17 63:16

**r**

**r** 4:3

**rail** 64:16

**railroads** 64:25 65:4

**raise** 63:14

**ramifications** 40:5

**ran** 60:19 63:18

**rapidly** 50:23

**rare** 61:8

**rarely** 104:23

**rate** 55:11 58:7,14 59:25 60:5,14,20 60:20,21,21,21 62:10,21 104:1,1,1 104:3

**rates** 24:22,22 58:8,19,23,25,25 59:12,20 61:15,18 62:19

**rationale** 66:6

**ray** 76:12,13,13 80:9

**reaction** 43:6

**read** 12:11 19:6 21:3,4 23:11,23 27:7,15,15,23,25 32:10,11 35:23 36:19 48:10,16 76:6 85:17,18 91:2,5 92:8,11,12 99:19 101:18,22 101:23 116:3

**reader** 32:4

**reading** 7:11 19:6 19:9 21:3 23:21 33:7,17 34:2 36:7

36:10 85:15,23,25

**ready** 109:7

**real** 94:5

**realistic** 25:9

**really** 14:11 15:16 17:25 18:9 35:16 35:17 74:11 89:6

**reason** 13:7,11,11 32:21 33:4 97:21 103:3 116:5

**reasonably** 77:6

**reasons** 26:9

**reby** 64:22

**recall** 12:3,23 13:20 27:15 32:21 33:7,17 34:1,2 37:24 38:12 39:24 41:18 42:2 46:22 47:7 48:21 49:5 53:21 76:19 80:12 82:4,11 86:23 93:15 108:17 110:8 113:23

**receive** 55:24 85:4

**received** 37:22 41:21 57:14 68:19 85:2 86:12,12 89:19 90:3

**receiver** 62:18

**recognize** 30:1,23 69:16,23

**recognized** 60:2

**recollection** 31:12 41:12 48:24

**recommend** 14:2 34:8 66:1

**record** 8:2,16 9:24 11:11,15,19 28:9 29:11,15,17,18,20 29:24 30:10 56:22 87:1 91:6 94:4

97:2,5,9 98:4 102:3 109:8,11,13 109:16,20 113:7,9 113:14,16 114:13 114:16

**recorded** 8:4

**recruit** 24:11

**recruited** 63:7,10 63:11 64:8,11

**recruiting** 45:5

**redacted** 31:25 60:16 62:15 86:25

**redirect** 113:9,10

**reduce** 24:6,7

**reduced** 115:8

**refer** 65:16,25 66:15 67:5

**reference** 58:6 87:19

**referenced** 58:4 99:21

**referred** 103:18

**referring** 12:24 23:12,17 35:24

**refers** 47:2 70:10

**refine** 21:14

**reflect** 94:6 95:12

**reflected** 16:13 68:5

**reflecting** 59:12

**reformatted** 69:21

**refresh** 97:22

**refreshed** 32:24

**regarding** 89:1 91:17 96:16 99:13

**regions** 59:2

**registration** 5:5 6:3 11:25

**regrouped** 43:11 43:12

Veritext Legal Solutions
866 299-5127

regular 78:5,8
regulations 17:23
relate 95:23
related 8:12 39:3
  115:16
relating 86:20
  87:23 88:14,20
relationship 42:14
  63:24 75:19 78:9
  79:4
relationships 22:9
  78:24
relay 100:21
relevant 94:23
relied 89:19 90:3
  105:7
rely 27:11
relying 99:25
  100:8
remedy 111:9
remember 12:18
  12:19 27:25 39:9
  59:8 75:9,10
  79:25 82:15 85:23
  88:2 89:5 110:6
  110:10
remembered
  12:13
remind 88:24
  94:15
remnants 62:4
remotely 2:9 3:1
  8:9,15
repair 24:1
replace 24:1 29:6
replacing 67:10
reported 1:24 2:12
reporter 5:21 8:10
  9:17 112:21,24
  115:1

reporters 71:25
reports 70:17
represent 10:2
  37:11 88:16
  105:19
representative
  29:13 56:24 101:3
represented 38:19
  101:8
representing 3:3
  4:2,14 38:25 39:1
  41:3,6 46:13,19
  49:12,25
reputation 38:5
request 73:12
  89:17 90:13,21,22
  90:23 91:3,7,19
  92:2,3,17,22,25
  93:9,20 94:5,13,16
  95:11,20 98:21
requested 93:7
requests 5:12 6:10
  50:25 84:20 85:16
  86:5,9,18 87:8
  88:6,11,18 97:17
research 12:9 39:7
  39:19 64:19
  108:17,20
resent 97:25
reserved 7:8
respect 14:8 15:1
  50:5 66:12 71:1
  77:11
respond 73:12
responded 94:16
responding 88:5
response 86:9,18
  88:17 90:21,23
  91:3 94:17 95:3
  95:23 99:6

responses 5:10,15
  6:8,13 73:14
  84:19 85:14 91:19
  96:22 97:17 98:9
responsibilities
  51:3 64:14 101:2
responsibility
  50:10 71:9 101:6
responsive 76:2,3
  87:8 88:11 91:7
  99:8
rest 101:7,13
restate 49:23
  95:10
restroom 84:9
result 24:8
retail 27:16
retailers 13:24
retain 19:19 24:11
  37:10,25 38:18
  39:6,20 48:15
  89:21
retained 38:15
  50:25 52:9,13,18
  52:24 73:23 74:14
  90:5 93:15
retaining 40:2
  45:5
retention 44:23,24
  92:19
retrain 24:11
retrospect 16:17
return 59:18
reveal 37:15 88:24
  91:15 96:4
revealed 82:25
revealing 92:14
revenue 19:21
  103:15,16
reverse 17:5

review 49:1 65:12
  65:16 86:2
reviewed 13:3,5
  48:12,17,18,22
  86:2 89:18 90:2
  99:15
reviewing 60:16
reviews 20:12 23:1
  23:14,15,19 26:21
  58:1 69:13 70:14
  90:12 92:13 93:22
  98:6,13 101:21
  102:2
rfp 73:12 74:9
rfps 74:5
rgrdlaw.com 3:20
ribbed 80:3
rick 27:12
right 10:8,19
  20:14 22:15 25:4
  29:3 30:17 31:24
  32:21 33:2 34:15
  35:2 37:10,23
  39:4 40:3,8 42:20
  44:8,14 46:20
  48:20,24 56:21
  57:9 60:24 61:19
  61:20,20 62:16,20
  66:19 69:23 76:19
  78:7 80:6 83:19
  85:9 87:13 88:1,4
  91:10 92:2,7
  93:13 95:9 97:8
  97:20 98:7,12
  99:3,5,17,18,18
  101:25 102:12
  103:6 108:9
  110:10 111:7,10
  111:10,20
ring 87:22

Veritext Legal Solutions
866 299-5127

**[risk - shopping]**

risk   23:1,4,8 25:17 25:18 26:19 27:5 27:16,24
road   16:18 17:2 21:15 26:14 56:11 103:19,20
roadway   34:21 63:8
robbins   3:15 9:3 9:15 45:20,23 46:4,7,13,17 47:14 47:21
robust   21:11,16 27:19 62:8
rodos   81:15 83:23 84:4
role   13:13 51:4,9 55:21,24 63:4 64:10
roles   77:11
room   8:14
roughly   38:14 51:15
route   17:1 62:19
routes   61:15,19
rudman   3:15
ruled   110:2
rules   7:5 10:21
run   17:1 66:21,22 104:3
running   66:17,18

**s**

s   1:9 40:12 74:15
sakes   24:23
sales   73:10 74:13
savings   24:9
saw   11:8 12:6 13:9 37:21 57:17 58:18 79:20 82:25 83:14
saying   39:12

says   30:17 31:3 58:6 65:10 67:5 70:16,24 71:17 81:15 98:21 99:7
scale   22:10
scanning   85:7
scenario   27:9
████████████
████████
science   43:4
scope   95:19
scott   3:4 8:24 14:12 15:5 25:21 28:25 29:16 33:22 41:5,9 47:11 52:17 91:1 94:20 112:20 113:3
scroll   72:23
scrolling   12:19
se   56:11 110:23
sea   64:16
seal   115:20
search   65:8 78:12 86:17,20 87:6,17 88:9 91:9
searching   91:6 98:5
seasonal   67:20,21
seasoned   24:19
seasons   104:8,11
seating   47:2
sec   15:13,20,20 17:23
second   10:1 20:1 28:5 47:2,3 70:15 71:17 81:15 112:20
section   15:20 17:22 20:15,20 21:15 23:4,8,17 25:3 26:18 27:5

27:12,24 110:20
secure   75:16
securities   1:16,17 1:20 5:4,7 6:2,5 9:11,11,12 11:24 28:8 30:3 43:24 89:21 90:4,15 106:15,20,22,24 107:2 108:11 110:22,23,24
see   20:14,18,20,21 23:2,5 24:18 29:17 30:16 31:25 57:22 58:1,5,12 62:21 65:14 70:9 70:13,21 71:20 72:24 73:4 76:18 78:21 79:10 81:12 81:16 85:18 86:2 89:17,22 90:13,21 91:3 92:3,11,12 93:4,12 94:10 95:15 97:13,15 98:6,14 99:2,10
seeing   13:19 19:7 35:22
seeking   42:23 66:7
seen   12:2 32:8,18 85:11 104:4,9 107:8
segments   21:17
selected   70:10 72:25 100:5
sell   34:24 60:3 89:21
send   29:1 42:12 56:17 86:15 97:22
sending   74:4
senior   73:10 74:13
sent   57:9 68:25 86:11,13 89:4

104:24
separate   102:11
separately   55:8,10
series   44:11
serious   64:6
serve   52:9 74:11 101:2
served   68:11 86:4
service   21:19 37:3
serving   51:12,16 51:25 54:21 55:11 67:7
set   5:16 6:14 82:13 96:24 116:5,7
settled   53:16
seven   78:4
severely   53:25
sewanee   13:21
shaken   75:11
share   11:6 28:12 28:20 60:10 65:5 65:6 112:9
shared   78:11
shareholder   36:21
shares   14:5 31:7 31:20
sharing   96:7
sheet   5:22 116:1
shelf   68:13
shipper   51:1 60:18 62:17 65:22 67:25 103:25
shipper's   53:24
shippers   50:25 59:24 62:14 73:13 103:9
shipping   60:16 62:14
shoot   32:13
shopping   13:22

Veritext Legal Solutions
866 299-5127

| | | | |
|---|---|---|---|
| **short** 64:13 70:11 | **slip** 109:3 | **speaking** 61:13 | **state** 8:15,17 9:24 |
| **shortage** 44:7,13 44:19 | **slow** 57:1 69:10 72:23 | **specialist** 56:5,6 65:11,13 | 48:14,20 70:18 102:6,12,16,20 |
| **shortages** 104:16 | **slowed** 28:13 | **specific** 41:3 46:19 | 115:3,12,13 |
| **shoulder** 24:1 | **slower** 69:5 | 58:3 61:7 110:20 | 116:10 |
| **show** 61:15 63:8 90:14 | **small** 50:18,19 73:9,16 | **specifically** 34:2,4 53:3,4 54:10 66:4 | **stated** 90:5 115:8 |
| **showing** 30:20 60:17 | **smile** 79:24 | **specifications** 67:15 | **statement** 5:5 6:3 11:25 20:24 23:7 |
| **shown** 11:22 | **smith** 1:14 105:23 | **speculate** 33:10 | 26:18 30:24 111:17 |
| **shows** 31:6 | **soccer** 25:12 26:12 26:13 | **speculation** 52:18 83:20 | **statements** 16:3 17:12,14,19 18:1 |
| **side** 20:16 51:1,2 110:4 113:3 | **sold** 31:17 | **speed** 23:19 | 21:9,9,24 25:2 27:11 |
| **sides** 55:6 | **somebody** 54:13 62:7 71:11 | **spell** 40:11 | **states** 1:1 5:4 6:2 |
| **sign** 38:17 | **sophisticated** 58:21 | **spend** 32:15 | 11:24 59:23 89:18 99:7 |
| **signature** 30:4 98:14,15 115:14 | **sorry** 8:4 11:10 14:12 25:21,22 | **spike** 68:2 104:8 104:11 | **stay** 77:6 110:5,6 |
| 115:20,22 | 26:14 28:11 37:18 | **spoke** 39:16 75:18 | **stayed** 63:8 74:16 74:18 |
| **signing** 7:11 | 38:24 41:25 48:2 | **spoken** 42:3 45:22 78:3 | **steger** 1:11 |
| **similar** 13:15 77:10 97:18 102:6 | 57:19 69:10 75:22 76:23,25 78:10 | **sporadically** 87:14 | **stein** 1:4 8:6 |
| **similarly** 1:5 | 93:24 98:1,4 | **spot** 104:1 | **stenographic** 28:9 29:11 56:22 |
| **simplification** 67:12 | 100:16 110:19 113:8,14 114:4 | **square** 4:17 | **step** 63:12 |
| **simply** 50:24 79:19 95:18 | **sort** 103:22 | **squared** 29:17 | **stephen** 82:7 |
| **sir** 10:4 23:2,5 | **sought** 7:9 | **squire** 3:6 8:25 9:5 37:7,8,23 38:1,20 | **stephens** 1:18 9:12 107:5,11 |
| 39:23 42:24 49:17 | **source** 58:24 59:12,19 62:11 | 39:3,6,20 40:3 | **stick** 87:22 |
| 71:22 73:5 89:25 | 64:24 90:14,17 | **squirm** 47:2 | **sticker** 29:5 |
| 92:21 93:4 99:2 | **sourced** 65:3 | **squirreled** 62:5 | **stifel** 1:18 9:12 |
| 109:6 | **sources** 58:20 | **stage** 66:5 | 107:13 108:7 |
| **sit** 27:7 83:17 | 59:16 61:14 65:4 | **stamped** 29:6 | 114:10 |
| **sites** 51:23 90:7 | 65:6 | 30:13 | **stipulated** 7:2,13 |
| **sitting** 14:6 17:18 | **southern** 13:14 | **stanley** 1:15 9:10 | **stipulation** 5:2 7:1 |
| 33:16 46:12 | **space** 67:25 | 106:7,11 | **stock** 13:1,3,12 |
| **situated** 1:6 | **spalding** 4:6 8:21 | **stars** 13:18 | 15:22,25 25:13 |
| **situation** 16:24 | **speak** 40:1,7 63:16 | **start** 69:14 | 26:13 27:13,24 |
| 82:17 | 71:25 | **started** 35:13 36:6 | 31:7,10,15,16,16 |
| **six** 49:6 | **speaker** 71:18 | 63:24 69:17 | 31:18,21,24 32:5,6 |
| **skill** 45:6 115:9 | | **starting** 87:13 | 32:22 33:8,18 |
| | | **starts** 29:6 | |

Veritext Legal Solutions
866 299 5127

34:9,12,18,19,20
34:24 35:1,6,12,22
36:3 43:9 44:1
72:17,20 86:21
90:18
**stockholder** 43:15
**stocks** 31:14 34:15
35:4
**stop** 24:23 72:20
**store** 88:14
**story** 58:17 64:13
**strange** 51:19
**strategies** 20:15
20:21 22:4 26:8
66:12
**street** 3:16 4:7
33:13
**stress** 73:14
**strict** 42:9,10 55:5
**strike** 35:8
**structured** 16:12
**structuring** 47:20
**stuff** 80:5 88:2
**subject** 53:20 94:8
95:13
**subscribe** 33:11
**subscribed** 116:12
**subsidiaries** 42:15
**subsidiary** 42:16
**substance** 37:16
88:25 92:15
**success** 18:6
**succinct** 110:3
111:9
**succinctly** 26:12
104:23
**sudden** 13:18
28:14 32:19
**suffer** 17:3
**sufficient** 90:14

**suing** 45:7,14
**suit** 45:9 82:17
83:13
**suite** 3:7,16 4:7
**sum** 23:20 25:6
**supply** 65:11
**support** 50:23
52:5 70:17
**supposed** 16:22
**sure** 10:25 12:3,4
14:22 28:1,14
33:10 37:18 39:15
39:17 40:24 41:2
46:12 47:10 49:14
49:20,22,23 51:6
55:2 63:24 66:13
69:15 75:2,6 80:5
81:21 89:14 90:12
90:16 97:3 101:7
101:10,24 105:4
106:18 107:7
114:15
**surfaced** 77:16
**sushon** 4:15 5:18
5:20 9:8,8 68:23
69:2,6 105:13,16
105:18 111:25
113:8,18,19
**suspect** 111:11
**suspects** 33:15
**swear** 9:17
**sworn** 9:20 116:12
**system** 105:6

**t**

**table** 5:1
**take** 11:11 23:11
23:13 24:7 28:4
46:24 55:7 56:19
84:9 90:23 105:1
105:3,7 107:1
108:6

**taken** 7:4 8:5 10:8
10:11 115:7
**takes** 69:18,18
**talk** 12:17 16:22
41:19 45:4 81:24
**talked** 41:8 67:21
79:23 82:10 92:18
104:22 110:5
**talking** 20:6 43:2,2
49:22 87:20
**talky** 13:14
**tape** 84:17
**target** 18:3,12
19:3,12,15
**taught** 98:3
**taxes** 51:6
**teaches** 18:17
**team** 24:20
**tech** 29:17
**technical** 29:12
**technically** 112:3
**technology** 105:13
**tell** 17:24 23:25
28:1 39:11 43:24
54:24 60:7 61:8
66:3,9 92:15
104:22
**telling** 11:1 80:4
**tells** 69:9
**ten** 33:24,24 60:15
78:21
**tend** 26:2
**tennessee** 1:2 2:3
13:22 53:10,13
70:5 102:7,12,17
115:13 116:10
**term** 13:14 35:1
65:24 67:4 111:1
**terminals** 65:17
66:1,7

**terms** 81:22
**terrible** 83:2
**terry** 45:18,23
46:4,7,13 47:13,21
**testified** 9:20 19:2
80:20 93:14
111:15
**testifying** 52:14
54:21 70:17,17
81:25 82:1,19
**testimony** 10:15
21:23 25:16 41:21
53:8,12 54:5,6,14
55:8,14 70:21,24
71:11 113:23
115:6
**thank** 10:7 23:14
52:17 57:16 69:18
89:7 91:25 105:11
109:4,6 112:24
114:4,11
**thanking** 89:7
**thanks** 28:25 68:7
97:24
**therefor** 116:5
**thereof** 7:9 91:16
**thereunder** 7:6
**thing** 16:16 24:15
28:12,20 47:22
56:10 60:4 66:8
68:9 69:22 75:15
87:13 92:9 95:21
**things** 15:14 16:24
19:16 21:13 22:7
22:20 24:2,3,3,17
24:18,19 25:9,11
25:18 26:7,23
27:3 32:1 36:14
36:15 40:7 43:10
44:2,3 56:8 58:3
59:9 63:10 64:19

Page 22

| | | | |
|---|---|---|---|
| 74:11 79:10 80:17 80:21 103:15 111:7 | **thumb** 87:15 **thundering** 105:24 **thursday** 2:2 | 85:17,21 104:21 105:8,13 110:14 **today's** 62:8 | **transom** 64:20 **transportation** 12:16 18:21 21:19 |
| **think** 13:4 16:1,2 16:16,25 17:6,8 19:15 20:12 21:4 21:6 22:3 23:20 23:21 26:12,21 27:5,19 31:13 33:1 35:12 37:8 38:4 39:10 42:22 43:1,1 46:17 47:17 52:24 54:16 62:6 69:19 71:13 72:19 75:24 76:17 77:15 78:17 79:1 79:19 80:1 90:20 91:12 92:18,19 95:1,6 96:5 99:24 104:24 105:10,13 105:21 108:3,4 109:9 110:1,5 114:13 | **ties** 66:16 **tiffany** 2:16 8:9 **time** 7:8 8:18 11:14,18 12:6,9,13 12:23,23 13:9,15 13:15,21 14:8,18 14:18 15:2,7,7 16:6,11,11 18:15 18:17,19 21:1,4 22:20 23:11,13,22 23:23 29:10,19,23 33:1,3,3 35:17,19 36:11,13 39:10,10 40:21 44:8,20 58:19 59:14,21,21 60:3 61:3 64:9 68:10,10 69:18,18 73:17 74:22 75:20 75:24 77:18,24 80:14 89:9 93:1 94:23 97:4,9 105:12 109:4,15 109:19 112:10 113:6,15 114:15 115:7 116:7 | **told** 32:17 37:12 42:16 **tongue** 109:3 **top** 31:2 **topic** 50:15 **total** 31:10 **totally** 94:25 104:2 **touch** 45:2 74:20 **touches** 53:2 **tough** 22:12 **track** 32:3 **tractor** 103:11 **tractors** 24:6 65:18 66:17,18 **trade** 13:8 17:4 27:17 32:4,9 33:12 35:15,15,23 61:11 76:7 90:6 **trades** 34:5 **trading** 61:10 86:21 **traffic** 67:20 111:3 | 34:16 50:22 52:5 52:7 56:5 64:12 64:15,19 65:11 66:12 70:19 **travel** 51:23 64:7 71:25 **tree** 13:20,23 66:3 **tricks** 69:19 **tricky** 19:23 **tried** 97:22 101:10 **tries** 21:20 **trouble** 44:4 **truck** 18:21 19:16 19:25 41:13 44:4 53:3 58:7,8,14 60:14 63:6,7 64:16 65:1,1,2,22 68:1 74:8 82:24 103:5 **truckers** 24:16 71:7 |
| **thinking** 27:18 **third** 3:7 24:20 30:7 70:16 **thirty** 10:12 **thorough** 39:25 **thought** 17:5 18:20 24:5 26:22 27:3 54:9 100:6 102:15 108:4 **thousand** 60:3 **thousands** 56:12 60:22 61:16 **three** 33:24 46:25 47:4,13 48:6 59:6 59:15 61:2 83:12 87:21,22 109:12 112:9,17 | **times** 4:17 10:10 10:13 33:13 50:24 52:13,20,22 53:1 61:10 75:4 **title** 50:17 **titled** 20:15 23:4 **tn** 1:25 2:13 3:17 115:3,24 **tnt** 63:12,14 **today** 10:23 14:6 17:19 31:21 33:16 34:4 44:25 46:12 59:4 74:19 83:17 | **trailers** 65:19 66:19 103:14 **training** 63:9 **trans** 50:20,21 51:5 65:8 78:12 **transactions** 90:15 **transcon** 34:22 63:19 **transcontinental** 63:20 **transcript** 1:1 30:11 115:6 116:6 **transfer** 89:21 **transition** 63:19 **translated** 86:1 | **trucking** 16:6 18:6 34:12,18 44:6,13 44:19 52:10,15,25 53:3 54:2 59:12 63:15 65:5 66:12 66:20 72:4,8,11,16 77:11 80:2 104:11 107:17 **trucks** 13:19 66:23 67:12,13,17 **true** 35:4 54:12 115:5 116:6 **trust** 101:8,9 **truth** 104:22 **truthfully** 115:11 **try** 81:6 |

Veritext Legal Solutions
866 299 5127

**trying** 16:24 18:24 39:24 57:12 58:22 66:8 79:1 89:9
**tune** 65:21
**turn** 9:6 20:2,4 22:23 30:7 70:15 71:16 72:21 89:12 90:10 93:19 98:10 98:17 99:4
**turning** 20:1 81:8 92:2 101:16
**turnover** 45:3
**turns** 18:8
**tutorial** 40:6
**twelve** 78:21
**two** 32:25 33:24 34:16 41:13 45:12 45:15,24 46:9,24 49:25 59:20 64:23 64:23 67:9,11,15 75:17 77:6 78:2,7 83:11 109:11,13
**type** 61:18 66:11
**types** 13:24
**typewritten** 115:9
**typical** 31:23 35:15 72:17

**u**

**u** 74:15
**u.s.** 1:9 2:4 4:2 8:6 13:19,25 16:23 31:16 33:1 42:15 45:10 73:4,8,15,21 73:22,24 74:9 75:16 79:5 81:7 82:24 83:1 105:19 106:2,5,11,13,20 107:3,11 108:2,8 108:14,21 110:21
**uh** 81:13,17

**ultimate** 111:5
**underneath** 65:10
**understand** 10:22 11:2,4 17:10,21 24:5,6 25:13 26:1 35:8 49:14,15 73:12 94:19 99:25 101:12 102:19,23 112:15
**understanding** 17:18 18:10,25 41:7,8 48:5 49:11 49:24 50:4 83:10 102:18 109:23 110:21 111:19 112:7,8,14,18
**understated** 25:25 26:19 27:5
**understatement** 25:20
**understood** 11:3 17:25 26:13 28:25 85:25,25 93:1,3 105:4
**underwriter** 4:14 9:9
**underwriters** 105:19
**union** 3:16
**unit** 8:3
**united** 1:1 5:4 6:2 11:24
**units** 103:13
**update** 59:15
**updates** 108:23
**upgrade** 24:10
**upgrading** 24:6
**use** 19:17,18,19 56:18 59:7 65:2 81:23 87:4,5,10

**usual** 33:14
**usually** 79:12 103:21,25
**usx** 5:11,15 6:9,13 8:21,22 10:2 13:3 13:12 17:11,15 18:1,11,25 19:11 22:15 27:13,24 30:17 31:7,10,17 31:21 32:6,22 33:7,17 34:9,19,24 35:6,10 36:11,18 36:21 37:21 42:19 43:19 45:7,15 50:6 74:14 76:21 77:3,22,23,25 78:25 80:23,25 81:3,6 82:20 83:18,24 84:20 85:15 86:4,21 88:14,20 89:21 90:4,15,18 93:2,3 94:7,22 95:12 96:7,16,23 102:12
**usx's** 26:19 44:20
**utilized** 67:17

**v**

**valentine's** 67:23
**van** 58:9 60:1,1
**variation** 103:12
**verbose** 13:14
**veritext** 8:10 28:20 29:13 56:23
**vernacular** 86:1
**version** 59:3
**versions** 59:4
**versus** 8:6 16:18 65:18
**vested** 115:12
**vice** 73:10

**video** 8:3
**videoconference** 1:23 2:1 7:3
**videoconferenci...** 7:15
**videographed** 2:16
**videographer** 8:1 9:16 11:14,18 29:14,19,23 84:13 84:18 97:4,8 109:7,15,19 113:6 113:11,13 114:14
**videotaped** 1:23 2:1 7:3
**view** 15:17 19:3
**viewed** 19:11
**violated** 43:25
**violation** 17:22 110:23
**violations** 15:21
**visit** 33:3
**visited** 79:20
**vital** 18:15
**voluntarily** 102:20
**volunteer** 100:18
**vp** 74:13
**vs** 1:8

**w**

**w** 3:4 9:25
**waived** 7:12 115:15
**waiving** 91:18
**walk** 79:16
**walker** 37:7,10,17 37:22 38:11 41:6
**wall** 33:13
**walmart** 66:18
**want** 21:7 28:21 29:14,16 32:3 41:2 49:20 55:2

Veritext Legal Solutions
866 299 5127

56:19 58:3 62:7 69:15 81:21 84:9 95:4 101:24 110:16 111:9
**wanted** 42:15 63:13 105:4
**wanting** 61:7
**warehouse** 67:25
**watch** 35:3 36:4
**watched** 34:25
**watching** 34:25 35:1
**water** 93:25 94:2
**waterburg** 77:4,8 77:10,20 78:3,19 79:20
**way** 15:21 25:6 26:23 29:2 35:20 37:2 45:22 47:12 52:3 55:20 63:12 63:18 65:21 73:17 83:18 103:15 112:15
**ways** 65:22
**we've** 18:6 24:20 24:21,21 27:19 40:24 43:11 75:11 77:2,21 104:24 105:12
**website** 12:10 37:5 37:20 39:22
**websites** 36:20
**week** 38:3 67:9
**weeks** 38:16 67:11 67:15
**weigh** 24:14
**welcome** 92:1
**wells** 1:17 9:11 106:22,24 107:2
**went** 26:14 29:4 48:15 58:22 71:14

74:20 80:17 83:3 83:11 86:10 102:17
**west** 63:21 82:9
**westlaw** 69:25
**white** 71:19
**wife** 98:3
**william** 4:15 9:8
**willing** 17:3 19:7 56:8
**witness** 2:3 7:14 9:17 14:11 15:4 25:21 37:18 48:2 51:12,16 52:1,10 54:1,6 55:12 56:7 68:21 70:17,24 84:15 85:5 89:2 90:20,25 91:15,18 92:11 95:2 98:23 100:24 112:25 114:4 115:6,10,15 115:20
**witnesses** 99:20 101:12
**witnessing** 10:17
**wolfe** 12:9 33:21 108:17,20 109:1
**won** 110:3
**wonder** 99:20
**wondered** 23:21 24:4
**wondering** 14:16
**wood** 3:13 9:2,2
**word** 50:14
**words** 64:25 111:5
**work** 19:10 49:9 49:13 50:1,24 51:1,11,15 63:17 63:23 64:1,2,4,5 73:1,7,20 81:11,18 82:2 87:10,12

96:18 114:10
**worked** 16:19 53:5 63:12 77:2,5 78:25 81:3 82:11 104:6
**working** 29:6 69:9 72:7 75:20,25
**works** 65:22 76:20 76:22 82:7 112:12
**worried** 48:14
**worrisome** 36:16
**worry** 98:2
**worst** 27:9
**worth** 59:18 67:2
**wr** 1:20 9:12 108:11
**wrong** 24:3,19 27:22 38:24 43:19 43:22 111:10
**wsushon** 4:20
**wyoming** 74:11

### x

**xpress** 1:9 2:4 4:2 8:6 13:19,25 16:23 21:20 31:16 33:1 42:15 45:10 73:4,8,15,21,22,24 74:9 75:16 79:5 81:7 82:24 83:1 105:19 106:2,5,11 106:13,20 107:3 107:11 108:2,8,14 108:21

### y

**yahoo** 12:8 33:20
**yeah** 12:18 19:8 19:24 20:12 24:24 26:7,7,14 27:2 29:10 32:4 38:6 40:8 41:17 43:16

46:8 48:12,21 54:4 56:20 58:1 63:5 68:25 69:6 70:1 71:21 72:5 72:14,19 74:18,21 75:16 78:17 79:13 83:13 85:18 86:23 86:24 87:17,25 94:1 101:22 106:17 110:6 111:4 113:4
**year** 27:1 51:19,19 54:16,17 56:15 60:4 67:22 72:3 78:5 80:3
**years** 10:12 16:20 18:5,6 24:16 33:24,24,24,25 34:20,22 44:23,23 45:2 52:23 53:14 56:14 58:20 59:5 59:14,15 60:1,15 62:24 64:21 65:20 68:7 70:13 72:8 73:1,8 74:18,24 77:12 78:4,21 79:2,18 80:9 81:12 82:19 107:16,16,25
**york** 3:8 4:18
**young** 24:15 37:9 52:3 56:4 63:18 63:22 67:2 68:8 73:11

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.