# EXHIBIT B

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

CHATTANOOGA DIVISION

---oOo---

LEWIS STEIN, Individually

and on behalf of All Others

Similarly Situated,

                Plaintiff,

vs.                                No. 1:19-CV-00098

U.S. XPRESS ENTERPRISES,

INC., et al.,

                Defendants.

                                /

VIDEOTAPED DEPOSITION OF JOHN TERRY

Taken before KIMBERLY R. HENDERSHOTT, RPR, CRR

CSR NO. 12552

October 12, 2020

Aiken Welch Court Reporters

One Kaiser Plaza, Suite 250

Oakland, California 94612

(510) 451-1580/(877) 451-1580

Fax: (510) 451-3797

www.aikenwelch.com

Page 1

Case 1:19-cv-00098-TRM-CHS   Document 131-2   Filed 12/18/20   Page 2 of 80
PageID #: 3360

I N D E X

WITNESSES                                                  PAGE

JOHN TERRY

Examination By Ms. Bugni                                    10

Examination By Mr. Sushon                                   60

Page 2

Veritext Legal Solutions
866 299-5127

E X H I B I T S

| PLAINTIFF'S | DESCRIPTION | MARKED |
|---|---|---|

(None marked.)

| DEFENDANTS' | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 7 | Certification filed with the court on May 10th, 2019, labeled Exhibit B | 23 |
| Exhibit 8 | Vanguard statement Bates stamped Terry 2205, dated August 7th, 2018 | 31 |
| Exhibit 9 | Document Bates stamped Terry 2204, Transaction History Detail for U.S. Xpress made for the John J. Terry rollover IRA brokerage account ending in 79 | 34 |
| Exhibit 10 | Vanguard statement Bates stamped Terry 2207 for a brokerage account for Mardin LLC with account ending in 1980 | 36 |
| Exhibit 11 | Transaction History Detail for the ██ CT ██ and Deirdre A. Terry, Bates stamped Terry 2212, UTMA brokerage account with account number ending in 1833 | 39 |
| Exhibit 12 | Transaction History Detail for the Comeragh Corporation, Bates stamped Terry 2210 | 40 |
| Exhibit 13 | Transaction History Detail Bates stamped Terry 2211 | 44 |
| Exhibit 14 | Transaction History Detail Bates stamped Terry 2209 | 45 |

Page 3

Veritext Legal Solutions
866 299-5127

Exhibit 15      Assignment Bates stamped       50
                  Terry 1, dated May 3rd, 2019

Exhibit 16      Assignment Bates stamped Terry 3    53

Veritext Legal Solutions
866 299-5127
Case 1:19-cv-00098-TRM-CHS   Document 131-2   Filed 12/18/20   Page 5 of 80
PageID #: 3363

VIDEOTAPED DEPOSITION OF JOHN TERRY

BE IT REMEMBERED, that pursuant to Notice, and on the 12th day of October 2020, commencing at the hour of 9:36 a.m., before me, KIMBERLY R. HENDERSHOTT, a Certified Shorthand Reporter, via videoconference appeared JOHN TERRY, produced as a witness in said action, and being by me first duly sworn, was thereupon examined as a witness in said cause.

---oOo---

APPEARANCES:

For the Plaintiffs and Deponent:

SEBASTIAN TORNATORE, ESQ.
(via videoconference)
Levi & Korsinsky LLP
1111 Summer Street
Suite 401-403
Stamford, Connecticut 06905
(203) 992-4523
Stornatore@zlk.com

SHANNON HOPKINS, ESQ.
(via videoconference)
Levi & Korsinsky LLP
445 S. Figueroa Street
31st Floor
Los Angeles, California 90071
(203) 992-4523
Shopkins@zlk.com

Page 5

For the Plaintiffs:

WILLOW E. RADCLIFFE, ESQ.
(via videoconference)
Robbins, Geller, Rudman & Dowd
One Montgomery Street
Suite 1800
San Francisco, California 94104
(415) 288-4545
Willow@rgrdlaw.com

DEBASHISH BAKSHI, ESQ.
(via videoconference)
Robbins, Geller, Rudman & Dowd
655 W Broadway
San Diego, California 92101
(619) 231-1058
Dbaskshi@rgrdlaw.com

For the Defendant U.S. XPress Enterprises Inc.:

LISA R. BUGNI, ESQ.
(via videoconference)
King & Spalding
101 2nd Street
Suite 2300
San Francisco, California 94105
(415) 319-1234
Lbugni@kslaw.com
JESSICA CORLEY, ESQ.
BRANDON R. KEEL, ESQ.
King & Spalding
(via videoconference)
1180 Peachtree Street
NE Suite 1600
Atlanta, Georgia 30309
(404) 572-2780
Jcorley@kslaw.com
Bkeel@kslaw.com

For the Underwriter Defendants:

REDWAN SALEH, ESQ.
WILLIAM J. SUSHON, ESQ.
(via videoconference)
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, New York 10036
(212) 326-2000
Rsaleh@omm.com
Wsushon@omm.com

Also Present:

David West, Videographer
Jeremy Kemp
Mallory Papp

Veritext Legal Solutions
866 299-5127

THE VIDEOGRAPHER: Good morning. We are on the record. The time is 9:36 a.m. The date today is October 12th, 2020.

Please note the microphones are sensitive and they pick up whispering and private conversations. Audio and video recordings will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of John Terry, taken by counsel for defendants in the matter of Lewis Stein, et al. versus U.S. Xpress Enterprises Inc., et al., filed in the United States District Court, Eastern District of Tennessee, Chattanooga Division. Case Number 1:19-CV-00098.

The deposition is being conducted using Remote Counsel technology, and all participants are attending remotely.

My name is David West. I am the videographer. The court reporter is Kimberly Hendershott. We represent Veritext Legal Solutions.

I am not related to any party in this action nor am I financially interested in the outcome.

Veritext Legal Solutions
866 299-5127

Counsel will now state their appearances and affiliations for the record.  If there are any objections to proceeding, please state them at the time of your appearance beginning with the noticing attorney.                                            09:37

MS. BUGNI:  Good morning.  Lisa Bugni with King & Spalding on behalf of the U.S. Xpress defendants.

MR. KEEL:  Brandon Keel, also with King & Spalding on behalf of USX defendants.        09:37

MS. CORLEY:  Jessica Corley, King & Spalding, on behalf of USX defendants.

MR. SUSHON:  Bill Sushon of O'Melveny & Myers on behalf of the Underwriter defendants.

MR. TORNATORE:  Is that everybody from        09:37
defendants' side?

MR. SUSHON:  I'm sorry, Sebastian.  We also have on my colleague Redwan Saleh, whose pro hac vice is forthcoming.

MR. TORNATORE:  And this is Sebastian        09:38
Tornatore from Levi & Korsinsky on behalf of plaintiffs and the deponent John Terry.  And with me I have Jeremy Kemp and Mallory Papp, who are two law clerks from Levi & Korsinsky.

I believe also on is Debashish Bakshi from        09:38

Page 9

Case 1:19-cv-00098-TRM-CHS    Document 131-2    Filed 12/18/20    Page 10 of 80
PageID #: 3368

Robbins Geller, also for the plaintiffs.

THE VIDEOGRAPHER: Thank you.

The court reporter may now swear the witness in, and we will continue.

JOHN TERRY,                                          09:38

sworn as a witness,

testified as follows:

EXAMINATION

BY MS. BUGNI:

Q. Good morning, sir. Will you please state      09:38
your full name for the record.

A. John Joseph Terry.

Q. Mr. Terry, have you ever been deposed before?

A. Yes.                                              09:38

Q. How many times?

A. I don't -- I'm not sure, but maybe 10.

Q. Okay. And when was the -- when was the last time you were deposed?

A. Oh, gosh. It's more than 10 years ago.        09:39
I'm not quite sure.

Q. I'm just going to go over some ground rules with you today since it's been a while since you were deposed. I'm going to ask a series of questions. For the benefit of Kimberly, our court      09:39

Page 10

reporter, I would ask that you please wait for me to finish, then answer, because she can only take down one of us at a time.

Do you understand that?

A. Yes. 09:39

Q. I would also ask that you, please, give verbal responses because Kimberly cannot take down a shake of the head.

Does that make sense?

A. Okay. Yes. 09:39

Q. If you do not understand a question that I ask, please ask me to rephrase the question. If you answer, I will assume that you understood the question.

Is that fair? 09:40

A. Yes.

Q. Are you represented by counsel today?

A. Yes.

Q. Who is your counsel?

A. Sebastian and his firm, Levi & Korsinsky. 09:40

Q. And when did you retain them to represent you?

A. I'm not quite sure of the date. Sometime in this process but -- I'm not quite sure.

Q. Okay. Ballpark, would it have been in the 09:40

Page 11

Case 1:19-cv-00098-TRM-CHS    Document 131-2    Filed 12/18/20    Page 12 of 80
PageID #: 3370

last few months or would it have been before that?

A. That I -- I'm -- maybe -- I'm not sure. It's not recent though. It's been several months.

Q. Your lawyer may object after I ask a question, but unless Sebastian instructs you not to answer, you will still need to answer the question.

Does that make sense?

A. Yes.

Q. Please let me know if you need a break at any point in time. We can take a break as long as there's no question pending.

Do you understand?

A. Yes.

Q. Mr. Terry, are you currently employed?

A. No.

Q. Just getting into your background a little bit, do you have an undergraduate degree?

A. Yes.

Q. From which school?

A. Loyola University, Chicago.

Q. And when did you graduate?

A. 1959.

Q. Do you have any graduate degree?

A. No.

Q. What did you major in at Loyola?

Page 12

Case 1:19-cv-00098-TRM-CHS     Document 131-2     Filed 12/18/20     Page 13 of 80
PageID #: 3371

A. Accounting and finance.

Q. And if you could, sir, just briefly give me your employment history since -- since college?

A. I worked for Two Fraus & Company until 1965. And then National City Lines and it's affiliate Time D.C. until late in 1971, and PepsiCo Inc. between '71 and the middle of '74.

The government corporation doesn't exist anymore, the U.S. -- the U.S. Railway between middle of '74 and the middle of '76. And then from the middle of 19 -- from about April of '76 until May 1985, IU International Corporation.

And then since 1985, I have not been working. I've been working from my own account. No -- no employers. I haven't -- haven't had a W-2 since 1985.

Q. Understood, sir.

And what was your position with IU International Corp.?

A. Executive vice president.

Q. And what type of business is IU International Corp.?

A. IU was a conglomerate, a large conglomerate, 131 on the Fortune 500. You might recognize some of its affiliates. We owned -- we

Page 13

owned the company that owned the Keystone Pipeline. We owned control of Royal Caribbean, the cruise ship line, which was a small part of our business. And a large group of trucking companies of which I was the chief executive. Mostly trucking. We had other businesses besides trucking in there, but it was primarily trucking.

Q. Okay. And you, I believe, mentioned you were the executive vice -- vice president of the trucking line of business; is that right?

A. No, I was the executive vice president of the parent.

Q. Okay. And what were your responsibilities in relation to the trucking companies as the executive vice president of the parent?

A. Well, each of them. There were 13 operating -- each of the chief executives reported to me. The technical term, I think, would be I was a group executive, except I had been promoted. My initial job there was as a group -- group vice president, and then I was promoted to executive vice president.

Q. And so you would have had the chief executive of the trucking line of business report up to you?

09:43
09:43
09:43
09:44
09:44

Page 14

A. Yes.

Q. And if you can recall, what were the names of some of the trucking lines that IU International Corp. held as a parent?

A. Well, the Ryder Truck Lines, Pacific Intermountain Express, Helms Express, W.T. Burns. The companies that are now components of a public company called Landstar reported to me, Ranger, Inway, Ligon, and the PIE Forwarding, which was a European -- primarily Europe. It was U.S. too, but International Freight Forwarder that was called PIE -- I forget what they called it then. The -- and -- that -- that's -- that's about it. I don't know if I can think of any others, little ones, but...

Q. And so based on your experience at IU International Corp., would you consider yourself familiar with the trucking business?

A. Yes.

Q. Have you had any involvement with any trucking businesses since you retired in 1985?

A. Yes.

Q. And what involvement have you had?

A. Well, I own -- I owned part of five trucking companies at one point, and I still own

Page 15

Veritext Legal Solutions
866 299-5127
Case 1:19-cv-00098-TRM-CHS    Document 131-2    Filed 12/18/20    Page 16 of 80
PageID #: 3374

36 percent of a trucking company called Basin Western, that's in Roosevelt, Utah. Hauls -- hauls crude -- it's a bulk hauler, liquid bulk hauler.

I -- I say that just because it's not in any way similar to USX.                          09:46

Q. Understood, sir.

And then the -- you said you owned part of five trucking companies.

What were those five trucking companies?

A. Well, they're -- they're all gone now. I       09:46
think it was -- let's see. Gabe Trucking, Caldwell Freight Lines, the G.G. Parsons Trucking.

We had one in New England. The name escapes me.

I can't remember at the moment. I'm             09:46
sorry.

Q. No problem. Were any of those five similar to U.S. Xpress in the times -- in the types of trucking services provided?

A. You have to understand, I was out of all       09:47
of those by December 1990.

So they -- so since then, I haven't been involved in them. But they -- I guess Parsons, G.G. Parsons would have -- could have -- if it had existed at the time, could have competed with U.S.    09:47

Veritext Legal Solutions
866 299-5127
Case 1:19-cv-00098-TRM-CHS    Document 131-2    Filed 12/18/20    Page 17 of 80
PageID #: 3375

Xpress.

Q. And were you 100 percent owner of G.G. Parsons?

A. No, no, 40 percent.

Q. 40 percent. 09:47

And who owns the remaining 60 percent?

A. It was -- the 40 percent was owned by a fellow named David E. Brenner, and the 20 percent was owned by the guy who was the president of it.

I'm sorry, his name escapes me at the 09:47 moment.

Q. No problem.

A. I can see him, and I know him very well, but I've forgotten. It's too long ago. Guy Richards. That was his name. 09:48

Q. And you indicated you exited ownership of those five trucking companies in December 1990; is that --

A. The four, all except for Basin Western, in December 1990. 09:48

Q. And you continued to hold 36 percent ownership of Basin Western; is that correct?

A. Yeah, as -- yes, as built. It originally was about 20 percent, but it was built because they bought in some -- some stock of some of the owners. 09:48

Page 17

Case 1:19-cv-00098-TRM-CHS    Document 131-2    Filed 12/18/20    Page 18 of 80
PageID #: 3376

Q. And since you retired from IU in 1985, other than being involved in owning the trucking companies we've just discussed, have you had any other business activities in which you've been involved in?

A. Yes.

Q. What else have you been involved in?

A. Well, let's see. I -- I had a number of -- of I guess you'd call them clients that I didn't -- I didn't -- I was not a consultant, and this is important. But I would do work that was out of my employment history. And so the world bank, and the European bank, and the European Union at one point, plus a number of -- I was an expert in several lawsuits where trucking knowledge was important.

Let me think what else did I do? But most of -- the biggest thing was me managing my own investments and doing the things I -- I did. I bought real estate, a good deal of real estate that I bought for truck terminals and bought them and then resold them.

Q. Okay. You indicated that you served as an expert in lawsuits where the trucking business was involved; is that right?

09:48

09:49

09:49

09:49

09:50

Page 18

A. Yes.

Q. How many times have you served as an expert in a lawsuit involving the trucking business?

A. Well, it must have been four or five. 09:50 They're mostly -- mostly divorces.

Q. And what was the subject matter of your expertise that you --

A. Well, primarily it was valuation.

Q. Is there anything else other than 09:50 valuation?

A. Yes. One case, I remember we had a fraudulent conveyance -- two of them. There were fraudulent conveyance assertions.

Q. Okay. For the cases involving valuation, 09:50 was your role to look at the trucking company at issue and provide a valuation of that business?

A. Yes. That's right. Yes.

Q. And you said most of those were in divorce cases? 09:51

A. The majority were, yes.

Q. Were there -- what was -- what were -- what type of cases other than divorce were involved?

A. There was a tax -- estate tax case. I 09:51

Page 19

think that's the only one other -- on the valuation side, that's the only other one was the -- the estate tax.

Q. And in those cases, was your opinion on the valuation upheld by the court or accepted by the court as far as you know?

MR. TORNATORE: Objection to form.

(Reporter interruption for clarification.)

MR. TORNATORE: Sorry, it's Sebastian.

BY MS. BUGNI:

Q. You may answer, sir.

A. Oh, okay. I'm sorry, I forgot the question already. Please ask me again.

Q. No problem.

In the cases in which you rendered an opinion on the valuation of a trucking business as an expert, was your expert opinion upheld or accepted by the court as far as you know?

A. I think in -- let me think. Well, remember these get settled, so -- I'm not sure. I think -- I'm really not sure. The -- let's -- because what happens in these is you give your opinion, and then it moves on. Most of the time, they're settled. And the others, if there was a decision, I didn't pay any attention to it. So

Page 20

Case 1:19-cv-00098-TRM-CHS    Document 131-2    Filed 12/18/20    Page 21 of 80
PageID #: 3379

I -- I -- I can't give you an honest answer to that. I really can't. I'm not sure.

Q. Fair enough.

Do you consider yourself an expert in valuating truck -- truck -- trucking businesses? 09:53

A. Not anymore. I mean, I haven't -- it's too -- I haven't done it in at least the last 10 years, and I'm -- I'm really over the hill. And the market has changed now. In truth, I don't trust my own -- my own investment acumen anymore. 09:53

Q. And when was the last time you rendered an expert opinion on the valuation of a trucking business?

A. Oh, boy, I'm -- I'm not sure. But I know it's more than 10 years ago. 09:53

Q. Do you recall the names of any of the trucking businesses that you valuated?

A. Yeah. Well, NW Transport was one. The -- was that one? There's one in Baltimore. The -- it's Triple C down in Florida, but that, we didn't 09:54 get to court. The McNabb in Illinois. The -- the -- those are the only ones I can remember.

Q. Other than the investment that you had in U.S. Xpress, and then your ownership of bay -- Basin Western, do you have any other investments in 09:54

Page 21

Case 1:19-cv-00098-TRM-CHS    Document 131-2    Filed 12/18/20    Page 22 of 80
PageID #: 3380

any trucking businesses?

A. I think I do.

Q. In which companies?

A. I have to check my portfolio. I don't --
I don't have -- I'd -- I'd have to check. I know
I'm short a company called Radiant, which is a --
it's a logistics company, really a freight
forwarder. But I don't know if I've got any other
logs that are in trucking. I'd have to -- I'd have
to look at the portfolio.

Q. Okay. Sir, where do you currently live?

A. I live in -- in Zephyr Cove, Nevada.

Q. And where are you located today?

A. In San Francisco.

Q. And how often are you in San Francisco?

A. I don't know. Part of the time.
Currently, I would say 25 percent of the time.

Q. I live here too. It's a nice city, so...

A. Pardon? Excuse me?

Q. I said I live in San Francisco. So it's a
nice city. I understand.

A. Well, I like -- I like Zephyr Cove better.
I like Nevada. I'm on the lake, on Lake Tahoe, so
I -- this is -- but the climate is nice here. A
lot of -- it's a strange city though.

Page 22

Case 1:19-cv-00098-TRM-CHS    Document 131-2    Filed 12/18/20    Page 23 of 80
PageID #: 3381

Q. Fair enough.

Sir, I would ask you -- you said you have Exhibit Share up. If you could go to the -- there's a document that's been marked as Exhibit 7. If you could pull up that document, please. 09:56

A. I've got Exhibit Share. How would I find it? Look at -- the one I've got -- exhibit. Let's see.

Q. It should be -- it's in the folder that's got -- 09:56

A. The one that says Exhibit B.

Q. No, this is exhibit, and then a dash, and then --

MR. TORNATORE: No, I think -- I think he's on the right one, exhibit -- Exhibit B is on 09:57 the cover page, Lisa.

BY MS. BUGNI:

Q. Oh, yeah, yeah, I apologize. You're right. Yes, exactly. Thank you, Sebastian.

MR. TORNATORE: No problem. Sorry to 09:57 interject.

THE WITNESS: Okay. I -- yeah, I've got it up. I've got it up.

(Defendants' Exhibit 7 marked for identification.) 09:57

Page 23

BY MS. BUGNI:

Q. Perfect.

For the record, Exhibit 7 to Mr. Terry's deposition is a document that was filed with the court on May 10th, 2019, labeled Exhibit B, and it is Ms. Deirdre Terry's certification of plaintiff pursuant to the federal securities logs. 09:57

Mr. Terry, have you seen this document before?

A. Yes. 09:57

Q. Okay. When was the last time you saw it?

A. This morning.

Q. And that was in connection with having some training done on Exhibit Share?

A. Yes, yes. It was as a matter of fact. John -- Jonathan, he helped me look at it. 09:57

Q. Okay. And prior -- had you seen the document prior to that this morning?

A. I -- I don't recall seeing it.

Q. Okay. On the first substantive page after the Exhibit B page, you'll see that it is a certification from Deirdre Terry? 09:58

A. Yes.

Q. And is Ms. Terry your daughter?

A. Yes. 09:58

Page 24

Q. And if you would look to Paragraph 4 of the certification that Ms. Terry signed, she indicates that "My transactions in U.S. Xpress, which are the subject of this litigation during the class period are set forth in the chart that's attached hereto."
09:58

Do you see that?

A. The way it's brought up, I can't read it, but I believe you.

Q. Okay. If you would turn to -- if you could scroll down on the document to Schedule A that's attached, and it lists a bunch of purchases and sales in U.S. Xpress?
09:58

A. Yes.

Q. Okay. And if you would just take a minute to look at the purchases and sales for these various accounts, and then let me know when you're ready.
09:59

A. Okay. I'm ready. I'm looking. I'm trying -- I can't -- I'm having trouble bringing it up big enough to see it somehow. If you hold on.
09:59

Q. So if you hover over the bottom. There's little magnifying glasses, one has a minus, one has a plus. You can click the plus to -- to make it bigger.
09:59

Page 25

A. Oh, yeah, I see. There we go.

Okay. Now, I've got it up. Okay.

Q. Okay. So if you would take a minute and look through the purchases and sales that are reflected on here and let me know when you're ready. 09:59

A. I'm ready.

Q. Okay. Do the purchases and sales reflected in this chart, to the best of your recollection, reflect any investment that you made in U.S. Xpress as of the date of this document, which is May 10th, 2019? 09:59

A. Well, I made those purchases and sales but somebody else prepared this document.

Q. Understood, sir. 10:00

A. And I haven't checked its accuracy, but I assume it is accurate.

Q. Okay. Did you make all of the investment decisions for the purchases and sales that are reflected on Exhibit 7? 10:00

A. Well, as I say, I made all of the decisions on our purchases and sales of U.S. Xpress. If -- if they're properly reflected here, then -- then they're on Exhibit 7.

Q. Understood, sir. 10:00

Page 26

And so the first purchase that's reflected on here is -- it looks like it's dated August 6th, 2018, and it's in the second account that is listed.

Do you see that?                                                10:00

A.   Yes, I do.

Q.   Okay.  And why did you decide to invest in U.S. Xpress starting August 6th, 2018?

A.   The -- I had an interchange with an analyst at Stifel, Dave Ross, and he -- he had     10:01 asked me a question.  He said why -- why did I think -- my recollection of it is -- and he might have a different one.  Why did I think the market had not reflected the earnings estimates that he had of U.S. Xpress.                                    10:01

And I looked at his care sheet and whatnot, and I concluded that gosh, the -- it was quite a bit lower multiple than the truck -- trucking companies generally, and I thought I would make a trade.  And I thought that -- that it was a     10:01 time for a -- a buy, a short-term trade.  That's why.

Q.   Okay.  And other than your conversation with Mr. Ross at Stifel, what other materials did you review before deciding to invest in U.S.     10:01

Page 27

Xpress?

A. Well, it's been a long time, okay. And I'm not sure I recall all of them. But I'm sure I looked at the SEC documentation. The offering documents probably. If there were 10-Qs, I'd look at those too. But I -- I don't recall exactly what I looked at before I started buying. But I -- I know I looked at stuff.

Q. Okay. Do you think you would have looked at any quarterly earnings, releases that the company issued?

A. Usually, I went right to the 10-Qs. The -- if it was a quarterly. I don't customarily read all of the -- sometimes I do. But -- and sometimes there isn't a 10-Q out yet, so you'll read the release. But my preference is to read what they sent to the SEC.

Q. And in looking at the SEC filings, would you also look at any Form 8-Ks that the company had filed?

A. I'm not -- I don't recall to be honest. They -- when -- I'm not sure.

Q. But you are -- you do know that you did read USX's registration statement?

A. I'm confident I looked at it. They

Page 28

866 299-5127
Case 1:19-cv-00098-TRM-CHS    Document 131-2    Filed 12/18/20    Page 29 of 80
PageID #: 3387

probably didn't read the whole thing, but I -- I
don't recall actually doing it, but I'm sure before
I do something, that's my customary practice.

Q. And then you would have also looked at any
10-Qs that had been filed and if the 10-Q was not    10:03
yet available, you would have looked at the
company's earnings release; is that right?

MR. TORNATORE: Objection.

You can answer, John.

THE WITNESS: As I said, I'm not sure what    10:03
I looked at. It's been a long time. But my
customary practice is to do what you just said.

BY MS. BUGNI:

Q. And it looks like from Exhibit 7, that the
last purchase that was made was on December 24th,    10:03
2018. Is that consistent with your recollection?

A. I -- I really don't recall, but I assume
if it's on here, that that's correct.

Q. Okay. And based on this schedule, there
were a number of purchases that continued after    10:04
August and then through December.

Would you have continued to stay updated
on U.S. Xpress before continuing to make investment
purchases?

A. Well, there probably wasn't much to -- to    10:04

Page 29

see in that period.

Q. If any earnings releases had been issued or 10-Qs had been filed, would you have read those in the interim?

A. You know I don't -- 10:04

MR. TORNATORE: Objection.

THE WITNESS: I -- I don't remember.

BY MS. BUGNI:

Q. Would you have made any of the purchases that are reflected on Exhibit 7 if you thought U.S. 10:04 Xpress had made any material misrepresentations?

MR. TORNATORE: Objection.

THE WITNESS: Do I have to answer?

MR. TORNATORE: Yes, you have to answer the question. 10:05

THE WITNESS: There's no way to answer a question like that. I mean, there's just no way to answer a question like that. What is the material misstatement? I mean, you know, just -- I mean, the judgment -- who decides material? I mean -- 10:05 you know...

BY MS. BUGNI:

Q. If you had become aware of any material misrepresentation, would you have continued to invest in U.S. Xpress? 10:05

Page 30

MR. TORNATORE:  Objection.

THE WITNESS:  If -- it's a question that's not answerable.  The -- the -- you -- in the real world.

BY MS. BUGNI:                                          10:05

Q.  Why?

A.  What -- what -- what is the -- what is the material misstatement?  How would anyone know if there was a material misstatement?  I guess the -- the -- the definition of material, I think, is that    10:06 it would cause someone to change an investment decision.  And so if you use that definition, then absolutely, because, by definition, I would have changed my investment decision.

So yes, if it's material in that -- in      10:06 that sense, then it would have caused me to change an investment decision.

Q.  Okay.  I'm now going to go through documents specific to each of the accounts that are listed on Exhibit 7.  So just give me a minute to    10:06 mark the next document.

(Defendants' Exhibit 8 marked for identification.)

BY MS. BUGNI:

Q.  Okay.  Sir, if you could please pull up      10:07

Page 31

Exhibit 8, which has just been marked?

A. Let me see if I can do this. All I have is Exhibit 7. Wait, let me try -- hold on, now, let me see if -- what to do -- if I can get it up.

Oh, there. Okay. I see it. Okay. 10:07 Exhibit -- let's try this one. How do I know if it's 8?

Q. So on the first page, at the top it says Vanguard, and it is the statement for individual brokerage account -- 10:07

A. Okay.

MR. TORNATORE: Can I ask everybody to take a pause for a second, because my Exhibit Share is spinning in circles, and I can't get the document up yet. I just need one second. 10:08

MS. BUGNI: No problem. Just let me know when you are ready.

MR. TORNATORE: Great. Thank you.

MR. SUSHON: Yeah, I also have nothing indicating to me that Exhibit 8 is available. 10:08

MS. BUGNI: You have to refresh the folder. You usually have to refresh the folder.

MR. TORNATORE: Okay. So I was able to back out, and I do have the document in front of me now. So thank you for the pause, Lisa. 10:08

Page 32

Case 1:19-cv-00098-TRM-CHS    Document 131-2    Filed 12/18/20    Page 33 of 80
PageID #: 3391

MS. BUGNI: Sure. No problem.

Bill, do you have it as well?

MR. SUSHON: Yes, I have it now. Thank you.

MS. BUGNI: Perfect. 10:08

MR. SUSHON: Excuse my technoidiocy.

MS. BUGNI: We'll get used to it at some point.

BY MS. BUGNI:

Q. So for the record, Exhibit 8 is a document 10:08 that is Bates stamped Terry 2205, and it is a Vanguard statement dated August 7th, 2018.

Mr. Terry, the document here indicates that it's an individual -- that account number 2638 is for an individual brokerage account in the name 10:08 of Deirdre Terry; is that right?

A. Deirdre Terry.

Q. Deirdre. Okay.

And do you -- did you make the investment decisions for this account? 10:09

A. Yes.

Q. And who owns this stock that is in this account?

A. Deirdre owns it. Deirdre Terry.

Q. Does Ms. Terry make -- make any of the 10:09

Page 33

investment decisions or are they 100 percent made by you?

MR. TORNATORE: Objection.

THE WITNESS: She makes any she wants to make. But I don't think she has ever actually made any. She may have. I don't know.

BY MS. BUGNI:

Q. With respect to the U.S. Xpress investment for purchases and sales that were made on this account ending in 2638, did you make those investment decisions?

A. Yes, I did.

MS. BUGNI: And I'm going to mark another exhibit. It will be Exhibit 9.

THE WITNESS: Let's see what happens here.

MS. BUGNI: And, sir, if you could let me know when Exhibit 9 appears.

(Defendants' Exhibit 9 marked for identification.)

THE WITNESS: Coming very slowly. Boy, let's see what's going on here.

Ah, there we are. Okay.

Okay. I see -- I think it's -- I see a different exhibit. It begins by U.S. Xpress Inc. CLA; is that the one there?

Page 34

BY MS. BUGNI:

Q. Yes, sir.

So for the record, Exhibit 9 is a document Bates stamp Terry 2204, and it is a transaction history detail for U.S. Xpress made for the John J. Terry rollover IRA brokerage account with the account ending in 79; is that right?

A. Yes.

Q. Okay. And the John J. Terry rollover IRA brokerage account, are you familiar with that account?

A. Yes.

Q. Do you make the investment decisions for this account?

A. Yes.

Q. And who owns the stock that is in this account?

A. I do.

Q. All right. Are there any beneficiaries for the stock that is in this account?

A. The -- it -- well, how would I say that? The -- the account -- typically with an account, you have a -- with -- with Vanguard you have instructions, so it goes to my estate, but -- that's the real beneficiary. Part of my estate are

Page 35

charitable contributions.  But other than the charitable contributions, they would all accrue to my estate, you know.

Q.  Understood, sir.

MS. BUGNI:  Let me mark the next exhibit.  10:12
This is going to be Exhibit 10.  Still loading.

(Defendants' Exhibit 10 marked for identification.)

BY MS. BUGNI:

Q.  If you can let me know when Exhibit 10 has  10:12
appeared in your folder, please.

A.  Okay.  I've got it.

Q.  Okay.  Exhibit 10, for the record, is a document Bates stamp Terry 2207, and it is for a -- it's a Vanguard statement for a brokerage account  10:12
for Mardin LLC, with account number ending in 1980; is that correct, sir?

A.  Yes.

Q.  Who makes the investment decisions for this account?  10:13

A.  I do.

Q.  And who owns the stock that is in this account?

A.  Mardin LLC.

Q.  What is the Mardin LLC?  10:13

Page 36

Case 1:19-cv-00098-TRM-CHS    Document 131-2    Filed 12/18/20    Page 37 of 80
PageID #: 3395

A. It's a limited liability company.

Q. What is its business?

A. Say again, please.

Q. What is the business of Mardin LLC?

A. Mardin owns property. 10:13

Q. What types of property?

A. Real estate.

Q. And -- and stock, I assume?

A. Yes. Yes. The excess -- excess funds are in stock. 10:13

Q. And where is Mardin LLC incorporated?

A. It's a Delaware LLC.

Q. And who are the members of Mardin LLC?

A. As we sit here today, Deirdre Terry, Michael Terry, my son, and me. But at the time of 10:14 this, my wife was alive, and she was the other member. I have it by virtue of her death. I don't really have -- her estate isn't -- she died in May, so it's conceivable I could refuse to accept her estate, and it would go to Mike and Deirdre, but -- 10:14 that -- that's who was family, just the family.

Q. Understood. I'm sorry for your -- for your loss.

A. Thanks. It's a real loss. It's a terrible time. 10:14

Page 37

Q. I'm sorry to hear that, sir.

Who is the manager of Mardin LLC?

A. I am.

MR. TORNATORE: Objection.

THE WITNESS: I'm sorry. I answered it 10:15
wrong too. Deirdre is shown as the managing
member.

BY MS. BUGNI:

Q. And has Ms. Terry always been the managing
member? 10:15

A. I don't -- I'm not sure.

Q. Do you know when Mardin LLC was formed?

A. In the '90s. It was in the '90s.

Q. And so Mardin LLC owned the stock in this
account. Is there -- what is the agreement at 10:15
Mardin with respect to if Mardin LLC is ever
dissolved or winded down as to who will get the
assets of the LLC?

MR. TORNATORE: Objection.

THE WITNESS: Right. Well, I -- I'm not 10:16
sure. I know -- I know the percentage ownerships.
But LLCs, you know, are -- I'm not sure. You know,
I think it would be in proportion to the percentage
ownerships.

///

Veritext Legal Solutions
866 299-5127

BY MS. BUGNI:

Q. And what are the percentage ownerships?

A. Well, roughly, Deirdre and Michael own a 43 percent, and I have the remainder amount now. And Terese, my wife, did while she was alive.

MS. BUGNI: Okay. I'm going to mark the next exhibit.

(Defendants' Exhibit 11 marked for identification.)

BY MS. BUGNI:

Q. I have marked Exhibit 11, sir, if you could please let me know when that appears in your folder.

A. I've got it.

Q. Exhibit 11 is a document Bates stamped Terry 2212. And it is a transaction history detail for the CT and Deirdre A. Terry, UTMA brokerage account with account number ending in 1833; is that correct?

A. Yes.

Q. What is the CT Deirdre A. Terry as custodian account.

A. That's -- that's -- CT is my granddaughter. She Terry's daughter. She's Deirdre's daughter, and so she -- it's a custodian,

Page 39

a typical parent/child custodian account. She's a minor child.

Q. And who makes the investment decisions for this account?

A. Oh, I made this one, but Deirdre could make any she wanted, I assume. 10:18

Q. And with respect to all of the transactions in U.S. Xpress that were made in this account, did you make those decisions?

A. Yes. 10:18

Q. And who owns the stock that is in this account?

A. I guess CT does.

MS. BUGNI: Okay. I'm going to mark another exhibit, and I've just marked Exhibit 12. 10:18

(Defendants' Exhibit 12 marked for identification.)

BY MS. BUGNI:

Q. If you could please let me know when that appears in your folder, sir. 10:18

A. Okay. I have it.

Q. Exhibit 12 is a document Bates stamped Terry 2210, and it is a transaction history detail for the Comeragh Corporation; is that right, sir?

A. Yes. 10:19

Page 40

Q. And did I say the name of the corporation correct?

A. Yes, Comeragh.

Q. Comeragh. Thank you, sir.

And the account number for the Comeragh Corporation account ends in 5620; is that correct?

A. Yes.

Q. Who makes the investment decisions for this account?

A. Generally, I do.

Q. And who owns the stock that is in this account?

A. It's in equal amounts owned by my son, Michael, and my daughter, Deirdre.

Q. And what is the Comeragh Corporation?

A. It's a company that owns real estate.

Q. And -- and stock, I assume?

A. And -- plus a stock portfolio, yeah, for the excess cash.

Q. And who are the shareholders of the Comeragh Corporation?

A. Yeah, as I said, it's Michael and Deirdre in equal amounts.

Q. Do you have any involvement in the Comeragh Corporation other than making investment

Page 41

decisions for this account?

A. Yeah, I do the work on the real estate too.

Q. Who is on the board of the Comeragh Corporation?

A. Well, it was my son and daughter and -- perhaps my wife. I don't know. I wasn't on the board.

Q. Are you an employee of the Comeragh Corporation?

A. No. No.

Q. Who was the -- what is the executive team of the Comeragh Corporation?

MR. TORNATORE: Objection.

THE WITNESS: It's -- it's really me. Comeragh owns just rental real estate, so there's not much work involved.

BY MS. BUGNI:

Q. And where is the Comeragh Corporation located?

A. It's a Georgia corporation.

Q. And what is the connection to Georgia?

A. Well, the first property we owned was in Georgia, and it still owns some property in Georgia. I wish I had made it a Delaware, to be

Page 42

honest, but I didn't.

Q. And where else does the Comeragh Corporation own property?

A. Hold on. Let me -- I don't know how I can get rid of this call. You're going to have to listen to a little ringing there.   10:22

I'm sorry. Ask me again.

Q. Sure. If you need to take a break to answer the phone, that's fine.

A. No, it was -- forget about it. It looks like one of those calls about -- that you get too.   10:22

Q. Yes.

A. Comeragh owns today. It owns a truck terminal in Raleigh, North Carolina. It owns another truck terminal in Wilson, North Carolina. And it owns a piece of undeveloped land in the port of Savannah, Georgia.   10:22

Q. I'm just going to wait for that message to complete, for the record.

A. Yeah, this darn thing. I'm sorry about that.   10:22

(Phone message left in the background.)

THE WITNESS: Whoever it was said God bless me, and I could use that.

Okay. Go ahead.   10:23

Page 43

Case 1:19-cv-00098-TRM-CHS    Document 131-2    Filed 12/18/20    Page 44 of 80
PageID #: 3402

BY MS. BUGNI:

Q. Does -- for any of the truck terminals that Comeragh Corporation owns, does U.S. Xpress use those truck terminals?

A. No. 10:23

Q. Other than the real estate you mentioned already in Georgia, Raleigh, Wilson, and Savannah, are there any other real estate holdings that Comeragh Corporation has?

A. No. 10:23

MR. TORNATORE: John, is that your phone? Is it off the hook? I'm hearing like a beep, beep, beep.

THE WITNESS: Okay. There, I got rid of it. Sorry about that. 10:23

MS. BUGNI: No problem. All right. I'm going to mark the next exhibit. I just marked Exhibit 13.

(Defendants' Exhibit 13 marked for

identification.) 10:24

BY MS. BUGNI:

Q. Sir, if you could please let me know when that document is available in your folder.

A. One that's coming very slowly.

Okay. I've got it. 10:24

Page 44

Q. Exhibit 13 is a document Bates stamped Terry 2211. And it's a transaction history detail for the JT and Deirdre A. Terry as custodian account number ending in 7547; is that correct, sir? 10:25

A. Yes.

Q. And who -- who owns this account?

A. I gather -- I expect JT owns it. JT is my grandson. He's Deirdre's son.

Q. And who makes the investment decisions for this account? 10:25

A. Well, I made this one.

Q. And with respect to other transactions in U.S. Xpress for this account, did you similarly make those decisions? 10:25

A. Yes.

MS. BUGNI: I'm going mark the next exhibit.

(Defendants' Exhibit 14 marked for identification.) 10:26

BY MS. BUGNI:

Q. I've just marked Exhibit 14. If you could please let me know when it is in your folder, sir.

A. It's coming up now. I've got it. Okay.

Q. Exhibit 14 is a document Bates stamped 10:26

Page 45

Case 1:19-cv-00098-TRM-CHS    Document 131-2    Filed 12/18/20    Page 46 of 80
PageID #: 3404

Terry 2209. It is a transaction history detail for the account that is John J. Terry and Terese M. Terry for the trust account, and the account number ends in 4882.

Is that correct, sir?                      10:26

A. Yes.

Q. What is the trust that is reflected on this page?

A. It is a typical estate planning trust. You know, the -- the -- one of those -- due to      10:26 avoid probate kind of trusts that our estate lawyer had us create.

Q. And who makes the investment decisions for this account?

A. I do.                                   10:26

Q. And who owns the stock that is in this account?

A. Well, it's the trust. My wife and I.

Q. And who manages the trust?

A. I do.                                   10:27

Q. Who are the beneficiaries of the trust?

A. Oh, our -- I think it's our estate.

Q. Okay. Did you have any involvement in this decision to file a lawsuit against U.S. Xpress and its officers and directors?      10:27

Page 46

A. I don't think I did.

Q. When did you first learn that a lawsuit had been filed against U.S. Xpress and its officers and directors related to the initial public offering?

MR. TORNATORE: Objection.

THE WITNESS: I don't -- I don't remember the date.

BY MS. BUGNI:

Q. How did you learn about the lawsuit?

MR. TORNATORE: Objection.

THE WITNESS: If -- if it -- on the internet, I follow my portfolio on the internet. And usually down below the stock prices, they'll show news about various things, and I saw one of those from Levi -- Levi & Korsinsky, that they were seeking investors who had invested in a certain period, and I recall we did. And so I sent -- I think there was an E-mail address in that that I responded to. I think that's how we got connected.

BY MS. BUGNI:

Q. That's -- that's how you got connected with Levi & Korsinsky?

A. Yes.

Q. And how is it that your daughter became

Page 47

Case 1:19-cv-00098-TRM-CHS    Document 131-2    Filed 12/18/20    Page 48 of 80
PageID #: 3406

involved in the lawsuit?

MR. TORNATORE:  Objection.

THE WITNESS:  Well, she owns part of the stock that we had.

BY MS. BUGNI:                                          10:28

Q.  And did you -- did you consider making a claim against U.S. Xpress in your name?

A.  Well, I considered it, yes.

Q.  And why did you decide not to?

MR. TORNATORE:  Objection.                            10:29

THE WITNESS:  I thought it would be better to have Deirdre do it on the basis of all the family members.  And I talked to her about it, and she thought about it and was agreeable to do it.

MR. TORNATORE:  And, Lisa, when you reach      10:29 a stopping point, sometime soon, a natural stopping point for your line of questions, I'd appreciate just a short break if you don't mind.

MS. BUGNI:  Sure, let me finish this line, and then we can take a break.                             10:29

MR. TORNATORE:  Yeah, no problem.

BY MS. BUGNI:

Q.  And what else have you discussed about the lawsuit with your daughter?

MR. TORNATORE:  And I caution the witness      10:29

Page 48

Case 1:19-cv-00098-TRM-CHS    Document 131-2    Filed 12/18/20    Page 49 of 80
PageID #: 3407

not to divulge anything that was related to attorney-client privileged communications.

THE WITNESS: Really, our only conversation was about whether she would be the named party on behalf of the family. I -- I haven't discussed that -- the -- the -- the merits or details of it with her.

BY MS. BUGNI:

Q. And does she --

A. I don't recall discussing the merits and details with her. I mean, you see your daughter a lot and you talk to her a lot. So it's conceivable I said something. She might have a different answer, because she remembers something I don't, but I don't remember ever talking to her about the substance of it.

Q. And have you discussed the lawsuit with anyone other than your daughter or your lawyers?

A. It's -- it's possible I mentioned it to our son, Michael.

Q. Do you recall anything about that conversation?

A. No.

MS. BUGNI: Okay. We can take a break. How long would you like, Sebastian?

Page 49

MR. TORNATORE: Five, ten minutes. It doesn't need to be a long one? John, do you need any more time than that, or is five, ten minutes good for you?

THE WITNESS: No, I don't need it. I don't need it. I'm okay. 10:31

MR. TORNATORE: So five minutes just to kind of regroup.

MS. BUGNI: Sure. Yeah, we'll take five minutes. 10:31

MR. TORNATORE: Thank you.

MS. BUGNI: We can go off the record.

THE VIDEOGRAPHER: We're off the record at 10:31 a.m.

(Break taken.) 10:37

THE VIDEOGRAPHER: We are back on the record at 10:37 a.m.

MS. BUGNI: All right. Sir, I'm going to mark the next exhibit, which is going to be Exhibit 15. 10:37

(Defendants' Exhibit 15 marked for identification.)

BY MS. BUGNI:

Q. If you could please let me know --

MR. TORNATORE: I'm sorry, Lisa, before 10:37

Page 50

you ask your question, I just want to record the appearance of --

(Reporter interruption for clarification.)

MR. TORNATORE:  The appearance of Willow Radcliffe from Robbins Geller on behalf of plaintiff.

BY MS. BUGNI:

Q.  Sir, do you have Exhibit 15?

A.  Yes, I've got it up.

Q.  Great.  So Exhibit 15, is document Bates stamped Terry 1, and it is an assignment dated May 3rd, 2019; is that correct, sir?

A.  Yes.

Q.  Is that your signature on the first page?

A.  Yes, it is.

Q.  And on the second page, is that your wife's signature?

A.  Yes, it is.

Q.  So on the -- on the first page, when did you sign this document?

A.  The 3rd of May, 2019.

Q.  And what is your understanding of the meaning of this document?

MR. TORNATORE:  Objection.

THE WITNESS:  I think it -- we delegated

Page 51

to Deirdre to -- to be the person that would be the -- the claiming party or the party that's named.  Is that right?  I mean, I'm not sure.  But I assume that's what this does.

BY MS. BUGNI:                                    10:39

Q.  I just want to get your understanding since you signed it.  So if that's your understanding, we can -- we can move on.  Or if there's anything you would like to add?

A.  Yeah -- yes, it is.                          10:39

Q.  Okay.  And why did you assign your claims to your daughter in May of 2019?

MR. TORNATORE:  Objection to form.

THE WITNESS:  Well, she was going to be the person who would claim them, be the lead party.  10:40
We didn't all want to do it and --

BY MS. BUGNI:

Q.  And according to this document, the last sentence of the first paragraph, you retained the -- the right to receive any proceeds that came  10:40
out of the lawsuit, correct?

A.  Yes.

Q.  And what is your understanding of what those proceeds will be?

A.  I -- I don't know.  Whatever they are,     10:40

Page 52

Case 1:19-cv-00098-TRM-CHS    Document 131-2    Filed 12/18/20    Page 53 of 80
PageID #: 3411

though, we get it.

MS. BUGNI: Okay. I'm going mark the next exhibit.

(Defendants' Exhibit 16 marked for identification.)                    10:41

BY MS. BUGNI:

Q. If you would please let me know when Exhibit 16 has appeared in your folder, sir.

A. I've got it.

Q. Exhibit 16 is a document Bates stamped    10:41
Terry 3, and it is the assignment that is dated May 3rd, 2019 by Michael Terry; is that correct, sir?

A. Yes.

Q. Michael Terry is your son?

A. Yes.                    10:41

Q. And to the best of your knowledge, is that signature your son's signature?

A. Yes.

Q. Do you have an understanding of why Michael Terry signed this assignment?                    10:41

MR. TORNATORE: Objection.

THE WITNESS: For the same reason, to make Deirdre the lead party.

BY MS. BUGNI:

Q. Have you ever met anyone who has worked at    10:41

Page 53

U.S. Xpress?

A. Let me ask you a question so I can answer your question. When was U.S. Xpress formed?

Q. It was formed a long time ago, but it went public June 2018?                                    10:42

A. So the -- you know, it was public before. So the same entity that was public before.

Q. Yes, sir.

A. Yes, well, I -- I met Pat Quinn. He's deceased now.                                                   10:42

Q. How did you meet Pat Quinn?

A. I recall meeting him at an investment conferences and at the ATA.

Q. What is the ATA?

A. American Trucking Association. The                         10:42
executive committee meetings of the American Trucking Association.

Q. And how often -- how many times did you meet Pat Quinn?

A. Oh, boy. I wouldn't be surprised if it                     10:42
was four or five times I talked to him. In fact, this is all before 2000 -- before -- before 2010. I'm sorry. I said 2000. I meant 2010.

Q. And other than Pat Quinn, is there anyone else that you have met that's associated with U.S.          10:43

Page 54

Xpress?

A. You know, it's conceivable I've met Max Fuller, but I don't recall doing it. I know I've been in the same room with him several times and seen him. And I might have nodded or said hello or something like that. But I -- I don't think I've ever had a discussion with him, substantive discussion.

Q. And in what instances have you been in the same room with Max Fuller?

A. Well, again, at ATA functions. And he was at the Stifel conference in February of '19. He was in the room when young Fuller made the presentation.

Q. Have you had any one-on-one conversations with Max Fuller?

A. I don't think so. I don't recall ever having one.

Q. Other than Max Fuller and Pat Quinn, have you met anyone who works or worked at U.S. Xpress?

A. I have no recollection of ever meeting anyone else from U.S. Xpress.

Q. Has anyone asked you to review your E-mails for documents related to your investment in U.S. Xpress?

Page 55

A. Well, the Levi people asked me to bring them up and send them to them.

Q. And how did you search for those documents?

A. On -- on Gmail. You know, you can name things or -- and that's what I did.

Q. And what searches did you run?

A. Well, I don't remember, but I would have run one for Dave Ross, I'm sure, or Stifel.

I think that's probably the only one that I would have looked for.

Q. And other than your Gmail account, did you search any other sources for documents related to your investment in U.S. Xpress?

A. Well, the -- the documents that you have, we got off our Vanguard thing, which is over the internet. And so I would have done that to get the stock trades and things for you, and the other related -- and that -- on my -- some -- I have some -- I downloaded some investment reports that are sent out, and I would search those for U.S. Xpress ones. And if I found them, I sent them on to Sebastian.

Q. And the -- I'm sorry, sir, go ahead. I didn't mean to interrupt you.

Page 56

Case 1:19-cv-00098-TRM-CHS    Document 131-2    Filed 12/18/20    Page 57 of 80
PageID #: 3415

A. No, no. There wasn't anything else.

Q. The investor reports that you downloaded on U.S. Xpress, are those documents that you would have reviewed at the time you made investment decisions?                                                    10:46

A. Well, it might have been before or after. See, that -- you know, I don't know. I don't remember actually. And I don't customarily keep all of those. I mean, periodically, I'll -- I do not purge E-mails, but I get rid of the old         10:46 investment reports.

Q. And how did you decide which investor reports to download for U.S. Xpress?

A. Well, if I had them, I sent them on to Sebastian.                                                             10:46

Q. And --

A. They're probably still on my computer.

Q. If you had them, is it likely that you had read them?

A. No, it's not. It's not for certain. I     10:46 don't read all of them.

Q. What did you do to prepare for your deposition today?

MR. TORNATORE: And I caution the witness not to divulge any communications with counsel.     10:46

Page 57

.

THE WITNESS:  Okay.  Well, they sent me an E-mail to read -- a memo to read, and I read it, and then we had a couple of Zoom conferences where they told me what it's like to get deposed.

BY MS. BUGNI:                                                    10:47

Q.  And the memo that they sent you to read, did you rely on that to prepare for your deposition today?

A.  Well, no, it was mostly a teaching about how you -- what you do when you're deposed.          10:47

Q.  Okay.  But did you rely on it to prepare for your deposition today?

A.  Well, I -- rely on it.  I read it.  I've been deposed a bunch of times before, so I read it. Reminded myself.  Refreshed my recollection of how    10:47 you're supposed to do this.

Q.  And then you said in addition to the memo you had a few meetings with your lawyers?

A.  I can recall two Zoom conferences, plus one this morning.  Three, I guess we had.          10:47

Q.  And on the first Zoom conference, when was that?

A.  Before the second one.  I don't remember. It would have been in the last couple weeks.

Q.  And who was on that first Zoom conference?    10:48

Page 58

Case 1:19-cv-00098-TRM-CHS    Document 131-2    Filed 12/18/20    Page 59 of 80
PageID #: 3417

A. Sebastian and Shannon.

Q. The second Zoom conference, when was that?

A. What day is today, Monday? Last week I think.

Q. And who -- 10:48

A. Yeah, last -- it was -- I remember it was -- it must have been -- was it Tuesday?

Q. And who was on that Zoom conference?

A. Sebastian and Shannon.

Q. And then the one this morning, who was on 10:48 that one?

A. There was a new lady and Shannon and Sebastian.

Q. Who was the new lady?

A. I don't remember her name. 10:48

Q. Was she a lawyer?

A. I don't know.

MS. BUGNI: Sebastian, I'll just ask you, if it's not a lawyer, I'm going to --

MR. TORNATORE: It was Willow. 10:49

MS. BUGNI: Okay. Thank you.

THE WITNESS: Willow. I'm sorry, I forgot your name.

BY MS. BUGNI:

Q. How long did the first Zoom conference 10:49

Page 59

Case 1:19-cv-00098-TRM-CHS    Document 131-2    Filed 12/18/20    Page 60 of 80
PageID #: 3418

last?

A. First one, I don't -- well, let's see. Which -- oh, God. I don't know. I don't know.

Q. More than an hour?

A. I think so.

Q. More than two hours?

A. I don't know.

Q. Okay. How about the second Zoom conference, how long did that one last?

A. One was a couple of hours, I think.

Q. And then this morning, how long was that one?

A. 20 minutes. 15, 20 minutes.

MS. BUGNI: Mr. Terry, I thank you for your time. I don't have any questions subject to Mr. Sushon. He might have some questions for the Underwriter defendants or your counsel might have some questions as well.

MR. SUSHON: I do have a few questions.

EXAMINATION

BY MR. SUSHON:

Q. Mr. Terry, I'm Bill Sushon from O'Melveny & Myers. I represent the Underwriter defendants.

In your testimony, you mentioned that you had contact with a Mr. David Ross at Stifel

Page 60

Page 60

Nicolaus about U.S. Xpress; is that correct?

A. Yes.

Q. And how did you come to have contact with Mr. Ross about U.S. Xpress?

A. I think he contacted me. I'm not sure. It's possible I contacted him. I don't remember.

Q. Do you have a preexisting relationship with Stifel?

A. I knew the people. I never had an account with them or did business with them, but I knew the people there.

Q. And did you know Mr. Ross before he contacted you about U.S. Xpress --

A. Yes.

Q. -- or you talked to him about U.S. Xpress?

A. Yes.

Q. How long did you know Mr. Ross?

A. I don't remember -- how long did I know him?

Q. Yes.

A. Oh, well, it's got to be three or four or five years.

Q. And you mentioned that you knew other people from Stifel as well; is that correct?

A. Yes.

Page 61

Q. And who were those people?

A. John Larkin.

Q. Other than Mr. Larkin, anyone else?

A. Not that I can remember.

Q. And how did you come to know Mr. Larkin?　10:51

A. Well, I go way back with him back to the pre-Alex Brown days. I remember the first meeting I had, because I think he was working for Conrail at the time.

At any rate, the chairman of Conrail sent　10:52 him and another guy to come and see me, and that's how I met him. But then I've known him in the interim all these years. That's 20 or 30 years ago.

Q. And did you have any discussions with　10:52 Mr. Larkin about U.S. Xpress?

A. I don't think so.

Q. Is there anyone else from Stifel Nicolaus whom you know?

A. No. There is another analyst there. I　10:52 forget his name. But I don't think -- I don't ever recall talking to him about U.S. Xpress.

Q. All right. Did you have any contact with anyone from Merrill Lynch, Pierce, Fenner & Smith about U.S. Xpress?　10:52

Page 62

A.  No.

Q.  How about Morgan Stanley & Company?

A.  No.

Q.  And did you have any contact with anyone from J.P. Morgan Securities concerning US Xpress?    10:53

A.  No.

Q.  Did you have any contact with anyone from Wells Fargo Securities concerning US Xpress?

A.  No.

Q.  Did you have any contact with anyone from    10:53 Stevens Inc. concerning U.S. Xpress?

A.  No.

Q.  And did you have any contact with anyone from WR Securities concerning U.S. Xpress?

A.  No.  Did you hear my answer?  I said no.    10:53

Q.  Yes, I heard you, sir.  I was just taking a moment to look at my notes.

A.  Oh, I see.  I'm sorry.

MR. SUSHON:  Okay.  I -- I have nothing further, Mr. Terry.  Thank you for your time.    10:54

THE WITNESS:  You're welcome.

MR. TORNATORE:  John, can we take just five minutes?  I can confirm with my co-counsel and come back on the record and just hopefully put this -- and get ourselves across the finish line.    10:54

Page 63

MS. BUGNI: Yes.

MR. TORNATORE: So can we go off the record, please.

THE VIDEOGRAPHER: We're going off the record at 10:54.                    10:54

(Break taken.)

THE VIDEOGRAPHER: Here we are back on the record at 11:01.

MR. TORNATORE: John, this is Sebastian. I have no additional questions. So thank you for          11:01 your time today.

MS. BUGNI: Thank you for your time, Mr. Terry.

THE WITNESS: Good-bye, everybody. Nice talking to you.                    11:01

THE VIDEOGRAPHER: Okay. This will end the deposition of John Terry. The total number of media units used in today's deposition was three and will be retained by Veritext Legal Solutions.

We're off the record at 11:02. Thank you.   11:02

MR. TORNATORE: Can we get a copy of the rough when it's available?

THE REPORTER: Yes.

MS. BUGNI: I'll take one as well, please.

(Whereupon, the deposition concluded at

Page 64

11:02 a.m.)

Page 65

Case 1:19-cv-00098-TRM-CHS    Document 131-2    Filed 12/18/20    Page 66 of 80
PageID #: 3424

REPORTER'S CERTIFICATE

I, KIMBERLY R. HENDERSHOTT, a Shorthand Reporter, State of California, do hereby certify:

That JOHN TERRY, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

That before completion of the proceedings, review of the transcript was not requested.

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 18th day of October, 2020.

*Kimberly R. Hendershott*

KIMBERLY R. HENDERSHOTT, RPR, CRR
CSR NO. 12552
State of California

Page 66

[& - account]

| & | | | |
|---|---|---|---|
| **&** 5:16,20 6:3,7,12 6:17 7:3 9:7,9,11 9:13,21,24 11:20 13:4 47:16,23 60:23 62:24 63:2 | **19** 13:11 55:12<br>**1959** 12:22<br>**1965** 13:5<br>**1971** 13:6<br>**1980** 3:15 36:16<br>**1985** 13:12,13,16<br>15:21 18:1<br>**1990** 16:21 17:17<br>17:20<br>**1:19** 1:10 8:15 | **288-4545** 6:5<br>**2nd** 6:13 | **655** 6:8<br>**6th** 27:2,8 |

| 0 | | **3** | **7** |
|---|---|---|---|
| **00098** 1:10 8:15<br>**06905** 5:17 | | **3** 4:2 53:11<br>**30** 62:13<br>**30309** 6:19<br>**31** 3:9<br>**319-1234** 6:14<br>**31st** 5:21<br>**326-2000** 7:5<br>**34** 3:11<br>**36** 3:14 16:1 17:21<br>**39** 3:16<br>**3rd** 4:1 51:12,21<br>53:12 | **7** 3:7 7:4 23:4,24<br>24:3 26:20,24<br>29:14 30:10 31:20<br>32:3<br>**71** 13:7<br>**74** 13:7,10<br>**7547** 45:4<br>**76** 13:10,11<br>**79** 3:13 35:7<br>**7th** 3:9 33:12 |

| 1 | **2** | | **8** |
|---|---|---|---|
| **1** 4:1 8:9 51:11<br>**10** 2:5 3:14 10:17<br>10:20 21:7,15<br>28:5,12,15 29:5,5<br>30:3 36:6,7,10,13<br>**100** 17:2 34:1<br>**10036** 7:5<br>**101** 6:13<br>**10th** 3:7 24:5<br>26:12<br>**11** 3:16 39:8,11,15<br>**1111** 5:16<br>**1180** 6:18<br>**12** 1:20 3:20 40:15<br>40:16,22<br>**12552** 1:19 66:23<br>**12th** 5:4 8:3<br>**13** 3:22 14:16<br>44:18,19 45:1<br>**131** 13:24<br>**14** 3:23 45:19,22<br>45:25<br>**15** 4:1 50:20,21<br>51:8,10 60:13<br>**16** 4:2 53:4,8,10<br>**1600** 6:18<br>**1800** 6:4<br>**1833** 3:19 39:19<br>**18th** 66:20 | **2** 13:15<br>**20** 17:8,24 60:13<br>60:13 62:13<br>**2000** 54:22,23<br>**2010** 54:22,23<br>**2018** 3:10 27:3,8<br>29:16 33:12 54:5<br>**2019** 3:7 4:1 24:5<br>26:12 51:12,21<br>52:12 53:12<br>**2020** 1:20 5:4 8:3<br>66:20<br>**203** 5:18,22<br>**212** 7:5<br>**21377** 66:22<br>**2204** 3:11 35:4<br>**2205** 3:9 33:11<br>**2207** 3:14 36:14<br>**2209** 3:24 46:1<br>**2210** 3:21 40:23<br>**2211** 3:22 45:2<br>**2212** 3:18 39:16<br>**23** 3:7<br>**2300** 6:13<br>**231-1058** 6:9<br>**24th** 29:15<br>**25** 22:17<br>**250** 1:23<br>**2638** 33:14 34:10 | **4**<br><br>**4** 25:1<br>**40** 3:20 17:4,5,7<br>**401-403** 5:17<br>**404** 6:19<br>**415** 6:5,14<br>**43** 39:4<br>**44** 3:22<br>**445** 5:21<br>**45** 3:23<br>**451-1580** 1:24,24<br>**451-3797** 1:24<br>**4882** 46:4 | **8** 3:9 28:19 31:22<br>32:1,7,20 33:10<br>**877** 1:24 |

| 5 | **9** |
|---|---|
| **50** 4:1<br>**500** 13:24<br>**510** 1:24,24<br>**53** 4:2<br>**5620** 41:6<br>**572-2780** 6:19 | **9** 3:11 34:14,17,18<br>35:3<br>**90071** 5:22<br>**90s** 38:13,13<br>**92101** 6:8<br>**94104** 6:4<br>**94105** 6:14<br>**94612** 1:23<br>**992-4523** 5:18,22<br>**9:36** 5:5 8:2 |

| 6 | a |
|---|---|
| **60** 2:6 17:6<br>**619** 6:9 | **a.m.** 5:5 8:2 50:14<br>50:17 65:1<br>**able** 32:23<br>**absolutely** 31:13<br>**accept** 37:19<br>**accepted** 20:5,18<br>**account** 3:13,15<br>3:15,18,18 13:14<br>27:3 32:10 33:14<br>33:15,20,23 34:10 |

Page 1

35:6,7,10,11,14,17
35:20,22,22 36:15
36:16,20,23 38:15
39:18,18,22 40:1,4
40:9,12 41:5,6,9
41:12 42:1 45:4,7
45:11,14 46:2,3,3
46:14,17 56:12
61:9
**accounting** 13:1
**accounts** 25:17
31:19
**accrue** 36:2
**accuracy** 26:16
**accurate** 26:17
**action** 5:8 8:24
66:8
**activities** 18:4
**acumen** 21:10
**add** 52:9
**addition** 58:17
**additional** 64:10
**address** 47:19
**affiliate** 13:6
**affiliates** 13:25
**affiliations** 9:2
**ago** 10:20 17:14
21:15 54:4 62:14
**agree** 8:7
**agreeable** 48:14
**agreement** 38:15
**ah** 34:22
**ahead** 43:25 56:24
**aiken** 1:22
**al** 1:12 8:11,12
**alex** 62:7
**alive** 37:16 39:5
**american** 54:15,16
**amount** 39:4
**amounts** 41:13,23

**analyst** 27:10
62:20
**angeles** 5:22
**answer** 11:2,13
12:6,6 20:11 21:1
29:9 30:13,14,16
30:18 43:9 49:14
54:2 63:15
**answerable** 31:3
**answered** 38:5
**anymore** 13:9
21:6,10
**apologize** 23:18
**appearance** 9:4
51:2,4
**appearances** 5:13
9:1
**appeared** 5:7
36:11 53:8
**appears** 34:17
39:12 40:20
**appreciate** 48:17
**april** 13:11
**asked** 27:11 55:23
56:1
**assertions** 19:14
**assets** 38:18
**assign** 52:11
**assignment** 4:1,2
51:11 53:11,20
**associated** 54:25
**association** 54:15
54:17
**assume** 11:13
26:17 29:17 37:8
40:6 41:17 52:4
**ata** 54:13,14 55:11
**atlanta** 6:19
**attached** 25:6,12
**attending** 8:18

**attention** 20:25
**attorney** 9:5 49:2
**audio** 8:6
**august** 3:9 27:2,8
29:21 33:12
**available** 29:6
32:20 44:23 64:22
**avoid** 46:11
**aware** 30:23

**b**

**b** 3:1,8 23:11,15
24:5,21
**back** 32:24 50:16
62:6,6 63:24 64:7
**background** 12:16
43:22
**bakshi** 6:6 9:25
**ballpark** 11:25
**baltimore** 21:19
**bank** 18:13,13
**based** 15:16 29:19
**basin** 16:1 17:19
17:22 21:25
**basis** 48:12
**bates** 3:9,11,14,17
3:20,22,23 4:1,2
33:11 35:4 36:14
39:15 40:22 45:1
45:25 51:10 53:10
**bay** 21:24
**beep** 44:12,12,13
**beginning** 9:4
**begins** 34:24
**behalf** 1:7 9:7,10
9:12,14,21 49:5
51:5
**believe** 9:25 14:8
25:9
**beneficiaries**
35:19 46:21

**beneficiary** 35:25
**benefit** 10:25
**best** 26:9 53:16
**better** 22:22 48:11
**big** 25:21
**bigger** 25:25
**biggest** 18:18
**bill** 9:13 33:2
60:22
**bit** 12:17 27:18
**bkeel** 6:20
**bless** 43:24
**board** 42:4,8
**bottom** 25:22
**bought** 17:25
18:20,21,21
**boy** 21:14 34:20
54:20
**brandon** 6:16 9:9
**break** 12:9,10 43:8
48:18,20 49:24
50:15 64:6
**brenner** 17:8
**briefly** 13:2
**bring** 56:1
**bringing** 25:20
**broadway** 6:8
**brokerage** 3:13,14
3:18 32:10 33:15
35:6,10 36:15
39:18
**brought** 25:8
**brown** 62:7
**bugni** 2:5 6:11 9:6
9:6 10:9 20:10
23:17 24:1 29:13
30:8,22 31:5,24
32:16,21 33:1,5,7
33:9 34:7,13,16
35:1 36:5,9 38:8
39:1,6,10 40:14,18

Veritext Legal Solutions
866 299 5127

42:18 44:1,16,21 45:17,21 47:9,21 48:5,19,22 49:8,24 50:9,12,18,23 51:7 52:5,17 53:2,6,24 58:5 59:18,21,24 60:14 64:1,12,24
**built** 17:23,24
**bulk** 16:3,3
**bunch** 25:12 58:14
**burns** 15:6
**business** 13:21 14:3,10,24 15:18 18:4,24 19:4,17 20:16 21:13 37:2 37:4 61:10
**businesses** 14:6 15:21 21:5,17 22:1
**buy** 27:21
**buying** 28:7
**bye** 64:14

**c**

**c** 21:20
**caldwell** 16:11
**california** 1:23 5:22 6:4,8,14 66:5 66:13,23
**call** 18:9 43:5
**called** 15:8,11,12 16:1 22:6
**calls** 43:11
**care** 27:16
**caribbean** 14:2
**carolina** 43:14,15
**case** 8:14 19:12,25
**cases** 19:15,20,23 20:4,15
**cash** 41:19
**cause** 5:9 31:11

**caused** 31:16
**caution** 48:25 57:24
**certain** 47:17 57:20
**certificate** 66:1
**certification** 3:7 24:6,22 25:2
**certified** 5:6 66:12
**certify** 66:5
**chairman** 62:10
**change** 31:11,16
**changed** 21:9 31:14
**charitable** 36:1,2
**chart** 25:5 26:9
**chattanooga** 1:3 8:14
**check** 22:4,5
**checked** 26:16
**chicago** 12:20
**chief** 14:5,17,23
**child** 40:1,2
**circles** 32:14
**city** 13:5 22:18,21 22:25
**cla** 34:25
**claim** 48:7 52:15
**claiming** 52:2
**claims** 52:11
▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮
**clarification** 20:8 51:3
**class** 25:5
**clerks** 9:24
**click** 25:24
**client** 49:2
**clients** 18:9
**climate** 22:24

**colleague** 9:18
**college** 13:3
**come** 61:3 62:5,11 63:24
**comeragh** 3:20 40:24 41:3,4,5,15 41:21,25 42:4,9,13 42:16,19 43:2,13 44:3,9
**coming** 34:20 44:24 45:24
**commencing** 5:4
**committee** 54:16
**communications** 49:2 57:25
**companies** 14:4,14 15:7,25 16:8,9 17:17 18:3 22:3 27:19
**company** 13:4 14:1 15:8 16:1 19:16 22:6,7 28:11,19 37:1 41:16 63:2
**company's** 29:7
**competed** 16:25
**complete** 43:19
**completion** 66:17
**components** 15:7
**computer** 57:17
**conceivable** 37:19 49:12 55:2
**concerning** 63:5,8 63:11,14
**concluded** 27:17 64:25
**conducted** 8:16
**conference** 55:12 58:21,25 59:2,8,25 60:9

**conferences** 54:13 58:3,19
**confident** 28:25
**confirm** 63:23
**conglomerate** 13:23,24
**connected** 47:20 47:22
**connecticut** 5:17
**connection** 24:13 42:22
**conrail** 62:8,10
**consider** 15:17 21:4 48:6
**considered** 48:8
**consistent** 29:16
**constitutes** 66:15
**consultant** 18:10
**contact** 60:25 61:3 62:23 63:4,7,10,13
**contacted** 61:5,6 61:13
**continue** 8:7 10:4
**continued** 17:21 29:20,22 30:24
**continuing** 29:23
**contributions** 36:1 36:2
**control** 14:2
**conversation** 27:23 49:4,22
**conversations** 8:6 55:15
**conveyance** 19:13 19:14
**copy** 64:21
**corley** 6:16 9:11 9:11
**corp** 13:19,22 15:4 15:17

Case 1:19-cv-00098-TRM-CHS   Document 131-2   Filed 12/18/20   Page 70 of 80
PageID #: 3428

**corporation** 3:20 13:8,12 40:24 41:1,6,15,21,25 42:5,10,13,19,21 43:3 44:3,9
**correct** 17:22 29:18 36:17 39:19 41:2,6 45:5 46:5 51:12 52:21 53:12 61:1,24 66:15
**counsel** 8:10,17 9:1 11:17,19 57:25 60:17 63:23
**couple** 58:3,24 60:10
**court** 1:1,22 3:7 8:13,20 10:3,25 20:5,6,18 21:21 24:5
**cove** 22:12,22
**cover** 23:16
**create** 46:12
**crr** 1:18 66:22
**crude** 16:3
**cruise** 14:2
**csr** 1:19 66:23
**currently** 12:14 22:11,17
**custodian** 39:22 39:25 40:1 45:4
**customarily** 28:13 57:8
**customary** 29:3,12
**cv** 1:10 8:15

**d**

**d** 2:1 45:3
**d.c.** 13:6
**darn** 43:20
**dash** 23:12
**date** 8:2 11:23 26:11 47:8

**dated** 3:9 4:1 27:2 33:12 51:11 53:11
**daughter** 24:24 39:24,25 41:14 42:6 47:25 48:24 49:11,18 52:12
**dave** 27:10 56:9
**david** 7:8 8:19 17:8 60:25
**day** 5:4 59:3 66:20
**days** 62:7
**dbaskshi** 6:9
**deal** 18:20
**death** 37:17
**debashish** 6:6 9:25
**deceased** 54:10
**december** 16:21 17:17,20 29:15,21
**decide** 27:7 48:9 57:12
**decides** 30:20
**deciding** 27:25
**decision** 20:25 31:12,14,17 46:24
**decisions** 26:19,22 33:20 34:1,11 35:13 36:19 40:3 40:9 41:8 42:1 45:10,15 46:13 57:5
**defendant** 6:10
**defendants** 1:13 3:6 7:1 8:11 9:8 9:10,12,14,16 23:24 31:22 34:18 36:7 39:8 40:16 44:19 45:19 50:21 53:4 60:17,23
**definition** 31:10 31:12,13

**degree** 12:17,23
**deirdre** 3:17 24:6 24:22 33:16,17,18 33:24,24 37:14,20 38:6 39:3,17,21 40:5 41:14,22 45:3 48:12 52:1 53:23
**deirdre's** 39:25 45:9
**delaware** 37:12 42:25
**delegated** 51:25
**deponent** 5:14 9:22
**deposed** 10:13,19 10:24 58:4,10,14
**deposition** 1:16 5:1 8:10,16 24:4 57:23 58:7,12 64:17,18,25 66:6 66:10,16
**description** 3:2,6
**detail** 3:11,16,20 3:22,23 35:5 39:16 40:23 45:2 46:1
**details** 49:7,11
**died** 37:18
**diego** 6:8
**different** 27:13 34:24 49:13
**directors** 46:25 47:4
**discussed** 18:3 48:23 49:6,17
**discussing** 49:10
**discussion** 55:7,8
**discussions** 62:15
**dissolved** 38:17

**district** 1:1,2 8:13 8:14
**division** 1:3 8:14
**divorce** 19:19,23
**divorces** 19:6
**divulge** 49:1 57:25
**document** 3:11 23:4,5 24:4,8,18 25:11 26:11,14 31:21 32:15,24 33:10,13 35:3 36:14 39:15 40:22 44:23 45:1,25 51:10,20,23 52:18 53:10
**documentation** 28:4
**documents** 28:5 31:19 55:24 56:4 56:13,15 57:3
**doing** 18:19 29:2 55:3
**dowd** 6:3,7
**download** 57:13
**downloaded** 56:20 57:2
**due** 46:10
**duly** 5:8

**e**

**e** 2:1 3:1 6:2 17:8 47:19 55:24 57:10 58:2
**earnings** 27:14 28:10 29:7 30:2
**eastern** 1:2 8:13
**employed** 12:14
**employee** 42:9
**employers** 13:15
**employment** 13:3 18:12

Page 4

Veritext Legal Solutions
866 299 5127

| | | | |
|---|---|---|---|
| **ends** 41:6 46:4 | 31:20,22 32:1,3,6 | **filings** 28:18 | **found** 56:22 |
| **england** 16:13 | 32:13,20 33:10 | **finance** 13:1 | **four** 17:19 19:5 |
| **enterprises** 1:11 | 34:14,14,17,18,24 | **financially** 8:24 | 54:21 61:21 |
| 6:10 8:12 | 35:3 36:5,6,7,10 | **find** 23:6 | **francisco** 6:4,14 |
| **entitled** 66:8 | 36:13 39:7,8,11,15 | **fine** 43:9 | 22:14,15,20 |
| **entity** 54:7 | 40:15,15,16,22 | **finish** 11:2 48:19 | **fraudulent** 19:13 |
| **equal** 41:13,23 | 44:17,18,19 45:1 | 63:25 | 19:14 |
| **escapes** 16:14 | 45:18,19,22,25 | **firm** 11:20 | **fraus** 13:4 |
| 17:10 | 50:19,20,21 51:8 | **first** 5:8 24:20 | **freight** 15:11 |
| **esq** 5:15,19 6:2,6 | 51:10 53:3,4,8,10 | 27:1 32:8 42:23 | 16:12 22:7 |
| 6:11,16,16 7:2,2 | **exist** 13:8 | 47:2 51:14,19 | **front** 32:24 |
| **estate** 18:20,20 | **existed** 16:25 | 52:19 58:21,25 | **full** 10:11 66:15 |
| 19:25 20:3 35:24 | **exited** 17:16 | 59:25 60:2 62:7 | **fuller** 55:3,10,13 |
| 35:25 36:3 37:7 | **expect** 45:8 | **five** 15:24 16:8,9 | 55:16,19 |
| 37:18,20 41:16 | **experience** 15:16 | 16:17 17:17 19:5 | **functions** 55:11 |
| 42:2,16 44:6,8 | **expert** 18:14,24 | 50:1,3,7,9 54:21 | **funds** 37:9 |
| 46:9,11,22 | 19:3 20:17,17 | 61:22 63:23 | **further** 63:20 |
| **estimates** 27:14 | 21:4,12 | **floor** 5:21 | **g** |
| **et** 1:12 8:11,12 | **expertise** 19:8 | **florida** 21:20 | **g.g.** 16:12,24 17:2 |
| **europe** 15:10 | **express** 15:6,6 | **folder** 23:9 32:22 | **gabe** 16:11 |
| **european** 15:10 | **f** | 32:22 36:11 39:13 | **gather** 45:8 |
| 18:13,13 | **fact** 24:15 54:21 | 40:20 44:23 45:23 | **geller** 6:3,7 10:1 |
| **everybody** 9:15 | **fair** 11:15 21:3 | 53:8 | 51:5 |
| 32:12 64:14 | 23:1 | **follow** 47:13 | **generally** 27:19 |
| **exactly** 23:19 28:6 | **familiar** 15:18 | **follows** 10:7 | 41:10 |
| **examination** 2:5,6 | 35:10 | **foregoing** 66:6,14 | **georgia** 6:19 42:21 |
| 10:8 60:20 | **family** 37:21,21 | **forget** 15:12 43:10 | 42:22,24,25 43:17 |
| **examined** 5:9 | 48:13 49:5 | 62:21 | 44:7 |
| **excess** 37:9,9 | **far** 20:6,18 | **forgot** 20:12 59:22 | **getting** 12:16 |
| 41:19 | **fargo** 63:8 | **forgotten** 17:14 | **give** 11:6 13:2 |
| **excuse** 22:19 33:6 | **fax** 1:24 | **form** 20:7 28:19 | 20:22 21:1 31:20 |
| **executive** 13:20 | **february** 55:12 | 52:13 | **glasses** 25:23 |
| 14:5,9,11,15,19,21 | **federal** 24:7 | **formed** 38:12 54:3 | **gmail** 56:5,12 |
| 14:24 42:12 54:16 | **fellow** 17:8 | 54:4 | **go** 8:8 10:22 23:3 |
| **executives** 14:17 | **fenner** 62:24 | **forth** 25:5 | 26:1 31:18 37:20 |
| **exhibit** 3:7,8,9,11 | **figueroa** 5:21 | **forthcoming** 9:19 | 43:25 50:12 56:24 |
| 3:14,16,20,22,23 | **file** 46:24 | **fortune** 13:24 | 62:6 64:2 |
| 4:1,2 23:3,4,6,7,11 | **filed** 3:7 8:12 24:4 | **forwarder** 15:11 | **god** 43:23 60:3 |
| 23:12,15,15,24 | 28:20 29:5 30:3 | 22:8 | **goes** 35:24 |
| 24:3,5,14,21 26:20 | 47:3 | **forwarding** 15:9 | **going** 10:22,24 |
| 26:24 29:14 30:10 | | | 31:18 34:13,21 |

Case 1:19-cv-00098-TRM-CHS   Document 131-2   Filed 12/18/20   Page 72 of 80
PageID #: 3430

36:6 39:6 40:14 43:5,18 44:17 45:17 50:18,19 52:14 53:2 59:19 64:4
**good** 8:1 9:6 10:10 18:20 50:4 64:14
**gosh** 10:20 27:17
**government** 13:8
**graduate** 12:21,23
**granddaughter** 39:24
**grandson** 45:9
**great** 32:18 51:10
**ground** 10:22
**group** 14:4,19,20 14:20
**guess** 16:23 18:9 31:9 40:13 58:20
**guy** 17:9,14 62:11

**h**

**h** 3:1
**hac** 9:19
**hand** 66:20
**happens** 20:22 34:15
**hauler** 16:3,3
**hauls** 16:2,2
**head** 11:8
**hear** 38:1 63:15
**heard** 63:16
**hearing** 44:12
**held** 15:4
**hello** 55:5
**helms** 15:6
**helped** 24:16
**hendershott** 1:18 5:5 8:21 66:4,22
**hereto** 25:6
**hereunder** 66:19

**hill** 21:8
**history** 3:11,16,20 3:22,23 13:3 18:12 35:5 39:16 40:23 45:2 46:1
**hold** 17:21 25:21 32:3 43:4
**holdings** 44:8
**honest** 21:1 28:21 43:1
███████████
███
**hook** 44:12
**hopefully** 63:24
**hopkins** 5:19
**hour** 5:4 60:4
**hours** 60:6,10
**hover** 25:22

**i**

**identification** 23:25 31:23 34:19 36:8 39:9 40:17 44:20 45:20 50:22 53:5
**illinois** 21:21
**important** 18:11 18:16
**incorporated** 37:11
**indicated** 17:16 18:23
**indicates** 25:3 33:13
**indicating** 32:20
**individual** 32:9 33:14,15
**individually** 1:6
**initial** 14:20 47:4
**instances** 55:9
**instructions** 35:24

**instructs** 12:5
**interchange** 27:9
**interested** 8:24
**interim** 30:4 62:13
**interject** 23:21
**intermountain** 15:6
**international** 13:12,19,22 15:3 15:11,17
**internet** 47:13,13 56:17
**interrupt** 56:25
**interruption** 20:8 51:3
**invest** 27:7,25 30:25
**invested** 47:17
**investment** 21:10 21:23 26:10,18 29:23 31:11,14,17 33:19 34:1,8,11 35:13 36:19 40:3 41:8,25 45:10 46:13 54:12 55:24 56:14,20 57:4,11
**investments** 18:19 21:25
**investor** 57:2,12
**investors** 47:17
**involved** 16:23 18:2,5,7,25 19:24 42:17 48:1
**involvement** 15:20 15:23 41:24 46:23
**involving** 19:3,15
**inway** 15:9
**ira** 3:12 35:6,9
**issue** 19:17
**issued** 28:11 30:2

**iu** 13:12,18,21,23 15:3,16 18:1

**j**

**j** 3:12 7:2 35:5,9 46:2
**j.p.** 63:5
███████████
**jcorley** 6:20
**jeremy** 7:9 9:23
**jessica** 6:16 9:11
**job** 14:20
**john** 1:16 2:4 3:12 5:1,7 8:10 9:22 10:5,12 24:16 29:9 35:5,9 44:11 46:2 50:2 62:2 63:22 64:9,17 66:6
**jonathan** 24:16
**joseph** 10:12
**judgment** 30:20
**june** 54:5

**k**

**kaiser** 1:23
**keel** 6:16 9:9,9
**keep** 57:8
**kemp** 7:9 9:23
**keystone** 14:1
**kimberly** 1:18 5:5 8:20 10:25 11:7 66:4,22
**kind** 46:11 50:8
**king** 6:12,17 9:7,9 9:11
**knew** 61:9,10,23
**know** 12:9 15:14 17:13 20:6,18 21:14 22:5,8,16 25:17 26:5 28:8 28:23 30:5,19,21

Page 6

31:8 32:6,16 34:6 34:17 36:3,10 38:12,21,21,22,22 39:12 40:19 42:7 43:4 44:22 45:23 46:10 50:24 52:25 53:7 54:6 55:2,3 56:5 57:7,7 59:17 60:3,3,7 61:12,17 61:18 62:5,19
**knowledge** 18:15 53:16
**known** 62:12
**korsinsky** 5:16,20 9:21,24 11:20 47:16,23
**ks** 28:19
**kslaw.com** 6:15,20 6:20

**l**

**labeled** 3:7 24:5
**lady** 59:12,14
**lake** 22:23,23
**land** 43:16
**landstar** 15:8
**large** 13:23 14:4
**larkin** 62:2,3,5,16
**late** 13:6
**law** 9:24
**lawsuit** 19:3 46:24 47:2,10 48:1,24 49:17 52:21
**lawsuits** 18:15,24
**lawyer** 12:4 46:11 59:16,19
**lawyers** 49:18 58:18
**lbugni** 6:15
**lead** 52:15 53:23
**learn** 47:2,10

**left** 43:22
**legal** 8:21 64:19
**levi** 5:16,20 9:21 9:24 11:20 47:16 47:16,23 56:1
**lewis** 1:6 8:11
**liability** 37:1
**ligon** 15:9
**limited** 37:1
**line** 14:3,10,24 48:17,19 63:25
**lines** 13:5 15:3,5 16:12
**liquid** 16:3
**lisa** 6:11 9:6 23:16 32:25 48:15 50:25
**listed** 27:4 31:20
**listen** 43:6
**lists** 25:12
**litigation** 25:4
**little** 12:16 15:14 25:23 43:6
**live** 22:11,12,18,20
**llc** 3:15 36:16,24 36:25 37:4,11,12 37:13 38:2,12,14 38:16,18
**llcs** 38:22
**llp** 5:16,20 7:3
**loading** 36:6
**located** 22:13 42:20
**logistics** 22:7
**logs** 22:9 24:7
**long** 12:10 17:14 28:2 29:11 49:25 50:2 54:4 59:25 60:9,11 61:17,18
**look** 19:16 22:10 23:7 24:16 25:1 25:16 26:4 28:5

28:19 63:17
**looked** 27:16 28:4 28:7,8,9,25 29:4,6 29:11 56:11
**looking** 25:19 28:18
**looks** 27:2 29:14 43:10
**los** 5:22
**loss** 37:23,24
**lot** 22:25 49:12,12
**lower** 27:18
**loyola** 12:20,25
**lynch** 62:24

**m**

**m** 46:2
**magnifying** 25:23
**mail** 47:19 58:2
**mails** 55:24 57:10
**major** 12:25
**majority** 19:21
**making** 41:25 48:6
**mallory** 7:9 9:23
**manager** 38:2
**manages** 46:19
**managing** 18:18 38:6,9
**mardin** 3:15 36:16 36:24,25 37:4,5,11 37:13 38:2,12,14 38:16,16
**mark** 31:21 34:13 36:5 39:6 40:14 44:17 45:17 50:19 53:2
**marked** 3:2,4,6 23:4,24 31:22 32:1 34:18 36:7 39:8,11 40:15,16 44:17,19 45:19,22 50:21 53:4

**market** 21:9 27:13
**material** 30:11,18 30:20,23 31:8,9,10 31:15
**materials** 27:24
**matter** 8:11 19:7 24:15
**max** 55:2,10,16,19
**mcnabb** 21:21
**mean** 21:6 30:17 30:19,19,20 49:11 52:3 56:25 57:9
**meaning** 51:23
**meant** 54:23
**media** 8:9 64:18
**meet** 54:11,19
**meeting** 54:12 55:21 62:7
**meetings** 54:16 58:18
**member** 37:17 38:7,10
**members** 37:13 48:13
**memo** 58:2,6,17
**mentioned** 14:8 44:6 49:19 60:24 61:23
**merits** 49:6,10
**merrill** 62:24
**message** 43:18,22
**met** 53:25 54:9,25 55:2,20 62:12
**michael** 37:15 39:3 41:14,22 49:20 53:12,14,20
**microphones** 8:4
**middle** 13:7,10,10 13:11
**mike** 37:20

Veritext Legal Solutions
866 299 5127

| | | | |
|---|---|---|---|
| **mind** 48:18 | **ne** 6:18 | **oh** 10:20 20:12 | **ownerships** 38:21 |
| **minor** 40:2 | **need** 12:6,9 32:15 | 21:14 23:18 26:1 | 38:24 39:2 |
| **minus** 25:23 | 43:8 50:2,2,5,6 | 32:5 40:5 46:22 | **owning** 18:2 |
| **minute** 25:15 26:3 | **nevada** 22:12,23 | 54:20 60:3 61:21 | **owns** 17:6 33:22 |
| 31:20 | **never** 61:9 | 63:18 | 33:24 35:16 36:22 |
| **minutes** 50:1,3,7 | **new** 7:5,5 16:13 | **okay** 10:18 11:10 | 37:5 40:11 41:11 |
| 50:10 60:13,13 | 59:12,14 | 11:25 14:8,13 | 41:16 42:16,24 |
| 63:23 | **news** 47:15 | 18:23 19:15 20:12 | 43:13,13,14,16 |
| **misrepresentation** | **nice** 22:18,21,24 | 22:11 23:22 24:11 | 44:3 45:7,8 46:16 |
| 30:24 | 64:14 | 24:17,20 25:10,15 | 48:3 |
| **misrepresentatio...** | **nicolaus** 61:1 | 25:19 26:2,2,3,8 | |
| 30:11 | 62:18 | 26:18 27:7,23 | **p** |
| **misstatement** | **nodded** 55:5 | 28:2,9 29:19 | **pacific** 15:5 |
| 30:19 31:8,9 | **north** 43:14,15 | 31:18,25 32:5,5,11 | **page** 2:3 23:16 |
| **moment** 16:15 | **note** 8:4 | 32:23 33:18 34:22 | 24:20,21 32:8 |
| 17:11 63:17 | **notes** 63:17 | 34:23 35:9 36:12 | 46:8 51:14,16,19 |
| **monday** 59:3 | **notice** 5:3 | 36:13 39:6 40:14 | **papp** 7:9 9:23 |
| **montgomery** 6:3 | **noticing** 9:4 | 40:21 43:25 44:14 | **paragraph** 25:1 |
| **months** 12:1,3 | **number** 3:18 8:15 | 44:25 45:24 46:23 | 52:19 |
| **morgan** 63:2,5 | 18:8,14 29:20 | 49:24 50:6 52:11 | **pardon** 22:19 |
| **morning** 8:1 9:6 | 33:14 36:16 39:18 | 53:2 58:1,11 | **parent** 14:12,15 |
| 10:10 24:12,18 | 41:5 45:4 46:3 | 59:21 60:8 63:19 | 15:4 40:1 |
| 58:20 59:10 60:11 | 64:17 | 64:16 | **parsons** 16:12,23 |
| **move** 52:8 | **nw** 21:18 | **old** 57:10 | 16:24 17:3 |
| **moves** 20:23 | | **omm.com** 7:6,6 | **part** 14:3 15:24 |
| **multiple** 27:18 | **o** | **ones** 15:14 21:22 | 16:7 22:16 35:25 |
| **myers** 7:3 9:14 | **o'melveny** 7:3 | 56:22 | 48:3 |
| 60:23 | 9:13 60:22 | **ooo** 1:4 5:11 | **participants** 8:17 |
| | **oakland** 1:23 | **operating** 14:17 | **parties** 8:7 |
| **n** | **object** 12:4 | **opinion** 20:4,16,17 | **party** 8:23 49:5 |
| **n** 2:1 | **objection** 20:7 | 20:23 21:12 | 52:2,2,15 53:23 |
| **name** 8:19 10:11 | 29:8 30:6,12 31:1 | **originally** 17:23 | **pat** 54:9,11,19,24 |
| 16:13 17:10,15 | 34:3 38:4,19 | **outcome** 8:25 | 55:19 |
| 33:15 41:1 48:7 | 42:14 47:6,11 | **owned** 13:25 14:1 | **pause** 32:13,25 |
| 56:5 59:15,23 | 48:2,10 51:24 | 14:1,2 15:24 16:7 | **pay** 20:25 |
| 62:21 | 52:13 53:21 | 17:7,9 38:14 | **peachtree** 6:18 |
| **named** 17:8 49:5 | **objections** 9:3 | 41:13 42:23 | **pending** 12:11 |
| 52:3 66:7 | **october** 1:20 5:4 | **owner** 17:2 | **people** 56:1 61:9 |
| **names** 15:2 21:16 | 8:3 66:20 | **owners** 17:25 | 61:11,24 62:1 |
| **national** 13:5 | **offering** 28:4 47:5 | **ownership** 17:16 | **pepsico** 13:6 |
| **natural** 48:16 | **officers** 46:25 47:3 | 17:22 21:24 | **percent** 16:1 17:2 |
| | | | 17:4,5,6,7,8,21,24 |

Veritext Legal Solutions
866.299.5127

22:17 34:1 39:4
**percentage** 38:21
  38:23 39:2
**perfect** 24:2 33:5
**period** 25:5 30:1
  47:18
**periodically** 57:9
**person** 52:1,15
**phone** 43:9,22
  44:11
**pick** 8:5
**pie** 15:9,12
**piece** 43:16
**pierce** 62:24
**pipeline** 14:1
**place** 8:7 66:8,11
  66:16
**plaintiff** 1:9 24:6
  51:6
**plaintiff's** 3:2
**plaintiffs** 5:14 6:1
  9:22 10:1
**planning** 46:9
**plaza** 1:23
**please** 8:4 9:3
  10:10 11:1,6,12
  12:9 20:13 23:5
  31:25 36:11 37:3
  39:12 40:19 44:22
  45:23 50:24 53:7
  64:3,24
**plus** 18:14 25:24
  25:24 41:18 58:19
**point** 12:10 15:25
  18:14 33:8 48:16
  48:17
**port** 43:16
**portfolio** 22:4,10
  41:18 47:13
**position** 13:18

**possible** 49:19
  61:6
**practice** 29:3,12
**pre** 62:7
**preexisting** 61:7
**preference** 28:16
**prepare** 57:22
  58:7,11
**prepared** 26:14
**present** 7:7 66:7
**presentation**
  55:14
**president** 13:20
  14:9,11,15,21,22
  17:9
**prices** 47:14
**primarily** 14:7
  15:10 19:9
**prior** 24:17,18
**private** 8:5
**privileged** 49:2
**pro** 9:18
**probably** 28:5
  29:1,25 56:10
  57:17
**probate** 46:11
**problem** 16:17
  17:12 20:14 23:20
  32:16 33:1 44:16
  48:21
**proceeding** 9:3
**proceedings** 66:16
  66:17
**proceeds** 52:20,24
**process** 11:24
**produced** 5:7
**promoted** 14:19
  14:21
**properly** 26:23
**property** 37:5,6
  42:23,24 43:3

**proportion** 38:23
**provide** 19:17
**provided** 16:19
**public** 15:7 47:4
  54:5,6,7
**pull** 23:5 31:25
**purchase** 27:1
  29:15
**purchases** 25:12
  25:16 26:4,8,13,19
  26:22 29:20,24
  30:9 34:9
**purge** 57:10
**pursuant** 5:3 24:7
**put** 63:24

**q**

**qs** 28:5,12 29:5
  30:3
**quarterly** 28:10
  28:13
**question** 11:11,12
  11:14 12:5,6,11
  20:13 27:11 30:15
  30:17,18 31:2
  51:1 54:2,3
**questions** 10:25
  48:17 60:15,16,18
  60:19 64:10
**quinn** 54:9,11,19
  54:24 55:19
**quite** 10:21 11:23
  11:24 27:18

**r**

**r** 1:18 5:5 6:11,16
  66:4,22
**radcliffe** 6:2 51:5
**radiant** 22:6
**railway** 13:9
**raleigh** 43:14 44:7

**ranger** 15:8
**rate** 62:10
**reach** 48:15
**read** 25:8 28:14,16
  28:16,24 29:1
  30:3 57:19,21
  58:2,2,2,6,13,14
**ready** 25:18,19
  26:6,7 32:17
**real** 18:20,20 31:3
  35:25 37:7,24
  41:16 42:2,16
  44:6,8
**really** 20:21 21:2,8
  22:7 29:17 37:18
  42:15 49:3
**reason** 53:22
**recall** 15:2 21:16
  24:19 28:3,6,21
  29:2,17 47:18
  49:10,21 54:12
  55:3,17 58:19
  62:22
**receive** 52:20
**recognize** 13:25
**recollection** 26:10
  27:12 29:16 55:21
  58:15
**record** 8:2,8 9:2
  10:11 24:3 33:10
  35:3 36:13 43:19
  50:12,13,17 51:1
  63:24 64:3,5,8,20
**recorded** 8:9
**recordings** 8:6
**redwan** 7:2 9:18
**reflect** 26:10
**reflected** 26:5,9,20
  26:23 27:1,14
  30:10 46:7

| | | | |
|---|---|---|---|
| **refresh** 32:21,22 | **reports** 56:20 57:2 | **rough** 64:22 | 34:15,21,23,23 |
| **refreshed** 58:15 | 57:11,13 | **roughly** 39:3 | 49:11 57:7 60:2 |
| **refuse** 37:19 | **represent** 8:21 | **royal** 14:2 | 62:11 63:18 |
| **registration** 28:24 | 11:21 60:23 | **rpr** 1:18 66:22 | **seeing** 24:19 |
| **regroup** 50:8 | **represented** 11:17 | **rsaleh** 7:6 | **seeking** 47:17 |
| **related** 8:23 47:4 | **requested** 66:18 | **rudman** 6:3,7 | **seen** 24:8,17 55:5 |
| 49:1 55:24 56:13 | **resold** 18:22 | **rules** 10:23 | **send** 56:2 |
| 56:19 | **respect** 34:8 38:16 | **run** 56:7,9 | **sense** 11:9 12:7 |
| **relation** 14:14 | 40:7 45:13 | **ryder** 15:5 | 31:16 |
| **relationship** 61:7 | **responded** 47:20 | | **sensitive** 8:4 |
| **release** 28:16 29:7 | **responses** 11:7 | **s** | **sent** 28:17 47:18 |
| **releases** 28:10 | **responsibilities** | **s** 3:1 5:21 | 56:21,22 57:14 |
| 30:2 | 14:13 | **saleh** 7:2 9:18 | 58:1,6 62:10 |
| **rely** 58:7,11,13 | **retain** 11:21 | **sales** 25:13,16 26:4 | **sentence** 52:19 |
| **remainder** 39:4 | **retained** 52:19 | 26:8,13,19,22 34:9 | **series** 10:24 |
| **remaining** 17:6 | 64:19 | **san** 6:4,8,14 22:14 | **served** 18:23 19:2 |
| **remember** 16:15 | **retired** 15:21 18:1 | 22:15,20 | **services** 16:19 |
| 19:12 20:20 21:22 | **review** 27:25 | **savannah** 43:17 | **set** 25:5 |
| 30:7 47:7 49:15 | 55:23 66:18 | 44:7 | **settled** 20:20,24 |
| 56:8 57:8 58:23 | **reviewed** 57:4 | **saw** 24:11 47:15 | **shake** 11:8 |
| 59:6,15 61:6,18 | **rgrdlaw.com** 6:5,9 | **says** 23:11 32:8 | **shannon** 5:19 59:1 |
| 62:4,7 | **richards** 17:15 | **schedule** 25:11 | 59:9,12 |
| **remembered** 5:3 | **rid** 43:5 44:14 | 29:19 | **share** 23:3,6 24:14 |
| **remembers** 49:14 | 57:10 | **school** 12:19 | 32:13 |
| **reminded** 58:15 | **right** 14:10 18:25 | **scroll** 25:11 | **shareholders** |
| **remote** 8:17 | 19:18 23:15,19 | **search** 56:3,13,21 | 41:20 |
| **remotely** 8:18 | 28:12 29:7 33:16 | **searches** 56:7 | **sheet** 27:16 |
| **rendered** 20:15 | 35:7,19 38:20 | **sebastian** 5:15 | **ship** 14:3 |
| 21:11 | 40:24 44:16 50:18 | 9:17,20 11:20 | **shopkins** 5:23 |
| **rental** 42:16 | 52:3,20 62:23 | 12:5 20:9 23:19 | **short** 22:6 27:21 |
| **rephrase** 11:12 | **ringing** 43:6 | 49:25 56:23 57:15 | 48:18 |
| **report** 14:24 66:15 | **robbins** 6:3,7 10:1 | 59:1,9,13,18 64:9 | **shorthand** 5:6 |
| **reported** 14:17 | 51:5 | **sec** 28:4,17,18 | 66:4,11,12 |
| 15:8 | **role** 19:16 | **second** 27:3 32:13 | **show** 47:15 |
| **reporter** 5:6 8:20 | **rollover** 3:12 35:6 | 32:15 51:16 58:23 | **shown** 38:6 |
| 10:3 11:1 20:8 | 35:9 | 59:2 60:8 | **side** 9:16 20:2 |
| 51:3 64:23 66:5 | **room** 55:4,10,13 | **securities** 24:7 | **sign** 51:20 |
| 66:12 | **roosevelt** 16:2 | 63:5,8,14 | **signature** 51:14,17 |
| **reporter's** 66:1 | **ross** 27:10,24 56:9 | **see** 16:11 17:13 | 53:17,17 66:22 |
| **reporters** 1:22 | 60:25 61:4,12,17 | 18:8 23:8 24:21 | **signed** 25:2 52:7 |
| | | 25:7,21 26:1 27:5 | 53:20 |
| | | 30:1 32:2,4,5 | |

Veritext Legal Solutions
866 299 5127

**similar** 16:5,18
**similarly** 1:8
  45:14
**sir** 10:10 13:2,17
  16:6 20:11 22:11
  23:2 26:15,25
  31:25 34:16 35:2
  36:4,17 38:1
  39:11 40:20,24
  41:4 44:22 45:5
  45:23 46:5 50:18
  51:8,12 53:8,12
  54:8 56:24 63:16
**sit** 37:14
**situated** 1:8
**slowly** 34:20 44:24
**small** 14:3
**smith** 62:24
**solutions** 8:22
  64:19
**somebody** 26:14
**son** 37:15 41:13
  42:6 45:9 49:20
  53:14
**son's** 53:17
**soon** 48:16
**sorry** 9:17 16:16
  17:10 20:9,12
  23:20 37:22 38:1
  38:5 43:7,20
  44:15 50:25 54:23
  56:24 59:22 63:18
**sources** 56:13
**spalding** 6:12,17
  9:7,10,12
**specific** 31:19
**specified** 66:9
**spinning** 32:14
**square** 7:4,4
**stamford** 5:17

**stamp** 35:4 36:14
**stamped** 3:9,11,14
  3:17,21,22,24 4:1
  4:2 33:11 39:15
  40:22 45:1,25
  51:11 53:10
**stanley** 63:2
**started** 28:7
**starting** 27:8
**state** 9:1,3 10:10
  66:5,12,23
**statement** 3:9,14
  28:24 32:9 33:12
  36:15
**states** 1:1 8:13
**stay** 29:22
**stein** 1:6 8:11
**stevens** 63:11
**stifel** 27:10,24
  55:12 56:9 60:25
  61:8,24 62:18
**stock** 17:25 33:22
  35:16,20 36:22
  37:8,10 38:14
  40:11 41:11,17,18
  46:16 47:14 48:4
  56:18
**stopping** 48:16,16
**stornatore** 5:18
**strange** 22:25
**street** 5:16,21 6:3
  6:13,18
**stuff** 28:8
**subject** 19:7 25:4
  60:15
**subscribed** 66:20
**substance** 49:16
**substantive** 24:20
  55:7
**suite** 1:23 5:17 6:4
  6:13,18

**summer** 5:16
**supposed** 58:16
**sure** 10:17,21
  11:23,24 12:2
  20:20,21 21:2,14
  28:3,3,22 29:2,10
  33:1 38:11,21,22
  43:8 48:19 50:9
  52:3 56:9 61:5
**surprised** 54:20
**sushon** 2:6 7:2
  9:13,13,17 32:19
  33:3,6 60:16,19,21
  60:22 63:19
**swear** 10:3
**sworn** 5:8 10:6
  66:7

      **t**

**t** 3:1
**tahoe** 22:23
**take** 8:7 11:2,7
  12:10 25:15 26:3
  32:13 43:8 48:20
  49:24 50:9 63:22
  64:24
**taken** 1:18 8:10
  50:15 64:6 66:10
  66:11
**talk** 49:12
**talked** 48:13 54:21
  61:15
**talking** 49:15
  62:22 64:15
**tax** 19:25,25 20:3
**teaching** 58:9
**team** 42:12
**technical** 14:18
**technoidiocy** 33:6
**technology** 8:17
**ten** 50:1,3

**tennessee** 1:2 8:14
**terese** 39:5 46:2
**term** 14:18 27:21
**terminal** 43:14,15
**terminals** 18:21
  44:2,4
**terrible** 37:25
**terry** 1:16 2:4 3:9
  3:11,12,14,17,17
  3:18,21,22,24 4:1
  4:2 5:1,7 8:10
  9:22 10:5,12,13
  12:14 24:8,22,24
  25:2 33:11,13,16
  33:17,24,25 35:4,6
  35:9 36:14 37:14
  37:15 38:9 39:16
  39:17,17,21,22
  40:23 45:2,3,3
  46:1,2,3 51:11
  53:11,12,14,20
  60:14,22 63:20
  64:13,17 66:6
**terry's** 24:3,6
  39:24
**testified** 10:7
**testimony** 60:24
**thank** 10:2 23:19
  32:18,25 33:3
  41:4 50:11 59:21
  60:14 63:20 64:10
  64:12,20
**thanks** 37:24
**thing** 18:18 29:1
  43:20 56:16
**things** 18:19 47:15
  56:6,18
**think** 14:18 15:14
  16:11 18:17 20:1
  20:19,19,21 22:2
  23:14,14 27:12,13

| | | | |
|---|---|---|---|
| 28:9 31:10 34:5 34:23 38:23 46:22 47:1,19,20 51:25 55:6,17 56:10 59:4 60:5,10 61:5 62:8,17,21 | **total** 64:17 **tower** 7:4 **trade** 27:20,21 **trades** 56:18 **training** 24:14 **transaction** 3:11 3:16,20,22,23 35:4 39:16 40:23 45:2 46:1 | **types** 16:18 37:6 **typewriting** 66:14 **typical** 40:1 46:9 **typically** 35:22 | **upheld** 20:5,17 **use** 31:12 43:24 44:4 **usually** 28:12 32:22 47:14 **usx** 9:10,12 16:5 **usx's** 28:24 |
| **thought** 27:19,20 30:10 48:11,14 **three** 58:20 61:21 64:18 | | **u** | **utah** 16:2 **utma** 3:18 39:18 |
| | **transactions** 25:3 40:8 45:13 | **u.s.** 1:11 3:12 6:10 8:12 9:7 13:9,9 15:10 16:18,25 21:24 25:3,13 26:11,22 27:8,15 27:25 29:23 30:10 30:25 34:8,24 35:5 40:8 44:3 45:14 46:24 47:3 48:7 54:1,3,25 55:20,22,25 56:14 56:21 57:3,13 61:1,4,13,15 62:16 62:22,25 63:11,14 | **v** |
| **time** 8:2 9:4 10:19 11:3 12:10 13:6 16:25 20:23 21:11 22:16,17 24:11 27:21 28:2 29:11 37:15,25 50:3 54:4 57:4 60:15 62:9 63:20 64:11 64:12 66:8,11 | **transcribed** 66:13 **transcript** 66:14 66:18 **transport** 21:18 **triple** 21:20 **trouble** 25:20 **truck** 15:5 18:21 21:5,5 27:18 43:13,15 44:2,4 | | **valuated** 21:17 **valuating** 21:5 **valuation** 19:9,11 19:15,17 20:1,5,16 21:12 **vanguard** 3:9,14 32:9 33:12 35:23 36:15 56:16 **various** 25:17 47:15 |
| **times** 7:4,4 10:16 16:18 19:2 54:18 54:21 55:4 58:14 | **trucking** 14:4,5,6 14:7,10,14,24 15:3 15:18,21,25 16:1,8 16:9,11,12,19 17:17 18:2,15,24 19:3,16 20:16 21:5,12,17 22:1,9 27:19 54:15,17 | **undergraduate** 12:17 **understand** 11:4 11:11 12:12 16:20 22:21 **understanding** 51:22 52:6,8,23 53:19 | **verbal** 11:7 **veritext** 8:21 64:19 **versus** 8:12 **vice** 9:19 13:20 14:9,9,11,15,20,22 **video** 8:6,9 |
| **today** 8:3 10:23 11:17 22:13 37:14 43:13 57:23 58:8 58:12 59:3 64:11 | | | |
| **today's** 64:18 **told** 58:4 **top** 32:8 **tornatore** 5:15 9:15,20,21 20:7,9 23:14,20 29:8 30:6,12,14 31:1 32:12,18,23 34:3 38:4,19 42:14 44:11 47:6,11 48:2,10,15,21,25 50:1,7,11,25 51:4 51:24 52:13 53:21 57:24 59:20 63:22 64:2,9,21 | **true** 66:15 **trust** 21:10 46:3,7 46:9,18,19,21 **trusts** 46:11 **truth** 21:9 **try** 32:3,6 **trying** 25:20 **tuesday** 59:7 **turn** 25:10 **two** 9:23 13:4 19:13 58:19 60:6 **type** 13:21 19:23 | **understood** 11:13 13:17 16:6 26:15 26:25 36:4 37:22 **underwriter** 7:1 9:14 60:17,23 **undeveloped** 43:16 **union** 18:13 **unit** 8:9 **united** 1:1 8:13 **units** 64:18 **university** 12:20 **updated** 29:22 | **videoconference** 5:6,15,20 6:2,7,12 6:17 7:3 **videographer** 7:8 8:1,20 10:2 50:13 50:16 64:4,7,16 **videotaped** 1:16 5:1 **virtue** 37:17 **vs** 1:10 |
| | | | **w** |
| | | | **w** 6:8 13:15 |

Veritext Legal Solutions
866.299.5127

w.t. 15:6
wait 11:1 32:3
  43:18
want 51:1 52:6,16
wanted 40:6
wants 34:4
way 16:5 25:8
  30:16,17 62:6
we've 18:3
week 59:3
weeks 58:24
welch 1:22
welcome 63:21
wells 63:8
went 28:12 54:4
west 7:8 8:19
western 16:2
  17:19,22 21:25
whatnot 27:17
whereof 66:19
whispering 8:5
wife 37:16 39:5
  42:7 46:18
wife's 51:17
william 7:2
willow 6:2,5 51:4
  59:20,22
wilson 43:15 44:7
winded 38:17
wish 42:25
witness 5:7,9 10:4
  10:6 23:22 29:10
  30:7,13,16 31:2
  34:4,15,20 38:5,20
  42:15 43:23 44:14
  47:7,12 48:3,11,25
  49:3 50:5 51:25
  52:14 53:22 57:24
  58:1 59:22 63:21
  64:14 66:7,19

witnesses 2:3
work 18:11 42:2
  42:17
worked 13:4 53:25
  55:20
working 13:14,14
  62:8
works 55:20
world 18:12 31:4
wr 63:14
wrong 38:6
wsushon 7:6
www.aikenwelc...
  1:25

**x**

x 2:1 3:1
xpress 1:11 3:12
  6:10 8:12 9:7
  16:18 17:1 21:24
  25:3,13 26:11,23
  27:8,15 28:1
  29:23 30:11,25
  34:8,24 35:5 40:8
  44:3 45:14 46:24
  47:3 48:7 54:1,3
  55:1,20,22,25
  56:14,22 57:3,13
  61:1,4,13,15 62:16
  62:22,25 63:5,8,11
  63:14

**y**

yeah 17:23 21:18
  23:18,18,22 26:1
  32:19 41:18,22
  42:2 43:20 48:21
  50:9 52:10 59:6
years 10:20 21:8
  21:15 61:22 62:13
  62:13

york 7:5,5
young 55:13

**z**

zephyr 22:12,22
zlk.com 5:18,23
zoom 58:3,19,21
  58:25 59:2,8,25
  60:8

Page 13

Case 1:19-cv-00098-TRM-CHS   Document 131-2   Filed 12/18/20   Page 80 of 80
PageID #: 3438