UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

CHATTANOOGA DIVISION

| | | |
|---|---|---|
| LEWIS STEIN, et al., Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 1:19-cv-00098-TRM-CHS |
| | ) | CLASS ACTION |
| Plaintiffs, | ) ) | |
| | ) | Judge Travis R. McDonough |
| vs. | ) ) | Magistrate Judge Christopher H. Steger |
| | ) | |
| U.S. XPRESS ENTERPRISES, INC., et al., | ) ) | DATE:    February 8, 2022 |
| | ) | TIME:    3:00 p.m. ET |
| Defendants. | ) ) | |
| | ) | |

REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL THE USX DEFENDANTS TO PRODUCE TEXT MESSAGES AND RELEVANT DOCUMENTS FROM SIX KEY PERCIPIENT WITNESSES AND DESIGNATE A RULE 30(b)(6) WITNESS

4856-4800-3340.v1

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..................................................................................................1

II. ARGUMENT......................................................................................................2

    A. The USX Defendants Misconstrue Relevance........................................................2

    B. The USX Defendants Should Be Ordered to Produce Text Messages ....................4

        1. Defendants Misstate the Applicable Legal Standards .................................4

        2. Defendants Do Not Dispute USX Has Control Over the Custodians' Text Messages ...........................................................................6

        3. The Text Messages Are Relevant ................................................................7

            a. Defendants' Declarations – or Lack Thereof – Do Not Support Their Contentions.................................................................7

            b. Evidence Produced in Discovery Establishes the Custodians' Text Messages Contain Relevant Information.............9

        4. The USX Defendants Fail to Establish Any Burden Associated with Searching the Custodians' Text Messages........................................12

    C. The USX Defendants Implicitly Concede that the Proposed Additional Percipient Witnesses Are Likely to Possess Relevant Documents and Fail to Establish Any Undue Burden ............................................................................12

        1. The Load Planner Witnesses' Documents Should Be Produced ...............13

        2. The Pricing Witnesses' Documents Should Be Produced .........................15

        3. Plaintiffs' Requests Are Proportional to the Needs of the Case, and Plaintiffs Should Not Be Penalized for Costs Related to Restoring Backup Tapes.............................................................................................17

    D. Rule 30(b)(6) Depositions on the Topics of Document Preservation, Collection and Production Are Routine Regardless of Any Deficiencies, Though Plaintiffs Have Identified Plenty in This Case .........................................19

III. CONCLUSION.................................................................................................22

4856-4800-3340.v1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Am. Mun. Power, Inc. v. Voith Hydro, Inc.*,
  2019 WL 6251339 (S.D. Ohio Nov. 22, 2019)..................................................................19

*Aramark Mgmt., LLC v. Borgquist*,
  2021 WL 864067 (C.D. Cal. Jan 27, 2021) ......................................................................8

*Brooks Sports, Inc. v. Anta (China) Co.*,
  2018 WL 7488924 (E.D. Va. Nov. 30, 2018)..................................................................8, 9

*Burrell v. Duhon*,
  2019 WL 5260481 (W.D. Ky. Oct. 17, 2019) ..............................................................2, 15

*Cotton v. Costco Wholesale Corp.*,
  2013 WL 3819975 (D. Kan. July 24, 2013) ....................................................................19

*DR Distrib., LLC v. 21 Century Smoking, Inc.*,
  513 F. Supp. 3d 839 (N.D. Ill. 2021) ...............................................................................5

*Edwards v. Scripps Media, Inc.*,
  331 F.R.D. 116 (E.D. Mich. 2019) .................................................................................22

*First Niagara Risk Mgmt., Inc. v. Folino*,
  317 F.R.D. 23 (E.D. Pa. 2016)....................................................................................5, 16

*Halabu Holdings, LLC v. Old Nat'l Bancorp*,
  2020 WL 12676263 (E.D. Mich. June 9, 2020)................................................................6

*In re Envision Healthcare Corp. Sec. Litig.*,
  2020 U.S. Dist. LEXIS 259982 (M.D. Tenn. Dec. 14, 2020).......................................12

*In re Envision Healthcare Corp. Sec. Litig.*,
  2020 WL 6750397 (M.D. Tenn. Nov. 16, 2020) .....................................................4, 14, 18

*In re Refco, Inc. Sec. Litig.*,
  2010 WL 11586941 (S.D.N.Y. May 11, 2010) ..............................................................10

*In re Toyota Motor Corp. Sec. Litig.*,
  2012 WL 3791716 (C.D. Cal. Mar. 12, 2012)................................................................15

*Kidd v. Lowe's Home Ctrs., LLC*,
  2020 WL 9258481 (S.D. Miss. Dec. 2, 2020) ..................................................................9

4856-4800-3340.v1

*Large on Behalf of Large v. Blazer*,
2022 WL 99986 (M.D. Tenn. Jan. 10, 2022)............................................................................12

*M.A. v. Wyndham Hotels & Resorts, Inc.*,
2020 WL 1983069 (S.D. Ohio Apr. 27, 2020) ........................................................................20

*Moore v. Westgate Resorts, Ltd.*,
2020 WL 7017740 (E.D. Tenn. Jan. 24, 2020)...................................................................21, 22

*Paisley Park Enters., Inc. v. Boxill*,
330 F.R.D. 226 (D. Minn. 2019)..............................................................................................12

*Pannek v. U.S. Bank Nat'l Ass'n*,
2021 WL 5533749 (S.D. Ohio July 21, 2021).........................................................................19

*Siriano v. Goodman Mfg. Co., L.P.*,
2015 WL 8259548 (S.D. Ohio Dec. 9, 2015) ..............................................................13, 17, 18

*Surles ex rel. Johnson v. Greyhound Lines, Inc.*,
474 F.3d 288 (6th Cir. 2007) ...................................................................................................18

*Willis v. Big Lots, Inc.*,
2017 WL 2608690 (S.D. Ohio June 16, 2017) ........................................................................15

## STATUTES, RULES AND REGULATIONS

Federal Rules of Civil Procedure
Rule 12(b)(6)............................................................................................................................13
Rule 26 .............................................................................................................................. *passim*
Rule 26(b)(1)......................................................................................................................17, 20
Rule 30(b)(6)..................................................................................................................... *passim*
Rule 37 ......................................................................................................................................5

## SECONDARY AUTHORITIES

The Sedona Conference,
*Commentary on Legal Holds, Second Edition: The Trigger & The Process*,
20 Sedona Conf. J. 341, 408 (2019)..........................................................................................5

## I.   INTRODUCTION

The USX Defendants' contentions about what is relevant in this case are deeply misguided and suggest there may be far greater problems with their document collection and production than just the issues currently before the Court.  While it is true the Court found only a limited number of statements in the Company's registration statement to be materially false and misleading, *why* those statements were false is multifaceted and complex.  Regardless, Defendants' Opposition provides no basis for denying Plaintiffs' Motion.[1]

First, the USX Defendants cannot so much as bring themselves to cite the correct legal standards applicable to the production of text messages; even then, they fail to rebut Plaintiffs' proof that the USX custodians communicated internally, as well as externally, with customers and underwriters regarding matters directly relevant to the IPO and Plaintiffs' allegations.  In fact, the Opposition concedes that one custodian did use text messages that must now be searched, contrary to the USX Defendants' prior representations to this Court.  Defendants also fail to submit declarations from four additional custodians presumably because they were unwilling to sign a declaration supporting Defendants' contentions.  At the same time, the USX Defendants make no assertions whatsoever regarding the burden associated with searching and producing text messages, making clear that any proportionality analysis overwhelmingly favors Plaintiffs.

Second, the Opposition confirms that the proposed Load Planner Witnesses and Pricing Witnesses are likely to possess relevant documents.  These custodians are meant to fill gaps in the

---

[1]   "Motion" or "Mot." refers to Plaintiffs' Memorandum of Law in Support of Their Motion to Compel the USX Defendants to Produce Text Messages and Relevant Documents from Six Key Percipient Witnesses and Designate a Rule 30(b)(6) Witness (ECF No. 152).  "Opposition" or "Opp." refers to the USX Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion to Compel the USX Defendants to Produce Text Messages and Relevant Documents from Six Key Percipient Witnesses and Designate a Rule 30(b)(6) Witness (ECF No. 157).  All terms not otherwise defined herein have the same meaning as in the Motion.

4856-4800-3340.v1

production to date by targeting documents concerning the promises the Company was making to its customers, whether USX was able to meet its customers' demands and whether USX was in fact prioritizing its Dedicated business segment. All of these issues are central to Plaintiffs' claims and are not duplicative of custodians already at issue. Further, the USX Defendants have not shown that the costs associated with producing documents from the proposed Percipient Witnesses exceed the routine costs of discovery or constitute an undue burden disproportionate to the needs of this case. Plaintiffs are entitled to these proposed Percipient Witnesses' documents.

Finally, Rule 30(b)(6) depositions on the topics of document preservations, collection and production are routine in civil litigation regardless of any proven deficiencies, although Plaintiffs have identified plenty in this action. Here, the USX Defendants ignore the many flaws Plaintiffs identified in their Motion, and their refusal to address Plaintiffs' concerns regarding the steps USX has taken to collect, retain, preserve and produce valuable ESI is precisely the reason a Rule 30(b)(6) deposition is the only answer at this stage of the litigation. The shortcomings identified by Plaintiffs in this case include the extensive delays as a result of identifying the backup tapes, the identification of missing documents from multiple key custodians including Michael Graham and Max Fuller and the lack of any supporting declarations from former USX employee custodians. Without the testimony of a USX corporate representative to address these concerns and explain what steps USX actually took to properly preserve and retain ESI and documents in this case, there is no way Plaintiffs can be assured they are in receipt of all documents to which they are entitled.

## II.     ARGUMENT

### A.     The USX Defendants Misconstrue Relevance

Relevance "is to be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on' any party's claim or defense." *Burrell*

*v. Duhon*, 2019 WL 5260481, at *2 (W.D. Ky. Oct. 17, 2019).[2]  To suggest this case relates to just "two sentences out of 250 pages in [USX's] registration statement" (Opp. at 1) when those statements hid material problems undermining the core justification for the IPO and were false because of broad-ranging undisclosed failures in USX operations presents a dangerously misleading picture of the appropriate relevance inquiry.

For instance, the Court found Plaintiffs adequately alleged the falsity of Defendants' warning that "'*[i]f* we are unable to continue to attract and retain a sufficient number of drivers, we could be forced to . . . continue to adjust our compensation packages or operate with fewer tractors and face difficulty meeting shipper demands, either of which could materially adversely affect our growth and profitability.'"  ECF No. 91 at 32.  This statement was false because the risks of which it warned had already come to pass as a result of myriad undisclosed problems at USX.  *Id.* at 32-33.  Specifically:

> "[1]    USX did not have in place compensation packages sufficient to hire and retain quality truck drivers to meet the demand for its services.  Such incentives and/or compensation required additional expenditures that necessarily would negatively impact [USX's] operating ratio.  Nor were the incentives USX had in place sufficient;
>
> [2]    USX drivers were not among the 'best paid in the industry' nor had USX increased driver pay commensurate with the market wages for trucks drivers which slowed the pace of hiring and hindered retention of drivers;
>
> [3]    [the operational changes failed to] improve load planning or truck maintenance which harmed trucker morale and worsened USX's poor driver retention rates;
>
> [4]    USX was unable to 'prioritize[e] growth in dedicated contract services' because a shortage of drivers . . . was negatively impacting USX's dedicated division, which forced USX to reallocate OTR drivers (at an increased cost) to drive dedicated routes – this was a common practice prior to the IPO which caused underperformance in OTR and continued after the IPO;

---

[2]    All citations and footnotes omitted and emphasis added unless otherwise indicated.

4856-4800-3340.v1

[5]  certain account shipping patterns [i.e., those of USX's largest account, Walmart] had already been negatively impacted . . . adversely impacting utilization as well as driver retention and hiring; [and]

[6]  USX's cost per mile for driver wages and independent contractors was exceeding [its] internal expectations[.]

*Id.* at 33.

This statement alone, and the reasons why it was false, plainly encompasses vast swaths of USX business.  Defendants' vastly limited notion of relevance is inconsistent with this Court's reasoning upholding the Complaint and should be rejected.

## B.  The USX Defendants Should Be Ordered to Produce Text Messages

### 1.  Defendants Misstate the Applicable Legal Standards

Defendants' suggestion that the Court should apply three separately erroneous legal standards should be rejected.

First, Defendants contend Plaintiffs "have the burden of proving a specific, material deficiency in USX Defendants' production of documents to justify additional discovery."  Opp. at 1.  This is plainly not the law, and courts have rejected the identical contention.  *In re Envision Healthcare Corp. Sec. Litig.*, 2020 WL 6750397, at *4 (M.D. Tenn. Nov. 16, 2020) ("Defendants incorrectly state that in order to successfully compel discovery, Plaintiffs must carry a 'well-established burden' to 'point[] to any substantive deficiencies in Defendants' productions.'") (alteration in original).  Consistent with the Federal Rules of Civil Procedure, and as the *Envision* court held, "the movant's burden is to establish that the discovery sought is relevant to any Party's claim or defense."[3]  *Id.*

---

[3]  The USX Defendants' contention is also inconsistent with the Stipulated Document Production Protocol, which provides: "[t]his is an iterative process whereby the Parties agree to revisit, reevaluate, and refine these processes as needed to ensure validity and completeness."  ECF No. 124 at 3.

- 4 -

Second, Defendants contend that the custodians did not use text messages for "substantive business communications." Opp. at 4. What that term means is anyone's guess; the USX Defendants cite no authority to support its use, and it finds no definition in the Federal Rules of Civil Procedure or in relevant case law, which, as set forth above, speak to relevance instead.

Finally, it is not the case that a producing party can simply "rely on the good faith actions of their employees in the discovery process" to determine relevance, as Defendants suggest. *Id.* at 4. Their only support for this proposition, the Sedona Conference, is not persuasive because: (i) it is not binding on any court (*First Niagara Risk Mgmt., Inc. v. Folino*, 317 F.R.D. 23, 29 (E.D. Pa. 2016) ("we note that these principles are not binding on us – while Fed. R. Civ. P. 26 and 37 most certainly are – and thus the Federal Rules are the proper analytical tool for this endeavor")); (ii) the principle they cite, Guideline 10, speaks to compliance with a legal hold, not the determination of relevance (The Sedona Conference, *Commentary on Legal Holds, Second Edition: The Trigger & The Process*, 20 Sedona Conf. J. 341, 408 (2019)); and (iii) case law contradicts their contentions (*e.g.*, *DR Distrib., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 953 (N.D. Ill. 2021) ("'[C]ounsel cannot simply take a client's representation about such matters at face value.' Blind reliance on a client's representation is rarely a reasonable inquiry.") (alteration in original)).

Furthermore, Defendants now appear to concede that they never conducted collection interviews with four agreed-upon former employee custodians (*see* Opp. at 3) despite previously representing to the Court that they "[i]nterviewed document custodians to identify responsive materials." ECF No. 138 at 13. This is inexplicable considering that three of these custodians were ***current*** employees at the time this action was filed (when collection interviews should have taken place) and White, who left USX in late 2018, signed a Separation Agreement requiring him to cooperate with USX and its counsel regarding matters such as this. *Infra* at n.4.

Having failed to so much as attempt to articulate the correct legal standards, it should be no surprise that Defendants' remaining contentions, when analyzed appropriately, utterly fail as well.

### 2. Defendants Do Not Dispute USX Has Control Over the Custodians' Text Messages

There is no dispute that Defendants have "possession, custody or control" with respect to all the custodians' text messages. *See* Mot. at 5-7.

Solely as it relates to four custodians (Ms. Bonneau, Mr. Graham, Ms. Eillson and Mr. Kibler), Defendants contend these custodians used personal mobile devices for all or part of the relevant period. Opp. at 6 n.4. In making this assertion (in a footnote), Defendants ***do not*** contend they lack the ability to retrieve text messages from such devices. Nor does *Halabu Holdings, LLC v. Old Nat'l Bancorp*, 2020 WL 12676263 (E.D. Mich. June 9, 2020), support the notion that Defendants lack the ability to obtain these custodians' text messages. Critically, in *Halabu* the defendants "objected on the grounds that it does not have possession, custody, or control over its employees' personal cell phone devices." *Id.* at *1. Here, the USX Defendants make no such contention. And *Halabu* does not stand for the proposition that information on a personal device is not discoverable from an employer, as Defendants imply. Opp. at 6 n.4. Rather, *Halabu* recognized that "[c]ontrol, then, is context-specific. . . . [E]mployers may contract for the right to access the employees' personal devices, and employers and employees may agree to use software that segregates employer data from the rest of the device." 2020 WL 12676263, at *3. Here, because the USX Defendants do not contend they lack possession, custody or control over any custodian's text messages, the Court should order them to be produced.

- 6 -

### 3. The Text Messages Are Relevant

#### a. Defendants' Declarations – or Lack Thereof – Do Not Support Their Contentions

The boilerplate declarations submitted by the USX Defendants do not demonstrate that the custodians' text messages lack relevant information.

First, in the parties' April 23, 2021 Joint Status Report, Defendants represented to the Court that they had confirmed with each of the custodians that they "did not use text messages for any substantive work communications." ECF No. 138 at 17. Yet, contrary to their prior representations to this Court and to Plaintiffs, the USX Defendants now appear to concede that at least one custodian, Shane Weeks, does in fact have relevant information contained in his text messages. *See* Opp. at 2-3. Not only is this inconsistent with the USX Defendants' prior representations, it also calls into question the adequacy of the collection interviews the USX Defendants purportedly conducted in this action.

Second, the USX Defendants failed to submit any declarations from its four former employee custodians – John White, David McBride, Ajay Rupramka and Steven Phillips – strongly suggesting that all four of these custodians also have relevant information contained in their text messages; there is certainly no evidence to the contrary.[4]

---

[4] The fact that these individuals are no longer current USX employees is no bar to inquiring about or collecting their text messages. John White's Separation Agreement and Release expressly requires, as "an essential term of" the agreement, that he cooperate with USX and its attorneys with respect to the defense of litigation such as this. Ex. 37. David McBride, Ajay Rupramka and Steven Phillips, given their positions as Company executives, likely have identical agreements and were all employed at USX at the time this litigation was commenced, at which time their text messages should have been collected. All "Ex. _" references are to the Declaration of Christopher M. Wood in Support of Reply in Support of Plaintiffs' Motion to Compel the USX Defendants to Produce Text Messages and Relevant Documents from Six Key Percipient Witnesses and Designate a Rule 30(b)(6) Witness, filed concurrently herewith.

4856-4800-3340.v1

Third, the nearly identical declarations submitted by the remaining custodians do not demonstrate that their text messages are unlikely to contain relevant information, raise more questions than they answer and are so hedged with lawyer-drafted qualifications as to make them functionally meaningless. Defs. Exs. B-R. The declarants are unwilling to say they did not send or receive text messages regarding USX's business. *Id.* The declarants are unwilling to say they never sent or received text messages containing "substantive information" (whatever that means) regarding USX's business, only that it was not their routine practice to do so.[5] *Id.* The declarants are unwilling to say they never sent or received text messages relevant to this litigation, only that they did not *recall* sending or receiving such messages. *Id.* While such vague representations may be a necessary prophylactic when these custodians' text messages do turn out to contain relevant and responsive information, they offer no basis for this Court to conclude that their text messages should not be searched in the first place, and courts have found similar declarations inadequate. *Aramark Mgmt., LLC v. Borgquist*, 2021 WL 864067, at *15 (C.D. Cal. Jan 27, 2021), *report and recommendation adopted*, 2021 WL 863746 (C.D. Cal. Mar. 8, 2021) ("The statements in the Borgquists' declarations that they 'rarely' use text messaging for business-related information and 'typically' communicate personal information via text do not convincingly establish that the text messages did not contain relevant information.").

Indeed, in *Brooks Sports, Inc. v. Anta (China) Co.*, 2018 WL 7488924 (E.D. Va. Nov. 30, 2018), the defendant was ordered to search a messaging app and produce all of the results, despite evidence showing the company prohibited its employees from using the app to conduct company business and a declaration from the company's executive director stating that the company's

---

[5] Max Fuller's assertion that his "primary form of correspondence for USX-related business has been email" is hard to square with the fact that USX has only produced *18 e-mails* by Max Fuller between October 2017 and October 2018, raising additional questions about the adequacy of Defendants' search.

executives and employees unequivocally did not use the app to exchange text messages "'regarding substantive business matters,'" because the court recognized "the possibility that employees may nonetheless have used [the app] for business purposes." *Id.* at *9-*10, *report and recommendation adopted*, 2019 WL 969572 (E.D. Va. Jan. 11, 2019), *order clarified*, 2019 WL 969569 (E.D. Va. Feb. 5, 2019); *see also Kidd v. Lowe's Home Ctrs., LLC*, 2020 WL 9258481, at *7 (S.D. Miss. Dec. 2, 2020) (where declarants "'d[id] not recall'" signing an arbitration agreement and did not include an express denial, their declarations were "not sufficient to create a factual dispute about the existence of the agreement").

The declarations provide no basis to find the custodians' text messages do not contain relevant and responsive information.

> ### b. Evidence Produced in Discovery Establishes the Custodians' Text Messages Contain Relevant Information

The USX Defendants' assertion that Exhibits 15-18 do not support ordering the search and production of text messages is baseless.

Exhibit 18 demonstrates Lisa Pate (Director and Chief Administrative Officer) and Eric Peterson (Chief Financial Officer) used text messages to communicate about USX business. Mot. at 7. Contrary to Defendants' contention, the e-mail does not "validate[] that substantive communications occur over email" instead of via text message. *See* Opp. at 6. Rather, Ms. Pate and Mr. Peterson are plainly using text messages to discuss issues directly relevant to why USX's registration statement is alleged to be false – "lower than planned utilization along with lower than planned seated truck count." Mot. at 7; Pltfs. Ex. 18.[6] The fact that additional conversations may

---

[6] All "Pltfs. Ex. _" references are to the Declaration of Christopher M. Wood in Support of Plaintiffs' Motion to Compel the USX Defendants to Produce Text Messages and Relevant Documents from Six Key Percipient Witnesses and Designate a Rule 30(b)(6) Witness (ECF No. 150-1). All "Defs. Ex. _" references are to the USX Defendants' Notice of Filing Exhibits in Support of Opposition to Plaintiffs' Motion to Compel the USX Defendants to Produce Text

- 9 -

have occurred via e-mail does not render the text messages irrelevant, nor does Exhibit 18 establish that all matters discussed via text messages were also relayed over e-mail.

Exhibit 15 demonstrates Eric Peterson communicated with the underwriters prior to the IPO specifically about the successful completion of the IPO and in the context of apparent problems Morgan Stanley was having attracting "quality long-only names" to subscribe to the offering. Pltfs. Ex. 15. Defendants' contention that the text message was referring to the "'discretionary fee component' that Morgan Stanley was seeking for underwriting the IPO" is not supported by the e-mail itself, which draws no such connection – and unless the USX Defendants have actually reviewed the text message in question, they have no basis for making such an assertion. In any case, the USX Defendants' suggestion that the "fees paid to the underwriters have zero relevance to the issue that remains in this case" (Opp. at 5) once again raises grave concerns about Defendants' understanding of relevance given that the underwriters are also defendants in this action, and while "proof of motive is not required for . . . Section 11 claims asserted against [underwriters] . . . evidence of motive is usually compelling to a finder of fact and . . . the Underwriter Defendants could be argued to have been motivated by a desire to procure underwriting fees and secure future business." *In re Refco, Inc. Sec. Litig.*, 2010 WL 11586941, at *5 (S.D.N.Y. May 11, 2010).[7]

_____

Messages and Relevant Documents from Six Key Percipient Witnesses and Designate a Rule 30(b)(6) Witness (ECF No. 158).

[7] Another of the underwriters, JP Morgan, was recently fined a total of ***$200 million*** for "widespread and longstanding failures" to preserve and maintain staff's personal text messages, WhatsApp communications and e-mails that related to its securities business. United States Securities and Exchange Commission Press Release No. 2021-262, *JPMorgan Admits to Widespread Recordkeeping Failures and Agrees to Pay $125 Million Penalty to Resolve SEC Charges* (Dec. 17, 2021), https://tinyurl.com/yckt424a; Commodity Futures Trading Commission Press Release No. 8470-21, *CFTC Orders JPMorgan to Pay $75 Million for Widespread Use by Employees of Unapproved Communication Methods and Related Recordkeeping and Supervision Failures* (Dec. 17, 2021), https://tinyurl.com/46znfy42. Between at least January 2018 and November 2020, JP Morgan pervasively used text messages for discussions "between and among

- 10 -

Exhibit 17 demonstrates that CEO Eric Fuller communicated with USX's customers, including Walmart (its biggest customer and the one most central to Plaintiffs' allegations), about business matters via text message. Contrary to the USX Defendants' contentions, the e-mail does not "confirm[] substantive communications occur over email, and not text." Opp. at 6. The e-mail does not reveal why Ms. Rosser was requesting certain information from Mr. Fuller, whether Mr. Fuller's response was actually responsive to her request or about what other matters Mr. Fuller and Ms. Rosser texted that were not reflected in the response.

Finally, Exhibit 16 shows that texting about USX business, and specifically about the pricing of the offering at issue in this case, occurred not only between USX executives and the underwriters but also by the family members of USX executives. Contrary to the USX Defendants' contentions, Exhibit 16 appears to show that Eric Fuller received text messages from his brother regarding concerns from investors that USX was pricing its IPO too high in part due to issues about which Plaintiffs allege USX expressly misled investors – *i.e.*, USX's ability to attract drivers at appropriate pay rates. Pltfs. Ex. 16 at USX0171624-626.

In sum, none of the USX Defendants' assertions support the notion that relevant communications only occurred via e-mail. Rather, the exhibits prove USX employees used text messages to communicate with one another, with USX customers and with the underwriters of the IPO about USX business and matters specifically related to this litigation.[8] Because e-mail alone

---

senior-level JPMorgan executives and employees, customers, clients, third-party advisers, and other market participants about debt and equity underwriting issues." United States Securities and Exchange Commission Press Release No. 93807, *Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Sections 15(B) and 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order* (Dec. 17, 2021), https://tinyurl.com/y9mrxvyv.

[8] It should be noted that while Eric Fuller, Eric Peterson and Lisa Quinn Pate had the opportunity to address the substance of these e-mails and the text messages related thereto in the declarations

- 11 -

leaves Plaintiffs "with an incomplete record of the communications that Defendants had with both each other and third parties[,]" the text messages must be produced. *Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 236 (D. Minn. 2019).

### 4. The USX Defendants Fail to Establish Any Burden Associated with Searching the Custodians' Text Messages

"When the information sought appears to be relevant, the party resisting production has the burden of establishing that the information either is not relevant or is so marginally relevant that the presumption of broad disclosure is outweighed by the potential for undue burden or harm." *Large on Behalf of Large v. Blazer*, 2022 WL 99986, at *2 (M.D. Tenn. Jan. 10, 2022). Here, the USX Defendants fail to present any argument or evidence whatsoever about any burden associated with the collection of text messages, leaving no doubt that any proportionality analysis falls entirely in Plaintiffs' favor.

Relevant and responsive information is very likely to be found in the custodians' text messages; because the USX Defendants have failed to articulate any burden associated with their production, the USX Defendants should produce the text messages.

### C. The USX Defendants Implicitly Concede that the Proposed Additional Percipient Witnesses Are Likely to Possess Relevant Documents and Fail to Establish Any Undue Burden

When considering whether an employee is an appropriate custodian, courts consider whether that employee was "in a position to send or receive documents that are relevant to the claims or defenses in this action." *In re Envision Healthcare Corp. Sec. Litig.*, 2020 U.S. Dist. LEXIS 259982, at *14 (M.D. Tenn. Dec. 14, 2020). While the USX Defendants contend that the proposed Percipient Witnesses do not possess relevant documents and that producing their

---

they submitted to the Court, they entirely declined to do so, leaving only argument unsupported by any evidence.

4856-4800-3340.v1

documents is not proportional to the needs of the case, the declarations in fact show that the proposed Percipient Witnesses do possess relevant documents, and Defendants have failed to establish that the costs of production outweigh the benefit of production.

### 1. The Load Planner Witnesses' Documents Should Be Produced

Because load planning is clearly alleged in the Complaint and discussed in the Court's motion to dismiss order, the Load Planner Witnesses' documents are relevant pursuant to Rule 26. *See Siriano v. Goodman Mfg. Co., L.P.*, 2015 WL 8259548, at \*7 (S.D. Ohio Dec. 9, 2015) (finding that where claims already survived Rule 12(b)(6) motion, discovery concerning those claims is relevant under Rule 26).

The Court has already found Plaintiffs adequately pled USX misleadingly "warned that '[i]f we are unable to continue to attract and retain a sufficient number of drivers, we could be forced to . . . continue to adjust our compensation packages or operate with fewer tractors and face difficulty meeting shipper demands, either of which could materially adversely affect our growth and profitability.'" ECF No. 91 at 32. In finding the statement misleading, the Court pointed to Plaintiffs' identification of internal adverse events contradicting that statement, including that "[operational changes *failed to] improve load planning* or truck maintenance[,]" "USX was unable to 'prioritize growth in dedicated contact services'" and "certain account shipping patterns [*i.e., those of USX's largest account, Walmart, had already been negatively impacted* . . . adversely impacting utilization as well as driver retention and hiring[.]" *Id.* at 33.

USX does not deny its load planners were at the forefront of the Company's efforts to meet shipper demands. According to USX's own 30(b)(6) deposition testimony, the Company's load planners made "sure that loads and trucks were planned to service our customers' freight." Pltfs. Ex. 1 at 21:5-7. Company documents confirm that load planners' responsibilities included "[c]reat[ing] capacity" and "[h]elp[ing] dedicated cover freight if their trucks are down[.]":

**Recap of Exercise** *(Facilitator-led discussion of the following questions)*

**What activities do Load Planners perform?**
**Which activities are proactive vs. reactive?**
**Which activities overlap with other operations groups?**

**Summary of Reponses[1]** *(Categorized by ops group Planners work with, or overlap with, to conduct activity)*

| CSR | Load Planning | Fleet Management | Driver |
|---|---|---|---|
| • Stay close to load balances<br>• Track trailers<br>• Review rates<br>• Review LOH/mile<br>• Coordinate with CSR on loads we may miss<br>• Explain/defend load assignments<br>• Read and respond to emails | • Create capacity<br>• Load/shift excess capacity to over-booked markets<br>• Approve bobtail requests<br>• Stack freight<br>• Monitor assigned screen<br>• Help dedicated cover freight if their trucks are down | • Review all trucks to check PTA/ETA, HOS, etc.<br>• Manage home time<br>• Verbals<br>• Routing trucks for BPM's, upgrades, terminal requests, or student upgrades<br>• Manage repowers<br>• Create a load for a driver close to turnover<br>• Explain/defend load assignments<br>• Read and respond to emails | • Assist with fall-offs<br>• Explain/defend load assignments |

Pltfs. Ex. 21 at USX0004409. Thus, USX's Load Planner Witnesses' documents are likely to show the effect the Company's driver shortage was having on the Company's ability to meet shipper demands, including whether its customers' accounts were already being negatively impacted at the time of the offering.

USX asks the Court to look at the misleading statements in isolation from the reasons those statements are misleading, suggesting that only the practice of OTR shifting is relevant to Plaintiffs' claims and not the Load Planner Witnesses' firsthand visibility into the impact the execution of such practice was having on the Company's ability to meet its customer demands. *See* Opp. at 11. As set forth above, this myopic view of relevance is misguided. *Supra* at §II.A.

Further, USX contends – without authority – that only decision makers' documents are relevant and discoverable. Opp. at 11. Case law is clear that it is not necessary for any of these custodians "'to have had any role in the alleged misstatements' . . . in order to establish that they may have relevant ESI." *See Envision*, 2020 WL 6750397, at *3. That is, "the Actionable Statements do not bound the limits of relevant or potentially relevant information," and "discovery should not be limited to the knowledge (or lack thereof) of the speakers of the . . . Actionable

4856-4800-3340.v1

Statements." *In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3791716, at \*9-\*10 (C.D. Cal. Mar. 12, 2012); *see also Willis v. Big Lots, Inc.*, 2017 WL 2608690, at \*3 (S.D. Ohio June 16, 2017) ("'The test under Rule 26 is not whether a putative deponent had personal involvement in an event . . . but whether the witness may have information from whatever source that is relevant to the claim or defense.'"). USX concedes that the requested Load Planner Witnesses (Bigner, Cowen, Johnson and Lofton) were front-line load planners at Walmart locations, and "[t]heir roles would have involved executing [on] load assignments at the site level." Defs. Ex. T, ¶5. USX concedes "[d]ecisions regarding driver availability and capacity and temporary OTR support would . . . have been relayed to them[.]" *Id.*; Opp. at 11. If such decisions were relayed to them, not only would they possess relevant documents regarding OTR support of Dedicated, but they would also possess documents directly evidencing the impact that support was having on the customer accounts. The Opposition and declarations only bolster Plaintiffs' showing that these proposed percipient witnesses are likely to possess relevant documents.

### 2. The Pricing Witnesses' Documents Should Be Produced

The Pricing Witnesses are also likely to possess relevant documents related to whether, at the time certain bids were made prior to the IPO, the Company's driver shortage was having a negative impact on the Company's growth and profitability and whether the Company was prioritizing growth in Dedicated. Mot. at 13-14. Specifically, documents from the Pricing Witnesses would provide insight into whether the rates the Company offered to its customers were facially unrealistic and faced risks of being unable to staff enough drivers to match those rates without negatively impacting the Company's operating ratio.

Relevance "is to be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on' any party's claim or defense." *Burrell*, 2019 WL 5260481, at \*2. Defendants, however, again take an impermissibly narrow view of

4856-4800-3340.v1

relevance, erroneously suggesting that: (1) only documents concerning USX's Dedicated segment – and not OTR – are relevant; (2) documents that do not apply to a specific customer are not relevant; and (3) Walmart is the only relevant customer. Opp. at 8-10. Each of these contentions is baseless.

*First*, the Dedicated book of business cannot be viewed in a vacuum separate from the Company's OTR business. Plaintiffs alleged, and the Court held, that the Company attempted to prioritize one at the expense of the other. ECF No. 91 at 12-13. Indeed, the very allegation that OTR support was being used to support Dedicated shows that the two business segments go hand in hand, and Justin Harness' declaration confirms that members of USX's OTR management team made decisions regarding OTR support of Dedicated. Defs. Ex. T, ¶5. Thus, Defendants' assertion that Exhibits 30-31 do not support Plaintiffs' requests is wrong.

*Second*, the USX Defendants assert that Exhibit 29, an e-mail showing Ms. Van de Kamp discussed different contract and billing structures to use for Dedicated bids, is irrelevant because it does not specify to which customers it would apply. Opp. at 9. The document, however, explicitly sheds light on the promises the Company was making to its Dedicated customers and of which Dedicated bidding processes Ms. Van de Kamp had knowledge – and in which she was even actively involved.

*Third*, Plaintiffs have made clear that their allegations are not limited to Walmart. *See e.g.*, Mot. at 14 n.9. While Walmart, as USX's largest customer, is surely important to the Company's success and to Plaintiffs' claims, this does not negate the relevance of other customers' demands and broken promises made to those customers – all of which impacted the Company's growth and profitability. Indeed, Exhibit 32 relates to Procter & Gamble, a customer USX touted as one of its longstanding top customers in its Offering Documents, and shows USX made unrealistic promises

to its customers to secure bids, only to then have to modify the promised rates at a later date because it could not properly support those customers' demands.

### 3. Plaintiffs' Requests Are Proportional to the Needs of the Case, and Plaintiffs Should Not Be Penalized for Costs Related to Restoring Backup Tapes

The additional Percipient Witnesses are reasonable and proportional to the needs of this case. In evaluating proportionality, Rule 26 considers "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

**Importance of the issues**. The action concerns the violation of federal securities laws, impacting thousands of shareholders, regarding false and misleading statements filed with the SEC.

**Amount in controversy**. Defendants' misstatements were made in connection with USX's $245 million IPO, and the shares issued pursuant to the registration statement lost 69% of their value in the six months after the IPO. Because this case is a class action, it "could include a significant number of class members who each purchased [defendants' securities, and] the amount in controversy in this matter is potentially very large." *Siriano*, 2015 WL 8259548, at *5-*6.

**Access to information**. Plaintiffs only seek these documents because they do not have access to the information requested. Notably, both the Pricing Witnesses and Load Planner Witnesses were customer-centric roles. The only other means by which Plaintiffs could conceivably obtain some (but not all) of the requested documents is through nonparty subpoenas, which the Court stayed on October 27, 2020. ECF No. 120. Though USX points to some overlapping e-mails between Ms. Van de Kamp and existing custodians, "an overlap of custodians on some already-produced documents is [not], on its own, sufficient to establish that the proposed

custodians will have no new responsive discovery." *Envision*, 2020 WL 6750397, at *6. In fact, the overlap in certain documents *justifies* Plaintiffs' requests because it suggests the Pricing Witnesses may remedy USX's failure to retain documents from the other pricing custodians prior to 2018.

**Parties' resources**. USX has reported operating revenues for 2020 of more than $1.7 billion, operating revenues for the third quarter of 2021 of over $491 million and assets of over $1.2 billion on October 21, 2021. Ex. 38. The individual defendants – including Max Fuller, Eric Fuller, Eric Peterson and Lisa Quinn Pate – also have substantial resources, having reaped millions from their association with USX as reflected in USX's publicly filed proxy statements.

**Importance of discovery**. The Load Planner Witnesses were in a unique position in their day-to-day visibility into both customer demand and driver availability – issues central to Plaintiffs' allegations. Mot. at 11-13. The Pricing Witnesses are also necessary to fill a gap in the production from Michael Graham and to evaluate whether the Company was making realistic bids that would allow for growth in Dedicated.

**Burden versus benefit**. Discovery can be expensive. "The Sixth Circuit, however, has held that limiting the scope of discovery is appropriate when compliance 'would prove *unduly* burdensome,' not merely expensive or time-consuming." *Siriano*, 2015 WL 8259548, at *6 (quoting *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007)) (emphasis in original). Here, moreover, at least a portion of Defendants' costs have been driven by Defendants' need to restore backup tapes to access responsive documents – a method of storage over which Plaintiffs had no control.

Because Plaintiffs do not otherwise have documents from load planners and appear to have an incomplete set of documents with regard to the pricing custodians, the benefit to Plaintiffs outweighs the burden on USX. "[G]iven the limited nature of plaintiffs' request and that defendant

has made no argument that the documents are not readily available for production, the Court [should have] no concerns over proportionality, burden, or expenses outweighing the potential benefit to plaintiffs of production." *Pannek v. U.S. Bank Nat'l Ass'n*, 2021 WL 5533749, at *3 (S.D. Ohio July 21, 2021).

Finally, Defendants have not justified that the estimated $285,000 in additional production costs is reasonable. USX premises its estimates almost entirely (~94%) on fees incurred through a multi-level attorney document review, which is unnecessary given the claw-back rights in the Stipulated Protective Order. *See* Defs. Ex. A; ECF No. 119, ¶¶3, 13-15. Nonetheless, even taking Defendants' estimates at face value, the estimated cost is not unduly burdensome when compared to the investor losses at issue. *See Am. Mun. Power, Inc. v. Voith Hydro, Inc.*, 2019 WL 6251339, at *13 (S.D. Ohio Nov. 22, 2019) ("While Voith presents evidence that Ricoh's cost for producing this ESI for the new time period for fifteen custodians . . . could exceed $100,000, the Court notes that this cost is not disproportionate to the $1.1 million for the cost of Ricoh's services related to ESI produced to date or to the amount AMP alleges at issue in this action ($40 million)."); *see also* Opening Br. at 10 n.8.

>  **D.  Rule 30(b)(6) Depositions on the Topics of Document Preservation, Collection and Production Are Routine Regardless of Any Deficiencies, Though Plaintiffs Have Identified Plenty in This Case**

Discovery in this case has lacked transparency. For this reason, Plaintiffs' request for a 30(b)(6) deposition is entirely reasonable. Such depositions are routine (*see* Mot. at 16-17), and a 30(b)(6) deposition is especially critical here to ensure Plaintiffs have received all information to which they are entitled. Further, the USX Defendants "simply [have] not shown that providing this testimony would result in annoyance, embarrassment, oppression, or undue burden or expense justifying the entry of a protective order" *Cotton v. Costco Wholesale Corp.*, 2013 WL 3819975, at *3 (D. Kan. July 24, 2013) (denying motion to quash deposition on retention and production

where the company provided "no estimate of how much time or cost it would take to produce a deponent qualified to testify about these subjects.").

A 30(b)(6) deposition on preservation issues to determine "the adequacy and scope of document production" is permitted and does not constitute impermissible discovery on discovery. *M.A. v. Wyndham Hotels & Resorts, Inc.*, 2020 WL 1983069, at *5 (S.D. Ohio Apr. 27, 2020). Plaintiffs are not required to identify evidence of wrongful spoliation. Rather "[d]iscovery of such matters is so deeply entrenched in practice that it is no longer necessary to clutter the long text of Rule 26 with" examples of such discovery. Fed. R. Civ. P. 26(b)(1) advisory committee's note on 2015 amendment; *see also* Mot. at 16 (collecting cases).[9]

Nevertheless, USX has given ample reason for Plaintiffs to cast doubt on their discovery efforts to date. *See* Mot. at 18 (listing deficiencies existing even after restoration of backup tapes). In early 2021, Defendants represented that they had substantially completed their production and otherwise satisfied all discovery obligations. It was only after Plaintiffs identified documents they had obtained through nonparty subpoenas that should have been produced in Defendants' production through the agreed-upon search terms and custodians that Defendants revealed the existence of USX's backup tapes. That experience alone was enough to "distrust the responding party's diligence" under USX's incorrect standard for taking a 30(b)(6) deposition.

Even now, despite representing to both Plaintiffs and the Court for months that custodians did not use text messages for "substantive" business purposes, only after Plaintiffs filed their Motion to compel did USX reveal that custodian Shane Weeks in fact did use text messages for business purposes. *See* ECF No. 138 at 18; Ex. 39. To date, the fact that USX still has not been

---

[9] Counsel for Plaintiffs has recently taken similar depositions in other cases defended by counsel for Defendants here. *See St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*, No. 3:18-cv-00988 (M.D. Tenn.) (ECF No. 108, Exs. 11-13).

willing to confirm the extent to which it preserved custodians' text messages, or when and if it conducted custodial interviews, raises concern beyond mere speculation that USX did not preserve relevant documents.

Defendants' dismissive response to Plaintiffs' concerns that critical communications regarding Walmart are missing between the October 2017 and January 2018 period and, moreover, that they had no obligation to preserve documents during that period is equally concerning. Instead of confirming that the e-mails were preserved, USX now claims Plaintiffs are not entitled to those documents in the first place. This response directly contradicts USX's previous representations to the Court that it would produce communications with its customers. *See* ECF No. 112 at 10-11 ("The subpoenas at issue here expressly call for the production of information that would be within USX's possession, repeatedly demanding communications that were exchanged with USX. . . . Plaintiffs cannot justify these non-party subpoenas when any relevant information could be obtained from, and will be produced by, USX itself."). Now USX represents that it may not even possess the communications at all.

Further declarations submitted on behalf of USX custodians only raise additional concerns. Matching the language of other declarations, Individual Defendant and Executive Chairman of the Board Max Fuller's declaration states that his primary form of correspondence for USX-related business has been e-mail through his Company e-mail address. Defs. Ex. R. However, a review of the documents reveals he only sent 18 e-mails between October 2017 and June 2018. *Id.*

Finally, the cases cited by Defendants are distinguishable. First, this case does not involve a precertification discovery dispute (*see Moore v. Westgate Resorts, Ltd.*, 2020 WL 7017740, at *6 (E.D. Tenn. Jan. 24, 2020)) and therefore involves different proportionality concerns. Additionally, unlike the cases cited by Defendants, the course of discovery has put the location

and manner of the storage of ESI data at issue in this case. *Cf. id.*; *cf. also Edwards v. Scripps Media, Inc.*, 331 F.R.D. 116, 125 (E.D. Mich. 2019).

Plaintiffs initially noticed a 30(b)(6) deposition early in the discovery process to ensure all appropriate sources were being searched. The discovered deficiencies, USX's lack of retention policies and the delays related to the backup tapes are precisely the reasons that Rule 30(b)(6) depositions on preservation, collection and production are critical. Given the opacity of Defendants' discovery efforts to date, however, at this stage of the litigation Plaintiffs require a 30(b)(6) deposition to confirm they have received all documents to which they are entitled.

For the foregoing reasons, Plaintiffs respectfully request this Court order Defendants to prepare one or more designees to testify at Plaintiffs' Rule 30(b)(6) deposition on the topics of document preservation, collection and production.

## III.    CONCLUSION

The Motion should be granted.

DATED: February 2, 2022

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD, #032977

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN  37219
Telephone: 615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com

- 22 -

ROBBINS GELLER RUDMAN
   & DOWD LLP
WILLOW E. RADCLIFFE (*pro hac vice*)
HADIYA K. DESHMUKH (*pro hac vice*)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
willowr@rgrdlaw.com
hdeshmukh@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
KEVIN S. SCIARANI (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
ksciarani@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
JACK REISE
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
rrobbins@rgrdlaw.com

LEVI & KORSINSKY, LLP
SHANNON L. HOPKINS (*pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT  06905
Telephone:  203/363-7500
866/367-6510 (fax)
shopkins@zlk.com

*Co-Lead Counsel for Lead Plaintiff*

- 23 -

BARRETT JOHNSTON MARTIN
   & GARRISON, LLC
JERRY E. MARTIN, #20193
DAVID GARRISON, #24968
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2202
615/252-3798 (fax)
jmartin@barrettjohnston.com
dgarrison@barrettjohnston.com

*Local Counsel*

BRAGAR EAGEL & SQUIRE, P.C.
W. SCOTT HOLLEMAN (*pro hac vice*)
MARION C. PASSMORE (*pro hac vice*)
810 Seventh Avenue, Suite 620
New York, NY  10019
Telephone:  646/860-9449
212/214-0506 (fax)
holleman@bespc.com
passmore@bespc.com

*Additional Counsel for Plaintiffs Charles
Clowdis and Bryan K. Robbins*

- 24 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on February 2, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses of the CM/ECF participants in this case.

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
& DOWD LLP
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 800/449-4900
615/252-3798 (fax)

E-mail: cwood@rgrdlaw.com