# EXHIBIT 1

Videotaped Deposition of

# Justin Harness

30(b)(6)

January 14, 2021

Volume I


Stein

vs.

U.S. Xpress Enterprises, Inc.

**Confidential**



www.aptusCR.com / 866.999.8310

**Page 1**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

CHATTANOOGA DIVISION

LEWIS STEIN, et al., Individually)
and on Behalf of All Others   )
Similarly Situated,         )
                    )
        Plaintiffs,      )
                    ) No.
        vs.            ) 1:19-cv-00098-
                    ) TRM-CHS
U.S. XPRESS ENTERPRISES, INC.,  )
et al.,               )
                    )
        Defendants.     )
_____)

REMOTE VIDEO RECORDED CONFIDENTIAL

30(b)(6) DEPOSITION OF

JUSTIN HARNESS

Chattanooga, Tennessee

January 14, 2021

VOLUME I

REPORTED BY:

JOHNNA PIPER

CSR 11268

Job No. 10076694

**Page 2**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

CHATTANOOGA DIVISION

LEWIS STEIN, et al., Individually)
and on Behalf of All Others   )
Similarly Situated,         )
                    )
        Plaintiffs,      )
                    ) No.
        vs.            ) 1:19-cv-00098-
                    ) TRM-CHS
U.S. XPRESS ENTERPRISES, INC.,  )
et al.,               )
                    )
        Defendants.     )
_____)

Remote Confidential 30(b)(6) video recorded deposition of JUSTIN HARNESS, Volume I, taken on behalf of Plaintiffs, in Chattanooga, Tennessee, beginning at 10:25 a.m. EST and ending at 1:53 p.m. EST on Thursday, January 14, 2021, before JOHNNA PIPER, Certified Shorthand Reporter No. 11268.

**Page 3**

APPEARANCES:

For lead Plaintiff:

    Robbins Geller Rudman & Dowd LLP
    Post Montgomery Center
    One Montgomery Street, Suite 1800
    San Francisco, California 94104
    (415) 288-4545
    willowr@rgrdlaw.com
    By: Willow E. Radcliffe, Esq,
        Hadiya K. Deshmukh, Esq.

           - and -

    Levi & Korsinsky, LLP
    1111 Summer Street, Suite 403
    Stamford, Connecticut 06905
    (203) 363-7500
    stornatore@zlk.com
    By: Sebastiano Tornatore (pro hac vice)

for Plaintiffs Charles Clowdis and Bryan K. Robbins:

    Bragar Eagel & Squire, P.C.
    810 Seventh Avenue, Suite 620
    New York, New York 10019
    (646) 860-9449
    holleman@bespc.com
    By: W. Scott Holleman (pro hac vice)

For plaintiffs in the Baubach vs. U.S. Xpress matter:

    Glancy Prongay & Murray LLP
    1925 Century Park E, Suite 2100
    Los Angeles, California 90067-2722
    (310) 201-9150
    esams@glancylaw.com
    By: Ex Kano Shirden Sams II, Esq.

**Page 4**

APPEARANCES (continued):

For the Defendants:

    King & Spalding LLP
    1180 Peachtree Street, NE
    Suite 1600
    Atlanta, Georgia 30309
    (404) 572-4717
    jpcorley@kslaw.com
    By: Jessica P. Corley, Esq.
        Brandon R. Keel, Esq.
    King & Spalding LLP
    50 California Street, Suite 3300
    San Francisco, California 94111
    (415) 318-1234
    lbugni@kslaw.com
    By: Lisa R. Bugni, Esq.

For the Underwriter Defendants:

    O'Melveny & Myers
    Times Square Tower
    7 Times Square
    New York, New York 10036
    (212) 728-5693
    wsushon@omm.com
    By: Bill Sushon, Esq.

Also Present:

    Nathan Harwell, in-house counsel U.S. Xpress
    Jeremy Kemp, law clerk
    John Tisa, videographer

PowerD://usCRL5
www.aptusCRI.com

Q. And what were the responsibilities of the load planning manager?

A. To provide management oversight for the load planners that they managed on very tactical, daily execution level, making sure that loads and trucks were planned to service our customers' freight.

Q. In what form did that oversight occur? Is that an in-person oversight, or is that done via -- over e-mail or other, you know -- I should say virtual format?

A. No. They were here in the building all together.

Q. And you -- you said that they had oversight over the load assignments. Approximately how many load planners were there?

A. Approximately 25.

Q. And this was just -- what did you say -- and the load planners were located at U.S. Xpress headquarters?

A. If not all of them, the vast majority were. There may have been one or two who were out in the field somewhere at that point in time, but the vast majority of them were here.

Q. And what were the responsibilities of the

load planner?

A. To match truck to load assignments every day while making the -- the best decisions to maximize utility and maximize service for our customers so they --

(Indiscernible crosstalk.)

THE WITNESS: That was -- that was the end of it.

MS. BUGNI: I think you said they were assigning truck --

THE WITNESS: Oh, assigning truck to load, making truck load assignments.

BY MS. RADCLIFFE:

Q. And were there any guidelines given to the load planners with regards to how they should prioritize the assignment to maximize utility?

A. I was responsible for dedicated at that point and didn't have direct oversight of that group, so I couldn't speak to what their, you know, specific directives or assignments were.

Q. So with respect to the load and -- and route planning, were that -- was that with respect to all of U.S. Xpress's divisions?

A. No. That was just the -- the descriptions and work structure I gave was specific to

over-the-road functionality because that's where load and route planning was -- was segregated for that division.

Q. And -- and who determined the -- the load and route planning for the dedicated?

A. That fell under my area of responsibility at that time.

Q. And did you have anyone assisting you?

A. So that -- there was not a -- the structure's completely different in dedicated. So the two vice presidents of -- vice presidents had directors under them. There were five directors split between the two of them, and under them they had regional managers responsible for their different customers and with -- at each customer -- on-site at each customer we had transportation managers who handled load planning, customer service, and fleet management all under -- under their umbrella, so no one directly responsible for load planning separately.

Q. And who were the five directors?

A. Greg Aftung, Brandy Kelly, Eric Holcomb, Shane Weeks, and Scott Adkins I believe were the five at that time.

Q. And what would have been their

responsibilities with respect to route -- excuse me -- load and route planning?

A. They had responsibility for -- they had vertical responsibility by customer, so they weren't responsible for areas per se. They were responsible for a customer vertical, and within that group of customers that they managed, they had transportation managers on-site at the location that would manage the daily execution of load and route planning along with customer and driver management.

Q. And then the regional managers, what would have been their responsibility with respect to the end route planning?

A. They were an escalation point between the transport -- transportation manager on-site of the customer and the director of -- of operations, those five directors.

Q. And in their role as an escalation point, what would have been their responsibility? Would they have -- well, let me rephrase it.

Well, when -- well, when would be an example of a situation where the issue of load and route planning would be escalated to a regional manager?

A. If a customer's volume for a period of time

Page 29

opportunities. They bring them in. The pricing team would evaluate them, price them, goes back to the customers, then the negotiation starts. Again, if it is new business and we don't have the contract term -- contract terms agreed upon, then that process would be going along simultaneously. If we did, then it'd just be a matter of agreeing to rates and establishing, you know, an -- an addendum for rates attached to the original contract. Then you move on and start up the business.

Q. In that over-the-counter, was there similarly an RFP process?

MS. BUGNI: I -- I think you mean over-the-road.

MS. RADCLIFFE: I'm sorry. Over-the-road. Too much -- too much time in securities.

THE WITNESS: Yes. Sometimes the -- there were RFPs. Sometimes it was just a, you know, the customer reaching out and asking for rates on a group of spare lanes. It varied.

BY MS. RADCLIFFE:

Q. In the dedicated division, was that always an RFP process?

A. For new business, yes. For existing business, no. We negotiated outside of an RFP

Page 30

process many, many times -- to renew the business.

Q. And besides yourself in the dedicated division, who else was involved in the RFP -- the RFP process and negotiating with the customer?

A. The sales associates in dedicated and senior VP of sales in dedicated.

Q. And -- and who was the senior VP of sales?

A. Paul Bowman.

Q. And is Mr. Bowman still with the company?

A. Yes.

Q. And approximately how many sales associates?

A. At the time in scope, two.

Q. I'm sorry. Can you repeat that?

A. Sure. At the time and the scope, there were two.

Q. And who were they?

A. Jeff Williams and Byron Park.

Q. And do you know what their primary job responsibilities were?

A. To sell new business within dedicated and to prospect and sell.

Q. And what about Mr. Bowman's responsibilities? Do you have a recollection of what his responsibilities were generally?

Page 31

A. Sure. He had oversight for the sales process in dedicated specifically, which included the -- the prospecting on and -- and RFP process.

Q. And did you have regular communications with the sales associates when you were in dedicated?

A. With Paul, yes.

Q. With Paul. And in what type of form did those communications take place?

A. E-mail and face-to-face.

Q. Is Mr. Bowman one of the persons you might have text back in the 2017-'18 time frame?

A. Yes, less frequently than the others, yes.

Q. Who would you say are -- are most -- the individuals who you more frequently text?

A. Ajay Clayton and those directors.

Q. What about Mr. Fuller? -- Eric Fuller?

A. Rarely.

Q. What about Ms. Pate? -- Lisa Quinn Pate?

A. No.

Q. And then for the over-the-road division, were there also sales associates responsible for the over-the-road division?

A. Yes.

Q. How many?

Page 32

A. That was John White's area of responsibility at that time. I can't recall how many he had. Approximately 20.

Q. And who did they report to?

A. The national account representatives reported directly to John. The regional vice president for sales reported to three area vice presidents of sales who reported to John.

Q. And do you re -- recall who the national account representatives were?

A. Yes.

Q. Who were they?

A. Sara Davis, Mark Pfuehler, and Shawn Lance.

Q. And what were their primary job responsibilities?

A. Customer relationship management and new business development.

Q. And do you know how they undertook those responsibilities?

A. How they what? I'm sorry.

Q. How they executed or undertook those responsibilities.

A. At that point in time, no, I was not terribly involved with the -- with those guys.

Q. Who would know that information?

Case 1:19-cv-00098-TRM-CHS   Document 162-2   Filed 02/03/22   Page 5 of 9   Page 29..32
PageID #: 1617
www.AptusCR.com

Volume I
Justin Harness

Confidential

Stein vs.
U.S. Xpress Enterprises, Inc.

Page 49

revenues for those over-the-road truck drivers were allocated to the over-the-road segment even though they were driving a dedicated route?

A. Sure. We say, "Revenue follows the truck," so a truck is dispatched in our system on a load regardless of what division the load is assigned to, the revenue associated with that load as well as the miles is allocated to that tractor which has a business unit code assigned to it. And so an over-the-road tractor running a dedicated load, the revenue follows the tractor in our reporting structure.

Q. And when you say "code," what -- what was the code used for -- for over-the-road?

A. They are SBU, strategic business unit codes, so there's code associated with the different operating groups in the road, regional groups for solo team, owner/operator. There would have been a code for each of those.

Q. And are you aware of whether there's like a -- a master sheet of the codes kept somewhere at U.S. Xpress?

A. No.

Q. Fair enough. Did dedicated have codes as well?

A. Yes.

Q. And do you recall what those codes were?

A. Every customer had its own unique code within the dedicated business unit.

Q. Okay. So, for example, do you recall the code for Walmart?

A. No, not down to the customer level like that. The dedicated SBU was -- was where the -- that every load in dedicated was assigned to a -- to the dedicated SBU, and it would trickle down to the customer.

Q. Fair enough. I'm going to move on to Topic Number 8. Could you generally explain the process -- processes related to U.S. Xpress negotiating new contracts with its dedicated customer?

A. Sure. So if it is a customer that we were already doing business with at another location, we would likely be receiving the opportunity to price or bid on new locations from them with -- without asking. They would include us if we were doing a good job.

We would get the request for information or request for pricing. That would go through the vetting process where relevant stakeholders would

meet to discuss the business opportunity: Does this make sense? Can we hire to this from a driver perspective?

And then, you know, if we vetted it and determined it was a viable opportunity, we would model what we expected to be able to run the business at in terms of utilization, driver wage, a number of other factors, price according to customer's template, and then return the pricing to the customer, and then ultimately either be moved to the next round and continue in negotiations, potentially eventually awarded, and then implement the business.

If it was not a -- an incumbent customer where we already had a working relationship with them, we would most likely have gotten that opportunity through our sellers in the field asking for those opportunities, establishing trust and rapport with customers, asking for opportunities and eventually getting a swing at the plate, if you will, getting an opportunity to bid the business.

Once it's in our hands, the very -- the process is the same, essentially, going through that same process of vetting and pricing and negotiating with the customer back and forth.

Q. Typically how long are the contracts that -- that are -- U.S. Xpress enters into with its dedicated customer?

A. Three years.

Q. And can you generally explain the process regarding the modifying terms of the contract?

A. Sure. So within the first 30 days, 60 days, 90 days, we would review the relevant KPIs with new business to understand if it is operating as we expected or modeled. If so, then if it was, then obviously we continue that review process and move on to longer increments in time.

If not, we would go back to that customer and explain where there was a gap in expectation versus what's -- what is reality and talk through the opportunity to adjust rate, adjust back-to-soil charges, adjust our truck and driver count, so on and so forth, and agree to whatever the -- the necessary changes were.

In the instance where -- instances where that first-year term would be up on business we'd been operating three years, on average, when that term was up, we would be asking that customer ahead of that term date for an opportunity to discuss renewal, either, you know, with a modest rate

Case 1:19-cv-00098-TRM-CHS   Document 162-2   Filed 02/03/22   Page 6 of 9   Page 49..52
PageID #: 4318
www.aptusCR.com

Volume I
Justin Harness
Confidential
Stein vs.
U.S. Xpress Enterprises, Inc.
Page 53

increase to offset costs, you know, of inflation, you know, the other variables being taken into consideration for potential rate changes, and we would renew typically for a period of a year and then every year there -- thereon after.

Q. You mentioned KPIs. Could you explain what those are?

A. Key performance indicators.

Q. And you mentioned that those were reviewed against expectations or modeling. Who -- who within U.S. Xpress would have been involved in that?

A. For the new business that I specifically mentioned in -- in terms of how that process would work, that would have come all the way up to my desk. The -- the transportation manager is responsible on-site. The regional manager, the director, and the VP responsible as well as me, and Paul Bowman, that's who's responsible for the sale side of it, would have reviewed those regularly upon implementation.

Q. And would -- would you have reviewed those with Eric Fuller?

A. Not consistently.

Q. What about Eric Peterson?

A. Not consistently.

Q. What about Lisa Pate?

A. No.

Q. Who would have come up with the expected models of the behavior of the new business?

A. Our design engineering team.

Q. And who heads that up?

A. That actually --

(Indiscernible crosstalk.)

THE WITNESS: That reported through John White and his pricing team.

BY MS. RADCLIFFE:

Q. And just so we're clear, was that the 2017-2018 time frame?

A. Correct.

Q. Okay. And then you -- you indicated that there would be discussion or attempts at discussions prior to the expiration of the -- the contract regarding renewal. How far in advance did those take place?

A. It varied.

Q. Would it have been typically more than a month before the renewal period?

A. On occasion.

Q. What about contracts with customers that had been with U.S. Xpress for quite a while? Would

those go through the -- the same kind of analysis regarding the KPIs at any point in time?

MS. BUGNI: Object to the form.

THE WITNESS: Can you clarify what you're asking?

BY MS. RADCLIFFE:

Q. Sure. I'll rephrase it.

So U.S. Xpress has some customers that it's had for quite a while. Is that accurate?

A. Yes.

Q. Okay. And -- and which would you say would be the -- the most longest, outstanding customers at U.S. Xpress?

A. I couldn't tell you for sure.

Q. How about some of -- some of the customers been around for, let's just say, ten years or more?

A. Sure. I could name a couple of those.

Q. So why -- why don't you go ahead and let us know.

A. Meyer, Walmart, Dollar General, Dollar Tree.

Q. And what would be the process for those customers that had been there for maybe ten years or so with regards to modification of their --

(Reporter requests clarification.)

MS. RADCLIFFE: I said, "Modification of their contracts."

THE COURT REPORTER: Thank you.

THE WITNESS: We would make every effort not to modify within term, so if -- you know, those customers having buildings that had been affect -- buildings that we were operating in that had been established for, you know, beyond that initial term, we, again, would be looking to renew those on an annual basis and adjusting our pricing to them based on any changes in behavior or whatnot that would happen throughout the year prior. And then once that new price and operating expectations were established for the next year term, we would just be reviewing the monthly P & Ls against historical to make sure that the rate and changes to the operating model that we had, you know, put in place with that new, one-year renewal were coming to fruition as expected.

Q. And -- and who would receive the month -- the monthly P & Ls as part of that process?

A. Down to the transportation managers, all --

Q. How far up?

A. All the way up to myself. Yeah, all the way up to myself.

Case 1:19-cv-00098-TRM-CHS   Document 162-2   Filed 02/03/22   Page 7 of 9   Page 53..56
PowerDeposCR.com
www.aptusCR.com

Page 81

MS. BUGNI: The transcript. Okay.

THE WITNESS: Transcript, yeah.

MS. RADCLIFFE: Yep.

Q. And is this one of the documents that refreshed your recollection that you reviewed yesterday?

A. Yes.

Q. And what refreshed your recollection? What part of this document refreshed your memory?

A. I believe there's mention in here about dedicated revenue protractor. On page 3, the second-to-last and the last paragraphs -- yes, those two sections.

Q. And what in the second-to-last paragraph on page 3 that refreshed your memory regarding events in 2018?

A. The last sentence, "The division's results continued to be impacted by certain accounts' shipping patterns performing different than expected which was first experienced in second quarter 2018."

Q. And which accounts do you recall are being mentioned in this earnings call?

A. That was specifically related to the two new Walmart distributions startup -- distribution center startups that I mentioned earlier. One

Page 82

started in February, one started in April.

Q. Okay. Please go ahead and put that document aside.

MS. RADCLIFFE: If we could take a short break, I'm just going to use it to determine if I have any additional questions. Don't get too excited, and then will 15 minutes be okay with you, Lisa?

MS. BUGNI: 15 minutes? Yeah, that's fine.

MS. RADCLIFFE: Okay. Great. Then we'll go off the record.

THE VIDEOGRAPHER: Okay. We're going off the record at 12:37 p.m.

(Recess taken.)

THE VIDEOGRAPHER: We'll go back on the record at 12:49 p.m.

BY MS. RADCLIFFE:

Q. I just had a couple of follow-up questions, Mr. Harness. You mentioned that there were -- earlier that there were two locations with respect to Walmart that had some new business. Where were those buildings located?

A. Robert Louisiana, and Gordonsville, Virginia.

Q. And -- and who would have been in charge of

Page 83

those buildings?

MS. BUGNI: Object to the form.

BY MS. RADCLIFFE:

Q. And I'll just --

A. At what level?

Q. Yeah, I'll rephrase it. Which transportation managers would have been responsible for those facilities?

A. I don't recall their names.

Q. Oh. Which regional managers?

A. The director at the time of startup was Shane Weeks. I don't recall the -- which regional manager had it.

Q. And Mr. Weeks reported to you. Is that fair to say?

A. No.

Q. Who did he report to?

A. Ajay.

Q. And then Ajay reported to you. Is that fair?

A. Yes.

Q. And then one other additional question, when we were referring to what is marked as plaintiff Exhibit 2, which is the deposition notice that you have in front of you --

Page 84

A. Okay.

Q. -- did you make any notes on that document?

A. Just circled the items that I'm responsible for.

MS. RADCLIFFE: Okay. We would request, Counsel, that that document be produced to us.

MS. BUGNI: Okay.

MS. RADCLIFFE: And we'd also like it marked as Plaintiff Exhibit 5 to this deposition.

MS. BUGNI: That's fine.

MS. RADCLIFFE: Okay.

(Plaintiff's Exhibit 4 was marked for identification.)

MS. BUGNI: 5 or 4?

MS. RADCLIFFE: 4, I apologize.

MS. BUGNI: That's okay.

BY MS. RADCLIFFE:

Q. And -- and those were the only questions I had remaining, Mr. Harness, today. I appreciate your time.

MS. RADCLIFFE: For the record, I do want to note that despite multiple requests that counsel provide the identification of the designee prior to the deposition, they refused to do so, and -- and we will be making that objection to the Court if it

**Page 85**

happens again.

MS. BUGNI: What is your authority for us to be required to tell you who the designee is?

MS. RADCLIFFE: It would be starters professional courtesy. If you would like to explain to the judge why you don't want to or don't need to, go ahead.

MS. BUGNI: I can explain that the deposition on Tuesday, your colleague went well beyond the scope of the noticed deposition. We had given the name of the witness in advance of that one, but given his behavior at the deposition, we didn't feel that it was appropriate for the ones that are proceeding on the next few days.

MS. RADCLIFFE: Well, that certainly wasn't communicated to us as a starter, and, secondly, that is not a basis to lack professional courtesy.

But with that said, I am -- I'm done with my questioning for today, and I don't know if anybody else has any further questions.

MS. BUGNI: Mr. Sams, do you have any questions?

MR. SAMS: I have no additional questions.

MS. BUGNI: We will designate the transcript as confidential, and the witness will

**Page 86**

read and sign.

MS. RADCLIFFE: Thank you very much for your time, Mr. Harness. You have a good afternoon.

THE WITNESS: All right. Thank you.

THE VIDEOGRAPHER: All right. This concludes today's deposition. We're going off record at 12:53 p.m. [sic].

(TIME NOTED: 1:53 p.m. EST)

**Page 87**

CERTIFICATE OF REPORTER

I, JOHNNA PIPER, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript [X]was [ ]was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: February 2, 2021

_____

JOHNNA PIPER, CSR NO. 11268

**Page 88**

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Stein vs. U.S. Xpress Enterprises, Inc.

Date of Deposition: 01/14/2021

Job No.: 10076694

I, JUSTIN HARNESS, hereby certify under penalty of perjury under the laws of the State of _____ that the foregoing is true and correct.

Executed this _____ day of _____, 2021, at _____.

_____

JUSTIN HARNESS

NOTARIZATION (If Required)

State of _____

County of _____

Subscribed and sworn to (or affirmed) before me on this _____ day of _____, 20__, by_____, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: _____ (Seal)