# EXHIBIT 35

# KING & SPALDING

King & Spalding LLP
50 California Street, Suite 3300
San Francisco, CA 94111
Tel: +1 415 318 1200
Fax: +1 415 318 1300
www.kslaw.com

Lisa Bugni
Direct Dial: +1 415 318 1234
Direct Fax: +1 415 318 1300
lbugni@kslaw.com

November 23, 2021

*By Email -* ksciarani@rgrdlaw.com

Kevin Sciarani
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

>       Re:     *Stein v. U.S. Xpress Enterprises, Inc., et al.*,
>               Case No. 1:19-CV-00098 (E.D. Tenn.)

Dear Kevin:

I write in response to your letter dated November 5, 2021. Each of the issues in your letter is addressed below.

**Request for Seven Additional Custodians.** As you know, we have already produced the responsive non-privileged documents for 23 individual custodians (plus additional sources). Despite the late stage of discovery in this case, where USX Defendants have already completed their document productions in accordance with the search parameters to which the parties agreed, Plaintiffs now ask that we add seven custodians. That is, Plaintiffs request that we start this entire process over for seven individuals, collecting their email, applying the agreed search terms, reviewing the search hits for responsiveness to Plaintiffs' requests, and producing or logging responsive documents. Your letter, however, does not provide a basis that would justify USX Defendants incurring the significant expense to add these new custodians at this point in the case.

With respect to the four requested custodians who you state were load planners for USX's Walmart accounts in Hammond, LA and Gordonsville, VA,[1] your letter asserts that these custodians are necessary given that "[a] key issue in this case is the impact of USX's lack of dedicated drivers to work its Hammond/Robert and Gordonsville accounts, USX's use of OTR drivers to support these accounts, and the impact of such support." But the custodians we have already used for our collection are more than sufficient to cover the relevant information for these two accounts.

---

[1] These individuals are Shannon Bigner, Michael Cowen, Aquanis Johnson, and Rebecca Lofton.

Indeed, the custodians for which we have already produced documents include the primary USX personnel involved in the initial bidding/negotiations for these accounts, such as Paul Bowman, and the primary USX personnel, Shane Weeks, responsible for overseeing the implementation of these accounts once USX won the bids. *See, e.g.*, USX0149718-20; USX0189228-256; USX0113905-09; USX0234467. Given that we already included those custodians, it is no surprise that our productions to date include thousands of documents concerning these two USX accounts. That includes information concerning the assumptions used for the initial bids, and the regular correspondence reflecting to what extent OTR drivers were needed (and used) to support these accounts. *See, e.g.*, USX0189220-225; USX0190950-51; USX0234467; USX0234521; USX0136876; USX0138248; USX0138334. You contend that these four additional custodians "would have had day-to-day visibility into the assignment of drivers to Walmart distribution centers." But your contention ignores that our productions **already reflect** the "day-to-day visibility into the assignment of drivers" for these two distribution centers, and, perhaps more importantly in light of Plaintiffs' only surviving allegations in this case, information reflecting the extent to which OTR drivers were used to support these accounts. No basis exists to add the requested four custodians.

Similarly, your only stated reason for requesting that we add two pricing team custodians—Julie Van de Kamp and Catherine Stephas—is that these custodians are purportedly necessary because "[t]he document production is missing information on the rates and pricing assumptions used by USX to prepare for Walmart dedicated business." But that is incorrect. Such pricing assumptions for USX's Walmart bids, including for the Hammond and Gordonsville accounts, are contained in our productions. *See, e.g.*, USX0189220-225; USX0190950-51.

Finally, although your letter asserts that USX Defendants need to add Mark Viale because he "would possess materials relevant to assessing the success of USX's driver first efforts," you make no attempt to explain why his information is unique and not already captured in other produced documents. In fact, we have already produced nearly 600 documents that refer to "Driver First" (and more than 1,200 such documents if you include the related families). Those documents include, among other things, quarterly reports on Driver First initiatives and weekly correspondence concerning those initiatives. *See, e.g.*, USX0117412; USX0113640; USX0104664; USX0164257. In light of our production, it is difficult to fathom how adding this custodian could be proportionate to the needs of the case.

For all of these reasons, your letter does not provide a basis sufficient to justify the additional expense USX Defendants would incur collecting, reviewing, and producing documents for these seven additional custodians. We have conducted more than a sufficient search to locate potentially responsive documents, and we have done so pursuant to an agreed search protocol. We decline to add these additional custodians based on the stated justification in your letter because it would serve no purpose but to delay this case, cause unneeded expense, and lead to the production of information that is likely redundant and unnecessary in light of what we have already produced.

**Text Messages**. In a similar tactic that seems intended to delay this case unnecessarily, your letter demands that USX Defendants collect and produce text messages for all of the 23 agreed individual custodians, on the basis that **three** emails (out of the 55,361 documents we have

produced to date) "confirm that USX employees regularly made substantive work communications over text messaging." Those three emails, however, show no such thing.

Two of the three emails, in fact, give no indication as to the content of any text message, and certainly do not indicate that USX personnel regularly exchanged "substantive" text messages. *See* USX0192475 ("John, per my text, this is a copy and paste of the invite I just received from Andy Butler. I will accept and forward to both you and Paul."); USX0197939 ("Tracey, here is an update from your text. If you'd like further information reach out to Justin Harness. I have copied Justin on this email."). And although the third email reflects the content of one text message, the email indicates that the entire message is copy and pasted into the email that was produced. *See* USX0194630 ("Text note from Lori: . . . ."). These emails simply do not provide a basis to conclude that USX personnel "regularly made substantive work communications over text messaging," as suggested in your letter.

Moreover, contrary to your suggestion, it is entirely appropriate for a defendant to rely on the representations of custodians when evaluating what information to collect for discovery. As we discussed previously, the agreed custodians indicated that they did not use text messages for substantive work communications. And nothing in your letter demonstrates otherwise or provides a justification for USX Defendants collecting, reviewing, and producing text messages for 23 custodians, particularly at this late stage of the case, when we have already gone to great lengths to collect and produce responsive emails and other information pursuant to the parties' agreed search protocol.

**Regularly Created Reports and Documents.** Next, your letter contends that our productions do not contain "entire categories of," or only "partial production of," certain regularly recurring reports that Plaintiffs are requesting or apparently were expecting to be produced. Each is addressed below.

Board Minutes & Materials. We have already produced USX's Board minutes and materials for the agreed time period. *See, e.g.*, USX0229366; USX0229432; USX0258924; USX0229661; USX0229675; USX0229788; USX0229871; USX0229933. And we did not rely solely on an email collection for these materials. Rather, we conducted an additional targeted collection for these documents. Although we are not aware of any relevant minutes or packages that are missing, if you believe there are any, please identify the meetings for which you believe you do not yet have the minutes or related packages, and we will work to track them down, as needed.

Walmart Portfolio Analysis. The "Walmart Portfolio Analysis" spreadsheet listed in your letter does not appear to be a regularly recurring report. Instead, the documents indicate that this report was created following negotiations on rates with Walmart in approximately December 2017. *See* USX0190016. That spreadsheet was then recirculated in a few email exchanges in February and March 2018. *See, e.g.*, *id.*; USX0147866; USX0216361; USX0148116. But this appears to be the same ad hoc report that was created for a particular analysis in December 2017. We do not believe anything is missing in this regard.

Monthly Turnover Reports. Here, again, it is not clear what you contend is missing. Your letter does not identify an example of the "Monthly Turnover Report" you are seeking. And our production contains a number of reports on driver turnover, including a report covering the full agreed time period of October 2017 through January 2019, with tabs to demonstrate the changes over the preceding time period (and a variety of the other details). *See* USX0063163. There are a number of similar reports for other time periods in our productions. *See, e.g.*, USX0223258; USX0223292; USX0223319; USX0104658; USX0104421; USX0091997. If for some reason this information does not provide what you are looking for, please let us know what else you believe you need.

Wage Reports. This is another category where you do not provide us an example of what report you are inquiring about. We nonetheless ran searches in our productions in response to your inquiry and identified reports titled "Weekly Driver Wage Analysis" and "Monthly Driver Wage Analysis." *See, e.g.*, USX0222210; USX0221288. If that is the information you are looking for, it appears that we have already produced that information for all of 2017 and January through September 2018. *See id.*

Headcount Reports. A quick search through our productions reveals that we have already produced monthly "Headcount Reports" reflecting the information contained therein for (at least) all of 2017 and January through November 2018. *See, e.g.*, USX0226848; USX0229307.

Customer Relation Reports/Customer Updates. Your letter does not provide an example of these reports, and we are not sure what report you are asking about, even after running searches in response to your letter. Are you referring to the "Service Report" reflected in the email and attachments produced with Bates USX0086470-75?

Spot Rate Reports/Quotes Activity. Although you contend there is a deficiency in our productions because you are missing these reports prior to June 2018, when we ran a search using the example you provided, one of the first documents that came up was a "Spot Quote Activity" report for the "Week of 9-23-2017." *See* USX0087851. A review of those search results indicates that we have already produced these reports from 9/23/2017 through the end of December 2018. Again, if you are actually missing something you believe you need, please let us know. But, at this point, we do not understand the contention in your letter.

Pay Sensitivity Analysis. Despite your request, the example you provide is a standalone document with no indication that it was a regularly recurring report. And, after running a search based on the example you cited, we confirmed this document was not a regular report, but rather was a spreadsheet created to be part of the "Baseline Dedicated Pricing Model." *See* USX0191005-06 (tab "Pay_Sensitivity").

Quarterly Exit Interview Summaries. We will follow up with our client to see if we can locate the Quarterly Exit Interview Summaries for 4Q17, 2Q18, and 3Q18 and will produce those documents if they exist.

**Missing Documents.** The Bates you listed for the first document you claim is "missing" from our productions is not accurate. But we ran a search for "Walmart" and "business review" for the time frame you identified and quickly found the presentation for the June 2018 "Walmart Business Review" that you indicated was missing. *See* USX0149609-11. Although your letter also requests the "transmittal email" for this presentation, the correspondence indicates that the presentation was delivered in hard copy and possibly displayed from a computer for the meeting. *See id.* ("I'll get 5 copies printed for the USX team and save a copy to Paul's flash drive.").

Although we have produced nearly 500 documents containing the phrase "Win the Week," including a number of "Win the Week" emails around the time period in your letter, we have not yet been able to identify the "Win the Week" emails for March 6, 2018 or July 10, 2018. If we are able to locate those two emails, we will produce them.

The same is true for the requested USX-Walmart "Popup Capacity Addenda." We have not located that in our database yet. If it exists and we are able to locate it with a reasonable search, we will produce it.

Finally, as to documents pre-dating July 2018 for Lori Bonneau (Casteel), Michael Graham, and Gregory McQuagge, we collected the email that was available for those custodians for the agreed time period, including from the back-up tapes we accessed, restored, and searched at significant expense. We have not identified any email for these custodians for the time periods identified in your letter (*e.g.*, prior to April 2018 for Bonneau, between October 2017 and December 2017 for Graham, and prior to July 2018 for McQuagge). That, however, is not particularly surprising given that USX had no obligation to preserve evidence for this case (or any related litigation) prior to November 21, 2018, when the first complaint was filed.

**Illegible Documents and Other Production Issues.** Some of the documents you identify as being "illegible or difficult to read" reflect the same content and readability as they do in our collection. *See* USX0087305; USX0087523. This does not appear to be a production issue or something we can remedy. The documents were produced in the same manner we are able to view them.

For the documents produced with cut-off charts or tables, however, we hope to be able to fix that and are working with our vendor to do so. *See* USX0149218; USX0233698; USX0234462; USX0235250. Assuming, as we expect, that we will be able to adjust those images, we will promptly re-produce them.

More broadly, we disagree with your contention that our productions do not comply with the Document Production Protocol requirements for color images. The protocol only requires production of color images where "the color is necessary to understand the meaning or content of the document." With that said, we will re-produce the specific documents you have identified that you would like to be produced in color, and if there are other specific documents where you are not able to understand the content or meaning of the document without color, please let us now. We would be happy to produce other documents in color if such is necessary. But, at this point,

we are not aware of any documents that need to be re-produced in color per the terms of the Document Production Protocol.

**Status of Production**. Subject to the items noted above where we have agreed to look for certain additional documents, our document productions in this case are complete, and we have produced our corresponding privilege log.

Please let us know if you would like to discuss any of the above further, in which case we will be available for a call on this matter.

Very truly yours,

Lisa R. Bugni

cc:    Jessica P. Corley
Ronni Solomon
Brandon R. Keel