# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

--------------------------------------------------------

LEWIS STEIN, Individually )
and All Others Similarly )
Situated, )
)
Plaintiffs, )
)
vs. )
)
U.S. XPRESS ENTERPRISES, )
INC., ERIC FULLER, ERIC )Civil Action No. 1:19-cv-00098
PETERSON, JASON GREAR, )
MAX FULLER, LISA QUINN ) CLASS ACTION
PATE, MERRILL LYNCH, )
PIERCE, PENNER & SMITH, ) Judge Harry S. Mattice, Jr.
INCORPORATED, MORGAN ) Magistrate Christopher Steger
STANLEY & CO., LLC, J.P. )
MORGAN SECURITIES, LLC, )
WELLS FARGO SECURITIES, )
LLC, STEPHENS, INC., )
STIFEL, NICOLAUS & )
COMPANY INCORPORATED, and )
WR SECURITIES, LLC, )
)
Defendants. )

--------------------------------------------------------

February 8, 2022

PLAINTIFFS' MOTION TO COMPEL ADDITIONAL DISCOVERY RE:
PRODUCTION OF TEXT MESSAGES
DISCOVERY OF CUSTODIAL WITNESSES
30(b)(6) DISCOVERY-ON-DISCOVERY WITNESS

Fouraker Reporting Service, Inc. (423)316-6484

APPEARANCES:
FOR THE PLAINTIFF

CHRISTOPHER WOOD, ESQUIRE
ROBBINS GELLER RUDMAN & DOWD
414 UNION STREET
SUITE 900
NASHVILLE, TENNESSEE 37219

FOR THE DEFENDANTS U.S. XPRESS ENTERPRISES, INC.
ERIC FULLER, ERIC PETERSON, JASON GREAR, MAX FULLER
AND LISA QUINN PATE

RONNI D. SOLOMON, ESQUIRE
JESSICA P. CORLEY, ESQUIRE
LISA R. BUGNI, ESQUIRE
KING & SPALDING
1180 PEACHTREE STREET, NORTHEAST
ATLANTA, GEORGIA 30309

and

K. STEPHEN POWERS, ESQUIRE
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ
633 CHESTNUT STREET
SUITE 1900
CHATTANOOGA, TENNESSEE 37450

FOR THE DEFENDANTS MERRILL LYNCH
PIERCE, PENNER & SMITH, INCORPORATED
MORGAN STANLEY CO., LLC
J.P. MORGAN SECURITIES, LLC, STEPHENS, INC.
STIFEL, NICOLAUS & COMPANY, INCORPORATED
AND WR SECURITIES, LLC

CREWS TOWNSEND, ESQUIRE
MILLER MARTIN
SUITE 1200, VOLUNTEER BUILDING
832 GEORGIA AVENUE
CHATTANOOGA, TENNESSEE 37402

Fouraker Reporting Service, Inc. (423)316-6484

February 9, 2022

BE IT REMEMBERED, the above-entitled cause came to be heard upon this date before the Honorable Christopher H. Steger, Magistrate of said Court, at which time, the following proceedings were had, to-wit:

--------------------------------------------------------

(Afternoon Session) (3:00 p.m.)

THE COURT: Please call the case.

THE CLERK: Civil Action 1-2019-00098, Stein versus U.S. Xpress Enterprises Incorporated, et al.

THE COURT: And would Counsel please enter appearances for the record, and we will start with the Plaintiffs' counsel.

MR. WOOD: Good afternoon, Your Honor. Christopher Wood, on behalf of the Plaintiffs.

THE COURT: Good to see you, Mr. Wood.

MS. SOLOMON: Your Honor, Ronni Solomon, for the Defendant U.S. Xpress; and I have Lisa Bugni and Jessica Corley with me and --

I'm sorry.

MR. POWERS: Steve Powers, here locally, on behalf of the U.S. Xpress Defendants and the individuals.

Fouraker Reporting Service, Inc. (423)316-6484

MR. TOWNSEND: Crews Townsend, here for the Underwriter Defendants.

THE COURT: All right. Well, it's good to have all of you here today. You guys are mostly from Atlanta, I take it; and, from Nashville, as I recall, for Mr. Wood.

MR. WOOD: (Moved head up and down.)

THE COURT: Okay. So I want to let you know that I've read your submissions. It's enthralling.

I also want to commend my staff for -- your latest submission, Mr. Wood, was addressed to Judge Sarala V. Nagala; and, somehow, it made its way to me.

Judge Nagala was born the year I graduated from law school; she is in Connecticut; and she went to Stanford. So nobody could confuse me with her. But my crack staff found this and gave it to me nonetheless, so we did read it.

MR. WOOD: I apologize, Your Honor.

THE COURT: I'm worried about what Judge Nagala might have that should be directed to me, but I'll let you sort that out.

MR. WOOD: Yes, Your Honor.

THE COURT: All right. So -- but I did read everything, and let me -- let me just lay some

Fouraker Reporting Service, Inc. (423)316-6484

Case 1:19-cv-00098-TRM-CHS Document 194-8 Filed 06/24/22 Page 2 of 35 PageID #: 4922

groundwork before we get started, mostly to refresh my memory, but I'm going to give you an opportunity to correct any deficiencies in what I'm about to say.

So this is a securities class action. The Plaintiffs have asserted a Securities-Act claim based upon two discrete statements contained in the company's registration statement in the initial public offering on the theory that those statements were false or misleading because U.S. Xpress did not have a sufficient number of drivers at the time of the IPO and was being forced to shift drivers from its, allegedly, more profitable over-the-road division to support its less-profitable dedicated division.

I know that the parties engaged in extensive discovery. I previously worked with you guys on a motion involving some subpoenas that were served upon U.S. Xpress's customers; and we worked through that, as I recall, and I directed -- I directed that those be held in abeyance until U.S. Xpress had an opportunity to respond to the discovery that had been served upon it because I believed that counsel, Plaintiffs' counsel, would be able to find much of the information they were looking for in U.S. Xpress' documents rather than having to seek that information from these customers all over

the country. And so part of what has been going on, I assume, is in response to that.

The parties have been working diligently, as I surmise, to respond to the discovery requests that were served on U.S. Xpress. It's my understanding that the Defendant has produced electronically stored information, ESI, from noncustodial sources and from twenty-two custodial sources.

Defendant represents that they have reviewed over two hundred and eighty-five thousand documents, which constitutes about one-point-five million pages; and they have produced fifty-five thousand documents, which amounts to about two hundred and sixty thousand pages; and that this effort on their behalf has cost the client about two-point-one million dollars directionally.

And I have practiced law for long enough and worked in Atlanta for a while and have a basic understanding that King & Spaulding has lawyers, like Ms. Solomon, who have great expertise in ESI production.

But they also have a special unit of lawyers designed -- whose job it is to review vast numbers of documents and determine whether they are privileged, whether they are relevant, so on and so forth. So they,

like so many other big firms in the country, are uniquely situated to perform this kind of document search and discovery.

The Plaintiffs ask the Court, at this point, to compel additional discovery from the Defendants; and, basically -- and I'll let you elaborate on this -- most of the discovery heretofore has focused on email, and I -- and I think -- and other kinds of documents.

But, with respect to the custodian witnesses in this case, I believe U.S. Xpress will take the position that the substantive communications about the business of the company are communicated through email, not through texts.

But the Plaintiff takes the position that it should also -- that the Defendant should also be required to perform the same sort of search with respect to the text messages on the custodians' mobile devices.

Defendant, in response, has furnished declarations from the currently employed custodians -- and I looked at all of those -- indicating that they did not use text messages for substantive business purposes.

They used email for that purpose, except for

Shane Weeks, apparently. The Defendant is willing to concede to reasonable discovery of Shane Weeks's text messages.

In addition to the discovery about the text messages, the Plaintiff's also seek -- they want discovery from six additional custodians, also referred to as "percipient witnesses." Those are four load managers directly assigned to work on two Walmart dedicated accounts and also two pricing team leads responsible for Walmart bidding strategy for those accounts.

Defendant argues that discovery from these additional custodians, or percipient witnesses, would not yield any new substantive information and that any such information that might be found by doing discovery concerning those custodians would be duplicative to what has already been produced.

Defendant also points out the discovery from these six additional custodians, if they were to use the same methods of collection and review as were used with the twenty-two previous custodians, would cost the Defendant an additional two hundred and eighty-five thousand dollars. I'm sure that's just an estimate, but it's based upon a tried-and-true formula that they have been using, so they do have a way to

Case 1:19-cv-00098-TRM-CHS   Document 194-8   Filed 06/24/22   Page 3 of 35
PageID #: 4923
02/10/2022 01:14:21 PM                     Page 5 to 9 of 32                     2 of 34 sheets

measure that.

And then, finally, the third thing is Plaintiff's are seeking a Rule 30(b)(6) deposition on the subject of what is commonly referred to as discovery on discovery. In other words, they want a Rule 30(b)(6) deponent to testify on all of the steps taken by Defendant to find, preserve and produce information sought in discovery.

And Defendant would respond to that that Plaintiffs have not -- are not entitled to that sort of Rule 30(b)(6) discovery-on-discovery witness because Plaintiff's have not demonstrated any preservation lapse or production issue that calls into question Defendants' preservation and production efforts.

So, in any event, I read this stuff over the weekend. I sat down today and tried to remember what I read; and that's a brief summary of what I recall this discovery dispute being about.

So I do that primarily to confirm for you that I've read your stuff and also that I have some basic understanding of what the issues are, so you don't have to start at ground level; and you can just flesh out what you want me to know about those issues.

So, Mr. Wood, I'll let you go first.

MR. WOOD: Should I go to the lectern,

Your Honor?

THE COURT: That would be great.

Everybody feel safe? Okay. Mr. Wood looks plenty healthy today. I think it's pretty safe.

MR. WOOD: Yes, Your Honor.

THE COURT: Go ahead.

MR. WOOD: Good morning, Your Honor. Christopher Wood, on behalf of the Plaintiffs.

I think Your Honor summarized well the dispute that we have. And, as Your Honor noted, the one focus on this case, just to kind of make sure we are grounded and put it in perspective, is what this IPO is about and the core -- whether or not the core selling point of this IPO was true, which is really the focus of our complaint and also reflected in the motion to dismiss, and whether or not the Defendant misled investors on their ability to execute on the plan that they presented in the IPO.

And, if Your Honor will recall, that, historically, U.S. Xpress had lagged its peers in terms of its operating ratio; it had not performed well in this space compared to its peers; and it had represented that it had gone through a transformation and that it was this transformation that was going to yield dividends for investors as they went into the IPO.

"We've done the transformation. The market is at an all-time high for trucking services. Now is your opportunity to get in and get the benefits of all this work that we've been doing."

And what we alleged in the complaint was that the state of affairs they represented in the registration statement was not true, that there were a lot of issues that they were seeing in the first half of 2018 specifically that were not disclosed.

And so, when they stated that they'd be able to capitalize on the current favorable truckload environment and warned that: "If we are unable to continue to attract and retain a significant number of drivers, there could be adverse consequences," but this wasn't true because they were already suffering from serious operational issues that they failed to disclose.

And that's the crux of what the Court upheld, and Pages 31 to 33 of the motion to dismiss order talks about that in detail and all the reasons why the company, we allege, was struggling to maintain -- retain drivers and struggling to service the dedicated division; that they didn't have in place compensation packages sufficient to hire and retain drivers; that they weren't the best paid in the industry; and that the load planning

and chart maintenance programs that they highlighted were not working; that they weren't able to prioritize running the dedicated division.

This is all on Page 33 of the Court's order denying the motion to dismiss, which gives context to some of the disputes that we're having now in terms of the custodians and text messages.

And I'm glad that Your Honor mentioned the dispute that we had previously about the third-party subpoenas, specifically because I think that's really important when we talk about the relevance of the load planners. But let me start with the text messages, Your Honor. This is an issue that the Court previously addressed.

Last year, we submitted a joint status report; and we told Your Honor that this was an issue that we are, you know, having a dispute about. And we had a conference with Your Honor to discuss it, and we kept working on it.

The Defendants kept producing -- at the time, the Defendants said that they checked with these custodians and that there were no relevant text messages; and that's the representation that they made to the Court in the joint status report and during that conference.

Case 1:19-cv-00098-TRM-CHS   Document 194-8   Filed 06/24/22   Page 4 of 35
PageID #: 4924

At the same time, if the Court will recall, we pointed out that, while the Defendants had told us that they were substantially complete with their document production, it turned out that they produced hardly any emails at all from the period leading up to the IPO, which was the most critical period of the case, at which point, apparently, they discovered backup tapes, restored those backup tapes and produced a whole slew of additional documents, which we have been reviewing, which was complete late last year.

And one of the things that we certainly saw in those documents -- and we submitted some of them to the Court -- was evidence that the folks were using text messages during the course of their business.

Some of the custodians were using text messages and communications with the underwriters; with Walmart, the customer that's kind of at the center of some of these allegations. And we submitted those documents to Your Honor to show that folks were texting, texting with customers and underwriters, and that this was relevant to the case.

In the opposition Defendants filed, for the first time, we learned that Mr. Weeks apparently was not willing to submit a declaration in the same vein as the

other folks that submitted declarations.

We have since learned that he has twenty-four thousand text messages on his phone, which we presume was company provided, although the Defendants never really come out and say it, and those are being searched.

One wonders who he was texting with about USX's business. I would presume it was other custodians and folks that are relevant to the case, but that's underway.

And, as Your Honor also mentioned, there are no declarations from the four former employees -- or executives of the company who were -- at least three of which were at the company when the case was filed. No declarations from them at all.

And then Your Honor summarized the declarations that the custodians did submit; but even those declarations, as we pointed out in the reply, Your Honor, they don't say that they never used text messages. They don't say that they never used text messages about items relevant to this litigation. They say that they didn't recall doing so routinely.

There's a lot of room in those declarations, which I think doesn't provide us, at least, any comfort that there aren't going to be any relevant responsive

documents in those text messages in light of what we saw during discovery.

And, so, I think, from the fact that we've got at least one custodian who implicitly admits and concedes he did use text messages during the course of his work at USX, we have four custodians where there's no representations whatsoever about whether or not they did use text messages, and we have at least a number of emails that indicate that text communications were occurring, I think that's a reasonable -- that's enough of a basis, Your Honor, to show that relevant documents are going to be located within those text messages, especially when you consider the flip-side, which is the Defendants haven't made any argument about burden whatsoever.

If you look in their opposition brief, there's not a single argument about the burden associated with collecting those text messages. We don't know if these text messages even still exist. Obviously, with Mr. Weeks -- or, for Mr. Weeks, they do. There are apparently twenty-four thousand.

We're not sure about the rest of these folks. I guess, if they didn't retain the text messages, there's not much of a burden in searching them; but we don't know.

But, if you're looking at a proportionality analysis for the relevance of these text messages, I would respectfully submit that we know some folks used them; we believe that, for all the custodians, there's going to be relevant information in that based on what we've seen in discovery; and there's been no showing of any burden associated with producing it; and, on that balance, we would submit that the Defendants should be ordered to search and produce text messages from these folks.

THE COURT: Let's -- it would be easier for me if we compartmentalize this a little bit; and I want to be interactive and talk about the text messages before we move on to the next subject.

So let me invite you -- I think it would be easier -- so y'all don't have to keep bobbing up and down, why don't you take a seat at counsel table. You have a microphone over there. And I may ask you some questions.

MR. WOOD: Yes, Your Honor.

THE COURT: Thank you, Mr. Wood.

Who will speak on behalf of the Defendants? Ms. Solomon?

MS. SOLOMON: I will, Your Honor.

THE COURT: You can --

Case 1:19-cv-00098-TRM-CHS Document 194-8 Filed 06/24/22 Page 5 of 35
PageID #: 4925
02/10/2022 01:14:21 PM Page 13 to 16 of 82 4 of 34 sheets

MS. SOLOMON: Do you want me to remain at the counsel table?

THE COURT: Yeah, just because I want to make this a little more interactive; and I don't want y'all to keep having to go back and forth.

I was -- in preparation for this right before the hearing, I had a vague recollection that you had included -- or someone had included an approximate cost of trying to search through these text messages if -- if you were required to do that, but I -- but, then, I couldn't find it; so maybe I was not remembering correctly.

MS. SOLOMON: There is not.

THE COURT: Okay.

MS. SOLOMON: There's not a reference like that.

THE COURT: Okay. So I know one of your arguments is: "Look, Your Honor. These folks who were custodians of the text messages would say they just -- in their normal course of day-to-day, they were not using their texts for business purposes. There's not substantive business communications on these texts. Therefore, we shouldn't have to search through hundreds of thousands of texts to try to weed out, you know, some reference to U.S. Xpress." But go ahead and flesh that

out for me and whatever other arguments that you want to make.

MS. SOLOMON: Sure. Your Honor, I just want to go back a little bit to address some of the statements Mr. Wood made and say that, you know, our discovery process is based on the honor system; and each party gets to fulfill their discovery obligations reasonably, the best way they know, using their processes and protocols; and no one gets to go behind that production process unless there is some showing of substantial problems with the production or abuse.

And this is because producing parties are the best -- best situated to deal with their own documents; and this is like a very-well-known rule amongst the federal courts. It's cited in the Sedona Conference's principle, Principle 6.

And it's premised on the fact that each lawyer, on each side, is an officer of the Court; and they are entitled to fulfill their obligations without direction from the Court or from opposing counsel. And deference is given to the producing party, since they're the one bearing the costs.

So I think it's important for the Court to recognize that this is the rule that we are proceeding under; and mere speculation that there's

missing documents is not enough to go behind that process.

Now, I know, from prior experience, that requesting parties, like the Plaintiffs, have a very hard time with this process and relying on it and trusting the other side; and, they -- you know, they assail the Sedona Conference in their reply and say it's not persuasive or controlling here.

And I'll just note, as an aside -- and Your Honor may know this -- that the Sedona Conference is the seminal think tank on ESI issues in the world. It's a big reason that the Federal Rules of Civil Procedure were amended in 2006 to address ESI issues.

And I'll note that, in this Circuit, the Court of Appeals and the -- and the District Courts in the Sixth Circuit have cited the Sedona Conference in their publications I think at least thirty times.

Some of the District Courts even come out and say that. They say things like: "The Sixth Circuit, including the Court" -- they say things like -- I'm sorry -- that: "The Sedona Conference's resources provide persuasive authority regarding discovery best practice and principles."

And, even one of the cases that the

Plaintiffs cited in their reply, the DR Distributors case, says that: "The Sedona Principles are packed full of practical user-friendly information regarding ESI."

And, so, up to this rule I'm telling you about -- it's important, because what they want to do is they want to just take the standard of discovery, relevance and proportionality and just apply that and not consider that this is going -- delving into our production process, when there's been no showing of abuse.

So, now, getting to the text messages. What they're essentially saying is there's four emails that have been produced in this case, and those four -- because there's four emails and there are references to texts, that that somehow makes the production at U.S. Xpress -- made the fifty-five thousand documents, like Your Honor said -- that that makes the production deficient, requiring us to go out and fix it by getting the text messages.

That's -- that's really the argument that they're making, and it's -- first of all, you know, U.S. Xpress produced the fifty-five thousand documents, and they produced -- and the third parties, including the Defendant Underwriters, produced about ten thousand

documents.

So they've got about sixty-five thousand documents that Plaintiffs obviously scoured through to try to find evidence of texting amongst the custodians; and all they could come up with is these four documents.

And I'll tell you, first of all, that three of those four, we had never seen before the motion to compel. That was the first time we saw them, during the meet-and-confer process, never got those documents, that I would submit should not be used against U.S. Xpress here because it was not part of the meet-and-confer process.

But, even if you take the four emails to show our deficiency, one of the four, which is Exhibit 16 to their motion, is not evidence at all of custodian texting. If you look at it, it's actually a text between one of the custodians' brothers and a third-party. There's no text to the custodian. So Exhibit 16 should have no bearing on this issue.

Another one of the four is about a hurricane coming and how it could impact operations, and it's about -- there's a reference to Eric Fuller receiving a text from a Walmart employee. And you can understand, with a pending hurricane and how that could impact

operations, how there might be a text in that situation, because it's nonroutine. It's not a routine situation.

So we're left with two emails. Those two, you know, I think you can dispose of; and they don't have any bearing on this. We're left with two documents, out of the sixty-five thousand, where there's a reference to texts.

And I would suggest to you, Your Honor, that those two don't establish a deficiency. They don't establish that there was rampant texting going on with these custodians.

And, in this case, U.S. Xpress, you know, they followed the process diligently and with good faith. They conducted collection interviews. And the custodians indicated that they didn't text about the underlying facts.

And then I think Your Honor suggested, at a prior hearing, like Mr. Wood said, that we should file declarations to that effect, and we did like Your Honor said.

And one -- a reference to one or two texts doesn't disturb this general principle of not being able to go behind the production and order additional discovery to address the deficiency. It's not

enough.

So I'll also say, again, just going back to the -- the issue of what do you -- what standard do you look at, do you look at the substantial production and you go behind that? Is that the rule that we go to?

And let me just back up one second and say the reason for this rule is because you can't have requesting parties going to the Court and saying: "We -- well, they didn't produce this and they didn't produce that and they didn't produce this," and, just every time, go to relevance and proportionality. There has to be some reliance on the producing party's production unless there's some showing of abuse.

It would be preposterous for every decision that the producing party made -- and there's a myriad of decisions that they have to make in terms of determining relevance and deciding what they're going to collect. There's a myriad.

And so it would be a preposterous result to always just resort to, well, it's not that it's not an important facet; but, first, you look at whether there's a substantial deficiency.

Then, with relevance, the problem with the Plaintiff's position is that they're relying on cases

that -- they're relying on a United States Supreme Court case from 1974, Oppenheimer, for their relevance standard; and that case was interpreting Rule 26(b)(1) in 19, I think, 74; and we're in 2022; and the rules were amended in 2015 to severely curtail the relevance standard.

The standard is not "reasonably calculated to lead to the discovery of admissible evidence" anymore. It's much more narrow, and it's contrary to the cases that Plaintiff cited. So they -- it's not as broad as they'd have you believe, the relevance standard here.

Those are my points, Your Honor.

THE COURT: All right. Let me ask you a couple of questions. So we're all familiar with Rule 26 and the standard and we look at whether this is relevant, but are there text messages out there that are relevant to the claims and defenses in this case, and is this discovery proportional to the needs of the case.

And it -- it's conceivable that, among the thousands of texts that may be out there, there might be some that have some relevance to the claims and defenses in this case. It's conceivable. We don't know.

Case 1:19-cv-00098-TRM-CHS   Document 194-8   Filed 06/24/22   Page 7 of 35   PageID #: 4927

But I -- I would respectfully say, to the Plaintiffs, why not ask? It's not costing you anything. You know, you're asking the Defendant to spend another hundred thousand dollars looking for stuff that may or may not have any bearing on your case whatsoever. I mean, that is the problem that we're always confronted with here.

MR. WOOD: Well --

THE COURT: Wait, wait, wait. Yeah. I'll give you a chance to talk.

But -- so I have two things I need to ask you about. Number one, I've got declarations from some of your folks saying: "We can use this -- the names that are substantially related to business purposes of the company."

But I -- as Mr. Wood points out, there were four custodians who are ex -- I guess ex-employees who did submit declarations; and then Christopher Weeks -- and I don't recall who that is. Is that a current employee who didn't submit a declaration?

MS. SOLOMON: It is. And he's the director of dedicated operations.

MS. CORLEY: No.

MS. SOLOMON: I'm sorry.

THE COURT: He's not? Okay.

(Whereupon, an off-the-record discussion was held.)

MS. SOLOMON: Oh. So he works -- he reports to the director of dedicated.

THE COURT: Okay. Why no declaration from Mr. Weeks?

MS. SOLOMON: Because he indicated that he did text --

THE COURT: Okay.

MS. SOLOMON: -- substantively, so we -- you know, once we realized that, we agreed and I think there's a footnote in our paper saying that we'll go ahead and apply the search terms and produce responsive documents from Mr. Weeks.

THE COURT: And, also, from Mr. -- was there a Shane somebody?

MS. SOLOMON: That's Shane Weeks.

THE COURT: Same guy.

MS. SOLOMON: That's the same gay. And then Mr. Wood is talking about the four former employees that we don't have declarations from.

THE COURT: Right.

MS. SOLOMON: The reason for that, Your Honor, again, you know, we had meet-and-confers about these issues; and we told the Plaintiffs that we were going and

getting these declarations.

And, mind you, this was around December, like around the holidays and like around when COVID kind of peaked and we told the Plaintiffs that it was taking a little time; and, so, before we could get the declarations, they went and filed a motion to compel.

So, if they would have waited for the meet-and-confer process to work out and they said to us: "Where are the four declarations from the former employees" and "we believe that you guys have possession, custody and control over these four," we might have agreed, at that point, to go ask them.

And, in fact, we did go and talk to John White, who is one of the four; and he signed a declaration, just like the other custodians. And we've tried to contact one of the others -- and we haven't been able to -- since we saw this in the motion.

So not -- not admitting that we have possession, custody and control; but we would be willing to try to determine whether they have --

THE COURT: Right.

MS. SOLOMON: -- you know, what they said they needed. There just wasn't -- the fact here is we just didn't have time to go over that in the meet-and-confer

process.

THE COURT: Okay. I got it.

So, second question, Ms. Solomon -- I know, from a prior life, that you have great expertise in ESI; and, with respect -- so, probably, among the people -- lawyers in the world, you might be uniquely situated to render an opinion on the extent to which discovery of texts is possible.

I, in my current job, do search warrants, which go to the telephone companies, which allow us to get information about calls and text messages and so forth from the phone companies; but we're talking about something different here.

We're talking about going to those phones themselves, I suppose, and searching through the phones and trying to find text messages. And I -- so you would take the phone and, just like a computer, I guess, you would download all the data.

MS. SOLOMON: Right. The way the technology works today is you have to take every single thing off the phone. You can't just take, you know, one -- one type of content. That's the way the technology is today. You have to take everything. So it is very intrusive --

THE COURT: Yeah.

Case 1:19-cv-00098-TRM-CHS    Document 194-8    Filed 06/24/22    Page 8 of 35
PageID #: 4928

MS. SOLOMON: -- to do that.

THE COURT: And then you would apply search terms.

MS. SOLOMON: You then apply search terms.

THE COURT: Do you have some sense for -- how long does a text -- unless somebody deletes it, how long does a text reside on a device? Is it forever?

MS. SOLOMON: It's really by -- by person and, you know, whether they've kept their phone a long time and restored from the old one. But they can exist for years. Like Shane Weeks, like Mr. Wood said, has twenty-four thousand of them from -- from the time -- you know, from this time period.

THE COURT: Yeah.

MS. SOLOMON: So it goes back. But it's really individual. You can't generalize at all. And it's really dependent on the individual and their -- and their practices.

THE COURT: Okay. And did all of the -- these folks that -- I guess it's the twenty-two or now twenty-eight custodians that he's seeking. Did they all have mobile devices issued by the company, as opposed to personal devices? They probably had both, but did they have --

MS. SOLOMON: The majority of them had company devices.

0THE COURT: Yeah.

MS. SOLOMON: And then a few -- I think four -- had personal devices.

THE COURT: Right.

MS. SOLOMON: But, you know, I don't -- I don't think our argument is that we're not willing to produce them if the Court orders it, you know; and the custodians will cooperate. I think it's more about, you know, the fact that parties have to be able to rely on their employees. They're the ones who know the underlying facts the best. And it's appropriate to rely on them. It would not be a best practice not to use them as part of this process.

And, here, you know, we asked them, during the collection interviews, did they text routinely; and they said: "No." And then we followed up and asked if they would sign declarations to that effect.

And the process worked okayed, because Shane Weeks said that, you know, he couldn't sign the declaration because he did. But these others -- and we are talking about a case here, Your Honor, that's not about a fraud, like there's no reason not to trust these custodians and whether they texted.

There's been no showing that there's any reason not to trust their statements in writing and under oath, that they didn't text routinely. So I -- I don't know why we'd go behind that, when there's been no showing, so -- you know, to date, except for these four emails, that they said that they text.

There's no -- in the cases that the Plaintiffs cite, there's rampant texting. There's testimony that the plaintiff texted. There's -- there's texts. You know, this is not one of those cases where there's been such a showing here to overcome these declarations and the statement -- and the statements during interviews.

THE COURT: When your four custodians who are no longer with the company left, would they have turned in their mobile devices or just taken them with them? Do they even exist?

MS. SOLOMON: You know, with John White -- you know, I'm not -- I'm not sure about those four, because, candidly, you know, we didn't think that we had possession, custody and control of the four, so we -- you know, they're former employees.

So we didn't -- you know, we checked to see if we had anything for them, but we didn't -- we didn't communicate with them, like I said, because, during the

meet-and-confer process, there was no discussion about it. So we haven't gone and done that step to know if there are phones still out with the text messages or not.

John White signed his declaration yesterday. It hasn't been filed with the Court yet. And I have copies here, and I'm happy to give one to Mr. Wood and to the Court. But he signed one saying that he didn't text routinely either.

THE COURT: Okay. So assume for a moment we take -- assume for a moment that I order production of all texts for these twenty-eight custodians and you gather up their phones and you have an outside vendor that downloads the data, I assume, or maybe y'all do that inhouse. But you download all the data from the phones. You sift through it. There's a cost to that.

MS. SOLOMON: There is a cost to that, and it's a similar process to what's in our declaration, showing --

THE COURT: Yeah.

MS. SOLOMON: -- you now, the two hundred and eighty-five thousand. It's the similar -- the same exact systems as there would be for regular documents.

Case 1:19-cv-00098-TRM-CHS Document 194-8 Filed 06/24/22 Page 9 of 35 PageID #: 4929

THE COURT: But you don't have a ballpark number on that yet?

MS. SOLOMON: I don't, because I don't know the -- you know, the exact number of text messages for all the custodians.

THE COURT: Okay.

I do think -- I'm going to make an observation, Mr. Wood, that people treat their -- generally, their text messages as confidential and mostly personal and generally write things to their wives, girlfriends, boyfriends, children, so forth, that they are not expecting the world to read.

And it is a little bit different than getting into somebody's business email account, where they have their guard up a little bit and are not writing intimate messages to family members and friends. So it's a -- there's that element, too.

MR. WOOD: Can I respond?

THE COURT: Yes. You can respond now.

MR. WOOD: All right. Let me start there, and then I have a list of other things that I'd like to respond to from what Ms. Solomon said.

But I take your point, Your Honor, on that last piece; but I would say two things. One, these are business phones. They are business -- these are not

personal cellphones. These are business phones.

And USX, presumably, has a policy about its ability to search those phones. It does have an IT policy that says that: "We can look at anything that's on your business devices," and so they should not have an expectation of privacy when it comes to text messages, particularly in their business phones, Your Honor; and that's not supported by the record in this case.

Number 2 --

THE COURT: Do you -- do you actually know that they have such a policy, or are you just speculating?

MR. WOOD: No. We have a copy of their IT policy, Your Honor; and it says, if you're using the company's IT devices, that they can look at it at any point. And we're happy to submit that.

THE COURT: So you're not asking to look at anybody's personal phone. You just want to look at their business phone.

MR. WOOD: Well, the -- so, the vast majority of the custodians, these are company-provided phones. I believe, in the footnote in Defendants' opposition, they said that, for four custodians, one of them had a business phone for part of the period and a personal

phone for part of the period; and the other three had personal phones.

But there's no suggestion that they don't have possession, custody and control of those phones as well, at least from their papers and what they said in their footnote, Your Honor.

But I think the other point here is that, you know, obviously, we're not interested in what they're writing to their wives or their children or their doctor. I mean, clearly. And there are ways, very simple ways, to search and filter those out in their text messages. We have no interest in knowing what they talked to their wives about. So just -- those can all go away. Right?

But what we're interested in is the communications that these folks are having with other employees at USX, with the underwriters, with the customers; and you can just -- you can look through -- so, with Mr. Weeks, for example, we are discussing with Defendants how to search and produce the twenty-four thousand text messages that Mr. Weeks has on his phone.

And one of the things that I proposed yesterday for the Defendants is just, you know, tell us who he's communicating with; and let's get rid of a bunch of them.

Right? Let's get that twenty-four thousand number down. There could be a bunch of spam text messages in there from DoorDash. I mean, whoever it is. Right? And let's get that number down to the messages that are actually relevant to this case.

And so my twofold response to Your Honor's point is that these are -- the vast majority of these are business phones. There is no expectation of privacy, and we can eliminate any personal conversations on there; and we, obviously, don't want to see those. There is also a protective order, as Your Honor knows; but we don't even need to see that stuff. So I think that deals with that issue.

As to the process and the Defendants' trust-us argument, you know, even the case-management order in this case recognizes that discovery is an iterative process. It's not just trust us. It is, at the very least, trust but verify. Right?

And the two examples, from this very case that we have, in terms of our concerns about whether we've got all of the documents that we believe we're entitled to, are things that I've already covered.

The Defendants told us that they were complete. They said: "Trust us. We know where to find all the relevant documents," and they told us they were

Case 1:19-cv-00098-TRM-CHS  Document 194-8  Filed 06/24/22  Page 10 of 35
PageID #: 4930
9 of 34 sheets                Page 33 to 36 of 82                02/10/2022 01:14:21 PM

substantially complete with their production.

And, as Your Honor has mentioned several times, these folks are experts. Right? Ms. Solomon like helped write the Sedona Principles, which she is asking Your Honor to apply instead of the Federal Rules. They are experts in this.

And the idea that they would tell us that they are complete with their production, when they knew or must have known that there were almost zero emails from before the IPO, that's a problem for us; and that gives us doubt about whether we can think -- whether we can be confident that we're doing what we need to do for our clients and get everything that we are entitled to.

And they are not the ones that told us: "By the way, we have these backup tapes." We had to point it out to them, from their production, that we were missing huge amounts of documents; and only then did they say: "Oh, we went back and found these backup tapes." That, for us, is a problem. They should have told us that without us even having to raise it. That's how it normally works in these cases.

And then you look at the text messages. They told us last year that they had talked to all of these custodians and that no one used text messages; and now

we have Mr. Weeks saying, in fact, he did use text messages.

And we don't know if these four custodians were ever asked, if there were even custodial interviews done, at the beginning of this case for these folks; and that's a problem, especially when we see, in the production, people texting with customers and texting with underwriters.

So it's trust but verify, Your Honor. In every single one of these cases that I have ever done, it is an iterative process; and it is relevance versus burden. I mean, that's the standard under the Federal Rules. And they've given you nothing, nothing, about burden. They gave you a whole declaration about the burden associated with these six custodians and nothing on text messages.

And we are more than happy to work with them to reduce any burden, of which there is no evidence, on text messages; but to say that we're not entitled to it, when there's been no showing of burden, I think, would be to turn the Federal Rules upside down, to say nothing of what we're going to find in Mr. Weeks's text messages when it turns out he was texting all the people that say they never used text messages, which I think gets me to my next point about the nature of text messages, which is

very important.

When we talk about substantive business communication, whatever that means, we are not suggesting that people would have signed contracts with Walmart -- that U.S. Xpress would include a contract with Walmart that they were going to sign in a text message. Right? That's not how text messages work. We have the contracts that they signed with Walmart. That's not what we're looking for.

But, along the lines of what Your Honor mentioned a minute ago, people do tend to be more candid in text messages, and not just, you know, with their spouse or their family, but with other people out in the world, too. People often don't put that type of stuff in an email.

And, while Ms. Solomon said this is not a fraud case, the Defendants told the Court that this was a fraud case in their motion to dismiss. They insisted that the Court apply Rule 9(b), which the Court did; and, in the Court's motion-to-dismiss order, he said that the complaint was dripping with allegations of fraud, which it certainly included fraud allegations.

The 10(b) claims were dismissed, but there are a lot of allegations still in there about why the Defendants conducted the IPO, the debt that some of the

individuals were able to get back from the company when it -- when it completed the IPO and their motivations for doing so.

So it's not a fraud case? That means fraud is not an element in Section 11? Motive is absolutely relevant, and it's going to be relevant in summary judgment and for a jury. Why would these people sign registration statements that had misleading statements in them? Motive is absolutely relevant to that.

And text messages, today -- it's kind of like what email was twenty years ago. I mean, people are more candid -- in my experience, from my time in doing this, people are more candid in text messages than they are in email; and, sometimes, the most critical communications are in those text messages. And so I think that that's an important distinction when you look at this particular form of discovery.

In terms of the timing of the declarations and why the Defendants didn't submit declarations, the Defendants reached out to me personally and asked for additional time to submit their opposition brief over Christmas; and I said, as I always do: "Absolutely. You take -- take the time that you need."

And so, to now say they didn't have time to get

Case 1:19-cv-00098-TRM-CHS   Document 194-8   Filed 06/24/22   Page 11 of 35
PageID #: 4931
02/10/2022 01:14:21 PM                    Page 37 to 40 of 82                    10 of 34 sheets

declarations, when my practice, as a lawyer, is to always give people extensions -- that's also their practice. We have a good working relationship. To say that they didn't have time to do it, when I had told them to take the time they needed, I -- I don't know what to do with that, frankly, Your Honor.

But, apparently, that doesn't have anything to do with -- that question was not submitted to the Court. I'd be happy to take a look at that. But, again, I don't think declarations get them there. People say they don't recall sending substantive text messages. They didn't use it routinely.

That's not the test, especially not -- when there's been no burden that's shown, Your Honor. And I would respectfully submit that they should be ordered to collect these text messages. And it may be that there are none for some people, in which case, there is no burden.

But we're entitled to know what's there; and then, if there is a burden associated, we can work to try to minimize that burden by getting rid of any extraneous messages and focusing on stuff that's really relevant to this case.

MS. SOLOMON: May I respond, Your Honor?

THE COURT: Yes.

MS. SOLOMON: First of all, I have the policy -- U.S. Xpress' mobile device policy up here on this iPad; and it specifically says, in Paragraph 4.1.5: "USX respects your privacy." This is to employees. "An AirWatch MDM cannot access your application data, your call history, your voicemail or your SMS messages on your mobile device. We cannot and do not collect your personal data. And, while the capabilities exists in AirWatch, we do not collect GPS location information." So it's not the case that they don't respect people's privacy, like Mr. Wood said.

Mr. Wood also talked about the situation where USX, U.S. Xpress, had to go get backup tapes because some -- there were some years that were not available in the accessible data. And Mr. Wood acknowledges that the discovery process is iterative. And it worked the way it was supposed to work.

In every case, there's some issue -- I've never had a case that hasn't had an issue with ESI. And, in each case, when the plaintiffs pointed it out that there was a problem here, we didn't make the plaintiffs file a motion to compel. We went ahead and went and got the backup tapes. We didn't ask for cost-shifting. And that's how the process works. That's why it is reliable to rely on us and how we -- and how we did

things here.

I will also note that the fraud claims were dismissed here; so Mr. Wood talking about fraud allegations is -- you can trust -- and we have to trust the custodians. We have to be able to rely on the custodians and their words here, unless there's some showing that their words -- there's some abuse or their words are wrong, and that's not the case here with the two emails that the Plaintiffs have provided.

THE COURT: All right. Here's what we're going to do. First of all, let me say that I'm dealing with two of the best firms in the country, who have good reputations for integrity; so I don't -- I don't accept, for a moment, that either side would deliberately do something wrong. It could happen. I've been proven wrong. But I wouldn't believe that, at the outset, that anybody is trying to hide the ball, either side.

So what I'd like to do is -- you're going to do a -- produce the text messages of Christopher Weeks. You've already agreed to do that.

MS. SOLOMON: Yes.

THE COURT: I'd like you to pick one other custodian, and I'd like you to produce the text

messages for that person as well. The reason I want you to do it, I want to test the theory -- one of these people that has signed the declaration saying: "I don't use this for substantive business purposes," let's test it.

And they did leave some wiggle room there and -- as they probably should. Nobody knows every text they've ever sent. But I want you to produce their text messages to the other side, and I want to test whether there are substantive business communications among those texts or whether there are not.

And I want to do it for two reasons. One is I want to test whether their declarations are really accurate. And I wouldn't accuse them, at this point, of misrepresenting anything. They probably just didn't remember that, two years ago, they sent a substantive communication that's possibly relevant to this case. But let's look at that.

The other reason I want to do it is I want to find out about what this is going to cost. If we extrapolate to twenty-two custodians or twenty-eight custodians, what's this going to cost to do it? What kind of burden are we looking at? That's what -- I'd like to do that.

So how much time -- and the other thing I want

Case 1:19-cv-00098-TRM-CHS   Document 194-8   Filed 06/24/22   Page 12 of 35
PageID #: 4932

to give you a little additional time to do is I want you to talk to the other four custodians who have not given declarations and submit accurate declarations as to what they tell you. They -- you might find another Christopher Weeks or two among them and -- but, whatever they say, just go ahead and submit a declaration about that.

So how much time do you need to do the data search and sifting through the information you pull off these phones?

MS. SOLOMON: I would say two to three weeks.

THE COURT: Okay. Why don't we do three weeks and then three weeks to get your declarations in. I need you to tell the Court -- you know, summarize for me what you found among -- not Mr. Weeks. I don't -- he's already admitted that he had substantive business communications -- but the other on custodian, and then I need an estimate of what this is costing projected out; and then I'll make a decision as to what I'm going to do with the rest of the text messages.

I can tell you want you speak.

MR. WOOD: Your Honor, just two points; and we're happy to follow up with Defendants and work out the dates on this. But I would respectfully submit that we

be allowed to choose the additional custodian for the text messages, and we also need to make sure that the custodian that we choose has text messages from the relevant time period.

I know that my phone, for example, deletes all my text messages after sixty days; so it's not going to be useful for the -- for us to pick someone that has a sixty-day delete policy. So I will have to -- I just raise those as logistical issues that we have to resolve.

THE COURT: I would agree with that. But I would also agree that we might be fighting about absolutely nothing.

If Ms. Solomon interviews these people or has some of her people do that and we find out that none of them have texts on their phones that are more than sixty days old, I'm spending a good portion of my life, you know, trying to decide a dispute that doesn't exist. Right? So I hope y'all will sort that out.

MS. SOLOMON: I was going to say, Your Honor, I think it would be fair to us to try to work on who would be the custodian; instead of the Plaintiff just getting to choose, that we try to work that out.

THE COURT: Okay. If y'all can't agree, I

will be very disappointed; but just call me on the phone --

MS. SOLOMON: Okay.

THE COURT: -- and then we'll do a quick conference call, and I'll pick a custodian if you can't agree.

MR. WOOD: Thank you, your Honor.

THE COURT: Yes.

MS. SOLOMON: And the other thing I wanted to clarify is we're going to do the same process, we're going to apply the search terms and do a responsiveness review. We're not just going to give any -- you know, all text messages.

THE COURT: No.

I -- particularly with text messages, they need to apply search terms and just produce text messages that are relevant to your inquiry.

MR. WOOD: So, Your Honor, this has been the subject of a meet-and-confer between us that is ongoing, so I want to make sure that we're able to flesh this out --

THE COURT: Yes.

MR. WOOD: -- rather than just have one statement about how the process of that meet-and-confer has gone.

As I said earlier, obviously, we're not interested in people's personal messages, and that's not what we want. In terms of -- there are two issues in terms of what it means to apply search terms or the search terms in connection with text messages.

First of all, the search terms were developed in order to find -- primarily, in order to deal with emails; and so the way that they are set up is designed to capture emails and emails threads.

With text messages, as we all know -- so, for an email, you could have a thread that's five emails long. Right? Someone writes to someone. Someone writes back. Someone writes back. You've got a thread of five emails. And, if the search term "USX within five of IPO" turns up anywhere in that document -- right? -- they produce the entire thread of all five emails.

THE COURT: Right.

MR. WOOD: That's generally how it works.

If you applied that concept to text messages, you could have one thread between a custodian and someone else that was two thousand text messages long -- right? -- if it was over a period of years.

So, if a search term shows up on that thread,

Case 1:19-cv-00098-TRM-CHS Document 194-8 Filed 06/24/22 Page 13 of 35 PageID #: 4933

are they going to produce the entire thread of two thousand text messages? Maybe that's appropriate. Maybe it isn't. But the way the text threading and emailing threading works is different, and it's not clear exactly how that's going to work on the Defendants' proposal.

I would also submit that people do not talk in text messages the same way that they talk in emails. Emails have subject lines. People talk in complete sentences -- or try to -- for the most part. That's not how text messages work.

THE COURT: I get it. So you're suggesting that they should apply a different methodology to searching text messages. I doubt we're going to work that out here in court today --

MR. WOOD: Well --

THE COURT: -- but I think that should be part of -- part of the discussion you have.

MR. WOOD: Absolutely.

THE COURT: Coming up with appropriate search terms is a laborious sort of exercise, and it takes a great deal of time.

Would you be -- are y'all going to resist his effort to suggest to you a different way to search text messages rather than emails?

MS. SOLOMON: So what we said, Your Honor, during the meet-and-confer, is that we would be willing to consider modified search terms to address Mr. Wood's concern; and that's kind of where we left it.

And the Plaintiffs are saying that, no, they don't want to use any search terms whatsoever, which I -- I don't think, given the personal nature, you know, of texts, is appropriate. There should be some search terms applied.

But we're willing to consider modified search terms to address, you know, acronyms and things like that if they -- you know, we will be happy to work with them on that.

THE COURT: Well, I would agree with that. I mean, it's -- I don't know how else you would be able to do it.

MR. WOOD: Your Honor, we're not saying don't use search terms. We're trying to be practical. Right? So, if somebody is talking to a hundred different people on their text messages -- and I'm just throwing out random numbers -- and fifty are personal, for whatever reason, so they're gone, then you've got fifty left.

Maybe you've got an important custodian who's

talking to the director of logistics and transportation at Walmart, as Mr. Fuller apparently was, according to his email. Maybe that chain has like fifty messages on it that would take someone three minutes to review.

If there's a text thread between two important people and there's only fifty messages, you don't need search terms to review that. You can read it in two minutes and determine if it's relevant or not.

If, on the other hand, there's a thread with three thousand text messages, maybe you need to use search terms; and, under those circumstances, you know, we think that's appropriate.

The devil is in the details, but what we're trying to do is just come up with something that makes sense in terms of actually finding relevant information and not arbitrarily applying terms or searching through conversations with people that we know are not relevant.

We are going to -- our first step, that we proposed to the Defendants yesterday, was: "Just tell us who these folks are talking to," so that we can identify people that are relevant to the case; and then we can come up with a methodology to search that that minimizes that burden and is likely to result in responsive

information being produced. It could include search terms. If it's a ten-message thread, it should not include search terms, for example.

MS. SOLOMON: And what I'd say, first of all, is, in their papers, the Plaintiffs said that they wanted us to apply search terms. You know, that was -- in the joint statement, that's exactly what they said. They wanted them to be searched for relevant ESI based on the search terms agreed by the parties. That's exactly what they said. I'm reading from their joint -- their portion of the joint statement.

And asking, every single person that they texted with, for us to identify them, I think is grossly intrusive; and it would be more effective to come up with substantive -- you don't do it by person. You do it by substantive search terms. That's typically how it's done.

We're willing to be reasonable about modifying the search terms; but asking us to identify every single person the person texted with, I think, is -- you know, is out of bounds.

THE COURT: Well, I am used to living in a world where we start with the concept of search terms; and I think that, as you're talking about texts, you would want to use some truncated, abbreviated forms of some of

those search terms, but I think that's your starting place.

As we have all discussed, this is an iterative process. It's a moving target. And I'm giving you an opportunity to see if you can get a foothold to convince the Court that this is an exercise really worth the time, effort and money of going through.

So start with this; and, if you come back with texts that suggest that business was discussed but you don't know who it was discussed with and you want the whole email -- or text string with that particular person at Walmart that they were texting with, you can make that request. But I -- right now, I don't really think that there is a foundation to do that; but I'll giving you an opportunity to explore it.

MR. WOOD: Understood, Your Honor.

THE COURT: So y'all try to work out the details, and we'll put a three-year -- excuse me -- a three-week timeline on this. And my law clerks will be mad at me, as I walk out of here today, trying to draft an order that comports with what I just directed be done. All right. It's only a three-week order; so, if it's too bad, it won't have any lasting impact.

So the next -- the next issue -- is everybody good? You need a break? We will try to go a little

quicker.

MS. SOLOMON: I'm good.

THE COURT: The next issue are these additional custodial sources that you want added.

MR. WOOD: Yes, Your Honor. And let me start with the -- with the load planners, Your Honor.

THE COURT: Say that again.

MR. WOOD: The load planners.

THE COURT: The load planners.

MR. WOOD: The four load planners. These are the folks who were on the ground -- the four individuals were the folks that were on the ground at the two Walmart locations that are, for lack of a better word, kind of most relevant to some of our claims in terms of the problems that the company was having getting dedicated drivers to those locations. That is the Gordonsville and Hamilton locations.

These were the folks -- and so these were USX employees -- there were two at each location -- who were on the front lines of dealing with these accounts for USX that the company admits was the cause of the weak performance in 3Q18.

And they -- these folks are figuring out coordinating loads between Walmart and USX, when loads are ready to be picked up, which drivers should go to

pick them up, when the drivers were available.

To the extent that there were problems fulfilling that relationship, these were the guys -- not the guys -- these were the people on the front line dealing with that relationship.

I think, for these four individuals, Your Honor, at least for us, the key point, which Your Honor alluded to at the beginning of the hearing, is that Your Honor -- the Defendants moved to quash our subpoenas on the third parties, and Your Honor stayed enforcement of those subpoenas and said that we should try to find the relevant documents that we need at USX without burdening third parties and expected us to work toward doing that.

These are the four people at Walmart that were interacting with Walmart and so -- most directly, and so -- and on a day-to-day basis. And so, you know, obviously, we have not attempted to enforce those -- that subpoena against Walmart.

But I do think it's problematic for the Defendants to come in and say -- I mean, this case is -- a lot of this case is about the problems at Walmart that they were having staffing these dedicated accounts.

And the Defendants have come in and said: "You

shouldn't be able to get documents from Walmart about that problem; and you also shouldn't be able to get documents from the four people that were on the front lines of dealing with that issue, because, you know, there are people higher up who are responsible for the decisions on that account, and so you don't need people on the front lines.

And I -- I think that that's a bridge too far, Your Honor. I mean, to stay third-party discovery against one of the most important entities at issue in this case and then to refuse production from the four people on the front lines of dealing with that entity -- I think they have to pick and choose.

Otherwise, we end up getting no or very little firsthand production from people who are actually, again, on the front lines, with a direct insight into what was happening in that relationship, how it was going and what we allege to be the company's inability to staff those contracts, Your Honor.

So that's -- that's the focus of the four load planners, and we think that they should search those documents and produce them.

THE COURT: So the load planners were USX employees who were embedded in Walmart, and their job was to facilitate transportation of products for

Case 1:19-cv-00098-TRM-CHS    Document 194-8    Filed 06/24/22    Page 15 of 35
PageID #: 4935
02/10/2022 01:14:21 PM                  Page 53 to 56 of 82                  14 of 34 sheets

Walmart -- to and from Walmart, I suppose, using USX trucks.

MR. WOOD: They're USX -- that's right. They were USX employees onsite at Walmart dealing day to day with the comings and goings of the trucks and these truck drivers and the problems that occurred in that relationship.

And I think it's -- you know, it's different from the text messages; but, in my experience, what I've found is that it's important to get the documents produced from folks at different levels of an organization. Right?

Because the CEO may be a very -- you know, the way that a CEO communicates, for example, and the candor that a CEO puts in an email is different from -- and the level of detail that you see in an email from a CEO is different from a vice-president; it's different from other executives; it's different from people on the front line.

The people on the front line are the ones that, you know, are really dealing day to day with the problem. If you want to get insight as to how a relationship is actually going and what issues are actually coming up, it's the people on the front line that often have the most relevant, unguarded, firsthand knowledge about

that.

And so to say that we have enough because we're getting information from their superiors and the executives, I don't think is right, and I --

THE COURT: Well, I -- hang on just a second.

(Whereupon, an off-the-record discussion was held.)

THE COURT: So, I mean, the theory here, though, is that, in its IPO, USX failed to disclose it didn't have enough -- didn't have sufficient drivers to carry all the loads that it needed to carry and that part of this was -- the problem was caused by the fact that it had these dedicated accounts -- this dedicated account with Walmart. Right?

I'm trying to think what the -- the people on the front lines arranging for loads, what information do they have that bears upon the overall claim that you have in this case?

MR. WOOD: So, Your Honor, I think the Defendants -- certainly, one of the defenses that the Defendants -- there's no dispute that the Defendants were having problems servicing these accounts. Right? That's not really a dispute in this case. The company admitted that later in the year.

THE COURT: A shortage of drivers, is what they

would say.

MR. WOOD: Well, Your Honor, yeah; but it's not just a shortage of drivers. And I think that --

THE COURT: Well, that's what they say. It's a shortage of drivers because there was a four-percent unemployment rate and the economy was great and everybody had jobs, and they were having trouble finding people to drive trucks.

MR. WOOD: But, Your Honor, it's not that simple.

THE COURT: I know.

MR. WOOD: And so -- but it's important to our case. I mean, you know, we quote the Court's order at Page 33 -- it's at Page 3 and 4 in our reply brief -- where we talk about the reasons why the Defendants were unable to hire enough drivers, were unable to staff these accounts.

And it -- it's not just that the economy was doing great and people were having a hard time finding truck drivers in general. It was -- what we point to and what the Court credited as the reasons why these statements were false were much broader issues within the company that we say their registration statement failed to disclose.

And a lot of that has to do with, for example,

operational challenges tied to load planning. That's Point 3 in the Court's -- in the Court's order, Your Honor, on Page 33.

Truck drivers don't just go to this company or that company based on a single metric about salary, because that's not how they get paid. A lot of reasons why truck drivers leave companies is because they can't get to the places they need to get to in time, because the loads aren't available or they have to end up waiting on the side of the road for hours not getting paid. Right? The challenges associated with employing truck drivers are logistical as much as they are like just pure compensation.

And what the Court recognized in the order and what we pled in the Complaint is that one of the big reasons the company was having a hard time recruiting enough drivers and staffing these accounts is that this transformation had not worked.

The load planning, that they said they had improved, had not happened. Morale had not improved. There was a whole -- and so they were not able to prioritize the growth. They didn't have the appropriate compensation practices in place, et cetera.

So it goes -- it goes -- the reasons why those

Case 1:19-cv-00098-TRM-CHS   Document 194-8   Filed 06/24/22   Page 16 of 35
PageID #: 4936

Page 57 to 60 of 82 02/10/2022 01:14:21 PM

statements were false go to what we allege were fundamental operational issues that were not disclosed in the registration statement.

And, in terms of the load planners, I mean, that -- it's Point 3 in the Court's order, citing our Complaint, that the operation changes failed to improve load planning for truck maintenance, which harmed driver morale and worsened USX's poor driver-retention rates.

And the load planners are going to have a lot of information about that because they're the ones doing that work on a day-to-day basis at the two sites that we say, you know, are most critical, in terms of specific customers, to this case.

And so the notion that we wouldn't search for documents with those four folks, I think, is -- fails to, you know, really comport with the complaint that we pled and the extent and the manner in which the Court denied the Defendants' motion to dismiss as well.

I would say one other thing, not by way of a concession; but, if there are ways to split the baby, for example, it could be that Your Honor could order them to produce documents from one custodian of each site instead of two; and, if they're concerned about costs, we could, you know, reduce the costs by reducing the number of

custodians. We included four in our motion, the two at each site. But that could be a method to address some of the burden and concerns, Your Honor.

THE COURT: Now, you've got two other custodians that you asked about.

MR. WOOD: Yes.

THE COURT: And they're the pricing -- tell me what they do again.

MR. WOOD: The pricing witnesses, Your Honor.

THE COURT: Yes.

MR. WOOD: And so what the Defendants said in their opposition brief was that these were not the folks who were responsible for pricing the Walmart bids, and so we shouldn't get their documents.

I just -- what I would first like to do, Your Honor, is make sure we're a hundred-percent clear on what the Defendants say about these two custodians in their declaration, and then I want to -- then I'd like to explain to you why we think it's important to get their documents.

So it -- on Exhibit T, Your Honor, from the Defendants' submission for the declaration of Justin Harness and -- in Paragraph 6, Mr. Harness says that: "These two potential custodians, Ms. Stephas and Ms. Van de Kamp, were not the decision-makers on pricing

for the Walmart Gordonsville and Hamilton locations after the business was awarded.

"Ms. Stephas and Ms. Van de Kamp were also not the decision-makers as to the prices used in USX's bids for the Gordonsville and Hamilton business.

"While it is possible they could have participated in the internal discussions regarding pricing for USX's bids for those locations, they didn't have decision-making authority with regard to pricing the bids and would not have been the ones to discuss pricing with Walmart.

"Rather, the responsibility for the decision-making and discussion with Walmart rested with, for example, myself, Michael Graham, John White, Paul Bowman or Shane Weeks."

So I think the state of play of these two custodians, at least from the Defendants' declarations, is that they -- and from what we see in the exhibits, which is why we asked for them -- is they were involved in these internal discussions. Even if they were not the ultimate decision-makers, they were, nevertheless, involved in the discussions.

Part of the reason why we asked for their -- for these two people to be included in the custodians -- as custodians is because these -- some of the other folks --

who Defendants said were the ones with ultimate authority for these Walmart bids -- some of these folks have very little documents in their custodial files as they were produced to us.

And so one of the things that -- for example, Justin Harness, who signed this declaration and who says that he was one of the principal decision-makers with respect to Walmart, if you look at the number of emails -- and just to put this in context, Your Honor, the IPO was in June 2018, and these are contracts that were negotiated at the end of 2017.

If you look at the documents that the Defendants produced from Mr. Harness' "sent" email box -- right? -- so that you're looking at one custodian's email box, you've got their inbox; you have some folders, probably, for different stuff; and you've got their "sent" items, which is all the stuff they send.

So, between December 2017 and June '18, when the IPO was, the number of emails the Defendants produced for Mr. Harness' "sent" box was eight total emails, which is -- I don't understand how that could be the case if there -- if he was the one -- one of the people with decision-making about this Walmart account.

Michael Graham, it's a similar number. It's three total emails that were produced from his "sent" box

Case 1:19-cv-00098-TRM-CHS Document 194-8 Filed 06/24/22 Page 17 of 35 PageID #: 4937

prior to the IPO.

Now, we have other emails that they sent from other people's inboxes; but, in terms of these two individuals, who are two of the people who the Defendants say were the principal decision-makers on Walmart, we have literally like a handful of emails alone from -- from their "sent" items; and that, to us -- and we will get to this on the 30(b)(6). Right?

But, as far as we understand it -- and we haven't heard anything different from the Defendants -- there was no document retention policy at U.S. Xpress. Prior -- and, so, prior to the time this case was filed, people could do whatever they wanted to do with their emails. Right? They could delete them. So we -- there's no reason anyone would have saved anything.

And what we see in the production are these gaps where -- and I'm not -- we're not saying anyone did anything wrong. Right? People delete emails all the time. If there's no litigation hold in place and it complies with their policy, you can delete emails. Right?

But, when we find ourselves in a situation where we have very few emails from folks who are very relevant, we want to make sure that we're not missing anything that

could have been deleted.

And, so, with respect to, for example -- excuse me -- Julie Van de Kamp, I believe the Defendants admit that she was the manager for -- I'm sorry. I need to find this in my notes. But she managed one of the individuals who was directly responsible for dealing with these Walmart bids, and so information would float up to her through that process.

That is -- Your Honor, that's Exhibit -- that's Exhibit S in their submission, Your Honor, and it's Paragraph 6, where Ms. Van de Kamp said that: "Mr. Graham reported to me on a dotted -- a dotted-line reporting basis, and I may have received some of his work product for the Gordonsville and Hamilton bids," although she said she wouldn't have been actively involved in those bids.

So the point of these two custodians is to make sure that we have a complete record about how these bids were produced; and it's, at least in part, due to the fact that we -- we have concerns about whether, with no retention policy, all of the -- we have all of the emails that existed from the folks who were involved in that.

So we have at least these two folks who were involved, we know, from the emails and from seeing these

communications, so we want to make sure that we have a complete record.

THE COURT: Okay.

MS. SOLOMON: Your Honor, a couple of points. First, on the load planning custodians, like Mr. Wood said and like Your Honor said, this is about operational changes. Only decision-makers can make -- can effect operational changes.

So what the load planners do -- and the load planners have very little contact with drivers, contrary to what Mr. Wood was saying. So it's completely irrelevant what the load planners -- what they have to say.

I'll also say that what Mr. -- again, what Mr. Wood is saying is that there are gaps in the production, and there's -- there's a deficiency in the production. That's the language he's using.

First of all, a lot of these arguments are not in the motion or the reply about the -- about how very little email there is. This is the first I'm hearing about this.

And so I'll say that we have produced -- what they say in their motion and their reply that they need the load planners for is they needed to show the impact that the driver shortage was having on the company's

ability to meet shipper demands -- that's what they're saying -- and whether customers' accounts were already being negatively impacted at the time of the offering.

Those are the two things they say in their motion and their reply, contrary to what Mr. Wood is saying now, that they say that's why they need those documents.

But we have produced several documents that would bear on these issues. We produced detailed spreadsheets, showing monthly financials, on how the different divisions, the dedicated and the OTR divisions, were performing as a result of any alleged shifting of workers.

We produced spreadsheets showing how many OTR workers there were on a monthly basis and how many dedicated. We produced spreadsheets beginning with Order 1 in 2018 and every week thereafter so they can see those.

If there was a negative impact to the company, it would be shown in the financials. I mean, that's really what we're talking about here. We're not talking about the load planners, who are lower-level employees. It's really what the decision-makers -- what's in their emails that's relevant here. So that's as to the load

Case 1:19-cv-00098-TRM-CHS   Document 194-8   Filed 06/24/22   Page 18 of 35   PageID #: 4936

planners.

As for the pricing -- the two pricing custodians, Your Honor, in the motion, they -- again, they talk about gaps in the production. The whole reason they needed the pricing custodians is because of Walmart. Walmart was such a critical client, and they needed the information on the Walmart bids.

And, then, when we filed this declaration saying that these two pricing witnesses, you know, were no longer -- had no involvement in the Walmart bids, now, all of a sudden, they need the pricing custodians for new reasons, that were not in the motion; and they shouldn't be able to do that.

These pricing custodians don't have anything to do -- and we have produced pricing documents similar to what I was saying about the load-planning custodians. They haven't shown any deficiency that warrants additional discovery. There's no gaps in the production. They have the documents that they need.

THE COURT: Do you have any -- one of the things that stands out from where Mr. -- in what Mr. Wood was saying is this -- you've produced emails from a couple of key decision-makers whose testimony should be relevant to the issues in this case, but there's a paucity of emails during the period of time when he suggests there should

Fouraker Reporting Service, Inc. (423)316-6484

be more emails. Any insight as to why that would be the case?

MS. SOLOMON: A couple of things, first of all. And, again, I haven't had a chance to go research this because this is the first I'm hearing about it --

THE COURT: Yes.

MS. SOLOMON: -- to know -- to know if that's true. But what I would say is what we do is we create a master custodian field, and so you only produce one copy of the document. You don't want to produce, you know, fifteen copies of the same document. So you have this master custodian field that talks about every single person that has that document or received that document.

So I don't know if Mr. Wood is talking about the full volume of emails, including everybody listed in our master custodian field, or not, you know, or if there's a paucity because he's not realizing that there's more people who received or sent the email. So I really need to opportunity to go look at that, Your Honor, to see if that's true.

I mean, the complaint was filed in 2019. We're talking about 2018. So they very well could have been deleted before the complaint was filed properly, so -- I mean, I -- I really would need the opportunity to look at

Fouraker Reporting Service, Inc. (423)316-6484

that and have the opportunity to respond, because, again, this wasn't -- there's nothing in their motion or the reply about the paucity of emails.

THE COURT: Yeah. All right.

And your final issue -- your final issue is discovery on discovery. You want a Rule 30(b)(6) deponent who would testify about all the efforts that have been made to preserve documents -- litigation hold, presumably -- how documents were collected, so on and so forth, everything about discovery, I assume.

MR. WOOD: Well, I think "everything about discovery" might be too broad; but let me just try to explain to Your Honor why I think this is important, particularly in this case, and what our goal is with the 30(b)(6) deposition.

At some point in this case, at summary judgment or at trial, the Defendants are going to say that there's no evidence of A, B, C, D, E, F -- right? -- and so we can't prove our claims.

And one of the problems that we have in this case is that we don't know what evidence used to exist that no longer exists today for some of the reasons we've been talking about already.

I believe -- I don't know, because the Defendants haven't been willing to tell us; but, from

Fouraker Reporting Service, Inc. (423)316-6484

what we understand, there was no document-retention policy at the company prior to the lawsuit being filed; so we don't know, you know, the scope of what people deleted or didn't delete or what they could or couldn't delete and what was gone prior to the time this case was filed. We don't know when litigation holds were issued or who got litigation holds, so we don't know what was preserved.

And we have, you know, questions, as we have seen throughout today and even last year, about the manner in which documents were stored, including the backup-tape issue that we've talked about, which we only found out about from production from other people, that showed us that there were emails that were relevant to the case that the Defendants hadn't produced.

So all we're trying to do is understand the scope of what documents used to exist versus what exists today so that we can understand what we're missing and why that is -- and that's really what we're getting at -- so that, later, down the road, when the Defendants -- I say it in every case I've been a part of -- say: "There's no evidence of this," we, at the very least, can have an opportunity to present a fulsome record and say: "Well, there may be no evidence of that; but, you know,

Fouraker Reporting Service, Inc. (423)316-6484

Case 1:19-cv-00098-TRM-CHS   Document 194-8   Filed 06/24/22   Page 19 of 35   PageID #: 4939

all these documents were deleted" or: "There was no requirement that anyone preserve any of these documents" prior to X date, and to give some context in terms of what's currently available versus what may have been lost. That's really the purpose.

And I think it's driven by the fact that, in this case, as opposed to some other cases, we don't have any of that information from the Defendants. We don't have copies of the litigation holds. We don't know who was put on a litigation hold. We don't know when litigation holds were issued. We don't have copies of the document retention.

THE COURT: Are you going to depose the twenty-two custodians? Are you planning to do that?

MR. WOOD: We are going to certainly depose a number of them.

THE COURT: Yeah. I mean, part of what you're going to do is ask: "When did you receive a litigation hold?" Right?

MR. WOOD: I am sure that I will. And the next thing that's going to happen is that someone at that table is going to say: "Objection. Calls for privileged information, and I instruct you not to answer."

I've done a lot of cases with these folks.

Fouraker Reporting Service, Inc. (423)316-6484

That's what's going to happen. I don't think it's privileged. Right? But I also don't think I should have to spend time, with twenty-two different custodians --

THE COURT: You want to ask one 30(b)(6)?

MR. WOOD: I want one that -- and it should be binding on the company. Because these individual custodians, from -- I'm talking from my general experience -- a lot of them say: "I have no idea if -- that's IT. I have no idea what the policy was.

"Do you have your emails?

"I don't know if I have my emails. I might. They're in the cloud somewhere."

THE COURT: Well, you're right. It has to -- because you're -- if you said it to an executive, they would have no idea --

MR. WOOD: They don't know.

THE COURT: -- of the state of their emails.

MR. WOOD: No, sir.

THE COURT: So it has to go to an IT person.

MR. WOOD: Yes.

THE COURT: I got it.

MR. WOOD: That's -- we're just trying to understand what happened, the factual -- factually, what happened. We're not trying to get into privileged

Fouraker Reporting Service, Inc. (423)316-6484

information.

THE COURT: Right.

MR. WOOD: We're not trying to second-guess, you know, what people did; but we just want the factual information so we understand it.

THE COURT: All right. On that point, I -- I mean, from the standpoint of -- I know one of the thresholds is to poke around and see if something nefarious has been done to discard documents that otherwise should be produced.

But a less nefarious reason for having a discovery-on-discovery deposition might be: "What policies or practices did you have in place to preserve documents? What was the normal way that -- where were documents kept? Did your IT -- where were emails stored? Was there a policy in effect that e-mails would automatically be discarded after six months?"

I mean, how do they get to the information but through a 30(b)(6) deponent? Because, I mean, you have asked all those questions and you know the answers to some of those questions, because you need to know that; but all of that's privileged. How does he get this information so that he understands the processes, other than through this mechanism?

MS. SOLOMON: So to answer your question

Fouraker Reporting Service, Inc. (423)316-6484

directly, and then if you'll let me give Your Honor some background.

THE COURT: Okay.

MS. SOLOMON: Typically, it's a meet-and-confer process. It's not done formally through a deposition. If the Plaintiffs have questions, like this issue about the paucity of emails, we talk about it, you know, and we say: "This is what we did" and -- like with the backup tapes.

THE COURT: Yeah.

MS. SOLOMON: There's back and forth. It's not -- when there's no showing of a preservation lapse or substantial problems with the production, it's like a complete no-no to do discovery about discovery.

Again, I hate to sound like a broken record; but, the Sedona Conference, it's Principle 6 that says that you don't do discovery about discovery unless there's a preservation lapse and that we're on the honor system.

I know Plaintiffs have a hard time with that, but that's what our system is; and there's a reason for it. And we shouldn't have to incur the expense to prepare a witness on this when we have done nothing wrong, there's nothing to call into question.

Mr. Wood is speculating what we're going to

Fouraker Reporting Service, Inc. (423)316-6484

Case 1:19-cv-00098-TRM-CHS   Document 194-8   Filed 06/24/22   Page 20 of 35
PageID #: 4940

Page 73 to 76 of 82  02/10/2022 01:14:21 PM

argue. I mean, and, like Your Honor said, he can ask questions to the individual witnesses, and he can ask me. We can have a meet-and-confer, and he can ask me some of these questions.

Or, if there's policies, we -- he says he has the retention policies or the mobile-device policies. You know, if there's policies we can provide that would help, that are not privileged. I mean, that's typically what we do.

THE COURT: All right.

MR. WOOD: Your Honor, I would just say we have tried to meet and confer about this stuff, and I -- we've not gotten the information that we think we're entitled to from the Defendants.

I certainly don't have the retention policy. I do have a copy of this IT policy they produced. But I think it's important to get binding testimony from the company on these topics so that we know where we stand on these issues.

THE COURT: All right. I've ruled on the first point, which is -- relates to the text messages, which is a -- sort of a temporary half measure; and I will wait to hear back from you guys, after you've taken the steps that I asked you to take, and so we'll leave that open with the possibility of exploring it further, depending

upon what you find.

With respect to the second issue, which is four additional custodians, the thing is, Mr. Wood, that we have many cases that are litigated from beginning to end over less than two hundred and eighty-five thousand dollars.

And what you're asking me to do is that, after this Defendant has already spent two-point-one million dollars giving you information that you think you need to prosecute your lawsuit, you're just asking me to sign my name to something that imposes another two hundred and eighty-five thousand dollars on something -- on the Defendant, just so you can be sure that you have more information.

I am unpersuaded that people at the lower level of the company are going to be able to give you better information that will have a bearing on your lawsuit than what you currently have with the information that's already been provided.

So I'm not saying that, if you took those depositions, that you might not find some information in there that is relevant to your claims and defenses. Frankly, I don't know that; and you don't know it yet, because you haven't seen what they would produce. But it is burdensome to cause somebody to spend two hundred and

eighty-five thousand dollars so you can poke around in it.

Now, if you'd like to pay the two hundred and eighty-five thousand dollars, then I would impose the obligation upon them to pull the information together for you; but it's easy for you to request it when it's not costing you anything. And that's a significant amount of money to impose upon somebody after they have already produced as much as they have.

So I'm -- I find that the -- it is not proportional to the needs of this case for you to impose another two hundred and eighty-five thousand dollars on the Defendant to get this information from custodians who are lower-level employees than the custodians who have already provided information that's relevant to the claims and defenses in your case. Therefore, I'm not going to grant your motion in that regard.

With respect to the final issue that you've raised, which is the Rule 30(b)(6) deponent on -- discovery-on-discovery deponent, what I would say is that, thus far, Plaintiff has not demonstrated any preservation lapse or production issue that calls into question the Defendants' preservation and production efforts. You have -- it's not before me in briefing that would suggest that they haven't taken proper

measures to preserve and produce information you've requested.

You're still in the midst of discovery; and, if you start taking depositions and you go down the road that you were projecting that you're going to go down and you find out you have a basis to believe that they have not preserved information to which you're entitled or they have not produced information to which you're entitled, you are welcome to bring that back to my attention, to file another motion with the Court for a Rule 30(b)(6) discovery-on-discovery deponent, and I'll be happy to hear you out. I just don't believe I have enough information that would cause me to order that at this point, but I'll listen to you if you want to raise it in the future. So --

MR. WOOD: Can I ask one question?

THE COURT: Absolutely. Yes, sir.

MR. WOOD: On Point Number 2, on the additional custodians --

THE COURT: Right.

MR. WOOD: -- we would -- if Your Honor is willing to do this, I would ask that Your Honor include in your order that, if we pay for it, that they have to do it, because that is something that we would want to consider and -- and consider paying the actual costs

Case 1:19-cv-00098-TRM-CHS    Document 194-8    Filed 06/24/22    Page 21 of 35    PageID #: 4941

81

associated with some or all of those custodians versus whatever the estimates are in their papers, which are estimates; and, if Your Honor would include that we can get that if we pay the costs, I would ask Your Honor to do that, because it is something that we may want to take up with the Court.

THE COURT: Well, I will tell the Defendants that the burden I'm looking at is primarily the cost of this, because you have a well-oiled machine over there to get it done and -- and I'll do the order that way; but, if you have any objection to this, because that's how the order is coming down --

MS. SOLOMON: I don't, Your Honor.

THE COURT: Okay.

All right. I think that's all of our business here today. Is there anything else, while I've got you here, from a case-management standpoint, that you want to raise with me?

MR. WOOD: Not for the Plaintiffs, Your Honor.

MS. SOLOMON: No, Your Honor.

THE COURT: All right. Mighty good to see you all. You guys have safe travels back.

MS. SOLOMON: Thank you.

MR. WOOD: Thank you, Your Honor.

(Hearing adjourned.)

82

C E R T I F I C A T E

STATE OF TENNESSEE

COUNTY OF HAMILTON

I, Robin Lee Fouraker, Notary Public and Licensed Court Reporter, the officer before whom the foregoing hearing was taken, do hereby certify that the preceding transcript is a true and correct transcript of this hearing in this case, taken on the 8th day of February 2022.

IN WITNESS WHEREOF, I have hereunto set my hand this _____ day of February 2022.

_____

Robin Lee Fouraker, LCR, RDR, CRR

Tennessee LCR Number: 021

My commission expires December 13, 2022.

Case 1:19-cv-00098-TRM-CHS   Document 194-8   Filed 06/24/22   Page 22 of 35
PageID #: 4942

| | | | | |
|---|---|---|---|---|
| **'** | **37450** [1] - 2:15<br>**3:00** [1] - 3:8<br>**3Q18** [1] - 54:22 | **accounts** [9] - 8:9,<br>8:11, 54:20, 55:24,<br>58:13, 58:22,<br>59:17, 60:17, 68:2 | 56:18, 61:1<br>**alleged** [2] - 11:5,<br>68:13<br>**allegedly** [1] - 5:12 | 6:18<br>**attempted** [1] -<br>55:18<br>**attention** [1] - 80:10 |
| **'18** [1] - 64:18 | **4** | **accurate** [2] - 44:14,<br>45:3<br>**accuse** [1] - 44:14 | **allow** [1] - 28:10<br>**allowed** [1] - 46:1<br>**alluded** [1] - 55:8 | **attract** [1] - 11:13<br>**authority** [3] - 19:23,<br>63:9, 64:1 |
| **0** | **4** [1] - 59:14<br>**4.1.5** [1] - 42:3<br>**414** [1] - 2:4 | **acknowledges** [1] -<br>42:15<br>**acronyms** [1] - 50:12 | **almost** [1] - 37:9<br>**alone** [1] - 65:6<br>**amended** [2] - 19:13,<br>24:5 | **automatically** [1] -<br>75:17<br>**available** [4] - 42:14,<br>55:1, 60:9, 73:4 |
| **021** [1] - 82:15<br>**0THE** [1] - 30:3 | **6** | **Act** [1] - 5:6<br>**Action** [2] - 1:9, 3:10<br>**action** [1] - 5:5 | **amount** [1] - 79:7<br>**amounts** [2] - 6:13,<br>37:18 | **AVENUE** [1] - 2:22<br>**awarded** [1] - 63:2 |
| **1** | **6** [4] - 18:16, 62:23,<br>66:11, 76:16<br>**633** [1] - 2:14 | **ACTION** [1] - 1:10<br>**actively** [1] - 66:15<br>**actual** [1] - 80:25 | **analysis** [1] - 16:2<br>**AND** [2] - 2:7, 2:19<br>**answer** [2] - 73:24, | **B** |
| **1** [1] - 68:18<br>**1-2019-00098** [1] -<br>3:10 | **7** | **added** [1] - 54:4<br>**addition** [1] - 8:4<br>**ADDITIONAL** [1] -<br>1:21 | 75:25<br>**answers** [1] - 75:20<br>**apologize** [1] - 4:19 | **baby** [1] - 61:21<br>**background** [1] -<br>76:2 |
| **10(b** [1] - 39:23<br>**11** [1] - 40:5<br>**1180** [1] - 2:10 | **74** [1] - 24:4 | **additional** [14] - 7:5,<br>8:6, 8:13, 8:19,<br>8:22, 13:9, 22:25, | **Appeals** [1] - 19:16<br>**appearances** [1] -<br>3:14 | **backup** [8] - 13:7,<br>13:8, 37:16, 37:19,<br>42:13, 42:23, |
| **1200** [1] - 2:21<br>**13** [1] - 82:16<br>**16** [2] - 21:15, 21:19 | **8** | 40:22, 45:1, 46:1,<br>54:3, 69:18, 78:3,<br>80:18 | **APPEARANCES** [1]<br>- 2:1<br>**application** [1] - | 72:12, 76:8<br>**backup-tape** [1] -<br>72:12 |
| **19** [1] - 24:4<br>**1900** [1] - 2:15<br>**1974** [1] - 24:2 | **8** [1] - 1:19<br>**832** [1] - 2:22<br>**8th** [1] - 82:8 | **address** [6] - 18:4,<br>19:13, 22:25, 50:3,<br>50:12, 62:2 | 42:5<br>**applied** [2] - 48:21,<br>50:10 | **bad** [1] - 53:23<br>**BAKER** [1] - 2:13<br>**balance** [1] - 16:8 |
| **1:19-cv-00098** [1] -<br>1:9 | **9** | **addressed** [2] -<br>4:11, 12:14<br>**adjourned** [1] - | **apply** [11] - 20:8,<br>26:13, 29:2, 29:4,<br>37:5, 39:19, 47:11, | **ball** [1] - 43:18<br>**ballpark** [1] - 33:1<br>**based** [6] - 5:6, 8:24, |
| **2** | **9** [1] - 3:1<br>**9(b** [1] - 39:19<br>**900** [1] - 2:4 | 81:25<br>**admissible** [1] - 24:8<br>**admit** [1] - 66:3 | 47:16, 48:4, 49:13,<br>52:6<br>**applying** [1] - 51:17 | 16:5, 18:6, 52:8,<br>60:5<br>**basic** [2] - 6:18, 9:20 |
| **2** [2] - 34:10, 80:18<br>**2006** [1] - 19:13<br>**2015** [1] - 24:5 | **A** | **admits** [2] - 15:4,<br>54:21<br>**admitted** [2] - 45:16, | **appropriate** [6] -<br>30:13, 49:2, 49:20,<br>50:9, 51:13, 60:23 | **basis** [6] - 15:11,<br>55:17, 61:12,<br>66:13, 68:16, 80:6 |
| **2017** [2] - 64:11,<br>64:18<br>**2018** [4] - 11:8, | **abbreviated** [1] -<br>52:25 | 58:23<br>**admitting** [1] - 27:19<br>**adverse** [1] - 11:14 | **approximate** [1] -<br>17:8<br>**arbitrarily** [1] - 51:17 | **BE** [1] - 3:2<br>**bear** [1] - 68:10<br>**bearing** [5] - 18:22, |
| 64:10, 68:18,<br>70:23<br>**2019** [1] - 70:22 | **abeyance** [1] - 5:20<br>**ability** [3] - 10:17,<br>34:3, 68:1 | **affairs** [1] - 11:6<br>**Afternoon** [1] - 3:8<br>**afternoon** [1] - 3:16 | **argue** [1] - 77:1<br>**argues** [1] - 8:12<br>**argument** [5] - | 21:20, 22:6, 25:5,<br>78:17<br>**BEARMAN** [1] - 2:13 |
| **2022** [6] - 1:19, 3:1,<br>24:4, 82:9, 82:11,<br>82:16 | **able** [15] - 5:23,<br>11:10, 12:2, 22:24,<br>27:17, 30:11, 40:1, | **ago** [3] - 39:11,<br>40:12, 44:16<br>**agree** [5] - 46:11, | 15:14, 15:17,<br>20:21, 30:8, 36:15<br>**arguments** [3] - | **bears** [1] - 58:17<br>**beginning** [4] - 38:5,<br>55:8, 68:17, 78:4 |
| **26** [1] - 24:16<br>**26(b)(1** [1] - 24:3 | 43:5, 47:20, 50:16,<br>56:1, 56:2, 60:22,<br>69:13, 78:16 | 46:12, 46:25, 47:6,<br>50:15<br>**agreed** [4] - 26:11, | 17:18, 18:1, 67:18<br>**arranging** [1] - 58:16<br>**aside** [1] - 19:9 | **behalf** [5] - 3:17,<br>3:24, 6:14, 10:8,<br>16:22 |
| **3** | **above-entitled** [1] -<br>3:2<br>**absolutely** [6] - 40:6, | 27:13, 43:22, 52:9<br>**ahead** [5] - 10:6,<br>17:25, 26:13, | **assail** [1] - 19:6<br>**asserted** [1] - 5:6<br>**assigned** [1] - 8:8 | **behind** [5] - 18:9,<br>19:1, 22:24, 23:5,<br>31:4 |
| **3** [3] - 59:14, 60:2,<br>61:5<br>**30(b)(6** [10] - 1:24, | 40:9, 40:23, 46:13,<br>49:19, 80:17<br>**abuse** [4] - 18:11, | 42:22, 45:6<br>**AirWatch** [2] - 42:5,<br>42:9 | **associated** [6] -<br>15:17, 16:7, 38:15,<br>41:20, 60:11, 81:1 | **benefits** [1] - 11:3<br>**BERKOWITZ** [1] -<br>2:14 |
| 9:3, 9:5, 9:11,<br>71:6, 71:15, 74:5,<br>75:19, 79:19, | 20:11, 23:14, 43:8<br>**accept** [1] - 43:15<br>**access** [1] - 42:5 | **al** [1] - 3:12<br>**all-time** [1] - 11:2<br>**allegations** [5] - | **assume** [5] - 6:2,<br>32:10, 32:11,<br>32:14, 71:10 | **best** [8] - 11:25,<br>18:8, 18:13, 19:23,<br>30:13, 30:14, |
| 80:11<br>**30(b)(6)** [1] - 65:8<br>**30309** [1] - 2:11 | **accessible** [1] -<br>42:15<br>**according** [1] - 51:2 | 13:19, 39:21,<br>39:22, 39:24, 43:4<br>**allege** [3] - 11:21, | **AT** [1] - 1:3<br>**ATLANTA** [1] - 2:11<br>**Atlanta** [2] - 4:4, | 43:13<br>**better** [2] - 54:13,<br>78:16 |
| **31** [1] - 11:19<br>**33** [4] - 11:19, 12:4,<br>59:14, 60:3<br>**37219** [1] - 2:5<br>**37402** [1] - 2:22 | **account** [4] - 33:14,<br>56:6, 58:13, 64:23 | | | **between** [6] - 21:17, |

Case 1:19-cv-00098-TRM-CHS   Document 194-8   Filed 06/24/22   Page 23 of 35<br>
02/10/2022 01:14:21 PM   Foufaker Reporting Service, Inc. (423) 316-6481<br>
Page 1 to 1 of 13   PageID #: 4943   22 of 34 sheets

47:19, 48:22, 51:6, 54:24, 64:18
**bidding** [1] - 8:10
**bids** [11] - 62:13, 63:4, 63:8, 63:10, 64:2, 66:7, 66:14, 66:16, 66:18, 69:7, 69:10
**big** [3] - 7:1, 19:12, 60:15
**binding** [2] - 74:7, 77:17
**bit** [4] - 16:12, 18:4, 33:13, 33:15
**bobbing** [1] - 16:16
**born** [1] - 4:14
**bounds** [1] - 52:21
**Bowman** [1] - 63:15
**box** [4] - 64:13, 64:14, 64:20, 64:25
**boyfriends** [1] - 33:11
**break** [1] - 53:25
**bridge** [1] - 56:8
**brief** [5] - 9:17, 15:16, 40:22, 59:14, 62:12
**briefing** [1] - 79:24
**bring** [1] - 80:9
**broad** [2] - 24:11, 71:12
**broader** [1] - 59:22
**broken** [1] - 76:15
**brothers** [1] - 21:18
**BUGNI** [1] - 2:9
**Bugni** [1] - 3:20
**BUILDING** [1] - 2:21
**bunch** [2] - 35:25, 36:2
**burden** [17] - 15:14, 15:17, 15:24, 16:7, 38:12, 38:14, 38:15, 38:18, 38:20, 41:14, 41:18, 41:20, 41:21, 44:23, 51:25, 62:3, 81:8
**burdening** [1] - 55:13
**burdensome** [1] - 78:25
**business** [24] - 7:12, 7:23, 13:15, 14:8, 17:21, 17:22, 25:14, 33:14, 33:25, 34:1, 34:5, 34:7, 34:20, 34:25, 36:8, 39:2, 44:4, 44:10, 45:17, 53:9, 63:2, 63:5, 81:15

**C**

**calculated** [1] - 24:7
**CALDWELL** [1] - 2:14
**candid** [3] - 39:11, 40:13, 40:14
**candidly** [1] - 31:20
**candor** [1] - 57:14
**cannot** [2] - 42:5, 42:7
**capabilities** [1] - 42:8
**capitalize** [1] - 11:11
**capture** [1] - 48:10
**carry** [2] - 58:10, 58:11
**case** [57] - 3:9, 7:11, 10:11, 13:6, 13:22, 14:9, 14:14, 20:2, 20:14, 22:13, 24:2, 24:3, 24:19, 24:20, 24:24, 25:5, 30:23, 34:9, 36:5, 36:15, 36:16, 36:19, 38:5, 39:17, 39:18, 40:4, 41:17, 41:23, 42:10, 42:18, 42:19, 42:20, 43:8, 44:17, 51:23, 55:21, 55:22, 56:11, 58:18, 58:23, 59:13, 61:14, 64:21, 65:12, 69:24, 70:2, 71:14, 71:16, 71:21, 72:5, 72:15, 72:22, 73:7, 79:11, 79:16, 81:17, 82:8
**case-management** [2] - 36:15, 81:17
**cases** [10] - 19:25, 23:25, 24:10, 31:7, 31:10, 37:22, 38:10, 73:7, 73:25, 78:4
**caused** [1] - 58:12
**cellphones** [1] - 34:1
**center** [1] - 13:18
**CEO** [4] - 57:13, 57:14, 57:15, 57:16
**certainly** [5] - 13:11, 39:22, 58:20, 73:15, 77:15
**certify** [1] - 82:6
**cetera** [1] - 60:24
**chain** [1] - 51:3
**challenges** [2] - 60:1, 60:11
**chance** [2] - 25:10, 70:4

**changes** [3] - 61:6, 67:7, 67:8
**chart** [1] - 12:1
**CHATTANOOGA** [3] - 1:3, 2:15, 2:22
**checked** [2] - 12:21, 31:23
**CHESTNUT** [1] - 2:14
**children** [2] - 33:11, 35:9
**choose** [4] - 46:1, 46:3, 46:24, 56:13
**Christmas** [1] - 40:23
**Christopher** [7] - 1:12, 3:4, 3:17, 10:8, 25:18, 43:21, 45:5
**CHRISTOPHER** [1] - 2:3
**Circuit** [3] - 19:15, 19:17, 19:20
**circumstances** [1] - 51:12
**cite** [1] - 31:8
**cited** [4] - 18:15, 19:17, 20:1, 24:10
**citing** [1] - 61:5
**Civil** [2] - 1:9, 19:13
**civil** [1] - 3:10
**claim** [2] - 5:6, 58:17
**claims** [8] - 24:18, 24:23, 39:23, 43:2, 54:14, 71:19, 78:22, 79:16
**clarify** [1] - 47:10
**class** [1] - 5:5
**CLASS** [1] - 1:10
**clear** [2] - 49:4, 62:16
**clearly** [1] - 35:10
**CLERK** [1] - 3:10
**clerks** [1] - 53:19
**client** [2] - 6:15, 69:6
**clients** [1] - 37:13
**cloud** [1] - 74:13
**CO** [2] - 1:12, 2:18
**collect** [4] - 23:18, 41:16, 42:7, 42:9
**collected** [1] - 71:9
**collecting** [1] - 15:18
**collection** [3] - 8:20, 22:15, 30:17
**comfort** [1] - 14:24
**coming** [4] - 21:22, 49:20, 57:23, 81:12
**comings** [1] - 57:5
**commend** [1] - 4:10
**commission** [1] - 82:16

**commonly** [1] - 9:4
**communicate** [1] - 31:25
**communicated** [1] - 7:13
**communicates** [1] - 57:14
**communicating** [1] - 35:25
**communication** [2] - 39:3, 44:17
**communications** [9] - 7:12, 13:17, 15:9, 17:22, 35:16, 40:15, 44:10, 45:17, 67:1
**companies** [3] - 28:10, 28:12, 60:7
**COMPANY** [2] - 1:15, 2:19
**company** [23] - 7:13, 11:20, 14:4, 14:13, 14:14, 25:15, 29:23, 30:1, 31:15, 34:22, 40:1, 54:15, 54:21, 58:23, 59:23, 60:4, 60:5, 60:16, 68:20, 72:2, 74:7, 77:18, 78:16
**company's** [4] - 5:7, 34:16, 56:18, 67:25
**company-provided** [1] - 34:22
**compared** [1] - 10:22
**compartmentalize** [1] - 16:12
**COMPEL** [1] - 1:21
**compel** [4] - 7:5, 21:9, 27:7, 42:22
**compensation** [3] - 11:23, 60:13, 60:23
**Complaint** [2] - 60:15, 61:6
**complaint** [6] - 10:15, 11:5, 39:21, 61:17, 70:22, 70:24
**complete** [9] - 13:3, 13:10, 36:24, 37:1, 37:8, 49:9, 66:18, 67:2, 76:14
**completed** [1] - 40:2
**completely** [1] - 67:11
**complies** [1] - 65:21
**comport** [1] - 61:17
**comports** [1] - 53:21
**computer** [1] - 28:17
**concede** [1] - 8:2
**concedes** [1] - 15:4

**conceivable** [2] - 24:21, 24:24
**concept** [2] - 48:21, 52:23
**concern** [1] - 50:4
**concerned** [1] - 61:24
**concerning** [1] - 8:16
**concerns** [3] - 36:20, 62:3, 66:20
**concession** [1] - 61:21
**conducted** [2] - 22:15, 39:25
**confer** [11] - 21:10, 21:12, 27:9, 27:25, 32:1, 47:19, 47:24, 50:2, 76:4, 77:3, 77:12
**Conference** [4] - 19:7, 19:10, 19:17, 76:16
**conference** [3] - 12:18, 12:25, 47:5
**Conference's** [2] - 18:15, 19:22
**confers** [1] - 26:24
**confident** [1] - 37:12
**confidential** [1] - 33:9
**confirm** [1] - 9:19
**confronted** [1] - 25:6
**confuse** [1] - 4:16
**Connecticut** [1] - 4:15
**connection** [1] - 48:5
**consequences** [1] - 11:14
**consider** [6] - 15:13, 20:9, 50:3, 50:11, 80:25
**constitutes** [1] - 6:11
**contact** [2] - 27:16, 67:10
**contained** [1] - 5:7
**content** [1] - 28:22
**context** [3] - 12:5, 64:9, 73:3
**continue** [1] - 11:13
**contract** [1] - 39:5
**contracts** [4] - 39:4, 39:7, 56:19, 64:10
**contrary** [3] - 24:9, 67:10, 68:6
**control** [4] - 27:12, 27:20, 31:21, 35:4
**controlling** [1] - 19:8
**conversations** [2] - 36:9, 51:18

Case 1:19-cv-00098-TRM-CHS    Document 194-8    Filed 06/24/22    Page 24 of 35
23 of 34 sheets                  Foufaker Reporting Service, Inc. (423)316-6481
Page 2 to 2 of 13              02/10/2022 01:14:21 PM
PageID #: 4944

convince [1] - 53:5
cooperate [1] - 30:10
coordinating [1] - 54:24
copies [4] - 32:6, 70:11, 73:9, 73:11
copy [3] - 34:14, 70:9, 77:16
core [2] - 10:13
Corley [1] - 3:21
CORLEY [2] - 2:9, 25:23
correct [2] - 5:3, 82:7
correctly [1] - 17:12
cost [9] - 6:14, 8:22, 17:8, 32:17, 32:18, 42:23, 44:20, 44:22, 81:8
cost-shifting [1] - 42:23
costing [3] - 25:2, 45:19, 79:7
costs [5] - 18:22, 61:24, 61:25, 80:25, 81:4
Counsel [1] - 3:13
counsel [6] - 3:15, 5:22, 16:17, 17:2, 18:20
country [3] - 6:1, 7:1, 43:13
COUNTY [1] - 82:3
couple [4] - 24:15, 67:4, 69:22, 70:3
course [3] - 13:14, 15:5, 17:20
court [1] - 49:15
Court [29] - 3:5, 7:4, 11:18, 12:13, 12:24, 13:1, 13:13, 18:18, 18:20, 18:23, 19:15, 19:21, 23:9, 24:1, 30:9, 32:6, 32:8, 39:17, 39:19, 41:8, 45:14, 53:6, 59:21, 60:14, 61:18, 80:10, 81:6, 82:5
COURT [92] - 1:1, 3:9, 3:13, 3:18, 4:3, 4:8, 4:20, 4:24, 10:2, 10:6, 16:11, 16:21, 16:25, 17:3, 17:14, 17:17, 24:14, 25:9, 25:25, 26:5, 26:9, 26:15, 26:18, 26:22, 27:22, 28:2, 28:25, 29:2, 29:5, 29:15, 29:20, 30:3, 30:6, 31:14, 32:10,

32:21, 33:1, 33:6, 33:19, 34:11, 34:18, 41:25, 43:11, 43:24, 45:12, 46:11, 46:25, 47:4, 47:8, 47:14, 47:22, 48:19, 49:12, 49:17, 49:20, 50:15, 52:22, 53:17, 54:3, 54:7, 54:9, 56:23, 58:5, 58:8, 58:25, 59:4, 59:11, 62:4, 62:7, 62:10, 67:3, 69:20, 70:6, 71:4, 73:13, 73:17, 74:5, 74:14, 74:18, 74:20, 74:22, 75:2, 75:6, 76:3, 76:10, 77:10, 77:20, 80:17, 80:20, 81:7, 81:14, 81:21
Court's [6] - 12:4, 39:20, 59:13, 60:2, 61:5
Courts [2] - 19:16, 19:19
courts [1] - 18:15
covered [1] - 36:22
COVID [1] - 27:3
crack [1] - 4:17
create [1] - 70:8
credited [1] - 59:21
CREWS [1] - 2:20
Crews [1] - 4:1
critical [4] - 13:6, 40:15, 61:13, 69:6
CRR [1] - 82:14
crux [1] - 11:18
current [3] - 11:11, 25:19, 28:9
curtail [1] - 24:5
custodial [4] - 6:8, 38:4, 54:4, 64:3
CUSTODIAL [1] - 1:23
custodian [16] - 7:10, 15:4, 21:16, 21:19, 43:25, 45:18, 46:1, 46:3, 46:23, 47:5, 48:22, 50:25, 61:23, 70:9, 70:12, 70:17
custodian's [1] - 64:14
custodians [57] - 7:21, 8:6, 8:13, 8:16, 8:19, 8:21, 12:7, 12:22, 13:16, 14:8, 14:17, 15:6, 16:4, 17:19, 21:5, 22:12, 22:15,

25:17, 27:16, 29:22, 30:9, 30:25, 31:14, 32:13, 33:5, 34:22, 34:24, 37:25, 38:3, 38:15, 43:5, 43:6, 44:21, 44:22, 45:2, 62:1, 62:4, 62:17, 62:24, 63:17, 63:24, 63:25, 66:17, 67:5, 69:3, 69:5, 69:11, 69:14, 69:16, 73:14, 74:4, 74:8, 78:3, 79:13, 79:14, 80:19, 81:1
custodians' [2] - 7:18, 21:18
custody [4] - 27:12, 27:20, 31:21, 35:4
customer [1] - 13:18
customers [6] - 5:18, 5:25, 13:21, 35:18, 38:7, 61:14
customers' [1] - 68:2

## D

data [7] - 28:18, 32:14, 32:16, 42:5, 42:8, 42:15, 45:8
date [3] - 3:3, 31:5, 73:3
dates [1] - 45:25
day-to-day [3] - 17:20, 55:17, 61:12
days [2] - 46:6, 46:17
de [4] - 62:25, 63:3, 66:3, 66:11
deal [3] - 18:13, 48:8, 49:22
dealing [8] - 43:12, 54:20, 55:5, 56:4, 56:12, 57:4, 57:21, 66:6
deals [1] - 36:12
debt [1] - 39:25
December [3] - 27:2, 64:18, 82:16
decide [1] - 46:18
deciding [1] - 23:18
decision [13] - 23:15, 45:19, 62:25, 63:4, 63:9, 63:13, 63:21, 64:7, 64:23, 65:5, 67:7, 68:24, 69:23
decision-makers [8] - 62:25, 63:4, 63:21, 64:7, 65:5,

67:7, 68:24, 69:23
decision-making [3] - 63:9, 63:13, 64:23
decisions [2] - 23:17, 56:6
declaration [14] - 13:25, 25:20, 26:5, 27:15, 30:22, 32:5, 32:19, 38:14, 44:3, 45:6, 62:18, 62:22, 64:6, 69:8
declarations [25] - 7:21, 14:1, 14:12, 14:15, 14:16, 14:18, 14:23, 22:20, 25:12, 25:18, 26:21, 27:1, 27:6, 27:10, 30:19, 31:11, 40:19, 40:20, 41:1, 41:10, 44:13, 45:3, 45:13, 63:17
dedicated [12] - 5:14, 8:9, 11:22, 12:3, 25:22, 26:4, 54:15, 55:23, 58:13, 68:12, 68:17
Defendant [13] - 3:20, 6:6, 7:16, 8:1, 8:22, 9:7, 9:9, 10:16, 20:25, 25:3, 78:8, 78:13, 79:13
defendant [4] - 6:9, 7:20, 8:12, 8:18
Defendants [43] - 1:16, 3:24, 4:2, 7:5, 12:20, 12:21, 13:2, 13:23, 14:4, 15:14, 16:8, 16:22, 36:23, 39:17, 39:25, 40:20, 40:21, 45:24, 51:21, 55:9, 55:21, 55:25, 58:20, 58:21, 59:15, 62:11, 62:17, 64:1, 64:12, 64:19, 65:4, 65:10, 66:3, 71:17, 71:25, 72:15, 72:21, 73:8, 77:14, 81:7
DEFENDANTS [2] - 2:6, 2:17
Defendants' [8] - 9:13, 34:23, 36:14, 49:5, 61:19, 62:22, 63:17, 79:23
defenses [5] - 24:18, 24:24, 58:20, 78:22, 79:16

deference [1] - 18:20
deficiencies [1] - 5:3
deficiency [6] - 21:15, 22:10, 22:25, 23:23, 67:16, 69:17
deficient [1] - 20:19
delete [6] - 46:8, 65:14, 65:19, 65:21, 72:4, 72:5
deleted [4] - 66:1, 70:24, 72:4, 73:1
deletes [2] - 29:6, 46:5
deliberately [1] - 43:16
delving [1] - 20:9
demands [1] - 68:1
demonstrated [2] - 9:12, 79:21
denied [1] - 61:18
denying [1] - 12:5
dependent [1] - 29:18
deponent [6] - 9:6, 71:7, 75:19, 79:19, 79:20, 80:11
depose [2] - 73:13, 73:15
deposition [4] - 9:3, 71:15, 75:12, 76:5
depositions [2] - 78:21, 80:4
designed [2] - 6:23, 48:9
detail [2] - 11:20, 57:16
detailed [1] - 68:10
details [2] - 51:14, 53:18
determine [3] - 6:24, 27:21, 51:9
determining [1] - 23:17
developed [1] - 48:7
device [4] - 29:7, 42:2, 42:7, 77:6
devices [8] - 7:19, 29:23, 29:24, 30:2, 30:5, 31:16, 34:5, 34:16
devil [1] - 51:14
different [16] - 28:13, 33:13, 49:4, 49:13, 49:24, 50:20, 57:8, 57:11, 57:15, 57:17, 57:18, 64:16, 65:10, 68:12, 74:3
diligently [2] - 6:3, 22:14
direct [1] - 56:16
directed [4] - 4:21,

Case 1:19-cv-00098-TRM-CHS Document 194-8 Filed 06/24/22 Page 25 of 35
02/10/2022 01:14:21 PM
Fouraker Reporting Service, Inc. (423)316-6484
PageID #: 4945
Page 3 to 3 of 13
24 of 34 sheets

5:19, 53:21
**direction** [1] - 18:19
**directionally** [1] - 6:16
**directly** [4] - 8:8, 55:16, 66:6, 76:1
**director** [3] - 25:21, 26:4, 51:1
**disappointed** [1] - 47:1
**discard** [1] - 75:9
**discarded** [1] - 75:17
**disclose** [3] - 11:17, 58:9, 59:24
**disclosed** [2] - 11:9, 61:2
**discovered** [1] - 13:7
**DISCOVERY** [4] - 1:21, 1:23, 1:24
**discovery** [48] - 5:16, 5:21, 6:4, 7:3, 7:5, 7:7, 8:2, 8:4, 8:6, 8:12, 8:15, 8:18, 9:4, 9:5, 9:8, 9:11, 9:18, 15:2, 16:6, 18:5, 18:7, 19:23, 20:7, 22:25, 24:8, 24:19, 28:7, 36:16, 40:18, 42:16, 56:9, 69:18, 71:6, 71:10, 71:12, 75:12, 76:14, 76:17, 79:20, 80:3, 80:11
**discovery-on-discovery** [4] - 9:11, 75:12, 79:20, 80:11
**DISCOVERY-ON-DISCOVERY** [1] - 1:24
**discrete** [1] - 5:7
**discuss** [2] - 12:18, 63:10
**discussed** [3] - 53:3, 53:9, 53:10
**discussing** [1] - 35:19
**discussion** [5] - 26:1, 32:1, 49:18, 58:6, 63:13
**discussions** [3] - 63:7, 63:20, 63:22
**dismiss** [6] - 10:15, 11:19, 12:5, 39:18, 39:20, 61:19
**dismissed** [2] - 39:23, 43:3
**dispose** [1] - 22:5
**dispute** [7] - 9:18, 10:9, 12:9, 12:17, 46:18, 58:21,

58:23
**disputes** [1] - 12:6
**distinction** [1] - 40:17
**Distributors** [1] - 20:1
**DISTRICT** [2] - 1:1, 1:2
**District** [2] - 19:16, 19:19
**disturb** [1] - 22:23
**dividends** [1] - 10:24
**division** [4] - 5:13, 5:14, 11:22, 12:3
**divisions** [2] - 68:12
**doctor** [1] - 35:9
**document** [10] - 7:2, 13:3, 48:16, 65:11, 70:10, 70:11, 70:13, 70:14, 72:1, 73:12
**document-retention** [1] - 72:1
**documents** [48] - 5:24, 6:10, 6:12, 6:24, 7:9, 13:9, 13:12, 13:19, 15:1, 15:11, 18:13, 19:1, 20:17, 20:23, 21:1, 21:3, 21:6, 21:10, 22:6, 26:14, 32:25, 36:21, 36:25, 37:18, 55:12, 56:1, 56:3, 56:22, 57:10, 61:16, 61:23, 62:14, 62:20, 64:3, 64:12, 68:8, 68:9, 69:15, 69:19, 71:8, 71:9, 72:11, 72:18, 73:1, 73:2, 75:9, 75:14, 75:15
**dollars** [9] - 6:15, 8:23, 25:4, 78:6, 78:9, 78:12, 79:1, 79:4, 79:12
**done** [11] - 11:1, 32:2, 38:4, 38:10, 52:17, 53:22, 73:25, 75:9, 76:5, 76:23, 81:10
**DONELSON** [1] - 2:13
**DoorDash** [1] - 36:3
**dotted** [2] - 66:12
**dotted-line** [1] - 66:12
**doubt** [2] - 37:11, 49:14
**DOWD** [1] - 2:3
**down** [10] - 4:7, 9:16, 16:17, 36:1, 36:4, 38:21, 72:21, 80:4, 80:5, 81:12

**download** [2] - 28:18, 32:15
**downloads** [1] - 32:14
**DR** [1] - 20:1
**draft** [1] - 53:21
**dripping** [1] - 39:21
**drive** [1] - 59:8
**driven** [1] - 73:6
**driver** [3] - 61:8, 67:25
**driver-retention** [1] - 61:8
**drivers** [20] - 5:11, 5:12, 11:14, 11:21, 11:24, 54:16, 54:25, 55:1, 57:6, 58:10, 58:25, 59:3, 59:5, 59:16, 59:20, 60:4, 60:7, 60:12, 60:17, 67:10
**due** [1] - 66:19
**duplicative** [1] - 8:16
**during** [10] - 12:24, 13:14, 15:2, 15:5, 21:9, 30:16, 31:12, 31:25, 50:2, 69:25

## E

**e-mails** [1] - 75:16
**easier** [2] - 16:11, 16:16
**EASTERN** [1] - 1:2
**easy** [1] - 79:6
**economy** [2] - 59:6, 59:18
**effect** [4] - 22:20, 30:19, 67:7, 75:16
**effective** [1] - 52:14
**effort** [3] - 6:14, 49:24, 53:7
**efforts** [3] - 9:14, 71:7, 79:24
**eight** [4] - 29:22, 32:12, 44:21, 64:20
**eighty** [8] - 6:10, 8:23, 32:23, 78:5, 78:12, 79:1, 79:4, 79:12
**eighty-five** [8] - 6:10, 8:23, 32:23, 78:5, 78:12, 79:1, 79:4, 79:12
**either** [3] - 32:9, 43:15, 43:18
**elaborate** [1] - 7:6
**electronically** [1] - 6:6
**element** [2] - 33:17, 40:5

**eliminate** [1] - 36:9
**email** [16] - 7:8, 7:13, 7:25, 33:14, 39:15, 40:12, 40:15, 48:12, 51:3, 53:11, 57:15, 57:16, 64:13, 64:14, 67:20, 70:19
**emailing** [1] - 49:4
**emails** [42] - 13:5, 15:9, 20:13, 20:15, 21:14, 22:4, 31:5, 37:9, 43:9, 48:8, 48:10, 48:12, 48:15, 48:18, 49:8, 49:9, 49:25, 64:9, 64:19, 64:20, 64:25, 65:2, 65:6, 65:14, 65:19, 65:21, 65:24, 66:22, 66:25, 68:25, 69:22, 69:24, 70:1, 70:16, 71:3, 72:14, 74:11, 74:12, 74:18, 75:15, 76:7
**embedded** [1] - 56:24
**employed** [1] - 7:21
**employee** [2] - 21:24, 25:19
**employees** [13] - 14:12, 25:17, 26:20, 27:11, 30:12, 31:22, 35:17, 42:4, 54:19, 56:24, 57:4, 68:23, 79:14
**employing** [1] - 60:11
**end** [4] - 56:14, 60:9, 64:11, 78:4
**enforce** [1] - 55:18
**enforcement** [1] - 55:10
**engaged** [1] - 5:15
**enter** [1] - 3:13
**ENTERPRISES** [2] - 1:9, 2:6
**Enterprises** [1] - 3:11
**enthralling** [1] - 4:9
**entire** [2] - 48:17, 49:1
**entities** [1] - 56:10
**entitled** [10] - 3:2, 9:10, 18:19, 36:21, 37:13, 38:19, 41:19, 77:13, 80:7, 80:9
**entity** [1] - 56:12
**environment** [1] - 11:12

**ERIC** [4] - 1:9, 2:7
**Eric** [1] - 21:23
**ESI** [8] - 6:7, 6:20, 19:11, 19:13, 20:4, 28:4, 42:19, 52:8
**especially** [3] - 15:13, 38:6, 41:13
**ESQUIRE** [6] - 2:3, 2:8, 2:9, 2:9, 2:13, 2:20
**essentially** [1] - 20:13
**establish** [2] - 22:10, 22:11
**estimate** [2] - 8:24, 45:18
**estimates** [2] - 81:2, 81:3
**et** [2] - 3:12, 60:24
**event** [1] - 9:15
**evidence** [9] - 13:13, 21:4, 21:16, 24:8, 38:18, 71:18, 71:21, 72:23, 72:25
**ex** [2] - 25:17
**ex-employees** [1] - 25:17
**exact** [2] - 32:24, 33:4
**exactly** [3] - 49:5, 52:7, 52:9
**example** [9] - 35:19, 46:5, 52:3, 57:14, 59:25, 61:22, 63:14, 64:5, 66:2
**examples** [1] - 36:19
**except** [2] - 7:25, 31:5
**excuse** [2] - 53:18, 66:2
**execute** [1] - 10:17
**executive** [1] - 74:15
**executives** [3] - 14:13, 57:18, 58:4
**exercise** [2] - 49:21, 53:6
**Exhibit** [5] - 21:15, 21:19, 62:21, 66:9, 66:10
**exhibits** [1] - 63:18
**exist** [6] - 15:19, 29:11, 31:17, 46:19, 71:21, 72:18
**existed** [1] - 66:22
**exists** [3] - 42:9, 71:22, 72:18
**expectation** [2] - 34:6, 36:8
**expected** [1] - 55:13
**expecting** [1] - 33:12
**expense** [1] - 76:22

Case 1:19-cv-00098-TRM-CHS    Document 194-8    Filed 06/24/22    Page 26 of 35
25 of 34 sheets                    Foufaker Reporting Service, Inc. (425)316-6484
                                   Page 4 to 4:13          PageID #: 4946          02/10/2022 01:14:21 PM

experience [4] - 19:3, 40:13, 57:9, 74:9
expertise [2] - 6:20, 28:4
experts [2] - 37:3, 37:6
expires [1] - 82:16
explain [2] - 62:19, 71:13
explore [1] - 53:15
exploring [1] - 77:25
extensions [1] - 41:2
extensive [1] - 5:15
extent [3] - 28:7, 55:2, 61:18
extraneous [1] - 41:21
extrapolate [1] - 44:21

## F

facet [1] - 23:22
facilitate [1] - 56:25
fact [9] - 15:3, 18:17, 27:14, 27:24, 30:11, 38:1, 58:12, 66:20, 73:6
facts [2] - 22:17, 30:13
factual [2] - 74:24, 75:4
factually [1] - 74:24
failed [4] - 11:16, 58:9, 59:23, 61:6
fails [1] - 61:16
fair [1] - 46:22
faith [1] - 22:14
false [3] - 5:9, 59:22, 61:1
familiar [1] - 24:15
family [2] - 33:16, 39:13
far [3] - 56:8, 65:9, 79:21
FARGO [1] - 1:13
favorable [1] - 11:11
February [4] - 1:19, 3:1, 82:9, 82:11
federal [1] - 18:15
Federal [4] - 19:12, 37:5, 38:12, 38:21
few [2] - 30:4, 65:24
field [3] - 70:9, 70:12, 70:17
fifteen [1] - 70:11
fifty [7] - 6:12, 20:17, 20:23, 50:22, 50:24, 51:3, 51:7
fifty-five [3] - 6:12, 20:17, 20:23

fighting [1] - 46:12
figuring [1] - 54:23
file [3] - 22:19, 42:21, 80:10
filed [10] - 13:23, 14:14, 27:6, 32:6, 65:13, 69:8, 70:22, 70:24, 72:2, 72:6
files [1] - 64:3
filter [1] - 35:11
final [3] - 71:5, 79:18
finally [1] - 9:2
financials [2] - 68:11, 68:21
firms [2] - 7:1, 43:13
first [19] - 9:24, 11:8, 13:24, 20:22, 21:7, 21:9, 23:22, 42:1, 43:12, 48:7, 51:20, 52:4, 62:15, 67:5, 67:18, 67:20, 70:3, 70:5, 77:20
firsthand [2] - 56:15, 57:25
five [18] - 6:10, 6:11, 6:12, 8:23, 20:17, 20:23, 21:2, 22:7, 32:23, 48:12, 48:15, 48:16, 48:17, 78:5, 78:12, 79:1, 79:4, 79:12
fix [1] - 20:19
flesh [3] - 9:22, 17:25, 47:20
flip [1] - 15:13
flip-side [1] - 15:13
float [1] - 66:7
focus [3] - 10:10, 10:14, 56:20
focused [1] - 7:7
focusing [1] - 41:22
folders [1] - 64:15
folks [27] - 13:13, 13:20, 14:1, 14:9, 15:22, 16:3, 16:10, 17:18, 25:13, 29:21, 35:16, 37:3, 38:5, 51:22, 54:11, 54:12, 54:18, 54:23, 57:11, 61:16, 62:12, 63:25, 64:2, 65:24, 66:22, 66:24, 73:25
follow [1] - 45:24
followed [2] - 22:14, 30:18
following [1] - 3:5
foothold [1] - 53:5
footnote [3] - 26:12, 34:23, 35:6
FOR [4] - 1:2, 2:2, 2:6, 2:17

forced [1] - 5:12
foregoing [1] - 82:6
forever [1] - 29:8
form [1] - 40:18
formally [1] - 76:5
former [4] - 14:12, 26:20, 27:10, 31:22
forms [1] - 52:25
formula [1] - 8:24
forth [6] - 6:25, 17:5, 28:11, 33:11, 71:10, 76:11
foundation [1] - 53:14
four [40] - 8:7, 14:2, 14:12, 15:6, 15:21, 20:13, 20:14, 20:15, 21:5, 21:8, 21:14, 21:15, 21:21, 25:16, 26:20, 27:10, 27:12, 27:15, 29:13, 30:4, 31:5, 31:14, 31:19, 31:21, 34:24, 35:21, 36:1, 38:3, 45:2, 54:10, 54:11, 55:6, 55:15, 56:3, 56:11, 56:20, 59:5, 61:16, 62:1, 78:2
four-percent [1] - 59:5
Fouraker [2] - 82:4, 82:14
frankly [2] - 41:6, 78:23
fraud [9] - 30:24, 39:16, 39:17, 39:21, 39:22, 40:4, 40:5, 43:2, 43:3
friendly [1] - 20:3
friends [1] - 33:16
front [10] - 54:20, 55:4, 56:3, 56:7, 56:12, 56:16, 57:18, 57:20, 57:24, 58:16
fulfill [2] - 18:7, 18:19
fulfilling [1] - 55:3
full [2] - 20:3, 70:16
FULLER [4] - 1:9, 1:10, 2:7
Fuller [2] - 21:23, 51:2
fulsome [1] - 72:24
fundamental [1] - 61:2
furnished [1] - 7:20
future [1] - 80:15

## G

gaps [4] - 65:17, 67:15, 69:4, 69:18
gather [1] - 32:13
gay [1] - 26:19
GELLER [1] - 2:3
general [3] - 22:23, 59:20, 74:8
generalize [1] - 29:17
generally [3] - 33:8, 33:10, 48:20
GEORGIA [2] - 2:11, 2:22
girlfriends [1] - 33:10
given [4] - 18:21, 38:13, 45:2, 50:8
glad [1] - 12:8
goal [1] - 71:14
goings [1] - 57:5
Gordonsville [4] - 54:16, 63:1, 63:5, 66:14
GPS [1] - 42:9
graduated [1] - 4:14
Graham [3] - 63:14, 64:24, 66:12
grant [1] - 79:17
GREAR [2] - 1:10, 2:7
great [6] - 6:20, 10:2, 28:4, 49:22, 59:6, 59:19
grossly [1] - 52:13
ground [3] - 9:22, 54:11, 54:12
grounded [1] - 10:11
groundwork [1] - 5:1
growth [1] - 60:22
guard [1] - 33:15
guess [5] - 15:23, 25:17, 28:17, 29:21, 75:3
guy [1] - 26:18
guys [7] - 4:4, 5:16, 27:11, 55:3, 55:4, 77:23, 81:22

## H

half [2] - 11:8, 77:22
HAMILTON [1] - 82:3
Hamilton [4] - 54:17, 63:1, 63:5, 66:14
hand [2] - 51:10, 82:10
handful [1] - 65:6
hang [1] - 58:5
happy [7] - 32:7, 34:17, 38:17, 41:9, 45:24, 50:13, 80:12
hard [4] - 19:4, 59:19, 60:16, 76:20
hardly [1] - 13:4
harmed [1] - 61:7
Harness [3] - 62:23, 64:6
harness' [2] - 64:13, 64:20
Harry [1] - 1:11
hate [1] - 76:15
head [1] - 4:7
healthy [1] - 10:4
hear [2] - 77:23, 80:12
heard [2] - 3:3, 65:10
hearing [7] - 17:7, 22:19, 55:8, 67:20, 70:5, 82:6, 82:8
Hearing [1] - 81:25
held [3] - 5:19, 26:2, 58:7
help [1] - 77:8
helped [1] - 37:4
hereby [1] - 82:6
heretofore [1] - 7:7
hereunto [1] - 82:10
hide [1] - 43:18
high [1] - 11:2
higher [1] - 56:5
highlighted [1] - 12:1
hire [2] - 11:24, 59:16
historically [1] - 10:20
history [1] - 42:6
hold [4] - 65:20, 71:8, 73:10, 73:19
holds [4] - 72:6, 72:7, 73:9, 73:11
holidays [1] - 27:3
honor [2] - 18:6, 76:18
Honor [86] - 3:16, 3:19, 4:19, 4:23, 10:1, 10:5, 10:7, 10:9, 10:10, 10:19, 12:8, 12:13, 12:16, 12:18, 13:20, 14:11, 14:16, 14:18, 15:11, 16:20, 16:24, 17:18, 18:3, 19:10, 20:18, 22:9, 22:18, 22:20, 24:13, 26:23, 30:23, 33:23, 34:8, 34:15, 35:6, 36:11, 37:2, 37:5, 38:9, 39:10,

Case 1:19-cv-00098-TRM-CHS   Document 194-8   Filed 06/24/22   Page 27 of 35
PageID #: 4947
02/10/2022 01:14:21 PM
Fouraker Reporting Service, Inc. (423)316-6481
Page 5 to 5 of 13
26 of 34 sheets

6

41:6, 41:14, 41:24, 45:23, 46:21, 47:7, 47:18, 50:1, 50:18, 53:16, 54:5, 54:6, 55:6, 55:7, 55:9, 55:10, 56:9, 56:19, 58:19, 59:2, 59:9, 60:3, 61:22, 62:3, 62:9, 62:16, 62:21, 64:9, 66:9, 66:10, 67:4, 67:6, 69:3, 70:20, 71:13, 76:1, 77:1, 77:11, 80:21, 80:22, 81:3, 81:4, 81:13, 81:19, 81:20, 81:24

**Honor's** [1] - 36:6
**Honorable** [1] - 3:4
**hope** [1] - 46:19
**hours** [1] - 60:10
**huge** [1] - 37:17
**hundred** [12] - 6:10, 6:13, 8:22, 25:4, 32:22, 50:20, 62:16, 78:5, 78:11, 78:25, 79:3, 79:12
**hundred-percent** [1] - 62:16
**hundreds** [1] - 17:23
**hurricane** [2] - 21:21, 21:25

## I

**idea** [4] - 37:7, 74:9, 74:10, 74:16
**identify** [3] - 51:22, 52:13, 52:19
**impact** [5] - 21:22, 21:25, 53:23, 67:24, 68:20
**impacted** [1] - 68:3
**implicitly** [1] - 15:4
**important** [14] - 12:11, 18:23, 20:6, 23:22, 39:1, 40:17, 50:25, 51:6, 56:10, 57:10, 59:12, 62:19, 71:13, 77:17
**impose** [3] - 79:4, 79:8, 79:11
**imposes** [1] - 78:11
**improve** [1] - 61:7
**improved** [2] - 60:20, 60:21
**IN** [2] - 1:1, 82:10
**inability** [1] - 56:18
**inbox** [1] - 64:15
**inboxes** [1] - 65:3
**INC** [4] - 1:9, 1:14, 2:6, 2:18

**include** [5] - 39:5, 52:1, 52:3, 80:22, 81:3
**included** [5] - 17:8, 39:22, 62:1, 63:24
**including** [4] - 19:21, 20:24, 70:16, 72:11
**INCORPORATED** [4] - 1:12, 1:15, 2:17, 2:19
**Incorporated** [1] - 3:11
**incur** [1] - 76:22
**indicate** [1] - 15:9
**indicated** [2] - 22:16, 26:7
**indicating** [1] - 7:22
**individual** [4] - 29:17, 29:18, 74:7, 77:2
**Individually** [1] - 1:5
**individuals** [6] - 3:25, 40:1, 54:11, 55:6, 65:4, 66:6
**industry** [1] - 11:25
**information** [37] - 5:23, 5:25, 6:6, 8:14, 8:15, 9:7, 16:5, 20:3, 28:11, 42:10, 45:9, 51:16, 52:1, 58:3, 58:16, 61:11, 66:7, 69:7, 73:8, 73:23, 75:1, 75:5, 75:18, 75:23, 77:13, 78:9, 78:14, 78:17, 78:18, 78:21, 79:5, 79:13, 79:15, 80:1, 80:7, 80:8, 80:13
**inhouse** [1] - 32:15
**initial** [1] - 5:8
**inquiry** [1] - 47:17
**insight** [3] - 56:16, 57:22, 70:1
**insisted** [1] - 39:18
**instead** [3] - 37:5, 46:23, 61:23
**instruct** [1] - 73:23
**integrity** [1] - 43:14
**interacting** [1] - 55:16
**interactive** [2] - 16:13, 17:4
**interest** [1] - 35:12
**interested** [3] - 35:8, 35:15, 48:2
**internal** [2] - 63:7, 63:20
**interpreting** [1] - 24:3
**interviews** [5] - 22:15, 30:17,

31:13, 38:4, 46:14
**intimate** [1] - 33:15
**intrusive** [2] - 28:24, 52:14
**investors** [2] - 10:16, 10:25
**invite** [1] - 16:15
**involved** [5] - 63:19, 63:22, 66:15, 66:22, 66:25
**involvement** [1] - 69:10
**involving** [1] - 5:17
**iPad** [1] - 42:2
**IPO** [14] - 5:11, 10:12, 10:14, 10:18, 10:25, 13:5, 37:10, 39:25, 40:2, 48:16, 58:9, 64:10, 64:19, 65:1
**irrelevant** [1] - 67:12
**issue** [19] - 9:13, 12:13, 12:16, 21:20, 23:3, 36:13, 42:18, 42:19, 53:24, 54:3, 56:4, 56:10, 71:5, 72:12, 76:6, 78:2, 79:18, 79:22
**issued** [3] - 29:23, 72:6, 73:11
**issues** [15] - 9:21, 9:23, 11:7, 11:16, 19:11, 19:14, 26:25, 46:9, 48:4, 57:23, 59:22, 61:2, 68:10, 69:24, 77:19
**IT** [8] - 3:2, 34:3, 34:14, 34:16, 74:10, 74:20, 75:15, 77:16
**items** [3] - 14:20, 64:16, 65:7
**iterative** [4] - 36:16, 38:11, 42:16, 53:3

## J

**J.P** [2] - 1:12, 2:18
**JASON** [2] - 1:10, 2:7
**Jessica** [1] - 3:21
**JESSICA** [1] - 2:9
**job** [3] - 6:23, 28:9, 56:24
**jobs** [1] - 59:7
**John** [4] - 27:14, 31:18, 32:5, 63:14
**joint** [5] - 12:15, 12:24, 52:7, 52:10, 52:11

**Jr** [1] - 1:11
**judge** [1] - 4:14
**Judge** [3] - 1:11, 4:12, 4:20
**judgment** [2] - 40:7, 71:16
**Julie** [1] - 66:3
**June** [2] - 64:10, 64:18
**jury** [1] - 40:7
**Justin** [2] - 62:22, 64:6

## K

**Kamp** [4] - 62:25, 63:3, 66:3, 66:11
**keep** [2] - 16:16, 17:5
**kept** [4] - 12:18, 12:20, 29:10, 75:15
**key** [2] - 55:7, 69:23
**kind** [8] - 7:2, 10:11, 13:18, 27:4, 40:11, 44:23, 50:4, 54:13
**kinds** [1] - 7:8
**KING** [1] - 2:10
**King** [1] - 6:19
**knowing** [1] - 35:12
**knowledge** [1] - 57:25
**known** [2] - 18:14, 37:9
**knows** [2] - 36:11, 44:7

## L

**laborious** [1] - 49:21
**lack** [1] - 54:13
**lagged** [1] - 10:20
**language** [1] - 67:17
**lapse** [4] - 9:12, 76:12, 76:18, 79:22
**last** [5] - 12:15, 13:10, 33:23, 37:24, 72:10
**lasting** [1] - 53:23
**late** [1] - 13:10
**latest** [1] - 4:11
**law** [3] - 4:15, 6:17, 53:19
**lawsuit** [3] - 72:2, 78:10, 78:17
**lawyer** [2] - 18:17, 41:1
**lawyers** [3] - 6:19, 6:22, 28:5
**lay** [1] - 4:25

**LCR** [2] - 82:14, 82:15
**lead** [1] - 24:8
**leading** [1] - 13:5
**leads** [1] - 8:9
**learned** [2] - 13:24, 14:2
**least** [12] - 14:13, 14:24, 15:4, 15:8, 19:18, 35:5, 36:18, 55:7, 63:17, 66:19, 66:24, 72:23
**leave** [3] - 44:6, 60:7, 77:24
**lectern** [1] - 9:25
**Lee** [2] - 82:4, 82:14
**left** [5] - 22:4, 22:6, 31:15, 50:4, 50:24
**less** [3] - 5:14, 75:11, 78:5
**less-profitable** [1] - 5:14
**level** [5] - 9:22, 57:16, 68:23, 78:15, 79:14
**levels** [1] - 57:11
**LEWIS** [1] - 1:5
**Licensed** [1] - 82:5
**life** [2] - 28:4, 46:18
**light** [1] - 15:1
**likely** [1] - 51:25
**line** [5] - 55:4, 57:19, 57:20, 57:24, 66:12
**lines** [8] - 39:10, 49:9, 54:20, 56:4, 56:7, 56:12, 56:16, 58:16
**Lisa** [1] - 3:20
**LISA** [3] - 1:10, 2:7, 2:9
**list** [1] - 33:21
**listed** [1] - 70:16
**listen** [1] - 80:14
**literally** [1] - 65:6
**litigated** [1] - 78:4
**litigation** [9] - 14:21, 65:20, 71:8, 72:6, 72:7, 73:9, 73:10, 73:11, 73:18
**living** [1] - 52:22
**LLC** [7] - 1:12, 1:13, 1:14, 1:15, 2:18, 2:18, 2:19
**load** [22] - 8:7, 11:25, 12:11, 54:6, 54:8, 54:9, 54:10, 56:20, 56:23, 60:1, 60:19, 61:4, 61:7, 61:10, 67:5, 67:9, 67:12, 67:24, 68:23, 68:25, 69:16

Fouraker Reporting Service, Inc. (423) 316-6481
02/10/2022 01:14:21 PM

load-planning [1] - 69:16
loads [5] - 54:24, 58:11, 58:16, 60:9
locally [1] - 3:23
located [1] - 15:12
location [2] - 42:9, 54:19
locations [5] - 54:13, 54:16, 54:17, 63:1, 63:8
logistical [2] - 46:9, 60:12
logistics [1] - 51:1
look [20] - 15:16, 17:18, 21:17, 23:4, 23:22, 24:16, 34:4, 34:16, 34:18, 34:19, 35:18, 37:23, 40:17, 41:9, 44:18, 64:8, 64:12, 70:20, 70:25
looked [1] - 7:22
looking [7] - 5:24, 16:1, 25:4, 39:9, 44:23, 64:14, 81:8
looks [1] - 10:3
lost [1] - 73:5
lower [3] - 68:23, 78:15, 79:14
lower-level [2] - 68:23, 79:14
LYNCH [2] - 1:11, 2:17

## M

machine [1] - 81:9
mad [1] - 53:20
Magistrate [2] - 1:12, 3:4
mails [1] - 75:16
maintain [1] - 11:21
maintenance [2] - 12:1, 61:7
majority [3] - 30:1, 34:21, 36:7
makers [8] - 62:25, 63:4, 63:21, 64:7, 65:5, 67:7, 68:24, 69:23
managed [1] - 66:5
management [2] - 36:15, 81:17
manager [1] - 66:4
managers [1] - 8:8
manner [2] - 61:18, 72:11
market [1] - 11:1
MARTIN [1] - 2:21
master [3] - 70:9, 70:12, 70:17

Mattice [1] - 1:11
MAX [2] - 1:10, 2:7
MDM [1] - 42:5
mean [20] - 25:6, 35:10, 36:3, 38:12, 40:12, 50:16, 55:21, 56:9, 58:8, 59:13, 61:4, 68:21, 70:22, 70:25, 73:17, 75:7, 75:18, 75:19, 77:1, 77:8
means [3] - 39:3, 40:4, 48:4
measure [2] - 9:1, 77:22
measures [1] - 80:1
mechanism [1] - 75:24
meet [13] - 21:10, 21:12, 26:24, 27:9, 27:25, 32:1, 47:19, 47:24, 50:2, 68:1, 76:4, 77:3, 77:12
meet-and-confer [10] - 21:10, 21:12, 27:9, 27:25, 32:1, 47:19, 47:24, 50:2, 76:4, 77:3
meet-and-confers [1] - 26:24
members [1] - 33:16
memory [1] - 5:2
mentioned [4] - 12:8, 14:11, 37:2, 39:11
mere [1] - 18:25
MERRILL [2] - 1:11, 2:17
message [2] - 39:6, 52:2
MESSAGES [1] - 1:22
messages [81] - 7:18, 7:23, 8:3, 8:5, 12:7, 12:12, 12:23, 13:14, 13:16, 14:3, 14:19, 14:20, 15:1, 15:5, 15:8, 15:12, 15:18, 15:19, 15:23, 16:2, 16:9, 16:13, 17:9, 17:19, 20:12, 20:20, 24:17, 28:11, 28:16, 32:3, 33:4, 33:9, 33:16, 34:7, 35:11, 35:21, 36:2, 36:4, 37:23, 37:25, 38:2, 38:16, 38:19, 38:22, 38:24, 38:25, 39:7, 39:12, 40:11, 40:14, 40:16, 41:11, 41:16,

41:22, 42:6, 43:21, 44:1, 44:8, 45:21, 46:2, 46:3, 46:6, 47:13, 47:15, 47:16, 48:2, 48:6, 48:11, 48:21, 48:23, 49:2, 49:8, 49:11, 49:14, 49:25, 50:21, 51:4, 51:7, 51:11, 57:9, 77:21
method [1] - 62:2
methodology [2] - 49:13, 51:24
methods [1] - 8:20
metric [1] - 60:5
Michael [2] - 63:14, 64:24
microphone [1] - 16:18
midst [1] - 80:3
might [12] - 4:21, 8:15, 22:1, 24:22, 27:12, 28:6, 45:4, 46:12, 71:12, 74:12, 75:12, 78:21
mighty [1] - 81:21
MILLER [1] - 2:21
million [3] - 6:11, 6:15, 78:8
mind [1] - 27:2
minimize [1] - 41:21
minimizes [1] - 51:24
minute [1] - 39:11
minutes [2] - 51:4, 51:9
misleading [2] - 5:10, 40:8
misled [1] - 10:16
misrepresenting [1] - 44:15
missing [4] - 19:1, 37:17, 65:25, 72:19
mobile [6] - 7:18, 29:23, 31:16, 42:2, 42:7, 77:6
mobile-device [1] - 77:6
modified [2] - 50:3, 50:11
modifying [1] - 52:18
moment [3] - 32:10, 32:11, 43:15
money [2] - 53:7, 79:8
monthly [2] - 68:11, 68:16
months [1] - 75:17
morale [2] - 60:20,

61:8
MORGAN [4] - 1:12, 1:13, 2:18, 2:18
morning [1] - 10:7
most [9] - 7:7, 13:6, 40:15, 49:10, 54:14, 55:16, 56:10, 57:25, 61:13
mostly [3] - 4:4, 5:1, 33:9
MOTION [1] - 1:21
motion [21] - 5:16, 10:15, 11:19, 12:5, 21:8, 21:16, 27:6, 27:18, 39:18, 39:20, 42:22, 61:19, 62:1, 67:19, 67:23, 68:6, 69:3, 69:12, 71:2, 79:17, 80:10
motion-to-dismiss [1] - 39:20
motivations [1] - 40:2
motive [2] - 40:5, 40:9
move [1] - 16:14
Moved [1] - 4:7
moved [1] - 55:9
moving [1] - 53:4
MR [50] - 3:16, 3:23, 4:1, 4:7, 4:19, 4:23, 9:25, 10:5, 10:7, 16:20, 25:8, 33:18, 33:20, 34:14, 34:21, 45:23, 47:7, 47:18, 47:23, 48:20, 49:16, 49:19, 50:18, 53:16, 54:5, 54:8, 54:10, 57:3, 58:19, 59:2, 59:9, 59:12, 62:6, 62:9, 62:11, 71:11, 73:15, 73:20, 74:6, 74:17, 74:19, 74:21, 74:23, 75:3, 77:11, 80:16, 80:18, 80:21, 81:19, 81:24
MS [47] - 3:19, 16:24, 17:1, 17:13, 17:15, 18:3, 25:21, 25:23, 25:24, 26:3, 26:7, 26:10, 26:17, 26:19, 26:23, 27:23, 28:19, 29:1, 29:4, 29:9, 29:16, 30:1, 30:4, 30:7, 31:18, 32:18, 32:22, 33:3, 41:24, 42:1, 43:23, 45:11,

46:21, 47:3, 47:9, 50:1, 52:4, 54:2, 67:4, 70:3, 70:7, 75:25, 76:4, 76:11, 81:13, 81:20, 81:23
must [1] - 37:9
myriad [2] - 23:16, 23:19

## N

Nagala [3] - 4:12, 4:14, 4:20
name [1] - 78:11
names [1] - 25:13
narrow [1] - 24:9
NASHVILLE [1] - 2:5
Nashville [1] - 4:5
nature [2] - 38:25, 50:8
need [24] - 25:11, 36:12, 37:12, 40:24, 45:8, 45:14, 45:18, 46:2, 47:15, 51:7, 51:11, 53:25, 55:12, 56:6, 60:8, 66:4, 67:23, 68:7, 69:11, 69:19, 70:19, 70:25, 75:21, 78:9
needed [6] - 27:24, 41:5, 58:11, 67:24, 69:5, 69:6
needs [2] - 24:19, 79:11
nefarious [2] - 75:9, 75:11
negative [1] - 68:20
negatively [1] - 68:3
negotiated [1] - 64:11
never [7] - 14:4, 14:19, 14:20, 21:8, 21:10, 38:24, 42:18
nevertheless [1] - 63:21
new [2] - 8:14, 69:11
next [6] - 16:14, 38:25, 53:24, 54:3, 73:21
NICOLAUS [2] - 1:14, 2:19
nobody [2] - 4:16, 44:7
noncustodial [1] - 6:7
none [2] - 41:17, 46:15
nonetheless [1] - 4:17

Case 1:19-cv-00098-TRM-CHS Document 194-8 Filed 06/24/22 Page 29 of 35
PageID #: 4949
02/10/2022 01:14:21 PM
Foufaker Reporting Service, Inc. (423)316-6481
Page #7 to #13
28 of 34 sheets

8

| | | | | |
|---|---|---|---|---|
| **nonroutine** [1] - 22:2 | 21:21, 22:22, 23:7, 25:12, 27:15, 27:17, 28:21, 29:11, 31:10, 32:7, 32:8, 33:24, 34:24, 35:23, 37:25, 38:10, 43:24, 44:2, 44:12, 47:23, 48:22, 56:10, 58:20, 60:15, 61:20, 61:23, 64:5, 64:7, 64:14, 64:22, 66:5, 69:20, 70:9, 71:20, 74:5, 74:6, 75:7, 78:8, 80:16 | **outset** [1] - 43:18 | 39:4, 39:11, 39:13, 39:14, 40:7, 40:12, 40:14, 41:2, 41:10, 41:17, 44:3, 46:14, 46:15, 49:7, 49:9, 50:21, 51:7, 51:18, 51:23, 55:4, 55:15, 56:3, 56:5, 56:6, 56:12, 56:15, 57:18, 57:20, 57:24, 58:15, 59:7, 59:19, 63:24, 64:22, 65:4, 65:13, 65:19, 70:19, 72:3, 72:14, 75:4, 78:15 | 46:7, 47:5, 55:1, 56:13 |
| **normal** [2] - 17:20, 75:14 | | **outside** [1] - 32:14 | | **picked** [1] - 54:25 |
| **normally** [1] - 37:21 | | **over-the-road** [1] - 5:13 | | **piece** [1] - 33:24 |
| **NORTHEAST** [1] - 2:10 | | **overall** [1] - 58:17 | | **PIERCE** [2] - 1:11, 2:17 |
| **Notary** [1] - 82:4 | | **overcome** [1] - 31:11 | | **place** [5] - 11:23, 53:2, 60:23, 65:20, 75:13 |
| **note** [3] - 19:9, 19:15, 43:2 | | **own** [1] - 18:13 | | **places** [1] - 60:8 |
| **noted** [1] - 10:10 | | | | **Plaintiff** [4] - 7:15, 24:10, 46:23, 79:21 |
| **notes** [1] - 66:5 | | **P** | | |
| **nothing** [8] - 38:13, 38:15, 38:21, 46:13, 71:2, 76:23, 76:24 | | | **people's** [3] - 42:11, 48:2, 65:3 | **plaintiff** [1] - 31:9 |
| | | **p.m** [1] - 3:8 | **percent** [2] - 59:5, 62:16 | **PLAINTIFF** [1] - 2:2 |
| | | **packages** [1] - 11:23 | | **Plaintiff's** [4] - 8:5, 9:3, 9:12, 23:25 |
| | | **packed** [1] - 20:2 | **percipient** [2] - 8:7, 8:13 | |
| **notion** [1] - 61:15 | **one-point-five** [1] - 6:11 | **Page** [4] - 12:4, 59:14, 60:3 | | **Plaintiffs** [19] - 1:7, 3:17, 5:6, 7:4, 9:10, 10:8, 19:4, 20:1, 21:3, 25:2, 26:25, 27:4, 31:7, 43:9, 50:6, 52:5, 76:6, 76:20, 81:19 |
| **Number** [3] - 34:10, 80:18, 82:15 | **ones** [6] - 30:12, 37:15, 57:20, 61:11, 63:10, 64:1 | **pages** [2] - 6:11, 6:14 | **perform** [2] - 7:2, 7:17 | |
| **number** [13] - 5:11, 11:13, 15:8, 25:12, 33:1, 33:4, 36:1, 36:4, 61:25, 64:8, 64:19, 64:24, 73:16 | **ongoing** [1] - 47:20 | **Pages** [1] - 11:19 | **performance** [1] - 54:22 | |
| | **onsite** [1] - 57:4 | **paid** [3] - 11:25, 60:6, 60:10 | | |
| | **open** [1] - 77:24 | **paper** [1] - 26:12 | **performed** [1] - 10:21 | |
| | **operating** [1] - 10:21 | **papers** [3] - 35:5, 52:5, 81:2 | **performing** [1] - 68:13 | **plaintiffs** [2] - 42:20, 42:21 |
| **numbers** [2] - 6:23, 50:22 | **operation** [1] - 61:6 | **Paragraph** [3] - 42:3, 62:23, 66:11 | **period** [8] - 13:5, 13:6, 29:14, 34:25, 35:1, 46:4, 48:24, 69:25 | **PLAINTIFFS'** [1] - 1:21 |
| | **operational** [5] - 11:16, 60:1, 61:2, 67:6, 67:8 | **part** [13] - 6:1, 21:12, 30:14, 34:25, 35:1, 49:10, 49:17, 49:18, 58:11, 63:23, 66:19, 72:22, 73:17 | | **Plaintiffs'** [2] - 3:15, 5:22 |
| **O** | | | **person** [9] - 29:9, 44:1, 52:12, 52:15, 52:20, 53:11, 70:13, 74:20 | **plan** [1] - 10:17 |
| | **operations** [3] - 21:22, 22:1, 25:22 | | | **planners** [15] - 12:12, 54:6, 54:8, 54:9, 54:10, 56:21, 56:23, 61:4, 61:10, 67:9, 67:10, 67:12, 67:24, 68:23, 69:1 |
| **oath** [1] - 31:2 | **opinion** [1] - 28:7 | **participated** [1] - 63:7 | | |
| **objection** [2] - 73:22, 81:11 | **Oppenheimer** [1] - 24:2 | **particular** [2] - 40:17, 53:11 | **personal** [12] - 29:24, 30:5, 33:9, 34:1, 34:19, 34:25, 35:2, 36:9, 42:8, 48:2, 50:8, 50:22 | |
| **obligation** [1] - 79:5 | **opportunity** [9] - 5:3, 5:20, 11:3, 53:5, 53:15, 70:20, 70:25, 71:1, 72:24 | **particularly** [3] - 34:7, 47:15, 71:14 | | **planning** [7] - 11:25, 60:1, 60:19, 61:7, 67:5, 69:16, 73:14 |
| **obligations** [2] - 18:7, 18:19 | | **parties** [10] - 5:15, 6:3, 18:12, 19:4, 20:24, 23:9, 30:11, 52:9, 55:10, 55:13 | **personally** [1] - 40:21 | |
| **observation** [1] - 33:7 | | | | **play** [1] - 63:16 |
| **obviously** [6] - 15:19, 21:3, 35:8, 36:10, 48:1, 55:18 | **opposed** [2] - 29:23, 73:7 | **party** [6] - 12:9, 18:6, 18:21, 21:18, 23:16, 56:9 | **perspective** [1] - 10:12 | **pled** [2] - 60:15, 61:17 |
| **occurred** [1] - 57:6 | **opposing** [1] - 18:20 | | **persuasive** [2] - 19:7, 19:23 | **plenty** [1] - 10:4 |
| **occurring** [1] - 15:10 | **opposition** [5] - 13:23, 15:16, 34:23, 40:22, 62:12 | **party's** [1] - 23:13 | **PETERSON** [2] - 1:10, 2:7 | **Point** [3] - 60:2, 61:5, 80:18 |
| **OF** [5] - 1:2, 1:22, 1:23, 82:2, 82:3 | | **PATE** [2] - 1:11, 2:7 | | **point** [21] - 6:11, 6:15, 7:4, 10:13, 13:7, 27:13, 33:23, 34:17, 35:7, 36:6, 37:16, 38:25, 44:14, 55:7, 59:20, 66:17, 71:16, 75:6, 77:21, 78:8, 80:14 |
| **off-the-record** [2] - 26:1, 58:6 | **order** [20] - 11:19, 12:4, 22:24, 32:11, 36:11, 36:15, 39:20, 48:8, 53:21, 53:22, 59:13, 60:2, 60:14, 61:5, 61:22, 80:13, 80:23, 81:10, 81:12 | **paucity** [4] - 69:24, 70:18, 71:3, 76:7 | **phone** [12] - 14:3, 28:12, 28:17, 28:21, 29:10, 34:19, 34:20, 34:25, 35:1, 35:22, 46:5, 47:2 | |
| **offering** [2] - 5:8, 68:4 | | **Paul** [1] - 63:14 | | |
| **officer** [2] - 18:18, 82:5 | | **pay** [3] - 79:3, 80:23, 81:4 | | |
| **often** [2] - 39:14, 57:24 | | **paying** [1] - 80:25 | **phones** [15] - 28:14, 28:15, 32:3, 32:13, 32:16, 33:25, 34:1, 34:3, 34:7, 34:22, 35:2, 35:4, 36:8, 45:10, 46:16 | **pointed** [3] - 13:2, 14:18, 42:20 |
| **oiled** [1] - 81:9 | **Order** [1] - 68:18 | **PEACHTREE** [1] - 2:10 | | |
| **okayed** [1] - 30:20 | **ordered** [2] - 16:9, 41:15 | **peaked** [1] - 27:4 | | **points** [5] - 8:18, 24:13, 25:16, 45:23, 67:4 |
| **old** [2] - 29:11, 46:17 | **orders** [1] - 30:9 | **peers** [2] - 10:20, 10:22 | | |
| **ON** [1] - 1:24 | **organization** [1] - 57:12 | **pending** [1] - 21:25 | | **poke** [2] - 75:8, 79:1 |
| **once** [1] - 26:11 | **otherwise** [2] - 56:14, 75:10 | **PENNER** [2] - 1:11, 2:17 | | **policies** [5] - 75:13, 77:5, 77:6, 77:7 |
| **one** [54] - 6:11, 6:15, 10:10, 13:11, 14:7, 15:4, 17:17, 18:9, 18:21, 19:25, 21:15, 21:18, | **OTR** [2] - 68:12, 68:16 | **people** [46] - 28:5, 33:8, 38:7, 38:23, | **pick** [5] - 43:24, | **policy** [15] - 34:2, |
| | **ourselves** [1] - 65:23 | | | |

8

8

Case 1:19-cv-00098-TRM-CHS   Document 194-8   Filed 06/24/22   Page 30 of 35
PageID #: 4950

Fouraker Reporting Service, Inc. (423)316-6481
Page 8 to 8 of 13
02/10/2022 01:14:21 PM

34:4, 34:12, 34:15, 42:1, 42:2, 46:8, 65:11, 65:21, 66:21, 72:2, 74:10, 75:16, 77:15, 77:16
**poor** [1] - 61:8
**portion** [2] - 46:17, 52:10
**position** [3] - 7:11, 7:15, 23:25
**possession** [4] - 27:11, 27:19, 31:21, 35:4
**possibility** [1] - 77:25
**possible** [2] - 28:8, 63:6
**possibly** [1] - 44:17
**potential** [1] - 62:24
**Powers** [1] - 3:23
**POWERS** [2] - 2:13, 3:23
**practical** [2] - 20:3, 50:19
**practice** [4] - 19:24, 30:14, 41:1, 41:2
**practiced** [1] - 6:17
**practices** [3] - 29:19, 60:23, 75:13
**preceding** [1] - 82:7
**premised** [1] - 18:17
**preparation** [1] - 17:6
**prepare** [1] - 76:23
**preposterous** [2] - 23:15, 23:20
**present** [1] - 72:24
**presented** [1] - 10:17
**preservation** [6] - 9:12, 9:14, 76:12, 76:18, 79:22, 79:23
**preserve** [5] - 9:7, 71:8, 73:2, 75:13, 80:1
**preserved** [2] - 72:8, 80:7
**president** [1] - 57:17
**presumably** [2] - 34:2, 71:9
**presume** [2] - 14:3, 14:8
**pretty** [1] - 10:4
**previous** [1] - 8:21
**previously** [3] - 5:16, 12:9, 12:13
**prices** [1] - 63:4
**pricing** [15] - 8:9, 62:7, 62:9, 62:13, 62:25, 63:8, 63:9, 63:10, 69:2, 69:5,

69:9, 69:11, 69:14, 69:15
**primarily** [3] - 9:19, 48:8, 81:8
**principal** [2] - 64:7, 65:5
**principle** [2] - 18:16, 22:23
**Principle** [2] - 18:16, 76:16
**principles** [1] - 19:24
**Principles** [2] - 20:2, 37:4
**prioritize** [2] - 12:2, 60:22
**privacy** [4] - 34:6, 36:8, 42:4, 42:11
**privileged** [6] - 6:24, 73:23, 74:2, 74:25, 75:22, 77:8
**problem** [9] - 23:24, 25:6, 37:10, 37:20, 38:6, 42:21, 56:2, 57:21, 58:12
**problematic** [1] - 55:20
**problems** [8] - 18:10, 54:15, 55:2, 55:22, 57:6, 58:22, 71:20, 76:13
**Procedure** [1] - 19:13
**proceeding** [1] - 18:25
**proceedings** [1] - 3:5
**process** [24] - 18:6, 18:9, 19:2, 19:5, 20:10, 21:10, 21:13, 22:14, 27:9, 28:1, 30:15, 30:20, 32:1, 32:19, 36:14, 36:17, 38:11, 42:16, 42:24, 47:10, 47:24, 53:4, 66:8, 76:5
**processes** [2] - 18:8, 75:23
**produce** [20] - 9:7, 16:9, 23:10, 23:11, 26:13, 30:8, 35:20, 43:21, 43:25, 44:8, 47:16, 48:17, 49:1, 56:22, 61:23, 70:9, 70:10, 78:24, 80:1
**produced** [28] - 6:6, 6:12, 8:17, 13:4, 13:8, 20:14, 20:23, 20:24, 20:25, 52:1, 57:11, 64:4, 64:13, 64:19, 64:25, 66:19, 67:22, 68:9,

68:10, 68:15, 68:17, 69:15, 69:22, 72:16, 75:10, 77:16, 79:9, 80:8
**producing** [6] - 12:20, 16:7, 18:12, 18:21, 23:13, 23:16
**product** [1] - 66:14
**production** [28] - 6:21, 9:13, 9:14, 13:4, 18:9, 18:11, 20:10, 20:16, 20:18, 22:24, 23:4, 23:13, 32:12, 37:1, 37:8, 37:17, 38:6, 56:11, 56:15, 65:17, 67:16, 67:17, 69:4, 69:18, 72:13, 76:13, 79:22, 79:23
**PRODUCTION** [1] - 1:22
**products** [1] - 56:25
**profitable** [2] - 5:13, 5:14
**programs** [1] - 12:1
**projected** [1] - 45:19
**projecting** [1] - 80:5
**proper** [1] - 79:25
**properly** [1] - 70:24
**proportional** [2] - 24:19, 79:11
**proportionality** [3] - 16:1, 20:8, 23:12
**proposal** [1] - 49:6
**proposed** [2] - 35:23, 51:21
**prosecute** [1] - 78:10
**protective** [1] - 36:11
**protocols** [1] - 18:8
**prove** [1] - 71:19
**proven** [1] - 43:17
**provide** [3] - 14:24, 19:23, 77:7
**provided** [5] - 14:4, 34:22, 43:10, 78:19, 79:15
**public** [1] - 5:8
**Public** [1] - 82:4
**publications** [1] - 19:18
**pull** [2] - 45:9, 79:5
**pure** [1] - 60:12
**purpose** [2] - 7:25, 73:5
**purposes** [4] - 7:24, 17:21, 25:14, 44:4
**put** [5] - 10:12, 39:14, 53:18, 64:9,

73:10
**puts** [1] - 57:15

**Q**

**quash** [1] - 55:9
**questions** [8] - 16:19, 24:15, 72:9, 75:20, 75:21, 76:6, 77:2, 77:4
**quick** [1] - 47:4
**quicker** [1] - 54:1
**QUINN** [2] - 1:10, 2:7
**quote** [1] - 59:13

**R**

**raise** [4] - 37:21, 46:9, 80:14, 81:18
**raised** [1] - 79:19
**rampant** [2] - 22:11, 31:8
**random** [1] - 50:22
**rate** [1] - 59:6
**rates** [1] - 61:9
**rather** [4] - 5:24, 47:23, 49:25, 63:12
**ratio** [1] - 10:21
**RDR** [1] - 82:14
**RE** [1] - 1:21
**reached** [1] - 40:21
**read** [8] - 4:9, 4:18, 4:24, 9:15, 9:17, 9:20, 33:12, 51:8
**reading** [1] - 52:10
**ready** [1] - 54:25
**realized** [1] - 26:11
**realizing** [1] - 70:18
**really** [20] - 10:14, 12:10, 14:5, 20:21, 29:9, 29:16, 29:18, 41:22, 44:13, 53:6, 53:13, 57:21, 58:23, 61:17, 68:22, 68:24, 70:19, 70:25, 72:20, 73:5
**reason** [13] - 19:12, 23:8, 26:23, 30:24, 31:1, 44:1, 44:19, 50:23, 63:23, 65:15, 69:4, 75:11, 76:21
**reasonable** [3] - 8:2, 15:10, 52:18
**reasonably** [2] - 18:7, 24:7
**reasons** [9] - 11:20, 44:12, 59:15, 59:21, 60:6, 60:16,

60:25, 69:12, 71:22
**receive** [1] - 73:18
**received** [3] - 66:13, 70:13, 70:19
**receiving** [1] - 21:23
**recognize** [1] - 18:24
**recognized** [1] - 60:14
**recognizes** [1] - 36:16
**recollection** [1] - 17:7
**record** [8] - 3:14, 26:1, 34:8, 58:6, 66:18, 67:2, 72:24, 76:15
**recruiting** [1] - 60:16
**reduce** [2] - 38:18, 61:25
**reducing** [1] - 61:25
**reference** [5] - 17:15, 17:25, 21:23, 22:7, 22:22
**references** [1] - 20:15
**referred** [2] - 8:6, 9:4
**reflected** [1] - 10:15
**refresh** [1] - 5:2
**refuse** [1] - 56:11
**regard** [2] - 63:9, 79:17
**regarding** [3] - 19:23, 20:3, 63:7
**registration** [5] - 5:8, 11:6, 40:8, 59:23, 61:3
**regular** [1] - 32:24
**related** [1] - 25:14
**relates** [1] - 77:21
**relationship** [6] - 41:3, 55:3, 55:5, 56:17, 57:7, 57:22
**relevance** [11] - 12:11, 16:2, 20:8, 23:12, 23:18, 23:24, 24:2, 24:5, 24:11, 24:23, 38:11
**relevant** [33] - 6:25, 12:22, 13:21, 14:9, 14:21, 14:25, 15:11, 16:5, 24:17, 24:18, 36:5, 36:25, 40:6, 40:9, 41:22, 44:17, 46:4, 47:17, 51:9, 51:16, 51:19, 51:23, 52:8, 54:14, 55:12, 57:25, 65:24, 68:25, 69:23, 72:15, 78:22, 79:15
**reliable** [1] - 42:25

Case 1:19-cv-00098-TRM-CHS   Document 194-8   Filed 06/24/22   Page 31 of 35
PageID #: 4951
02/10/2022 01:14:21 PM
Fouraker Reporting Service, Inc. (423) 316-6481
Page #9 to #13
30 of 34 sheets

**reliance** [1] - 23:13
**rely** [4] - 30:11, 30:13, 42:25, 43:5
**relying** [3] - 19:5, 23:25, 24:1
**remain** [1] - 17:1
**remember** [2] - 9:16, 44:16
**REMEMBERED** [1] - 3:2
**remembering** [1] - 17:11
**render** [1] - 28:6
**reply** [8] - 14:18, 19:7, 20:1, 59:14, 67:19, 67:23, 68:6, 71:3
**report** [2] - 12:15, 12:24
**reported** [1] - 66:12
**Reporter** [1] - 82:5
**reporting** [1] - 66:13
**reports** [1] - 26:3
**representation** [1] - 12:23
**representations** [1] - 15:7
**represented** [2] - 10:22, 11:6
**represents** [1] - 6:9
**reputations** [1] - 43:14
**request** [2] - 53:13, 79:6
**requested** [1] - 80:2
**requesting** [2] - 19:4, 23:8
**requests** [1] - 6:4
**required** [2] - 7:17, 17:10
**requirement** [1] - 73:2
**requiring** [1] - 20:19
**research** [1] - 70:4
**reside** [1] - 29:7
**resist** [1] - 49:23
**resolve** [1] - 46:10
**resort** [1] - 23:21
**resources** [1] - 19:22
**respect** [8] - 7:10, 7:18, 28:5, 42:11, 64:8, 66:2, 78:2, 79:18
**respectfully** [4] - 16:3, 25:1, 41:15, 45:25
**respects** [1] - 42:4
**respond** [8] - 5:21, 6:4, 9:9, 33:18, 33:19, 33:22, 41:24, 71:1

**response** [3] - 6:2, 7:20, 36:6
**responsibility** [1] - 63:12
**responsible** [4] - 8:10, 56:5, 62:13, 66:6
**responsive** [3] - 14:25, 26:13, 51:25
**responsiveness** [1] - 47:11
**rest** [2] - 15:22, 45:20
**rested** [1] - 63:13
**restored** [2] - 13:7, 29:11
**result** [3] - 23:20, 51:25, 68:13
**retain** [4] - 11:13, 11:21, 11:24, 15:23
**retention** [7] - 61:8, 65:11, 66:21, 72:1, 73:12, 77:6, 77:15
**review** [5] - 6:23, 8:20, 47:12, 51:5, 51:8
**reviewed** [1] - 6:9
**reviewing** [1] - 13:9
**rid** [2] - 35:25, 41:21
**road** [4] - 5:13, 60:10, 72:21, 80:4
**ROBBINS** [1] - 2:3
**Robin** [2] - 82:4, 82:14
**RONNI** [1] - 2:8
**Ronni** [1] - 3:19
**room** [2] - 14:23, 44:6
**routine** [1] - 22:2
**routinely** [5] - 14:22, 30:17, 31:3, 32:9, 41:12
**RUDMAN** [1] - 2:3
**Rule** [9] - 9:3, 9:5, 9:11, 24:3, 24:16, 39:19, 71:6, 79:19, 80:11
**rule** [5] - 18:14, 18:24, 20:5, 23:5, 23:8
**ruled** [1] - 77:20
**rules** [1] - 24:4
**Rules** [4] - 19:12, 37:6, 38:13, 38:21
**running** [1] - 12:2

---

### S

**safe** [3] - 10:3, 10:4, 81:22

**salary** [1] - 60:5
**Sarala** [1] - 4:12
**sat** [1] - 9:16
**saved** [1] - 65:15
**saw** [4] - 13:11, 15:1, 21:9, 27:18
**school** [1] - 4:15
**scope** [2] - 72:3, 72:18
**scoured** [1] - 21:3
**search** [40] - 7:2, 7:17, 16:9, 17:9, 17:23, 26:13, 28:9, 29:2, 29:4, 34:3, 35:11, 35:20, 45:9, 47:11, 47:16, 48:4, 48:5, 48:7, 48:15, 48:25, 49:20, 49:24, 50:3, 50:7, 50:9, 50:11, 50:19, 51:8, 51:12, 51:24, 52:1, 52:3, 52:6, 52:9, 52:16, 52:19, 52:23, 53:1, 56:21, 61:15
**searched** [2] - 14:6, 52:8
**searching** [4] - 15:24, 28:15, 49:13, 51:17
**seat** [1] - 16:17
**second** [5] - 23:7, 28:3, 58:5, 75:3, 78:2
**second-guess** [1] - 75:3
**Section** [1] - 40:5
**securities** [1] - 5:5
**SECURITIES** [5] - 1:13, 1:13, 1:15, 2:18, 2:19
**Securities** [1] - 5:6
**Securities-Act** [1] - 5:6
**Sedona** [8] - 18:15, 19:6, 19:10, 19:17, 19:22, 20:2, 37:4, 76:16
**see** [13] - 3:18, 31:23, 36:10, 36:12, 38:6, 53:5, 57:16, 63:18, 65:17, 68:19, 70:20, 75:8, 81:21
**seeing** [2] - 11:8, 66:25
**seek** [2] - 5:25, 8:5
**seeking** [2] - 9:3, 29:22
**selling** [1] - 10:13
**seminal** [1] - 19:11
**send** [1] - 64:17
**sending** [1] - 41:11

**sense** [2] - 29:5, 51:16
**sent** [9] - 44:8, 44:16, 64:13, 64:16, 64:20, 64:25, 65:2, 65:7, 70:19
**sentences** [1] - 49:10
**serious** [1] - 11:16
**served** [3] - 5:17, 5:21, 6:5
**service** [1] - 11:22
**services** [1] - 11:2
**servicing** [1] - 58:22
**Session** [1] - 3:8
**set** [2] - 48:9, 82:10
**several** [2] - 37:2, 68:9
**severely** [1] - 24:5
**Shane** [7] - 8:1, 8:2, 26:16, 26:17, 29:12, 30:20, 63:15
**shift** [1] - 5:12
**shifting** [2] - 42:23, 68:13
**shipper** [1] - 68:1
**shortage** [4] - 58:25, 59:3, 59:5, 67:25
**show** [4] - 13:20, 15:11, 21:14, 67:24
**showed** [1] - 72:14
**showing** [13] - 16:6, 18:10, 20:10, 23:14, 31:1, 31:4, 31:11, 32:20, 38:20, 43:7, 68:11, 68:15, 76:12
**shown** [3] - 41:14, 68:21, 69:17
**shows** [1] - 48:25
**side** [7] - 15:13, 18:18, 19:6, 43:15, 43:19, 44:9, 60:10
**sift** [1] - 32:16
**sifting** [1] - 45:9
**sign** [5] - 30:19, 30:21, 39:6, 40:8, 78:10
**signed** [7] - 27:15, 32:5, 32:8, 39:4, 39:8, 44:3, 64:6
**significant** [2] - 11:13, 79:7
**similar** [4] - 32:19, 32:23, 64:24, 69:15
**Similarly** [1] - 1:5
**simple** [2] - 35:10, 59:10
**single** [7] - 15:17,

28:20, 38:10, 52:12, 52:19, 60:5, 70:13
**site** [2] - 61:23, 62:2
**sites** [1] - 61:12
**situated** [3] - 7:2, 18:13, 28:6
**Situated** [1] - 1:6
**situation** [4] - 22:2, 22:3, 42:12, 65:23
**six** [4] - 8:6, 8:19, 38:15, 75:17
**Sixth** [2] - 19:17, 19:20
**sixty** [6] - 6:13, 21:2, 22:7, 46:6, 46:8, 46:17
**sixty-day** [1] - 46:8
**sixty-five** [2] - 21:2, 22:7
**slew** [1] - 13:8
**SMITH** [2] - 1:11, 2:17
**SMS** [1] - 42:6
**SOLOMON** [47] - 2:8, 3:19, 16:24, 17:1, 17:13, 17:15, 18:3, 25:21, 25:24, 26:3, 26:7, 26:10, 26:17, 26:19, 26:23, 27:23, 28:19, 29:1, 29:4, 29:9, 29:16, 30:1, 30:4, 30:7, 31:18, 32:18, 32:22, 33:3, 41:24, 42:1, 43:23, 45:11, 46:21, 47:3, 47:9, 50:1, 52:4, 54:2, 67:4, 70:3, 70:7, 75:25, 76:4, 76:11, 81:13, 81:20, 81:23
**Solomon** [8] - 3:19, 6:20, 16:23, 28:3, 33:22, 37:3, 39:16, 46:14
**someone** [9] - 17:8, 46:7, 48:13, 48:14, 48:23, 51:4, 73:21
**sometimes** [1] - 40:15
**somewhere** [1] - 74:13
**sorry** [4] - 3:22, 19:22, 25:24, 66:4
**sort** [6] - 4:22, 7:17, 9:10, 46:19, 49:21, 77:22
**sought** [1] - 9:8
**sound** [1] - 76:15
**sources** [3] - 6:7, 6:8, 54:4
**space** [1] - 10:22

Case 1:19-cv-00098-TRM-CHS   Document 194-8   Filed 06/24/22   Page 32 of 35
31 of 34 sheets
Fouraker Reporting Service, Inc. (423)316-6481
Page #0 to #0 of 13
PageID #: 4952
02/10/2022 01:14:21 PM

SPALDING [1] - 2:10
spam [1] - 36:2
Spaulding [1] - 6:19
special [1] - 6:22
specific [1] - 61:13
specifically [3] - 11:9, 12:10, 42:3
speculating [2] - 34:13, 76:25
speculation [1] - 18:25
spend [3] - 25:3, 74:3, 78:25
spending [1] - 46:17
spent [1] - 78:8
split [1] - 61:21
spouse [1] - 39:13
spreadsheets [3] - 68:11, 68:15, 68:17
staff [4] - 4:10, 4:17, 56:18, 59:16
staffing [2] - 55:23, 60:17
stand [1] - 77:18
standard [8] - 20:7, 23:3, 24:3, 24:6, 24:7, 24:11, 24:16, 38:12
standpoint [2] - 75:7, 81:17
stands [1] - 69:21
Stanford [1] - 4:16
STANLEY [2] - 1:12, 2:18
start [8] - 3:14, 9:22, 12:12, 33:20, 52:23, 53:8, 54:5, 80:4
started [1] - 5:1
starting [1] - 53:1
STATE [1] - 82:2
state [3] - 11:6, 63:16, 74:18
statement [8] - 5:8, 11:7, 31:12, 47:24, 52:7, 52:11, 59:23, 61:3
statements [9] - 5:7, 5:9, 18:4, 31:2, 31:12, 40:8, 40:9, 59:22, 61:1
STATES [1] - 1:1
States [1] - 24:1
status [2] - 12:15, 12:24
stay [1] - 56:9
stayed [1] - 55:10
Steger [2] - 1:12, 3:4
Stein [1] - 3:11
STEIN [1] - 1:5
step [2] - 32:2, 51:20

Stephas [2] - 62:24, 63:3
STEPHEN [1] - 2:13
STEPHENS [2] - 1:14, 2:18
steps [2] - 9:6, 77:23
steve [1] - 3:23
STIFEL [2] - 1:14, 2:19
still [4] - 15:19, 32:3, 39:24, 80:3
stored [3] - 6:6, 72:11, 75:15
strategy [1] - 8:10
STREET [3] - 2:4, 2:10, 2:14
string [1] - 53:11
struggling [2] - 11:21, 11:22
stuff [9] - 9:15, 9:20, 25:4, 36:12, 39:14, 41:22, 64:16, 64:17, 77:12
subject [4] - 9:4, 16:14, 47:19, 49:9
submission [3] - 4:11, 62:22, 66:10
submissions [1] - 4:9
submit [15] - 13:25, 14:17, 16:3, 16:8, 21:11, 25:18, 25:20, 34:17, 40:20, 40:22, 41:15, 45:3, 45:6, 45:25, 49:7
submitted [5] - 12:15, 13:12, 13:19, 14:1, 41:8
subpoena [1] - 55:19
subpoenas [4] - 5:17, 12:10, 55:9, 55:11
substantial [4] - 18:10, 23:4, 23:23, 76:13
substantially [3] - 13:3, 25:14, 37:1
substantive [12] - 7:12, 7:23, 8:14, 17:22, 39:2, 41:11, 44:4, 44:10, 44:16, 45:17, 52:15, 52:16
substantively [1] - 26:10
sudden [1] - 69:11
suffering [1] - 11:15
sufficient [3] - 5:10, 11:24, 58:10
suggest [4] - 22:9, 49:24, 53:9, 79:25

suggested [1] - 22:18
suggesting [2] - 39:3, 49:12
suggestion [1] - 35:3
suggests [1] - 69:25
SUITE [3] - 2:4, 2:15, 2:21
summarize [1] - 45:14
summarized [2] - 10:9, 14:16
summary [3] - 9:17, 40:7, 71:16
superiors [1] - 58:3
support [1] - 5:13
supported [1] - 34:8
suppose [2] - 28:15, 57:1
supposed [1] - 42:17
Supreme [1] - 24:1
surmise [1] - 6:4
system [3] - 18:6, 76:19, 76:21
systems [1] - 32:24

## T

table [3] - 16:17, 17:2, 73:22
talks [2] - 11:19, 70:12
tank [1] - 19:11
tape [1] - 72:12
tapes [7] - 13:7, 13:8, 37:16, 37:19, 42:13, 42:23, 76:9
target [1] - 53:4
team [1] - 8:9
technology [2] - 28:19, 28:22
telephone [1] - 28:10
temporary [1] - 77:22
ten [2] - 20:25, 52:2
ten-message [1] - 52:2
tend [1] - 39:11
TENNESSEE [5] - 1:2, 2:5, 2:15, 2:22, 82:2
Tennessee [1] - 82:15
term [2] - 48:15, 48:25
terms [38] - 10:20, 12:6, 23:17, 26:13, 29:3, 29:4, 36:20, 40:19, 47:11,

47:16, 48:3, 48:4, 48:5, 48:7, 49:21, 50:3, 50:7, 50:9, 50:12, 50:19, 51:8, 51:12, 51:16, 51:17, 52:2, 52:3, 52:6, 52:9, 52:16, 52:19, 52:23, 53:1, 54:14, 61:4, 61:13, 65:3, 73:3
test [5] - 41:13, 44:2, 44:5, 44:9, 44:13
testify [2] - 9:6, 71:7
testimony [3] - 31:8, 69:23, 77:17
TEXT [1] - 1:22
text [92] - 7:18, 7:23, 8:2, 8:4, 12:7, 12:12, 12:22, 13:14, 13:16, 14:3, 14:19, 14:20, 15:1, 15:5, 15:8, 15:9, 15:12, 15:18, 15:19, 15:23, 16:2, 16:9, 16:13, 17:9, 17:19, 20:12, 20:20, 21:17, 21:19, 21:24, 22:1, 22:16, 24:17, 26:8, 28:11, 28:16, 29:6, 29:7, 30:17, 31:3, 31:6, 32:3, 32:8, 33:4, 33:9, 34:6, 35:11, 35:21, 36:2, 37:23, 37:25, 38:1, 38:16, 38:18, 38:22, 38:24, 38:25, 39:6, 39:7, 39:12, 40:11, 40:14, 40:16, 41:11, 41:16, 43:21, 43:25, 44:7, 44:8, 45:20, 46:2, 46:3, 46:6, 47:13, 47:15, 47:16, 48:5, 48:11, 48:21, 48:23, 49:2, 49:3, 49:8, 49:11, 49:14, 49:24, 50:21, 51:6, 51:11, 53:11, 57:9, 77:21
texted [4] - 30:25, 31:9, 52:12, 52:20
texting [11] - 13:20, 14:7, 21:4, 21:17, 22:11, 31:8, 38:7, 38:23, 53:12
texts [16] - 7:14, 17:21, 17:22, 17:24, 20:16, 22:8, 22:22, 24:22, 28:7, 31:9, 32:12, 44:10, 46:16, 50:9, 52:24,

53:9
THE [96] - 1:1, 1:2, 2:2, 2:6, 2:17, 3:9, 3:10, 3:13, 3:18, 4:3, 4:8, 4:20, 4:24, 10:2, 10:6, 16:11, 16:21, 16:25, 17:3, 17:14, 17:17, 24:14, 25:9, 25:25, 26:5, 26:9, 26:15, 26:18, 26:22, 27:22, 28:2, 28:25, 29:2, 29:5, 29:15, 29:20, 30:6, 31:14, 32:10, 32:21, 33:1, 33:6, 33:19, 34:11, 34:18, 41:25, 43:11, 43:24, 45:12, 46:11, 46:25, 47:4, 47:8, 47:14, 47:22, 48:19, 49:12, 49:17, 49:20, 50:15, 52:22, 53:17, 54:3, 54:7, 54:9, 56:23, 58:5, 58:8, 58:25, 59:4, 59:11, 62:4, 62:7, 62:10, 67:3, 69:20, 70:6, 71:4, 73:13, 73:17, 74:5, 74:14, 74:18, 74:20, 74:22, 75:2, 75:6, 76:3, 76:10, 77:10, 77:20, 80:17, 80:20, 81:7, 81:14, 81:21
themselves [1] - 28:15
theory [3] - 5:9, 44:2, 58:8
thereafter [1] - 68:18
therefore [2] - 17:23, 79:16
they've [4] - 21:2, 29:10, 38:13, 44:7
third [7] - 9:2, 12:9, 20:24, 21:18, 55:10, 55:13, 56:9
third-party [3] - 12:9, 21:18, 56:9
thirty [1] - 19:18
thousand [24] - 6:10, 6:12, 6:13, 8:23, 14:3, 15:21, 20:17, 20:23, 20:25, 21:2, 22:7, 25:4, 29:13, 32:23, 35:21, 36:1, 48:23, 49:2, 51:11, 78:5, 78:12, 79:1, 79:4, 79:12
thousands [2] -

Case 1:19-cv-00098-TRM-CHS Document 194-8 Filed 06/24/22 Page 33 of 35
02/10/2022 01:14:21 PM
Foufaker Reporting Service, Inc. (423)316-6481
Page 11 to 11 of 13
PageID #: 4953
32 of 34 sheets

17:24, 24:22
**thread** [9] - 48:12, 48:14, 48:17, 48:22, 48:25, 49:1, 51:6, 51:10, 52:2
**threading** [2] - 49:3, 49:4
**threads** [1] - 48:10
**three** [12] - 14:13, 21:7, 35:1, 45:11, 45:12, 45:13, 51:4, 51:11, 53:18, 53:19, 53:22, 64:25
**three-week** [2] - 53:19, 53:22
**three-year** [1] - 53:18
**thresholds** [1] - 75:8
**throughout** [1] - 72:10
**throwing** [1] - 50:21
**tied** [1] - 60:1
**timeline** [1] - 53:19
**timing** [1] - 40:19
**TO** [1] - 1:21
**to-wit** [1] - 3:6
**today** [12] - 4:4, 9:16, 10:4, 28:20, 28:23, 40:11, 49:15, 53:20, 71:22, 72:10, 72:19, 81:16
**together** [1] - 79:5
**took** [1] - 78:20
**topics** [1] - 77:18
**total** [2] - 64:20, 64:25
**toward** [1] - 55:13
**TOWNSEND** [2] - 2:20, 4:1
**Townsend** [1] - 4:1
**transcript** [2] - 82:7
**transformation** [4] - 10:23, 10:24, 11:1, 60:18
**transportation** [2] - 51:1, 56:25
**travels** [1] - 81:22
**treat** [1] - 33:8
**trial** [1] - 71:17
**tried** [4] - 8:24, 9:16, 27:16, 77:12
**tried-and-true** [1] - 8:24
**trouble** [1] - 59:7
**truck** [6] - 57:5, 59:20, 60:4, 60:7, 60:11, 61:7
**trucking** [1] - 11:2
**truckload** [1] - 11:11
**trucks** [3] - 57:2,

57:5, 59:8
**true** [7] - 8:24, 10:14, 11:7, 11:15, 70:8, 70:21, 82:7
**truncated** [1] - 52:25
**trust** [9] - 30:24, 31:2, 36:14, 36:17, 36:18, 36:24, 38:9, 43:4, 43:5
**trust-us** [1] - 36:14
**trusting** [1] - 19:5
**try** [11] - 17:24, 21:4, 27:20, 41:20, 46:22, 46:24, 49:10, 53:17, 53:25, 55:11, 71:12
**trying** [12] - 17:9, 28:16, 43:18, 46:18, 50:19, 51:15, 53:20, 58:15, 72:17, 74:23, 74:25, 75:3
**turn** [1] - 38:21
**turned** [2] - 13:4, 31:15
**turns** [2] - 38:23, 48:16
**twenty** [15] - 6:7, 8:21, 14:2, 15:21, 29:13, 29:21, 29:22, 32:12, 35:21, 36:1, 40:12, 44:21, 73:14, 74:3
**twenty-eight** [3] - 29:22, 32:12, 44:21
**twenty-four** [5] - 14:2, 15:21, 29:13, 35:21, 36:1
**twenty-two** [6] - 6:7, 8:21, 29:21, 44:21, 73:14, 74:3
**two** [57] - 5:7, 6:7, 6:10, 6:13, 6:15, 8:8, 8:9, 8:21, 8:22, 22:4, 22:6, 22:10, 22:22, 25:11, 29:21, 32:22, 33:24, 36:19, 43:9, 43:13, 44:12, 44:16, 44:21, 45:5, 45:11, 45:23, 48:3, 48:23, 49:2, 51:6, 51:8, 54:12, 54:19, 61:12, 61:24, 62:1, 62:4, 62:17, 62:24, 63:16, 63:24, 65:3, 65:4, 66:17, 66:24, 68:5, 69:2, 69:9, 73:14, 74:3, 78:5, 78:8, 78:11, 78:25,

79:3, 79:12
**two-point-one** [2] - 6:15, 78:8
**twofold** [1] - 36:6
**type** [2] - 28:22, 39:14
**typically** [3] - 52:16, 76:4, 77:8

## U

**U.S** [21] - 1:9, 2:6, 3:11, 3:20, 3:24, 5:10, 5:18, 5:20, 5:24, 6:5, 7:11, 10:20, 17:25, 20:17, 20:23, 21:11, 22:13, 39:5, 42:2, 42:13, 65:11
**ultimate** [2] - 63:21, 64:1
**unable** [3] - 11:12, 59:16
**under** [4] - 18:25, 31:2, 38:12, 51:12
**underlying** [2] - 22:16, 30:12
**Understood** [1] - 53:16
**underway** [1] - 14:10
**Underwriter** [1] - 4:2
**Underwriters** [1] - 20:25
**underwriters** [4] - 13:17, 13:21, 35:17, 38:8
**unemployment** [1] - 59:6
**unguarded** [1] - 57:25
**UNION** [1] - 2:4
**uniquely** [2] - 7:1, 28:6
**unit** [1] - 6:22
**United** [1] - 24:1
**UNITED** [1] - 1:1
**unless** [5] - 18:10, 23:13, 29:6, 43:6, 76:17
**unpersuaded** [1] - 78:15
**up** [26] - 4:7, 13:5, 16:16, 20:5, 21:5, 23:7, 30:18, 32:13, 33:15, 42:2, 45:24, 48:9, 48:16, 48:25, 49:20, 51:15, 51:24, 52:14, 54:25, 55:1, 56:5, 56:14, 57:23, 60:9, 66:7, 81:6
**upheld** [1] - 11:18

**upside** [1] - 38:21
**useful** [1] - 46:7
**user** [1] - 20:3
**user-friendly** [1] - 20:3
**USX** [15] - 15:6, 34:2, 35:17, 42:3, 42:13, 48:15, 54:18, 54:20, 54:24, 55:12, 56:23, 57:2, 57:3, 57:4, 58:9
**USX's** [4] - 14:8, 61:8, 63:4, 63:8

## V

**vague** [1] - 17:7
**Van** [4] - 62:25, 63:3, 66:3, 66:11
**vast** [3] - 6:23, 34:21, 36:7
**vein** [1] - 13:25
**vendor** [1] - 32:14
**verify** [2] - 36:18, 38:9
**versus** [5] - 3:11, 38:11, 72:18, 73:4, 81:1
**very-well-known** [1] - 18:14
**vice** [1] - 57:17
**vice-president** [1] - 57:17
**voicemail** [1] - 42:6
**volume** [1] - 70:16
**VOLUNTEER** [1] - 2:21
**vs** [1] - 1:8

## W

**wait** [4] - 25:9, 77:22
**waited** [1] - 27:8
**waiting** [1] - 60:9
**walk** [1] - 53:20
**Walmart** [34] - 8:8, 8:10, 13:17, 21:24, 39:4, 39:5, 39:8, 51:2, 53:12, 54:12, 54:24, 55:15, 55:16, 55:19, 55:23, 56:1, 56:24, 57:1, 57:4, 58:14, 62:13, 63:1, 63:11, 63:13, 64:2, 64:8, 64:23, 65:5, 66:7, 69:5, 69:6, 69:7, 69:10
**warned** [1] - 11:12
**warrants** [2] - 28:9, 69:17

**ways** [3] - 35:10, 61:21
**weak** [1] - 54:21
**weed** [1] - 17:24
**week** [3] - 53:19, 53:22, 68:18
**weekend** [1] - 9:16
**weeks** [3] - 45:11, 45:12, 45:13
**Weeks** [17] - 8:1, 13:24, 15:20, 25:18, 26:6, 26:14, 26:17, 29:12, 30:21, 35:19, 35:21, 38:1, 43:21, 45:5, 45:15, 63:15
**Weeks's** [2] - 8:2, 38:22
**welcome** [1] - 80:9
**well-oiled** [1] - 81:9
**WELLS** [1] - 1:13
**whatsoever** [4] - 15:7, 15:15, 25:5, 50:7
**WHEREOF** [1] - 82:10
**White** [4] - 27:14, 31:18, 32:5, 63:14
**whole** [5] - 13:8, 38:14, 53:11, 60:21, 69:4
**wiggle** [1] - 44:6
**willing** [9] - 8:1, 13:25, 27:20, 30:8, 50:3, 50:11, 52:18, 71:25, 80:22
**wit** [1] - 3:6
**WITNESS** [2] - 1:24, 82:10
**witness** [2] - 9:11, 76:23
**WITNESSES** [1] - 1:23
**witnesses** [6] - 7:10, 8:7, 8:13, 62:9, 69:9, 77:2
**wives** [3] - 33:10, 35:9, 35:13
**wonders** [1] - 14:7
**Wood** [25] - 3:17, 3:18, 4:6, 4:11, 9:24, 10:3, 10:8, 16:21, 18:5, 22:19, 25:16, 26:20, 32:7, 33:8, 42:11, 42:12, 42:15, 43:3, 67:5, 67:11, 67:15, 68:6, 69:21, 76:25, 78:3
**wood** [2] - 29:12, 70:15
**WOOD** [49] - 2:3, 3:16, 4:7, 4:19, 4:23, 9:25, 10:5,

Case 1:19-cv-00098-TRM-CHS   Document 194-8   Filed 06/24/22   Page 34 of 35
33 of 34 sheets                    Foufaker Reporting Service, Inc. (423)316-6484
Page 2 to 2 of 13
PageID #: 4954                                                       02/10/2022 01:14:21 PM

10:7, 16:20, 25:8, 33:18, 33:20, 34:14, 34:21, 45:23, 47:7, 47:18, 47:23, 48:20, 49:16, 49:19, 50:18, 53:16, 54:5, 54:8, 54:10, 57:3, 58:19, 59:2, 59:9, 59:12, 62:6, 62:9, 62:11, 71:11, 73:15, 73:20, 74:6, 74:17, 74:19, 74:21, 74:23, 75:3, 77:11, 80:16, 80:18, 80:21, 81:19, 81:24

**Wood's** [1] - 50:4

**word** [1] - 54:13

**words** [4] - 9:5, 43:6, 43:7, 43:8

**workers** [2] - 68:14, 68:16

**works** [6] - 26:3, 28:20, 37:21, 42:24, 48:20, 49:4

**world** [5] - 19:12, 28:6, 33:12, 39:14, 52:22

**worried** [1] - 4:20

**worsened** [1] - 61:8

**worth** [1] - 53:6

**WR** [2] - 1:15, 2:19

**write** [2] - 33:10, 37:4

**writes** [3] - 48:13, 48:14

**writing** [3] - 31:2, 33:15, 35:9

## X

**Xpress** [16] - 3:11, 3:20, 3:24, 5:10, 5:20, 6:5, 7:11, 10:20, 17:25, 20:17, 20:23, 21:11, 22:13, 39:5, 42:13, 65:11

**XPRESS** [2] - 1:9, 2:6

**Xpress'** [2] - 5:24, 42:2

**Xpress's** [1] - 5:18

## Y

**y'all** [7] - 16:16, 17:4, 32:15, 46:19, 46:25, 49:23, 53:17

**year** [7] - 4:14,

12:15, 13:10, 37:24, 53:18, 58:24, 72:10

**years** [5] - 29:12, 40:12, 42:14, 44:16, 48:24

**yesterday** [3] - 32:5, 35:23, 51:21

**yield** [2] - 8:14, 10:24

## Z

**zero** [1] - 37:9