BARRETT JOHNSTON MARTIN
  & GARRISON, PLLC
JERRY E. MARTIN, #20193
DAVID GARRISON, #24968
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2202
615/252-3798 (fax)

*Local Counsel*

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD, #032977
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com

*Class Counsel*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

CHATTANOOGA DIVISION

| | |
|---|---|
| LEWIS STEIN, et al., Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>     vs.<br><br>U.S. XPRESS ENTERPRISES, INC., et al.,<br><br>                    Defendants. | Civil Action No. 1:19-cv-00098-TRM-CHS<br><br>CLASS ACTION<br><br>Judge Travis R. McDonough<br>Magistrate Judge Christopher H. Steger |

DECLARATION OF CHRISTOPHER M. WOOD IN SUPPORT OF:
(1) FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND
APPROVAL OF PLAN OF ALLOCATION; AND
(2) AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND
AWARD TO PLAINTIFFS PURSUANT TO 15 U.S.C. §77z-1(a)(4)

**TABLE OF CONTENTS**

Page

I. SUMMARY OF LITIGATION AND REASONS FOR SETTLEMENT .........................2

II. FACTUAL BACKGROUND OF LITIGATION ................................................10

III. PROCEDURAL HISTORY........................................................................13

    A. Filing of Initial Complaint, Appointment of Lead Plaintiff and Partial Denial of Defendants' Motion to Dismiss ............................................13

    B. Defendants' Answer to the Complaint.................................................15

    C. Plaintiffs Obtain Class Certification ..................................................15

    D. Fact Discovery ...............................................................................16

        1. Requests for Documents .........................................................16

            a. Document Requests Directed at USX Defendants.........................16

            b. Document Requests Directed at the Underwriter Defendants ................................................17

            c. Document Requests and Related Discovery Directed at Plaintiffs................................................18

        2. Interrogatories ................................................................19

            a. Interrogatories Directed at Defendants ...........................19

        3. Discovery Disputes with Defendants.........................................20

            a. Disputes over Scope of USX Defendants' Document Production ................................................20

            b. Disputes over Discovery of USX's Document Retention Practices ................................................21

            c. Disputes over the Production of Text Messages...........................23

            d. Disputes over Completeness of Document Production .................24

            e. Disputes over USX Defendants' Responses to Plaintiffs' Interrogatories................................................25

        4. Discovery from Third Parties.................................................25

- i -

|   |   | a. | USX's Top Customers | 25 |
|   |   | b. | Lenders | 26 |
|   |   | c. | Consultants | 26 |
|   |   | d. | USX's Outside Counsel Advising on the IPO | 27 |
|   | 5. | | Fact Depositions | 27 |
| E. | | | Investigators, Experts and Consultants Assisting the Litigation | 29 |
|   | 1. | | Factual Investigators | 29 |
|   | 2. | | Consultants | 30 |
|   | 3. | | Economic and Damages Expert | 30 |
|   | 4. | | Disclosure and Due Diligence Expert | 31 |
| F. | | | Depositions of Defendants' Experts | 32 |
| G. | | | Summary Judgment and Daubert Motion Preparation | 32 |

IV. STRENGTHS AND WEAKNESSES OF CASE .......................... 33

V. NATURE AND ADEQUACY OF SETTLEMENT .......................... 35

    A. History of Settlement Negotiations .......................... 35

    B. The Settlement Is in the Best Interests of the Class and Warrants Approval ........ 36

VI. PLAN OF ALLOCATION .......................... 37

VII. CLASS COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE .......................... 38

    A. The Requested Fee Is Reasonable .......................... 38

    B. The Requested Fee Is Supported by Plaintiffs .......................... 39

    C. The Requested Fee Is Supported by the Effort Expended and Results Achieved .......................... 39

    D. The Risk of Contingent Class Action Litigation Supports the Requested Fee Award .......................... 40

4882-8712-0998.v1

VIII.   CONCLUSION..................................................................................................................41

4882-8712-0998.v1

Case 1:19-cv-00098-TRM-CHS   Document 230   Filed 06/05/23   Page 4 of 46
PageID #: 5586

I, CHRISTOPHER M. WOOD, declare as follows:

1.      I am a member of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or, together with Levi & Korsinsky, LLP, "Class Counsel"), Court-appointed Class Counsel for Lead Plaintiff Deirdre Terry and Class Representatives Charles Clowdis and Bryan K. Robbins ("Plaintiffs") in this action.  I was actively involved in the prosecution of this action (hereinafter, the "Litigation"), am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my supervision of, and participation in, all material aspects of the Litigation.[1]

2.      I submit this Declaration in support of Plaintiffs' application, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for approval of: (a) the all-cash settlement of $13 million on behalf of the Class; (b) the proposed Plan of Allocation; and (c) the application for attorneys' fees and expenses.

3.      The Class, previously certified by the Court in its February 12, 2021 Memorandum Opinion and Order granting Plaintiffs' motion for class certification (ECF 134), is defined in the Stipulation and herein as:

> All persons or entities who purchased or otherwise acquired Class A common stock of USX pursuant to and/or traceable to the Offering Documents filed with the United States Securities and Exchange Commission ("SEC") in connection with the offering that commenced on June 14, 2018, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants and their immediate families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

---

[1]    Unless otherwise defined herein, capitalized terms have the meanings ascribed to them in the Stipulation of Settlement, dated and filed on March 27, 2023 (ECF 221) ("Stipulation").

4882-8712-0998.v1

## I. SUMMARY OF LITIGATION AND REASONS FOR SETTLEMENT

4. This action was brought against U.S. Xpress Enterprises, Inc. ("USX" or the "Company"), the Individual Defendants,[2] and the Underwriter Defendants[3] (collectively, "Defendants"), on behalf of the Class, for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and §§11 and 15 of the Securities Act of 1933 ("Securities Act") in connection with the Company's June 14, 2018 initial public offering (the "IPO"). On June 30, 2020, the Court upheld certain statements Plaintiffs alleged to be materially false or misleading pursuant to the Securities Act but dismissed other statements and all claims brought pursuant to the Exchange Act. ECF 91. This case was vigorously litigated until the proposed settlement agreement was reached at the end of December 2022 – on the eve of this Court's summary judgment deadlines.

5. Plaintiffs achieved the global settlement only after, *inter alia*: (a) researching and drafting Lead Plaintiff's Complaint for Violation of the Federal Securities Laws ("Complaint") with the assistance of an independent private investigator retained to identify and interview percipient witnesses; (b) opposing Defendants' motions to dismiss the entire case; (c) retaining an economic consultant to assist with class certification and obtaining class certification over Defendants' objections; (d) completing years of fact discovery, including reviewing and analyzing more than 480,000 pages of documentary evidence produced by Defendants and third parties, and taking numerous fact depositions; (e) filing or responding to six discovery motions, including motions related to Defendants' interrogatory responses, the production of Defendants' text messages, and Defendants' communications with their outside counsel who provided advice during preparation of

---

[2] "Individual Defendants" refers collectively to Eric Fuller, Eric Peterson, Max Fuller, Jason Grear, and Lisa Quinn Pate.

[3] "Underwriter Defendants" refers collectively to Merrill Lynch, Pierce, Fenner & Smith, Inc., Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC, Wells Fargo Securities, LLC, Stephens Inc., Stifel, Nicolaus & Company, Inc., and WR Securities LLC.

the Company's Offering Materials;[4] (f) retaining experts in the fields of disclosure standards and due diligence, as well as economics and damages, to prepare opening and rebuttal reports; (g) completing expert discovery, including taking depositions of Defendants' three experts and defending depositions of two of Plaintiffs' experts; (h) engaging in settlement negotiations with Defendants, assisted by a nationally recognized mediator; and (i) assessing the risks of prevailing on Plaintiffs' claims at summary judgment and trial and the Class's ability to collect on any judgment awarded.

6. The Complaint alleges that, on June 14, 2018, USX issued $245 million in shares of USX common stock in connection with the Company's IPO based on materially false and misleading Offering Materials in violation of the Exchange Act and the Securities Act. Plaintiffs, *inter alia*, specifically alleged the Offering Materials misstated that USX was primed to expand its truckload freight fleet to capitalize on favorable truckload demand, including by prioritizing growth in its Dedicated[5] contract services. ¶¶8, 112, 122.[6] In fact, contrary to the successful "transformation" initiatives touted in the Offering Materials, USX was allegedly unprepared for any such expansion as it was reeling from its inability to address a crippling truck driver shortage in the months prior to the IPO. ¶122. Although USX – along with its closely held ownership group consisting of the founders' families, the Fullers and Quinns – reaped the rewards of selling securities in the IPO at inflated prices to pay down over $100 million in Company debt, Plaintiffs alleged Class Members suffered damages as a result of the artificially inflated price of USX's stock. ¶¶150-151, 193.

---

[4] Offering Materials refers to USX's June 11, 2018 final Amended Registration Statement on Form S-1/A, which amended the May 7, 2018 Registration Statement on Form S-1; and the June 13, 2018 final Prospectus on Form 424B4.

[5] Within the Company's "Truckload" segment, USX operates two divisions: over-the-road ("OTR") and "Dedicated." ECF 57 at ¶46. OTR ships freight under short-term contracts at variable rates, whereas Dedicated fulfills multi-year contracts at fixed rates. *Id*. at ¶¶6, 47-48.

[6] All paragraph references ("¶_") are to the Complaint (as defined herein). ECF 57.

4882-8712-0998.v1

7.    Plaintiffs further alleged USX's Offering Materials were false and misleading because they stated: (1) USX would expand its fleet in order to capitalize on the then-favorable trucking environment; and (2) if the Company was unable to attract and retain a sufficient number of drivers, it could be forced to continue to adjust its compensation packages or operate with fewer tractors, which would make the Company face difficulty meeting its customer's demands – "either of which could materially adversely affect [the Company's] growth and profitability." ¶¶112, 118. In partially denying Defendants' motions to dismiss, the Court found Plaintiffs had adequately alleged these statements were materially misleading because Plaintiffs had alleged a number of specific adverse facts concerning the Company's internal operations at the time of the IPO.  ECF 91 at 33.

8.    Plaintiffs alleged, and were prepared to prove, the misrepresentations upheld by the Court were materially misleading given the following realities occurring internally at the Company at the time of the IPO:

> [1] USX did not have in place compensation packages sufficient to hire and retain quality truck drivers to meet the demand for its services.  Such incentives and/or compensation required additional expenditures that necessarily would negatively impact [USX's] operating ratio.  Nor were the incentives USX had in place sufficient;

> [2] USX drivers were not among the "best paid in the industry" nor had USX increased driver pay commensurate with the market wages for trucks drivers which slowed the pace of hiring and hindered retention of drivers;

> [3] [the operational changes failed to] improve load planning or truck maintenance which harmed trucker morale and worsened USX's poor driver retention rates;

> [4] USX was unable to "prioritize[e] growth in dedicated contract services" because a shortage of drivers . . . was negatively impacting USX's dedicated division, which forced USX to reallocate OTR drivers (at an increased cost) to drive dedicated routes – this was a common practice prior to the IPO which caused underperformance in OTR and continued after the IPO;

> [5] certain account shipping patterns [*i.e.*, those of USX's largest account, Walmart] had already been negatively impacted . . . adversely impacting utilization as well as driver retention and hiring; [and]

> [6] USX's cost per mile for driver wages.

- 4 -

ECF 91 at 33-34 (citing ECF 57 at ¶122).

9.     Plaintiffs believe that discovery supported these allegations, demonstrating USX could not cover its Dedicated contracts and, as a result, was shifting drivers away from its OTR routes, which was already negatively impacting the growth and profitability at the Company at the time of the IPO.  Plaintiffs further believe that, for this reason, the misrepresentations in the Offering Materials were also misleading by omission; they failed to inform investors of the internal adverse realities already manifesting at the Company at the time of the IPO.

10.     The parties negotiated this Settlement through arm's-length mediation overseen by David M. Murphy of Phillips ADR, a respected mediator with substantial experience in mediating claims arising under the federal securities laws.  The parties participated in a full-day mediation session on November 16, 2021, which occurred prior to the completion of fact discovery.  After the initial mediation session proved unsuccessful, the parties proceeded through fact and expert discovery.  Upon further evaluation of the strengths and weaknesses of the case, on the eve of the parties' filing for summary judgment and with the assistance of Mr. Murphy, the parties were able to reach an agreement in principle to resolve the Litigation.

11.     The proposed Settlement is the result of diligent litigation pursued by zealous advocates on both sides and takes into consideration the significant risks specific to the case.  It was negotiated by experienced counsel for Plaintiffs and Defendants with a solid understanding of both the strengths and weaknesses of their respective positions.

12.     This Settlement represents an excellent result for the Class.  Based upon the evidence obtained in discovery, as well as the investigation, research, analysis, motion practice, and trial preparation conducted, Plaintiffs and Class Counsel believe Plaintiffs' case has significant merit but also recognize the significant risks at summary judgment and trial and in recovering any judgment, which were carefully evaluated in determining what course was in the best interests of the Class.  In

making this determination, Class Counsel and Plaintiffs considered whether the Court would grant Defendants' summary judgment motion; whether Plaintiffs would prevail at trial; and the significant additional costs and time spent on a likely appeal process following any successful trial, during which time the Class would be denied any recovery. As set forth in further detail below, the specific circumstances involved here presented many risks and uncertainties in Plaintiffs' ability to prevail if the case were to proceed past the summary judgment stage to trial and to collect on any judgment awarded.

13. Plaintiffs' perseverance through almost four years of litigation resulted in the discovery of substantial evidence in support of the alleged claims. Class Counsel believe discovery revealed evidence sufficient to sustain a jury verdict in Plaintiffs' favor, including evidence that, prior to the IPO: (i) USX was unable to meet its customers' demands in the Company's Dedicated segment, including its largest customer, Walmart; (ii) USX was required to shift drivers from its more expensive OTR accounts to support the Walmart account, thereby diverting drivers, which would have earned more profits for the Company; (iii) USX was unable to retain experienced drivers, many of whom left the Company because they received lower pay or different routes from those they were promised; (iv) the Company was required to expend additional funds to recruit, train, and hire new drivers due to high driver turnover; (v) the Company's performance was suffering as a result of the driver turnover and cannibalization – so much so that it had hired outside consultants to help institute a "Driver First" initiative; and (vi) the Underwriters did not perform adequate due diligence, including conducting adequate diligence with regards to the Company's largest customer, Walmart.

14. Despite the strength of the evidence developed in discovery, there were substantial risks to Plaintiffs' ability to obtain, protect, and ultimately recover on a favorable judgment at trial. Defendants vigorously contested liability and planned to marshal evidence at trial they hoped would

convince the jury that: (i) the Offering Materials were not misleading because they adequately disclosed the Company's driver retention problems; (ii) the practice of OTR cannibalization was a common practice in the industry and investors were aware this was occurring at the Company; and (iii) the OTR cannibalization did not materially negatively impact the Company's operations at the time of the IPO. Plaintiffs recognize that they faced obstacles to prove falsity as a result of the limited statements that remained in the case following the Court's motion to dismiss ruling. Plaintiffs believe that, at trial, Defendants would isolate the issue of falsity to the two specific statements upheld by the Court and would seek to prevent Plaintiffs from making any reference to the other misrepresentations the Court dismissed for purposes of providing a jury the proper context in which to evaluate the misleading nature of the Offering Materials. As a result, Plaintiffs believe there was a legitimate risk the Court or jury would find the alleged misrepresentations were not materially misleading.

15. Defendants also challenged Plaintiffs' claims by asserting a negative causation defense, and there was a risk Defendants would be able to prevail on their defense to reduce or eliminate any recovery for the Class. Specifically, Defendants argued that Plaintiffs' damages were caused by factors other than the decline in USX's stock price as a result of the alleged misrepresentations in the Offering Materials. Defendants provided expert testimony opining that the alleged misrepresentations could not have caused the stock to decline because the Company had already disclosed driver shortage issues and its practice of OTR cannibalization to the public. Plaintiffs were prepared to challenge Defendants' arguments and proffered experts on several grounds, including that Defendants' expert failed to analyze or opine on the actual misrepresentations at issue – *i.e.*, that the Offering Materials failed to disclose that USX's poor driver retention and resulting need to cannibalize OTR drivers was negatively impacting the growth and profitability of the Company at the time of the IPO. Further, neither Defendants nor their

experts have been able to provide any explanation for the cause of USX's stock drop beyond claiming it was not caused by those misrepresentations Plaintiffs had alleged. Despite having responses Plaintiffs believed would prevail at summary judgment and trial, the resolution of Defendants' negative causation defenses largely depended on the competing testimony of experts. As such, at the time the agreement to settle was reached, there was substantial uncertainty whether a jury would find Plaintiffs' experts or Defendants' experts more compelling.

16. Similarly, at the time settlement was reached, there was a risk that a jury would accept Defendants' expert's opinion that the amount of damages Plaintiffs sought should be significantly reduced because any price decline resulting from the alleged misrepresentations was minimal. While Plaintiffs intended to introduce expert testimony that damages per share were $9.06, Defendants' expert maintained that damages per share did not exceed $0.11. Thus, there was a risk that any damages awarded would be drastically reduced from those sought by Plaintiffs if Defendants were successful in convincing a jury that Defendants' expert's analysis should be adopted.

17. Even if Plaintiffs prevailed on the merits of their claims, there was significant risk of delay in providing Class Members with compensation for the harm caused by Defendants' unlawful conduct. The case was already delayed for months due to Defendants' need to restore backup tapes they only found after Plaintiffs identified major gaps in their purportedly complete production. Summary judgment, *Daubert* briefing, trial preparation, and post-trial proceedings, including proceedings attendant to the determination of damages, would threaten to delay the Class's recovery on any favorable judgment obtained at trial. In addition, Defendants were certain to appeal any verdict achieved in Plaintiffs' favor. The appeals process could span years, during which time the Class would receive no recovery. Any appeal would also create the risk of reversal, in which case the Class would receive nothing after having prevailed on the claims at trial.

- 8 -

18.     Plaintiffs and Class Counsel considered all of these factors, together with the other factors discussed herein, in concluding that the $13 million cash settlement amount provides fair, reasonable, and adequate consideration in light of the case's risks and uncertainties.  In reaching the determination to settle, Plaintiffs and their counsel weighed the documentary evidence, deposition testimony, expert reports, and legal authority that weigh in favor of and against their claims.  On balance, considering all the circumstances and risks both sides faced at both summary judgment and after trial, in addition to Plaintiffs' ability to collect on a final judgment, Plaintiffs concluded settlement on the agreed terms was in the best interests of the Class.

19.     The Settlement confers a substantial benefit on the Class and eliminates the significant risks inherent at trial and in post-trial proceedings and appeals, the outcome of which was uncertain.  It is respectfully submitted that the Settlement should be approved as fair, reasonable, and adequate; Plaintiffs' Counsel should be awarded attorneys' fees of one-third of the Settlement Fund and their expenses of $1,368,163.51; the Plan of Allocation should be approved; and Plaintiffs should be awarded $32,000 in the aggregate for their time and expenses in representing the Class.

20.     Class Counsel have, as described below, vigorously prosecuted this action on a wholly contingent basis for almost four years and advanced or incurred significant litigation expenses.  Class Counsel have long borne the risk of an unfavorable result.  They have not received any compensation for their substantial efforts, nor have they been paid for their expenses.

21.     The fee application for one-third of the Settlement Fund is fair both to the Class and Class Counsel, is supported by Plaintiffs, and warrants this Court's approval.  This fee request is within the range of fees frequently awarded in these types of actions and is justified in light of the substantial benefits conferred on the Class, the risks undertaken, the quality of representation, and the nature and extent of legal services performed.

22.     Plaintiffs' Counsel should also be awarded their expenses in the aggregate of $1,368,163.51, all of which were reasonably and necessarily incurred in prosecuting the Litigation. This amount includes the fees and expenses for: (a) investigators, consultants, and experts whose services Class Counsel required in the successful prosecution, analysis, and resolution of this case; (b) stenographic and videographer services for depositions; (c) travel and lodging for Class Counsel to attend depositions, meet with witnesses, and conduct discovery; (d) photocopying, imaging, and printing thousands of pages of documents; (e) litigation database costs for hosting, cataloguing, and facilitating the review and analysis of more than 480,000 pages of documents; (f) factual and legal research; (g) court and witness fees; and (h) mediation fees.

23.     As described in detail below, these expenses were reasonably and necessarily incurred to plead Plaintiffs' claims, certify the Class, complete fact discovery, prepare summary judgment and expert briefing in the event that a settlement was not reached, prepare for trial, and obtain a settlement on the terms proposed.

## II.     FACTUAL BACKGROUND OF LITIGATION

24.     The following is a summary of the nature of the Class's claims, the principal events that occurred during the course of this Litigation, and the legal services provided by Class Counsel.[7]

25.     USX is a Tennessee-based trucking company founded in 1985 by Defendant Max Fuller and Patrick Quinn. USX maintains a fleet of approximately 6,800 tractors and 16,000 trailers. ¶¶24, 45. Max Fuller took the Company public in 1994 and took it private again in 2007. ¶3.

26.     In October 2015, Max Fuller's son, Defendant Eric Fuller, became USX's President and Chief Operating Officer, and Defendant Peterson was appointed Chief Financial Officer. ¶3. A

---

[7]     The information in this section is based on the allegations in the Complaint, the evidence produced in discovery, and other sources of information believed to be accurate. However, the undersigned counsel does not have personal knowledge of the conduct of USX's business other than what it has reviewed in the course of discovery.

4882-8712-0998.v1

year and a half later, Eric Fuller replaced his father as Chief Executive Officer.  ¶3.  Fuller decided to take the Company public again to alleviate the Company's debt load.  However, Plaintiffs alleged that a public offering was not a reasonable possibility unless USX achieved significant improvement to its lagging operating ratio,[8] which at the time would have been among the lowest margins of any then-public trucking company.  USX then pursued what Fuller described as a "turnaround" to improve USX's poor operating ratio and "clos[e] the gap" between its ratio and those of its peers.  ¶3.

27.    USX hired business consultants, who flagged for the Company a set of issues negatively impacting USX's operating ratio.  As a remedy, USX implemented an initiative to address those issues.  These purported improvements were touted to investors in the Offering Materials as evidence of USX's success in closing the gap between it and its competitors.  ¶¶7, 9, 105, 117.  Plaintiffs alleged that USX's Offering Materials, however, presented a materially false and misleading narrative that it had transformed its operations and was thus well positioned to "expand" its fleet to achieve the necessary increase in its driver force to take advantage of the then-high demand for truckload services.  In fact, Plaintiffs allege that USX could not sufficiently rectify its longstanding problems with driver recruitment and retention and was unable to meet its existing driver commitments to its Dedicated customers even after cannibalizing other areas of its truckload business.[9]

28.    On May 7, 2018, USX filed a registration statement on Form S-1 with the SEC.  ¶102.  The Registration Statement was subsequently amended, with the final Amended Registration

---

[8]    Truckload carriers such as USX report their Operating Ratio (and Adjusted Operating Ratio) as a primary business metric of profit margins.  The Operating Ratio measures operating expenses as a percentage of revenue – lower is better.

[9]    USX's business was divided into two core offerings: (1) truckload, consisting of Dedicated and over-the-road ("OTR") divisions; and (2) brokerage.  *See* ¶¶45-48.

- 11 -

Statement filed on Form S-1/A on June 11, 2018. ¶102. The Amended Registration Statement was declared effective by the SEC on June 13, 2018. USX filed its final Prospectus with the SEC on June 15, 2018. ¶102.

29. On June 14, 2018, USX initiated the IPO, selling 16,668,000 shares of Class A common stock at $16 per share, yielding $245.2 million in net proceeds to the Company. ¶¶4, 103. Plaintiffs allege the Offering Materials associated with the IPO contained and incorporated materially misleading statements concerning USX's fleet and driver capacity. ¶¶112, 118. This included a statement that the Company would expand its fleet in order to capitalize on the then-favorable trucking environment:

> Strategically expand our fleet based on expected profitability and driver availability, including through our company-sponsored independent contractor lease program (which has grown from zero drivers in the second quarter of 2017 to approximately 485 drivers at March 31, 2018).

¶112.

30. It also included a misrepresentation that if USX were "unable to continue to attract and retain a sufficient number of drivers, we could be forced to, among other things, continue to adjust our compensation packages or operate with fewer tractors and face difficulty meeting shipper demands, either of which could materially adversely affect our growth and profitability." ¶118.

31. Plaintiffs alleged that, unknown to investors and contrary to the Offering Materials, at the time of the IPO the Company was *already* facing immense driver retention problems caused by: (1) inadequate driver compensation packages and incentives; (2) the failure to improve load planning or truck maintenance, which further harmed trucker morale; (3) forcing OTR drivers to cover less desirable routes for the Dedicated division (and thus "cannibalizing" OTR); (4) the loss of certain shipping patterns, including those of USX's largest customer, Walmart; and (5) driver wages and independent contractor costs exceeding the Company's internal expectations. ¶122. As a result of

the misleading Offering Materials, Plaintiffs and the Class suffered damages from their purchases of Class A common stock pursuant to and/or traceable to the Offering Materials.

## III. PROCEDURAL HISTORY

32. The litigation of this case was highly contentious, involving significant disputes at all phases of the case. Defendants mounted vigorous challenges at the pleading and class certification phases of this case, and the parties had numerous disputes over the scope and adequacy of discovery. As described below, extensive briefing was required to sustain and maintain the claims asserted in this action through all phases of the Litigation, including at pleading and class certification. Voluminous communications were exchanged with defense counsel regarding several disputes that arose during the pendency of this case, including numerous disputes over discovery and expert testimony. The parties participated in extensive meet-and-confer efforts to ensure Defendants located and produced documents responsive to Plaintiffs' discovery requests and to address Defendants' delays in doing so, as well as their overbroad claims of privilege and other purported protections from discovery. Even when documents were produced, Plaintiffs believed Defendants' productions were at times incomplete; repeated follow-up communications were necessary to pressure Defendants to fill the gaps in their production.

### A. Filing of Initial Complaint, Appointment of Lead Plaintiff, and Partial Denial of Defendants' Motions to Dismiss

33. On April 2, 2019, plaintiff Lewis Stein filed a class action complaint alleging Securities Act claims against the Company and Individual Defendants. ECF 1. Pursuant to 15 U.S.C. §77z-1(a)(3)(B), on May 10, 2019, Plaintiff Deirdre Terry filed a motion for appointment as lead plaintiff and approval of lead plaintiff's selection of lead counsel. ECF 19, 20.

34. On July 18, 2019, the Honorable Harry S. Mattice, Jr. appointed Deirdre Terry as Lead Plaintiff and Robbins Geller and Levi & Korsinsky, LLP ("Levi & Korsinsky") as Co-Lead Counsel. ECF 44. Pursuant to the PSLRA, the Court made a preliminary finding of Lead Plaintiff's

- 13 -

adequacy and typicality as part of the appointment order. *See id.* at 4. On October 8, 2019, named Plaintiffs Charles Clowdis and Bryan K. Robbins joined Lead Plaintiff in filing the operative Complaint. ECF 57. On March 10, 2020, the case was reassigned from the Honorable Harry S. Mattice, Jr. to the Honorable Travis R. McDonough. ECF 86.

35. Based on an extensive analysis of the Company's SEC filings and public statements, media articles, and interviews of former employees conducted by investigators retained by Class Counsel, on October 8, 2019, Plaintiffs filed the operative Complaint, alleging violations of §§11 and 15 of the Securities Act and §§10(b) and 20(a) of the Exchange Act. ECF 57.

36. On December 23, 2019, USX Defendants and Underwriter Defendants moved to dismiss the Complaint on numerous grounds, including that the alleged false statements were protected forward-looking statements, statements of opinion, or otherwise vague corporate puffery. ECF 72-1, 73. Plaintiffs filed their opposition on March 9, 2020, arguing Defendants had not contested allegations they operated a scheme and course of conduct that misled investors and had made actionably false or misleading statements and omissions. ECF 85. Plaintiffs argued that Defendants misled investors concerning the true state of USX's internal business operations' impact on the Company's growth and profitability ahead of the IPO and Individual Defendants' motive for carrying out the IPO was to pay off significant high interest debt. On April 23, 2020, USX Defendants and Underwriter Defendants filed replies in support of their motions to dismiss. ECF 89-90.

37. On June 30, 2020, the Court issued a Memorandum Opinion and Order granting in part and denying in part Defendants' motions to dismiss the Complaint, holding Plaintiffs had alleged sufficient specific facts that collectively stated actionable claims under §§11 and 15 of the Securities Act for certain alleged misrepresentations, but not others. ECF 91. The Court, however,

dismissed Plaintiffs' Exchange Act claims, finding Plaintiffs had failed to plead falsity and/or scienter with respect to those statements. *Id*.

**B.      Defendants' Answer to the Complaint**

38.      On August 14, 2020, USX Defendants and Underwriter Defendants filed answers to the Complaint, in which they each denied all of Plaintiffs' substantive allegations and asserted 37 and 19 separate affirmative defenses, respectively.  ECF 96, 100.

**C.      Plaintiffs Obtain Class Certification**

39.      On September 11, 2020, Plaintiffs moved to certify this action as a class action, appoint Plaintiffs as Class Representatives, and appoint Robbins Geller and Levi & Korsinsky as Class Counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure.   ECF 104-105. Defendants opposed Plaintiffs' motion for class certification, asserting that the truth was disclosed on August 2, 2018 and therefore purchasers of USX securities following that date should not be Class Members, that predominance and typicality were not satisfied, and further that Plaintiffs did not show they were adequate class representatives.  ECF 122.

40.      On February 12, 2021, the Court rejected Defendants' arguments and granted Plaintiffs' motion for class certification and appointed Plaintiffs Terry, Clowdis, and Robbins as Class Representatives and Robbins Geller and Levi & Korsinsky as Class Counsel.  ECF 134.

41.      Plaintiffs retained Gilardi & Co. LLC ("Gilardi") as the notice administrator and worked with it to prepare and mail the Notice of Pendency of Class Action to potential Class Members.  Plaintiffs filed their Unopposed Motion of Class Representatives to Approve the Form and Manner of Class Notice and Notice Plan on June 30, 2021.  ECF 143.  The Court approved the form of notice on August 4, 2021.  ECF 144.  The Notice of Pendency was provided in accordance with this Court's Order.

### D. Fact Discovery

42. Plaintiffs undertook fact discovery for over two years – from approximately August 2020 until October 2022 – requesting, obtaining, and analyzing more than 480,000 pages of documents from Defendants and third parties. Class Counsel took the depositions of 24 fact witnesses (including six Rule 30(b)(6) designees of various entities) in places such as Tennessee, Texas, Nebraska, New Jersey, New York, Arkansas, and Florida, as well as remotely. Class Counsel also obtained interrogatory responses from Defendants to narrow the issues at trial. Below is a summary of Plaintiffs' discovery efforts, as well as the discovery Defendants propounded to which Plaintiffs responded.

### 1. Requests for Documents

#### a. Document Requests Directed at USX Defendants

43. On August 19, 2020, Plaintiffs served their First Set of Requests for Production of Documents to USX Defendants containing 68 document requests regarding all aspects of their claims and Defendants' asserted defenses. USX Defendants served their responses to Plaintiffs' first set of requests on September 18, 2020, objecting to many of the requests as overbroad, unduly burdensome, and disproportionate to the needs of the case and agreeing to produce documents identified through a "reasonable search" pursuant to some requests and responding solely with objections for a number of others.

44. To facilitate the production of documents, Class Counsel negotiated the Stipulated Protective Order with Defendants concerning the treatment of confidential information. ECF 119. In addition, Class Counsel negotiated a Stipulated Document Production Protocol to facilitate the efficient production of electronically stored information ("ESI") and hard-copy documents. ECF 124.

- 16 -

45. On July 30, 2021, Plaintiffs served their Second Set of Requests for Production of Documents to USX Defendants containing nine follow-up requests regarding categories of relevant documents Class Counsel identified after reviewing the initial document productions. Defendants served their responses to Plaintiffs' second set of document requests on August 30, 2021, objecting in part to all requests and insisting on limiting such production to documents identified after a "reasonable search" that "relate to the two remaining challenged statements."

46. On July 12, 2022, Plaintiffs served their Third Set of Requests for Production of Documents to Defendants containing a request for all statements and testimony provided in a Tennessee state court case concerning a number of similar claims as this Litigation. Defendants served their responses to Plaintiffs' third set of document requests on August 11, 2022, agreeing to produce non-privileged documents responsive to the request.

47. Ultimately, after months of negotiations concerning the scope and relevance of many of Plaintiffs' requests, including the discussion of custodians, sources of information, the application of search terms, and the extent of USX's document retention, USX Defendants produced over 187,000 pages of documents over the course of the fact discovery period. Plaintiffs expended significant time reviewing, organizing, and analyzing the documents produced in preparation for depositions, expert reports, mediation, the anticipated summary judgment motions, and trial.

**b. Document Requests Directed at the Underwriter Defendants**

48. On August 13, 2020, Plaintiffs served their First Set of Requests for Production of Documents to Underwriter Defendants. Plaintiffs propounded 20 document requests to Underwriter Defendants regarding all aspects of their claims and Underwriter Defendants' asserted defenses. Underwriter Defendants served their response to Plaintiffs' requests on September 14, 2020, objecting to some requests in whole and other in part. Underwriter Defendants' objections included, among others, that the requests were purportedly unduly burdensome, vague, not relevant, and/or not

- 17 -

created, received or reviewed by Underwriter Defendants. The Underwriter Defendants initially resisted conducting any custodial searches. The parties met and conferred and negotiated disputes over the sources of documents and the relevance of Plaintiffs' requests with the Underwriters agreeing to produce a subset of the requested documents. Initially, Underwriter Defendants agreed to produce only a copy of the IPO working group list and due diligence questionnaires.

49. Plaintiffs continued to pursue the timely production of documents from the Underwriter Defendants despite Underwriter Defendants' continued resistance to producing documents that did not fall within their unduly limited view of relevance. Following Plaintiffs' extensive efforts to obtain responsive documents, the Underwriter Defendants produced over 276,000 pages of documents. Plaintiffs expended significant time reviewing, organizing, and analyzing the documents produced in preparation for depositions, expert reports, mediation, the anticipated summary judgment motions, and trial.

        **c.**       **Document Requests and Related Discovery Directed at Plaintiffs**

50. On August 28, 2020, USX Defendants propounded discovery requests to Plaintiffs. Defendants' requests included 37 individual document requests and sought not only information relevant to class certification and representation, such as Plaintiffs' investments in USX stock, but also information going to Plaintiffs' investigation of the Complaint, such as communications with any former USX employees whom Class Counsel had contacted in investigating the allegations or preparing the Complaint. On September 28, 2020, Plaintiffs served their responses and objections to both sets of discovery, including objections based on, among other things, the appropriate temporal scope for the production and the relevancy of the requests to the limited statements and omissions upheld by the Court.

51. After negotiating the parameters of document discovery for Plaintiffs' document production, Class Counsel worked with Plaintiffs to identify relevant and responsive materials. As a

result of these efforts, each Plaintiff produced certain trading records, brokerage statements, and account statements related to his or her investments in USX securities, among other responsive documents, in September and October 2020.

52. On September 2, 2020, USX Defendants served five interrogatories on each of the three Plaintiffs seeking information regarding individuals related to their investments in USX securities and information concerning investigation related to their claims. Class Counsel worked with Plaintiffs to ensure they could provide appropriate responses. On October 2, 2020, each Plaintiff responded with non-privileged information.

53. In October 2020, Defendants served a Notice of Deposition on Plaintiffs Clowdis, Terry, and Robbins, along with Plaintiff Deirdre Terry's father, John Terry. After time preparing for the depositions, including meetings with Class Counsel, Plaintiffs Clowdis, Terry, and Robbins testified on October 8, October 14 and October 21, 2020, respectively. Class Counsel also prepared and represented fact witness John Terry at his October 12, 2020 deposition.

### 2. Interrogatories

54. Through interrogatories, Class Counsel worked to evaluate fully the factual bases, if any, for Defendants' assertion they are not liable for the alleged false and misleading statements and the factual bases for Defendants' affirmative defenses asserted in their Answers.

### a. Interrogatories Directed at Defendants

55. On February 4, 2022, Plaintiffs served their First Set of Interrogatories to USX Defendants, including seven interrogatories seeking Defendants' bases for their affirmative defenses asserted in their Answers. On March 7, 2022, Defendants provided objections and responses. Class Counsel expended significant efforts to confer with USX Defendants concerning the adequacy of their responses.

56.     On February 8, 2022, Plaintiffs served their First Set of Interrogatories to Underwriter Defendants seeking the bases for the defenses asserted in their Answers.  On March 17, 2022, Underwriter Defendants provided objections and responses.

### 3.     Discovery Disputes with Defendants

#### a.     Disputes over Scope of USX Defendants' Document Production

57.     Beginning in September 2020, counsel for Plaintiffs and USX Defendants engaged in multiple meet-and-confer teleconferences to negotiate numerous issues concerning their anticipated document production, which were memorialized in voluminous letters and email correspondence documenting the parties' positions and outstanding issues.  The issues in dispute included, *inter alia*, anticipated redactions to purported irrelevant material; the relevance of the requested documents to Plaintiffs' allegations; the extent to which the Court's motion to dismiss order narrowed Plaintiffs' claims and thereby the scope of relevance in the case; the relevant time period of responsive documents for each request; the titles, job duties, and identities of relevant custodians; the relevance and proportionality of searching custodians' Company-issued phones for text messages; and the burden of production.  These negotiations were lengthy and hard fought, and Plaintiffs refused to concede on USX Defendants' unfounded attempts to limit their discovery obligations or narrow the scope of the case.  Plaintiffs also spent considerable time identifying USX Defendants' failure to search for or produce complete sets of internal documents, including scorecards, committee meetings, and other recurring business reports.  As a result of these negotiations and Plaintiffs' ongoing efforts to identify gaps in the productions, USX Defendants made over 20 productions (and reproductions) between October 2020 and October 2022, including producing discrete sets of internal quarterly reports and Board of Directors committee minutes Plaintiffs had identified as missing.

4882-8712-0998.v1

58. Plaintiffs and USX Defendants also had significant disputes over the scope of production of electronic evidence. Defendants initially sought to produce documents from only six custodians (which included the five named Defendants), while Plaintiffs' independent research identified at least 39 relevant custodians. After the exchange of correspondence and multiple meet-and-confer calls, the parties eventually agreed on an initial set of 20 custodians to be included in Defendants' production. Nevertheless, disputes over Defendants' electronic evidence preservation and production efforts continued throughout discovery as numerous issues arose over the completeness of Defendants' document preservation and collection, and the comprehensiveness of their search.

59. Through the review of documents and testimony in the case, Plaintiffs requested USX supplement its document production through the addition of custodians focusing on percipient witnesses with direct knowledge of the bid process and operational performance of USX at key accounts. These custodians were also proposed to cover temporal gaps in the production.

60. Plaintiffs requested three additional custodians identified in the January 2021 Rule 30(b)(6) depositions of USX, but during the meet-and-confer process, Defendants refused to add these custodians unless Plaintiffs withdrew certain other discovery requests. In the April 23, 2021 Joint Status Report, Plaintiffs requested these custodians as relevant and proportional to the needs of the case irrespective of other requests. ECF 138. USX Defendants ultimately agreed to include these custodians, which resulted in additional relevant document productions.

### b. Disputes over Discovery of USX's Document Retention Practices

61. Plaintiffs repeatedly requested that USX Defendants produce USX's document retention policy and set forth the state of preservation of each custodian's documents. To determine the universe of available and potentially destroyed documents, Plaintiffs demanded information regarding which custodians had their ESI preserved and for what time periods ESI was preserved, as

- 21 -

well as the comprehensiveness of the preservation and when it occurred, which was critical to assessing the completeness of Defendants' productions. USX refused to provide clear responses to these inquiries and, in certain instances, refused to respond at all, requiring Class Counsel to send follow-up correspondence seeking clarification.

62. After USX's initial productions of ESI, Plaintiffs' counsel analyzed the data and discovered unexpected temporal gaps that varied by custodian in the production. Plaintiffs were able to confirm gaps in USX's production by finding emails produced by third parties that included USX custodians during the relevant time period that had not been produced by Defendants. After raising the issue with Defendants, USX revealed the existence of relevant backup tapes that may contain additional responsive materials – a revelation resulting in a months-long delay in document production while the restoration and production of those tapes could be made. The data restoration resulted in additional document productions that would likely not have been identified and produced by USX Defendants without Plaintiffs' perseverance. After further analysis of these backup productions, certain critical gaps remained in the custodial files for documents, such as documents dated in 2017, a relevant time period concerning the bidding process for the Walmart accounts at issue. Plaintiffs undertook the additional task of seeking missing documents through alternative custodians and third parties, even though there was no guarantee of success. The time and effort needed to obtain this information given the state of the production significantly increased the time and expense of discovery in this case.

63. As further revealed during depositions taken of fact witnesses, USX did not have a formal document retention policy; thus, decisions on whether to retain any particular document was left to the discretion of the employee (prior to a litigation hold going into effect). Addressing this issue required further analysis, negotiation, and related motion practice regarding the addition of document custodians and other sources of documents.

64. On December 29, 2021, Plaintiffs filed a motion to compel requesting, in part, that the Court order USX to designate a witness to testify concerning Plaintiffs' Rule 30(b)(6) topics concerning document retention. ECF 150. The Court denied Plaintiffs' request. ECF 165. In response to this ruling, Plaintiffs undertook additional steps to elicit similar information from fact witnesses in this case and conducted significant analysis to identify and assess alternative means of filling in the temporal and information gaps. The time and effort needed to obtain this information, which were at times compounded by Defendants' refusal to provide it, increased the time and expense of discovery in this case.

### c. Disputes over the Production of Text Messages

65. Plaintiffs' document requests encompassed relevant text messages from the custodians. Rather than collect those text messages, USX Defendants asserted those documents were neither substantive nor proportional to the needs of the case and submitted declarations from certain custodians attempting to support their position.

66. On April 23, 2021, Plaintiffs first raised the issue of missing text messages in their section of a Joint Status Report to the Court. Defendants claimed no substantive messages existed except for one custodian. ECF 138. Plaintiffs expended time and effort to identify additional documentary evidence that text messaging was indeed used for substantive work purposes, consistent with a witness' testimony, and exhausted their meet-and-confer efforts with Defendants. On December 29, 2021, Plaintiffs filed a Motion to Compel USX to produce text messages. ECF 150. At a hearing held on February 8, 2022, the Honorable Christopher Steger ordered the production of text messages from two custodians. The parties then negotiated the proper protocol for such a search, which required further Court guidance. On March 3, 2022, Magistrate Judge Steger held a hearing during which he agreed that USX should search custodians' text messages for relevant and responsive information. At the hearing, the parties and Magistrate Judge Steger had an

4882-8712-0998.v1

extensive discussion regarding the appropriate protocol for such a search. On March 30, 2022, Magistrate Judge Steger entered an Order further explaining the steps USX would need to take in conducting a search of the text messages. ECF 167. The parties further met and conferred concerning the interpretation and proper application of the text search protocol. These efforts resulted in the production of over 700 text messages, which provided Plaintiffs with additional context to support their allegations.

### d. Disputes over Completeness of Document Production

67. In addition to the issues related to where and how Defendants were searching for responsive documents, numerous other matters arose that required follow up, including the format of production, missing attachments, reproduction of illegible documents, and the failure to populate metadata fields.

68. The massive size of the production in this case required expending significant time and expense on document hosting, storage, review, and analysis. Class Counsel used industry-leading Relativity software, which permits a reviewer to search, sort, categorize, tag, prioritize, highlight, and annotate documents in preparation for depositions, summary judgment, expert reports, and trial. Attorneys and support staff worked in Relativity to compile and review sets of documents and to locate the evidence needed to certify the class, support expert testimony, depose witnesses, and prepare the case for trial. Attorneys and staff used search terms, date filters, and custodian fields to review documents related to key issues in the case. These efforts also allowed Class Counsel to evaluate the completeness of USX Defendants' production. For example, USX Defendants did not produce all instances of the Walmart bidding materials; Plaintiffs therefore obtained missing bid materials from Walmart.

- 24 -

e. Disputes over USX Defendants' Responses to Plaintiffs' Interrogatories

69. Plaintiffs maintained that USX Defendants' interrogatory responses were insufficient, in part, because their responses hedged their legal positions, were vague, and did not set forth the bases for their affirmative defenses with specific evidence. The parties exchanged correspondence and debated the relevant case law on meet-and-confer calls. Despite Plaintiffs' efforts, USX Defendants refused to amend their responses in any way. On April 21, 2022, Plaintiffs filed a Motion to Compel USX Defendants to Supplement Incomplete Interrogatory Responses. ECF 171. On May 5, 2022, Defendants opposed the motion. ECF 177. On May 12, 2022, Plaintiffs filed their reply. ECF 178. On May 20, 2022, Magistrate Judge Steger denied the motion, suggesting Plaintiffs should seek the relevant information during depositions. ECF 181. On June 3, 2022, Plaintiffs sought review of Magistrate Judge Steger's Order, which the Court overruled. ECF 190, 210.

### 4. Discovery from Third Parties

70. Class Counsel sought and obtained relevant evidence from numerous third parties, including those described below.

### a. USX's Top Customers

71. On September 22, 2020, Plaintiffs served subpoenas on USX's top ten customers requesting documents regarding their contracts with USX and the level and quality of service USX provided. On September 30, 2020, USX moved to quash all ten of Plaintiffs' subpoenas. ECF 111. Plaintiffs opposed this motion on October 6, 2020. ECF 114. Magistrate Judge Steger denied USX Defendants' motion but stayed enforcement of the subpoenas so that the parties could first assess the party document productions to avoid duplication with the non-party productions. ECF 120. To this end, Plaintiffs' counsel identified key gaps in USX's production. Counsel then assessed the extent of the discovery needed and how to best focus the subpoenas to fill those gaps. When Plaintiffs

requested that Defendants agree to jointly move to lift the stay as to one of the ten non-party subpoenas, Defendants elected to oppose the motion. Thus, Plaintiffs moved to lift the stay with respect to a narrow set of Walmart documents, which USX Defendants opposed. ECF 194, 199. After holding oral argument on July 8, 2022, the Court granted Plaintiffs' motion. ECF 202. Plaintiffs immediately engaged with Walmart to obtain documents responsive to their subpoena. After numerous telephonic negotiations with Walmart to focus discovery on highly relevant and/or non-duplicative materials, non-party Walmart ultimately produced over 600 pages of targeted documents.

### b. Lenders

72. Plaintiffs sought documents concerning Plaintiffs' allegations that USX's debt load contributed to its decision to conduct an IPO and the related alleged omissions from seven banks and investment companies that provided USX credit facilities. Plaintiffs met and conferred with these entities, which in some instances took months of negotiation when the lender was resistant to producing documents. Plaintiffs were ultimately successful in obtaining more than 18,000 pages of documents from USX's lenders, some of which enabled Plaintiffs to provide USX Defendants with concrete examples of documents missing from USX Defendants' production that should have been produced – thus leading to the discovery of backup tapes.

### c. Consultants

73. Plaintiffs subpoenaed documents from two USX consultants, Kearney and Solebury Trout, that USX hired to consult on its Transformation project, IPO, and public filings. The subpoenas sought, *inter alia*, documents concerning the consulting services provided to USX and related reports. After hours considering these third-parties' responses and negotiating the scope of production, the consultants produced over 10,000 pages of documents.

- 26 -

### d. USX's Outside Counsel Advising on the IPO

74. Plaintiffs subpoenaed USX's counsel, Scudder Law Firm, which provided professional services concerning USX's IPO and public filings. The subpoena sought, *inter alia*, documents related to the specific alleged misstatements in the Offering Materials and documents related to USX Defendants' poor operational performance. Plaintiffs insisted on the importance of these documents due to Defendants' position they had relied upon their counsel in drafting the Offering Materials. Plaintiffs met and conferred with the non-party (represented by USX's counsel), which refused to conduct any search for documents or produce a privilege log.

75. On August 10, 2022, Class Counsel engaged local counsel to file Plaintiffs' motion to compel in the District of Nebraska, which Defendants then moved to transfer to this District. The motion to transfer was granted, and Magistrate Judge Steger granted in part and denied in part Plaintiffs' motion to compel. *Stein v. Scudder Law Firm*, No. 1:22-cv-00207 (E.D. Tenn.), ECF 40. Specifically, the Magistrate Judge ordered Scudder Law Firm to produce documents concerning the drafting of USX's statement in the Registration Statement that USX would "[s]trategically expand our fleet based on expected profitability and driver availability, including through our company-sponsored independent contractor lease program" – one of the alleged false statements. *Id.* Additionally, Scudder Law Firm was ordered, despite its objections, to provide a privilege log for any documents that it intended to withhold on the basis of privilege. *Id.* In response to the motion, USX produced over 15,000 pages of Scudder Law Firm's records.

### 5. Fact Depositions

76. Class Counsel negotiated with Defendants an increase in the number of fact depositions allowed beyond the ten provided for by the Federal Rules of Civil Procedure. Plaintiffs' efforts culminated in a joint motion to enter a stipulation allowing Plaintiffs to take 25 depositions.

The increased number provided Plaintiffs with the opportunity to more thoroughly build their case and test affirmative defenses.

77.     During the course of fact discovery, Plaintiffs took the following fact depositions:

| Deponent | Position | Date | Location |
|---|---|---|---|
| Amanda Thompson (as 30(b)(6) witness) | Chief People Officer | 01/12/2021 | Remote |
| Justin Harness (as 30(b)(6) witness) | Chief Revenue Officer | 01/14/2021 | Remote |
| Brian Baubach (as 30(b)(6) witness) | SVP of Corporate Finance and Investor Relations | 01/19/2021 | Remote |
| Steven Phillips | Former SVP OTR Operations | 05/26/2022 | Omaha, NE |
| Shane Weeks | Director of Operations | 06/09/2022 | Chattanooga, TN |
| John White | Former Chief Marketing Officer | 06/15/2022 | Ponte Vedra Beach, FL |
| Phillip Connors | Former Director | 06/17/2022 | Roseland, NJ |
| Ajay Rupramka | Former VP of Dedicated Operations | 06/29/2022 | Chattanooga, TN |
| Brian Baubach | SVP of Corporate Finance and Investor Relations | 07/08/2022 | Chattanooga, TN |
| Paul Bowman | SVP Sales | 07/19/2022 | Chattanooga, TN |
| Justin Harness | Chief Revenue Officer | 07/21/2022 | Chattanooga, TN |
| Eric Peterson | Chief Financial Officer | 07/26/2022 | Chattanooga, TN |
| Lisa Quinn Pate | Former Chief Administration Officer | 07/28/2022 | Chattanooga, TN |
| Michael Graham | Director of Pricing | 08/02/2022 | Chattanooga, TN |
| Don Devendorf (as 30(b)(6) witness) | Morgan Stanley, Managing Director | 08/04/2022 | New York, NY |
| Kristen Patterson (as 30(b)(6) witness) | Merrill Lynch, Director | 08/05/2022 | New York, NY |
| Jason Grear | Chief Accounting Officer | 08/09/2022 | Chattanooga, TN |
| Eric Fuller | CEO | 08/11/2022 | Chattanooga, TN |
| Max Fuller | Executive Chairman | 08/12/2022 | Chattanooga, TN |
| Mark Scudder | Scudder Law Firm | 08/19/2022 | Chattanooga, TN |
| Latasha Mack | VP, Recruiting | 08/22/2022 | Dallas, TX |
| Jeffery Ward (as 30(b)(6) witness) | Kearney, Vice President | 09/01/2022 | Remote |
| Manoj Vemula (as 30(b)(6) witness) | J.P. Morgan Securities VP Investment Banking | 09/09/2022 | New York, NY |
| Tommy Ferguson (as 30(b)(6) witness) | Walmart, Senior Director of Transportation | 09/20/2022 | Rogers, AR |

78.     The percipient witness depositions included USX operations and sales employees, as well as one of USX's corporate directors and Individual Defendants.  Class Counsel spent numerous

- 28 -

hours preparing questions and identifying and analyzing documents to use in their examinations. In addition, as detailed in the chart above, Plaintiffs took the Rule 30(b)(6) depositions of USX, three of the underwriters, one of USX's outside consultants, and USX's largest customer, consisting of eight witnesses, which required additional efforts to draft targeted deposition topics and multiple meet-and-confer calls to negotiate disputes over the relevance and purported burden of Plaintiffs' topics.

### E. Investigators, Experts, and Consultants Assisting the Litigation

79. Class Counsel used the services of investigators, expert witnesses, and other consultants to assist Plaintiffs in the prosecution of the Litigation. Factual investigators helped Class Counsel draft the Complaint and litigate this action by describing the manner in which USX operated its business, obtaining the information available to Company insiders, and confirming information obtained from other sources. In addition, the work performed by experts and consultants provided valuable insight to Plaintiffs and Class Counsel in the discovery phase, as well as preparing their case for trial and in evaluating prospects for settlement during the course of the Litigation. To assist Class Counsel in identifying potential expert witnesses, Plaintiffs retained the services of Expert Institute Group, LLC.

### 1. Factual Investigators

80. Prior to the filing of the Complaint, Plaintiffs retained the services of an independent private investigator, L.R. Hodges & Associates, Ltd. ("LRH&A"). Among other things, LRH&A identified and confirmed the employment status of prospective witnesses; located potential witnesses; contacted and interviewed targeted third-party witnesses; and thereafter prepared comprehensive interview summaries and other case reports. In addition, at the direction of Lead Counsel, LRH&A followed up with certain witnesses regarding their initial interviews and potential knowledge of facts related to the case.

- 29 -

### 2. Consultants

81.     Plaintiffs retained the consulting services of Michael H. Belzer through his consulting firm, Sound Science, Inc.  Dr. Belzer has a Ph.D. in Industrial Relations, is a university professor, and has expertise in Transportation Economics.  Dr. Belzer was retained to provide his insight into the trucking industry, a relatively esoteric field.  He provided consulting and analysis of documents regarding the significance of USX's truck driver retention problems, the industry driver shortage, and the causes of high driver turnover.

82.     Plaintiffs also retained the services of economic consulting firm Crowninshield Financial Research, Inc. ("Crowninshield"), and its founder, Steven P. Feinstein, Ph.D., CFA, to advise on damages and potential issues relating to class certification.  Dr. Feinstein provided necessary consulting regarding damage calculations and negative causation.

### 3. Economic and Damages Expert

83.     Plaintiffs retained W. Scott Dalrymple, CFA, as an expert in the field of damages and negative causation.  Mr. Dalrymple, with the assistance of other members of BVA, provided critical economic analysis, an expert report, and testimony in preparation for trial.  Mr. Dalrymple's October 7, 2022 expert report set forth his expert opinions regarding the calculation of damages for each class member on a class-wide basis.  After receiving defense expert's report on negative causation and a review of hundreds of pages of documents and data produced in connection with the defense report, Mr. Dalrymple issued a rebuttal report on November 7, 2022, in which he provided a detailed factual rebuttal of the event study analysis contained in the defense expert's report. Mr. Dalrymple spent significant time preparing to give testimony in this matter, including in advance of his deposition on November 22, 2022.

4882-8712-0998.v1

### 4. Disclosure and Due Diligence Expert

84. Plaintiffs retained the expert services of William H. Purcell. Mr. Purcell has over 50 years of investment banking experience and relevant expertise in the prevailing standards used by industry participants in making public disclosures and conducting pre-IPO diligence. He provided necessary expert analysis and testimony regarding the prevailing standards used by industry participants regarding full, accurate, and non-misleading disclosures and the adequacy of the Underwriter's due diligence.

85. Mr. Purcell's opening report, dated October 7, 2022, set forth his opinions on the prevailing standards used by industry participants to ensure that disclosures are full, accurate, and non-misleading. Based on his review of the documents and testimony, Mr. Purcell opined the driver turnover and lack of trucks was the type of material information investors would expect to be disclosed in the Offering Materials and documentary evidence revealed Individual Defendants confirmed as much through discussions they had in preparation for an IPO due diligence meeting.

86. On November 7, 2022, Mr. Purcell provided a rebuttal report assessing the opinions of Defendants' expert report concerning Underwriter Defendants' due diligence. Mr. Purcell's rebuttal report set forth why Underwriter Defendants' due diligence process was inconsistent with longstanding, well established custom and practice and why Underwriter Defendants failed to recognize or ignored red flags indicating material misstatements or omissions. In his rebuttal, Mr. Purcell opined that the Company's purportedly successful "turnaround" or "transformation" initiatives were important to investors because of the extent to which USX had touted them in the Offering Materials. Thus, in Mr. Purcell's opinion, when the Underwriter Defendants drafted the Offering Materials to disguise as *potential* risks adverse business conditions that were *actually* occurring at the time of the IPO, the positive statements about the Company's continued growth and profitability in the Offering Materials became materially misleading. Without Mr. Purcell's expert

4882-8712-0998.v1

opinions, Plaintiffs would have faced difficulties explaining to a jury why Underwriter Defendants' due diligence defense fails.

87. Mr. Purcell spent significant time preparing to give testimony in this matter, including in advance of his depositions on November 23, 2022 and December 5, 2022. Mr. Purcell was compelled to sit for two separate days after Underwriter Defendants demanded a full seven-hour deposition rather than allocate the time with USX Defendants. He also assisted Class Counsel in preparing to take the depositions of Underwriter Defendants' due diligence expert, Gary Lawrence.

### F. Depositions of Defendants' Experts

88. Class Counsel spent significant hours preparing for and taking the testimony of Defendants' experts, which included Paul Zurek (a damages expert), Gary Lawrence (a due diligence expert), and Amanda Rose (rebuttal expert submitted in response to Plaintiffs' expert Purcell). The parties collectively conducted five expert depositions within five days – with multiple expert depositions occurring even on the same day. Preparation for the depositions required extensive review of the experts' respective reports, documents, and information produced in discovery beyond that cited in the reports; analysis of the parties' respective positions on issues that were the subject of expert testimony; research into academic literature; and, where applicable, relevant legal standards.

### G. Summary Judgment and Daubert Motion Preparation

89. Summary judgment and *Daubert* motions were required to be filed on December 23, 2022. At the time settlement was reached, Class Counsel were preparing both an affirmative motion for summary judgment on the issue of negative causation and a motion to exclude at least one of Defendants' proffered experts, as well as an anticipated opposition to Defendants' expected motions. Plaintiffs would have challenged the basis for Defendants' assertion that Plaintiffs could not establish investors' losses were attributable to the alleged misrepresentations and omissions.

Although the parties reached a preliminary settlement before the parties presented these issues to the Court, Plaintiffs expended significant resources preparing to present such issues to the Court.

## IV.    STRENGTHS AND WEAKNESSES OF CASE

90.    At the time of the Settlement, Class Counsel and Plaintiffs had a thorough understanding of the issues and risks present in this case.  While there was substantial evidence to support a jury verdict in favor of the Class, there were considerable risks and uncertainties if the case had proceeded through summary judgment and to trial.  Plaintiffs, in consultation with Class Counsel, carefully considered these risks throughout the Litigation and in deciding to settle this matter.

91.    At the time the Settlement was reached, as Plaintiffs prepared their motions to exclude Defendants' proffered expert testimony and affirmative motion for summary judgment, it was apparent Plaintiffs' case faced legitimate risks and uncertainties if it went to trial.  As explained *supra* at §I., if the case were to proceed to trial, Plaintiffs believed it likely Defendants would seek to exclude any reference to statements dismissed at the pleading stage in order to isolate the remaining upheld misrepresentations from the necessary context that these statements provided.  If successful, a jury could have been confused as to the meaning of the upheld misrepresentations and discounted evidence demonstrating their misleading nature, which could have resulted in a drastically reduced or even no recovery for the Class.

92.    In addition, while Plaintiffs believe discovery supported a finding that USX's Offering Materials were materially false, Defendants vigorously contested falsity throughout this Litigation.  Defendants have maintained that: (i) the Offering Materials adequately disclosed USX's driver shortage problem; (ii) the practice of OTR cannibalization was a common practice in the industry, and investors were aware this was occurring at the Company; and (iii) the OTR cannibalization did not materially negatively impact the Company's operations at the time of the

IPO.  If Defendants were successful in convincing the Court or a jury that the Offering Materials were not materially misleading, Plaintiffs recognized that they may have no recovery for their claims.

93.     Defendants also vigorously contended they would prevail on their negative causation defenses for Plaintiffs' securities claims.  They argued and submitted expert testimony that Plaintiffs' alleged misrepresentations could not have caused the stock price to decline on November 1, 2018 because the negative information disclosed on that day had been previously disclosed to the market, at the very latest, on August 2, 2018.  As a result, Defendants maintained Plaintiffs were entitled to no recovery.  The issues of causation and damages would have been vigorously contested at trial and the outcome would have largely depended on an inherently unpredictable battle of the experts.  There was a very real risk that the Class could have recovered significantly less than the Settlement Amount or nothing at all if Defendants were successful in convincing a jury that the misrepresentations did not cause the damages Plaintiffs sought.

94.     Defendants also asserted additional affirmative defenses, including that: (a) Individual Defendants acted in good faith; and (b) Underwriter Defendants exercised reasonable and diligent investigation and had reasonable grounds to believe the Offering Materials were not materially misleading.  If these Defendants were able to persuade a jury as to these defenses, Plaintiffs' ability to recover could have been greatly reduced.

95.     Further, because the experts used different metrics affecting the stock price that informed their damages analyses, there was also uncertainty as to what damages may be awarded by a jury.  For example, Defendants' expert sought to opine that any price decline resulting from the alleged misrepresentations did not exceed $0.11 per share, while Plaintiffs' expert sought to opine that the maximum damages per share were $9.06.  The proposed Settlement provided a less risky outcome given the variables that could affect the potential recovery awarded by a jury.

- 34 -

96.     In summary, while Plaintiffs had developed strong documentary and testimonial evidence supported by expert opinion, they faced both factual and legal challenges in presenting this matter to a jury and potentially on appeal. The Settlement Amount was carefully considered by Class Counsel and Plaintiffs in the context of the risks and the uncertainties facing the likelihood of Plaintiffs' recovery in this case.

## V.      NATURE AND ADEQUACY OF SETTLEMENT

97.     The proposed Settlement was the result of arm's-length negotiations between zealous advocates on both sides and could not have been reached without the substantial participation and assistance of a highly experienced mediator. Class Counsel believe the proposed Settlement represents a successful resolution of a complex and risky class action that has been aggressively litigated on both sides for over three years. Our zealous prosecution of this case to date enabled us to achieve a fair outcome.

### A.      History of Settlement Negotiations

98.     The parties engaged in extensive settlement negotiations, including those set forth below.

99.     Settlement discussions occurred at various points throughout the pendency of the Litigation, including at a formal mediation with Phillips ADR mediator Mr. Murphy that occurred in November 2021. The parties also participated in numerous less formal settlement communications, including communications between counsel (in person, by phone, and by email), as well as communications with and through the mediator.

100.    In November 2021, the case was still in fact discovery; the parties' widely diverging views of the strengths and weaknesses of the case during the negotiations prevented a settlement from being reached. Nevertheless, the initial mediation effort laid the groundwork for the continuing discussions with the mediator that occurred as Class Counsel prepared their summary judgment and

*Daubert* motions. In particular, through the parties' settlement communications, as well as during the prosecution and defense of this case, each party gained a better understanding of the opponent's case and, as a result, gained a better appreciation of the strengths and risks of its own case.

101. Prior to the November 2021 mediation with Mr. Murphy, the parties exchanged detailed mediation statements, including responses to the opposing party's opening statement, explaining their positions to the mediator and each other. Subsequently, the parties intermittently updated Mr. Murphy on the progress of the case, including by advising him of significant developments during discovery or as the result of motion practice. As expert discovery took place and the summary judgment and *Daubert* motion papers were being briefed, the frequency of communications regarding settlement negotiations increased. The information learned and exchanged during these communications was significant in obtaining and evaluating a potential settlement.

102. On December 15, 2022, following extensive discussions with both sides, the parties reached an agreement in principle to settle the case for a cash payment of $13 million in exchange for a mutual release of claims and other terms.

103. The Court was notified of the proposed Settlement shortly thereafter, whereupon it vacated all deadlines in the case. ECF 218. The parties then drafted, finalized, and signed the formal settlement agreement detailing the terms of the proposed Settlement, which was submitted to the Court with the Motion for Preliminary Approval, filed on March 27, 2023. ECF 220-221.

### B. The Settlement Is in the Best Interests of the Class and Warrants Approval

104. On March 28, 2023, the Court granted preliminary approval of the Settlement, as well as of the form and manner of notice of the Settlement to the Class. ECF 222. Plaintiffs believe they could have prevailed on the merits of the case but acknowledge there were very real risks, as discussed above, that even if they were able to prove their claims, the Class would not be able to

recover the full damages Plaintiffs' expert had calculated. Furthermore, even if Plaintiffs prevailed at trial and Defendants had the resources to fund a judgment, any recovery would be delayed by post-trial proceedings and appeals.

105. Having considered the foregoing, and evaluating Defendants' likely defenses at trial, it is my informed judgment, based upon the litigation of this action to date and the extensive experience of Class Counsel in litigating shareholder class actions, that the proposed Settlement of this matter before the Court, upon a payment of $13 million in exchange for a mutual release of all claims and on the other terms set forth in the Stipulation, provides fair, reasonable, and adequate consideration and is in the best interests of the Class.

## VI. PLAN OF ALLOCATION[10]

106. The Plan of Allocation is set forth in the Notice of Proposed Settlement of Class Action (attached as Exhibit A-1 to the Stipulation) and provides that the Net Settlement Fund will be distributed *pro rata* to Class Members who submit valid, timely Proof of Claim forms to the Claims Administrator. ECF 221-2. The Plan of Allocation provides that Class Members will be eligible to participate in the distribution of the Net Settlement Fund only if they purchased or otherwise acquired USX common stock in or traceable to the IPO on June 13, 2018 or purchased USX Class A common stock between June 13, 2018 and April 2, 2019, inclusive. No distributions will be made to Authorized Claimants who would otherwise receive a distribution of less than $10.00.

107. Counsel created the proposed Plan of Allocation in an attempt to distribute the funds in a fair and equitable manner. The Plan of Allocation was derived from the damage analysis

---

[10] The summary of the Plan of Allocation provided herein is intended only to explain the basis on which the plan was developed in order to assist the Court in evaluating the fairness, reasonableness, and adequacy of the proposed Plan of Allocation. Nothing set forth herein is intended to, or does, modify or affect the interpretation of the Plan of Allocation, which is set forth in full in the Notice sent to Class Members and will be applied by the Claims Administrator according to its express terms.

Plaintiffs intended to present at trial and is intended to compensate Class Members who purchased or otherwise acquired USX Class A common stock pursuant and/or traceable to the Offering or during the Class Period and who were injured thereby.

108.    Based on Class Counsel's experience in this and other securities actions and their understanding of the factual circumstances giving rise to this action and the risks at trial, including the risks to both liability and damages, Class Counsel believe the Plan of Allocation set forth in the Notice provides a fair, reasonable, and adequate method of compensating Class Members for the economic harm they suffered as a result of the wrongdoing alleged in the Litigation.

## VII.    CLASS COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

109.    Based on the extensive efforts on behalf of the Class, as described above, Class Counsel are applying for compensation from the Settlement Fund on a percentage basis and are requesting a fee of one-third of the Settlement Fund.

110.    The percentage method is the appropriate method to determine a reasonable fee award because, *inter alia*, it aligns the lawyers' interest in being paid a fair fee with the interest of the Class in achieving the maximum recovery in the shortest amount of time required under the circumstances. As set forth in the accompanying memorandum in support of Class Counsel's application for an award of attorneys' fees and expenses ("Fee Memorandum"), courts throughout the Sixth Circuit have applied the percentage-of-recovery method in awarding fees.

### A.    The Requested Fee Is Reasonable

111.    In light of the nature and extent of the Litigation, the diligent prosecution of the action, the complexity of the factual and legal issues presented, and the other factors described above, and as stated in the accompanying Fee Memorandum, Class Counsel believe the requested fee of one-third of the Settlement Fund is fair and reasonable.

- 38 -

112.     A one-third fee award is consistent with percentages awarded by courts in this Circuit and is justified by the specific facts and circumstances in this case and the substantial risks Plaintiffs had to overcome at the pleadings, class certification, and numerous discovery hurdles throughout the Litigation and to prepare to overcome at trial, as set forth herein.

**B.     The Requested Fee Is Supported by Plaintiffs**

113.     Plaintiffs actively monitored the Litigation and consulted with Class Counsel during the course of settlement negotiations.  Plaintiffs spent considerable time and effort fulfilling their duties and responsibilities in this case, including reviewing briefs, answering discovery requests, and sitting for deposition.  As a result, Plaintiffs developed an understanding of the strengths and weaknesses of this case, the risks to continued litigation, and the nature and extent of Class Counsel's efforts on behalf of the Class, and they fully support the fee request.

**C.     The Requested Fee Is Supported by the Effort Expended and Results Achieved**

114.     As set forth herein, the $13 million cash settlement was achieved as a result of extensive prosecutorial and investigative efforts, contentious and complicated motion practice, years of hard-fought discovery and analysis of voluminous evidence.  As the Settlement was only reached on the eve of the summary judgment and *Daubert* deadlines, counsel had prepared a substantial portion of those briefs and marshaled the evidence in support thereof as well.

115.     As discussed in greater detail above, this case was fraught with significant risk factors concerning liability and Defendants' affirmative defenses.  Plaintiffs' success was by no means assured.  Defendants disputed whether the alleged misrepresentations were even actionable and contended the Company had adequately disclosed the alleged omitted information.  Further, it was uncertain whether Defendants would prevail on their affirmative defenses, including their good faith, due diligence and negative causation defenses.  Were this Settlement not achieved, and even if Plaintiffs prevailed at trial, Plaintiffs and the Class faced years of costly and risky appellate litigation

- 39 -

against Defendants with ultimate success far from certain. It is also possible a jury could have found no liability, as well as reduced or found no damages. Plaintiffs faced the further risk they would be unable to collect on a sizable judgment against Defendants.

116. As a result of this Settlement, thousands of Class Members will benefit and receive compensation for their losses and avoid the substantial risk of no recovery in the absence of a settlement. These risk factors also support Class Counsel's request for one-third of the Settlement Fund.

**D.      The Risk of Contingent Class Action Litigation Supports the Requested Fee Award**

117. As set forth in the accompanying Fee Memorandum, a determination of a fair fee should include consideration of the contingent nature of the fee, the financial burden carried by Class Counsel, and the difficulties overcome in obtaining the settlement.

118. This action was prosecuted by Class Counsel on an "at-risk" contingent fee basis. Class Counsel fully assumed the risk of an unsuccessful result. Class Counsel have received no compensation for their services during the course of this Litigation and have incurred very significant expenses in litigating for the benefit of the Class. Any fees or expenses awarded to Class Counsel have always been at risk and are completely contingent on the result achieved. Because the fee to be awarded in this matter is entirely contingent, the only certainties from the outset were that there would be no fee without a successful result and such a result would be realized only after a lengthy and difficult effort.

119. Class Counsel's efforts were performed on a wholly contingent basis despite significant risk and in the face of determined opposition. Under these circumstances, Class Counsel are justly entitled to the award of a reasonable percentage fee based on the benefit conferred and the common fund obtained. Under all the circumstances present here, a one-third fee plus expenses is fair and reasonable.

- 40 -

120.    There are numerous cases, including many handled by my firm, where class counsel in contingent fee cases such as this, after expenditure of thousands of hours of time and incurring significant out-of-pocket costs, have received no compensation whatsoever.  The losses suffered by class counsel in other actions where insubstantial settlement offers were rejected, and where class counsel ultimately receive little or no fee, should not be ignored.  Class Counsel know from personal experience that, despite the most vigorous and competent of efforts, attorneys' success in contingent litigation is never assured.

121.    Lawsuits such as this are expensive to litigate.  Those unfamiliar with the efforts required to litigate class actions often focus on the aggregate fees awarded but ignore the fact that those fees fund enormous overhead expenses incurred during the course of many years of litigation, are taxed by federal and state authorities, are used to fund the expenses of other contingent cases prosecuted by Class Counsel, and help pay the salaries of the firms' attorneys and staff.

## VIII.    CONCLUSION

122.    For all of the foregoing reasons, Class Counsel respectfully request that the Court approve the Settlement and Plan of Allocation, approve the fee and expense application, and award Class Counsel one-third of the Settlement Amount plus $1,368,163.51 in expenses, as well as the interest earned on both amounts at the same rate and for the same period as that earned on the Settlement Fund until paid, and approve the award of $32,000 to Plaintiffs.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 5th day of June, 2023 at Nashville, Tennessee.

s/ Christopher M. Wood<br>
CHRISTOPHER M. WOOD

4882-8712-0998.v1

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on June 5, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses of the CM/ECF participants in this case.

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN & DOWD LLP
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com
